N THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Case No.: 1:25-CV-00113

| | | |
|---|---|---|
| THE SUMMIT CHURCH-<br>HOMESTEAD HEIGHTS<br>BAPTIST CHURCH, INC., | )<br>)<br>)<br>) | |
| Plaintiff, | )<br>) | **COMPLAINT** |
| v. | )<br>) | **JURY TRIAL DEMANDED** |
| CHATHAM COUNTY, NORTH<br>CAROLINA BOARD OF<br>COMMISSIONERS, | )<br>)<br>)<br>) | |
| Defendant. | )<br>) | |

## COMPLAINT FOR DECLARATORY JUDGMENT
## AND INJUNCTIVE RELIEF

Plaintiff The Summit Church-Homestead Heights Baptist Church, Inc. ("Summit Church" or "Summit") brings this action against Defendant Chatham County, North Carolina Board of Commissioners ("Chatham County Board" or the "County Board"), to enforce the provisions of the Religious Land Use and Institutionalized Persons Act.

## PARTIES

1.     Plaintiff Summit Church is a religious nonprofit corporation organized and existing under the laws of the State of North Carolina.

2.     Defendant Chatham County Board of Commissioners is the policy-making body of Chatham County, a chartered county of the State of

North Carolina (N.C. Gen. Stat. § 153A-10). The powers of Chatham County, including those related to land use, are exercised by the County's Board of Commissioners. *Id*. at § 153A-12.

## JURISDICTION AND VENUE

3.      Summit seeks to enforce its civil rights as enshrined in the First and Fourteenth Amendments to the United States Constitution and codified in the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc *et seq*.  This Court has jurisdiction over this matter under 28 U.S.C. § 1331.

4.      Venue is proper in this district under 28 U.S.C. § 1391(b) because all of the events that give rise to Summit's claim occurred in this district and because the Chatham County Board is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

### Summit Church

5.      Summit Church began in Durham, North Carolina, in 1961 as Grace Baptist Mission.  Over the next forty years, the church's membership grew and shrank, stabilizing in the 1990s at around 300 members.

6.      In 2001, the church relaunched as The Summit Church and called J.D. Greear as its new lead pastor.  Under Greear's leadership, Summit Church has intentionally sought to reflect the diversity of its

2

community and "to visibly demonstrate the power of the gospel to save souls and unite people across historically polarized communities."

7. Summit Church experienced significant growth following Pastor Greear's calling. By 2007, Summit Church held three services a day to accommodate churchgoers at Riverside High School in Durham. These services were attended by more than 2,000 people each week.

8. To manage this growth, Summit Church divided into two campuses: one in southeastern Durham, and another in northern Durham.

9. From there, Summit Church continued to grow. Today, it has thirteen campuses meeting in twelve different locations across the Triangle region of North Carolina, each hosting between two and four services each week.

10. Summit's multi-site strategy is a key part of its religious practice. Summit's goal is to ensure that everyone in the Triangle region lives no more than fifteen minutes from a thriving evangelical church campus where the gospel is preached. Pastor Greear has described succinctly the importance of local churches to evangelism: "You might drive 45 minutes to a church you love, but that person you just met at Starbucks who doesn't know Jesus won't be as committed."

3

11. Accordingly, Summit Church has adopted something of a rallying cry in support of its multi-site strategy: "Stay where you are. Serve where you live. Be the church in your local community."

12. Just as Summit Church has grown, so has its capacity to serve the communities in which it has a campus. Indeed, each campus organizes service projects to benefit its local community. For example, Summit's staff and members provide tutoring services and school supplies for local school children, renovate homes for low-income families, support local families going through the fostering and adoption process (particularly of kids with special needs), provide preventative care services to prevent kids from needing to enter foster care, provide respite care nights for non-Summit foster parents in the community, provide English as a Second Language classes, extend outreach and support for newly arrived refugees, and partner with local organizations that serve the community in various ways including healthcare.

13. These community service engagements, coined ServeRDU by Summit, have generated notable praise by community leaders. In or around 2022, the then director for the Durham branch of the charity organization

World Relief said that "Summit has probably contributed the largest number of volunteers to help his organization resettle refugees in the Triangle."[1]

14.    In 2013, Summit launched a campus in Chapel Hill.  Presently, the Chapel Hill Campus meets for weekly services at East Chapel Hill High School. As is often the case when Summit organizes mobile campuses at local public high schools, Summit has upgraded the school's audio/visual and production equipment at Summit's cost, which it plans to leave behind – at no cost to the public school – when it moves to a permanent building.

15.    Though Summit and East Chapel Hill High School have a strong relationship, meeting at a local high school presents logistical challenges. For example, Summit Church's ability to use East Chapel Hill High School during the week is limited by the school's calendar.  For that reason, the Chapel Hill Campus's high school student group holds its weekly meetings at another church building in the area.

16.    As the Chapel Hill Campus has grown in weekly attendance, continued use of the borrowed space at East Chapel Hill High School has become more challenging.  Approximately 800 people attend services at East Chapel Hill High School weekly, with approximately fifteen percent of those attendees coming from Chatham County.

---

[1] Molly Worthen, *The Soul Truth*, The Assembly (April 28, 2022), https://www.theassemblync.com/culture/the-soul-truth-summit-church/

17.     Summit Church has sought an appropriate location to build a new facility for the people of the Chapel Hill Campus that would accommodate its growth, permit more flexibility for its weekly calendar, and allow the Chapel Hill Campus to more effectively serve the surrounding community.

18.      Last year, Summit Church acquired, through an agreement, an option to purchase six parcels of land located in Chatham County totaling approximately ninety-seven acres, designed the new campus, and sought to secure appropriate zoning for the property.

## Plan Chatham

19.     Chatham County is one of the fastest growing counties in North Carolina.  According to data released by the United States Census Bureau in December 2024, Chatham County is the fourth *fastest growing* county in North Carolina over the last five years.

20.     The Chatham County Commission adopted the current iteration of the county's comprehensive land use plan, "Plan Chatham," on or around November 20, 2017.  (Ex. 1 hereto).

21.     Plan Chatham describes the culture and character of the County as it pertains to land use, explaining that social activities "have shifted" from agricultural features like gristmills and inns "to downtowns and clusters of commerce."

6

22.     Plan Chatham specifically notes that "churches remain central gathering places in towns and rural townships in the County."

23.     Plan Chatham includes the below "Future Land Use and Conservation Plan" (the "Future Use Map"), which it describes as "a framework for future land use."  (Ex. 1 at 44–45).

24.     That Future Use Map depicts the ways in which the County anticipates land development into the future and specifies varying land uses. Specifically, the Future Use Map divides the county's land into segments, with different colors representing Park/Protected Lands, Conservation, Agriculture, Rural, Compact Residential, and Extraterritorial Jurisdiction.

25.     In addition to the larger segments, the Future Use Map contains different nodes designating various "centers":  Town Centers, Employment Centers, Community Centers, Neighborhood Centers, Village & Village Centers, and Crossroads Communities. (*See* Fig. 1 below).



Figure 1

26.     Upon information and belief, since Plan Chatham and the Future Use Map were adopted, the Chatham County Board of Commissioners has granted every privately initiated rezoning request it voted on that was consistent with the Future Use Map.

27.     In fact, upon information and belief, only **<u>one</u>** privately initiated rezoning request was denied prior to December 2024.  In 2023, an applicant sought to rezone property in order to build a boat and recreational vehicle storage facility.  Upon information and belief, the applicant already owned three such storage facilities, one of which was located a mere two parcels away from the proposed fourth facility.

8

28.     According to the signed consistency statement regarding that denial, a driving factor behind the Board of Commissioners' decision was the request's incompatibility with the Future Use Map.  Specifically, the consistency statement explains that the parcel "is located within the Rural area of the land use plan," and the proposed use "would not keep in harmony with the surrounding area."  (Ex. 2 hereto).

29.     Upon information and belief, the County had denied substantially similar plans from the same applicant in 2016, and it had done so for substantially similar reasons.  That is, the County found that the proposed rezoning was "inconsistent with the adopted comprehensive plan which encourages the protection of historically residential and agricultural zoned areas."

30.     In keeping with its commitment to the Future Use Map, the Board of Commissioners voted in 2020 to approve a rezoning request ***over the Planning Board's recommended denial*** of the proposed project, known as "501 Landing."  501 Landing involved building more than 14,000 square feet of retail and commercial space on approximately five acres of land.

31.     The County's signed consistency statement indicates that the Future Use Map was again the driving factor behind the Board of

9

Commissioners' approval of 501 Landing, which "supports the goals of Plan Chatham by being located within a Community Center node." (Ex. 3 hereto).

32. Plan Chatham defines each of the segments and centers on the Future Use Map and provides detailed descriptions of the types of development the County desires in each region.

33. For example, Plan Chatham describes Community Centers as "[r]etail hubs located along key roadway corridors" that "accommodate regional retail tenants complemented by local-serving commercial development." (Ex. 1 at 47).

34. The Future Use Map contains two Community Center nodes, Chatham Downs and Briar Chapel Commercial Center marked in orange on Figure 2. These nodes sit along U.S. Highway 15-501 in northeastern Chatham County. Both nodes sit within a Compact Residential segment—one of the largest such segments on the Future Use Map.



Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 10 of 743

Figure 2

35.     Despite Plan Chatham's recognition of churches' importance as "central gathering places in towns and rural townships in the County" (Ex. 1 at 18), only the Compact Residential segment includes churches within its description of desired development.  No other land use description in Plan Chatham even mentions churches:

### COMPACT RESIDENTIAL

- Mix of detached and attached residential units complemented by a variety of open spaces. Mix of uses include single family detached and attached units and some multifamily units. Community centers, amenities, recreational uses, schools, and churches may be part of the fabric.

Figure 3 (Ex. 1 at 47)

36.     Plan Chatham explains that the Compact Residential segment encompassing these two Community Center nodes is "more urbanized than the remainder of the County," with "[t]wo of the largest planned developments in the County," namely, Fearrington Village and Briar Chapel. (Ex. 1 at 22).  In a social media posting dated May 26, 2024, County Commissioner David Delaney called this corridor "the densest part of unincorporated Chatham County."  Plan Chatham includes a map of existing and approved commercial centers along the U.S. Highway 15-501 corridor (Fig. 4).

11



Figure 4

**The Six Undeveloped Parcels**

37.     Summit Church identified six undeveloped parcels in the heart of the Compact Residential segment in northeast Chatham County, straddling U.S. Highway 15-501.  Four parcels sit on the eastern side of the highway, and two parcels sit on the western side.

38.     Upon information and belief, more than 22,000 people live within five miles of these six parcels. In other words, it is not a particularly rural area.

12

39.     These parcels sit along the northern edge of the Briar Chapel Community Center and immediately to the south of the Chatham Downs Community Center.

40.     As Figure 4 shows, Briar Chapel includes 500,000 square feet of approved commercial space, including a Central Carolina Community College campus and The Veranda, a shopping center housing dining, retail, and professional offices that opened in 2016.

41.     The Veranda sits immediately across the street from the site where Summit desires to build.

42.     Less than one mile north of Summit's parcels, Chatham Downs includes more than 80,000 square feet of commercial space, anchored by a grocery store.  Across the street from the Chatham Downs commercial development is 501 Landing and the Chatham Professional Park.  Upon information and belief, 501 Landing and Chatham Professional Park combine to provide more than 31,000 square feet of commercial space on a total of approximately ten acres.

43.     Moving north toward the County line, one encounters several other large developments, including a Walmart that, upon information and belief, exceeds 150,000 square feet in size and was built in 2013.

44.     This Walmart is approximately 2.8 miles north of the parcels on which Summit Church sought to build.

13

45.     The six undeveloped parcels Summit identified presented an ideal opportunity for Summit Church to build a new Chapel Hill Campus. Specifically:

   a.  The parcels are approximately thirteen miles from the current campus;

   b.  The parcels sit among "the largest planned developments in the County" where many current Chapel Hill Campus-attendees live;

   c.  The parcels sit in an area of the Future Use Map that expressly considers churches as appropriate additions;

   d.  The parcels are in what Plan Chatham describes as the most "urbanized" area of the County;

   e.  The parcels are large enough that Summit can build, but also preserve many of the natural features and the viewshed from the highway;

   f.  The parcels are nestled between two Community Centers in which Plan Chatham intends to "provide a variation and mix" of uses.

46.     The only small hurdle Summit believed it faced, given all of these considerations, was the parcels' zoning. In early 2019, plans were set in motion to develop these six parcels into an active-adult (55+) community called "Herndon Farms."

47.     Herndon Farms was approved by the County Commission in 2022. As part of that approval, the six parcels were rezoned from R-1—a

14

residential zone with a minimum lot size of 40,000 square feet—to Conditional District-Compact Community.

48. According to the County's zoning ordinance (Ex. 4 hereto), nothing is permitted of right in a conditional zoning district; a builder must obtain approval of a project "as a prerequisite to any use or development." (Ex. 4 at 6).

49. The approved Herndon Farms plans (Ex. 5 hereto at 5–6) included:

a. 161 residential units;

b. a four-story, 140,000 square foot congregate care facility;

c. a one-story, 10,000 square foot office/daycare; and

d. a barn for events.

50. The application for the Herndon Farms development states that the developer was concerned, after talking with other property owners in the immediate vicinity, that another commercial development might "dilute commercial demand" in the area. Accordingly, Herndon Farms was designed as a "community-focused space" to "complement . . . commercial uses in the surrounding developments." (Ex. 6 at 29–30).

51. According to Plan Chatham, churches also serve this same function as a community-focused space. Specifically, Plan Chatham notes

15

that churches "remain central gathering spaces in towns and rural townships in the County." (Ex. 1 at 18).

52.     Upon information and belief, the approval for Herndon Farms expired because development plans were not submitted by the deadline established by ordinance. The six parcels remain undeveloped.

## Summit Church's Rezoning Applications

53.     Summit Church acquired an interest in the six undeveloped parcels in early December 2023 when it entered into an agreement with the current property owner granting Summit the option to purchase the parcels by July 1, 2025.

54.     Prior to entering into that agreement, in or around October 2023, Summit's planning and design representative, Qunity, PA, arranged a pre-submittal meeting with review staff representing each stage of Chatham County's rezoning process.

55.     During that meeting, the review staff expressed the opinion that Summit's project was consistent with Plan Chatham and the Future Use Map.

56.     The review staff also noted that one of the sticking points Herndon Farms experienced during the approval process had been resistance from adjacent landowners to the increased density—an issue that Summit's project was not expected to encounter.

16

57. Before Summit Church could submit the rezoning application to the County's Planning Department, it was required by ordinance to meet with the Chatham County Appearance Commission and to hold a Community Meeting.

58. Summit Church met with the Chatham County Appearance Commission on April 24, 2024. It held the Community Meeting on April 29, 2024. As explained in Summit's application, attendees of the Community Meeting "were excited to see a project proposed that will benefit the community and limit environmental impacts [and] density." (Ex. 7 at 2). Approximately one month later, Summit Church submitted its rezoning application to the Planning Department.

59. Summit Church's application sought to have three of the parcels on the eastern side of the highway rezoned to Conditional District-Office & Institutional. These three parcels (the "Property") included just over fifty acres of land.

60. At the County staff's suggestion, Summit Church submitted a separate application to restore the remaining three parcels to their pre-2022 zoning, R-1, because the Church has no plans to develop them at this time.

61. As for the Property, the site plans submitted in Summit's application showed the church's efforts to maintain the "rural character" prioritized by Plan Chatham. The site plans submitted by Summit provide

17

setbacks along all shared property lines that exceed the minimum municipal requirements. The placement for Summit's proposed current and future buildings further protect the intent of Plan Chatham, sitting approximately 440 feet from U.S. Highway 15-501N (compared to the minimum 40-foot municipal setback requirement) and approximately 500 feet from its northbound driving lanes. In contrast, the viewshed buffer for the approved Herndon Farms development had been only 100 feet, and the County had granted a waiver for portions of the Herndon Farms development to extend to a mere fifty feet from U.S. Highway 15-501.

62.    Summit's site plans also preserved eighteen acres of forested land, including a larger-than-necessary buffer off the intermittent stream located on the Property, and designed the stormwater ponds and underwater septic system to provide the look and feel of open pastureland and natural habitat. Figure 5 below is a rendering of the site plan presented to the Planning Board in September 2024. It shows the general layout of the parcel, with the underwater septic system on the lower left (northwestern corner of the Property), the stormwater pond at the bottom in the center (western edge of the Property), and the preserved forest at the top right of the image (southeastern corner of the Property).

63.    Figure 6, by contrast, shows the Herndon Farms site plans.  This side-by-side comparison shows how much more of the open space, forested area, and rural character Summit Church's plans preserved.



Figure 5



Figure 6

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 19 of 743

## August Public Hearing

64. Consistent with Section 5.7(D) of the Zoning Ordinance (Ex. 4 at 10), the Planning Department set Summit Church's applications for a public hearing on August 19, 2024.

65. At the August public hearing, the zoning administrator noted the Appearance Commission's praise for Summit Church's efforts to preserve the rural appearance. In her presentation to the Board of Commissioners, the zoning administrator explained that the Appearance Commission felt that Summit Church "took special care" to preserve the viewshed from U.S. Highway 15-501, and it was "very happy with [Summit Church's] proposed landscaping plan" for the Property. (Aug. 19, 2024 Hrg. Video, Board of Commissioners on 2024-08-19 2:00 PM (Auto-Generated Trim Backup), at 3:09:02).

66. Summit Church was represented at the hearing by landscape architect Jael Wagoner. In Ms. Wagoner's presentation, she noted for the Board of Commissioners that the building and signage had been designed "to match some of the surrounding commercial [development] that is adjacent to the site to make sure that it's fitting in with what's there." (Aug. 19, 2024 Hrg. Video, Board of Commissioners on 2024-08-19 2:00 PM (Auto-Generated Trim Backup), at 3:14:55).

67.     Despite the Appearance Commission's praise, and despite Plan Chatham's representation that churches are "central gathering places" throughout the County, then-Vice Chair Karen Howard of the Board of Commissioners called Summit Church "a poor fit for what we are envisioning" and "antithetical to real rural character preservation." (Aug. 19, 2024 Hrg. Video, Board of Commissioners on 2024-08-19 2:00 PM (Auto-Generated Trim Backup), at 3:20:45).

68.     Vice Chair Howard also took issue with outsiders—"overflow from somewhere else"—worshipping in Chatham County.  When Summit Church's representative noted that the "maximum use" contemplated in the study was based on weekly Sunday services, Vice Chair Howard wrongly concluded that this meant that attendees "aren't Chatham County residents . . . because people who are . . . trying to find community in a church aren't just going on Sunday." (Aug. 19, 2024 Hrg. Video, Board of Commissioners on 2024-08-19 2:00 PM (Auto-Generated Trim Backup), at 3:23:40).

69.     Then-Chair Mike Dasher inquired regarding tax revenue, wondering how much of the land would be exempt from property taxes:  "If a church were the owner of all that property, I'm assuming that would all be exempt then from property tax.  Is that true?"  He reiterated later that he was worried about pulling all of that land out of the property tax base "in

perpetuity." (Aug. 19, 2024 Hrg. Video, [Board of Commissioners on 2024-08-19 2:00 PM (Auto-Generated Trim Backup)](), at 3:18:16).

70.    Following this discussion, the Board of Commissioners referred the applications to the Planning Board.

71.    The resistance expressed by Commissioners Dasher and Howard surprised Qunity and, upon information and belief, surprised Chatham County's planning staff as it diverged from what they were expecting.

72.    Prior to the August 19 hearing, no elected official or member of the planning staff had publicly expressed any concern regarding Summit's rezoning request or its consistency with Plan Chatham. Indeed, the general consensus was that Summit's proposal accomplished Plan Chatham's goals as well or better than the Herndon Farms plan.

## September Planning Board Hearing

73.    The Planning Board heard Summit Church's rezoning applications on September 3, 2024.

74.    At this hearing, the Planning Board received presentations on Summit Church's applications from the zoning administrator and from Summit Church's planning representative, Qunity PA. It also heard from Chatham County residents. (*See* Plan. Bd. Sept. 3, 2024 Minutes, Ex. 8).

75.    As part of her presentation at the September hearing, the zoning administrator provided the Board with a proposed consistency statement,

which read: "The rezoning request is **consistent with** the comprehensive plan by being located within a compact community note **where churches are specifically mentioned** as part of the fabric of development." (emphases added). The zoning administrator did not propose a non-consistency statement for the Planning Board to consider at that time. (Ex. 8 at 12).

76.     The public commenters at the September hearing focused primarily on Summit Church's size. One commenter called Summit Church "an 88,000 square foot megachurch" that "would be more fitting in [an] urban environment[,] not a rural county where we value open spaces." Another noted that "[t]his megachurch is simply not a church in context and requires a defined community." (Ex. 8 at 13–18).

77.     Other commenters suggested that Chatham County residents ought to attend "any of the other Baptist churches that are already here." As one resident stated: "We have the churches that are here, find one of those little churches and have fun with that."

78.     During Planning Board discussion, member Tony Mayer conceded that "there are not really any clear reasons to object" to Summit Church's application. (Ex. 8 at 23).

79.     That did not stop other members from trying. Vice Chair Mary Roodkowsky argued that Summit Church "is not like the other churches we have in the County." Despite Plan Chatham's description of the U.S.

23

Highway 15-501 corridor as "more urbanized," and despite the half-million square feet of approved commercial development across the street, Roodkowsky claimed that Summit Church was "better suited in a more urban environment. It is not a rural church when you picture a rural church." (Ex. 8 at 21).

80. Planning Board member Amanda Robertson, then a candidate for County Commissioner, said she "heard loud and clear what a lot of the residents in the area had to share and their concerns." (Ex. 8 at 21). Member Shelley Colbert apparently did as well, pointing out the five-to-one ratio between received comments opposed to the project and received comments in support. (Ex. 8 at 13).

81. Colbert also noted that, while churches were not allowed under the parcels' current zoning, other exempt uses are. She explained that "there is a tradeoff, because what happens is, for example, if you have open space, that is an exempt use, we do not receive tax revenue for it, but it adds to the rural character." (Ex. 8 at 22).

82. The Planning Board did not vote on a recommendation at the September hearing, instead choosing to continue the matter to the Planning Board's meeting on October 1.

83. Upon information and belief, planning staff once again expressed surprise with the Planning Board's resistance to Summit's proposal following the September hearing.

## Summit Church's Letter of Clarification

84. On behalf of Summit Church, Qunity drafted a Letter of Clarification (Ex. 9) regarding some of the objections raised by the Board of Commissioners, the Planning Board, and members of the public. Among the topics covered by the Letter of Clarification were (1) potential tax revenue loss and economic impact; (2) preserving rural character; and (3) traffic and pedestrian safety.

85. Concerning tax revenue and economic impact, the Letter clarified that Summit Church's proposal contained *less* tax-exempt land than Herndon Farms—a point alluded to by Ms. Colbert at the September 3 Planning Board hearing. (Ex. 9 at 3–4).

86. Specifically, Summit Church sought to develop roughly 50.117 acres that would be tax-exempt. Herndon Farms 1st Plat Submittal included 53.63 acres of tax-exempt land.

87. Additionally, though Summit Church would not directly provide tax revenue (as a tax-exempt religious organization), it would help to address an issue identified by Plan Chatham—retail "leakage." Figure 6 is an image pulled from Plan Chatham providing retail leakage statistics.

25



**RETAIL SALES LEAKAGE**

58% OF ALL POTENTIAL RETAIL SALES IN CHATHAM "LEAK" OUT TO OTHER COUNTIES. THIS REPRESENTS ABOUT $207 MILLION IN LOST RETAIL ANNUALLY

CLOTHING
90% LEAKAGE

ELECTRONICS & APPLIANCES
86% LEAKAGE

MOTOR VEHICLES & PARTS
79% LEAKAGE

SOURCE: ESRI 2014 DATA

Figure 6

88.    As the Letter explains, building Summit Church's new campus in Chatham County would bring to, or keep, approximately 800 people in Chatham County each Sunday.  Many of these 800 people would spend their money at area businesses, generating economic growth and tax revenue for the County.

89.    Indeed, Plan Chatham includes a strategy—"encourag[ing] development of hotels and other lodging—to bring people in from outside the County for 'day-long, weekend-long, or week-long visits.'"  According to Plan Chatham, these visitors increase retail spending in the area and "reduc[e] retail leakage to neighboring counties."  (Ex. 1 at 58) (Fig. 7).

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 26 of 743

► **Strategy 6.2**

Review land use policies to encourage development of hotels and other lodging accommodations.

- The synergy between retail, service, entertainment and lodging uses in key areas of the County could spur day-long, weekend-long, or week-long visits. Having such destinations could address economic development goals, such as increasing tourism (and related spending), reducing retail leakage to neighboring counties, and attracting employers (as well as younger members of the workforce to fill employment positions).

Figure 7

90.     Concerning rural character, the Letter pointed back to Plan Chatham. That Plan defines "preserving rural character" as "preserv[ing] and restor[ing] cultural and historic resources that contribute to the identity of the County." This includes protecting "forests and open space in the eastern part of the County," where the Property is located. (Ex. 1 at 41).

91.     The Letter explained that Summit Church's proposed development would preserve both open space and natural resources, consistent with the stated goals of Plan Chatham. The viewshed would be well-preserved in a way that matched other developments in the area. And, as set forth in the site plan, eighteen acres of forest would remain untouched. (Ex. 9 at 4–9).

92.     Finally, the Letter included a refined Traffic Impact Analysis which showed that Summit Church's Chapel Hill Campus would generate fewer weekly trips than other developments or planned developments in the

27

area.  This Traffic Impact Analysis had been accepted by the North Carolina Department of Transportation.

## October Planning Board Meeting

93.     As Summit Church and Qunity prepared the Letter of Clarification, the Planning Board continued to receive public comments. Commenters called Summit Church "a large big business masquerading as a house of worship," "a three-ring circus eye-sore church 'corporation' hogging 50 acres of tax-exempt land," and "simply not a church in context."  (Ex. 10).

94.     Another commenter added that "praising Jesus does not actually require the development of a 50 acre, 88,000 sq ft, 3000 parishioner megachurch."  One even suggested that building the church was a sinful act that would "go against the teachings of Jesus to love your neighbor as yourself."

95.     Other commenters were incapable of masking their anti-Christian views, making it clear that they opposed Summit Church because of what they perceived to be the church's beliefs:

> a.  "This rezoning would essentially endorse the church's presence and potentially marginalize LGBTQ+ residents who should feel safe and respected in their own community."
>
> b.  "Building a mega-church in this area runs contrary to" Chatham County's "progressive, LGBTQ-friendly, and open-minded atmosphere."

c. "Can I add I would be in favor of anything there that is more community friendly and does not discriminate? 100% in favor of anything that isn't a ***divisive religious organization***? Especially one that contributes taxes."

d. "You want high income workers living and paying taxes in Chatham County? Then you'd better not invite a ***churchful of ignorant zealots with outstanding sexual abuse charges*** to ruin traffic and ***consume resources tax free***. We'd rather pay the higher taxes in Orange County than ***subsidize these high-earning homophobes***."

96. The public comments continue at length, in writing and in person at the Planning Board's public hearings. They refer to Summit Church as a "monstrosity." They accuse Summit Church of attempting to "colonize" Chatham County. They assert that "Megachurches" like Summit create a "segregation effect" that "contradicts the historical role of churches as institutions that bring together diverse groups of people on equal footing."

97. In contrast, Summit Church's commitment to ethnic unity is well-documented.[2] In fact, Greear and Summit have been recognized for that

---

[2] For example, when asked the question, "What do you see as the benefits of having a diverse church?" Pastor Greear answered:

It is a testimony of the Gospel of Jesus Christ. The early church lived in as racially divided time as any but the New Testament says that in Christ, there is "neither Jew nor Greek." In Christ, we experience a unity that transcends our cultural experience. To live in unity and love for one another is a witness to the world of what Christ has done for us. "They will know you are my disciples by your love for one another." It is also a sign of the coming multi-cultural unity around the throne of Christ, proclaiming the mystery and power of God's wisdom (Rev 5:9; Eph 3:10).

29

commitment and benefit it is to the communities they serve.[3]  Senior leaders such as Greear and Dr. Bryan Loritts, Teaching Pastor at Summit Church, have published articles, books, and sermons on this topic.

98.     At the October hearing, apparently recognizing the path down which the discussion was heading, Planning Board Member Eric Andrews expressed concern "that a denial of rezoning based on lack of revenue could be discriminatory and a violation of the [First] Amendment."  He also mentioned RLUIPA as a law about which the Planning Board needed to be aware.  (Oct. Meeting Minutes, Ex. 11 at 15–16).

99.     Andrews then attempted to spoon feed to his colleagues an appropriate (although pretextual) reason for recommending denial of Summit Church's applications: traffic.  Specifically, Andrews stated that, "even with NCDOT approval," it could be the Planning Board's "interpretation that the

---

*See* Interview with J.D. Greear, Pastor, The Summit Church (July 9, 2024), https://www.trillianewbell.com/blog/pastors-pursuing-diversity-interview-with-jd-greear.

[3] In 2010, Greear was invited to speak at the Durham annual Martin Luther King, Jr. rally because, as the county manager said, of how Summit "has blessed our city." That same day, another city official said to Greear: "It seems that everywhere in our city we find a need, we also find people from The Summit Church meeting that need." *See* J.D. Greear, *Five Defining Moments for the Summit Church* (Feb. 3, 2017), https://summitchurch.com/story/five-defining-moments-for-the-summit-church.

traffic issue could be [an] impediment or dangerous and not compliant with our proposed land use."

100.  Then-Board Member Amanda Robertson pointed instead to rural character.  But rather than use the definitions and metrics set forth by Plan Chatham and compare it to the actual site plans, Robertson simply inserted the word "megachurches" into a passage from Plan Chatham to argue that churches like Summit "do[ ] not fit."

101.  Specifically, Robertson read the passage that quotes the *previous* comprehensive plan (Ex. 1 at 19), which stated that Chatham County's "rural character is manifested in a backdrop of forests and fields, dotted with natural features such as creeks and hills and structures such as barns, silos, churches, poultry houses, general stores, and craft studios."  But, Robertson noted, if you change that passage from the previous comprehensive plan to read "barns, silos, *megachurches*, poultry houses, general stores, and craft studios," the addition of megachurches "does not fit."  (Ex. 11 at 15).

102.  Indeed, the Planning Board's discussion never actually veered into a consideration of the merits of the site plans, the evidence put forward by Summit Church, or how the site plans accomplish or undermine the goals, objectives, and strategies of Plan Chatham.  Rather, from the outset, it was clear that the Planning Board was determined to reject the proposal because

31

of who the applicant was and the kind of organization it is. The Board just needed to find a pretext for doing so.

103. The Planning Board ultimately recommended denial of Summit Church's application by a vote of 8-0.

## County Commission December Hearing

104. Summit Church's applications were scheduled to be heard by the Board of Commissioners in November.

105. Nine days after the Planning Board issued its recommendation, Commissioner David Delaney advertised an "office hours" event allowing Chatham County residents to discuss their thoughts and concerns with him. He specifically invited people to comment on "the Summit [Church] rezoning request." (Fig. 8).





**David Delaney, Chatham County NC** ...
Oct 10, 2024 · 🌐

Join me Friday morning, October 11, 8-9:30 a.m. at Breakaway Cafe to discuss any county issue on your mind. Key Oct-Nov commissioner decisions will address: the Unified Development Ordinance; county rezoning strategy and map; water and wastewater merger with Sanford; and the Summit church rezoning request.

👍 Like     💬 Comment     🔗 Copy     ↗ Share

Figure 8

106.    Summit Church requested a continuance of the November hearing to the following month, which was granted by the Board of Commissioners.

107.    Summit Church sought a second continuance in December, which the Board of Commissioners denied.

108.    In December, Commissioner Delaney held another "office hours" event.  In the description of the event (Fig. 9), Delaney once again singled out Summit Church's application, making sure his social media followers know when the Board of Commissioners would consider Summit's application.

33

**What to expect**

There's time for one last resident "office hours" session in 2024. Hope you can join me and fellow residents to talk about what's on your mind as we head into 2025. Breakaway Cafe, 58 Chapelton Court, Chapel Hill, 8-9:30 a.m.

Big 2025 county milestones include: property revaluation effective January 1; water utility rates increase in March as TriRiver begins serving county residents; and county community discussions planned for March-June showing proposed new UDO zoning districts.

Next public Board of Commissioner meetings are:
Dec. 2, 6pm, swearing-in of recently elected commissioners.
Dec. 16, 2pm and 6pm, regular meetings at Historic Courthouse. Summit Church proposal on the agenda.
Jan. 7-9, 9a-4p each day, Budget Workshop at Chatham Ag Center.
Jan. 21, 2pm and 6pm, regular meetings at Historic Courthouse.

Figure 9

109.   At the hearing, the Board of Commissioners allowed for general public comment prior to addressing any specific topics.  Many speakers chose to speak on the Summit Church applications, with most supporting the applications.  (Dec. 16, 2024 Hrg. Video, 12-16-2024 Video.mp4 - Google Drive, at 4:09:50).

110.   When the Board of Commissioners reached the Summit Church applications, it heard only from the zoning administrator and asked no questions of the applicant before purporting to begin a discussion of the applications.

111.   That "discussion" was not much of a discussion.  Chair Karen Howard immediately "jump[ed] in" and announced she was "not inclined to go in a different direction than the Planning Board's unanimous decision." (Dec.

34

16, 2024 Hrg. Video, [12-16-2024 Video.mp4 - Google Drive](), at 5:46:27).

Despite asking no questions of the applicant, Chair Howard already knew all she needed to know to vote against the application: "I have heard nothing, and anticipate that I will hear nothing that is going to change my perspective on [Summit Church's applications]." (Dec. 16, 2024 Hrg. Video, [12-16-2024 Video.mp4 - Google Drive](), at 5:46:35).

112.    Howard was dismissive of the burdens facing Summit Church's Chapel Hill Campus due to not having a building of its own and the burden that placed on Summit Church's evangelical mission and beliefs. To Howard, the fact that residents were "already commuting to a Summit Church" meant that they were "clearly comfortable with" having to leave the County to worship. (Dec. 16, 2024 Hrg. Video, [12-16-2024 Video.mp4 - Google Drive](), at 5:46:52).

113.    Howard also showed no interest in Summit Church's ability to serve the community, stating:

> Chatham County is a community that takes wonderful care of its own. There are volunteers in our schools, every one of our schools. Every day. They are volunteers at our thrift stores that support our schools every day. There are incredible small community churches all over this county that anyone is invited to -- welcome in. We are meeting the needs of our community. We are loved.

(Dec. 16, 2024 Hrg. Video, [12-16-2024 Video.mp4 - Google Drive](), at 5:47:26).

114.   Howard's insinuation was clear: Chatham County doesn't *need* or *want* Summit Church or any church because the people there take care of their own.

115.   Finally, Howard noted the vagueness of labeling Summit Church a "megachurch," but proceeded to use that label anyway.  "[I]n Chatham, that would be a megachurch—whether it considers itself a megachurch or not." (Dec. 16, 2024 Hrg. Video, [12-16-2024 Video.mp4 - Google Drive](#), at 5:48:09).

116.   Vice Chair Katie Kenlan chimed in only to express her "full support" for Howard's hostile reasoning.  (Dec. 16, 2024 Hrg. Video, [12-16-2024 Video.mp4 - Google Drive](#), at 5:49:03).

117.   New Commissioner (and former Planning Board Member) Amanda Robertson once again offered her thanks to the community for their input.

> We've heard our community speak on this, and I agree with a lot of the reasonings, for I can't tell you how many emails I got from all of you . . . .  I thank you for all of the emails. That's what it means to be a community like this that we all love and care for.  And I'm grateful for that.  And all of you spoke a lot about the amount of traffic this would contribute and the lack of tax base that this would contribute, because that's a concern for all of us, and I'm really grateful for that. So, thank you.

(Dec. 16, 2024 Hrg. Video, [12-16-2024 Video.mp4 - Google Drive](#), at 5:50:19).

118. Before proceeding with a vote on the applications, Howard once again spoke up to ensure Summit Church got the message: "Chatham County is not a place to call home for that size of a church." (Dec. 16, 2024 Hrg. Video, [12-16-2024 Video.mp4 - Google Drive](#), at 5:51:24).

119. Despite Summit Church's request being consistent with Plan Chatham and the Future Use Map, and despite the Appearance Commission's recognition of Summit Church's extraordinary efforts to protect the rural character of the area, the County Commissioners voted unanimously to deny Summit Church's rezoning applications.

120. The Board of Commissioners issued a non-consistency statement concerning the denial explaining its reasoning. According to the Board, Summit Church's application was "not consistent with" Plan Chatham and was not "reasonable and in the public interest" because it did not "provid[e] a diversity in the tax revenue and does not provide more high-quality jobs for the area." (Non-Consistency Statement, Ex. 12).

121. Immediately before adjourning the meeting, Howard circled back to lob one last volley at Summit Church to emphasize that what the Board of Commissioners did not want in their County was a church like Summit. She noted that the Board

> heard a lot from the group that was here talking about what a church can do in our community. And I do believe, yes, churches can do wonderful things. But people, just ordinary

37

people in our community are already doing wonderful things, and ***we can continue to do that with or without a church***.

(Dec. 16, 2024 Hrg. Video, [12-16-2024 Video.mp4 - Google Drive](#), at 6:17:20).

## FIRST CLAIM FOR RELIEF
### Religious Land Use and Institutionalized Persons Act
### Violation of 42 U.S.C. § 2000cc(a)
### (Substantial Burden on Summit Church's Religious Exercise)

122.    Summit Church repeats and realleges all of the prior paragraphs of this Complaint and incorporates them by reference herein.

123.    Summit Church's Chapel Hill Campus has outgrown its current space, which it rents from East Chapel Hill High School.  Summit Church's Chapel Hill Campus requires a building of its own that can provide a closer venue for its Chatham County residents to worship, accommodate the campus's mission-oriented growth, and expand its capacity to serve the local community according to its beliefs.  That is, Summit Church needs a space that will permit its Chapel Hill Campus members to stay where they are, serve where they live, and be the church in their local community.

124.    The Property along U.S. Highway 15-501 presents an ideal opportunity for Summit Church to build a campus within reasonable proximity of its current space.

125.   As early as October 2023, Chatham County's review staff expressed opinions that Summit's proposal fit within its understanding of Plan Chatham and the Future Use Map, meaning its rezoning application was likely to be approved.

126.   Summit Church had a reasonable expectation that it would be able to obtain the required rezoning to build its new campus on the Property because, among other reasons, the proposed use was inarguably consistent with the Future Use Map.  That is, the Property sits within a Compact Residential segment of the Future Use Map, and Plan Chatham explicitly contemplates churches in the Compact Residential areas.

127.   Additionally, the Property sits among a wide array of existing and approved commercial space totaling hundreds of thousands of square feet in the most "urbanized" corridor of the County's jurisdiction.

128.   Summit designed its building and signage to blend with the commercial uses around the Property.

129.   Summit designed the site to preserve open space, the viewshed from the highway and the adjoining properties, and eighteen acres of forested area.

130.   In other words, Summit designed the site specifically to reflect the area's "rural character."

39

131. Indeed, the Appearance Commission agreed that Summit Church had taken "special care" to ensure its site fit with the character of the area.

132. Upon information and belief, the Chatham County Board of Commissioners has not, since the 2017 implementation of Plan Chatham, denied a privately initiated rezoning application that was consistent with the Future Use Map.

133. Nevertheless, the Board of Commissioners was dismissive of Summit Church's burdens and efforts at the December hearing. According to Chair Karen Howard, Summit Church did not need to build in Chatham County because County residents were "already commuting to a Summit Church somewhere that they're clearly comfortable with commuting to."

134. The Board of Commissioners' denial of the rezoning application imposes a substantial burden on Summit Church's religious exercise; namely, its mission to ensure that there is a thriving evangelical church within fifteen minutes of every person in the Triangle and its need to find a site of its own to practice its religious beliefs.

135. This substantial burden was imposed by the Board of Commissioners at the conclusion of a formal procedure requiring it to make an individualized assessment of Summit Church's proposed use of the Property.

136.   The impediment created by the County was absolute.  Though the County had authority to propose conditions for the use of the Property (Ex. 4 at 8), it declined to do so.  Indeed, Commissioner Howard declared that Summit was not welcome **anywhere in Chatham County**.

137.   As Commissioner Howard stated at the Board of Commissioner's December meeting, Chatham County is a "wealthy county [that] commit[s] millions of dollars to all kinds of things."  (Dec. 16, 2024 Hrg. Video, [12-16-2024 Video.mp4 - Google Drive](#), at 2:37:48).  Accordingly, the Board of Commissioners' stated reason for the denial—"providing a diversity in the tax revenue"—is not a compelling governmental interest.

138.   No other pretext given by members of either the Board of Commissioners or the Planning Board presents a compelling governmental interest.

139.   Nor was denial of Summit Church's application the least restrictive means of accomplishing **any** of the County's purported interests. The County has thus violated 42 U.S.C. § 2000cc(a).  As a result of the County's illegal conduct, Summit Church is entitled to injunctive relief and compensatory damages incurred due to the County's denial.

41

## SECOND CLAIM FOR RELIEF
### Religious Land Use and Institutionalized Persons Act
### Violation of 42 U.S.C. § 2000cc(b)(1)
### (Less Than Equal Terms)

140.   Summit Church repeats and realleges all of the prior paragraphs of this Complaint and incorporates them by reference herein.

141.   Chatham County's land use regulations and policies treat religious assemblies and institutions on less than equal terms than nonreligious assemblies and institutions—a *per se* violation of RLUIPA that cannot be remedied by meeting strict scrutiny.

142.   The County's Compact Community Zoning Ordinance requires compact communities to include a civic component and larger open spaces for residents.  (Ex. 13 at 15–16).

143.   Indeed, the Herndon Farms development originally planned for the Property included a congregate care facility, a one-story office/daycare, community gardens, and a barn to be used as an event center.

144.   At 140,000 square feet, the approved congregate care facility alone would be more than fifty percent larger than Summit's proposed church building.

145.   The Board of Commissioners approved the Herndon Farms plan, including the congregate care facility, declaring it "consistent with the Chatham County Land Conservation and Development Plan [i.e., Plan

Chatham]." Yet, the Board of Commissioners rejected Summit Church because it was too large and "antithetical to . . . real rural preservation."

146. Though the County permitted these larger secular assemblies and institutions as part of the Herndon Farms development that never broke ground, they refused to allow Summit Church to build on the same parcels.

147. Though the County justified this denial by pointing to lost tax revenue, the County does not treat secular "exempt uses" the same as religious assemblies and institutions, either. Indeed, Shelley Colbert of the Planning Board admitted approvingly that other "exempt uses" were permitted under the current zoning, but churches were not.

148. By failing to treat religious assemblies and institutions on equal terms with nonreligious assemblies and institutions, the County has violated 42 U.S.C. § 2000(b)(1). As a result of the County's illegal conduct, Summit Church is entitled to injunctive relief and compensatory damages incurred due to the County's denial.

**THIRD CLAIM FOR RELIEF**
**Religious Land Use and Institutionalized Persons Act**
**Violation of 42 U.S.C. § 2000cc(b)(2)**
**(Discrimination on the Basis of Religion)**

149. Summit Church repeats and realleges all of the prior paragraphs of this Complaint and incorporates them by reference herein.

150. The actions and comments of both the Board of Commissioners and the Planning Board evince a plain discriminatory motive behind denying Summit Church's application—a *per se* violation of RLUIPA that cannot be remedied by meeting strict scrutiny.

151. Upon information and belief, the Chatham County Board of Commissioners has voted on more than fifty rezoning requests since the adoption of Plan Chatham.

152. Upon information and belief, prior to December 2024, only one of those requests had been denied.

153. That denial was due to the proposed use's inconsistency with the Future Use Map.

154. In that matter, the applicant was given an opportunity to present his application to the Board of Commissioners. Upon information and belief, that did not happen in this case.

155. Upon information and belief, in every other case, the Board of Commissioners approved the rezoning request, even over public concerns regarding traffic or rural character.

156. Upon information and belief, the Board of Commissioners' denials of Summit Church's two rezoning applications represent only its second and third denials of such requests since the adoption of Plan Chatham

44

nearly eight years ago, and the *only* two denials of requests that were

inarguably consistent with the Future Use Map.

157.   Upon information and belief, Summit Church is the first church

to request such a rezoning.

158.   In addition to their consistency with the Future Use Map,

Summit Church's applications would advance at least six of Plan Chatham's

ten stated goals.

159.   The Board of Commissioners' denial of Summit Church's

applications followed multiple significant departures from normal

procedures.

160.   The Board of Commissioners' denial of Summit Church's

applications represented multiple significant departures from written

policies, namely Plan Chatham.

161.   The Board of Commissioners' denial of Summit Church's

applications conflicts with its past decisions in terms of substance.  For

example, the Board of Commissioners has, in recent years, approved larger

projects with more significant traffic footprints and less concern for "rural

character" along the same corridor.  Indeed, many of these projects are within

a three-mile radius of the Property.  One such project sits *immediately*

*across the street* from the Property.

162. Commissioner Howard's statement at the December 16 hearing that "Chatham County is not a place to call home for that size of a church" is particularly troublesome. Given the sprawling commercial development around the Property, the **size** of Summit's building is clearly not the problem. Larger developments line U.S. Highway 15-501 near the Property.

163. Instead, the Board of Commissioners takes issue with building "that size of **a church**." Additionally, the reasons stated during public discussion by County Commissioners and the Members of the Planning Board reveal arbitrary and transparently pretextual standards to limit the sizes of churches within the County's jurisdiction. Rather than adhere to the language of Plan Chatham, members of both boards invented *ad hoc* standards designed to deny Summit Church specifically and churches more broadly.

164. The Board's signed Non-Consistency Statement and Statement of Non-Reasonableness evinces a rationale that would apply to almost any house of worship: its failure to provide "diversity in the tax revenue" or "more high-quality jobs for the area."

165. The signed Non-Consistency Statement and Statement of Non-Reasonableness rings hollow considering the Herndon Farms plans had been approved **on the same parcels** in 2021 and removed **more land** from the tax base than Summit Church's proposed use.

46

166. Herndon Farms was approved under the same comprehensive land use plan—Plan Chatham—that purportedly justified denial of Summit Church's application.

167. That denial's inconsistency with policy, procedure, and historical practice, combined with its apparent application to houses of worship, provides compelling evidence of religious discrimination.

168. So, too, do the Commissioners' statements during public proceedings. Chair Howard's comments during the December hearing— which Vice Chair Kenlan and Commissioner Robertson explicitly agreed with—sent an unmistakable message: "We take care of our own here. We don't want you or the outsiders you might bring in."

169. Indeed, in the face of Plan Chatham's stated goal to bring in outsiders and stop retail leakage, the most logical way to reconcile Howard's statement with Plan Chatham is: We want you to visit and spend your money in Chatham County *unless you're religious*.

170. Even Howard's statement appearing to support local churches— "There are incredible small community churches all over this county that *anyone is invited to – welcome in*"— is a clear nod to the false allegations made against Summit Church in anti-religious public comments.

171. In addition to their explicit agreement with Chair Howard, other Commissioners' and Planning Board Members' statements reveal that they

47

were responding to—and even in agreement with—public comments communicating anti-religious prejudice.

172. Commissioner Delaney, though silent during the hearing, took to social media in the weeks prior to ensure opponents of Summit Church's applications knew exactly when the Board of Commissioners would hear those applications.

173. In sum, the Board of Commissioners denied Summit Church's applications because they allegedly would not "diversify the tax base" despite the fact that the proposals created *less tax-exempt property* than the previously approved Herndon Farms on the same site. The Board of Commissioners criticized Summit Church's site plans for allegedly failing to preserve the "rural character" of an area that contained:

    a. Half a million square feet of approved commercial space beginning with a parcel across the street from the Property;

    b. Another half a million square feet of commercial space within the three miles to the north of the Property; and

    c. At least 22,000 people living within a five-mile radius with another large residential development planned in the immediate vicinity of the Property.

174. The same plans were praised by the Appearance Commission for their efforts to preserve the character of the area.

175. These obvious contradictions and the thinly veiled anti-religious rhetoric of both the Planning Board and the Board of Commissioners lay bare

48

the real reason for the County's denial of Summit Church's applications: religious discrimination.

176.   Because its denial of the rezoning applications was motivated by religious discrimination, the County has violated 42 U.S.C. § 2000(b)(2).  As a result of the County's illegal conduct, Summit Church is entitled to injunctive relief and compensatory damages incurred due to the County's denial.

<div align="center">

**FOURTH CLAIM FOR RELIEF**
**Religious Land Use and Institutionalized Persons Act**
**Violation of 42 U.S.C. § 2000cc(b)(3)(B)**
**(Unreasonable Limitation)**

</div>

177.   Summit Church repeats and realleges all of the prior paragraphs of this Complaint and incorporates them by reference herein.

178.   The Planning Board's and County Commission's interpretation of Plan Chatham places an unreasonable limitation on religious assemblies, institutions, and structures within the County—a *per se* violation of RLUIPA that cannot be remedied by meeting strict scrutiny.

179.   Members of the Board of Commissioners and Planning Board frequently asserted that Summit Church did not "fit" the "rural character" of Chatham County because of its size.

180.   No part of Plan Chatham or the County's Zoning Ordinance sets a size limit on "rural character," and Plan Chatham's definition of "rural

49

character" focuses on preserving farmland in the west and forests and open space in the east.

181. Nevertheless, members of the Planning Board and the Board of Commissioners made up their own definitions of rural character by, e.g., arbitrarily limiting new churches to a capacity of 300 people, or replacing the word "churches" with "megachurches" in passages of Plan Chatham to demonstrate how an arbitrarily defined "megachurch" "does not fit" within the spirit of Plan Chatham.

182. This arbitrary cap on size, which is found nowhere in Plan Chatham, unreasonably limits the ability of churches to build or grow within the County.

183. The arbitrary cap of 300-person churches also does not fit with the growing character of the U.S. Highway 15-501 corridor, with more than a million square feet of existing or approved commercial space and tens of thousands of people living in the immediate vicinity of the corridor.

184. The Board of Commissioners also made clear during their discussion of Summit Church's applications that it would not be swayed by, and indeed was not even interested in, a church's ability to serve the people of the County, or its ability to spur economic activity in the area.

185. The signed Non-Consistency Statement and Statement of Non-Reasonableness suggests that *no church* would be permitted unless it

voluntarily paid taxes or it was large enough to provide "more high-quality jobs" for the area—a constitutionally suspect standard that almost certainly could not be met by smaller churches.

186.   Upon information and belief, these standards would apply in nearly every parcel across the County, whether a church sought rezoning or whether it sought a special use permit to build in a residential zone—the County's default zoning for undeveloped parcels.

187.   The County's application of its zoning laws makes it difficult for religious institutions to locate anywhere within the jurisdiction in violation of 42 U.S.C. § 2000cc(b)(3)(B).  As a result of the County's illegal conduct, Summit Church is entitled to injunctive relief and compensatory damages incurred due to the County's denial.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Summit Church respectfully requests the following relief:

1. That this Court grant preliminary and permanent injunctive relief requiring the County to approve Summit Church's rezoning request and associated site plan;

51

2. That this Court enter a Declaratory Judgment that the County's denial of Summit Church's rezoning applications violates RLUIPA, and is therefore void;

3. That this Court award Summit Church its costs and expenses of this action, including reasonable attorney's fees, pursuant to 42 U.S.C. § 1988 and other applicable law;

4. That this Court award Summit Church all the damages to which Summit Church is entitled;

5. That this Court retain jurisdiction of this matter as necessary to enforce its orders; and

6. That this Court grant such further relief as it deems appropriate.

[Signature Page Follows.]

Respectfully submitted this the 14th day of February, 2025.

MICHAEL BEST & FRIEDRICH, LLP

*/s/ Keith E. Richardson*

KEITH E. RICHARDSON
N.C. Bar No. 40778
kerichardson@michaelbest.com
MICHAEL G. SCHIETZELT
N.C. Bar No. 53599
mgschietzelt@michaelbest.com
4509 Creedmoor Road, Suite 501
Raleigh, NC 27612
Tel.: 984.220.8750

JOSEPH L. OLSON
(*special appearance notice forthcoming*)
Wis. Bar No. 1046162
790 N Water St.
Milwaukee, WI 53202
jlolson@michaelbest.com
Tel.: (414) 271-6560

KELLYE FABIAN STORY
(*special appearance notice forthcoming*)
Ill. Bar No. 6272195
444 W. Lake St., Suite 3200
Chicago, IL 60606
kellye.story@michaelbest.com
Tel.: (312) 222-0800

*Counsel for Plaintiff The Summit Church-Homestead Heights Baptist Church, Inc.*

53

# EXHIBIT 1

**Adopted November 20th 2017**
**Effective November 20th 2017**

**Document Amended March 16th 2020**



# PLAN CHATHAM

working together to preserve & progress

# COMPREHENSIVE PLAN

2017

Page intentially left blank.

Plan best viewed in Adobe Acrobat as in two page view mode.
Navigate to View / Page Display / Two Page View.



# Acknowledgements

Thank you to all of the individuals and organizations who committed their time and energy to this effort.

## County Commissioners

Karen Howard (District 1)
Mike Cross/ Mike Dasher (District 2)
Diana Hales (Vice Chair of the Board: District 3)
James G. Crawford (Chairman of the Board: District 4)
Walter Petty (District 5)

## Planning Board

Bill Arthur (District 1)
James Elza (District 1)
Jamie Hager (District 2)
Jon Spoon (District 2)
Cecil Wilson (District 2)
BJ Copeland (District 3)
Emily Moose (District 3)
Allison Schwarz Weakley (District 3)
Caroline Siverson, Vice-Chair (District 4)
Anthony Gaeta, Jr. (District 4)
Brian Bock (District 5)
Gene Galin (District 5)
George Lucier, Chair (At-large)
Diana Hales, County Commissioner Liaison (non-voting)

## Planning Staff

Jason Sullivan
Cara Coppola
Dylan Paul
Angela Birchett
Hillary Pace

Lynn Richardson
Kim Tyson
Janie Phelps
Paula Phillips

## Consultants

LandDesign
Nealon Planning
Economic Leadership

VHB
Vertical Results
Greener Prospects

## Steering Committee

Jim Elza, BOC At Large, Chair
Andy Bailey, BOC At Large, Vice Chair
Sharon Garbutt, BOC At Large
James Crawford (Commissioner & Affordable Housing Committee)
Del Turner, Board of Education
Caroline Siverson Planning Board
George Lucier, Planning Board alternate
Tandy Jones, Agricultural Advisory Board
John Fogleman, Recreation Advisory Board
Kalyan Ghosh, Council on Aging
Linda Harris, Economic Development Board
Marcia Herman-Giddens, Board of Health
Casey Mann/ Roy Girolami, Transportation Advisory Committee
Amanda Robertson/Mike Petruska Climate Change Committee
Terry Schmidt, Environmental Review Advisory Committee

Esta Cohen, Agricultural Advisory Board alternate
George Pauly, Recreation Advisory Board alternate
John Kessler, Board of Health alternate
Jamie Nunnelly, Transportation Advisory Committee alternate
John Graybeal, Climate Change Committee alternate
Sherri Stuewer Environmental Review Advisory Committee alternate

# Contents

About the Plan ................................................................................................ 6

I. The Planning Process ................................................................................ 7

    Purpose ....................................................................................................... 9

    Relationship to Previous Plans ................................................................ 10

    Public Involvement .................................................................................. 11

II. The Big Picture: Issues and Opportunities ........................................ 12

    Economics and Growth ........................................................................... 14

    Land Use .................................................................................................. 18

    Housing and Demographic Trends .......................................................... 24

    Agriculture .............................................................................................. 26

    Infrastructure .......................................................................................... 30

    Environment ............................................................................................ 32

    Parks and Health ..................................................................................... 36

III. Plan Chatham ....................................................................................... 38

    Vision ...................................................................................................... 39

    Goals ....................................................................................................... 40

    Objectives ................................................................................................ 41

    Future Land Use and Conservation Plan ................................................ 44

    Chatham Future Land Use Descriptions ................................................ 46

IV. Plan Elements and Recommendations ................................................ 50

    Economic Development ........................................................................... 52

    Land Use .................................................................................................. 60

    Housing ................................................................................................... 70

    Health ..................................................................................................... 76

    Agriculture .............................................................................................. 92

    Natural Resources ................................................................................. 102

    Resiliency ............................................................................................... 110

    Parks and Recreation ............................................................................ 116

    Transportation ...................................................................................... 124

    Utilities and Public Services ................................................................. 136

V. Chatham County Action Items ............................................................ 142

    Implementation Steps .......................................................................... 143

VI. Appendices ......................................................................................... 158

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 59 of 743

# About the Plan

Chatham County is at a critical point in its history. It has experienced exceptional growth in recent years, and is in the path of additional growth, particularly in the northeast portion of the County. The more rural parts of the County are also undergoing changes that threaten agriculture and quality of life.

---

Plan Chatham is a Comprehensive Plan that provides a strategic guide for future decisions in order to address the most pressing needs of the County and improve the quality of life enjoyed by current and future residents.

The Plan outlines policies, strategies, short term and long-term priorities for addressing key goals.

The Plan is divided into four sections.
- **Section I** describes the planning process and highlights the purpose of the plan, previous efforts and public involvement.
- **Section II** describes issues and opportunities that need to be addressed in the coming years.
- **Section III** includes the goals and objectives, Future Land Use and Conservation Plan and recommendations by topic area (see key below).
- **Section IV** is the Action Plan and includes concrete steps needed to implement the recommendations in this Plan.
- **Section V** includes the appendices that can be accessed digitally at www.chathamnc.org.

## PLAN ELEMENTS

 Economic Development

 Land Use

 Housing

 Health

 Agriculture

 Natural Resources

 Resiliency

 Parks and Recreation

 Transportation

 Utilities and Public Services



PLAN CHATHAM
working together to preserve & progress

6



# The Planning Process

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 61 of 743

# THE PLANNING PROCESS
## 1.1 PURPOSE

A Comprehensive Plan can be best described as a guide to the County's future. It represents a culmination of a community-wide conversation about what is working, outstanding needs, opportunities and how efforts by the County, local businesses and citizens can help make progress toward goals.

The planning process was initiated in January of 2016 and consisted of two phases. The first phase was conducted over a four-month period which included meetings with key stakeholders and three meetings with the Steering Committee. Phase I also included an initial assessment of the existing conditions in the County and its context. This assessment involved the compilation and synthesis of information gathered through stakeholder interviews, a review of adopted plans, and a look at relevant data provided by the County and acquired from various sources. From this, a preliminary set of issues and opportunities were identified. For more information on this phase see the Phase I Report in the Appendices. Phase II began in the summer of 2016 with a set of public meetings where initial findings were presented and feedback on goals and pressing issues was received. Initial land use concepts and policy ideas were developed with input from feedback received at the public meetings, Steering Committee meetings, and from the public survey. A second round of public meetings was held in February of 2017. Feedback was used to refine the concept plans and policy framework and to create detailed strategies and action items in the Plan Elements portion of this document.

## THE PLANNING PROCESS

**1** **County-Assessment + Draft Goals**

"Chatham Today" Assessment of current and emerging conditions, identification of issues and opportunities, and development of goals

**2** **Develop Initial Concept Plan + Policy Ideas**

"Shaping Chatham's Future" Development of future land use concepts and policy ideas

**3** **Refine Concept Plan + Policy Framework**

"Putting the Plan into Action" Refine concepts and policies Draft action steps and strategies

**4** **Plan Documentation + Adoption**

Collection of plan components into a final plan report document to be presented for adoption

PHASE I ••••••••••••••••••• PHASE II ••••••••••••••••••••••••••••••••••

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 62 of 743



Study Area    Parks and Managed Areas    Cities    ETJ

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 63 of 743

# 1.2 RELATIONSHIP TO PREVIOUS PLANS

**Plan Chatham is meant to serve as an update to the Chatham County Land Conservation and Development Plan.**

The Land Conservation and Development Plan (LCDP) is over 15 years old and has served the County well in guiding growth and development. Many of the policies and principles included in the LCDP were carried over into Plan Chatham. This landmark document provided a vision of the intended physical form of the County, supported a balanced growth pattern and emphasized resource protection and conservation. Plan Chatham builds on this and factors in recent changes in development patterns and responds to emerging environmental threats and economic development opportunities. Plan Chatham also

includes a Future Land Use and Conservation Map that is meant to add clarity to future land use and public and private investment decisions. Since the adoption of the Land Conservation and Development Plan a number of other plans have been developed and/or adopted. These plans included the Farmland Preservation Plan, Parks and Recreation Master Plan, Comprehensive Conservation Plan, Chatham County-Town of Cary Joint Land Use Plan, Chatham Economic Development Corporation (EDC) Conceptual Land Use Plan, and the Community Health Assessment. Each of these plans included policies and strategies that guided staffing, land use, and programming. A review of these plans was essential to develop and update the County's Comprehensive Plan. A review of existing plans is included in the Phase I Report in the Appendix.



**CHATHAM COUNTY PLANS 2000-2017**

(Refer to the Phase 1 Report in the Appendix for a review of plans, key recommendations and relevance to the Comprehensive Plan.)

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 64 of 743

# 1.3 PUBLIC INVOLVEMENT

Guiding the development of Plan Chatham was an extensive public involvement process. Understanding the values of Chatham's citizens and addressing shared priorities was an integral part of this effort. Meetings with stakeholders and advisory groups, traditional public meetings, attendance of community events and steering committee meetings were augmented with a robust online engagement process which included a county website devoted to the Comprehensive Plan and an online web forum. An Agricultural Focus Group was convened in the fall of 2016 to discuss concerns and needs of farmers and those involved in different facets of agricultural industry. Consultation with the Chatham Health Alliance, town boards and other groups including the Home Builders Association and the Chatham Conservation Partnership ensured a broad base of input.



Traditional public meetings were held in different areas of the County and over 70 other outreach events and meetings were held during the development of Plan Chatham.



## ONLINE PARTICIPATION

The Plan Chatham My Sidewalk web forum received more than **23,500 views** during the course of the planning process. Other key statistics included:

- **1900+** responses to the public surveys
- **132** responses to the Agricultural Focus Group Survey

"I'm sure there will be growth, but hope to see managed, sensible growth with infrastructure and attention to roads, green space, etc."

- Response to survey question: "What is your Vision for the County?"

"When will most or all of Chatham County join the 21st century in terms of internet access?"

- Plan Chatham MySidewalk participant

"I informally polled my AP government students and 0/29 said that they could see themselves living in Chatham County in 10 years!!"

- Skip Thibault, Teacher at Northwood High School

(Refer to the public comments document in the Appendix for further reading.)

11



The Big Picture:
Issues and Opportunities

Case 1:25-cv-00113-UA-JLW   Document 1   Filed 02/14/25   Page 66 of 743

# THE BIG PICTURE
## ISSUES + OPPORTUNITIES

The Plan Chatham process started with meeting citizens and stakeholders to document the issues that need to be addressed by governmental and non-governmental actions and decisions in the coming years. This section of the Plan highlights topics discussed during these meetings and additional research and analysis conducted as part of the planning process.

A more detailed report on issues by topic area is included in the Appendix in the Phase I Report. Refer to the Community Profile in the Appendix for additional demographic information.

### HISTORIC POPULATION GROWTH



The estimated 2015 population of Chatham County was 70,928 people (US Census Bureau). This is an increase of 32,169 people since 1990 (an increase of 84% in 25 years). The NC Office of State Budget and Management estimates that the County grew by 13.1% between April of 2010 and July of 2015 (an increase of 8,324 people), making it the 2nd fastest growing county in the state during that period (based on percent growth).

13



# ECONOMICS AND GROWTH

Photo Source: betterphotography.in

**Chatham County is the 2nd fastest growing county in the state of North Carolina. That growth is expected to continue. Balancing residential growth with jobs and business development will be key to the long term financial health of the County.**

There were 29,322 housing units in Chatham County as of 2014. The number of housing units grew by 7,395 between 2000 and 2014 (an increase of 37%). Residential building permits hit a peak of over 600 per year between 2003 and 2007. Residential growth slowed significantly during the recession, but has rebounded in the past few years.

Population projection alternatives were produced during the development of the Plan. If the County continues to experience the rate of growth seen from 2000 to 2014 (2.4% AGR) the population could grow by 58,000 people. County growth rates could be higher or lower, depending on the growth rate of Chatham Park (see inset on p. 23).

### Projected Population Growth



2015 | 70,928

2040 | 128,327

= 10,000 PEOPLE
SOURCES: US CENSUS BUREAU (1990-2015), LANDDESIGN

14

## Employment and Income

Chatham enjoys one of the lowest **unemployment rates** in North Carolina and in the region, most recently at 4.2% (NC Dept of Commerce (July 2016 unadjusted rates)). The unemployment rate for North Carolina is 4.9% and rates in adjacent counties include 4.5% (Durham County), 4.8% (Moore County) and 5.7% (Harnett County). But job growth has been slower than many nearby counties.

The median income for the County is 45% higher than the rest of NC, but income and poverty rates vary significantly throughout the County. For instance, some census tracts in the northeast have median incomes over $100,000, but others in the west and southwest have incomes under $30,000. A lack of good paying jobs is a contributing factor to income disparities.

### County Job Growth: 2000-2016

| County | Growth |
|--------|--------|
| Johnston | 29.8% |
| Harnett | 7.7% |
| Lee | -8.9% |
| Chatham | -11.4% |
| Randolph | -12.7% |

SOURCE: NC COMMERCE.COM, OCTOBER 2017



FIGURE 2: MEDIAN INCOME MAP (SOURCE: CENSUS 2014 ACS DATA)

Legend:
$22,000 – $30,000
$30,000 – $50,000
$50,000 – $60,000
$60,000 – $75,000
$75,000 – $90,000
$90,000 – $105,000
> $105,000

15

There are only about 14,000 **jobs** in the County with an adult labor force of approximately 32,000. Fifty-seven percent of Chatham workers **commute** for work outside the County *(2015 American Community Survey)*. This creates a situation where Chatham County residents are dependent on the success of surrounding metro counties for their economic well-being. This high level of out-commuting lowers the daytime population in the County thereby lowering the demand for retail and restaurants.

## Retail Sales

**Retail sales** "leakage" compares the potential total value of sales within the County (based on population and income) to actual sales volume. An estimated 58% of potential sales in Chatham "leak" out to other communities, resulting in the County missing out on an estimated $207 million in retail sales *(ESRI 2014*

*data)*. Chatham has a generally dispersed, low-density population. Its two biggest towns, Siler City and Pittsboro, each have less than 10,000 residents, meaning they lack the critical mass needed to attract many retailers. The 15-501 corridor in northeast Chatham County has good retail potential—in fact it is home to almost 20,000 residents which is more than Pittsboro and Siler City combined, but it too currently lacks the population density to appeal to most national retail and restaurant operators. Later, in the recommendations section, this Plan will discuss opportunities for capturing more retail dollars.

## Education and Opportunity

Access to quality education and non-traditional postgraduate training opportunities is key to creating an educated work force with relevant skills that attract employers. During the development of the Plan, it was

# RETAIL SALES LEAKAGE

**58% OF ALL POTENTIAL RETAIL SALES IN CHATHAM "LEAK" OUT TO OTHER COUNTIES. THIS REPRESENTS ABOUT $207 MILLION IN LOST RETAIL ANNUALLY**

| CLOTHING | ELECTRONICS & APPLIANCES | MOTOR VEHICLES & PARTS |
|---|---|---|
| **90% LEAKAGE** | **86% LEAKAGE** | **79% LEAKAGE** |

    

SOURCE: ESRI 2014 DATA

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 70 of 743

noted that in some parts of the County it was difficult to recruit skilled workers. In addition, providing access to educational opportunity is critical to ensuring equity. There is a significant disparity between educational attainment for different ethnicities. For instance, only 7% of Hispanic residents and only 14% of African American residents in the County have a bachelor degree or higher, whereas White and Asian residents have much higher level of educational attainment with 43% and 71% achieving a bachelor degree or higher respectively. This educational disparity correlates with differences in income as well. For instance, Hispanic and African American residents have lower median incomes than White residents (Census 2015 ACS Data).

## Agriculture and Forestry

Agriculture and forestry are valuable to the local economy. Seventy-five percent of the land area in the County is used for agricultural or forestry purposes (Tax parcel data, 2016). Forty-eight percent of the land is enrolled in the Present Use Value (PUV) Program, which grants tax breaks to working farms and timberlands. Chatham is #2 in the state of North Carolina in cattle sales. The poultry sector is also strong, consistently ranked in the top 15 in the state. Small farms and timber operations are also significant contributors to the economy.





# 75% OF LAND AGRICULTURE AND FORESTRY
### TAX PARCEL DATA, 2016

# 48% OF LAND IN PUV PROGRAM
### PRESENT USE VALUE DATA, 2016

# $154,908,000
### LIVESTOCK SALES, 2012 CENSUS OF AGRICULTURE

# $238,600,000
### FORESTRY INDUSTRY ECONOMIC IMPACT 2012, NCSU EXTENSION

17



Photo Source: Debbie Roos, Chatham County Cooperative Extension

# LAND USE

**The location, intensity and design of development is important to maintain the character of Chatham County.**

## Settlement Patterns and Features

Farms have been, and still are, the dominant form of land use. Historic landscapes in the County are anchored by farm houses and barns. They were constructed with natural materials, such as wood and brick, until prefabricated materials were introduced in the twentieth century. Social activities around gristmills, inns, taverns, ferries and fords have shifted to downtowns and clusters of commerce. Churches, however, remain central gathering places in towns and rural townships in the County. There is a history of practical reuse of structures. Old homes became outbuildings, or were incorporated into new structures. Farms underwent organic expansion, with larger complexes resembling "small villages with various dwellings and working units (Osborn and Selden-Sturgill, "Architectural Heritage of Chatham Co.", 1991)."

## Rural Character

Preserving rural character was identified as the most important goal during the planning process. Rural character means different things to different people. For some, it is clean water, forests, and wildlife. For others, it is scenic beauty or a lifestyle that includes privacy, peace and quiet. For many, it is simply the ability to farm. The previous comprehensive plan, the Land Conservation and Development Plan, defined Rural Character as:

*"The combination of natural and built features that portray the traditional form and preserve the traditional function of the rural landscape. In Chatham County, rural character is manifested in a backdrop of forests and fields, dotted with natural features such as creeks and hills and structures such as barns, silos, churches,*

*poultry houses, general stores, and craft studios. These physical features support traditional rural activities such as farming, lumbering, craft making, and outdoor recreation that have been practiced for generations in the County. Homes in rural areas are either scattered at low densities or clustered together in small communities."*

This description of rural character includes features and activities that should be preserved, while also offering insights on how new development can be integrated. Concurrently, it shows how some degree of flexibility is needed to encourage the unique tapestry of uses that compose the rural landscape.

**"It will be a tremendous challenge to Chatham County to maintain its tranquil rural landscape, historic farm complexes, and agrarian lifeways into the twenty first century."**

The Architectural Heritage of Chatham County, NC. Osborn and Selden-Sturgill. 1991

# CHATHAM COUNTY HISTORY

The Piedmont region of North Carolina was settled around 1750. Quaker English, Scotch-Irish and Germans migrated from the North. The Highland Scots migrated from the South, specifically up the Deep River. Chatham County was officially created when it separated from Orange County in 1771. This split was due to unrest between the yeoman farmers and the English government. The resulting County government was seated in "Pittsborough" where the Chatham Courthouse is still located today.

The cultural heritage of Chatham County is a result of the rich United States history and is still represented today through its people, places and events. North Carolina was one of the original thirteen states, and thus, took part in the colonial fight for independence. Family farms, churches and schools served as hubs for community social life in the early years. The County experienced the trauma associated with the Civil War and took part in Reconstruction. This community also faced the hardships of The Great Depression. The memories of the two World Wars still linger. Today, the County has successfully transitioned into the Digital Age and continues to move forward into the future with the rest of the nation.

The dense and timeless history associated with the County continues to remain alive in several ways. Family stories, school classes and anniversary celebrations, such as the County bicentennial of 1971, continue to serve as conduits that pass down this history today.



BYNUM COTTON MILL, SOURCE: CHATHAM COUNTY HISTORICAL SOCIETY

19

## Land Use Trends

The majority of land in the County is currently being utilized for agriculture, which includes timber operations. Agricultural uses account for approximately 75% of the land area in the County. Protected open space is the next largest land use. Much of the 41,000 acres of open space is part of the Jordan Lake State Recreation Area, although there are also large tracts of land in conservation easements held by land trusts. There is a large disparity between existing land use trends in different areas of the County. For instance, developed areas, which include residential homes (without an associated agricultural use), commercial and industrial areas, account for approximately 10% of the land area based on county tax parcel data. In contrast, developed areas account for over 31% of the land area in the 15-501 area.

Residential growth has historically been concentrated in the northeast part of the County, although, since 2010,

there has been significant residential development west of the Haw River as part of the Chapel Ridge development and other smaller subdivisions. There have been 628 new homes within a 1/4 mile of Voluntary Agricultural Districts since 2000. These growth trends are likely to continue and could potentially lead to conflict between agriculture operations and residential growth.

## Tax Base

Chatham County's total tax base, by dollar value, is approximately 84% residential, 8% agricultural and forestry land; and 8% commercial or industrial (Chatham Co. Tax Office 2016). By comparison, adjacent counties Lee, Durham, and Wake have commercial and industrial segments of the tax base in the range of 20% to 40%. The relatively low level of non-residential tax base means that the County is more reliant on residential property owners to raise revenue for needed county services. For example, if the County decides to spend more on teachers



**Existing Land Use**

- 0.4%
- 0.5%
- 9.3%
- 7.6%
- 6.0%
- 26.8%
- 49.4%

Legend:
- Open Space
- Vacant
- Agricultural (no home)
- Agriculture (with home)
- Residential
- Commercial
- Industrial

SOURCE: CHATHAM COUNTY TAX PARCEL DATA

**Tax Base**

- 8%*
- 8%
- 84%

SOURCE: CHATHAM COUNTY TAX OFFICE

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 74 of 743

or law enforcement, or to expand services by providing a new fire station or school, the burden of funding those improvements in Chatham will largely fall on residents rather than the business community.

In addition, research studies across the nation have generally shown that while residential properties cost more for governments to serve than the tax revenue those properties generate, commercial and industrial properties tend to bring in more tax revenue than the government's cost to provide services (such as law enforcement and fire protection) to those properties. According to a 2007 study by NC State, it was estimated that commercial and industrial land uses contribute $3.01 in revenues for each dollar of public services they receive. This "net tax benefit" is also typically found with agricultural and forest land. The same study found that agricultural land uses contribute $1.72 in revenues for each dollar of services received. In contrast, residential development contributes only $0.87 for every dollar of services received.

## Geographic Diversity

Chatham County is large and diverse. The County is 708 square miles in area. It takes an hour to drive from the southwest corner to the northeast corner. Parts of western Chatham are more closely integrated with the Triad economy than the Triangle. Poultry farms are more plentiful than subdivisions in parts of the County. Land use policies must be tailored to this diversity.

## Land Use Suitability

A suitability analysis was conducted using geographic information systems (GIS) software to identify lands economically and environmentally suitable for different land use types. Suitability maps were produced for residential, industrial and commercial land use types.

The industrial and commercial suitability analyses were utilized to identify areas where non-residential, employment bearing uses would be most viable. Factors included proximity to existing compatible uses, access to adequate transportation infrastructure, proximity to utilities and environmental constraints.



**Revenue for Every Dollar of Public Services by Land Use Type**

SOURCE: 2007 COST OF SERVICES STUDY BY NC STATE



**Industrial Suitability Map**

- Low Suitability
- Medium Suitability
- High Suitability
- ☐ ETJ (Extraterritorial Jurisdiction)

FIGURE 3: INDUSTRIAL SUITABILITY MAP

21

Residential suitability was mapped to identify potential growth areas that have access to infrastructure and limited environmental conflicts.

In addition to these suitability analyses, Agricultural Suitability and Conservation Suitability was mapped. Feedback from the Agriculture Focus Group and the Agricultural Survey was used to determine Agricultural Suitability. The Conservation Suitability Analysis was utilized to identify key landscape level concentrations in natural assets. Inputs included the biodiversity and habitat suitability mapping that resulted from the Chatham County Conservation Plan.

## Land Use Preference

The results of the suitability analysis was paired with input from the public via an interactive mapping exercise at the first round of public meetings and online. This exercise allowed participants to provide input on where retail, jobs and housing should be located, where transportation problems exist and where sensitive natural features should be targeted for protection. Together these two inputs were used to inform the Future Land Use and Conservation Plan Map. See the Appendix for maps of the suitability analysis and the land use preference activity.



**Retail / Shopping Preference Map**

☐ Low
Medium
High

FIGURE 4: RETAIL/SHOPPING PREFERENCE MAP

## US 15-501

The area along US 15-501 between Bynum and the Orange County boundary was studied in detail as part of this Plan. This part of the County is more urbanized than the remainder of the County, but still includes large and medium sized tracts of undeveloped land and farms. Two of the largest planned developments in the County, Fearrington Village and Briar Chapel are located in this



FIGURE 5: EXISTING AND APPROVED COMMERCIAL CENTERS ON 15/501

(Refer to the 15-501 Market Analysis document in the Appendix for further reading.)

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 76 of 743

area. Fearrington Village, which includes residential areas and a commercial village center, was designed to resemble a traditional English village. It includes renovated farm structures and new buildings that house an inn and event venue, shops and restaurants. The frontage along 15-501 was preserved as pasture and common open space. Briar Chapel is a newer mixed use development that is located west of US 15-501 and north of Andrews Store Road. It was developed as a "Compact Community" under the Compact Communities Ordinance. Parts of the residential areas in Briar Chapel are under construction and only a portion of the non-residential part of the development is built. Both of these developments could be considered rural traditional neighborhood developments (TND) as they have a mix of housing styles, a relatively compact, walkable form, open space and amenities and some shopping and dining options that were designed as part of the development. The importance of these traditional design elements cannot be overstated.

## Approved Development

An inventory of approved development was created as part of this planning effort. In total, there is a total of 3,000 remaining dwelling units in subdivisions that have been approved in the County. The majority of these are in the Northeast. This does not include Chatham Park. In total, there is 636,000 square feet of existing non-residential uses in commercial centers along the 15-501 corridor and an additional 987,200 square feet approved and unbuilt (not including Chatham Park).

> ### COMPACT COMMUNITIES
> **See the Land Use Recommendations Section for strategies to update the Compact Communities Ordinance**

# CHATHAM PARK

Chatham Park is the most ambitious master-planned, mixed-use development in the County's history. It is proposed to unfold over the next 40 years on 7,100 acres immediately northeast and southeast of the Town of Pittsboro. Even though the development is located within the Town of Pittsboro's jurisdiction it will have impacts that transcend political boundaries. The approval of the development included entitlements to 22,000 new residential units and up to 22 million square feet of non-residential space. The latest details regarding phasing and the master planning effort can be found at http://pittsboronc.gov.

(Refer to page 134 for transportation impacts)



█ Chatham Park

FIGURE 6: CHATHAM PARK MAP

23

# HOUSING AND DEMOGRAPHIC TRENDS

New homes in Briar Chapel

**Demographic changes present both challenges and opportunities for Chatham County.**

Chatham's population is on average older, more educated, and more affluent than its neighbors and the state as a whole. The median age of residents is 45.5 compared to 37.8 for North Carolina. Over 21% of residents are over 65 years of age. 36% of residents are over 55 years of age. Over half of residents are over 45 years of age. Pittsboro is currently a certified retirement community (Retire NC) but this is set to expire. Many planned developments in the County jurisdiction are attractive to retirees. The UNC Gillings School of Global Public Health has proposed a Capstone project: a "Comprehensive Plan for Aging in Chatham." Results of this work are intended to supplement the information and strategies presented in Plan Chatham.



| 0-4 | 5-19 | 20-64 | 65+ |
|-----|------|-------|-----|
| 3,625 | 11,370 | 37,075 | 13,980 |
| 5.5% | 17.2% | 56.1% | 21.1% |

SOURCE: US CENSUS BUREAU ACS DATA

There are significant demographic differences across the County. The average age of the population in the census tracts around Siler City is under 40, while the average age of many census tracts in the northeast part of the County is over 56.

## Preferences

The senior population is likely to increase in the coming years, due to the youngest of the baby boomers reaching their older years. Research has shown that Millennials and Boomers have a stronger preference for lower maintenance yards and smaller housing types than other age groups. Making accommodations for the housing preferences of these two age groups by providing opportunities for well-located housing products, such as cottage, patio homes, townhomes and condos, may help Chatham appeal to a broader demographic.

## Housing Mix

There were 29,322 housing units in Chatham County as of 2014. The number of housing units grew by 7,395 between 2000 and 2014 (an increase of 37%).

The majority of housing is single family detached product (75%). Mobile homes are the second most prevalent housing type (14%) and serve as the primary type of affordable housing in many parts of the County. As land prices rise, especially in the Northeast part of the County, many mobile home parks may be redeveloped, which will further exacerbate the affordable housing issue in that part of the County.

## Affordability

Traditional measures of housing affordability ignore transportation costs. Typically a household's second-largest expenditure, transportation costs are largely a function of the characteristics of the household's neighborhood. Factoring in both housing and transportation costs provides a more comprehensive way of thinking about the cost of housing and true affordability. Chatham residents spend 28% of their income on transportation compared to 22% for residents of Durham.

The median home sale price for Chatham County over the past 12 months was $260,500, which is a 7.7% increase over the past year (ESRI, Zillow). An income of >$62,600 is necessary for a mortgage of the average new home to be considered affordable (<30% of monthly income). Police officers, teachers, social workers and other professionals have incomes significantly below this threshold and need access to more affordable for-sale and rental housing.



**22,027**
SINGLE FAMILY UNITS



**1,307**
TOWNHOMES



**1,870**
APARTMENT
& DUPLEX UNITS



**4,118**
MOBILE
HOMES

SOURCE: US CENSUS BUREAU ACS DATA

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 79 of 743



Farm near Silk Hope in Western Chatham County

# AGRICULTURE

**Annual agricultural and forestry sales in Chatham County exceed $246 million (Chatham County Agricultural Economic Development Plan, 2009).**

Approximately 63,500 acres of farmland has been lost in the Triangle Region since 1997 (CTNC Farms for Food Report).  Agriculture in Chatham County has fared better than some counties in the Triangle, buoyed by a strong commodity production sector and a steady growth in small and specialty farms. The number of farms in the County has actually increased slightly every agricultural census since 1992 (in 2007, there were 1,089 farms and in 2012, there were 1,138 farms). Acreage in farms has remained more or less steady since 1987 (112,674 acres in 1987 and 111,778 acres in 2012).

## Support for Agriculture

The County has a long history of supporting Agriculture. Significant recent achievements include:
- The 2009 Farmland Preservation Plan
- Successful farmers' markets
- Expanding Community Supported Agricultural (CSA) operations
- Voluntary Agricultural Districts (26,000+ acres)
- Agricultural Extension programs and staff
  - Agricultural Extension classes draw participants from across the state
  - County officials provided support for staffing during state funding crisis
- Chatham County Agricultural & Conference Center
  - Funded in 2012, open in 2017

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 80 of 743

**Number of Farms**



| 1987 | 1992 | 1997 | 2002 | 2007 | 2012 |
| --- | --- | --- | --- | --- | --- |

961   926   956   1,089   1,138

SOURCE: USDA CENSUS OF AGRICULTURE

## Assets

Chatham County is one of the few counties in the state with increasing agricultural land (USDA Census of Agriculture, 2012). The majority of land in the County is considered "prime farmland" or "farmland of statewide importance" by the Natural Resource Conservation Service (NRCS). Approximately 68% of the County is covered in forests (USDA Cropscape Data, 2015). Farm and timber product sales place Chatham 29th highest and 16th highest, respectively, of North Carolina's 100 counties. Leading farm products are livestock, hay, dairy, and poultry.

In addition to traditional agriculture, small-scale specialty, niche and organic farms are increasingly important. Forty-seven percent of Chatham farms contain less than 50 acres. Demand for local food is increasing within the County and the region. There are four farmers markets in the County [Chatham Mills [Pittsboro], Pittsboro Farmers Market [Main Street Station in Pittsboro], Fearrington Farmers Market, and Siler City Farmers Market]. There is an occasional farmers market in Goldston, although, it does not occur every year. There are also two winter markets that are held periodically. In addition, many Chatham farmers travel to farmers markets in adjacent counties.



FIGURE 7: CHATHAM COUNTY AGRICULTURAL & CONFERENCE CENTER EXHIBIT HALL

27

The creation of value-added timber and agricultural products, including food processing, holds promise in Chatham. In addition to existing sawmills, Mountaire Farms' reopening of a poultry processing facility in Siler City is an example of this on a larger scale. On a smaller scale, the region is experiencing greater demand for locally-derived products made from organic vegetables, meat, and honey. The trend of increasing population in Chatham and surrounding counties will likely provide additional opportunities for selling Chatham-made products locally.

Despite encouraging signs of growth in the agricultural economy, and an abundance of assets, there is cause for concern. Many farm owners must work outside of the farm to generate additional income. Fifty-five percent of Chatham farm operators list another occupation as their primary job (National Agricultural Statistics Service, NC Cooperative Extension). There is concern over the longevity of farming in the County. The average age of principal operators for farms in the County is 58.6 (2012 Census of Agriculture). Land fragmentation from dispersed, low-density residential growth has led to increased property values, traffic and concerns over groundwater availability.

In the fall of 2016, an Agricultural Survey was conducted that solicited feedback from farmers and representatives from the agricultural industry, which was used to inform the development of Plan Chatham. Key findings from the survey include:

- Residential growth and associated impacts ranked as #1 threat to agriculture
- Limited surrounding residential development ranked as the #1 factor contributing to the long-term viability of farms
- Many types of non-farm businesses were identified as being compatible with and/or supportive of farming

directly or indirectly. These businesses include:
- Agritourism (including event venues, B&Bs)
- Food industry/Grocery/Restaurants
- Processing facilities (food and forestry)
- Farm and feed suppliers
- Stockyards
- Welding, Machining, Engine Repair
- Opinions vary on what the County should be doing to support agriculture, but the four ideas with the most support are:
  - Consider impact on agriculture and forestry of new ordinances
  - More education and outreach to farmers— and to non-farmers (about benefits of farms (ecological and economic)
  - Designate areas of important agricultural lands and/or concentrations of working farms on a future land use map and direct development away from these areas
  - Zoning modifications, including an agricultural zoning district to reduce residential growth and/ or more flexibility in current zoning for non-residential uses that indirectly support agriculture.

Chatham farmers and other residents frequently mention a desire to protect farmland and timberland from incompatible uses nearby. They also mention the desire to maintain the ability of farmers and rural residents to have farm-related small businesses and home occupations, to provide additional income.

Understanding how to preserve the form, function and lifestyle of the County is a central goal of the Plan. Recommendations on how to protect the viability of agricultural and forestry operations, while addressing needs and accommodating future development, are included in the Land Use and Agricultural elements of the Plan.

# FARMERS' CONCERNS

The Plan Chatham Agricultural Survey asked farmers about their concerns. Specifically the question was asked, **"What is it about your farming future that keeps you up at night?"** Here is what we heard:

- Residential Growth & Conflicts

  *"Developments that encroach near farms that drive land prices up and take away from land that can be used to further expand farms. It is hard to compete with a developer when you are trying to buy land to farm and they have investors that want to build houses. Biggest fear to me is that I will be limited to space and my surroundings are developments. This can be seen if you go just into Wake County…"*

- Land Costs and Infrastructure

  *"The rising costs of land and the availability of agricultural land for prospective farmers. The lack of infrastructure for mid-scale production on farms including small dairies and other livestock operations that the county is well suited for."*

- Support for and Understanding of Local Agriculture

  *"We live in a society that has little to zero respect for farmers. People believe that food magically appears in the grocery store."*

- Strict Regulations and Sustainability

  *"With continuing regulations and restrictions that small farmers will be forced to sell out due to the financial burdens created. Some say this regulations are required to prevent damage to the surrounding environment but farming is 100% dependent on the environment. So by not taking care of your environment to promote your positive farming operation you are destroying the very thing you worked so hard to build."*

29



# INFRASTRUCTURE

**Chatham County is a primarily rural county that is increasingly feeling growth pressures. Growth is expected to continue, as are increasing demands on infrastructure.**

Chatham County is one of the fastest growing counties in North Carolina, growing 28% between 2000 and 2010. Development pressure is primarily being felt in the eastern part of the county, where growth in the Triangle is leading to new housing and commercial development. The growth pressures in the northeastern portion of the County and commute patterns were a precipitating factor in the US 15-501 Corridor Study. This study examined future traffic conditions along US 15-501 between Pittsboro and Chapel Hill, as well as past utility infrastructure planning efforts, such as the Triangle Regional Water Supply Plan, which identified potential future allocations of drinking water for local governments surrounding Jordan Lake.



CHATHAM'S COMMUTE

**27.1 MINUTES**
AVERAGE WORK COMMUTE

**5.4%**
PERCENT OF HOUSEHOLDS WITHOUT ACCESS TO A VEHICLE

**76%**
OF WORKERS DRIVE ALONE

**11%**
CARPOOL

**8%**
WORK AT HOME

**1%**
TRANSIT

**4%**
OTHER

**8,923** COMMUTING IN

**5,016** LIVING AND WORKING IN CHATHAM

**20,985** COMMUTING OUT

*SOURCE: CENSUS ACS DATA

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 84 of 743

The portions of the County that are further from the more urbanized Wake, Durham, and Orange Counties remain more rural. These parts of the County have active agricultural operations and some significant industrial uses. Chatham County's infrastructure network must meet the different needs and demands of different parts of the County. The western portion of the County is typically more focused on maintaining high quality principal roadways and good vehicular levels of service. Parts of the eastern part of the County, and particularly areas around Pittsboro and along US 15-501, are riper for more urban amenities, such as sidewalks and various types of bike facilities. The differences in residents' needs and preferences in the rural, suburban, and urban parts of the County are and will continue to be important drivers of transportation infrastructure and policy in Chatham County. As part of the development of Plan Chatham, a Transportation Existing Conditions Report was produced that detailed recent plans as well as pressing roadway, safety, transit, freight, rail, and bicycle and pedestrian issues. This document can be viewed in the Appendix. The key challenges for Chatham County in the future will be:

- Balancing the different needs in the rural, suburban, and urban parts of the County
- Preserving vehicular, freight, and farm equipment capacity and mobility as growth occurs
- Providing context-appropriate pedestrian and bicycle accommodations
- Maintaining roads and modernizing roadway designs on some outdated rural cross sections
- Strategizing for future transit growth in urbanized areas and areas of high demand
- Balancing mobility needs and environmental concerns
- Providing safe and affordable transit for an aging population.

## Transportation Priorities

Based on feedback received during the planning process, the priorities for residents are to include:

- Improving transit service to Chapel Hill, Durham, RTP and Raleigh
- Constructing sidewalks and greenways near Centers
- Providing on-road bike lanes or wide shoulders for bicyclists
- Spotting safety improvements on rural roads

## Utility Needs

The primary water source for the County is Jordan Lake, although interconnects with nearby cities augment the supply. Lack of access to public sewer has kept the density of new residential growth relatively low, which has helped to preserve the rural character of the County. Limited access to sewer has also been a barrier for industry. Allowance for private wastewater systems have allowed the creation of compact communities along the 15-501 corridor. It is likely that distributed private and public systems will be needed to meet environmental and economic goals. Access to reliable, high-speed internet throughout the County is another important utility need.

### Water and Sewer Usage and Capacity



WATER

**3 MGD**

CURRENT WATER TREATMENT CAPACITY

CHATHAM COUNTY WATER PLANT FOR NORTH WATER DISTRICT

**PURCHASE WATER**

FROM SANFORD AND SILER CITY FOR ASBURY AND SOUTHWEST SYSTEMS

AGREEMENT WITH CITY OF DURHAM FOR UP TO 4 MGD

**6 MGD**

COUNTY ALLOCATION FROM JORDAN LAKE

REQUESTED EXPANSION OF THIS TO 12 MGD AND 18 MGD-AWAITING APPROVAL



SEWER

**BYNUM**

WASTEWATER TREATMENT PLANT ONLY COUNTY OWNED FACILITY

**4 MGD**

CURRENT CAPACITY OF SILER CITY WWTP

**1.25 MGD**

PERMITTED CAPACITY AT PITTSBORO WWTP

ADDITIONAL DISCHARGE PERMIT FOR 1.6 MGD ON HAW RIVER

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 85 of 743



Rock garden on the Haw River south of US 64

# ENVIRONMENT

## Chatham County is part of the "green heart" of NC, a stretch of forest and farmlands that stretch from Raleigh to Charlotte.

Pockets of development are growing, but the County is mostly rural and still has many high quality, intact natural resources. Sixty-eight percent of the County is covered in forests. The County is home to Jordan Lake State Recreation Area and three rivers (the Haw, Deep and Rocky) that provide recreational and tourism opportunities, aquatic habitat for rare and non-rare fauna, and clean water for county residents and communities downstream.

## Water Quality

Over half a million people rely on Jordan Lake and the Cape Fear River for drinking water downstream. Many county residents also rely on municipal and county water drawn from the Rocky River, Haw River or Jordan Lake.

### Natural Resource Stats


**55,000 ACRES** — ACRES OF PUBLIC LAND AND CONSERVATION AREAS


**49 SPECIES** — RARE, THREATENED AND ENDANGERED SPECIES CALL CHATHAM HOME


**52** — DESIGNATED NATURAL HERITAGE NATURAL AREAS IN THE COUNTY


**14.6 MILES** — MILES OF SCENIC PADDLING ON THE HAW RIVER

Case 1:25-cv-00113-UA-JLW   Document 1   Filed 02/14/25   Page 86 of 743

Protecting water quality was identified as a shared goal and driving force behind land use, natural resources and agricultural recommendations.

The health of the County's waterways has long been threatened. Municipal and industrial wastewater polluted many of Chatham County's waterways until the Federal Clean Water Act of 1972 began to improve water quality. Non-point source pollution from stormwater runoff and sedimentation from construction activities is a relatively new threat. The County has a Watershed Protection Ordinance in place that limits impervious surface coverage and requires riparian buffers in all watersheds within the County's jurisdiction. Currently there are 13 water bodies considered impaired in Chatham County (2014 303(d) List). There is also a growing concern over groundwater availability in agricultural areas and the potential impact of coal ash storage and potential hydraulic fracturing on water quality.

## Unique Assets

Chatham County's forests and streams are home to at least 49 rare, threatened or endangered species. The Rocky River drainage is the last stronghold for the endangered Cape Fear Shiner. 52 designated Natural Heritage Natural Areas (NHNAs) are located in the County. The majority of these are located on private land. Growth pressure and associated land conversion are a primary threat to these sensitive natural areas.

## Tourism

Recreational tourism is growing in the County. Rural character, scenic beauty, protected areas with hiking and wildlife viewing opportunities are a draw. Quaint bed and breakfasts as well as popular event venues bring visitors to the County. More than 1.6 million people visited Jordan Lake State Recreation Area in 2015. The Haw River corridor is growing in popularity as a canoeing and kayaking destination. Protecting the resources that draw people



FIGURE 8: EXISTING LAND COVER (2015 USDA CROPSCAPE DATA)

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 87 of 743

to the County, as well as providing accommodations and building capacity to market, are essential to capitalize on the potential economic impact of tourism.

## Emerging Issues

Emerging environmental issues include the challenges, many of which are man-made, that threaten the preservation of our ecosystems, health, economy, and quality of life. Minimizing, mitigating and adapting to impacts of climate change are a part of creating a more resilient community. Limiting emissions from the transportation sector, through promotion of a compact urban form and the provision of transportation options, was identified as an important issue early in the planning

> "Converting 10 percent of the watershed from forest cover to developed area increases chemical treatment costs by 8.7 percent, which would be an annual increase of over $65,000 for the typical treatment plant."
>
> -AWWA's Source Water Protection Committee



FIGURE 9: PERCENT FORESTED BY WATERSHED (2015 USDA CROPSCAPE DATA)

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 88 of 743

process. Identifying ways to encourage energy and water efficiency, carbon sequestration and the mitigation of impacts from a warmer, wetter future were also identified as emerging issues.

There is a growing recognition of the financial, ecological and health benefits natural systems provide. Land conservation organizations, state agencies, and the Chatham County Parks and Recreation Department have preserved thousands of acres in the County as parks or as part of conservation easements. Moving forward, it is important to continue conservation efforts. Also, it is increasingly evident that the County and its partners need to work with private parties to ensure that new development is designed in a way to preserve the highest quality natural assets on sites, and employ Low Impact Development (LID) and Green Stormwater Infrastructure (GSI) techniques, in order to mitigate impacts of growth. Natural gas exploration and extraction via hydraulic fracturing is also an emerging issue. Although the extent of the geologic formations where natural gas is likely is limited in the County, potential environmental impacts

have led the County to place a temporary moratorium on oil and gas development activities. This is to remain the case until a study is completed to assess potential impacts and determine if modifications to local regulations are needed. Refer to the Natural Gas Impacts Study, a parallel effort currently underway.

## Open Space

Open space is part of Chatham County's brand. The farms and forests that line rural roads contribute to the lifestyle that residents value. Managing some natural resources, such as soil and timber, for sustainable use, while continuing to conserve irreplaceable natural communities and scenic assets, will be an essential part of preserving the character of Chatham County. A proactive approach is needed to protect a connected system of open space for future generations.



FIGURE 10: LOW IMPACT DEVELOPMENT TECHNIQUES

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 89 of 743



Cape Fear River Trail, Fayetteville, NC (Source: Wikimedia Commons)

# PARKS AND HEALTH

## Access to parks, healthy food, and healthcare are key determinants of quality of life and wellness.

### Parks

Chatham County has a large amount of public land due to the presence of the Jordan Lake State Recreation Area. Significant progress has been made to acquire and develop land for district parks since the 2009 Parks and Recreation Master Plan. However, access to parks and recreation opportunities remains an issue. Only 17% of residences are located within a half mile of a trail or park. There is a need to create a better connection between neighborhoods and recreational destinations. This is needed to satisfy the demand for greenways and a variety of park types, such as smaller parks, playgrounds and nature preserves. An improved system of parks can lead to improved health outcomes and can be an asset to economic development efforts.



**KEY STATS**

**55,500 ACRES**
OF PUBLIC LAND AND CONSERVATION AREAS*
*INCLUDES JORDAN LAKE

**435**
ACRES OF COUNTY PARK LAND

**1476.3**
ACRES OF
GOLF COURSES

**GREENWAYS AND MULTI-USE PATHS**

**6.67 MILES**
OF GREENWAYS
COMPLETE

**26.5 MILES**
OF NATURAL
SURFACE TRAILS

**107 MILES**
OF GREENWAYS AND
TRAILS PLANNED

SOURCE: CHATHAM COUNTY / US CENSUS BUREAU

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 90 of 743

## Access to Healthy Food

According to a study conducted during the Plan, a surprising 29% of Chatham households do not have access to healthy food. This statistic is derived from analyzing areas farther than two miles from a store with a food vendor score of 2, 4 or 5. The following is a list of food vendors scores shown in the map below.

- 0    No MyPlate*, No fresh fruits/vegetables
- 1    No MyPlate*, < 5 fresh fruits/vegetables
- 2    No MyPlate*, ≥ 5 fresh fruits/vegetables
- 3    MyPlate*, No fresh fruits/vegetables
- 4    MyPlate*, < 5 fresh fruits/vegetables
- 5    MyPlate*, ≥ 5 fresh fruits/vegetables

*Stores that meet the MyPlate criteria have one food item from all four food groups available (fruits/veggies, grains, lean protein and dairy).

## "26% of adults in Chatham County are obese"

-2014 Community Health Assessment, Chatham County, NC

## Healthcare

Obesity, access to mental health services and access to healthcare are priorities identified in the 2014 Community Health Assessment. Promoting a healthy environment, physical activity, and improved access to health services are part of a Health in All Policies (HiAP) approach, which is advocated in this plan.



FIGURE 11: 2016 FOOD VENDOR SURVEY RESULTS.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 91 of 743



Plan Chatham

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 2/14/25    Page 92 of 743

# PLAN CHATHAM
## VISION



Plan Chatham envisions a future where a network of agricultural fields, pasture, timberlands, rural homesteads, and natural areas still dominate the County. The Haw, Rocky, and Deep rivers and their tributaries provide good water quality and aquatic habitat. Vibrant towns, walkable centers and clean industries provide jobs for residents. Shopping and dining options exceed expectations. Agriculture is thriving. The form and function of rural character is preserved. Tourism contributes significantly to the economy and is buoyed by a connected network of trails, conservation lands and open spaces--many publicly owned and accessible, others are privately owned and are sensitively integrated into new development through innovative design that achieves environmental goals while protecting private property rights. Education and housing options fulfill the needs of an evolving county, and infrastructure and services are scaled to meet demands while reinforcing land use and economic goals.

The following section outlines goals for the Plan, objectives meant to keep track of progress and a framework of policies and strategies that will help achieve this vision.



Above: The Haw River running low and clear on an Autumn day
Image Source for previous page: Debbie Roos, Chatham County Cooperative Extension

# GOALS

The vision is supported by a set of interrelated goals that served as guideposts in the development of the plan. Going forward, the goals provide direction for County leaders as they make decisions about future development, conservation, and related investments over the next two decades. The matrix below shows the relationship of the goals to the 10 plan elements, indicating that achievement of a goal ensures progress on two or more plan elements.

| GOAL | ECONOMIC DEVELOPMENT | LAND USE | HOUSING | HEALTH | AGRICULTURE | NATURAL RESOURCES | RESILIENCY | PARKS AND RECREATION | TRANSPORTATION | UTILITIES |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Preserve the rural character and lifestyle of Chatham County. | | ● | ● | | ● | ● | | ● | | ● |
| 2. Preserve, protect, and enable agriculture and forestry. | ● | ● | | ● | ● | ● | | | | ● |
| 3. Promote a compact growth pattern by developing in and near existing towns, communities, and in designated, well planned, walkable, mixed use centers. | ● | ● | ● | ● | ● | ● | ● | | ● | ● |
| 4. Diversify the tax base and generate more quality, in-county jobs to reduce dependence on residential property taxes, create economic opportunity and reduce out-commuting. | ● | ● | | ● | ● | | ● | | ● | |
| 5. Conserve natural resources. | | | | ● | ● | ● | ● | ● | | ● |
| 6. Provide recreational opportunities and access to open space. | ● | ● | | ● | | ● | | ● | ● | |
| 7. Provide infrastructure to support desired development and support economic and environmental objectives. | ● | ● | | | ● | ● | | | ● | ● |
| 8. Become more resilient by mitigating, responding and adapting to emerging threats. | | ● | | ● | | ● | ● | ● | ● | ● |
| 9. Provide equitable access to high-quality education, housing and community options for all. | ● | | ● | ● | ● | | | | | |
| 10. Foster a healthy community. | ● | ● | ● | ● | ● | ● | ● | ● | ● | ● |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 94 of 743

# OBJECTIVES

The development of the Plan goals was followed by an activity to identify key objectives for each goal. These objectives were used to produce the policy recommendations in the following sections. Metrics are listed for each goal in order to guide future efforts to track progress related to the goals.

## 1. Preserve the rural character and lifestyle of Chatham County.

- Preserve and restore cultural and historic resources that contribute to the identity of the County.
- Preserve farms and "lifestyle" in the western part of the County as well as forests and open space in the eastern part of the County.
- Leverage assets to promote entrepreneurship, arts, culture and tourism.
- Potential Metrics:
  - Acreage in farms and forestry.
  - Number of farms and forestry.
  - Number of small businesses.
  - Number of telecommuters.
  - Economic impact of tourism.
  - Number of historic structures lost or saved.
  - Acreage and Conservation.

## 2. Preserve, protect, and enable agriculture and forestry.

- Maintain the number and diversity of farms and forestry operations.
- Support existing and expanded agriculture, forestry, and horticultural operations, including value-added production.
- Reduce encroachment on or development pressure on agriculture, including forestry.
- Avoid conflicts between agriculture and residential development over water availability.
- Potential Metrics:
  - Acreage in farms and forestry.
  - Number of farms and forestry.
  - Agricultural production (crops, livestock, forestry and horticulture).
  - Average age of farmers.
  - Local food sales.

## 3. Promote a compact growth pattern by developing in and near existing towns, communities, and in designated, well planned, walkable, mixed use centers.

- Reduce impacts to natural resources and systems.
- Lessen infrastructure burden and long-term cost of providing services.
- Reinforce towns as residential and commercial centers of the County.
- Strive to locate 70% of new development within ETJs or designated County centers.
- Potential metric: Percentage of new development within ETJs or designated County centers.

## 4. Diversify the tax base and generate more high-quality, in-county jobs to reduce dependence on residential property taxes, create economic opportunity and reduce out-commuting.

- Increase non-residential share of the tax base.
- Increase high-quality, in-county jobs.
- Strengthen support for existing businesses, including small and medium-sized firms.
- Improve workforce development system by strengthening connections between the business community, Chatham EDC, Chatham County Schools, Triangle South Workforce Development Board and Central Carolina Community College.
- Potential Metrics:
  - Non-residential tax base (as percentage of total).
  - Number of new living wage jobs.
  - Number of work experiences (internships, apprenticeships, job shadowing) undertaken

41

# OBJECTIVES

by students in Chatham County Schools.
- Number of small businesses.
- Percentage of out-commuting residents.

## 5. Conserve natural resources.
- Maintain and restore the quality and quantity of groundwater and surface water resources.
- Preserve and protect the ecosystem services provided by green infrastructure.
- Avoid or minimize landscape fragmentation.
- Preserve night skies by minimizing light pollution.
- Potential Metrics:
    - Acres of protected land (public and private).
    - Number of acres of conservation land or forested land cover along rivers and streams.
    - Stream miles considered impaired.
    - Water quality in rivers and Jordan Lake.
    - Percent tree canopy in the county or in threatened watersheds.

## 6. Provide recreational opportunities and access to open space.
- Provide expanded recreation opportunities and improve access to parks, community facilities, trails and open space.
- Potential Metrics:
    - Percentage of population with access to parks and trails.
    - Recreational opportunities (# of facilities, programs) and participation (usage).
    - Park acreage.

## 7. Provide infrastructure to support desired development and support economic and environmental objectives.
- Focus the development of utilities and urban services to foster compact development and support economic development in defined areas.
- Create a multi-modal transportation system that is well-maintained, age-friendly, and context-appropriate.
- High-speed internet/broadband should be available to all to and enable education and entrepreneurship.
- Potential Metrics:
    - Number of new residential wells vs. public water system customers.
    - Groundwater usage statistics from residential development.
    - Number and location of failing wells and septic tanks.
    - Number of new septic tanks, private wastewater systems and public sewer customers.
    - Transit ridership.
    - Transportation mode for work and non-work based trips.
    - Percentage of homes and businesses with internet available.

# OBJECTIVES

## 8. Become more resilient by mitigating, responding and adapting to emerging threats.

- Improve emergency response and limit risk associated with natural and man-made disasters (drought, floods, energy costs and availability, etc.).
- Become/remain a carbon negative county.
- Encourage resource efficient building standards.
- Increase awareness through outreach and provision of information.
- Improve and increase food waste and recycling systems.
- Potential Metrics:
  - Structures at risk for flooding and/or wildfire.
  - Carbon emissions vs. carbon sequestration (carbon balance).
  - Vehicle miles traveled.
  - Number of electric vehicles (or charging stations).
  - Acreage of forest and woodlands.
  - Alternative energy produced.

## 9. Provide equitable access to high-quality education, housing and community options for all.

- Increase high school graduation rate (current rate is 87.3 (2015 NC BOE)).
- Increase number of post secondary degrees (career and technical school, university, etc.).
- Provide a diversity of educational options (public, private, STEM, magnet) and support services.
- Provide housing and community options (types, locations and prices) for all ages and incomes.
- Potential Metrics:
  - Graduation rates.
  - Income level.
  - Number of affordable housing units by type.

- Competitive salaries for teachers.
- High school participation in Central Carolina works program.

## 10. Foster a healthy community.

- Assure access to health care for all county residents
- Improve access to healthy food
- Support active lifestyles (walking and biking as transportation options)
- Potential Metrics:
  - Obesity rates.
  - Death rates from chronic diseases.
  - Longevity.
  - Access to healthy food.
  - Biking and walking trends.
  - Other health metrics, as appropriate.



New Elam Christian Church

# FUTURE LAND USE AND CONSERVATION PLAN

The Land Use and Conservation Plan is a map, graphically depicting the community's vision for the future of Chatham County. It is aspirational, and it reflects the community's goals and objectives stated earlier in this plan. The map indicates the preferred locations for future development, as well as the type and intensity of such development. More importantly, it indicates areas that are valued for their natural and cultural assets, and should therefore be the subject of future conservation efforts. The map is meant to provide a framework for future land use, and as such, serve as a companion to written policies and provide additional guidance with respect to the provision of County services, capital investments, and land development regulations.

## MAJOR RECOMMENDATIONS

*Concentrate future growth in compact, walkable development, located in municipalities as well as existing and planned growth areas.*

*Increase employment opportunities within the County.*

*Support context-sensitive design that preserves rural and small town character.*

*Bring open space in its many forms to the forefront of development.*

*Preserve concentrations and connections of green infrastructure.*

*Promote agriculture as a key component of the local economy.*

*Provide flexibility for rural businesses.*

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 98 of 743



FIGURE 12: FUTURE LAND USE AND CONSERVATION PLAN MAP

*Note: This map is a guide showing the intended future land use pattern using various land use areas. Land use areas (or 'place types') differ from zoning districts in that they generally define the community's expectations. Each can be translated into one or more zoning districts; however, only the provisions of the zoning ordinance are enforceable. Though each land use areas is geographically delineated on the map, strict adherence to the Land Use and Conservation Plan in making land use decisions is not recommended. Instead, when making decisions about specific sites or contemplating new initiatives, decision makers are encouraged to use the map as a guide while taking into account economic, environmental, and social factors. Zoning parcels in a manner that is consistent with the Land Use and Conservation Plan is one of the most effective ways of implementing Plan Chatham and realizing the vision. See the Appendix for a large version of the Future Land Use and Conservation Map. Areas in municipalities are not fully represented. See town of Pittsboro, Town of Siler City and Town of Goldston Land Use Plans for more details.*

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 99 of 743

## SMALL TOWNS, RURAL CHARACTER, JOBS AND GROWTH MANAGEMENT
### public feedback

During the summer of 2016 an online survey was conducted that received over 1,600 responses. Respondents overwhelmingly agreed that what they liked about Chatham County included the small town feel of communities and the rural character enjoyed in different ways throughout the County.

When asked "What is your vision for Chatham County 15 years from now?" The top four responses included:

- Preserving rural character (which included mentions of farming, lifestyle, quality of life)
- Managing growth and focusing on quality growth near towns and centers
- Creating jobs and economic opportunity throughout the County
- Preservation of the natural environment and agriculture



Downtown Siler City

# CHATHAM FUTURE LAND USE DESCRIPTIONS

Various land use areas are delineated on the Land Use and Conservation Plan. They are an expression of the types of places that are expected to define the County 20 years from now, and together they illustrate this vision. Each land use area (or 'place type') is characterized by the range of uses—existing and envisioned—as well as the scale of development, amenities incorporated, and infrastructure. A description of each place type is provided on the pages that follow. With more specific information than the map alone can offer, these descriptions enhance the utility of the map as a tool for decision making.

## TOWN CENTER

- The heart of the municipalities, these are the established centers of commerce in the County.
- Mix of uses include civic and governmental, retail, restaurants, services, office, institutional, and higher density residential (4DUA+) uses
- Buildings: 2- to 4-story buildings are common
- Streets: Grid or modified grid pattern, block lengths are 600 feet or less
- Public/open space: Small formal greens, small parks, grounds of civic buildings, urban greenways
- Locations:
    - Siler City, Pittsboro and Goldston

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 100 of 743

## EMPLOYMENT CENTER

- These centers are targeted for future job-generating uses in settings that meet today's workplace expectations.
- Mix of uses include industrial, office, and supporting retail, restaurant, service, recreation, and other uses.
- Streets: Arterial, collector and local streets and private drives for local and regional accessibility
- Public/open space: Parks, trails, natural areas, enhanced storm-water management.
- Locations:
    - CAM Megasite
    - Moncure Megasite Area
    - 751 Employment Center
    - 3M Property near 15-501 South
    - US 421 Interchange area near Goldston

## COMMUNITY CENTER

- Retail hubs located along key roadway corridors, these centers accommodate regional retail tenants complemented by local-serving commercial development.
- Allow flexibility to provide a variation and mix of centers at quadrant intersections.
- Mix of uses include retail, restaurants, services, and office uses (+/-125-400K SF commercial).
- Residential uses can include as much as 60% of land area and can include single family homes, patio/cottage homes and attached units.
- Buildings: 2+ stories (or comparable) are common
- Streets: A network of local streets + private drives with few access points to adjacent arterials and collectors
- Public/open space: Plazas, greens, enhanced stormwater management.
- Locations:
    - Briar Chapel Commercial Area (Planned): Intersection of Andrews Store Rd and 15-501
    - Chatham Downs, Polk Center, and Williams Corner: Intersection of Lystra Rd and 15-501

## NEIGHBORHOOD CENTER

- Grocery-anchored center with complementary retail and service uses, small restaurant.
- Mix of uses include grocery-anchored retail with some restaurants, services, and office uses (+/-30-125K SF commercial)
- Residential uses can include as much as 60% of land area and can include single family homes, patio/cottage homes and attached units.
- Buildings: Mostly 1- and 2-story, some 3 story
- Streets: Private drives functioning as local streets, internal connections to adjacent properties to lessen impact on local roads
- Public/open space: small usable green spaces and courtyards associated with buildings, enhanced storm-water management.
- Locations:
    - North Chatham Village / Chatham Crossing
    - Walmart on 15/501

## COMPACT RESIDENTIAL

- Mix of detached and attached residential units complemented by a variety of open spaces. Mix of uses include single family detached and attached units and some multifamily units. Community centers, amenities, recreational uses, schools, and churches may be part of the fabric.
- Buildings: Mostly 1- and 2-story, some 3 story
- Streets: connected system of local and collector streets with access to surrounding development
- Public/open space: Range of types (from large natural resource areas to small pocket parks and gardens)
- Locations:
    - Current extent of Compact Communities Ordinance within 1 mile of community centers (transit potential)
    - Wastewater service (private or proposed public)
    - In close proximity to Employment Centers, but not in conflict with industrial operations
    - In areas not in conflict with high value natural resources

47

## VILLAGES

- These historic centers and newer pedestrian scale villages accommodate small-scale, local-serving retail, office, institutional, and service uses, restaurants, and some residential.
- Mix of uses include retail, restaurants, services, and office uses clustered near a village center (typically consisting of smaller commercial footprints than other centers (>30K SF), although can be more if appropriately designed). The total non-residential footprint in a Village Center is typically < 60K SF.
- Light Industrial uses, with minimal impact on surrounding residential developments are appropriate if appropriately designed.
- Residential uses are designed in a context sensitive manner, in keeping with historic development patterns, which may include smaller lot sizes and setbacks than typically rural and suburban development. Attached product may be appropriate if designed to mimic traditional single family homes in the area.
- Buildings: Mostly 1- and 2-story, some 3 story
- Streets: Typically served by a network of local streets and private drives
- Public/open space: small formal greens, small parks, courtyards, greenways and walking paths, preserved viewsheds
- Locations:
  - Historic: Bynum, Moncure, Bennett, Bonlee, Silk Hope
  - New / Potential: Fearrington Village

## CROSSROAD COMMUNITY

- Smaller than villages, these communities are within rural areas and typically have a minimal amount of retail and institutional uses.
- Mix of uses include single-family residential, some agriculture support services, limited supporting retail, and institutional uses.
- Residential uses are designed in a context sensitive manner, in keeping with historic development



Historic house & store near Merry Oaks

patterns, which may include smaller lot sizes and setbacks than typically rural and suburban development.
- Buildings: 1- and 2-story, more for farm buildings
- Streets: rural two-lane ("farm-to-market") roads
- Public/open space: informal greens at centers, regional greenway trails
- Locations:
  - Haywood, Brickhaven, Corinth, Griffins Crossroads, Wilsonville, Bear Creek, Harper's Crossroads

## RURAL

- Low density development is comprised of single family homes on large lots or in conservation subdivisions as well as some commercial buildings designed to protect function and form of rural character. Pastures, farms and forests dominate the landscape.
- Mix of uses include agriculture, large lot residential, supporting service uses, and home-based & small scale businesses
- Buildings: 1- and 2-story, more for farm buildings
- Streets: rural two-lane ("farm-to-market") roads
- Public open space: conservation easements, protected lands, regional greenway trails, preservation sites (historic and cultural), private space in large lots (POA/HOA)
- Locations:
  - Outside of Centers and Compact Residential
  - Residential areas

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 102 of 743



## CONSERVATION

- The natural features are the primary elements of these areas. Development, which is predominantly residential, is sensitively integrated into the landscape.
- Mix of uses include single family detached lots and attached units with overall very low density, some tourism related uses allowed. Conservation subdivisions are encouraged in order to protect natural resources while not disrupting agricultural practices.
- Buildings: 1 and 2 stories in height
- Streets: Limited (sufficient to connect homes within and provide access per fire code), and low impact development (LID) design
- Public/open space: Passive recreation areas, greenway trails, variety of valuable natural resource areas
- Locations:
    - Haw River Corridor, Rocky River Corridor, Big Woods Natural Heritage Natural Area

## AGRICULTURE

- The location of large-scale working farms and timberlands, this area is comprised of intensive, highly productive operations.
- Mix of uses include large-scale agriculture, related processing facilities, supporting commercial and service uses, single family homes
- Buildings: 1- and 2-story, more for farm buildings

## PARKS AND PROTECTED LANDS

- Permanently protected lands, these areas are composed of federal- and state-maintained recreation areas parkland, as well as privately owned land.
- Mix of uses include passive and active recreation uses, accessory uses, limited residential uses (per easement agreements)
- Buildings: 1- and 2-story, mostly homes and park buildings
- Streets: local roads, private and park drives
- Public/open space: parkland, conservation easements
- Locations:
    - Jordan Lake State Recreation Area, White Pines Nature Preserve, Lower Haw River Natural Area

FIGURE 13: CONSERVATION SUITABILITY MAP

**Conservation Suitability**

- Low
- Medium
- High
- Parks and Conservation Easements

(Refer to the suitability maps in the Appendix for more information.)

## CONSERVATION AREAS

A GIS-based conservation suitability analysis was conducted to determine landscape level concentrations of natural assets. This analysis utilized data from the Chatham County Comprehensive Conservation Plan and the North Carolina Conservation Planning Tool. The results of the mapping informed the extent of the Conservation Area identified on the Future Land Use and Conservation Plan. See the Appendix for a larger version of the map and specific inputs.

49



# Plan Elements

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 104 of 743

# PLAN ELEMENTS
## INTRO

This section includes policy recommendations and detailed strategies that will help the County achieve the community-supported goals.

Some strategies are a continuation of ongoing activities, others can be achieved with redirection of available resources while others will need to be addressed through cooperative efforts between the County and municipalities or through public/private partnerships.

## PLAN ELEMENTS

 ECONOMIC DEVELOPMENT

 LAND USE

 HOUSING

 HEALTH

 AGRICULTURE

 NATURAL RESOURCES

 RESILIENCY

 PARKS AND RECREATION

 TRANSPORTATION

 UTILITIES AND PUBLIC SERVICES

Image Source for previous page: Debbie Roos, Chatham County Cooperative Extension

51



# ECONOMIC DEVELOPMENT

Chatham County's economy has long been dependent on agriculture and manufacturing. The agricultural sector is healthy and expanding, despite pressure to convert farms to residential uses. Manufacturing employment has fallen from 5,294 jobs (37.1% of all jobs) in 2002 to 2,100 jobs (15.1% of all jobs) in 2014 , reflective of national trends (Source: Census On the Map).

The County benefits from its proximity to Raleigh, Durham, Chapel Hill, Research Triangle Park, and Guilford County as well as access to major highways and rail. The median income for the County is 45% higher than the rest of NC, but income and poverty rates vary significantly throughout the County. For instance, some census tracts in the northeast have median incomes over $100,000, but others in the west and southwest have incomes under $30,000. Lack of jobs is a contributing factor to income disparities.

There are only 14,000 jobs in the County, but there is an adult workforce of 32,000. Many residents have to make long commutes to work each day. 55% of workers commute to jobs outside of the County. Because of this, the County's tax base is heavily dependent on residential properties. Lack of businesses as well as the dispersed nature of residential growth in the County contributes to retail leakage. 58% of potential sales in Chatham "leak" out to other communities. This is a loss of $207 million in annual retail sales. Creating a more balanced tax base and reducing retail leakage are key issues that are addressed with the recommendations in this section of Plan Chatham.

## BIG IDEA

**14,000 new jobs by 2040 (a 100% increase, up from 14,000 jobs today)**

## GOALS

### PRIMARY GOAL

**Diversify the tax base and generate more high quality, in-county jobs to reduce dependence on residential property taxes, create economic opportunity and reduce out-commuting.**

### SECONDARY GOAL

**Provide equitable access to high-quality education, housing and community options for all.**

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 107 of 743





Farm in Northwestern Chatham County

# RECOMMENDATIONS AND STRATEGIES

## Recommendation 01
### Provide flexibility for rural businesses.

### ED Policy 1
Provide flexibility for rural businesses that have limited impact on adjacent properties and preserve rural character.

▶ **Strategy 1.1**

Continue to support home-based businesses.

> Chatham County currently allows home-based businesses that meet a few criteria, including:
> - Up to 25% of the living space can be used for the business
> - The business can have up to 3 employees who do not reside at the premises
> - No traffic should be generated beyond that which is normal for a residential neighborhood
> - All parking shall be off-street, and not in the front yard

54

► **Strategy 1.2**

Modify zoning regulations to allow for more flexibility for rural businesses that have minimal impact on adjacent properties, traffic, and rural character. See the Land Use Element for more information.

► **Strategy 1.3**

Utilize a performance based approach to zoning in Agricultural and Rural areas on the Future Land Use map that allows for more flexibility in uses if criteria are met (i.e. min lot size, max building size, buffers, traffic generation, employees, etc.).

> Performance Based Zoning is "An alternative to the traditional, conventional zoning method, performance standards regulate development by setting the desired goals to be achieved by regulation rather than regulating how those community goals are met. Instead of restricting specific uses on a property, performance requirements allow any use that meets the set standard. Performance standards attempt to address the same goals desired by traditional zoning ordinances, such as environmental protection, neighborhood character, traffic control, etc., but with a greater amount of flexibility."
>
> Source: American Planning Association (https://www.planning.org/divisions/planningandlaw/propertytopics.htm#Performance)

## Recommendation 02

### Increase employment opportunities across the County.

#### ED Policy 2

Encourage growth in designated Employment Centers, towns and other appropriate locations.

► **Strategy 2.1**

Encourage small-scale retail development, service, office, "flex" space, and other small business development by designating Village Centers and Crossroads Communities at appropriate locations across the County.

► **Strategy 2.2**

Direct larger-scale retail (and complimentary uses such as professional and medical offices) to locate to existing towns and at designated Community and Neighborhood Centers as well as in Employment Centers.

► **Strategy 2.3**

As demand warrants, consider zoning to allow distribution and warehouse uses along major transportation corridors, particularly US 421.

> Most recent average weekly wage is $685/week for all private sector industries in Chatham County and $864/week in the manufacturing sector.
> (BLS QCEW, 3rd quarter 2016)

#### ED Policy 3

Continue to develop and promote the Chatham-Siler City Advanced Manufacturing (CAM) Site and the Moncure megasites to ensure future job creation in the County.

► **Strategy 3.1**

Target recruitment efforts for larger industrial projects towards sustainable, clean industries, paying above average wages.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 109 of 743

### Strategy 3.2

Consider the long-term return on investment and environmental impacts when recruiting businesses and industries and approving rezonings.

### Strategy 3.3

Encourage businesses in megasites to utilize low-waste production methods, implement water conservation measures, and minimize emissions.

### Strategy 3.4

Allow a range of complimentary uses in proximity to the megasites to create attractive work environments with amenities to compete with other employment location options in the Southeastern United States.
- The mix of uses, development configuration and quality, variety of amenities, and connectivity affect the attractiveness—and competitiveness—of employment centers. Many employers in manufacturing and technology industries seek live-work-play locations that current and prospective employees and their families can enjoy.

### Strategy 3.5

Conduct small area plans and/or develop design principles and standards to give guidance to developers of sites within and at the edges of the megasites.
- Such guidance should inform decisions about relationships between buildings (orientation, placement, scale); architecture (building materials, fenestration); transportation network (vehicular, bike, pedestrian, and transit facilities – placement, capacity, materials, furnishings, etc.); streetscape; public and publicly-accessible spaces and amenities.

> 46% of Chatham workers are employed by businesses with less than 100 employees.
>
> Source: U.S. Small Business Administration (2011)

### ED Policy 4

Support existing businesses, including small and medium-sized firms.

### Strategy 4.1

Support Chatham EDC and the community college in carrying out an expanded business visitation program, engaging an increasing number of medium-sized and smaller businesses.

### Strategy 4.2

Review incentive policies to allow greater participation by creating new or expanding existing small and medium-sized firms (i.e. revise thresholds for new investment and/or job creation).
- Chatham's current incentive policy uses a point system that greatly favors projects with 100+ new employees and $5+ million in new capital investment. This policy could be revised, or a separate policy could be created to focus on smaller incentives in proportion of job creation and investment. Rehab of an old building might be a much smaller investment but still important to other economic development goals, such as focusing on towns and promoting small businesses. This could be done in conjunction with the towns.

### Strategy 4.3

Increase engagement between elected officials and local businesses.

### Strategy 4.4

Permit existing commercial and industrial uses that are appropriately zoned to continue to operate, and allow for reasonable expansion, contingent upon meeting environmental and transportation requirements.

### ED Policy 5

Strengthen Chatham EDC's capacity to carry out business retention, recruitment, workforce development, and data gathering and dissemination activities.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 110 of 743

### ► Strategy 5.1

Support and enhance the EDC's ability to market Chatham County and recruit businesses, and determine if funding or staffing adjustments are needed.

- Target existing businesses in the Research Triangle and Piedmont Triad regions. Funding and/or dedicated staff time may be needed to increase involvement in Triangle and Triad business groups and market Chatham to existing businesses.
- Promote appropriate targeted industries and commercial uses at Megasites and Employment Centers. To increase job opportunities and tax base throughout the County, suitable industry targets should be matched with the most appropriate locations and sites. Industry targets should reflect the priorities of Chatham EDC, Research Triangle Regional Partnership, Piedmont Triad Partnership, and the Economic Development Partnership of North Carolina. These currently include:

  **Chatham-Siler City Advanced Manufacturing site:**
  Aerospace • Automotive • Food Processing and Manufacturing • Agriculture Biotechnology • Furniture

  **Moncure Megasite:**
  Defense Technologies • Pharmaceuticals • Food Processing and Manufacturing • Agriculture Biotechnology

  **U.S. 1 Employment Centers:**
  Wood Products • Distribution and Electronic Commerce • Complementary support services for Moncure Megasite

  **U.S. 64 Employment Center:**
  Advanced Medical Care and other medical offices • Business and Financial Services • Information Technology • Ecotourism

### ► Strategy 5.2

Develop more complete databases and distribute current information on commercial properties and land.

- There is no complete inventory or database of all commercial/industrial buildings and land in the County, and thus no reliable vacancy rates or complete listing of available properties. Because Chatham is a small and fragmented commercial real estate market, the EDC should strive to be THE source of property information. A project/partnership between the municipalities, county planning department and tax office will be needed. Once a database is completed, staff could update and publish data and space availability semi-annually.

### ► Strategy 5.3

Explore new communication tools to link Chatham county residents, businesses and organizations.

- Consider joint funding (with business and civic organizations) of a study to evaluate communication tools and platforms to improve dissemination of information across the County.

## Recommendation 03

## Support entrepreneurship, tourism, arts, and culture.

### ED Policy 6

Support entrepreneurship and new businesses that diversity the local economy and capitalize on the unique assets of Chatham County.

### ► Strategy 6.1

Support existing service providers, including the Pittsboro-Siler City Convention & Visitors Bureau and the CCCC Small Business Center.

- Priority services for the CVB to increase and include visitor services, social media, marketing, journalist tours, and the Certified Retirement Community program.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 111 of 743

- Priority services and initiatives for the Small Business Center include bringing on a bilingual (Spanish) business development support person; developing agricultural processing resources for smaller farm operations; and increasing availability of capital for expanding businesses (particularly a need for loans between $50,000 and $100,000).
- Increase awareness of small business and

> **Economic Impact of Tourism**
>
> Annual economic impact of tourism in Chatham County is $32.5 million with $2.07 million in state and local sales taxes generated by travelers in the County. Jordan Lake State Recreation Area, the Haw River, and venues such as Fearrington Village attract millions of visitors each year. There is a need for additional accommodations to grow the tourism industry.

entrepreneurship resources such as the Small Business Center, UNC SBTDC, and SCORE.

▶ **Strategy 6.2**

Review land use policies to encourage development of hotels and other lodging accommodations.
- The synergy between retail, service, entertainment and lodging uses in key areas of the County could spur day-long, weekend-long, or week-long visits. Having such destinations could address economic development goals, such as increasing tourism (and related spending), reducing retail leakage to neighboring counties, and attracting employers (as well as younger members of the workforce to fill employment positions).

▶ **Strategy 6.3**

Support increased tourism and recreation opportunities and amenities, particularly promoting sustainable tourism and authentic experiences.
- Support NC GreenTravel designations
- Encourage more locally-based outdoor recreation outfitters, recreation rental shops, and Chatham-based tour guides.
- Build infrastructure for outdoor recreation, such as parking areas, restrooms, and river put-ins.
- Connect Chatham residents and entrepreneurs with initiatives such as People-First Tourism
- Agritourism – County staff from various departments should continue providing coordinated assistance to farms in meeting state and local requirements necessary to increase agritourism sites.
- Work with organizations such as the Triangle Land Conservancy to increase and advertise guided tours of conservation lands.
- Support development that leads to the co-location of compatible uses that, together, create destinations in the County.

▶ **Strategy 6.4**

Recognize and take greater advantage of Chatham County's experienced, well-educated senior population in economic development activities.
- Enlist retired business people for mentoring of small business owners and entrepreneurs.
- Consider using retired business leaders to expand the existing business visitation program.
- Publicize opportunities for seniors to volunteer in economic development efforts such as SCORE (Service Corps of Retired Executives).
- Highlight the discretionary income of Chatham's senior population in business attraction efforts.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 112 of 743



Jordan Lake State Recreation Area is one of North Carolina's most popular attractions with 1.6 million visitors annually (NC Division of Tourism)

## Recommendation 04
## Provide equitable access to high-quality education and workforce training.

### ED Policy 7
Strive to increase engagement between youth, employers, educators with Chatham County Schools and Central Carolina Community College, workforce professionals, and Chatham EDC.

▶ **Strategy 7.1**
Strengthen involvement by EDC Board members and other business leaders to increase student apprenticeships, internships and other workplace exposure opportunities with large and small Chatham companies.

▶ **Strategy 7.2**
Encourage the availability of work-related credentials and certifications at the community college level, particularly those aligned with the needs of Chatham-based employers.

▶ **Strategy 7.3**
Facilitate regular communication between local employers, educators and training providers to align offerings with business needs.

• Chatham EDC should continue to partner with Central Carolina Community College and also partner with the Triangle South Workforce Development Board to determine how best to focus workforce development resources.

▶ **Strategy 7.4**
Current certificate options include healthcare and construction. New offerings could include:
• The sciences, which would help prepare residents for work in existing and targeted industry clusters such as Agricultural Biotechnology, Pharmaceuticals, Food Processing, and Professional, Scientific, and Technical Services; and
• The National Career Readiness Certificate, which certifies foundational work skills for individuals across a variety of potential career paths.

## Recommendation 05
## Reinforce towns as residential and commercial centers of the County.

### ED Policy 8
Partner with the towns to incentivize and attract investment and business development in Pittsboro, Siler City, and Goldston.

▶ **Strategy 8.1**
Consider partnerships with towns on incentive policies promoting job creation, downtown revitalization, building renovation and adaptive reuse, façade improvements, and new retail businesses in existing towns.

▶ **Strategy 8.2**
Provide technical support to towns lacking appropriate staffing (i.e. Goldston).

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 113 of 743



 # LAND USE

Protecting the rural character and lifestyle of the County is the primary goal of Plan Chatham. Since the year 2000, 90% of the residential growth in Chatham County has occurred in county jurisdiction. This growth has occurred despite ample available land inside municipal limits and Extra Territorial Jurisdictions (ETJ).

Most new development in Chatham County and the Triangle Region is being built in a low-density pattern that separates different uses such as homes and shopping. This trend negatively impacts natural resources and agriculture by fragmenting rural lands and increasing traffic.

The Future Land Use and Conservation Plan establishes a new framework for growth and development in the County. In the future, more growth and development should occur within and near established and planned centers of activity. Policy recommendations seek to guide the form and intensity of development by clustering development in appropriate areas, establishing walkable centers, defining edges and keeping rural areas rural. Design oriented recommendations attempt to establish ways to integrate new development into the rural landscape in a seamless manner. Secondary goals and associated recommendations are targeted at making progress towards economic development goals and creating a compact growth pattern that includes vibrant towns and mixed use activity centers in designated areas.

> Since the year 2000, 90% of the residential growth in Chatham County has occurred in county jurisdiction.

## BIG IDEA

**70% of new development is in municipalities and in or near county centers. Chatham is a model for growth in the agricultural industry.**

## GOALS

### PRIMARY GOAL
**Preserve the rural character and lifestyle of Chatham County.**

### SECONDARY GOAL
**Diversify the tax base and generate more quality, in-county jobs to reduce dependence on residential property taxes, create economic opportunity and reduce out-commuting.**

### SECONDARY GOAL
**Promote a compact growth pattern by developing in and near existing towns, communities, and in designated, well planned, walkable, mixed use centers.**





*Downtown Pittsboro*

# RECOMMENDATIONS AND STRATEGIES

## Recommendation 01

**Concentrate future growth in compact, walkable development located in municipalities as well as existing and planned growth areas.**

### Land Use Policy 1

Coordinate with towns to direct new development in the County toward municipalities where utilities and other municipal services can support such development.

### Land Use Policy 2

Direct development of any intensity requiring public utilities and other urban services to planned growth areas.

### ▶ Strategy 2.1

Allow areas within and near Community and Neighborhood Centers, as shown on the Future Land Use Map, to be developed for larger scale commercial, office and mixed use developments.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 116 of 743

**Design Details** — *Compact Communities*

▶ **Strategy 2.2**

Allow areas within and near Community and Neighborhood Centers and within Compact Residential areas to be developed for Compact Communities, conventional subdivisions, and planned unit developments.

▶ **Strategy 2.3**

Allow areas designated as Village Centers and Crossroad Communities, as shown on the Future Land Use Map, to be developed for residential, commercial and some light industrial purposes if appropriately designed to be in keeping with historic development patterns.

**Land Use Policy 3**

Facilitate well-designed, walkable, mixed use communities that fit the character and scale of Chatham County within areas indicated as suitable on the Future Land Use Map including within and near Community and Neighborhood Centers, Village Centers, in Crossroad Communities and within Compact Residential Areas.

▶ **Strategy 3.1**

Revise regulatory framework to require design elements in mixed use communities that respect the traditional development patterns of Chatham County and the piedmont of North Carolina, reduce the cost of infrastructure, protect farmland and open space and encourage biking, walking and transit usage (see design details call out).

▶ **Strategy 3.2**

Establish a revised set of zoning districts that accommodate mixed-use development at various scales.
- Small scale mixed use
  - Consider adding residential as a conditional use in the Neighborhood Business zoning district. This would allow for mixed use infill at a small scale near Centers and in Villages and Crossroads Communities.

The Compact Communities Ordinance allows for the creation of neotraditional neighborhoods or villages that save land and create more walkable neighborhoods. Briar Chapel is one local development that has taken advantage of this option and demonstrates a more traditional style of community design. These types of communities include a mix of uses, integrated open spaces and pedestrian oriented design. Key design details for compact communities include:
- A clustered pattern of development;
- A mix of land uses, with residential, commercial, and civic components;
- A mix of housing types;
- An interconnected street network;
- Walkable, pedestrian-friendly design;
- A defined edge that marks the transition to the surrounding rural landscape;
- Connection to transit; and
- Connection to open space and recreation.
- A mix of commercial and residential in multi-story buildings.

63

- Mixed Residential
  - Utilize the provisions of the existing Planned Residential Development (PRD) option with minor updates.
- Mostly residential with some supporting retail
  - Borrow applicable provisions from the Compact Communities Ordinance (CCO)
  - Allow this type of development in areas designated as Centers
  - Modify performance standards and remove redundancies
- Mostly nonresidential with some complementary residential
  - Modify the minimum area and maximum area to be devoted to nonresidential uses.

- Amend the exterior boundary setback requirement and strengthen screening requirements.
- *See proposed regulatory amendments in Action Plan for details*

▶ **Strategy 3.3**

Encourage infill and redevelopment near Village Centers and Crossroads Communities.

- Create small area plans that include a public design process to tailor zoning districts to meet goals of rural communities. These efforts could establish design guidelines and/or a regulating plan and associated form based zoning district for Villages and Crossroads Communities. One or more new "Village Zoning District" could be tailored to the goals of rural



FIGURE 14: MIXED USE INFILL EXAMPLE

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 118 of 743

communities and emphasize the importance of form over use with dimensional, landscaping and parking requirements that fit the character of smaller, rural communities in the County.

## Land Use Policy 4

Support future transit through land use decisions.

### ▶ Strategy 4.1

Recognize opportunities for the incorporation of future transit stops and consider the minimum number of dwelling units and/or non-residential floor area required within 1/2-mile of the stops to generate transit riders, and approve development in these areas that help achieve ridership targets.

- For areas where transit stops are contemplated, prepare small area plans that conceptually depict an appropriate development pattern (types and locations of residential uses with number of dwelling units, types and locations of nonresidential uses with amount of floor area, circulation pattern, stop location, etc.)
- Establish design standards that ensure areas identified for future transit stops are developed as "transit-ready" areas. Development design should anticipate, not preclude, the integration of transit stops and associated amenities.



FIGURE 15: MONCURE VILLAGE CONCEPT

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 119 of 743

# Recommendation 02

## Support context-sensitive design that preserves rural and small town character.

> Context-sensitive design is meant to describe an approach to site layout, landscaping, building design, and transportation infrastructure that seeks to preserve the rural nature and small town feel that defines the character of the County.

### Land Use Policy 5

New development should demonstrate design principles that preserve rural and small town character.

#### ▶ Strategy 5.1

Encourage context-sensitive development design. This type of design includes elements such as architectural features that resemble historical structures and local vernacular, site design that reduces impacts on historical structures, working landscapes and viewsheds from public roadways, integrated open space, and preservation of unique natural features such as heritage trees and mature forests.

#### ▶ Strategy 5.2

Encourage residential development types that fit the character of different areas of the County.

### Conventional Subdivisions

These subdivisions are typically composed of residential lots and minimal amount of open space. Dimensional requirements, including minimum lot size and buffers are based on requirements of the applicable zoning district.

- These subdivisions are most appropriate as part of Major Centers (Town, Community, Neighborhood, Employment), Minor Centers (Village, Crossroads), in Compact Residential areas and in Rural Areas within 1 mile of a Major or Minor Center.
- Open spaces within conservation subdivisions should conserve most important natural resources.

### Compact Communities

Compact Communities are mixed use developments anchored by a village center composed of commercial, civic and residential uses that add to Chatham County's tax base, help residents meet their daily needs and preserve Chatham County's small town atmosphere. Residential density is 2 dwelling units per acre.

- These types of developments are most appropriate in Major Centers (Town, Community, Neighborhood, Employment), Minor Centers (Village, Crossroads), and in Compact Residential areas.

### Conservation Subdivisions

These subdivisions have over 40% open space and preserve natural features as amenities in exchange for flexibility related to minimum lot sizes and housing type.

- This is a voluntary and incentivized type of subdivision encouraged in Rural and Conservation areas as well as areas with sensitive natural features in other land use areas.
- Open spaces should be reserved and designed so that they extend contiguously across property boundaries to create corridors and core areas.
- Open spaces within conservation subdivisions should conserve most important natural resources.

### Agricultural Friendly Subdivisions

These subdivisions have a very low gross density, as evident on page 97, (typically one dwelling unit per 4 acres, with some clustering to the degree practical given soils and/or utilities and some larger "farmstead lots > 7 acres that could have active agricultural uses), design guidelines /performance based criteria are followed to reduce impact on working agricultural lands (i.e. open space/buffers located near working farms and forests).

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 120 of 743

- These types of developments are appropriate in Rural areas and Agricultural Areas on the future land use map.

## Land Use Policy 6

Avoid "strip" commercial development along key road corridors.

Even along the most developed corridors in the County, there is a clear transition between built up commercial areas and the rural countryside that is dominated by pasture, fields, forests and rural homesites. Managing the limits of intense commercial growth and focusing on the design of new development will be key to maintaining the scenic nature of the County. Commercial and mixed use development should be sited along major highways at key intersections and in clusters at specific, designated locations along major collectors and arterials. These sites should be designed to retain a crossroads or village character; and uses should be integrated with nearby development.

### ▶ Strategy 6.1

Limit shopping centers and highway commercial development only in areas indicated as suitable for commercial development on the Future Land Use Map: within Towns, Employment Centers, Community and Neighborhood Centers, Village Centers, and in Crossroad Communities.

### ▶ Strategy 6.2

Update design guidelines that improve the aesthetics of commercial, office, industrial and mixed use development along major corridors.

- Inside of centers encourage pedestrian scale design including buildings close to the street, transparent facades, building details, street trees, and parking located to the side or rear of buildings.
- Near the edges and outside of centers encourage larger setbacks and preservation of existing vegetation and unique frontage features, such as foreground meadows maintained to visually replicate pasture.

### ▶ Strategy 6.3

Amend land development regulations to establish location standards for commercial development that pushes such development to nodes (i.e., intersections), and establish landscaping standards where commercial development should be discouraged.

- With a maximum distance standard, establish a radius around certain types of intersections identified as appropriate for commercial nodes. For example, commercial nodes could be encouraged at intersections of arterials and major collectors, with commercial development extending no further than 1,350 feet (a 10-minute walk distance) in any direction from the center point of any such intersection. This will encourage the clustering of development in a manner that internalizes circulation, taking trips between uses off of the major arterial and reducing the number of driveways along those arterials. This may also alleviate some congestion issues resulting from too many vehicular turning movements into driveways.
- To avoid overlapping nodes, establish a minimum distance between nodes.
- Establish landscaping requirements that create a "green break" between commercial nodes. Such landscaping, often referred to as street buffers, is not conducive to commercial development due to reduced visibility. Therefore, parcels subject to such requirements are not desirable locations for commercial uses. This will further encourage clustering of commercial development at the appropriate intersections.

### ▶ Strategy 6.4

Work with NCDOT to manage access along these road corridors to ensure the identified commercial nodes offer the best access (relatively) and therefore reinforce the attractiveness of the nodes.

- Discourage driveway permits for every parcel by incentivizing shared driveways, cross-access easements, and other mechanisms that reduce the number of direct access points onto arterials and

67

major collectors from adjoining parcels.

- Require new commercial subdivisions to provide access to the newly platted parcels via one or two access points (depending on size of development and amount of frontage on arterial and major collector).
- Encourage roadway design—or redesign—that includes planted medians with limited breaks and turn lanes to better control left turns.
- Recognize that nodes where several compatible commercial uses can be organized around signalized intersections and accessible by an internal network of streets and private drives are more desirable commercial locations than individual parcels with separate driveways. By promoting this development pattern, the County can also address NCDOT's concerns about turning movements that impede traffic flow (and exacerbate traffic congestion).

## Land Use Policy 7

Provide flexibility for rural businesses.

### ▶ Strategy 7.1

Continue to support home-based businesses throughout the County.

### ▶ Strategy 7.2

Support rezonings for businesses uses or properties made non-conforming by the extension of zoning in 2016.

### ▶ Strategy 7.3

Support rezonings for the adaptive reuse of existing industrial sites that are not being used (i.e. feedmill and truck maintenance facility for the poultry industry).

### ▶ Strategy 7.4

Modify zoning regulations to allow for more flexibility for rural businesses that have minimal impact on adjacent properties and rural character.

The County has an existing allowance for home-based businesses. Neighborhood Home Occupations with up to four employees are allowed to utilize 25% of the heated living space in a dwelling and an accessory building up to 1,000 square feet in area. Rural home occupations are allowed on parcels over three acres and allow the use of 25% of the heated living space in a dwelling and accessory buildings up to 2,500 square feet. Buildings, material storage and operations require a minimum setback (50 ft, 100 ft for noise generating uses) and a 15ft vegetative buffer.

- Update regulations to utilize a performance-based approach to zoning in Agricultural and Rural areas on the Future Land Use map that allows for more flexibility in use if criteria is met (i.e. minimum lot size, max building size, buffers, screening, limits on hours of operation, limits on lighting, limits on % impervious area, etc.).
- *See proposed regulatory amendments in Action Plan.*

## Land Use Policy 8

Support the viability of agricultural operations through land use policies and regulations.
- *See Agriculture Element for recommendations.*

## Recommendation 03
**Bring open space in its many forms to the forefront, making it a key/integral component of the development pattern.**

## Land Use Policy 9

Limit development in Conservation Areas.

### ▶ Strategy 9.1

Encourage only low density development in Conservation Areas.

▶ **Strategy 9.2**

Establish a zoning district that is appropriate for permanently protected lands (i.e. Army Corps land adjacent to Jordan Lake and conservation easements) and rezone areas accordingly.

- *See proposed regulatory amendments in Action Plan*

## Land Use Policy 10

Encourage integrated open space in new development.

▶ **Strategy 10.1**

Update open space requirements for new development.

- Define the various types and purposes of open space in the County, now and in the future. These range from large, undeveloped nature preserves to greenways to small parks that are focal points at the center of development, designed and improved for active use and community gatherings.
- Consider updates to requirements for new subdivisions and other development types to improve the amount and quality of open space.
- Use the Chatham Conservation Partnership (CCP) Conservation Plan, maps and GIS data for land use planning and development review.

▶ **Strategy 10.2**

Incentivize conservation design.

- *See Natural Resource recommendations and proposed regulatory amendments in Action Plan.*

## Recommendation 04
## Increase cooperation with adjacent jurisdictions, landowners and the public.

## Land Use Policy 11

Continue cooperative approach to growth management and economic development by working closely with other jurisdictions.

▶ **Strategy 11.1**

- Work with municipalities to:
  - Create town vibrant centers
  - Accommodate an equitable distribution of senior services and affordable housing.
  - Coordinate to create compatible plans and ordinances with towns.
  - Establish utility policies to require annexation to access municipal services.

## Land Use Policy 12

Work toward an open (clear/concise) and cooperative approach to land use planning and regulation

- Updates the regulatory framework, including revisions to development regulations to implement plan.
- Provide clear standards to set expectations.
- Explore ways to streamline approval process while getting better results
  - Revamp procedures to allow for administrative approval in certain cases.
  - Focus on performance of form of development and limiting impacts.

## Recommendation 05
## Create land banking for schools, public facilities and parks.

## Land Use Policy 13

Coordinate with schools, parks and recreation, towns and developers to anticipate future land needs.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 123 of 743



Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 124 of 743



# HOUSING

The median home sale price for Chatham County over the past 12 months was $260,500 (The range of the average price per home varies by location), which is a 7.7% increase since the start of 2016 (ESRI, Zillow). An income of >$62,600 is necessary for a mortgage of the average new home to be considered affordable (<30% of monthly income). Police officers, teachers, social workers and other professionals have incomes significantly below this threshold, and need access to more affordable housing for sale and rental.

The number of seniors in the County is growing and their preferences, along with those of millennials and young families are leading to a higher demand for different housing types and lot sizes. Recommendations in this section encourage the provision of quality housing that retains the rural character of the County, and appeals to a changing demographic. The need for affordable and workforce housing is becoming a pressing issue due to equity implications, but it also has economic impacts and influences health and family stability.

A temporary committee was appointed in 2017 by the County Board of Commissioners with representatives from the County and municipalities and they developed recommendations for increasing affordable rentals in the County. It is assumed that many of the strategies in this Plan Element will be further refined and implemented with the help of a future committee.

## BIG IDEA

**100 new affordable or workforce housing units per year.**

## GOALS

### PRIMARY GOAL
**Provide equitable access to high-quality education, housing and community options for all.**

### SECONDARY GOAL
**Preserve the rural character and lifestyle of Chatham County.**

### SECONDARY GOAL
**Foster a healthy community.**

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 125 of 743





Rural home in Southeastern Chatham County

# RECOMMENDATIONS AND STRATEGIES

## Recommendation 01
### Process.

### Housing Policy 1
Encourage the incorporation of affordable and workforce housing in new developments.

▶ ### Strategy 1.1
Update ordinances to include zoning provisions for affordable housing with contribution options (i.e. land donation or reservation, fee in lieu)
- Updates to Compact Communities Ordinance and other districts/development that meet certain criteria (i.e. tied to voluntary CCO/PUD, rezoning or conditional use)
- Allow flexibility for developers to match target demographic
- Locational parameters
- Pricing / rates / delivery parameters / timing

▶ ### Strategy 1.2
Study local investment options.
- Establish a Housing Trust Fund for affordable housing with housing type targets and location parameters. This could work in tandem with fee in lieu provisions. May need to be joint effort with municipalities or non-profit (i.e. Arlington, VA).

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 126 of 743

▶ **Strategy 1.3**

Encourage developers to partner with other developers specializing in affordable and accessible housing such as Habitat for Humanity, or other nonprofit builders.

## Recommendation 02
## Places.

### Housing Policy 2

Accommodate and incentivize affordable and workforce housing.

▶ **Strategy 2.1**

Accommodate a mix of housing types and unit sizes where appropriate.

- Transportation access, future transit, access to utilities, grocery stores, schools and parks should be considered
- Towns (including Cary), 15-501, Moncure and other villages, Compact Residential Areas

▶ **Strategy 2.2**

Evaluate options for encouraging affordable housing in well located sites (coordination with towns needed).

- Fee reduction or continued reimbursement of fees
- Density bonus provisions
- Reduced parking requirements
- Establish a location policy that provides incentives for well-located developments

▶ **Strategy 2.3**

Build on work completed by the Chatham County Housing Committee.

- Evaluate County-owned properties to determine whether any such properties are suitable to transfer to an appropriate entity to utilize (and upfit) for affordable housing.
- Focus on locations proximal to jobs, transit, utilities, parks, schools and healthy food outlets.
- Consider an RFP process for soliciting bids for creating affordable and workforce housing.
- Evaluate sites for targeted workforce housing (i.e. teachers, police officers, veteran, etc.)



**Case Study** Supports Strategy 2.3

## McDowell County Teacher Village (Welch, WV)

A Teacher Village will be constructed in downtown Welch, WV with 30 units to accommodate teachers in rural McDowell County. The goal of the public/private partnership is to attract and retain quality educators in rural county with limited housing options.

Chatham County could benefit from a similar project to provide affordable, attractive housing options to qualified teachers. Currently housing prices and lack of smaller housing units are a barrier to recruiting teachers. Partnerships with local universities, could also be explored to provide an additional avenue to recruit young teachers to fill positions in the County.

This could be a model for housing for other County personnel, such as those employed in public safety.

73

# Recommendation 03
## Product.

### Housing Policy 3
Encourage quality affordable housing in a context sensitive manner.

▶ ### Strategy 3.1
Support existing and new assistance programs.
- Impact fee reimbursement program
- Security Deposit Revolving Loan Assistance Pilot Program
- Weatherization and rehabilitation programs to repair substandard existing housing that acts as Naturally Occurring Affordable Housing (NOAH)

▶ ### Strategy 3.2
Improve tracking of existing assistance programs and partner with non-profits to target needs.

▶ ### Strategy 3.3
Continue to allow Accessory Dwelling Units (ADU) if properties meet reasonable criteria.

▶ ### Strategy 3.4
Increase availability of quality senior housing.
- Consider incentives for Universal Design and Visitability.
- Consider allowing pocket neighborhoods, co-housing and other forms of housing that appeal to seniors near Centers.

> **Universal Design and Visitability**
> Universal design features enable occupants to live in a dwelling regardless of their level of ability or disability. Features include stepless entrances, accessible bathroom fixtures and kitchen appliances. Visitability is a design approach for new homes guided by the principle that a non-resident in a wheelchair should be able to visit.

▶ ### Strategy 3.5
Require energy efficiency in affordable housing.

▶ ### Strategy 3.6
Minimum housing code amendments to clarify definitions, responsibilities, inspections and penalties. Encouraging accountability through outreach and increased enforcement can improve the quality of the County's housing stock.

▶ ### Strategy 3.7
Develop guidelines and a streamlined approval process for the following affordable housing types:
- Prototype #1: Mini-Planned Residential Development (PRD)
  - Location: Appropriate in Towns and near Centers, in Compact Residential Areas
  - Size & Product types: 30-100 units | Ideally 2 or 3 product types | Mixed income with some market rate units | Attached, Detached (cottage/patio or zero lot line), Accessory Dwelling Units (ADUs), Multifamily – In Town jurisdiction.
- Prototype #2: Rural Prototype
  - Location: Rural and Agricultural Areas, in areas without utilities
  - Size & Product types: 1-12 units | Single family homes, duets, ADUs



FIGURE 16: THE MONCURE VILLAGE CONCEPT (SEE THE LAND USE ELEMENT) SHOWS HOW A MIX OF HOUSING ON INFILL SITES COULD REINFORCE EXISTING RURAL CENTERS IN THE COUNTY.

Case 1:25-cv-00113-UA-JLW   Document 1   Filed 02/14/25   Page 128 of 743



Affordable Housing in Davidson, NC

## Recommendation 04
## Partnerships.

### Housing Policy 4
Increase partnerships between the County, the Housing Authority, municipalities, non-profits, landlords and private entities to increase affordable and workforce housing as well as emergency/transitional and supportive housing.

▶ **Strategy 4.1**
Track expiring income-based housing and partner to preserve affordability of existing housing.

▶ **Strategy 4.2**
Plan for redevelopment of existing mobile home parks [preserve affordability of housing for future uses].

▶ **Strategy 4.3**
Promotion and education on needs, trends, and opportunities.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 129 of 743



Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 130 of 743



# HEALTH

Discussions of community health are often limited to aspects of physical health (access to treatment, exercise, diet, nutrition, food access, and so on). However, the well-being of a community is linked to several dimensions of health: physical, social, emotional, behavioral, mental, occupational, intellectual, spiritual, and environmental. Each of these dimensions can be addressed to some degree through the choices we make about our natural and built environments. Community health is affected by the ways we maintain, utilize, and enhance the places in which we live, work, worship, and play. The comprehensive planning process provides an opportunity to establish policies, supported by actions, that will lead to the creation of a place that is more conducive to achieving an improved state of wellness and enhance health equity. The big idea in this element of the plan is to adopt a Health in All Policies (HiAP) approach to ensure integration of health considerations, healthcare and equity in Chatham's plans, programs, projects and policies.

## BIG IDEA

Assure effective integration of health, healthcare, and equity in Chatham's plans, programs, projects, and policies.

## GOALS

### PRIMARY GOAL
Foster a healthy community.

### SECONDARY GOAL
Promote a compact growth pattern by developing in and near existing towns, communities, and in designated, well planned, walkable, mixed use centers.

### SECONDARY GOAL
Provide recreational opportunities and access to open space.

**Health in All Policies Approach**

Health in All Policies is an approach to public policies across sectors that systematically takes into account the health implications of decisions, seeks synergies, and avoids harmful health impacts, in order to improve population health and health equity.

-May 9, 2013

http://www.who.int/healthpromotion/conferences/8gchp/130509_hiap_framework_for_country_action_draft.pdf

**Health Equity**

Health equity is achieved when every person has the opportunity to "attain his or her full health potential" and no one is "disadvantaged from achieving this potential because of social position or other socially determined circumstances." Health disparities or inequities, are types of unfair health differences closely linked with social, economic or environmental disadvantages that adversely affect groups of people.

Attaining Health Equity. (2013, October 25). Retrieved November 06, 2017, from https://www.cdc.gov/nccdphp/dch/programs/healthycommunitiesprogram/overview/healthequity.htm

77





Hiking trail in White Pines Nature Preserve

# RECOMMENDATIONS AND STRATEGIES

## Recommendation 01
### Improve community health through systems level planning.

### HL Policy 1
Adopt a Health in All Policies (HiAP) Approach.

### ▶ Strategy 1.1
Develop and promote cross-sector relationships.

- Build capacity for HiAP by developing partnerships through cross-sector collaboration, then embed and sustain a framework for change
- Collaborate and share resources across departments and disciplines on policies, projects and strategies to promote efficiencies and reduce redundancies, thus potentially decreasing costs and improving performance and outcomes

According to the American Public Health Association, the **health "equity lens"** is a tool used to "improve planning, decision-making, and resource allocation, leading to more equitable policies and programs. Essentially, the lens is a set of principles, reflective questions, and processes that focuses at the individual, institutional, and systemic levels by:

- Deconstructing factors that exacerbate health disparities;
- Reconstructing and supporting factors that promote health equity;
- Shifting the way we make decisions; and
- Healing and transforming our structures, our environments, and ourselves."

In using this evaluation tool as Plan Chatham is implemented, questions such as the following can be raised as decisions are made.

- Could the planned program, service, initiative, or policy have a negative health impact on some populations or communities? If so, how can the impacts be mitigated?

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 132 of 743

- Support the work and progression of the Chatham Health Alliance
- Support the following Action Items: Develop school siting and design guidelines, create safe routes to schools, design outdoor play areas to minimize tick exposure, institute and support tobacco-free grounds and parks policies, and work collaboratively to address substance abuse.

### ▶ Strategy 1.2

Incorporate an equity lens into the HiAP strategies, goals, policies, and processes.
- Promote and maintain a diversity of community and stakeholder engagement.
- Prioritize communities and populations with higher risk of adverse social, economic, and health outcomes.
- Consider social determinants of health in strategies and decision making.

## HL Policy 2

Review and adapt strategies based on evolving health needs.

### ▶ Strategy 2.1

Adapt programs, policies, and projects to address emerging issues.
- Utilize community assessments, such as the Community Health Assessments, to inform future initiatives.
- Coordinate funding and partnerships to improve health outcomes, impact current health needs (obesity, healthcare, and mental health which includes substance abuse and tobacco prevention and control), and future needs that may be identified.

### ▶ Strategy 2.2

Address localized data needs.
- Align various community assessments to be comprehensive and reduce redundancy.
- Explore innovative strategies for data sharing across agencies and organizations (Example: universal

---

**Mecklenburg County, North Carolina**

The County's Health Department has been mapping areas of health disparity to uncover contributing factors. In "priority areas," the department has found that proximity does not equate to access (rec facilities or food, for example). Barriers include safety (lack of safe routes) and affordability. Access audits were conducted to identify issues to be addressed, such as gaps in the pedestrian network. Shared use agreements were facilitated to broaden the range of facilities in underserved areas.

---

electronic health records).
- Seek out and develop new data sources that can inform decision making.
- Pursue grants and opportunities for research, data collection and local metrics related to health risks, outcomes, and equity.

### ▶ Strategy 2.3

Consider implementing requirements for Health Impact Assessments to be completed for certain types of major public projects and/or proposed developments over a certain size or threshold.

## HL Policy 3

Address infrastructure gaps to promote healthier living.

### ▶ Strategy 3.1

Maintain and improve water quality and supply to improve utility systems to meet critical needs.
- *See Environment and Utilities recommendations for more information.*

### ▶ Strategy 3.2

Assess transportation network, including alternative multimodal transportation, to identify improvements needed to provide safe and convenient access to healthcare, healthy food vendors and parks.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 133 of 743

- Conduct a study to determine steps to improve access for areas within Wellness Priority Areas that do not have safe access to healthy food vendors, healthcare and/or parks.
  - Identify areas of potential need for greenways or multi-use paths to achieve goals for parks and recreation and related health benefits.
- Pursue safe routes to school funding, where appropriate.

## Recommendation 02
## Promote a diverse range of development uses within the County.

### HL Policy 4
Consider how better access to a diverse range of uses, amenities, services, and programs through distribution and integration in the development pattern can contribute to a healthier community.

### ▶ Strategy 4.1
Amend the County's land development regulations to facilitate a broader mix of uses and link housing development with employment opportunities, human/social services, and transportation.
- Housing – Our individual sense of safety is derived in part from the adequacy (as we define it) of our housing. The housing mix should include a range of product types, ensuring a minimum level of quality as well as affordability.
- Employment – The availability of jobs, which contributes to economic security of people living in the County, depends in part on the proximity and accessibility of job-generating uses, as identified in the economic development strategy customized for the County. The County can accommodate such uses in a manner that sensitively integrates them into the development pattern in locations where such uses can be successful. A corresponding reduction in work commutes equates to additional health benefits as it helps improve air quality and lower stress levels associated with driving congested conditions.

- Education – Access to education at all levels, including workforce training that is appropriate with the needs of existing and targeted employers, also contributes to economic security of people living in the County. Quality education needs to be available in locations close to concentrations of population as well as through broadband access to online resources
- Healthcare – The distribution of hospitals, urgent cares, clinics, and other healthcare facilities relative to the population has an impact on access to healthcare.
- Shopping and services – Proximity of shopping and services that meeting daily needs of County residents should be considered in determining the appropriate mix of uses throughout the County.
- Agriculture – Agriculture at all scales, including community gardens and small-scale specialty agriculture, can be integrated into the development pattern in a manner that supports increasing access to nutritious food, job generation, and a healthier ecosystem.
- Recreation and Open Space – Parks, walking paths, and natural areas can be part of and complement existing and future development in the County. Having safe and affordable access to place(s) to walk, bike, socialize, and play is important to maintaining and improving physical, emotional, and mental health. In addition, visual and physical access to nature can improve overall health and well-being of County residents. Conserving environmentally valuable areas in the creation of the open space system can also lead to a healthier ecosystem with better air and water quality.

## Recommendation 03
## Increase access to healthy foods and better nutrition.

### HL Policy 5
Build community support for better access.

### ▶ Strategy 5.1
Support the Chatham Community Food Council and the

> **Chatham County Food Council**
>
> The Chatham Community Food Council (CCFC) is made of key people involved in and interested in local food economies. Their goal is to improve community and regional food systems. A food system refers to all aspects of buying, selling, and eating food, which includes production, processing, distribution, consumption, and waste.
>
> The council's work serves as a bridge across various organizations, agencies, and groups whose work supports vibrant farms and food producers, healthy people, strong communities, thriving local economies, and resilient ecosystems through a common aim: strengthening Chatham County's local food system.

Chatham Health Alliance in their work to understand food insecurity and improve access to healthy food.

▶ **Strategy 5.2**

Inform community leaders about obstacles that local government agencies are positioned to address.

- Conduct a survey to identify the most common obstacles
- Ask leaders to support initiatives to remove such obstacles in order to promote access to healthy food options

## HL Policy 6

Broaden interest and skills in small-scale production and local consumption of fresh fruits and vegetables.

▶ **Strategy 6.1**

Raise awareness of and encourage the use of existing educational resources.

- Take advantage of the North Carolina Cooperative Extension / Chatham County Center offerings. NC Cooperative Extension is one organization that can support some amount of training to help groups construct and maintain community gardens. Classes, especially those offered on site, can facilitate community gardening through hands-on education. Schedules for classes in the region as well as resource materials available on the NC Cooperative Extension web site can extend that reach to interested individuals and groups.
- Bring training to people of all ages. Partnerships with local schools can expose children to healthy nutritional habits, while mobile solutions could include bringing basic training courses in gardening and cooking to existing institutions (e.g., schools, senior centers, community centers).



REAL School Gardens implementation

> **REAL School Gardens**
>
> The REAL School Gardens program unites teachers, parents, businesses and the students themselves to design a learning garden tailored to each school's unique needs. Volunteers from the community come together to build the garden. The learning garden is paired with a multi-year training program and teaching resources. Students spend more time outside, are taught about nutrition and learn valuable STEM skills.

81

**Public Health Priority Areas**

During the development of Plan Chatham an analysis was conducted to map factors that contribute to overall wellness. Demographic and health data were analyzed to determine areas of poverty, households without access to cars, areas of ethnic diversity and areas of high death rates from heart disease. This data was combined with information on access to parks and trails and healthy food vendors. These variables represent risk factors that correlate with health outcomes. The areas with Moderate or High designations are areas where at least four risk factors exist. Exact factors used include:

- Percent Poverty: Over 15% of Households below the Federal Poverty line
- Zero Vehicle Households: Over 10% of Households without a car
- Percent Minority Population: Over 25% of population is minority
- Access to Healthy Food: Healthy food vendors are greater than 2 miles away
- Access to Parks and Trails: Parks and Trails are more than 1/2 mile away
- Death Rates: Death rates from heart disease are more than 1 standard deviation above the mean

*See the Appendix for maps of inputs used to identify Public Health Priority Areas.*



FIGURE 17: MAP OF PUBLIC HEALTH PRIORITY AREAS

▶ **Strategy 6.2**

Consider allocation of land within public parks and other county-owned lands for community gardens and/or edible landscapes. Such gardens can be created through use agreements with groups demonstrating a commitment to the operations, maintenance, and associated costs.

▶ **Strategy 6.3**

Remove regulatory hurdles. Municipal permitting of healthy food outlets may be difficult, as regulations may be prohibitive. However, Siler City recently passed a new ordinance to remove barriers and promote access to fresh fruits and vegetables. The Town of Siler City expanded their permitting process to allow for the sale of fresh fruits and vegetables throughout certain areas of the town.

▶ **Strategy 6.4**

Encourage new vendors and mobile solutions to improve access to healthy foods.

- Promote new healthy food vendors in established communities (i.e. Johnsons Crossing, Asbury, Corinth, Bynum, Silk Hope) and Public Health Priority Areas.

▶ **Strategy 6.5**

Implement a healthy corner store initiative.

- This program could include marketing, educational outreach and/or providing grants to upgrade

**Healthy Food Vendor Inventory**

The healthy food vendor inventory enabled the mapping of food outlets and deserts (See the map in the Issues and Opportunities section for more information). One key takeaway was that some communities, like Silk Hope, Goldston, Bennett, Bonlee and Harper's Crossroads, have food vendors that do not currently offer a variety of food options. Initiating a program that offers incentives to provide more options could improve access to healthy food in these communities.

equipment in exchange for the provision of additional healthy food options at existing vendors.

- *Note: The goal of this program would be to increase number of healthy food vendors. Incentives could be used to get existing vendors to carry more fresh vegetables or other key food groups.*

▶ **Strategy 6.6**

Support the establishment of CSAs, food stands, and farmers markets, especially in Wellness Priority Areas. See high public health risks in figure 17.

▶ **Strategy 6.7**

Encourage healthy food outlets to accept SNAP, WIC and other nutrition benefits.

# Recommendation 04

## Build a comprehensive and integrated healthcare system that ensures adequate access for all residents.

### HL Policy 7

Facilitate the integration of various types of healthcare facilities into developed and developing areas.

▶ **Strategy 7.1**

Allow healthcare facilities in mixed-use development and near residential areas provided site/building design and operations ensure compatibility.

- Depending on the types of facilities, the distribution of a range of healthcare facilities can contribute to a higher percentage of residents living within a reasonable distance of care and a reduction in emergency response times.
- There could be a performance based approach to zoning and need to accommodate healthcare facilities as long as there is minimal impact on adjacent properties (i.e. through design).

► **Strategy 7.2**

Create new linkages and strengthen existing links across human services to improve access to healthcare, data availability, and services. (Role for the Chatham Health Alliance).

- Promote in-county referrals across providers.
- Develop a no-wrong-door approach. This approach ensures that any person contacting any component of the healthcare system (including medical and community resources) for a specific need is not turned away but, instead, connected to the broader system's resources to address both specific and comprehensive needs.

## HL Policy 8

Expand preventative and rehibilitative mental health services.

## Strategy 8.1

Raise awareness of mental health resources in Chatham County..

### Access to Healthcare

Access to healthcare influences health outcomes. The map below shows areas in the County that are within a ten minute drive of hospitals and urgent care centers. Note that the urgent care center which recently opened in Briar Chapel filled a key gap in service along 15-501. Many other areas of the County are underserved based on this ten minute drive time analysis. More information is needed to determine access to primary care physicians, specialists and dentists.



FIGURE 18: MAP OF HEALTHCARE ACCESS

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 138 of 743

- Improve communication across County departments, agencies, and organizations to better utilize resources for effective outreach.
- Together, provide easy access to information about who, how and when to call and where to go. Families and friends of individuals suffering from mental health issues need to be able to recognize possible symptoms and be able to call that appropriate provider. Consider that such assistance could range from emotional support (NAMI Family-to-Family Education Program) to requesting help from a Mobile Crisis Team (available 24 hours a day).
- Celebrate the successes of The Farm at Penny Lane and similar groups that are showing leadership in addressing mental health issues at the local level.

### ▶ Strategy 8.2

Identify gaps in services for those with issues related to mental health, developmental disabilities, and substance abuse.

- Investigate areas of substance abuse to determine underlying mental health issues that may be undiagnosed and untreated.
- Define common developmental disabilities to identify the programs needed and the appropriate locations for delivering the programs.

### ▶ Strategy 8.3

Help create and promote a sustainable "safety-net" provider that serves all ages effectively.

### ▶ Strategy 8.4

Improve efforts to integrate services, facilities, and amenities into our developing areas to enhance efforts to improve mental health.

- Stress the importance of and encourage community members to actively promote planning for better mental health.
- Build an advocacy group and equip advocates with information about planning and development issues (planning processes, meetings, public hearings) so they can effectively participate

**FaithHealth NC – McDowell County**

FaithHealth is a free program (and ministry) focused on healing. The goal is to reduce hospital readmissions. Volunteers are coordinated to help people with transportation to doctors' appointments, taking medications, and getting food, clothing and other necessities. The organization is guided by 4 principles that ensure those in need get care in a timely manner, go to the right provider, are prepared for their appointments, and have support they need to reduce feelings of isolation and anxiety. Typically, hospitals and physicians make the referrals.

**The Farm at Penny Lane – Northeast Chatham County, NC**

The Farm at Penny Lane helps community members with severe mental illness live longer, healthier, inclusive, and more self-sufficient lives. Through horticulture therapy, farm work days, and other programs, participants exercise, socialize, and learn about health and nutrition while developing marketable skills.

**Wellness on Wheels (WOW) – Chatham County, NC**

According to the Farm at Penny Lane, the organization behind this mobile service, "WOW's mission is to expand access to comprehensive, integrated care for people with serious mental illness by providing community-centered treatment and support services via our mobile health clinic."



77

in planning processes and give input into development decisions.

## HL Policy 9
Support the development of a comprehensive set of transportation (or mobile) solutions.

### ▶ Strategy 9.1
In addition to creating a multimodal network that enhances access to healthcare by supporting alternative means of travel, consider transportation service provision through County-supported programs that include the participation of various types of organizations:
- Chatham Transit and other local and regional transit and paratransit providers.
- Volunteer organizations (typically through churches and hospitals) willing to offer assistance with transportation, such as taking people to appointments, pharmacies, grocery stores, etc.

### ▶ Strategy 9.2
Encourage expansion of mobile healthcare services.

### ▶ Strategy 9.3
Designate locations for mobile unit stops. Mobile units that circulate on a regular basis and with scheduled stops at specified locations can help bring healthcare to rural and older residents with limited transportation options. The County may need to participate in the steps to designate and maintain such stop locations. Land acquisition and formal use agreements may be among those steps.

## HL Policy 10
Support efforts to provide and extend broadband service.

### ▶ Strategy 10.1
Healthcare providers are reaching more people through online services and resources, emphasizing prevention through education and training. With access to broadband, County residents can improve personal health with information as well as connections to healthcare professionals (i.e., virtual doctor visits).

## Recommendation 05
## Increase opportunities for education and economic security.

Individual economic security is derived in part from a sense of ample employment opportunities and affordable education and training.

## HL Policy 11
Promote education, training, and job growth.

### ▶ Strategy 11.1
Recruit new employers, and support expansion of existing businesses.

### ▶ Strategy 11.2
Increase workforce training program offerings.

### ▶ Strategy 11.3
Expand access to broadband (for virtual workplaces, which expand opportunity)
- *See Economic Development recommendations for more information about employment and related workforce development.*

## Recommendation 06
## Promote "healthy community" design.

## HL Policy 12
Establish a framework for guiding public and private investments so the end results are environments that are conducive to healthier living.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 140 of 743

► **Strategy 12.1**

Adopt regulatory standards and/or guidelines that contribute to the creation of a healthier community. As part of the process of amending the regulations and related plan review processes, consider developing a "Healthy Community Checklist." Focus on the elements of healthy communities:

- Connected neighborhoods and centers, with a mix of uses within walkable distances
- Active living, physical activity
- Multigenerational neighborhoods
- Safe access to schools and public facilities
- School siting and school design
- Housing diversity
- Integration of open space (nature) into development using landscape design that minimizes appeal to deer and ticks
- Gathering places to create spaces conducive to social interaction, from conversational space for two or more people to large lawns for community gatherings.
- Appearance and maintenance. ["Broken windows theory" suggested that "crime emanated from disorder and that if disorder were eliminated, then serious crimes would not occur. One type of disorder is physical disorder, typified by vacant buildings, broken windows, abandoned vehicles, and vacant lots filled with trash."]
- Safety, adhering to Crime Prevention Through Environmental Design (CPTED) principles
- Stormwater management techniques (i.e., pervious area and infiltration) to protect water quality
- Managed landscapes, especially public spaces, to prevent tick-borne illnesses
- Support "senior centers without walls" concept

## Recommendation 07
## Improve park, recreation, and open space system for better health.

### HL Policy 13

Update County plans to ensure access to a range of passive and active recreational facilities.

---

**Landscape Design and Management Guidelines - Loudon County, VA**

In 2012, Loudon County created the Lyme Disease Commission to raise awareness of and combat Lyme disease. A key effort of the commission is to reduce tick bites through reduced exposure. The commission published landscape management guidelines to be used by public and private entities.

**https://www.loudoun.gov/DocumentCenter/View/102688**







▶ **Strategy 13.1**

Study system gaps in active recreation to improve obesity issues and other health issues.

- Examine the types of facilities, equipment, and programs needed to combat obesity in Health Priority Areas.
- Examine and address equitable access to quality and affordable places to walk, bike, play and utilize recreational services.

▶ **Strategy 13.2**

Utilize open and shared spaces to foster community connectedness and social cohesion.

**Sensory Garden – Seattle, Washington**

The Seattle Sensory Garden is a place for people of all ages to experience nature through the five senses. It incorporates sensory elements, such as fragrant plants, cool water, music, and a variety of colors, textures, and patterns. The garden was designed for people who enjoy it to be enlivened and renewed physically, mentally, or spiritually.

**https://www.seattle.gov/Documents/ Departments/ParksAndRecreation/ Projects/WoodlandParkSensoryGardne/ SensoryGardenSitePlan.pdf**



- Create opportunities to link communities by prioritizing areas between new and existing developments

▶ **Strategy 13.3**

Consider system gaps in passive recreation to effectively improve mental and emotional well-being.

- Recognize that "improved" park space can include gardens that appeal to the senses.

▶ **Strategy 13.4**

Integrate privately-maintained, publicly accessible recreation areas into the system.

- Allow spaces created through private development that are publicly accessible to count toward "improved open space" requirements in new development.

▶ **Strategy 13.5**

Promote access to public and publicly-accessible spaces through safe connections, including vehicular, bike, pedestrian routes (sidewalks and greenway trails).

- Assess connections to existing and planned facilities to determine need for improvements, and prioritize.

## Recommendation 08
### Support efforts to conserve natural areas and the natural resources within.

#### HL Policy 14

Encourage conservation for environmental health.

▶ **Strategy 14.1**

Develop an open space framework plan (or plans) to inform decisions that accomplish the following:

- Connect wildlife areas/corridors,
- Improve water quality,
- Improve air quality
- Balance ecosystems

#### ▶ Strategy 14.2

Increase environmental education and awareness. A greater appreciation for the environment and related health benefits will broaden efforts to conserve valued natural resources. Supportive grassroots organizations can bolster the efforts of government agencies.

#### ▶ Strategy 14.3

Encourage integration of "wild" and "everyday" nature for human health benefits. "Restorative eco-therapy," "stress reduction theory," and "attention restoration theory" all refer to the positive impact of nature on an individual's well-being. Studies are showing that access to nature, even visual access, can have a calming effect and, at the same time, improve our abilities to think creatively. Consider:

- Conservation design – Development that is integrated into the natural landscape allows open space to be a featured element and amenity for those living adjacent to or near such natural areas. Too often, open space within a planned neighborhood is merely the remnant pieces of land not well suited for development. Homes and other structures are typically oriented away from such spaces, and they often become inaccessible and are poorly maintained. The County should encourage developers to choose conservation design option through which open space is delineated first and then becomes a featured element in the design—and an amenity in the neighborhood—rather than an afterthought.

- Therapeutic, healing gardens – Gardens that are deliberately designed to appeal to the senses can also have positive health impacts. In addition to communing with nature, users might also be able to socialize and participate in light exercise within such spaces. The County and municipalities should consider such gardens as enhancements to existing parks and public facilities as well as components of future parks and public facilities. According to a 2001 study conducted by the City of Seattle's Park and Recreation Department, spaces can be as



FIGURE 19: CONSERVATION SUBDIVISION DESIGN (SOURCE: RANDALL ARENDT)

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 143 of 743


Bynum Front Porch music and storytelling events are cultural events that create a sense of place and encourage interaction.

small as a quarter of an acre to be effective.

- Passive recreation facilities – In addition to parks with ballfields and other active recreation facilities, the parks and recreation system should include components that provide direct access to open space and the natural features and wildlife within. Activities ranging from bird watching to spending time in wooded areas should be supported by designated passive recreation areas.

## Recommendation 09
## Promote the cultural aspects of the community.

### HL Policy 15
Promote the County's history, traditions, and cultural assets.

"Place attachment" goes beyond the person-to-place bond that emerges from experiences in nature, as promoted by Green Cities: Good Health. A sense of belonging can arise out of connections with cultural experiences, especially those associated with the history and heritage of the place.

▶ **Strategy 15.1**
Align County initiatives with those of local organizations that seek to build cultural program offerings and preserve historic assets. Such efforts could be focused on the following:

- Celebrating heritage through events, art (performing and visual), and programs. This presents a learning opportunity for participants while helping them connect with other people and the place in which they live.
- Strengthening identity and community image through art and design that reinforces the history and heritage. Recognizable features that recall the past in a positive

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 144 of 743

way builds community pride as well as a sense of ownership of and belonging to the community.

- Creating or promoting opportunities for art (performing arts, visual arts, etc.). Artistic expression is a powerful catalyst for community gatherings and the development of local networks.

## Recommendation 10
## Enhance the lives of seniors in the County.

### HL Policy 16

Support efforts to broaden the range of housing options that are suitable for older residents.

### ▶ Strategy 16.1

Allow a variety of housing products that meet the preferences of people 55 years old and above.

### ▶ Strategy 16.2

Encourage neighborhood design and location that support active living for seniors.

- Allow mixed-residential development that includes products aimed at seniors (patio homes, cohousing, etc.) within walking distance of (and connected to) neighborhood retail centers. Independence is enhanced by being able to walk safely to grocery stores, drug stores, restaurants, senior centers, hair salons, etc.
- Require design of neighborhoods to include walkable streets for safe pedestrian access to destinations within and adjacent to the neighborhood, and amenities that support active lifestyles.

### ▶ Strategy 16.3

Update building standards to encourage "universal design."

- *See Housing recommendations for more information.*

### ▶ Strategy 16.4

Continue/implement programs to address sub-standard housing.

### ▶ Strategy 16.5

Assess the programs and facilities that are part of the County's parks and recreation system to determine gaps, and update the Parks and Recreation Master Plan accordingly.

- *See Parks, Recreation, and Open Space recommendations for more information.*

### HL Policy 17

Help seniors remain involved in the community.

- Being connected to their community can have positive effects on the mental and emotional well-being of seniors. Interaction between the different generations strengthens social networks, helps foster a sense of belonging, and reduces the instances of isolation so many seniors face.

### ▶ Strategy 17.1

Facilitate partnerships that engage seniors in mentoring students and young adults who can benefit from the wisdom and experience shared by those seniors.

### ▶ Strategy 17.2

Encourage mixed-use and mixed-residential development that leads to the creation of multi-generational neighborhoods, promotes safe independent living, and facilitates healthy, active lifestyles among seniors.

### ▶ Strategy 17.3

Promote and facilitate lifelong learning through programs offered by CCCC and other partners.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 145 of 743





# AGRICULTURE

Agriculture, including forestry activities, is a cornerstone of the livelihoods and lifestyles for many in Chatham County. Some flexibility is needed when it comes to allowing non-residential activities that support farming directly and indirectly. Land use policies are needed that discourage intense residential growth and associated increases in property values and traffic. Key themes include increasing education and outreach, protecting existing operations and long-term access to water, supporting the growth of the agricultural industry, encouraging voluntary land conservation efforts, and minimizing conflict between new residential and existing agricultural operations while protecting property rights of rural land owners.

Recommendations in this Plan are meant to augment those found in the Chatham County Farmland Preservation Plan and highlight priority strategies that are related to other Plan Elements. Key recommendations in this Plan that reinforce those in the Farmland Preservation Plan include:

- Increase capacity of the Chatham County Cooperative Extension and added support for education and outreach
- Encourage participation in the Voluntary Agricultural District (VAD) program and consider enhancements such as real estate notification in VAD areas
- Update utility policies to protect agricultural water access
- Implement a county-led farmland protection program
- Land use policies tailored to areas identified as strategic farmland
- Updates to regulations to better meet the needs of the agricultural community by encouraging "agricultural friendly design" that includes greater setbacks from working lands and clustering to protect prime farmland

## BIG IDEA

**Agricultural areas designated on future land use map and policies that discourage higher density residential while allowing more flexibility for non-residential uses.**

## GOALS

### PRIMARY GOAL
**Preserve, protect, and enable agriculture and forestry.**

### SECONDARY GOAL
**Diversify the tax base and generate more quality, in-county jobs to reduce dependence on residential property taxes, create economic opportunity and reduce out-commuting.**

### SECONDARY GOAL
**Preserve the rural character and lifestyle of Chatham County.**

93

Image Source for previous page: Debbie Roos, Chatham County Cooperative Extension





Image Source: Debbie Roos, Chatham County Cooperative Extension

# RECOMMENDATIONS AND STRATEGIES

## Recommendation 01
## Increase education, outreach and training.

### AGR Policy 1
Support agriculture through increased education, outreach and training.

### ▶ Strategy 1.1
Assist operators of existing farms that are contributing to the economy to remain in operation even when faced with pressures to develop the land for other uses.
- Encourage participation in Voluntary Agricultural District (VAD) program.
- Raise awareness of the benefits of participating in VADs.
- Partner with land trusts to provide technical assistance to those who demonstrate interest in establishing agricultural conservation easements.

### ▶ Strategy 1.2
Require the disclosure of the presence of VADs and/or other working lands to potential homebuyers and other investors.

> Education and outreach was voted as the #1 thing the County should be doing, based on the Agricultural Survey.

▶ **Strategy 1.3**

Through educational programs (and partnering with Coopertive Extension), continue to raise awareness of and appreciation for agriculture in the County, especially: (1) the value to the community (economy, environment, health with access to fresh nutritious foods, etc.) and (2) the diversity and compatibility of many types with various types of development, including residential neighborhoods.

- Agri-tourism
- Health and nutrition programs
- Local food access programs
- Expanded course offerings
- Support volunteer opportunities related to community gardens and agriculture
- Partner with Chatham County Schools to create schoolyard gardens.
- Continue / increase support for agricultural related training programs in high schools
- Facilitate partnerships between the agricultural community and Central Carolina Community College to offer a degree and/or certification programs.

▶ **Strategy 1.4**

Increase capacity of the Chatham County Cooperative Extension Office.

▶ **Strategy 1.5**

Initiate a program to connect farmers to available lands for lease.

## Recommendation 02
**Promote agriculture as a key feature of the County and component of the local economy and discourage conversion of areas with viable agricultural operations, for development.**

### AGR Policy 2
Support the viability of agricultural operations through land use policies and regulations.

▶ **Strategy 2.1**

Allow temporary uses in conjunction with the programs, events and activities.

▶ **Strategy 2.2**

Support the continuation and/or integration of supporting uses that are vital to the long-term viability of major agricultural operations, including but not limited to:

- Suppliers of agriculture goods and services; processing facilities; food outlets (such as produce stands and small grocery stores); home-based businesses (such as tax services; small engine repair, furniture refinishing; restaurants; barber shops; bed-and-breakfasts and small inns; small-scale food and beverage production and retail; event venues.

▶ **Strategy 2.3**

Create an agricultural district that allows agricultural uses; discourages residential subdivisions over a specified scale or density (establish caps for project acreage, total lots, and/or dwelling units per acre); and allows a wide range of complementary uses, including businesses that can supplement income, provided (1) performance standards are met to avoid or mitigate impacts (see rural business recommendation in the Land Use section above), and (2) adequate utility service is or will be available.

- Evaluate modifications to zoning regulations to allow for supporting non-residential uses in Agricultural Areas. These could include the addition of flexibility via performance-based standards.
- Determine the need for an agricultural zoning district that codifies the recommendations above, and if such district is warranted, consider performance standards that emphasize compatibility over specific land use restrictions.

▶ **Strategy 2.4**

Update and adopt the Farmland Preservation Plan which includes additional land use recommendations to preserve agricultural operations in the county.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 149 of 743



## Case Study

**Supports Strategy 3.1**

### Agricultural Supply Chain Infrastructure

Agricultural Supply Chain Infrastructure includes farmers markets and Community Supported Agriculture (CSA) operations, which can expand outlets for small-scale agricultural operations; and storage, transfer and processing facilities, which can enable the access to additional markets and increase opportunities for value-added production.

Blue Ridge Food Ventures in Asheville, NC and Piedmont Food & Agriculture Processing Center in Hillsborough, NC are two examples of how local governments have supported new facilities that assist in the agricultural supply chain.

http://www.blueridgefoodventures.org/

http://www.pfapnc.org/

96

---

## AGR Policy 3

Support the long term economic viability of agricultural operations.

### ▶ Strategy 3.1

Support the expansion of agricultural supply chain infrastructure.
- Participate in partnerships to identify local and regional needs.
- Work to remove regulatory barriers for retail, storage, transfer and processing facilities provided impact to adjacent properties and the environment is minimized.

### ▶ Strategy 3.2

- Promote and encourage sustainable agricultural practices including preserving soil fertility and minimizing soil loss (e.g., using cover crops, rotational grazing, and no-till farming techniques); reuse of nutrients to minimize the net import of nutrients into local watersheds; the production of agricultural goods that can be consumed or used in the County (e.g., food crops); and farmscale BMPs that protect water quality.

## AGR Policy 4

Ensure that agriculture has long term access to water supplies.

### ▶ Strategy 4.1

Improve understanding of groundwater usage and availability in Agricultural Areas.

### ▶ Strategy 4.2

Consider impacts of new development on ground and surface water resources during development approval process by encouraging residential development in areas served by utilities.

### ▶ Strategy 4.3

Establish utility policies that reduce potential conflicts over groundwater.
- Discourage community wells in strategic agricultural areas.
- Establish policies for extending utilities into strategic agricultural areas. Policies could include:
  - Allow utility extensions (water and sewer) for
    - Serving Villages and Crossroads communities, denoted on the Future Land Use Map

- Providing water for agricultural operations and possibly certain types of storage, transfer or processing facilities
- Providing water to encourage decentralized wastewater systems for Agriculture Friendly Developments with an overall lower density than those allowed on wells via by-right zoning
- Do not allow utility extensions for serving major, conventional subdivisions over a certain size.

## AGR Policy 5

Support permanent, voluntary protection of agricultural lands.

▶ **Strategy 5.1**

Implement a county-led farmland protection program.
- This could be a Purchase of Development Rights (PDR) program that purchases development rights for agricultural lands from willing sellers.

▶ **Strategy 5.2**

Allow for density transfer.
- Agriculture and Conservation Areas to Compact Residential and Centers.

## AGR Policy 6

Encourage Agricultural Friendly Design.

▶ **Strategy 6.1**

Encourage "Agricultural Friendly Design" in new residential developments that reduce groundwater usage and protect adjacent working lands.
- Encourage only low density development in Agricultural Areas
- Encourage site design that reduces potential for conflicts through the preservation or establishment of vegetative buffers between residential uses and agricultural operations, and the location of open space and natural areas to provide separation between residential and agricultural operations

---

## Case Study

**Supports Strategy 4.1**

### Anne Arundel County Agricultural & Woodland Preservation Program

Landowners interested in preserving their land from development may qualify for this program offered through Anne Arundel County in partnership with the Maryland Department of Agriculture and Department of Natural Resources. Buying development rights from willing landowners provides a market-driven and compensatory approach to preserving agricultural lands. Typically landowners receive a portion of the lands value and an easement restricts the future use of the land to farming or forestry. Exceptions can be made for an additional home or two as long as the long term agricultural potential is not jeopardized. Proceeds can be used however landowners choose, including to purchase additional acreage, upgrading equipment or investing for retirement. In total 6,118 acres have been permanently protected as of December 1, 2015 through this program in Anne Arundel County. See http://www.aacounty.org/departments/recreation-parks/agricultural/ for more information.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 151 of 743

### ▶ Strategy 6.2

Amend land development regulations to create more compatible edge conditions where new development adjoins parcels in agricultural use.

### ▶ Strategy 6.3

Modify the subdivision process to encourage Agricultural Friendly Developments.

- Re-evaluate the allowances for and definitions of major and minor subdivisions in the Agricultural Area.
- For instance:
  - Consider allowing administrative approval of minor subdivisions up to 15 lots in rural and agricultural areas as long as design criteria is met.
- Require all major subdivisions, or just those receiving county water to be designed as Agricultural Friendly Developments.
- Include specific recommendation for conservation subdivisions and agricultural subdivisions—relaxation of roadway standards could be an incentive.

### ▶ Strategy 6.4

Study sliding scale zoning as a way to balance preservation of property rights with reduced conflicts over traffic, groundwater, etc.

**Agricultural Friendly Development Illustration:** Existing "R1" zoning encourages large lot subdivisions in agricultural areas. This could lead to higher land prices and conflicts over groundwater use. Agricultural friendly development could be encouraged that allows land owners to develop their land for residential use, but encourages lower density and/or design that protects rural character and reduces conflicts between agriculture and new development.



FIGURE 20: ILLUSTRATIVE COMPARISON BETWEEN CONVENTIONAL DEVELOPMENT AND AGRICULTURAL FRIENDLY DEVELOPMENT. THE DEVELOPMENT ON THE LEFT HAS 60 LOTS ON ROUGHLY 120 ACRES AND HAS LOTS LOCATED ADJACENT TO WORKING FARMLAND. THE DEVELOPMENT ON THE RIGHT HAS LESS LOTS AND DESIGN THAT BUFFERS EXISTING FARMS FROM NEW RESIDENTIAL DEVELOPMENT. THE ALTERNATIVE ALSO INCLUDES INNOVATIVE SEPTIC SYSTEM THAT ALLOWS FOR SOME CLUSTERING WITHOUT A SEWER SYSTEM AND A FEW LARGE "FARMSTEAD" LOTS THAT WOULD ALLOW AGRICULTURAL USES.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 152 of 743



**Case Study**

**Supports Strategy 5.3**

Sliding Scale Zoning

Many communities utilize a method of zoning called sliding scale zoning to reduce conflicts between residential development and agricultural operations. In this method of zoning the number of residential lots permitted for a given property is based on the size of the property. As parcels size increases, so does the number of residential units allowed. However, the development yield decreases as the size of the property increases. This results in a lower overall density if land is built out, but preserves the ability for land owners to sell smaller properties for conventional development. This method, in combination with design criteria for minimizing impacts to adjacent properties and viewsheds can result in well-designed residential "hamlets" that coexist with existing agricultural operations and rural communities.

The table illustrates a potential sliding scale zoning example that could be implemented to preserve the ability of rural land owners to sell or develop land for residential purposes, while reducing the overall density of development and potential for conflicts over groundwater and traffic that large scale subdivisions bring to agricultural communities. Adjustments could be made to result in lower densities based on community preference.

| Area of Lot of Record | Example Area (Acres) | Dwelling Units Allowed | Density (DU/Acre) | Avg Lot Size | Notes |
|---|---|---|---|---|---|
| 1-30 Acres | 30 | 15 | 0.50 | 2 | 1 dwelling unit per 2 acres--same avg. density as R1 Zoning due to soils, min. lot size dependent on utilities and/or soils. |
| 30-50 Acres | 50 | 22 | 0.43 | 2.3 | 1 dwelling unit per 2 acres for first 30 acres, then 1 dwelling unit per 3 acres for additional acreage. Gross density /min. lot size dependent on utilities/soils. |
| 50-100 Acres | 100 | 36 | 0.36 | 2.8 | 1 dwelling unit per 2 acres for first 30 acre, then 1 dwelling unit per 5 acres for additional acreage. Gross density /min. lot size dependent on utilities/soils. |
| >100 Acres | 200 | 60 | 0.30 | 3.3 | 1 dwelling unit per 2 acres for first 30 acre, then 1 dwelling unit per 7 acres for additional acreage. Gross density /in lot size dependent on utilities/soils. |

99



**Case Study** **Supports Strategy 5.4**

## Willowsford Farms

Willowsford is a master planned community located in Loudon County, Virginia, 35 miles west of Washington D.C. The community is designed around a working farm, forests and meadows. The community is a series of villages that are nestled around open space that accounts for 50% of the land area. Elements of the community preserve the agricultural heritage of the land including horse fencing, low stone walls, wooden signs, a farm and the Willowsford Farm market stand where residents can pick up fresh eggs, chickens, honey and other items produced on-site.

For more information see: https://casestudies.uli.org/willowsford/

▶ **Strategy 6.5**

Encourage integration of small-scale agriculture into urbanizing areas where such operations are compatible with adjacent urban uses.

- Allow operations of 50 acres or less within residential and commercial development, provided such operations meet the following criteria:
  - All land (one or multiple parcels) devoted to the operation, including areas with accessory uses, do not exceed 50 acres.
  - Sustainable farming practices are employed (limited pesticide use).
  - Associated (wholesale and retail) sales of products are conducted in buildings and structures with the required permits to ensure the storage of materials is not visible from public roads or adjoining development.
  - Such operations adhere to all applicable restrictions pertaining to noise and light.
  - Buffers, walls, and/or fences are installed as needed to increase compatibility with surroundings.
- Continue providing a density bonus for working farms in Conservation Subdivisions.



Willowsford Farms

**Strategic Agricultural Areas**

The 2009 Farmland Protection Plan recommended mapping strategic agricultural lands in the County and establishing land use policies to protect them. The map below shows result of the GIS-based suitability analysis utilized to identify Agricultural Areas on the Future Land Use and Conservation Plan. The factors that were considered include:

- Present Use Value Program Enrollment
- Proximity to Voluntary Agricultural Districts
- Soil quality (prime farmland of state significance based on Natural Resource Conservation Service (NRCS) data)
- Proximity to conserved farms
- Size of properties

Weights for each input were assigned based on input from the Agricultural Survey conducted in the fall of 2016.



FIGURE 21: AGRICULTURAL SUITABILITY ANALYSIS

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 155 of 743





# NATURAL RESOURCES

Chatham County has significant natural assets including large tracts of intact upland forests, rare aquatic habitats, many conserved lands and productive agricultural and forestry areas. These resources provide invaluable ecosystem services including clean water and air. They also help to sustain the local economy by providing local food, raw materials and attracting eco-tourism.

Maintaining and improving water quality is a primary concern of citizens. Sedimentation and non-point source pollution from new development is a major threat to water quality. Land fragmentation and habitat loss are also concerns in that they are one of the leading reasons for decline in wildlife species. Promoting conservation design and maintaining a regulatory framework incentivizes low impact development that can help mitigate impacts. Emerging threats, including the potential impacts of natural gas extraction and climate change, will need to be addressed in the coming years through public and private actions.

The big idea for natural resources is to actively work to create a connected system of public and privately owned lands that maintain key ecosystem services and are sensitively integrated into well-designed development. This land protection effort will require local and regional partners and could target lands that contribute to maintaining water quality in Jordan Lake, serve as key habitat areas, and/or consist of strategic farmland.

Recommendations in this Plan are meant to augment those found in the Chatham County Comprehensive Conservation Plan and highlight priority strategies that are related to other Plan Elements.

## BIG IDEA

Permanently protect 20,000 acres of additional land by 2040.

## GOALS

### PRIMARY GOAL
**Conserve natural resources.**

### SECONDARY GOAL
**Preserve the rural character and lifestyle of Chatham County.**

### SECONDARY GOAL
**Provide recreational opportunities and access to open space.**

### SECONDARY GOAL
**Preserve, protect, and enable agriculture and forestry.**

103

Image Source for previous page: Haw River Trail Partnership Staff





Rock outcrops and upland habitat adjacent to the Haw River

# RECOMMENDATIONS AND STRATEGIES

## Recommendation 01
### Maintain and improve water quality.

#### NR Policy 1
Ensure the long-term quality of water resources.

▶ **Strategy 1.1**
Maintain riparian buffers in Watershed Protection Ordinance and minimize stream crossings in new developments.

▶ **Strategy 1.2**
Continue policies that discourage mass grading.

▶ **Strategy 1.3**
Increase capacity of the Land and Water Resources staff to ensure adequate enforcement of sedimentation and erosion control standards.

▶ **Strategy 1.4**
Encourage tree plantings and restoration activities in watersheds with low or diminishing tree cover.





A mature tree canopy provides a variety of ecosystem services including the capture of stormwater, provision of food and habitat for wildlife, air quality and protection of water quality.

Stormwater Tree Trench

Green Roof

Flow-through Planter

Rain Garden

Rain Barrel

Stormwater Planter

...ter Bump-out

Pervious Paving

FIGURE 22: GREEN INFRASTRUCTURE TOOLS (SOURCE: PHILADELPHIA WATER DEPARTMENT)

### ► Strategy 1.5

Provide incentives for preservation of headwater streams, reforestation of riparian areas, and stream restoration.

### ► Strategy 1.6

Participate in sub-watershed level studies to determine the causes of impaired streams, establish a funding mechanism for restoration of impaired streams, and conduct riparian and stream restoration projects with public, non-governmental and private partners in threatened sub-watersheds.

### ► Strategy 1.7

Encourage Best Management Practices (BMPs) in agricultural and timber operations.
- Encourage replanting after harvesting forest cover.



FIGURE 23: MATURE TREES ARE LOCATED ALONG RURAL ROADS AND SERVE AS DRAMATIC VERTICAL ELEMENTS THAT PROVIDE TEXTURE TO VIEWS. WHERE FEASIBLE, THESE TREES SHOULD BE INCORPORATED INTO THE DESIGN OF AMENITY SPACES IN NEW DEVELOPMENT.

### ► Strategy 1.8

Update policies and regulations to limit impacts of natural gas exploration and extraction.
- Complete the Natural Gas Impacts Study, a parallel effort to identify the potential impacts and appropriate strategies to minimize, mitigate, or avoid such impacts.
- Coordinate with regional partners, such as Lee County, to establish regulations for site planning, development, and restoration based on best practices.

## Recommendation 02
## Preserve site and landscape level concentrations and connections of green infrastructure.

### NR Policy 2

Protect and improve site level green infrastructure.

### ► Strategy 2.1

Encourage development design that preserves unique natural features on sites. Examples include wildlife hubs and corridors, mature forest, hedgerows, rare habitats, riparian areas, drainage-ways (above USGS defined "blue-line" Streams).

### ► Strategy 2.2

Encourage development design to preserve forest cover and additional uplands.

### ► Strategy 2.3

Heritage Trees: Through a tree protection ordinance, establish protection for heritage trees. (Note: Heritage trees are defined by some North Carolina communities, such as Charlotte, as "any tree that is listed in the American Forest Association's Champion Tree List, the North Carolina Big Trees List, or any tree that would measure 80 percent of the points of a tree on the North Carolina Big Tree List.") Refer to the following guides for more information about identifying and protecting trees:

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 160 of 743



FIGURE 24: DENSITY TRANSFER ILLUSTRATION

**Density Transfer**
Voluntary density transfer should be encouraged as a way to preserve Rural, Agricultural and Conservation Areas as greenbelts surrounding Towns and planned activity centers. Allowable residential density (dwelling units) and/or non-residential built upon area can legally be transferred between two properties based on an administrative approval.

Guidelines should be established that include eligible sending and receiving areas, caps on density and built upon area for receiving areas. This process would require an approved plat for both properties or a conservation easement on the sending property. It will also require staff time and a tracking mechanism.

- **Developing Tree Protection Ordinance in North Carolina**
- **Protecting and Retaining Trees: A Guide for Municipalities and Counties in North Carolina**

▶ **Strategy 2.4**
Require/incentivize Low Impact Development (LID) techniques and Green Stormwater Infrastructure (GSI) in and near Centers and in Compact Residential Areas. LID/GSI techniques can improve the quality of stormwater run-off and reduce velocity and quantity. Techniques such as green roofs, pervious pavement, stormwater planters, bio-retention areas, filter strips, cisterns and rain gardens should be deployed to mitigate the impacts of additional impervious surface.

▶ **Strategy 2.5**
Consider recommendations provided by the NC WLRC to minimize impacts to important natural resources.

▶ **Strategy 2.6**
Encourage eradication of invasive species plants.

**NR Policy 3**

Ensure the long-term viability of natural systems by acknowledging valuable natural resources and employing techniques to preserve the functionality of the systems of which they are a part.

▶ **Strategy 3.1**
Protect Natural Heritage Natural Areas (NHNAs), habitat hubs and wildlife corridors through voluntary reservation, acquisition and partnerships with non-profits and private entities. Study the establishment of a county-led land acquisition program to assist in local land protection efforts.

▶ **Strategy 3.2**
Limit overall density of development in Conservation Areas.

### ▶ Strategy 3.3

Allow density transfers to protect landscape level green infrastructure (i.e. greenbelts around towns and planned activity centers).

## Recommendation 03

### Encourage conservation design in and near Conservation and Protected Lands and in Rural Areas.

#### NR Policy 4

Provide options that make conservation design the easy choice in new residential development design.

### ▶ Strategy 4.1

Continue to allow administrative approval for conservation subdivisions up to 15 lots and consider allowing administrative approval for conservation subdivisions up to a certian size provided that design criteria are established.

### ▶ Strategy 4.2

Continue to allow private roads that are appropriately designed and sized as an incentive for small-scale conservation subdivisions and agricultural friendly subdivisions.

### ▶ Strategy 4.3

Allow off-site septic for conservation subdivisions, but discourage for conventional subdivisions

### ▶ Strategy 4.4

Modified submittal requirements for conventional and conservation subdivision design (CSD). Specific amendments to the existing regulations could include the following:

- Modify procedures to simplify the review and approval steps. The process for designing and permitting a residential subdivision that adheres to conservation design standards should be no more arduous or expensive than the process for designing and permitting a conventional residential subdivision.

- Clarify requirements to eliminate vague language and increase predictability.
    - Clearly define specific design criteria to be met.
    - Ensure standards are measurable.
    - Consider allowing administrative approvals.
- Offer incentives to make CSD a more attractive option than conventional subdivision, especially for smaller properties (i.e. <50 acres). Consider the following:
    - Density bonus adjustments (sliding scale based on parcel size),
    - Modifications to street requirements, and/or
    - Off-site septic allowances (contingent on soil survey results).
- Further clarify primary and secondary conservation areas, and make datasets available to applicants to use as a starting point for identifying primary and secondary conservation areas to be set aside.
- Require conditional use permits for conventional subdivisions in Conservation Areas.

Refer to the Big Woods Conservation Design Guide in the Appendix for more information on a proposed conservation design process and types of resources to consider in expanding the definitions of primary and secondary conservation areas as open space standards in the County's ordinance are amended.

## Recommendation 04

### Improve education and awareness of natural assets.

#### NR Policy 5

Improve outreach and access to environmental data.

### ▶ Strategy 5.1

Website updates and creation of county GIS datasets.
- Inventory of public and private green space (this dataset is referenced on website, and in regulations but is not available)
- Percent Slope data derived from high resolution elevation data

- Wildlife corridors and hubs
- Stands of mature, native trees

▶ **Strategy 5.2**

Education and outreach activities.

- Technical assistance to assist with conservation design and backyard habitat improvements (i.e. pollinator gardens)
- Environmental education at public parks (i.e. signage or a Bio-Blitz event)

▶ **Strategy 5.3**

Update biodiversity and wildlife habitat assessment created during the CCP Conservation Plan and Natural Heritage Survey, augment with updated / additional data.

---

**Nature Preserves – Mecklenburg County, NC**

In addition to active recreational facilities, the Mecklenburg County Parks and Recreation department has worked with local land trusts to acquire and manage 7,000 acres of nature preserves. **Nature preserves have been shown to create a 440% return on investment** due to direct revenue, tax value benefits, tourism and ecosystem services (Source: Mecklenburg County Division Director of Nature Preserves & Natural Resources). The department is fulfilling goals from the Mecklenburg County Vision 2015 plan by protecting native plant and animal species and natural community types that are unique to the County. Active management and restoration activities have helped restore Piedmont Prairie ecosystems at a number of parks. Many of the preserves offer passive recreational opportunities such as hiking, biking and guided tours. For more information visit: **http://charmeck.org/mecklenburg/ county/ParkandRec/StewardshipServices/ NaturalResources/Pages/default.aspx**

---

## Recommendation 05

**Improve access to natural areas and support outdoor recreation based tourism.**

### NR Policy 6

Consider impacts of new development on unique resources and improve public access to protected lands.

▶ **Strategy 6.1**

Consider impacts to viewsheds and recreational access needs during the development review process.

- Many planned regional trails and blueways depend on linkages through the County. These offer tourism opportunities if resources are protected.

▶ **Strategy 6.2**

Continue to limit light pollution, especially in Rural and Conservation Areas.

- Regularly evaluate and update the Chatham County Lighting Ordinance to minimize offsite impacts of lighting.

▶ **Strategy 6.3**

Partner with state and local governments and non-profit organizations to increase access to protected lands and unique natural features.



110



# RESILIENCY

The reason for the "Big Idea" to "become a Carbon Negative County" is to reduce the County's greenhouse gas emissions and the environmental risks that will result from global warming. This section focuses on avoiding, mitigating and adapting to anthropogenic climate change and the associated impacts of acute natural events and emergencies. Chatham County has an opportunity to take leadership as a local government in reducing carbon emissions, while also promoting green and sustainable jobs. Resiliency can be defined in many ways. Financial resiliency includes fostering a diverse economy and tax base in order to remain solvent through the ebb and flow of growth and recession. A resilient natural environment performs valuable, irreplaceable ecological services. Infrastructure, in the form of roads and utility systems, which are capable of withstanding peak demands and have built in redundancy, can be considered a key piece of resiliency. The recommendations in the Resiliency Element build on financial, natural and infrastructure related resiliency recommendations addressed in the Land Use, Economic Development, Infrastructure and Transportation elements of this plan.on financial, natural and infrastructure related resiliency recommendations addressed in the Land Use, Economic Development, Infrastructure and Transportation elements of this plan.

## BIG IDEA

**Become a carbon negative county.**

## GOALS

### GOAL 01
**Become more resilient by mitigating, responding and adapting to emerging threats.**

### OBJECTIVE 01
**Improve emergency response and limit risk associated with natural and man-made disasters (drought, floods, energy costs and availability, etc.)**

### OBJECTIVE 02
**Encourage resource efficient building standards.**

Image Source for previous page: Tom Scheitlin (via Solarize-nc.org





Photo source: Debbie Roos

# RECOMMENDATIONS AND STRATEGIES

## Recommendation 01
**Prepare for and respond to acute natural events and man-made emergencies.**

### Resiliency Policy 1
Prepare for impacts of drought, fire, flooding and pests.

▶ **Strategy 1.1**
Update landscape planting guidelines to emphasize native species, diversity, drought tolerant plants, xeriscaping and other sustainable landscaping practices.

▶ **Strategy 1.2**
Discourage the use of invasive species and encourage removal of invasive species.

▶ **Strategy 1.3**
Discourage alterations of floodplain.

▶ **Strategy 1.4**
Encourage "Firewise" development design in rural areas.

112

▶ **Strategy 1.5**

Encourage the design of parks that reduce the transmission of tick borne illnesses.

### Resiliency Policy 2

Improve emergency response.

▶ **Strategy 2.1**

Coordination between the Planning Department, Watershed Protection Department, Erosion Control Department, Fire Marshal Office and the Fire Departments in areas of proposed development.

▶ **Strategy 2.2**

Require static water points in new residential developments in areas without adequate fire protection service.

▶ **Strategy 2.3**

Encourage CERT (Community Emergency Response Teams) organizations at the County and community levels.
• Foster EMT training opportunities

## Recommendation 02
### Minimize, mitigate and adapt to present and future risks.

### Resiliency Policy 3

Increase energy and water efficiency of buildings.

▶ **Strategy 3.1**

Encourage infill and reuse of buildings and sites.

▶ **Strategy 3.2**

Implement and build on the policy that future county owned buildings be LEED certified or equivalent by encouraging energy and water efficiency in all county buildings.

▶ **Strategy 3.3**

Develop a LEED or LID or equivalent recognition program, such as a program that encourages new commercial and industrial buildings to meet LEED standards and encourages new neighborhoods to achieve "LEED-ND" certification.

▶ **Strategy 3.4**

Encourage LID storm water practices including the use of cisterns, rain barrels and other rainwater collection.

▶ **Strategy 3.5**

Encourage or require communities over a certain size to include water reuse systems.



Green Roof on Central Carolina community college's Sustainable technologies center

**LEED by Example**

Central Carolina Community College's Sustainable Technologies Center is a LEED certified Gold level building that has a vegetative roof with drought-resistant plantings, water recycling technology and solar power.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 167 of 743

## ▶ Strategy 3.6

Provide training for staff to increase capacity to review and permit Green Certified buildings, alternative energy systems, water reuse systems, green stormwater infrastructure (GSI) and other innovative building methods.

### Resiliency Policy 4

Encourage alternative energy in order to lessen dependency on the utility grid.

## ▶ Strategy 4.1

Evaluate barriers to renewable energy installations and consider permitting on-site small-scale renewable energy generation as a principal or accessory use in appropriate zoning districts.

## ▶ Strategy 4.2

Allow by-right small-scale solar and wind systems; consider relaxed setbacks for these systems.

## ▶ Strategy 4.3

Orient blocks and buildings to maximize active and passive solar access.

## ▶ Strategy 4.4

Discourage home ownership association rules that prohibit outdoor clothes lines.

## ▶ Strategy 4.5

Consider sites within or near Employment Areas (including proposed megasites) for renewable energy facilities such as solar farms as a complimentary use.

### Resiliency Policy 5

Reduce per capita emissions.

## ▶ Strategy 5.1

Recruit jobs and increase access to broadband in order to reduce the rate of out-commuting.

## ▶ Strategy 5.2

Concentrate higher density mixed use development in designated areas to encourage walking and biking trips and support successful transit service.

- *See Land Use Element for specific recommendations*

## ▶ Strategy 5.3

Partner with academic institutions, regional partners and other organizations to monitor emissions and carbon sequestration, as well as develop strategies to reduce emissions and encourage carbon sequestration.

## ▶ Strategy 5.4

Encourage electric vehicles by (1) studying ways to leverage public assets and private development to create a county-wide network of Electric Vehicle (EV) charging stations, and (2) incorporating electric powered vehicles in government owned vehicle fleets (i.e. Chatham County, Chatham Transit, and Chatham County Public Schools).

## ▶ Strategy 5.5

Encourage "Complete Street" elements and transit service expansions to provide residents with transportation options in order to reduce vehicle miles traveled.

- *See Transportation Element for specific recommendations*

### Resiliency Policy 6

Improve waste and recycling services to meet the needs of the County.

## ▶ Strategy 6.1

Improve facilities and expand programs as needed.

- Increase the number of recycling centers
- Improve collection centers to extend service life and incorporate landscaping and stormwater improvements
- Evaluate fee structure
- Expand programs to accommodate increased population

Page intentionally left blank



116



# PARKS AND RECREATION

The Parks, Recreation and Open Space element includes a Concept Plan Map. Policies and strategies in this element are meant to lay the groundwork for a connected system of parks, recreation facilities and open space. It reinforces previous recommendations that were supported by public input during the comprehensive planning process and introduces new concepts that will require further study and cooperation with governmental and non-governmental partners to bring to fruition.

The Concept Plan illustrates key future recreation and cultural destinations and, combined with the recommendations, provides a strategic blueprint for future parks, recreation facilities, programs, open space linkages, amenities, trail connections, priority greenways and paddle trails.

## BIG IDEA

**Double the amount of natural surface trails and paved greenways by 2030.**

Note: Currently there are 26 miles of natural surface trails in the County, with the majority of them being in the Jordan Lake State Recreation Area. Currently there are 6.7 miles of greenways, with the majority being the 4.9 miles of the American Tobacco Trail.

## GOALS

### PRIMARY GOAL
Provide recreational opportunities and access to open space.

### SECONDARY GOAL
Foster a healthy community.

### SECONDARY GOAL
Conserve natural resources.

117

# PARKS, RECREATION, AND OPEN SPACE CONCEPT

**Highlights from the map and recommendations include:**

- **Regional trails and greenways and improved river access**
- **Greenway connections to Pittsboro, Siler City, Moncure, Cary and Apex**
- **New indoor recreation facilities**
- **New nature preserves**
- **Areas of strategic open space**
- **Protection of historic assets**
- **Policies that encourage parks, open space and amenities in new development**



FIGURE 25: PARKS, RECREATION AND OPEN SPACE CONCEPT MAP

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 172 of 743



Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 173 of 743





# RECOMMENDATIONS AND STRATEGIES

> **Conservation of natural areas, greenways and hiking trails** are the highest priority recreational facilities in the County.
>
> (Source: Plan Chatham Public Survey, June 2016)

## Recommendation 01
## Maintain and improve existing parks.

### PR Policy 1

Maintain and improve existing parks to meet evolving facility and programming needs.

### ▶ Strategy 1.1

Fund the design and construction of facility improvements at district parks.

- Briar Chapel Community Park:
    - Phase II improvements including a playground, shelter, walking trail, paved parking area and lighting improvements
- Northeast District Park:
    - Outdoor multiuse courts (including basketball), recreation center, disc golf course, additional walking trails or mountain bike trails, and lighting improvements (note park includes a 14 acre conservation easement which may allow for some recreation facilities i.e. disc golf)
- Northwest District Park:
    - Equestrian trail, athletic field(s), observation deck, new site plan
- Southwest District Park:
    - Indoor recreation center, multipurpose field

▶ **Strategy 1.2**

Improve parking at all parks. Parking lot improvements could include paving or use of alternative surface materials (i.e. pervious pavement or gravel) for sensitive areas and/or overflow parking.

▶ **Strategy 1.3**

Upgrade playgrounds and equipment at all parks as needed.

▶ **Strategy 1.4**

Improve accommodations for senior and disabled populations at existing parks.
- Chatham County is currently meeting requirements in the Americans with Disabilities Act (ADA), however additional or new benches, restrooms, clear signage, water fountains, and/or specialty play and fitness equipment in existing parks would enhance use by a more diverse group.

▶ **Strategy 1.5**

Support inclusive and ecologically responsible facility design and programming.

▶ **Strategy 1.6**

Incorporate environmental and cultural education and programming into existing and future parks and greenways.

▶ **Strategy 1.7**

Improve access to and condition of existing trails. For example, many hiking trails exist in the Lower Haw River Natural Area, but improved signage and more regular maintenance, especially after storms and floods, is needed.

▶ **Strategy 1.8**

Encourage park safety for all citizens by adhering to CPTED principles.

## Recommendation 02

### Plan for and create a complete and connected system of parks and open space.

#### PR Policy 2

Address recreational and open space priorities through planning efforts.

▶ **Strategy 2.1**

Update the Parks and Recreation Comprehensive Master Plan (2009). The update should consider the following:
- Supplementing private park space with public parks in planned Centers.
- Facilities and programming to address health issues, i.e. obesity.
- Role of county related to acceptance of donated land, historic sites, community gardens and other gathering spaces.
- Mechanisms to facilitate maintenance of trails, greenways and smaller parks in unincorporated communities.

▶ **Strategy 2.2**

Create a Greenway and Blueway Master Plan as a standalone document or as a component of a parks and recreation plan update.
- Work to have this document adopted by the Board of Commissioners. Note: The existing Parks and Recreation Plan from 2009 was never adopted. Formal adoption is beneficial as PART-F grant applications receive higher ranking if the plan has been accepted.

▶ **Strategy 2.3**

Develop Open Space Framework Plans for areas with high value natural assets. These plans would acknowledge the areas identified as valuable natural resources, and describe the integration with public and private development while maintaining the integrity of the resources. Mapped

## A Framework for Open Space

The Parks, Recreation and Open Space Concept Plan acknowledges agricultural and conservation areas shown on the Future Land Use and Conservation Plan. Though these areas are largely privately owned, and likely to remain that way, the type and form of land uses in these areas will contribute to a county-wide open space network. A key piece of the future system of open space in the County will be open space set-asides that will be included in private development. It is recommended that in areas with high value natural assets, conservation subdivisions should be promoted and incentivized. Area plans that illustrate an ideal arrangement between developed areas and a connected system of open space should be useful to guide future development.

See the Conservation Design Guide in the Appendix for an example of a small area planning effort that outlines priority open space.



FIGURE 26: BIG WOODS CONCEPT PLAN

using GIS, this data could inform decisions about open space preservation in conservation design (See Natural Resources Element. Also see the Big Woods Concept Plan, included as an appendix). Areas that would be candidate locations include:

- Haw River Corridor
- Rocky River Corridor
- Southeast Jordan Lake
- Other areas surrounding Natural Heritage Natural Areas

### PR Policy 3
Increase the number and mileage of trails and greenways.

### ▶ Strategy 3.1
Coordinate with municipalities and private entities to acquire land for, and build priority trail segments.
- Support the completion of the Haw River Trail and Deep River Trail through Chatham County
- Support the completion of other trails and greenways shown on the Parks, Recreation and Open Space Concept Map

### ▶ Strategy 3.2
Update policies and regulations to require the reservation of easements and encourage the construction of trails and greenways that are shown on adopted plans.

### ▶ Strategy 3.3
Create a trail coordinator position within the Parks and Recreation department that can focus on planning for trails and greenways, coordinating with local governments, non-profit organizations and private entities, and applying for, and administering grants.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 176 of 743

▶ **Strategy 3.4**

Work with transportation counterparts to obtain easements for multi-use paths along roadways
- Specifically work to determine feasibility of multi-use paths along:
    - US 15-501 from Pittsboro to Rock Ridge Park
    - The proposed backage roads east of 15-501
    - Pittsboro-Moncure Road
    - US 64 from Jordan Lake east to the County Line
    - NC 751 between US 64 and Martha's Chapel
    - Other roads as outlined on the Parks and Recreation Concept Map

## PR Policy 4

Partner with municipalities and private developers to improve access to recreation facilities.

▶ **Strategy 4.1**

Provide more outdoor recreational opportunities and open space.
- Level of Service (LOS) gaps that should be addressed include:
    - Northwest Chatham
    - Central Chatham (Rocky River Corridor)
    - Northern Haw River Area (i.e. Frosty's and Terrell's Chapel)
    - Martha's Chapel Area
    - Southeast Chatham (including Moncure)

▶ **Strategy 4.2**

Provide more access to indoor recreational facilities, programming and outdoor facilities.
- Construct a multi-purpose indoor recreation center at the Northeast District Park property and/or as a co-located shared facility at a new elementary school in the vicinity of Briar Chapel Park (Parker-Herndon Road).
- Collaborate with municipalities to determine a location for a district park that serves the Town, areas in the ETJ and county residents.
- Collaborate with the Town of Pittsboro to determine a location for an indoor recreation center / aquatic center to serve the Town, areas in the ETJ and county residents.

- Coordinate with the Town of Pittsboro and Chatham Park to determine opportunities for parks and recreational facilities within or near the proposed development.
- Partner with Chatham County schools to develop a model joint-use agreement that allows for access to outdoor facilities at appropriate times.
    - An agreement currently exists for leagues, but an "open gate" policy could help address access to parks in many areas.

▶ **Strategy 4.3**

Encourage the activation of Village Centers with public space.
- Develop small area plans for Villages and Village Centers to determine opportunities and priorities for open space.
- Work with private developers to locate and integrate plazas, pocket parks and greenways within new developments.
- Partner with community organizations to pursue grant funding for land acquisition and park development.
- Partner with towns to create a potential land trust fund.

## PR Policy 5

Leverage natural, cultural and historic resources to enhance authentic community character; improve access to recreation and support tourism.

▶ **Strategy 5.1**

Improve river access (Haw, Deep, Rocky and Cape Fear) in locations shown on the Concept Map.
- Formalize the Chicken Bridge Road Haw River access.
- Locate additional canoe/kayak access points along the Deep and Cape Fear River.

▶ **Strategy 5.2**

Study the feasibility of establishing a nature preserve on the County owned land along Terrell's Creek adjacent to Crawford Dairy Road.



124



# TRANSPORTATION

Although the Comprehensive Plan is not a transportation plan, transportation is one of its integral elements. The transportation system influences, or is affected by, nearly all aspects of the Plan, either directly or indirectly. Travel itself is a direct response to the geographic distribution of jobs, housing, shopping, and other land uses. It is a "derived demand" that can be influenced to varying degrees by land use and urban design decisions.

In the case of Chatham County, a substantial share of traffic on major US routes like US 64 and US 421 consists of through-trips outside the influence of Chatham County's planning efforts. Many more trips, especially for commuting, begin or end outside the County, and are also subject to conditions at their external origin/destination. However, within the County, thoughtful planning of both land use and transportation infrastructure can reduce the number, length, and geographic distribution of automobile trips, as well as promote alternative modes of travel. Providing options to walk, bike and take transit can help create a healthier community, reduce time wasted in traffic and reduce pollution.

The transportation component of the Comprehensive Plan focuses on identifying and integrating policies and priorities that support the overall vision of the Plan. Recommendations in this Plan element are meant to inform future transportation planning activities, such as regional long range transportation plans and the Comprehensive Transportation Plan (CTP). The Transportation Concept Map (Figure 28) highlights key transportation infrastructure and service needs identified when developing the Comprehensive Plan, and recommends strategies for addressing these needs.

## BIG IDEA

County residents of all ages and abilities can travel safely and easily through the County using a range of appropriate travel modes.

## GOALS

### PRIMARY GOAL
Provide infrastructure to support desired development as well as economic and environmental objectives.

### SECONDARY GOAL
Foster a healthy community.

### SECONDARY GOAL
Provide recreational opportunities and access to open space.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 179 of 743





Source: chathamtransit.org

# RECOMMENDATIONS AND STRATEGIES

### Recommendation 01
### Big Recommendation: Expand transit.

During the plan development process, attendees at the second round of public meetings were asked to allocate a hypothetical amount of funds to transportation projects in a way that would be beneficial to the County. The results of the survey indicated that improving transit service was their number one priority. However, it soon became apparent that not everyone meant the same thing when they said "transit." Some were focused primarily on fixed-route service, especially for commuting and trips to major regional destinations. Their goal was to reduce automobile travel and associated impacts, as well as providing options to automobile travel. Others were more concerned with providing access to important services and activities for those who are unable to drive due to financial or physical limitations. While both goals are valid, they have very different solutions.

### Trans Policy 1

Attract more ridership by improving the service quality of the current fixed-route transit system, while optimizing system efficiency (Commuter/Regional).

▶ **Strategy 1.1**

Short-term – Evaluate the benefits of increased frequency and extended service hours, implementing as feasible.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 180 of 743

### ▶ Strategy 1.2

Short-term – Upgrade and maintain amenities at existing stops, and encourage improvements to pedestrian connections.

### ▶ Strategy 1.3

Medium-term – Evaluate modifications to routes and stop locations to increase efficiency and ridership. Explore express, local, and skip-stop options, as well as route-deviations. Examples include:
- Pittsboro Circulator
- US 64 Express service

### ▶ Strategy 1.4

Long-term – Build ridership by extending or adding routes to expand service area where justifiable. Examples include:
- Service to Megasites, Moncure and Goldston

## Trans Policy 2

Ensure development is appropriately supportive of existing or future transit service. (Commuter/Regional)

### ▶ Strategy 2.1

Short-term – Update subdivision and site plan regulations to provide "transit-supportive" development and amenities where appropriate.

### ▶ Strategy 2.2

Medium-term - Encourage the inclusion of transit accommodations within new development at planned Community and Neighborhood Centers. Accommodations could include transit stops, shelters, and/or park-and-ride lots.

### ▶ Strategy 2.3

Medium-term - Evaluate intergovernmental agreements for future transit service.

---

**Transit-supportive development**

Recognizes that in the proper locations, walkable mixed-use development of the appropriate size and density can effectively support quality transit service, regardless of mode. This enhanced transit service, in turn, can attract additional compatible development. Transit-supportive development can yield other benefits, as well, including reduced sprawl, increased pedestrian and bicycle activity, economic development potential, and reduced environmental impacts.

---

## Trans Policy 3

Improve and expand demand-response service.

### ▶ Strategy 3.1

Short-term - Identify, monitor, and regularly publicize the benefits of services provided to rural areas and the transportation disadvantaged, as well as unmet needs and their associated costs.

### ▶ Strategy 3.2

Short-term - Encourage the Village-to-Village Network concept as a low-risk way to identify and grow potential markets and series.

### ▶ Strategy 3.3

Medium-term - Investigate the potential for any emerging private or public transportation services technologies for all modes of travel (i.e. Uber, Uber Elevate) to supplement demand-responsive service and fulfill first-mile/last-mile needs.

### ▶ Strategy 3.4

Short/Medium-term - Consider acquiring additional vans for demand responsive service.

## Recommendation 02
## Promote active transportation.

### Trans Policy 4
Work with public and private partners to build a connected network of greenways and trails as shown on the Parks, Recreation and Open Space Concept Map.

▶ **Strategy 4.1**
Partner with Siler City, Pittsboro, Goldston, non-governmental organizations and private land owners to acquire easements for and/or construct greenways and trails.

### Trans Policy 5
Where appropriate, encourage developers to provide adequate pedestrian and bicycle facilities, based on anticipated demand for pedestrians and bicyclists, and the ability of such facilities to effectively mitigate speeds and/or traffic volumes that could contribute to unsafe or uncomfortable conditions.

▶ **Strategy 5.1**
Short-term – Update regulations, as appropriate, to require the inclusion of sidewalks in new development in areas near existing or planned Centers, as well as other potential pedestrian generators (i.e. schools, parks, senior centers, retail)

▶ **Strategy 5.2**
Short/medium-term – To meet current design standards and/or better accommodate bicyclists and motor vehicles, include paved shoulders, wide outside lanes, and bike lanes on key routes as roads are improved. See map for proposed projects.

▶ **Strategy 5.3**
Short-term – Establish standards for collector streets that include on-road bicycle facilities where appropriate, to be constructed as part of private developments.

▶ **Strategy 5.4**
Short-term – Encourage installation of bike racks and other amenities at strategic locations.

▶ **Strategy 5.5**
Short-term – Expand educational and informational outreach identifying dedicated pedestrian/bicycle facility and preferred shared roadways, though maps, wayfinding signage, smartphone apps, and online resources.

## Recommendation 03
## Use transportation infrastructure to reinforce character.

The divide between rural and suburban/urban land use in Chatham County is a challenge to providing a safe and efficient transportation system. Travel needs and characteristics vary significantly between these area types, requiring different types of roadways and pedestrian/bicycle accommodations. Transitions between these areas are particularly challenging, especially since conditions can change over time due to urbanization. It is critical that design standards avoid prescribing roadways that become obsolete, inappropriate, or ineffective before the end of their effective lifespan.

### Trans Policy 6
Incorporate more **Urban/Suburban** transportation design in and near Centers and Compact Residential Areas identified on the Future Land Use and Conservation Map.

▶ **Strategy 6.1**
Short-term – Establish and enforce clear and consistent design guidelines or standards for new street construction related to cross-section elements:
• Travelway
  • Curb-and-gutter designs
  • Travel lane widths
  • Median treatments and dimensions

- Turn lane warrants and dimensions
- On-street parking locations and dimensions
- Crosswalk location, signage, marking, and signalization
- On-road bicycle facilities (separate/shared lanes)
- Bus stops/pullouts
- Streetscape
  - Sidewalk and planting area/buffer widths
  - Bus shelters and street furnishings
  - Street lighting (pedestrian and roadway)
  - Street trees/vegetation/landscaping
  - Curb bumpouts

### ▶ Strategy 6.2

Short/Medium-term – Establish and enforce clear and consistent design guidelines or standards for new street construction related to intersection types:

- Yield-controlled
- Stop-controlled
- Signalized
- Roundabouts and intersection components:
  - Turn lanes
  - Curve radii
  - Crosswalks
  - Bicycle treatments

### ▶ Strategy 6.3

Medium-term – Establish a process for identifying and retrofitting existing roads that are candidates for upgrading, or removing travel lanes from a roadway and utilizing the space for other uses and travel modes.

What modifications to current standards are needed?

- Street / sidewalk standards
- The Compact Communities Ordinance should be modified to include additional on-street and off-street parking if residential density exceeds a certain density threshold, as on-street parking is not sufficient to accommodate residents' cars. On-street slows traffic and creates a safer condition for pedestrians along residential collectors.

A **Road Diet** refers to the conversion an existing roadway segment into a narrower segment with fewer travel lanes, offering the following benefits:

- Safety improvements – the narrower road reduces the crossing distance for pedestrians thereby reducing exposure to conflicts with vehicular traffic, and reduces vehicular travel speeds thereby reducing crash severity.
- Usable space – the space gained on each side of the narrower road can be allocated to other purposes, including bicycle lanes, on-street parking, transit stops, and wider sidewalks for pedestrians, sidewalk café seating, retail displays, street trees, planters, seating, and other street furnishings.

## Trans Policy 7

Preserve rural character through appropriately designed transportation infrastructure in areas designated as Rural, Agriculture and Conservation on the Future Land Use and Conservation Map.

### ▶ Strategy 7.1

Short-term – In most of Chatham County, encourage rural cross section road design.

- Ditch and swale for drainage
- Paved shoulder (where possible)
- Off-road bicycle facilities
- Limited sections with sidewalks, street lighting, bike lanes

### ▶ Strategy 7.2

Short-term – Work with NCDOT to investigate innovative options for rural cross-section road design (such as yield streets; wide, advisory shoulders; on-street pedestrian/bicycle lanes; and wide, contrasting-pavement shoulders), and incorporate in current policies and standards for new subdivisions.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 183 of 743

### ▶ Strategy 7.3

Medium-term – Consider pilot or temporary demonstration projects for rural road design and/or pedestrian or bicycle enhancements. Seek out Federal Highway Administration (FHWA) or non-profit grants.

### ▶ Strategy 7.4

Include specific recommendation for conservation subdivisions and agricultural subdivisions—relaxation of roadway standards could be incentive.

### ▶ Strategy 7.5

Short-term – Allow flexibility in designs near Village Centers and Crossroads Communities to incorporate urban elements and rural street elements.

### ▶ Strategy 7.6

Medium-term – Prepare multimodal Small-Area Network Plans to identify and address traffic and connectivity deficiencies. Initial candidates include Goldston and Gulf.

## Rural Networks

Based on extensive input received throughout this planning process, many residents of rural Chatham County do not feel the current transportation network adequately serves their needs. A wide range of deficiencies were identified, accompanied by sometimes conflicting goals and suggestions. A major challenge (and objective) of this plan is to effectively address these needs, along with future needs, in a dynamic and uncertain environment.

Some of the frustrations voiced are rooted in the rapid pace of change, and the perception that planning and investment are focused on urban areas, without proper consideration of rural needs and conditions. While rural areas vary considerably, even within Chatham County, they typically share several important transportation-related characteristics that distinguish them from more urbanized areas:

- Longer trip lengths

- Higher crash rates
- Lower household incomes
- Higher rates of physical inactivity

Rural and small town residents, particularly those without access to a private automobile, face common transportation challenges. Examples include:

- Low densities and long distances encourage a system of automobile-oriented roadways that favor traffic speed and capacity over other concerns. Travel options are limited, and safety is sometimes compromised, especially for walking and biking.
- Public lands attract visitors unfamiliar with the area, and can increase the volume of vehicular, trailer, bicycle, and pedestrian traffic during non-typical times.
- Agricultural uses generate trips by large, slow-moving equipment.
- State highways often follow routes that include segments of small-town main streets. Such routes give priority to through traffic and truck traffic, creating conflicts with local vehicular access, pedestrian activity, and on-street parking are often routed along small-town Main Streets, conflicting with local access needs and presenting challenges to pedestrian activity, on-street parking, and aesthetics.
- Environmental constraints, such as dynamic topography, limit options for locating or improving facilities. This, as a result, increases construction costs, creating significant hurdles for cost-effective bicycle and pedestrian facilities.
- Limited resources, low traffic volumes, older infrastructure, and large coverage areas often lead to inadequate or substandard maintenance.

Like all North Carolina counties, Chatham County does not build or maintain roads, and is severely limited in funding roadway projects. Historically, NCDOT's centralized administration created and operated an extensive and consistent statewide network. However, this massive bureaucracy is not well-suited to flexibility or responsiveness, especially given

today's changing expectations and priorities. This is exacerbated by funding shortfalls. Fortunately, NCDOT's more recent decentralization may provide an opportunity for individual NCDOT Divisions to be more sensitive to local context. There may be an opportunity to, at least, test some innovative approaches (such as yield streets, advisory shoulders, and wide, contrasting-pavement shoulders), especially if they are more cost-effective, or yield safety benefits. Such benefits are critical considerations when designing and packaging projects that maximize competitiveness under NCDOT's current SPOT/STI prioritization.

Since many local roads constructed in new subdivisions are privately built and maintained (at least initially), these provide an opportunity for greater design innovation and flexibility. However, concerns about emergency and sanitation vehicle access must be carefully addressed, along with the possibility that NCDOT may ultimately have to take over maintenance of these streets.

Pedestrian and bicycle connectivity is usually the critical missing piece in rural transportation networks. Network connectivity is essential for safe and convenient non-motorized travel, which can yield additional benefits by improving transit access and efficiency; enhancing active health opportunities; increasing mobility options for non-drivers; and reducing traffic, emissions, and fuel consumption. Although it may require creative thinking, the creation of better network connectivity in rural setting, such as Crossroad Communities, Villages, Agricultural Districts, and public lands, is definitely possible, although it may require creative thinking. It would also require a focus on the network as an integrated system, rather than a collection of individual facilities and improvements.

The figures below suggest ways of combining facility treatments to create cohesive rural/small town networks:



FIGURE 27: FROM SMALL TOWN AND RURAL MULTIMODAL NETWORKS

131

# TRANSPORTATION CONCEPT MAP

Highlights and recommendations from this map include:

- New "backage" roads parallel to 15-501 in sections
- Small-area studies (i.e. for Andrews Store Road)
- Widening of NC 751
- Safety improvements
- Minor upgrades to improve functionality of rural roads
- Regional trails and greenways



**FIGURE 28: TRANSPORTATION CONCEPT MAP**
BASE RECOMMENDATIONS CAME FROM NCDOT CTP

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 186 of 743



Legend:

- ○ Intersection Improvement
- ⊗ Cross Bucks
- ★ Flashing Lights
- ✚ Gates
- ■ Grade Separated
- ● Stop Signs
- ★ Megasites

- Potential Upgrades
- New Location Major Roads
- New Location Minor Roads
- Operational / Access Management Upgrades
- Road Safety Audits
- Small Area Study (Example Area)
- Area Requiring Additional Safety Measures
- Chatham Park Boundary

- American Tobacco Trail
- Existing Greenways and Trails
- Proposed Greenways
- Proposed Natural Surface Trail
- Widening

133

# Impacts of Chatham Park

## Summary of Modeling Process

The pending development of Chatham Park presents a dramatic challenge to transportation services and infrastructure in eastern Chatham County. It also provides opportunities to create a transportation infrastructure that balances modes.

To assess the potential traffic impacts of Chatham Park, modifications were made to the Triangle Regional Travel Demand Model (TRM). The latest available version of the model (v5) covers only the eastern portion of Chatham County, and does not represent the latest plans for Chatham Park with respect to either land use or roadway network. The following modifications were made to the TRM to more accurately reflect conditions anticipated in 2040:

.
- 6,818 households and 2,925 jobs were added to traffic analysis zones (TAZs) associated with Chatham Park (TAZs 2140, 2143, 2144, 2149, 2191, and 2193).
- Household and employment growth, in some TZAs, was reduced to compensate for the concentration of growth in Chatham Park. However, this was not a 1-for-1 reduction.
- New roads and existing roadway improvements identified as part of Chatham Park were added to the transportation network, along with corresponding revisions to the centroid connectors used to load trips onto the network from TAZs. Other links added to the model network in anticipation of Chatham Park include:
  - Charlie Brooks Road
  - Mt. View Church Road

All other aspects of the TRM appear consistent with the 2040 DCHC MTP in terms of socio-economic growth and transportation system improvements.

It is important to stress that these findings are intended to test the potential build-out impacts of Chatham Park in support of the Comprehensive Plan, and do not constitute official or adopted model results or traffic forecasts. The pending official update to the TRM (v6) will provide additional information through 2045, but is based on a different set of inputs and assumptions. While the traffic forecasts yielded by the new TRM will differ from those prepared for this project, the overall impacts are expected to be relatively similar.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 188 of 743

**Summary of Findings**

The revised TRM was run to generate, distribute, and assign trips to the network, and these results were reviewed. Based on this analysis, the following findings are deemed significant.

- Most of the traffic generated by Chatham Park is oriented northward towards Chapel Hill via US 15/501 north. *See the Action Plan for recommendations for 15/501 north.*
- While the next most significant share of Chatham Park traffic is oriented eastward, this traffic is split between US 1 and NC 64.
- Interestingly, US 1 carries more of the east-oriented traffic than US 64. This is especially true with regards to longer trips. Also, Mountain View Church Road and Moncure-Pittsboro Road are critical access routes for these US 1 trips. Without fluid mobility along those routes, a significant number of trips would shift northward to access US 64 in Pittsboro, with many of them using US 501 south.
- The major roads proposed for Chatham Park are critical to providing an efficient network at both local and regional scales. In addition to serving Chatham Park trips, they divert some traffic from US 64 and US 501 in Pittsboro, and provide minimal relief to Hanks Chapel Road and Mt. Gilead Church Road (although Mt. Gilead Church still experiences some congestion during peak periods).
- Model results tend to support the need to widen NC 751, especially north of US 64. Congestion on Farrington/Farrington Point Road is also indicated, particularly north of Lystra Road.
- Other roads predicted to experience significant traffic growth include Chicken Bridge Road and portions of Crawford Dairy and Jones Ferry Roads, and to a lesser degree, Morrisville Parkway/Lewter Shop Road and Martha's Chapel Road.

**Potential for Transit:**

Because of its size, location, and composition, Chatham Park provides a rare opportunity to create a transit-supportive community in a previously rural setting, even if it is not a true "Transit-Oriented Development." Walkability, combined with appropriate densities and mixtures of uses in a well-designed setting, is critical to the success of any transit service, regardless of mode. A "park once" community that balances automobility with other modes and values can offer a range of economic and health benefits beyond merely supporting transit use. Given the uncertainty currently surrounding funding and the rapidly-evolving nature of transportation and transit, the most prudent approach is to create a walkable community. The design, placement, and sizing of roads and parking facilities should be determined by balancing the need to accommodate motor vehicles with the comfort of pedestrians and other modes of travel, as well as land use, environmental, and urban design considerations.

135



136



# UTILITIES AND PUBLIC SERVICES

Well planned utilities and public services are critical to accomplishing economic development, land use, and environmental goals. Key objectives guiding the policies and strategies in this Plan Element include:

- Focus the development of utilities and urban services to foster compact development and support economic development in defined areas.
- High-speed internet/broadband should be available to all and enable education and entrepreneurship.

## BIG IDEA

Define urban service areas & update policies to accomplish economic development and environmental goals.

## GOALS

### PRIMARY GOAL
Provide infrastructure to support desired development and support economic and environmental objectives.

### SECONDARY GOAL
Preserve the rural character and lifestyle of Chatham County.

137





# RECOMMENDATIONS AND STRATEGIES

## Recommendation 01
## Support the desired development pattern with utility policies and public services.

### Utility Policy 1
Ensure adequate utilities and public services to support the desired development pattern.

### ▶ Strategy 1.1
Support well-designed, decentralized wastewater systems in order to support land use goals and objectives, particularly:
- Growth in designated, well-planned, walkable, mixed use centers
- Conservation subdivisions that conserve sensitive natural resources while protecting property rights

### ▶ Strategy 1.2
Develop utilities policies, systems and services that facilitate compact development and support economic development in defined areas.
- Adopt an Urban Service Area (USA) and update utility and public service policies to reinforce the USA.
- Locate new public services and public service facilities, such as governmental offices and schools, in growth areas identified on the Future Land Use and Conservation Plan or where existing infrastructure exists and public services are needed.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 192 of 743

### ▶ Strategy 1.3

Expand public services (including police, fire, health and other county services) concurrent with demands.

## Recommendation 02
## Support environmental, economic and other objectives with utility policies and public services.

### Utility Policy 2

Consider long-term impacts of new development on water supply and public systems.

### ▶ Strategy 2.1

In evaluating a development proposal, and prior to approval, consider the potential demands relative to existing and planned water and sewer capacity, the relationship to existing and future service areas and commitments for current and future allocations.

## Case Study

**Supports Strategy 1.2**

Defining Urban Service Areas (USAs) are one way a local government can set expectations related to utility provision and guide growth and development. USAs could include towns and other areas where public sewer service is feasible or preferable in order to achieve defined land use and environmental goals. For more information see the Action Plan.



FIGURE 29: MAP IDENTIFIES POTENTIAL FUTURE PUBLIC UTILITY/URBAN SERVICE AREAS.

139



## Case Study

**Supports Strategy 4.2**

### Rural Broadband Expansion

Mid-Atlantic Broadband (a non-profit), Microsoft and the Virginia Tobacco Commission are partnering to expand broadband in rural Halifax and Charlotte counties in Virginia.

For More Information:
http://www.sovanow.com/index.php?/news/article/warner_brought_up_to_speed_on_broadband_rollout/

http://www.mbc-va.com/news/b2xonline-inc-partners-with-mbc-to-expand-broadband-services/



140

### ▶ Strategy 2.2

Require new development to demonstrate the ability to provide an adequate water supply and wastewater treatment indefinitely for all uses in the proposed project.

### ▶ Strategy 2.3

Require private water and wastewater systems to be built according to county standards that include monitoring of potential environmental impacts.

### Utility Policy 3

Require water efficiency in public and private developments.

### ▶ Strategy 3.1

Require new developments over a certain size to include water reuse systems and remove county regulatory barriers for site-scale systems.

### ▶ Strategy 3.2

Require the design process of new county buildings over a certain size threshold to study the utilization of innovative water reuse / recycle systems.

### Utility Policy 4

Support economic development and other goals with public utility planning and investment.

### ▶ Strategy 4.1

Promote county-wide planning and coordination with municipalities regarding water, sewer, solid waste, and broadband internet.

### ▶ Strategy 4.2

Building on previous broadband coverage research, explore grant funds (such as through the Golden LEAF Foundation) and partnerships to expand broadband internet service to high-priority portions of the County.

### ▶ Strategy 4.3

Partner with Siler City to serve the Chatham-Siler City Advanced Manufacturing (CAM) Site with water and wastewater service.

▶ **Strategy 4.4**

Partner with Sanford to serve the Moncure Megasite with water and wastewater service.

▶ **Strategy 4.5**

As part of extending service to the Moncure Megasite, allow a certain percentage (i.e. up to 30%) of sewer capacity to be utilized for residential, commercial or mixed use developments in the vicinity of the community of Moncure.

- A water and/or sewer capacity allocation policy could be used to:
  - Encourage diversification of land uses (i.e. more non-residential tax base)
  - Allow for a portion of the designated capacity to be utilized by properties that have failing septic tanks.
  - Encourage new residential development to include affordable and/or workforce housing units.
  - Incentivize reservation of land for publicly accessible open space (i.e. parks).
  - Incentivize the construction of publicly accessible greenways.

▶ **Strategy 4.6**

Encourage regular maintenance of septic systems.

**Utility Policy 5**

Support agricultural operations with utility policies.

▶ **Strategy 5.1**

Limit utility extensions or upgrades in key agricultural areas (Agricultural Areas on the Future Land Use Plan and concentrations of agricultural areas shown on the strategic farmland map).

▶ **Strategy 5.2**

Discourage community well systems in Agricultural Areas (SUP requirement).

▶ **Strategy 5.3**

Improve understanding of groundwater usage and availability in Agricultural Areas.

- Create an accurate, spatial inventory of permitted wells
- Improve permitting process

**Case Study**

*Supports Strategy 4.5*

**Town of Knightdale Water Allocation Policy**

Knightdale's Water Allocation Policy is an example of an innovative approach to encouraging quality development. A proposed development must obtain a certain number of points to receive an additional water allocation if the proposal is over a minimum density. Points can be awarded for non-residential uses, roadway improvements, gateway improvements, transit facilities, and amenities (including greenways). See Knightdale's Ordinance for more details.

For More Information: www.knightdalenc.gov/index.aspx?page=460



# Chatham County
# Action Items

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 196 of 743

# ACTION PLAN
## IMPLEMENTATION STEPS

The Action Plan includes specific plans, policies and programs that, if implemented, will help to accomplish goals of Plan Chatham. Implementing the recommendations in this Plan will involve elected officials, county staff, citizens, community leaders, non-profits, landowners and businesses.

The Action Plan is organized by topic area and includes short and medium term steps that should be taken in the next 1 to 5 years. Many of these steps should drive direction of departmental work plans moving forward. Staff capacity, whether existing or added over time, will be an important consideration in the development of such work plans.



## About Implementation

The following pages contains a short list of plans, programs and projects that are meant to be undertaken within the next 1-5 years in order to implement the community's vision for Chatham County. The Implementation Guide, which can be used to monitor progress, complements the Action Plan by naming responsible parties, appropriate timeframes, and defining metrics to measure success.

143

# Economic Development Action Items

## Action Item 01

Targeted recruitment of existing businesses in the Triangle and Triad regions and promotion of appropriate targeted industries and commercial uses at Megasites and Employment Centers.

## Action Item 02

After the occupancy of the first major tenant within the Moncure megasite, prepare a small area plan for the Moncure Area. The type and scale of the tenant will help define the housing, commercial, and service needs as well as the demand for infrastructure capacity.

## Action Item 03

Coordinate with Chatham EDC and municipalities to draft a new incentive policy geared for small to medium-sized businesses (less than 100 employees), to encourage new investment, job creation, and local business expansion by small and medium-sized companies in the towns.

## Action Item 04

Consider increased funding and staffing for the Pittsboro-Siler City Convention & Visitors Bureau and the CCCC Small Business Center to expand services.

## Action Item 05

Use relationships between the EDC, the business community, Triangle South Workforce Development Board, and educators with Chatham County Schools and Central Carolina Community College to expand participation in existing work readiness opportunities (such as Central Carolina Works), and develop new work-experience opportunities for Chatham high school students, including work experience with small and medium-sized local companies

## Action Item 06

Review existing incentive and loan programs in the towns for possible participation or extension by Chatham County. Current programs include the Pittsboro Façade Grant Program, Siler City Economic Development Incentive Policy, and Siler City Revolving Loan Fund. These initiatives could have a greater impact if enhanced with County funds and/or extended to areas in the ETJs or defined activity centers in the County jurisdiction.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 198 of 743

# Land Use Action Items

**Priority Projects, Plans, Programs**

## Overall Action Item

Revise the regulatory framework through an update of the County ordinances and regulations. Create a Unified Development Ordinance by making amendments concurrently to ensure such changes work in concert and administration of the updated ordinances is streamlined.

## Action Item 01

Facilitate well-designed mixed-use development in appropriate locations.

1.1     Allow more residential uses in some of the non-residential districts. Single-family attached dwellings are permitted in O&I. Multi-family dwellings (apartments and condominiums) would be appropriate in this district, as well as in NB and B-1 under certain circumstances. This would effectively enable mixed-use development on small sites (less than 50 acres), particularly sites targeted for infill development in areas designated as Centers.

- Add Multi-family Dwelling as a use in the Zoning Table of Permitted Uses.
- Consider allowing Multi-family Dwelling as a conditional use (CU) in O&I, NB, and B-1.
- Define the specific criteria for granting a conditional use permit for multi-family dwellings in the non-residential districts identified as appropriate.
- Establish a maximum percentage of area (gross land area in the project and/or total non-residential floor area) to be devoted to residential units.

1.2.    Create a set of mixed-use zoning districts.

Circumstances differ across the County, and while a mix of uses may be appropriate in various locations, the specific conditions and range of uses may be different for each. Adopted regulations include the CD-MU and the Planned Residential District (PRD) in the Zoning Ordinance and the Compact Communities Ordinance (CCO). Each provide a starting point for the creation of three new districts to be incorporated into the Zoning Ordinance as a way of more effectively facilitate mixed-use development as is appropriate for Chatham County now and in the future.

- MU-1 – For residential mixed-use development, utilize the provisions of the existing PRD.
- MU-2 – For mixed-use development that is predominantly residential with some supporting neighborhood retail, borrow applicable provisions from the CCO. Modifications and additions may include but not be limited to the following:
  - Allow this type of development in areas designated as Centers rather than sites "currently zoned for RA-40 Residential-Agricultural," including sites that are in locations other than those defined in 6.1.D of the CCO.
  - Modify buffer and setback requirements to ensure such requirements accomplish intended mitigation of potential impacts while not impeding connectivity to adjacent compatible development.
  - Reduce open space requirement to a minimum of 25% and refer (or repeat) standards in the Conservation Design section of the Subdivision Regulations for determining open space to meet this requirement.
  - Alter performance standards;

145

# Land Use Action Items

- to ensure maximum flexibility to be responsive to market conditions, particularly with respect to commercial development (i.e., provisions pertaining to Town Center and Commercial Component).
- to be clear about expectations (revisit "performance" for Transit, Narrow Streets, and Botanical Preservation and Diversity).
- to remove redundancies. For example, remove the maximum built-upon provision, provided the Watershed Protection Ordinance addresses this requirement.
- Specific amendments could include the following:
  - Expand extent of Compact Communities Ordinance so that it can be applied to appropriate areas and sites within the County.
  - Clarify locational requirements for non-residential areas within a Compact Community.
  - Clarify # of dwelling units allowed
  - Revise parking / street standards
- MU-3 – For mixed-use development that is predominantly non-residential and includes some amount of complementary residential, utilize the provisions of the CD-MU with modifications to accommodate contemporary development practices, and consider the following modifications:
  - Modify the minimum area and maximum area to be devoted to non-residential uses.
  - Amend the exterior boundary setback requirement and strengthen screening requirements. Consider

the following:

- A setback of one hundred (100) feet shall apply to residential and non-residential buildings along property lines that adjoin existing residential development. Within the setback, a minimum of 50 feet shall be preserved/planted as a vegetative perimeter buffer in accordance with the existing Ordinance.
- A setback of one hundred (100) feet shall apply to all residential and non-residential buildings along existing street rights-of-way in designated corridors. (Note: Such corridors should be identified elsewhere in the Ordinance.)
- A lesser setback (TBD) shall apply to structures (i.e., surface parking lots) along the exterior boundary of the mixed-use development, including any existing street right-of-way.

## Action Item 02

Develop a mechanism for facilitating home-based and rural business activity in areas designated for Agriculture and Rural.

- Consider a performance-based approach to zoning in these areas, where different performance standards could apply based on different types of uses and/or existing adjacent development. For instance, less intense uses could be required to meet requirements slightly higher than smaller rural home-based businesses. More intense uses could be subject to additional requirements.

# Land Use Action Items

## Priority Projects, Plans, Programs

**Hypothetical Example of Performance Based Zoning Standards for Rural and Agricultural Areas**

| Business Type | Description | Performance Standards |
|---|---|---|
| Farm Uses | Produce stand | Exempt |
| Home Bases Business (Currently Allowed) | See Current Ordinance | See Current Ordinance |
| Tourism Uses | Venues, Bed and Breakfast, Restaurants, etc. | Bed and Breakfasts are covered in existing regs. Venues and restaurants need to be addressed in order to clarify difference between agritourism and event venues. |
| Small Business / Low Intensity | Farm machinery and small engine repair, professional office, accounting, small daycare, contractor or trade shop | 2,500-5,000 square foot building: • Minimum setback and lot size requirement comparable to rural home-based businesses • Outdoor storage requirements (i.e. storage must be a minimum distance away from residential properties, be located at rear of property and/or have a max size of storage (i.e. 20,000 sqft)) • Buffers and landscaping requirement (i.e. vegetative buffers of buildings and storage areas of 25ft, landscaping extent based on building frontage visible from public road) • Parking standards (access, paving standards, size limits or design criteria) |
| Medium - High Intensity | Larger businesses (>5,000 square feet), more intense uses such as retail store , restaurants, automobile repair, self-storage, gas station, restaurant with drive through, manufacturing uses | >5,000 square foot building: • Max building size based on lot size (i.e. up to 2% of lot area, not to exceed 20,000 square feet), scalable setbacks, buffer and landscaping requirements dependent on building size and/or height, lighting standards, impervious surface limits, hours or ITE trip generation limits • Additional locational requirements (i.e. at intersections or along certain classes of roadway) • Additional parking, setback, buffer and/or landscaping requirements • Certain high intensity uses and >20,000 square foot buildings – need to go through a rezoning or a conditional use process and preferably be located in a Town, Community or Neighborhood Center, Village, Crossroads or Employment Center. |

147

# Land Use Action Items

**Priority Projects, Plans, Programs**

## Action Item 03

With the intent of preserving the rural character and supporting "agricultural friendly" development to minimize encroachment on existing agricultural operations, modify the subdivision process to encourage Agricultural Friendly Developments.

- Re-evaluate the allowances for and definitions of major and minor subdivisions in the Agricultural Area. For instance:
  - Consider allowing administrative approval of minor subdivisions up to 15 lots in rural and agricultural areas as long as design criteria are met.
  - Require all major subdivisions, or just those receiving county water to be designed as Agricultural Friendly Developments.
- Study sliding scale zoning as a way to balance preservation of property rights with reduced conflicts over traffic, groundwater, etc.

## Action Item 04

Revise the Subdivision Regulations to make conservation design an easy choice. In other words, the process for designing and permitting a residential subdivision that adheres to conservation design standards should be no more arduous than the process for designing and permitting a conventional residential subdivision. Specific amendments to the existing regulations could include those stated in the Natural Resource Plan Element.

## Action Item 05

Assess the Zoning Ordinance and Subdivision Regulations to identify ways to make the rezoning, site plan review, and subdivision plan review processes more predictable for property owners, investors, and other stakeholders.

- Modify language of the Zoning Ordinance and Subdivision Regulations.
- Eliminate vague language to ensure interpretation of the provisions of the Zoning Ordinance and Subdivision Regulations is as intended and to avoid unintended results.
- Improve standards to ensure evaluations of rezoning petitions and development plans are less subjective.
  - Example of language in need to modifications in the CCO: "Narrow streets. Streets shall be relatively narrow, with trees. Pedestrian walkways may be required on both sides of the street."
- Consider administrative approvals of some applications.

## Action Item 06

Update design guidelines that improve the aesthetics of commercial, office, industrial and mixed-use development along major corridors.

## Action Item 07

Coordinate with the Chatham Conservation Partnership to host and update conservation data on County website for land use planning and development review.

## Action Item 08

Continue updates of the Chatham Cary Joint Land Use Plan and Facilitate Joint land use plans with municipalities contingent on their annexation into Chatham.

## Action Item 09

Establish a zoning district that is appropriate for permanently protected lands and rezone areas accordingly.

# Housing Action Items

**Priority Projects, Plans, Programs**

### Action Item 01

Update ordinances to include zoning provisions for affordable housing with contribution options (i.e. land donation or reservation, fee in lieu)

### Action Item 02

Establish a Housing Trust Fund for affordable housing with housing type targets and location parameters.

### Action Item 03

Evaluate options for encouraging affordable housing in well located sites.

### Action Item 04

Build on work completed by a housing committee and evaluate potential use of county owned properties for affordable housing.

### Action Item 05

Improve tracking of existing assistance programs and expiring income-based housing.

### Action Item 06

Continue to partner with Rebuilding Together to address housing conditions.

# Health Action Items

**Priority Projects, Plans, Programs**

### Action Item 01

Assure the effective integration of health, healthcare, and equity in Chatham's plans, programs, projects, and policies by collaborating cross-sector and developing a Health in All Policies approach.

### Action Item 02

Support the work and progression of the Chatham Health Alliance and collaborate on cross-sector issues to improve health outcomes.

### Action Item 03

Address localized data needs and gaps.

### Action Item 04

Consider implementing requirements for Health Impact Assessments to be completed for certain types of major public projects and/or proposed developments over a certain size or threshold.

### Action Item 05

Conduct studies to determine steps to improve access for areas within Public Health Priority Areas that do not have safe access to healthy food vendors, healthcare and/or parks.

### Action Item 06

Support the development of solutions that expand access to healthcare and mental health services.

### Action Item 07

Acknowledge recommendations of the upcoming Capstone project, "Comprehensive Plan for Aging in Chatham," proposed by the UNC Gillings School for Global Public Health, which will augment the recommendations of this plan by addressing facilities (i.e., a senior education retreat, senior care for Alzheimer's disease, and senior centers), senior-friendly fitness, isolation, nutrition, estate planning, and safety (particularly with regards to fraud and independent living).



150

# Agriculture Action Items

**Priority Projects, Plans, Programs**

### Action Item 01

Consider funding an additional agricultural extension position that would allow for additional outreach and to assist in farmland protection.

### Action Item 02

Consider participating in an Agricultural Infrastructure Study with surrounding counties.

### Action Item 03

Coordinate with the Agricultural Advisory Board to establish or update utility extension policies for Agricultural Areas.

### Action Item 04

Evaluate development approval processes, conditional use and rezoning requirements in Agricultural Areas to include consideration of impacts on ground and surface water resources.

### Action Item 05

Update land use regulations to support rural businesses and protect existing agricultural operations. *See Land Use Action Items for more information*.

### Action Item 06

Evaluate and update real estate notification precedures to include a Real Estate Transfer Disclosure Statement in areas near established Voluntary Agricultural Districts (VADs), in Agricultural Areas identified on the Future Land Use and Conservation Map and/or near other designated working lands.

### Action Item 07

Update and adopt the Farmland Preservation Plan by 2019.

### Action Item 08

Develop policies and ordinances for fostering Ag friendly. subdivisions

### Action Item 09

Determine need or desirability of an Ag Zoning District.



151

# Natural Resources and Resiliency Action Items

**Priority Projects, Plans, Programs**

## Action Item 01

Increase capacity of the Land and Water Resources staff to ensure adequate enforcement of sedimentation and erosion control standards.

## Action Item 02

Protect Natural Heritage Natural Areas (NHNAs), habitat hubs and wildlife corridors through voluntary reservation, acquisition and partnerships with non-profits and private entities. Using GIS, study the establishment of a county-led land acquisition program to assist in local land protection efforts.

- Explore regional partnerships to protect water quality
- Coordinate with municipalities to develop a network of nature preserves and the capacity to acquire and maintain properties
- Coordinate with other entities to protect working lands
- Consider a recognition program for participants

## Action Item 03

Modify submittal requirements for conventional and conservation subdivision design and update the conservation design guidelines for clarity as specified in the Natural Resources Plan Element.

## Action Item 04

Encourage CERT (Community Emergency Response Teams) organizations at the County and community levels.

## Action Item 05

Evaluate barriers to renewable energy facilities in the County.

## Action Item 06

Create an Electric Vehicle Infrastructure Plan.

## Action Item 07

Provide training for staff to increase capacity to review and permit green certified buildings, alternative energy systems, water reuse systems, green stormwater infrastructure (GSI) and other innovative building methods.

## Action Item 08

Improve facilities and expand programs as needed.

## Action Item 09

Work with towns, county law enforcement, fire safety and health department for a regular review and update of the Disaster Response Strategies.

# Parks and Recreation Action Items

**Priority Projects, Plans, Programs**

### Action Item 01

Prioritize and fund the design and construction of facility improvements at district parks.

### Action Item 02

Update the Parks and Recreation Comprehensive Master Plan (2009).

### Action Item 03

Create a Greenway and Blueway Master Plan as a standalone document or as a component of a parks and recreation plan update.

### Action Item 04

Update policies and regulations to require the reservation of easements and encourage the construction of trails and greenways that are shown on adopted plans.

### Action Item 05

Assess staffing at all levels. At a minimum, create a trail coordinator position within the Parks and Recreation department that will specialize in planning trails and greenways, taking into account ways to minimize tick exposure and coordinating with local governments, non-profit organizations and private entities, and applying for and administering grants.

### Action Item 06

Reinstate contributions to the park capital reserve for park improvements.



153

# Transportation Action Items

**Priority Projects, Plans, Programs**

## Action Item 01

Transit

- Consider adding park-and-ride locations at Briar Chapel and US 64 in the US 15/501 Corridor
- Identify a future location for park-and-ride lot at planned Employment Center at US 64 and NC 751
- Identify a future park-and-ride lot location near the US 64/US 421 interchange in Siler City
- Expand and upgrade Chatham Transit's vehicle fleet
  - Include additions of alternative fuel vehicles as appropriate
- Given the large share of potential transit trips that cross the Chatham County line, the benefits of interagency cooperation, coordination, or even consolidation could be significant, and should be evaluated. Specific steps worth investigating could include joint purchasing; consolidated funding and grant administration; shared Mobility Manager/ Coordinator; and a Transportation Management Coordination Center (TMCC).

## Action Item 02

Active Transportation

- Update policies and regulations to require the reservation of easements and encourage the construction of trails and greenways that are shown on adopted plans.
- Establish and enforce clear and consistent design guidelines or standards for new street construction and address when sidewalks and/or on-road bicycle facilities are required.

## Action Item 03

Roadway and Freight

- Vision Zero /Safety Audits
  - Embrace Vision Zero commitment to eliminate crash fatalities and injuries. As part of an annual crash monitoring program, conduct regular Safety Audits at priority locations.
  - Conduct geometric examination of roadway to identify deficiencies, and develop safety-targeted upgrades, such as
    - Adding/widening shoulders
    - Improving horizontal/ vertical alignments
    - Lane-width adjustments

> **Vision Zero** policies are efforts by state and local agencies specifically aimed to eliminate traffic fatalities and severe injuries using data-driven prevention strategies, including education, enforcement, engineering, emergency response. These policies may apply to pedestrians, cyclists, and motor vehicles individually, but should address all modes together, and are intended to improve safety, health, and equitable mobility for all.

  - Median treatments, turn lanes, or traffic calming
  - Kick off this program with a Safety Audit in southwestern Chatham County, studying an apparent crash cluster involving:
    - NC 22 between Bennett and NC 42, including adjoining segments of Chatham and Washington Streets
    - NC 42 from NC 22 to Siler City Glendon Road
    - Siler City Glendon Road from NC 42 to just north of NC 902/Harpers Crossroads

154

Megasite and Rail

- Coordinate with Megasite planning to identify potential truck routes and volumes for consideration in updating transportation and land use plans, not only to develop improvement projects, but also to minimize and mitigate safety, congestion, and nuisance impacts of increased truck traffic.

- Convenient and reliable access to the CSX and Norfolk Southern rail lines is critical to the attractiveness and long-term viability of the two Megasites, and to the County's economy overall. While maintaining and improving these rail lines is not a County responsibility, it is important that local land use and transportation plans do not conflict with future rail operations or infrastructure improvements. At the same time, while volumes are currently low, growth in both rail and road traffic will increase conflicts and potential for crashes at 82 at-grade rail crossings. Considering this knowledge, future planning efforts should address the following:

  - Identify low-volume and redundant at-grade crossings that are likely candidates for closure or consolidation. Minimize investments in roadway capacity expansion at these locations, and discourage development that would be dependent on such crossings for access, or that would significantly increase crossing traffic.

  - Monitor rail crossing conditions, and request upgrades to crossing control devices as warranted. Consider bicycle and pedestrian crossing volumes as well as motorized traffic.

  - Coordinate with Megasite planning to identify potential railroad grade-separations, such as

Corinth Road in Moncure, or the proposed US 64 Bypass in Siler City. Consider these projects and their impacts in updating transportation and land use plans.

Access Management

- Access management reduces traffic conflicts by selectively eliminating/consolidating driveways, restricting turn movements, and maintaining adequate spacing between major intersections. This strategy preserves roadway capacity without requiring additional through lanes, and typically lowers crash rates. Access management reduces vehicle delay and stops, thereby increasing average travel speeds. It is most appropriate for major arterials serving high volumes of through traffic.

- Access management presents trade-offs for bicyclists and pedestrians, typically reducing side street and driveway conflicts; however, crossings of the main road must be carefully located and designed.

- Frontage or backage roads are often required to provide connectivity and access as part of a major access management project, channeling traffic onto major cross streets, and allowing shorter trips to avoid travelling on the main road, thereby reducing turn conflicts. These roads can also provide better pedestrian and bicycle routes.

- Access management is recommended along all major US routes.

- Current plans for US 15-501 north of Pittsboro incorporate an incremental application of access management techniques, culminating in the conversion of this segment of US 15-501 to a "superstreet" concept in which most left turns are heavily restricted. Instead, special signal timings and U-turns reduce delay and maximize traffic

throughout. A limited network of backage roads is also recommended, to be implemented primarily through the development process.

- Roadway Improvements
  - A number of roadway improvements or upgrades are supported, many of which are already identified in draft or final plans such as the Chatham County Comprehensive Transportation Plan and the DCHC MPO Metropolitan Transportation Plan. Highlights include:
    - Widening NC 751 to a 4-lane divided facility accommodating bicycles and pedestrians.
    - Preserve the option for an eventual interchange with US 64. Roadway design must be sensitive to critical environmental constraints, and should respect, preserve, and even enhance the corridor's rural character.
    - New roads associated with Chatham Park will create an efficient network serving Chatham Park trips, as well as diverting traffic from US 64 and US 501 in Pittsboro. Other local routes will experience relief due to better connectivity and more direct routing.
    - Consider incremental upgrades of key secondary roads (collectors) to current design standards or better (wider lanes and shoulders, improved vertical and horizontal alignments, etc). Other

than some turn lanes and intersection improvements, no additional widening (i.e., through lanes) would be involved. Some improvements are currently warranted; others may be triggered by growth and development. Further study is needed for some roadways. Candidates include:
  - NC 87
  - NC 902
  - Andrews Store Road
  - Moncure-Pittsboro Road
  - Siler City-Snow Camp Road
  - Farrington/Farrington Point Road
  - Old Graham Road
  - Jones Ferry/Hamlet Chapel Roads
  - Mt. Gilead Church Road
- Several intersections would benefit from turn lane and alignment improvements to improve safety and reduce delay. Over time, traffic growth will increase the number and severity of intersection deficiencies. Current candidates include:
  - Manns Chapel Road & Andrews Store Road
  - NC 22 and NC 42
  - NC 42 and Ronald Scott Road
  - Silk Hope Road and Silk Hope Gum Spring Road

# Utilities and Public Services Action Items

**Priority Projects, Plans, Programs**

## Action Item 01

Adopt an Urban Service Area (USA) and update utility and public service policies. Potential USAs include:

- Future Cary per joint land use plan
- Employment center at NC 751 and US 64 (service from Apex is a possibility, but their policy requires non-residential uses)
- Moncure area (megasite and the Moncure community)
- Goldston and US 421 interchange area

The structure of the USAs and supporting policies could include reimbursement policies and guidance on when public water or sewer should be extended for new development. The approach could define tiered zones that provide a prioritization of utility extension such as:

- Tier I = close to capacity and near centers, extension is ok, but may require private investment
- Tier II = extension is discouraged except for agricultural use
- Tier III = no service

## Action Item 02

Expand public services (including police, fire, health and other county services) concurrent with demands.

## Action Item 03

Modify regulations to encourage or require new development of a certain type or size to include water reuse systems.

## Action Item 04

Explore grant funds and partnerships to expand broadband internet coverage.

## Action Item 05

Partner with municipalities to serve economic development priorities with water and wastewater.

## Action Item 06

Establish a water and/or sewer allocation policy to accomplish economic development, housing, and other goals.

## Action Item 07

County-wide water / sewer master plan to identify key infrastructure upgrades, regional connections, and water supply solutions. This plan could also establish county standards for decentralized wastewater systems.

# DIGITAL APPENDICES

CLICK ON LINKS TO ACCESS DOCUMENTS

- MAPS
  - FUTURE LAND USE AND CONSERVATION PLAN MAP
  - PARKS, RECREATION AND OPEN SPACE CONCEPT PLAN MAP
  - HEALTH PRIORITY AREAS INPUT MAPS
  - LAND USE SUITABILITY ANALYSIS
    - INDUSTRIAL, COMMERCIAL, RESIDENTIAL, AND CONSERVATION SUITABILITY
    - AGRICULTURAL SUITABILITY
  - LAND USE PREFERENCE ACTIVITY RESULTS
- RELATED DOCUMENTS
  - PHASE I REPORT
  - COMMUNITY PROFILE
  - 15-501 MARKET ANALYSIS
  - ECONOMIC DEVELOPMENT STRATEGIES MEMO
  - PUBLIC COMMENTS / SURVEY RESULTS
  - BIG WOODS CONSERVATION DESIGN GUIDE
  - FISCAL IMPACT GUIDANCE
  - CHATHAM TRANSPORTATION EXISTING CONDITIONS REPORT
  - IMPLEMENTATION GUIDE



# PLAN CHATHAM

working together to preserve & progress

# EXHIBIT 2



**CHATHAM COUNTY COMMISSIONERS**

Mike Dasher, Chair
Karen Howard, Vice Chair
Franklin Gomez Flores
David Delaney
Katie Kenlan

**COUNTY MANAGER**

Dan LaMontagne



Established 1771

P. O. Box 1809, Pittsboro, NC 27312-1809 ● Phone: (919) 542-8200

## Resolution of the Chatham County Board of Commissioners

# Approving a Consistency Statement and Statement of Reasonableness for the Denial of

A Conditional District Rezoning request by Walt Lewis

**WHEREAS**, the Chatham County Board of Commissioners has reviewed the application to rezone Parcels 88772 and 17696 from R-1 Residential to CD-NB Conditional District Neighborhood Business for a boat and RV storage facility (the "Amendment") and finds that the same is NOT consistent with the Chatham County Land Conservation and Development Plan; and

**WHEREAS, in addition**, the Chatham County Board of Commissioners considers the Amendment to be not reasonable and in the public interest because the property is located within the Rural area of the land use plan and would not keep in harmony with the surrounding area;

**WHEREAS,** the Chatham County Board of Commissioners considers that the Amendment does not encourage context-sensitive development design. This type of design includes such elements as architectural features that resemble historical structures and local vernacular, site design that reduces impacts on historical structures, working landscapes, and viewsheds from public roadways, integrated open space, and preservation of unique natural features such as heritage trees and mature forests.

**NOW, THEREFORE, BE IT RESOLVED**, by the Chatham County Board of Commissioners that, for the reasons set forth above, the Amendment and presented documentation are found to be not consistent with the county land use plan and are determined not to be reasonable and in the public interest.

Adopted, this the 18 day of March, 2024

Mike Dasher, Chair
Chatham County Board of Commissioners

ATTEST:

Jenifer K. Johnson, MMC, Clerk to the Board
Chatham County Board of Commissioners

OFFICIAL SEAL

# EXHIBIT 3



**CHATHAM COUNTY COMMISSIONERS**

Karen Howard, Chair
Diana Hales, Vice Chair
Jim Crawford
Mike Dasher
Andy Wilkie

**COUNTY MANAGER**
Dan LaMontagne

Established 1771

P. O. Box 1809, Pittsboro, NC 27312-1809 • Phone: (919) 542-8200

## Resolution of the Chatham County Board of Commissioners

# ADOPTING A CONSISTENCY STATEMENT FOR THE APPROVAL OF

### Pitt Hill X, LLC

**WHEREAS**, the Chatham County Board of Commissioners has reviewed the application for Pitt Hill X, LLC to rezone approximately 5.01 acres, Parcel 2721, located at 10329 US 15-501 N, from R-1 Residential to CD-NB Conditional District Neighborhood Business (the "Amendment") and finds that the same is consistent with the Chatham County Land Conservation and Development Plan; and

**WHEREAS, in addition**, the Chatham County Board of Commissioners considers the Amendment to be reasonable and in the public interest because parcel No. 2721 located at 10329 US 15-501 supports the goals of Plan Chatham by being located within a Community Center node.;

**NOW, THEREFORE, BE IT RESOLVED**, by the Chatham County Board of Commissioners that, for the reasons set forth above, the Amendment and presented documentation are found to be consistent with the county land use plan, and are determined to be reasonable and in the public interest.

Adopted, this the 17th day of February, 2020

*Karen A. Howard*

Karen Howard, Chair
Chatham County Board of Commissioners

ATTEST:

*Lindsay K. Ray*

Lindsay K. Ray, NCCCC, Clerk to the Board
Chatham County Board of Commissioners

# EXHIBIT 4



# The Chatham County Zoning Ordinance

# Chatham County, North Carolina

*For Baldwin, Williams, New Hope, Cape Fear, and portions of Haw River, Oakland, Center, Albright, Gulf, Hickory Mountain, Matthews, and Hadley Townships*



**CHATHAM COUNTY**
NORTH CAROLINA

**ADOPTED: DECEMBER 1, 2008**
**EFFECTIVE: DECEMBER 2, 2008**

# DATE OF ORDINANCE ADOPTION: DECEMBER 1, 2008

# EFFECTIVE DATE OF ORDINANCE: DECEMBER 2, 2008

# ORDINANCE AMENDMENT DATES:

April 19, 2010

June 21, 2010

February 21, 2011

May 16, 2011

June 6, 2011

September 6, 2011

May 21, 2012
*Effective July 1, 2012*

August 20, 2012

April 15, 2013

May 20, 2013

July 15, 2013

September 16, 2013

February 17, 2014

June 16, 2014

July 21, 2014

November 17th, 2014

December 15th, 2014

May 18th, 2015

January 15th, 2016

April 17th, 2017

April 16, 2018

January 22, 2019

August 19th, 2019

September 16th, 2019

April 20th, 2020

February 15th, 2021

March 21st, 2022

December 18th, 2023

# TABLE OF CONTENTS
## CHATHAM COUNTY ZONING ORDINANCE

**SECTION 1      TITLE** ..........................................................................................2
**SECTION 2      JURISDICTION**............................................................................2
**SECTION 3      BONA FIDE FARM EXEMPT** ......................................................2
**SECTION 4      DISTRICTS ESTABLISHED** .........................................................3
**SECTION 5      CONDITIONAL ZONING DISTRICTS**...........................................5
5.1.      Purpose ............................................................................................5
5.2      Conditional Zoning Districts ............................................................5
   A.      *Residential Districts*...............................................................5
   B.      *Office, Institutional and Commercial Districts*........................5
   C.      *Industrial Districts*.................................................................5
   D.      *Mixed Use Districts*................................................................6
5.3.      General Requirements .......................................................................6
   A.      *Application*...........................................................................6
   B.      *Plans and other information to accompany application*...........6
5.4.      Uses Within District .........................................................................8
5.5.      Conditions ........................................................................................8
5.6.      Non-compliance with District Conditions ........................................8
5.7.      Procedure .........................................................................................8
   A.      *Community Meeting*...............................................................9
   B.      *Chatham County Appearance Commission Review* .................9
   C.      *Submittal to Planning Department* ........................................9
5.8      Effect of Approval ..........................................................................10
5.9      Alterations to Approval ...................................................................11
**SECTION 6      OFFICIAL MAPS ADOPTED - DISTRICT BOUNDARIES ESTABLISHED......12**
6.1.      Zoning Map.....................................................................................12
6.2.      Incorporation by Reference .............................................................12
6.3.      Interpretation of Boundaries ...........................................................12
   A.      *Boundaries That Follow Lot Lines*.......................................12
   B.      *Boundaries That Do Not Follow Lot Lines* ...........................13
**SECTION 7      DEFINITIONS** ..............................................................................14
7.1.      General Purpose ..............................................................................14
7.2.      Definitions......................................................................................14
**SECTION 8      GENERAL PROVISIONS**...............................................................28
8.1.      Relationship of Buildings to Lot ......................................................28
8.2.      Open Space Requirements ...............................................................29
8.3.      Reduction of Lot and Yard Areas Prohibited ...................................29
8.4.      Access to Property ..........................................................................30
8.5.      Interpretation of District Boundaries ...............................................30
8.6.      Interpreting Permitted Uses ............................................................30
8.7.      Water and Sewer Requirements .......................................................30
8.8.      Height Limitation Exceptions ..........................................................30
8.9.      Fees ................................................................................................30
8.10.      Conflicts of Interest.......................................................................31
**SECTION 9      NON-CONFORMING SITUATIONS** ................................................31
9.1.      Definitions......................................................................................31
9.2.      Continuation of Non-conforming Situations.....................................31
9.3.      Non-conforming Lots of Record ......................................................31

i

| 9.4. | Extension or Enlargement of Non-conforming Situations | 31 |
| 9.5. | Reconstruction Limitations | 32 |
| 9.6. | Change in Kind of Non-conforming Use | 32 |
| 9.7. | Discontinuance of Non-conforming Uses | 32 |
| 9.8. | Building on Subdivision Lots of Record | 33 |

**SECTION 10    SCHEDULE OF DISTRICT REGULATIONS ... 34**

| 10.1. | R 5 - Residential District | 34 |
| A. | *Permitted Uses* | 34 |
| B. | *Dimensional Requirements* | 34 |
| C. | *Visibility at Intersections* | 35 |
| D. | *Off-Street Parking and Loading* | 35 |
| E. | *Signs* | 35 |
| 10.2. | R 2 - Residential District | 35 |
| A. | *Permitted Uses* | 35 |
| B. | *Dimensional Requirements* | 35 |
| C. | *Visibility at Intersections* | 36 |
| D. | *Off-Street Parking and Loading* | 36 |
| E. | *Signs* | 36 |
| 10.3. | R 1 - Residential District | 36 |
| A. | *Permitted Uses* | 36 |
| B. | *Dimensional Requirements* | 36 |
| C. | *Visibility at Intersections* | 37 |
| D. | *Off-Street Parking and Loading* | 37 |
| E. | *Signs* | 37 |
| 10.4. | O&I - Office and Institutional District | 37 |
| A. | *Permitted Uses* | 37 |
| B. | *Dimensional Requirements* | 37 |
| C. | *Visibility at Intersections* | 38 |
| D. | *Off-street Parking and Loading* | 38 |
| E. | *Signs* | 38 |
| 10.5. | B-1 - Business District | 38 |
| A. | *Permitted Uses* | 38 |
| B. | *Dimensional Requirements* | 38 |
| C. | *Visibility at Intersections* | 39 |
| D. | *Off-Street Parking and Loading* | 39 |
| E. | *Signs* | 39 |
| 10.6. | NB - Neighborhood Business District | 39 |
| A. | *Permitted and Conditional Uses* | 39 |
| B. | *Dimensional Requirements* | 39 |
| C. | *Visibility at Intersections* | 40 |
| D. | *Off-Street Parking and Loading* | 40 |
| E. | *Signs* | 40 |
| 10.7. | CB - Community Business District | 40 |
| A. | *Permitted and Conditional Uses* | 40 |
| B. | *Dimensional Requirements* | 40 |
| C. | *Visibility at Intersections* | 41 |
| D. | *Off-Street Parking and Loading* | 41 |
| E. | *Signs* | 41 |
| 10.8. | RB - Regional Business District | 41 |
| A. | *Permitted and Conditional Uses* | 41 |
| B. | *Dimensional Requirements* | 41 |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 222 of 743

| | | |
|---|---|---|
| C. | Visibility at Intersections | 42 |
| D. | Off-Street Parking and Loading | 42 |
| E. | Signs | 42 |
| 10.9. | IL - Light Industrial District | 42 |
| A. | Permitted Uses | 42 |
| B. | Dimensional Requirements | 42 |
| C. | Visibility at Intersections | 43 |
| D. | Off-Street Parking and Loading | 43 |
| E. | Signs | 43 |
| 10.10. | IH - Heavy Industrial District | 43 |
| A. | Permitted Uses | 43 |
| B. | Dimensional Requirements | 43 |
| C. | Visibility at Intersections | 44 |
| D. | Off-Street Parking and Loading | 44 |
| E. | Signs | 44 |
| 10.11. | CD-CC Conditional Use Compact Community | 44 |
| A. | Permitted Use: | 44 |
| B. | Requirements: | 44 |
| 10.12 | CD-MU Mixed Use | 44 |
| A. | Purpose | 44 |
| B. | Minimum Size | 45 |
| C. | Maximum Net Density and Built Upon Area Allowed | 45 |
| D. | Net Land Area Computation | 45 |
| E. | Permitted Uses | 45 |
| F. | Dimensional and Off-Street Parking Requirements | 46 |
| G. | Signage | 46 |
| 10.13 | Table 1: Zoning Table of Permitted Uses Notes:  Compact Communities (CC) uses are listed separately in the Compact Communities Ordinance | 47 |
| **SECTION 11** | **GENERAL ENVIRONMENTAL PERFORMANCE STANDARDS** | **60** |
| 11.1. | In General | 60 |
| 11.2. | Specific Requirements | 60 |
| A. | Noise | 60 |
| B. | Vibration | 60 |
| C. | Smoke and Other Particulate Matter | 60 |
| D. | Odors | 60 |
| E. | Toxic, Noxious or Hazardous Matter | 60 |
| F. | Electromagnetic Interference | 61 |
| G. | Fire and Explosion Hazards | 61 |
| H. | Humidity, Heat or Glare | 61 |
| I. | Light | 61 |
| J. | Stormwater Discharge | 61 |
| 11.3. | Environmental Impact Assessment | 62 |
| **SECTION 12** | **LANDSCAPING AND BUFFERING STANDARDS** | **63** |
| 12.1. | Additional Requirements | 64 |
| 12.2. | Water Conservation Guidelines | 64 |
| A. | Xeriscaping | 64 |
| 12.3. | Landscape Buffering Requirements and Screen Types | 65 |
| 12.4 | Screening of Storage Areas | 67 |
| 12.5 | Screening of Loading Areas | 68 |
| 12.6. | Applicability | 69 |

iii

**SECTION 13    LIGHTING** ......................................................................................................**70**
13.1.    Intent and purpose ...............................................................................................70
13.2.    Illuminating Engineering Society of North America (IESNA) Cutoff Classifications ......70
13.3.    Definitions............................................................................................................71
13.4.    Light Measurement Technique ...............................................................................73
13.5.    General Standards for Outdoor Lighting..................................................................73
13.6.    Lighting in Outdoor Areas (Residential and Non-Residential)...................................74
13.7.    Lighting for Vehicular Canopies.............................................................................75
13.8.    Outdoor Sports Field /Outdoor Performance Area Lighting.......................................76
13.9.    Natural Recreation Areas ......................................................................................76
13.10.   Lighting of Outdoor Display Areas .........................................................................76
13.11.   Lighting of Buildings .............................................................................................77
13.12.   Permanent Sign and Billboard Lighting...................................................................77
13.13.   Holiday/Festive Lighting .......................................................................................77
13.14.   Walkways, Bikeways and Parks (Section to be lighted) ..........................................78
13.15.   Landscape Lighting...............................................................................................78
13.16.   Permitting and Approval Process............................................................................78
13.17.   Nonconformities...................................................................................................79
**SECTION 14    OFF-STREET PARKING AND LOADING** ....................................................**80**
14.1.    Off-Street Parking Requirements ...........................................................................80
    A.    *Certification of Minimum Parking Requirements* ...............................................80
    B.    *Definition of a Parking Space* ..........................................................................80
    C.    *Minimum Off-Street Parking Requirements* .......................................................80
    D.    *Combination of Required Parking Spaces* .........................................................83
    E.    *Day Time/Night Time Assignments* ..................................................................83
    F.    *Lighting*........................................................................................................83
    G.    *Remote Parking*.............................................................................................83
14.2.    Parking Lot Improvement, Design and Locational Requirements ..............................84
14.3.    Off-Street Loading Requirements ...........................................................................85
    A.    *Type of Use Required Off-Street Loading Space* ................................................85
**SECTION 15    REGULATIONS GOVERNING SIGNS** ........................................................**86**
15.1.    Definitions............................................................................................................86
15.2.    Non-conforming signs............................................................................................86
15.3.    Lighting of Signs...................................................................................................86
15.4.    Prohibited Signs....................................................................................................86
15.5.    Signs Permitted in Any Zoning District....................................................................87
15.6.    Signs Permitted in the O&I, Office and Institutional Districts ...................................88
    A.    *Sign Area*......................................................................................................88
    B.    *Freestanding Signs*........................................................................................88
    C.    *Attached Signs* ..............................................................................................88
    D.    *Sign Size* ......................................................................................................88
15.7.    Signs Permitted in the B-1, NB, CB, and RB Districts...............................................89
    A.    *Sign Area*......................................................................................................89
    B.    *Freestanding Signs*........................................................................................89
    C.    *Attached Signs* ..............................................................................................89
    D.    *Sign Size* ......................................................................................................89
15.8.    Signs Permitted in the IL, Light Industrial District....................................................89
    A.    *Sign Area*......................................................................................................89
    B.    *Freestanding Signs*........................................................................................89
    C.    *Attached Signs* ..............................................................................................89

iv

| | | |
|---|---|---|
| D. | *Sign Size* | *89* |
| 15.9. | Signs Permitted in the IH, Heavy Industrial District | 89 |
| A. | *Sign Area* | *89* |
| B. | *Freestanding Signs* | *90* |
| C. | *Attached Signs* | *90* |
| D. | *Sign Size* | *90* |
| 15.10. | Temporary Signs | 90 |
| 15.11. | Off-Premise Directional Signs | 91 |
| 15.12. | Permit Required | 91 |
| **SECTION 16** | **HOME OCCUPATIONS** | **92** |
| 16.1. | Neighborhood Home Occupations | 92 |
| 16.2. | Rural Home Occupations | 92 |
| **SECTION 17** | **SPECIAL USE PERMITS** | **95** |
| 17.1. | Procedure | 95 |
| 17.2. | Plans | 96 |
| 17.3. | Violations | 96 |
| 17.4. | Changes or Amendments | 96 |
| 17.5. | Specific Conditions for Conditional Uses Listed in Residential Districts | 96 |
| A. | *Boarding Kennels* | *96* |
| B. | *Public and Private Recreation Camps and Grounds* | *97* |
| C. | *Planned Residential Development* | *97* |
| 17.6. | Standards for Solar Energy Uses | 98 |
| A. | *Solar Collectors* | *98* |
| B. | *Solar Farms on Less than Two (2) Acres* | *99* |
| C. | *Solar Farms on Greater than Two (2) Acres* | *99* |
| D. | *General Standards for All Solar Farms* | *99* |
| 17.7. | Standards for Events Center Limited | 100 |
| A. | *Size and Capacity Limits-* | *100* |
| B. | *Accessory Uses Permitted-* | *100* |
| **C. Signage Allowed-** | | *100* |
| 17.8. | Standards for Sexually Oriented Businesses | 100 |
| *A. Separation Requirements* | | *100* |
| **SECTION 18** | **BOARD OF ADJUSTMENT** | **104** |
| 18.1. | Board of Adjustment Created | 104 |
| 18.2. | Meetings | 104 |
| A. | *Oath* | *104* |
| B. | *Hearing Notice* | *105* |
| C. | *Subpoenas* | *105* |
| 18.3. | Powers and Duties of the Board of Adjustment | 105 |
| A. | *Administrative Review* | *105* |
| B. | *Variance* | *105* |
| C. | *Quasi-Judicial Decisions* | *106* |
| 18.4. | Appeal Procedure | 107 |
| 18.5. | Vote Required - Judicial Appeal | 108 |
| **SECTION 19** | **AMENDMENT TO ZONING ORDINANCE** | **109** |
| 19.1. | Statement of Intent | 109 |
| 19.2. | Amendment Initiation | 109 |
| 19.3. | Conditional Zoning District Rezoning | 109 |
| *B. Citizen-Initiated Amendments* | | *110* |
| *C. Contents of Application* | | *110* |

v

19.5     Joint Public Hearing for County-Initiated Amendments.................................................111
19.6     Public Hearing and Notice Thereof...............................................................................111
19.7     Planning Department Prepares Final Analysis and Recommendation...............................111
19.8     Planning Board Action on the Amendment Application ...................................................111
19.9     Board of Commissioners Receives Recommendation of Planning Board..........................112
19.10    Withdrawal of Application...............................................................................................112
19.11    Effect of Denial on Subsequent Petitions.......................................................................112
19.12    Vested Rights and Permit Choice ...................................................................................113

**SECTION 20      ENFORCEMENT .............................................................................118**
20.1.     Zoning Administrator......................................................................................................118
20.2.     Certificate of Zoning Compliance..................................................................................118
     *A.     Application Procedures .........................................................................................118*
     *B.     Right of Appeal ....................................................................................................119*
20.3.     Duties of Zoning Administrator, Zoning Official, Board of Adjustment, and Courts as to Matters of Appeal     119

**SECTION 21      PENALTY FOR VIOLATIONS....................................................................120**
**SECTION 22      EFFECTS UPON OUTSTANDING BUILDING PERMITS ...................................123**
**SECTION 23      EFFECTS UPON OUTSTANDING SPECIAL USE PERMITS ............................124**
23.1     Cancellation by surrender of a Conditional use permit....................................................124
**SECTION 24      REENACTMENT AND REPEAL OF EXISTING ZONING ORDINANCE .......125**
**SECTION 25      INTERPRETATION, PURPOSE AND CONFLICT.............................................126**
**SECTION 26      VALIDITY.........................................................................................................127**
**SECTION 27      EFFECTIVE DATE ..........................................................................................128**
**SECTION 28      AMENDMENTS ...............................................................................................129**

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 226 of 743

# THE CHATHAM COUNTY ZONING ORDINANCE FOR BALDWIN, WILLIAMS, NEW HOPE, CAPE FEAR, AND PORTIONS OF HAW RIVER, OAKLAND, CENTER, ALBRIGHT, GULF, HICKORY MOUNTAIN, MATTHEWS AND HADLEY TOWNSHIPS, CHATHAM COUNTY, NORTH CAROLINA

AN ORDINANCE PROVIDING FOR THE ZONING OF BALDWIN, WILLIAMS, NEW HOPE, CAPE FEAR, AND PORTIONS OF HAW RIVER, OAKLAND, CENTER, ALBRIGHT, GULF, HICKORY MOUNTAIN, MATTHEWS AND HADLEY TOWNSHIPS, CHATHAM COUNTY, NORTH CAROLINA.

In pursuance of authority conferred by Chapter 160D Articles 1 through 14 of the General Statutes of North Carolina and for the purpose of promoting the public health, safety and general welfare; promoting the orderly growth of the jurisdiction; lessening congestion on the roads and streets; securing safety from fire, panic and other dangers; providing adequate light and air; preventing the overcrowding of land; avoiding undue concentration of population; and facilitating the adequate provision of transportation, water, sewage, schools, parks and other public requirements; all in accordance with the adopted Land Use Plan; NOW THEREFORE,

The Board of Commissioners of Chatham County do ordain as follows:

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 227 of 743

## SECTION 1   TITLE

This Ordinance shall be known as "<u>The Chatham County Zoning Ordinance for Baldwin, Williams, New Hope, Cape Fear, and portions of Haw River, Oakland, Center, Albright, Gulf, Hickory Mountain, Matthews and Hadley Townships, Chatham County, North Carolina</u>", and may be referred to as "The Zoning Ordinance."

## SECTION 2   JURISDICTION

The regulations set forth in this Ordinance shall apply within the zoning areas designated on the official zoning maps as established in Section 6 herein for Baldwin, Williams, New Hope, Cape Fear and portions of Haw River, Oakland, Center, Albright, Gulf, Hickory Mountain, Matthews and Hadley Townships, Chatham County, North Carolina.

## SECTION 3   BONA FIDE FARM EXEMPT

This Ordinance shall in no way regulate, restrict, prohibit or otherwise deter or affect property used for bona fide farm purposes, but any use of farm property for non-farm purposes shall be subject to the regulations of this Ordinance, per North Carolina General Statutes §153A-340(b). For purposes of determining whether a property is being used for bona fide farm purposes, any of the following shall constitute sufficient evidence that the property is being used for bona fide farm purposes:

    a.  A farm sales tax exemption certificate issued by the Department of Revenue.

    b.  A copy of the property tax listing showing that the property is eligible for participation in the present use value program pursuant to NCGS §105-277.3.

    c.  A copy of the farm owner's or operator's Schedule F from the owner's or operator's most recent federal income tax return.

    d.  A forest management plan.

A building or structure that is used for agritourism is a bona fide farm purpose if the building or structure is located on a property that (i) is owned by a person who holds a qualifying farmer sales tax exemption certificate from the Department of Revenue pursuant to G.S. 105-164.13E(a) or (ii) is enrolled in the present-use value program pursuant to G.S. 105-277.3. Failure to maintain the requirements of this subsection for a period of three years after the date the building or structure was originally classified as a bona fide purpose pursuant to this subdivision shall subject the building or structure to applicable zoning and development regulation ordinances adopted by a county pursuant to subsection (a) of this section in effect on the date the property no longer meets the requirements of this subsection. For purposes of this section, "agritourism" means any activity carried out on a farm or ranch that allows members of the general public, for recreational, entertainment, or educational purposes, to view or enjoy rural activities, including farming, ranching, historic, cultural, harvest-your-own activities, or natural activities and attractions. A building or structure used for agritourism includes any building or structure used for public or private events, including, but not limited to, weddings, receptions, meetings, demonstrations of farm activities, meals, and other events that are taking place on the farm because of its farm or rural setting.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 228 of 743

**SECTION 4   DISTRICTS ESTABLISHED**
In order to achieve the purposes of this Ordinance as set forth above, the jurisdictional area subject to this Ordinance is hereby divided into general use districts of which there shall be 10 with the designation and purposes as listed below:

**R5** Residential district
Primarily for very low density residential developments along the County's rivers and streams which are compatible with protecting the water quality of the rivers and streams.

**R2** Residential district
Primarily for low density residential development to protect water supply watersheds

**R1** Residential District
This district is primarily for low to moderate density residential development within the residential-agricultural areas of the jurisdiction.

**O&I** Office and Institutional District
Primarily for office and institutional type uses along with residences

**B-1** General Business District
Intended for retail trade and consumer services dealing with the general public; the old district has been split into 3 new districts (NB, CB, and RB, below) that are intended for retail and consumer services, but are scaled to better fit different needs around the County. This district is historical and no parcel or portion of a parcel can be rezoned to this district. Should an applicant for a rezoning wish to rezone to a district with approved land uses listed for this district, the applicant may apply for a rezoning to one of the 3 new business districts (NB, CB, and RB, below).

**NB** Neighborhood Business District
This district is meant to serve a small retail market, roughly equivalent to the trade area of a small (40,000 square foot) grocery store and limited ancillary services. No building within this district shall exceed 40,000 square feet and the cumulative building square footage shall not exceed 160,000.

**CB** Community Business District
This district is similar to the Neighborhood Business District, but at a slightly larger scale, roughly equivalent to a 80,000 square foot grocery store and ancillary services. No building within this district shall exceed 80,000 square feet and the cumulative building square footage shall not exceed 320,000.

**RB** Regional Business District
This district is similar to the old General Business District in that a wider array of uses is allowed and there are not limitations on single-occupant, single-use structure sizes or outdoor storage and display of merchandise.

**IL** Light Industrial District

Primarily for wholesale activities, warehouses, and light manufacturing operations which do not involve heavy processing activities and which are not likely to create noise, smoke, dust, vibration, heat, odor or other obnoxious effects, controlled or uncontrolled.


**IH** Heavy Industrial District

Primarily for manufacturing operations involving heavy manufacturing processes such as dyeing, chemical mixing, melting, and stamping but which control such processes so as not to exceed the environmental performance standards of this Ordinance. IH also permits all uses as permitted in the IL District.

**SECTION 5   <u>CONDITIONAL ZONING DISTRICTS</u>**
Conditional Zoning district (bearing the designation CD) corresponds to the general purpose zoning districts and to the mixed use districts as authorized in this ordinance.

## 5.1.     Purpose

Conditional Zoning districts are zoning districts in which the development and use of the property is subject to predetermined ordinance standards and the rules, regulations, and conditions imposed as part of the legislative decision creating the district and applying it to the particular property.

Some land uses are of such a nature or scale that they have significant impacts on both the immediate surrounding area and on the entire community, which cannot be predetermined and controlled by general district standards.  The review process established in this Ordinance provides for accommodation of such uses by a reclassification of property into a conditional zoning district, subject to specific conditions, which ensure compatibility of the use with neighboring properties.  A conditional zoning district is not intended for securing early zoning for a proposal, except when that proposal is consistent with an approved land use plan or the proposal can demonstrate that public infrastructure needed to serve the development will be made available within a reasonable time period.

## 5.2     Conditional Zoning Districts

### A.  Residential Districts
The following districts are identical to the corresponding residential districts, except that approval of a conditional zoning district is required as a prerequisite to any use or development, as provided for in this Ordinance:
CD-R5
CD-R2
CD-R1

### B.  Office, Institutional and Commercial Districts
The following districts are identical to the corresponding commercial districts, except that approval of a conditional zoning district is required as a prerequisite to any use or development, as provided for in this Ordinance:
**CD-O&I** Office & Institutional
**CD-B1** General Business
**CD-NB** Neighborhood Business
**CD-CB** Community Business
**CD-RB** Regional Business

### C.  Industrial Districts
The following districts are identical to the corresponding industrial districts, except that approval of a conditional zoning district is required as a prerequisite to any use or development, as provided for in this Ordinance:
**CD-IL** Light Industrial
**CD-IH** Heavy Industrial

Chatham County Zoning Ordinance

**D.  Mixed Use Districts**
Approval of a conditional zoning district shall be required as a prerequisite to any use or development, as provided for in this Ordinance, for the following districts:
**CD-CC** Compact Community – a compact residential development with a mixed commercial use village center.  See the Compact Communities Ordinance for more information.
**CD-MU** Mixed Use – a mixed use development that provides for an integration of diverse but compatible uses into a single development.

## 5.3.    General Requirements

Property may be rezoned to a conditional zoning district only in response to and consistent with an application submitted in compliance with Section 5.

**A.  Application**
Rezoning to a conditional zoning district shall only be considered upon request of the property owner or the authorized agent of the owner.  In addition to the documents specified in **Subsection B** below, all applications shall also contain the following information:
1. The alleged error in this Ordinance, if any, which would be remedied by the proposed amendment with a detailed explanation of such error in the Ordinance and detailed reasons how the proposed amendment will correct the same.
2. The changed or changing conditions, if any, of the area or in the County generally, which make the proposed amendment reasonably necessary to the promotion of the public health, safety and general welfare.
3. The manner in which the proposed amendment will carry out the intent and purpose of any adopted plans or part thereof.
4. The requested amendment is either essential or desirable for the public convenience or welfare.
5. All other circumstances, factors and reasons which the applicant offers in support of the proposed amendment.
6. Information required on the application form received from the Planning Department.

**B.  Plans and other information to accompany application**
(1) The application shall include a site plan, drawn to scale, with supporting information and text that specifies the actual use or uses intended for the property and any rules, regulations, and conditions that, in addition to the predetermined ordinance requirements, will govern the development and use of the property.  The following information must be provided, if applicable:

a. Information showing the boundaries of the proposed property as follows:
1. If the entire parcel will be zoned, a GIS or survey map and parcel number of the subject property.
2. If only a portion of the parcel will be zoned, a boundary survey and vicinity map showing the property's total acreage, parcel number, current zoning classification(s) and the general location in relation to major streets, railroads, and/or waterways,
b. Legal Description of proposed conditional zoning district
c. All existing and proposed easements, reservations, and rights-of-way;
d. Proposed number and general location of all building sites, their approximate location, and their approximate dimensions;

Page 6

      e. Proposed use of all land and structures, including the number of residential units and the total square footage of any nonresidential development;

      f. All yards, buffers, screening, and landscaping required by these regulations or proposed by the applicant;

      g. All existing and proposed points of access to public and/or private streets;

      h. Stream buffers required through this or other Chatham County Ordinances or Regulations, and other Local, State, or Federal regulatory agencies. Delineation of areas within the regulatory floodplain as shown on the Official Flood Insurance Rate Maps for Chatham County

      i. Proposed phasing, if any;

      j. Generalized traffic, parking, and circulation plans;

      k. Proposed provision of utilities;

      l. The location of known sites of historic or cultural significance within or adjacent to the project area, including any structure over 50 years old;

      m. The approximate location of any cemetery,

      n. Proposed number, location, and size of signs;

      o. Location and description of any proposed lighting on the project site with a note that any lighting will comply with Section 13; and

      p. The location of existing and/or proposed storm drainage patterns and facilities intended to serve the proposed development, and impervious surface calculations; and

      q. Environmental Impact Assessment pursuant to Section 11.3 of the Zoning Ordinance, if applicable.

(2) The Zoning Administrator has the authority to waive any application requirement where the type of use or scale of the proposal makes providing that information unnecessary or impractical.

(3) In the course of evaluating the proposed use, the Zoning Administrator, Planning Board, Chatham County Appearance Commission, or Board of Commissioners may request additional information from the applicant. This information may include, but not be limited to, the following:

      a. Proposed screening, buffers, and landscaping over and above that required by these regulations, as well as proposed treatment of any existing natural features;

      b. Existing and general proposed topography;

      c. Scale of buildings relative to abutting property;

      d. Height of structures;

      e. Exterior features of the proposed development;

      f. A traffic impact analysis of the proposed development prepared by a qualified professional. The traffic impact analysis shall follow the NCDOT TIA Analysis Guidelines, and shall also include consideration for non-motorized and public transportation;

      g. Any other information needed to demonstrate compliance with these regulations.

(4) The site plan and any supporting text shall constitute part of the application for all purposes under this section.

**5.4.    Uses Within District**

Within a conditional zoning district, only those uses listed (or determined to be equivalent uses) as permitted uses or conditional uses in the corresponding zoning district shall be permitted, and no use shall be permitted except as a conditional use subject to approval of a conditional zoning district rezoning authorized by the Board of Commissioners as provided herein.

**5.5.    Conditions**

Specific conditions may be proposed by the petitioner or the local government or its agencies, but only those conditions mutually approved by the local government and the petitioner may be incorporated into the zoning regulations. Conditions and site-specific standards imposed in a conditional district shall be limited to those that address the conformance of the development and use of the site to local government ordinances, plans adopted pursuant to G.S. 160D-5-1, or the impacts reasonably expected to be generated by the development or use of the site.

In approving a reclassification of property to a conditional zoning district, the Planning Department and Planning Board may recommend, and the Board of Commissioners request, that reasonable and appropriate conditions be attached to approval of the rezoning. Property may be placed in a conditional zoning district only in response to a petition by the owners of all the property to be included. Specific conditions applicable to the district may be proposed by the petitioner or the county, but only those conditions approved by the county and consented to by the petitioner in writing may be incorporated into the zoning regulations or permit requirements. Any such conditions should relate to the relationship of the proposed use to surrounding property, proposed support facilities such as parking areas and driveways, pedestrian and vehicular circulation, screening and buffer areas, the timing of development, street and right-of-way improvements, water and sewer improvements, stormwater drainage, the provision of open space, and other matters that the Board of Commissioners may find appropriate or the applicant may propose.  Such conditions to approval of the rezoning may include dedication to the County or State, as appropriate, of any rights-of-way or easements for roads, water, or other public utilities necessary to serve the proposed development.  The applicant shall have a reasonable opportunity to consider and respond to any such conditions prior to final action by the Board of Commissioners.

**5.6.    Non-compliance with District Conditions**

Any violation of a use or condition included in the approval of a conditional zoning district shall be treated the same as any other violation of this Ordinance and shall be subject to the same remedies and penalties as any such violation.  Any violation of such a condition shall be deemed to be the same type of violation as the use of a property for a use not permitted under the district regulations, for the reason that any use permitted in a conditional zoning district is permitted only subject to the specified conditions.

**5.7.    Procedure**

Applications for new conditional zoning districts or expansion of existing Conditional Zoning Districts shall be processed, considered and voted upon using the following procedure.  Before filing an application for a conditional zoning district, the applicant(s) is encouraged to meet with

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 234 of 743

the Planning Department staff to discuss the nature of the proposed reclassification, the standards for development under the existing and proposed classifications, and concerns that persons residing in the vicinity of the property may have regarding the proposed reclassification, if known.

**A. Community Meeting**

(1) The applicant is required to hold a community meeting prior to the application deadline for a conditional zoning district rezoning. The applicant shall provide mailed notice of the meeting.

    a. Notice of the meeting shall be provided to owners of abutting property, as listed with the Chatham County Tax Department. Properties are abutting even if separated by a street, railroad, public or private right of way, or other transportation corridor

    b. Notice may be sent to additional properties by the applicant.

    c. At a minimum, the notice shall be sent by standard mail and be postmarked at least fourteen (14) days prior to the date of the community meeting. Additional types of notice may be provided by the applicant.

(2) A written report of the community meeting shall be included as part of the application packet.

    a. The written report of the meeting shall include a listing of those persons and organizations contacted about the meeting and the manner and date of contact, the time, date, and location of the meeting, a roster of the persons in attendance at the meeting, a summary of issues discussed at the meeting, and a description of any changes to the rezoning application made by the applicant as a result of the meeting.

    b. In the event the applicant has not held at least one meeting pursuant to this subsection, the applicant must file a report documenting efforts that were made to arrange such a meeting and stating the reasons such a meeting was not held. The adequacy of the meeting held or a report filed pursuant to this subsection shall be considered by the Board of Commissioners, but shall not be subject to judicial review.

(3) Revisions to existing Conditional Zoning Districts and existing Special Use Permits shall not require a community meeting if the physical boundaries of the district or permit are not proposed to be expanded.

**B. Chatham County Appearance Commission Review**

The applicant is required to meet with the Chatham County Appearance Commission for review of landscaping and signage plans prior to submittal to the Planning Department. The Appearance Commission shall have forty-five (45) days from the date of submittal to forward a recommendation to the applicant and Planning Department. The submittal date shall be seven (7) days prior to the date of the Appearance Commission meeting.

**C. Submittal to Planning Department**

(1) A completed application and supporting information shall be submitted to the Planning Department at least forty-five (45) days prior to the Public Hearing. A digital copy of the application and all accompanying materials shall be submitted pursuant to the Planning Department Digital Document Submission Guidelines.

(2) The Planning Department shall, before scheduling the public hearing, ensure that the application contains all the required information as specified in Section 5.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 235 of 743

(3) The Planning Department shall have fifteen (15) days from the date of submittal to notify the applicant that the application is complete for scheduling the public hearing.

    a. If the Planning Department determines the information is not sufficient for review, the Department shall notify the applicant of the specific information that is required for review.

    b. The Planning Department shall take no further action on the application until the applicant submits the required information.

    c. Once the applicant corrects the identified deficiencies, the applicant shall resubmit to the Planning Department at least 45 days prior to the next Public Hearing meeting, and the Department shall have 15 days to review the information and notify the applicant that the information is sufficient for review.

    d. A determination that an application contains sufficient information for review as provided in this subsection (b) does not limit the ability of other county agencies, the Planning Board or the Board of Commissioners to request additional information during the review process.

(4) The application is reviewed by the Technical Review Committee prior to the Public Hearing for comments and recommendations from other agencies.

**D. Joint Public Hearing by Board of Commissioners and Planning Board**

(1) The Board of Commissioners and Planning Board shall receive public comment on Conditional Zoning District applications in a public hearing at the County Commissioners' last regular meeting in January, February, March, April, May, June, August, September, October, and November.

(2) The lack of quorum of the Planning Board at such meetings shall not affect the proceedings nor require further hearings.

(3) Notice of the public hearing shall be given according to G.S. 160D-602. At a minimum, the following notice shall be provided:

    a. A notice of the public hearing shall be prominently posted on the site proposed for the Conditional Zoning District or on an adjacent public street or highway right-of-way during the same time period specified for mailed notices of the hearing. When multiple parcels are included in the proposed Conditional Zoning District, a posting on each individual parcel is not required, but sufficient notices shall be posted to provide reasonable notice to interested parties.

    b. Mailed notice shall be sent to adjoining properties pursuant to State law.

    c. Published notice of the hearing shall be given pursuant to State law.

(4) The Board of Commissioners may continue the Public Hearing in order to receive more public input or requested information from the applicant.

**E. Planning Board and Board of Commissioners Action**

Once the Public Hearing is closed by the Board of Commissioners, the Planning Board and Board of Commissioners shall review the application pursuant to the procedure outlined in Sections 19.6 – 19.11.

**5.8     Effect of Approval**

A. If an application for conditional zoning is approved, the development and use of the property shall be governed by the predetermined ordinance requirements applicable to the district's classification, the approved site plan for the district, and any additional approved rules,

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 236 of 743

regulations, and conditions, all of which shall constitute the zoning regulations for the approved district and are binding on the property as an amendment to these regulations and the zoning maps.

B. If an application is approved, only those uses and structures indicated in the approved application and site plan shall be allowed on the subject property. A change of location of any structures may be authorized pursuant to Section 5.9.

C. Following the approval of a rezoning application for a conditional zoning district, the subject property shall be identified on the Zoning Map by the appropriate district designation.

D. Any conditional zoning district shall have vested rights pursuant to Section 19.12.

## 5.9    Alterations to Approval

A. Except as provided in Section 5.9(B), changes to the approved conditional zoning district application or to the conditions attached to the approval shall be treated the same as a new application for a conditional zoning district and shall be processed in accordance with the procedures in Section 5.7.

B. The Zoning Administrator shall have the delegated authority to approve an administrative amendment change to an approved site plan. The standard for approving or denying such a requested change shall be that the change does not significantly alter the site plan or its conditions and that the change does not have a significant impact upon abutting properties. Any modifications in conditional district standards that do not involve a change in uses permitted or the density of the development permitted may be reviewed and approved administratively. Any changes that increase the intensity of the development are limited for nonresidential development to 10% of the approved building square footage or 5,000 square feet, whichever is less. For residential development, increases in density are not allowed as an administrative change.

C. The Zoning Administrator shall always have the discretion to decline to exercise the delegated authority because a rezoning application for a public hearing and Board of Commissioners action is deemed appropriate under the circumstances. If the Zoning Administrator declines to exercise this authority, then the applicant can only file a rezoning application for a public hearing and Commissioner decision.

## SECTION 6   OFFICIAL MAPS ADOPTED - DISTRICT BOUNDARIES ESTABLISHED

### 6.1.    Zoning Map

The location and boundaries of zoning districts shall be as kept in spatial databases entitled "Zoning" and "Zoning Overlays" that are maintained as part of the County's geographic information system (GIS) under the direction of the Planning Director, or designee. This depiction of zoning boundaries along with additional reference data in the GIS shall constitute the Official Zoning Map for the County's zoning jurisdiction, and is adopted into this Ordinance by reference. The County Clerk, as applicable, may upon validation by the Planning Director, or designee, certify a paper copy of the Official Zoning Map, or portions of the map, as a true and accurate copy of the Official Zoning Map, or a portion thereof, under the authority of G.S. 160D-105.

The Planning Director, or designee, shall revise the Official Zoning Map when amendments are passed by the governing body in accordance with Section 17, Amendment to Zoning Ordinance. The Planning Director, or designee, shall correct errors in the map as they are discovered.

No unauthorized person may alter or modify the Official Zoning Map. Errors in the Official Zoning Map shall be corrected as they are discovered, and the corrected information shown on the GIS system.

The Planning Director, or designee, may authorize printed copies of the Official Zoning Map to be produced, and shall maintain digital or printed copies of superseded versions of the Official Zoning Map for historical reference.

### 6.2.    Incorporation by Reference

This ordinance, pursuant to G.S. 160D-105, shall reference or incorporate by reference flood insurance rate maps, watershed boundary maps, or the maps officially adopted or promulgated by state and federal agencies. For these maps, a regulation text or zoning map may reference the most recent officially adopted versions of such maps. When zoning district boundaries are based on these maps, the regulation may provide that the zoning district boundaries are automatically amended to remain consistent with changes in the officially promulgated state and federal maps provided a copy of the currently effective version of any incorporated map shall be maintained for public inspection as provided in Section 6.1.

### 6.3.    Interpretation of Boundaries

The Planning Director, or designee, may authorize periodic changes to the boundaries of the Official Zoning Map in conformance with this section. Interpretations of zone boundaries may be appealed to the Board of Adjustment.

### A. Boundaries That Follow Lot Lines
A boundary shown on the Official Zoning Map as following a lot line or parcel boundary shall be construed as following the lot line or parcel boundary as it actually existed at the time the zoning boundary was established, as shown on maps submitted or used when the boundary was established.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 238 of 743

If, subsequent to the establishment of the zoning boundary, a minor property line adjustment is made, such as from settlement of a boundary dispute, the zoning boundary shall be construed to move with the lot line or parcel boundary if the adjustment is less than ten feet.

**B. Boundaries That Do Not Follow Lot Lines**

Where the ordinance establishing a zoning boundary identifies the boundary as following a particular natural feature such as a ridgeline, contour line, a river, stream, lake or other water course, or reflects a clear intent that the boundary follow the feature, the boundary shall be construed as following that feature as it actually exists. If, subsequent to the establishment of the boundary, such natural feature should move as a result of natural processes (slippage, subsidence, erosion, flooding, sedimentation, etc.), the boundary shall be construed as moving with the natural feature.

A boundary shown on the Official Zoning Map as approximately following a street or railroad line shall be construed as following the centerline of the street or railroad right-of-way. If, subsequent to the establishment of the boundary, the centerline of the street or railroad right-of-way should be moved as a result of its widening or a minor realignment (such as at an intersection), the boundary shall be construed with moving with the centerline only if the centerline is moved no more than 25 feet.

A boundary shown on the Official Zoning Map as approximately parallel to, or as an apparent extension of, a feature described above shall be construed as being actually parallel to, or an extension of, the feature.

If a zoning boundary splits an existing lot or parcel, the metes and bounds description, if one was submitted at the time the zoning boundary was established, shall be used to establish the boundary.

If the specific location of the boundary cannot be determined from application of the above rules to the Official Zoning Map, it shall be determined by scaling the mapped boundary's distance from other features shown on the map.

**SECTION 7**     <u>**DEFINITIONS**</u>

**7.1.     General Purpose**

For the purpose of this Ordinance certain words and terms used herein are defined as herein indicated.  All words used in the present tense shall include the future tense; all words in the singular number shall include the plural number; all words in the plural number shall include the singular number unless the natural construction of the wording indicates otherwise; words in the male gender include the female gender; all words not defined in this section shall carry the definition prescribed in the common dictionary.

**7.2.     Definitions**

**Accessory Building** - A detached subordinate building the use of which is incidental to that of the principal building and located on the same lot therewith.

**Accessory Dwelling Unit** (i.e. guest house, pool house, garage apartment, in-house apartment) - An accessory dwelling unit that is smaller than the principal residential dwelling. The accessory dwelling unit is situated on the same lot as the principal residence and may be located within the principal residence or in a separate building with a separate access. The accessory dwelling unit is restricted to 1,500 square feet of heated living space. The use is to conform to the character of the existing structures and neighborhood, i.e. mobile homes are not allowed as an accessory dwelling unit on lots smaller than 80,000 square feet.

**Accessory Structure -** A detached subordinate structure, the use of which is incidental to that of the principal structure and located on the same lot therewith.

**Accessory Use** - Any use which is clearly incidental, secondary, and/or supportive of a principal use.

**Accessory Use Sign** - Any sign which is located on the same premises with a principal permitted use and which are clearly incidental, secondary and/or supportive of the principal use.

**Administrative Decision-** Decisions made in the implementation, administration or enforcement of development regulations that involve the determination of facts and the application of objective standards set forth in this ordinance.

**Adult Arcade -** Any place to which the public is permitted or invited wherein coin-operated or slug-operated or electronically, electrically, or mechanically controlled still or motion picture machines, projectors, or other image-producing devices are maintained to show images to five or fewer persons per machine at any one time, and where the images so displayed are distinguished or characterized by the depicting or describing of Specified Sexual Activities or Specified Anatomical Areas.

**Adult Cabaret -** A business operating in a building or portion of a building regularly featuring dancing or other live entertainment if the dancing or entertainment that constitutes the primary live entertainment is distinguished or characterized by an emphasis on the exhibiting of specified sexual activities or specified anatomical areas for observation by patrons therein.

**Adult Escort -** A person who, for consideration, agrees or offers to act as a companion, guide, or date for another person for the purpose of participating in, engaging in, providing, or facilitating Specified Sexual Activities.

**Adult Escort Agency -** A person or business that furnishes, offers to furnish, or advertises to furnish adult escorts as one of its business purposes for a fee, tip, or other consideration.

**Adult Media Store -** A business: (a) Which receives a majority of its gross income during any calendar month from the sale or rental of publications (including books, magazines, other periodicals, videotapes, compact discs, other photographic, electronic, magnetic, digital, or other imaging medium) which are distinguished or characterized by their emphasis on matter depicting, describing, or relating to Specified Sexual Activities or Specified Anatomical Areas, as defined in this article; or (b) Having as a preponderance (either in terms of the weight and importance of the material or in terms of greater volume of materials) of its publications (including books, magazines, other periodicals, videotapes, compact discs, other photographic, electronic, magnetic, digital, or other imaging medium) which are distinguished or characterized by their emphasis on matter depicting, describing, or relating to Specified Sexual Activities or Specified Anatomical Areas.

**Adult Merchandise -** Any product dealing in or with explicitly sexual material as characterized by matter depicting, describing, or relating to Specified Sexual activities or Specified Anatomical Areas.

**Adult Mini Motion Picture Theater -** An enclosed building with viewing booths designed to hold patrons which is used for presenting motion pictures, a preponderance of which are distinguished or characterized by an emphasis on matter depicting, describing, or relating to specified sexual activities or specified anatomical areas. A booth shall not mean a theater, movie house, playhouse, or a room or enclosure or portion thereof that contains more than 600 square feet.

**Adult Motel -** A hotel, motel or similar commercial establishment that offers accommodation to the public for any form of consideration and: (a) Provides patrons with closed-circuit television transmissions, films, motion pictures, video cassettes, slides, or other photographic reproductions that are characterized by the depiction or description of Specified Sexual Activities or Specified Anatomical Areas; and has a sign visible from the public rights-of-way that advertises the availability of this adult type of photographic reproductions; or (b) Offers a sleeping room for rent for a period of time that is less than six hours; or (c) Allows a tenant or occupant of a sleeping room to sub-rent the room for a period of time that is less than twelve hours.

**Adult Motion Picture Theater -** A commercial establishment where, for any form of consideration, films, motion pictures, videocassettes, slides, or similar photographic reproductions are regularly shown as one of its principal business purposes that depict or describe specified sexual activities and/or specified anatomical areas.

**Adult Patron -** Any person who is physically present on the premises of a sexually oriented business and who is not an owner, employee, agent, subcontractor, or independent contractor of said business, or any entertainer or performer at said business.

**Adult Theater -** A theater, concert hall, auditorium, or similar commercial establishment which regularly features, exhibits, or displays as one of its principal business purposes, persons who appear in a state of nudity or semi-nudity, or live performances that expose or depict specified anatomical areas and/or specified sexual activities.

**Agriculture -** For purposes of this Ordinance the terms "agriculture", "agricultural", and "farming" refer to all of the following:

    (1)    The cultivation of soil for production and harvesting of crops, including but not limited to fruits, vegetables, sod, flowers and ornamental plants.

    (2)    The planting and production of trees and timber.

    (3)    Dairying and the raising, management, care, and training of livestock, including horses, bees, poultry, and other animals for individual and public use, consumption, and marketing.

    (4)    Aquaculture as defined in G.S. 106-758.

    (5)    The operation, management, conservation, improvement, and maintenance of a farm and the structures and buildings on the farm, including building and structure repair, replacement, expansion, and construction incident to the farming operation.

    (6)    When performed on the farm, "agriculture", "agricultural", and "farming" also include the marketing and selling of agricultural products, agritourism, the storage and use of materials for agricultural purposes, packing, treating, processing, sorting, storage, and other activities performed to add value to crops, livestock, and agricultural items produced on a farm, and similar activities incident to the operation of a farm.

**Animal Husbandry, Specialized** - The use of land for the raising and keeping of animals, fowl, reptiles, etc. which are not general livestock or poultry and not classified as a bona fide farm. Specialized animal husbandry farming includes but is not limited to the following: fur-bearing animal farms, game bird farming and animal farms, wild animal farms, aviaries, snake, alligator and frog farms, laboratory animal farms, worm farms, and fish farms.

**Apartment Buildings** - A building containing three (3) or more residential dwelling units that are not on their own individual lot. Such units may be leased separately or developed as condominiums.

**Apartment Complex** – A grouping of two or more apartment buildings.

**Attached Sign** - Any sign attached to, painted on the wall surface of, or erected and confined within the limits of the outside wall of any building or structure, which is supported by such wall or building.

**Auto Wrecking** - A commercial activity that provides open storage, disassembling, or salvaging for more than two junked motor vehicles.

**Avocational Farming** - The use of land for those activities which constitute farming, but does not meet the definition of a bona fide farm.

**Awning -** A structure made of cloth, metal, or other material affixed to a building in such a manner that it shades windows or doors below, but is not a constructed canopy.

**Banner Sign** - A sign of lightweight fabric or similar material which is attached to a pole or a building, structure and/or vehicle by any means. National, state or municipal flags shall not be considered banners.

**Bed and Breakfast Home** - Owner-occupied bed and breakfast homes with no more than two (2) rooms (units) for rent for stays no longer than seven (7) consecutive days and may be located on legal, non-conforming and conforming lots of record, on at least one and one half (1.5) acres, which may have standard setbacks as set in the district in which it is located.

**Bed and Breakfast Inn** - Small, owner-operated businesses where the owner usually lives on premises, but is not required to do so. The building's primary usage is for lodging of overnight guests and meals served in conjunction with the stay of guests. Inns advertise, have business licenses, comply with government ordinances, pay all appropriate taxes and post signs. The inn may host events such as weddings, small business meetings, et cetera, with up to 8 overnight rooms for rent to overnight guests, provided all other local and state requirements are met.

**Board of Commissioners** – The Chatham County Board of Commissioners.

**Bona Fide Farm** - The use of land for agriculture as defined in Section 3 of this Ordinance.

**Building** - Any structure having a roof supported by walls or columns constructed, used or intended for supporting or sheltering any use or occupancy.

**Building Height** - The vertical distance measured from the average elevation of the finished grade to the topmost section of the roof.

**Building Line** - A line perpendicular to the lot depth which establishes the horizontal distance between the structure and the front property line excluding the outermost steps, uncovered porches, gutters, and similar features.

**Canopy -** A permanent structure, not enclosed and not retractable, attached or unattached to a building, for the purpose of providing shelter to patrons or automobiles, or as a decorative feature on a building wall.

**Childcare -** The law defines Child Care (G.S. § 110-86) as a program or arrangement where three or more children less than 13 years old, who do not reside where the care is provided, receive care on a regular basis of at least once per week for more than four hours but less than 24 hours per day from persons other than their guardians or full-time custodians, or from persons not related to them by birth, marriage, or adoption.

**Churches** – see Place of Worship.

**Commercial Design Guidelines** - The Chatham County Commercial Design Guidelines and Section 12 of this Ordinance.

**Common Area** - All areas, including private streets, conveyed to an owners' association in a townhouse development, residential development, or owned on a proportional undivided basis in a condominium.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 243 of 743

**Common Plan of Development** – A group of two or more buildings constructed, planned and developed with a unified design including coordinated parking and service areas, and may include associated out parcels. Shopping centers are examples of common plans of development.

**Compact Community** – A compact residential development with a mixed commercial use village center with a special use permit required as a prerequisite to any use or development.

**Concealed Wireless Facility** – Any tower, ancillary structure, or equipment compound that is not readily identifiable as such, and is designed to be aesthetically compatible with existing and proposed building(s) and uses on a site.

There are two (2) types of concealed facilities: 1) Antenna Attachments, including painted antenna and feed lines to match the color of a building or structure, faux windows, dormers or other architectural features that blend with an existing or proposed building or structure and 2) Freestanding. Freestanding concealed tower's usually have a secondary, obvious function which may include church steeple, bell tower, clock tower, light standard, flagpole, or tree.

**Conditional Use Permit**- See definition for Special Use Permit.

**Conditional Zoning District** - A zoning district in which the development and the use of the property included in the district is subject to the predetermined ordinance standards and the rules, regulations, and conditions imposed as part of the legislative decision creating the district and applying it to the particular property.

**Condominium** - A form of property ownership whereby the owner gains ownership of an interior space within a building. The building structure, the land under the building, and all of the surrounding land is commonly owned by all the inhabitants on a proportional basis.

**Congregate Care Facility** - A facility providing shelter and services for ambulatory individuals at least 55 years of age who by reason of their age, functional impairment, or infirmity may require meals, housekeeping and personal care assistance. Congregate Care Facilities do not include nursing homes or similar institutions devoted primarily to the care of the chronically ill or the incurable.

**Corner Lot** - A lot abutting two or more streets at their intersection. The front of the lot shall be the portion on the highest order road, or when road types are equal, the length with the most frontage. Where there are equal frontage portions the owner shall designate the front.

**Development-** The planning for or carrying out of a building activity, the making of a material change in the use or appearance of any structure or property, or the dividing of land into two or more parcels. When appropriate to the context, "development" refers to the planning for or the act of developing or to the result of development. Reference to a specific operation is not intended to mean that the operation activity, when part of other operations or activates/, is not development. Reference to particular operations is not intended to limit the generality of this item.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 244 of 743

**Directional Sign** - A sign which has use incidental to the use of the zone lot on which it is located, such as "no parking", "entrance", "loading only", "telephone", and other similar directives, and may include certain signs with commercial messages that are not legible from a location off the lot.

**District** - Any section of the zoning jurisdiction in which zoning regulations are uniform.

**Dwelling-** Any building, structure, manufactured home, or mobile home, or part thereof, used and occupied for human habitation or intended to be so used, and includes any outhouses and appurtenances belonging thereto or usually enjoyed therewith, except that it does not include any manufactured home, mobile home, or recreational vehicle if used solely for a seasonal vacation purpose.

**Dwelling Unit** - A single unit, or a portion of a multi-family dwelling, providing complete, independent living facilities for one or more persons, including permanent provisions for living, sleeping, eating, cooking, and sanitation.

**Duplex** -   See two-family dwelling.

**Environmental Impact Assessment** – A document that must be prepared for any proposed development project that is subject to and meets the criteria in either Section 6.2 of the Subdivision Regulations or Section 11.3 of the Zoning Ordinance which discusses the potential environmental impact of the proposed project and the methods proposed to mitigate or avoid significant adverse environmental impacts.

**Environmental Impact Statement** – A document that must be prepared pursuant to the National Environmental Policy Act of 1969, or the North Carolina Policy Act of 1971, regarding proposed federal or certain State actions respectively that significantly affect the quality of the human environment.

**Events Center Limited** – A venue to allow for various gatherings such as weddings, receptions, arts and crafts shows, corporate meetings, outdoor movies (no drive ins), etc. on a smaller scale and which can be indoor or outdoor or a combination thereof. Please refer to Section 17.7 of this Ordinance for further standards. All other standards of this Ordinance shall also apply.

**Family** - One or more persons occupying a dwelling unit and living as a single household.

**Family Care Home** -   A home as defined by NCGS § 168-21 with support and supervisory personnel that provides room and board, personal care and habilitation services in a family environment for not more than six resident persons with disabilities.

**Family Child Care Homes**- Is a licensed childcare facility within a principal residence to care for five (5) or fewer preschool age children, and an additional three (3) school age children. This includes preschoolers living in the home, but the provider's own school age children are not counted.

**Family Subdivision** - Family subdivision means one or more divisions of a tract of land (a) to convey the resulting parcels, with the exception of parcels retained by the grantor, to a relative or

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 245 of 743

relatives of direct lineage, or to the surviving spouse, if any, of any deceased lineal descendant, as a gift or for nominal consideration, but only if no more than one parcel from such tract is conveyed by the grantor to any one relative or such relative's surviving spouse; or (b) to divide land from common ancestor among tenants in common, all of whom inherited by intestacy or by will.  This provision shall apply only where the grantor or decedent already owned the land so divided before January 1, 1994.

**Farming** - See Agriculture.

**Fence** - A  physical barrier or enclosure consisting of wood, stone, brick, block, wire, metal or similar material used as a boundary or means of protection or confinement, but not including a hedge or other natural growth.

**Forestry Plan** - A document related to the management of forest resources, generally written by a North Carolina State Forester or a Certified Forestry Consultant. Such plan shall include forest management practices to insure both maximum forest productivity and environmental protection of the lands to be treated under the management plan (see N.C.G.S § 113A 178).

**Freestanding Sign** - A non-movable sign which is entirely supported by one or more uprights, poles, braces or base in or upon the ground.

**Frontage** - That side of a lot abutting on a street.

**Front Setback** - Any setback from a street or road, as measured from the edge of the public right-of-way..

**Group Care Home** – A facility licensed by the State of North Carolina, other than a Family Care Home, with support and supervisory personnel that provides room and board, personal care or habilitation services in a family environment for more than six resident persons with disabilities.

**Guest House, Pool House or Garage Apartment** - See Accessory Dwelling Unit.

**Home Occupation** - Any use conducted on residential premises and carried on by the occupants thereof, and which use is incidental and secondary to the use of the premises for residential purposes and does not change the character thereof.

**Hotel (also motels and inns)** – Structures/buildings with individual rooms for rent.  Rooms may include suites with kitchenettes for extended stays and may provide area for eating and drinking establishments and personal service facilities within the principle structure.

**Informational Sign** - Any sign which contains no commercial or advertising message that is located on-site providing information as required by regulatory authorities and/or other public entity.  These include, but are not limited to, "No Parking," "Loading/Unloading Zone," "Keep off Grass" and "No Smoking."

**Junked Motor Vehicle** - A motor vehicle that does not display a current license plate and is one of the following:  1) partially dismantled or wrecked; or 2) cannot be self-propelled or moved in

the manner in which it originally was intended to move; or 3) more than five years old and appears to be worth less than $500.00.

**Junk/Salvage Yard** - Any land or area used, in whole or in part, for the storage, keeping, or accumulation of material, scrap metals, waste paper, rags, or other scrap materials, or used building materials or for the dismantling, demolition or abandonment of automobiles or other vehicles or machinery or parts thereof.

**Land Clearing and Inert Debris Landfill** - Land areas of greater than one-half acre in size, for the deposit of inert materials and land clearing materials including gravel, rocks, stumps, soil (not contaminated by petroleum products), unpainted and untreated building materials such as bricks, concrete blocks and lumber. Personal home-owners use of inert debris landfill materials (beneficial fill) not to exceed two (2) acres in size be exempt from requiring a special use permit. Commercial inert debris landfills or any that exceed two (2) acres in size will require a Special Use Permit.

**Land Use Plan** – Any Comprehensive Land Use Plan adopted by Chatham County, as well the Chatham-Cary Joint Land Use Plan.

**Live-Work Unit** - See Mixed Use Building.

**Lot** - A portion of a subdivision or any other parcel of land intended as a unit for transfer or ownership or for development or both. The word "lot" includes "plot", "parcel", or "tract".

**Lot Depth** - The distance along the perpendicular bisector of the lot.

**Lot of Record** - A lot, plot, parcel or tract recorded in the Office of the Register of Deeds in conformance with the ordinance in effect at the time of recording.

**Lot Width** - The width measured at right angles to its depth at the widest point of the lot.

**Map Repository -** The location of the official flood hazard data to be applied for floodplain management. It is a central location in which flood data is stored and managed; in North Carolina, FEMA has recognized that the application of digital flood hazard data products carry the same authority as hard copy products. Therefore, the NCEM's Floodplain Mapping Program websites house current and historical flood hazard data. For effective flood hazard data the NC FRIS website (http://FRIS.NC.GOV/FRIS) is the map repository, and for historical flood hazard data the FloodNC website (http://FLOODNC.GOV/NCFLOOD) is the map repository.

**Manufactured Dwelling** - A dwelling that 1) is composed of one or more components, each of which was substantially assembled in a manufacturing plant and designed to be transported to the home site on its own chassis; 2) exceeds 40 feet in length and eight feet in width; 3) is constructed in accordance with the National Manufactured Home Construction and Safety Standards; and 4) is not constructed in accordance with the standards of the North Carolina Uniform Residential building Code for one- and two-family dwellings.

**Major Utility -** All utility facilities other than minor utilities. Includes public utilities serving regional areas and public utility service and storage yards. Examples include, but are not limited

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 247 of 743

to, electrical substations and wastewater treatment plants. This definition exludes public utility transmission lines.

**Minor Utility -** Any above-ground structures or facilities owned by a governmental entity, a nonprofit organization or corporation used in connection with the transmission, delivery, collection, or storage of water, sewage, electricity, gas, oil, or electronic signals. Minor utilities are necessary to support development within the immediate vicinity and involve only minor structures. Examples include, but are not limited to, pump stations, community well houses and above ground utility cabinets. Excepted from this definition are Major Utilities.

**Mixed Use Building** - Small commercial enterprises with the ground floor (and optionally second floor) occupied by commercial uses and a residential unit or units above. Commercial space may be a home-based business or may be leased independently.

**Modular Dwelling** - A dwelling constructed in accordance with the standards set forth in the NC State Residential Building Code and composed of components substantially assembled in a manufacturing plant and transported to the building site for final assembly on a permanent foundation.

**Multi-Family Dwelling** - A residential use consisting of a building designed or constructed to contain more than one dwelling unit, including apartments and condominiums. This definition does not include two-family (duplex) dwellings.

**Non-conforming Building or Structure** - A non-conforming situation that occurs when the height of a structure or the relationship between an existing building or buildings and other buildings or lot lines do not conform to the dimensional regulations applicable to the district in which the property is located.

**Non-conforming Lot of Record** - A lot existing at the effective date of this Ordinance or any amendment to it (and not created for the purpose of evading the restrictions of this Ordinance) that cannot meet the minimum area and/or lot width requirements of the district in which the lot is located.

**Non-conforming Situation** - A situation that occurs when, on the effective date of this Ordinance or any amendment to it, an existing lot or structure or use of an existing lot or structure does not conform to one or more of the regulations applicable to the district in which the lot or structure is located. A non-conforming situation may also occur due to governmental acquisition of property whether voluntary or involuntary. Among other possibilities, a non-conforming situation may arise because a lot does not meet minimum acreage requirements, because structures do not satisfy minimum yard requirements, because the relationship between existing buildings and the land (in such matters as density and setback requirements) is not in conformity with this Ordinance, or because land or buildings are used for purposes which are not in conformance with the list of permitted uses for the district in which the property is located.

**Non-conforming Use** -  A non-conforming situation that occurs when property is used for a purpose or in a manner not permitted by the use regulations applicable to the district in which the property is located.

**Nude or A State of Nudity -** The appearance of a human anus, male genitals, or female genitals; or a state of dress which fails to opaquely cover a human anus, male genitals, or female genitals.

**Nude Model Studio -** Any place where a person who appears nude or semi-nude, or who displays specified anatomical areas is provided to be observed, sketched, drawn, painted, sculptured, photographed, filmed, or similarly depicted by other persons who pay money or any other form of consideration. Nude Model Studio shall not include a preparatory school licensed by the State of North Carolina or a college, junior college, or university supported entirely or in part by public taxation; a private college or university which maintains and operates educational programs in which credits are transferable to a college, junior college, or university supported entirely or partly by taxation.

**Nursing Home** - An establishment which provides full-time convalescent or chronic care, or both, to persons who are not related by blood or marriage to the operator or who, by reason of advanced age, chronic illness or infirmity, are unable to care for themselves.

**Off-Premise Sign -** Any sign that advertises or otherwise identifies any property, structure or use not located on the same parcel as sign.

**Off-Premise Directional Sign** – Any off-premise sign indicating the location of or directions to a business, church, park, historic property, school, or other place of public assembly and shall contain no advertising content.

**On-Site Directional Sign** - A sign incidental to the use of the lot on which it is located that provides necessary information to guide traffic, whether vehicular or otherwise, within the site. Any one directional sign shall be no larger than five (5) square feet.

**Open Structures-** A building or structure, open on all sides and supported by a roof and posts or columns.

**Owner** - A holder of any legal or equitable estate in the premises, whether alone or jointly with others, and whether in possession or not.

**Pennant Sign** - A sign made of lightweight plastic, fabric or other material, whether or not containing a message, suspended from a rope, wire or string, usually in series, designed to move in the wind.

**Person** - Any individual, partnership, firm, association, joint venture, public or private corporation, trust, estate, commission, board or public or private institution, utility, cooperative, interstate body or other legal entity.

**Photovoltaic System** - An active solar energy system that converts solar energy directly into electricity.

**Place of Worship** - A building and/or land primarily used by a non-profit organization for organized religious services and supporting uses.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 249 of 743

**Planned Residential Development** - A residential project not bound by typical minimum lot sizes, housing development types and dimensional requirements as set forth in the district in which the development is located but are subject to the standards as set forth in section 17.5(c) of this ordinance. Also referenced informally as a Planned Unit Development, or PUD.

**Portable Sign** - Any sign not permanently attached to the ground or other permanent structure, or a sign designed to be transported.

**Primary Live Entertainment -** On-Site entertainment by live entertainers that characterizes the establishment, as determined from a pattern of advertising and/or actual performances.

**Principal Building** - A building in which is conducted the principal use of the lot on which it is located.

**Principal Permitted Use** - Any use listed as a permitted use in any zoning district, except those which by definition or their nature are accessory uses.

**Principal Structure** - A structure in which is conducted the principal use of the lot on which it is located.

**Principal Use Sign** - A sign which constitutes the sole and/or principal use of land.

**Public Facilities-** Any improvement created and/or maintained by a public entity, including, but not limited to, transportation, sanitary sewer, solid waste, drainage, potable water, educational, parks and recreational, and health systems and facilities.

**Public Street** - A dedicated public right-of-way in which the roadway has been accepted or constructed to public standards for vehicular traffic, but not an alley.

**Quasi-Judicial Decision**- A decision involving the finding of facts regarding a specific application of a development regulation and that requires the exercise of discretion when applying the standards of the regulation. The term includes, but is not limited to, decisions involving variances, special use permits, certificates of appropriateness, and appeals of administrative determinations.

**Rear Setback** - Any interior property line other than a front setback which provides a usable outdoor space. (Any lot having two or more front setbacks may not have to provide a rear setback).

**Recreational Vehicles (RV) -** A Vehicle, or vehicle type portable structure which can be hauled, towed or driven, designed for recreational use (as in camping). Recreational Vehicles are not designed for permanent occupancy. This would include, but is not limited to travel trailers, motor homes, camping trailers, campers, truck and recreational vans. Recreational vehicles are considered domestic vehicles.

**Recreational Vehicle (RV), Park Model -** A vehicle that is built on a single chassis, is 400 sq. feet or less when measured at the largest horizontal projection, is self-propelled or permanently

towable by a light duty truck, and is generally used as temporary living quarters for recreational, camping, travel, seasonal, and special uses.

**Roof Line** - The top edge of the roof or the top of the parapet, whichever forms the top line of the building silhouette.

**Semi-Nude -** A state of dress in which clothing covers no more than the genitals, pubic region, and areola of the female breast, as well as portions of the body covered by supporting straps or devices

**Setback** - The minimum required horizontal distance between a structure and the property line, street right-of-way line, or street centerline.

**Special Use Permit**- A permit issued to authorize development or land uses in a particular zoning district upon presentation of competent, material, and substantial evidence establishing compliance with one or more general standards, set forth in Section 17 of this ordinance, requiring that judgement and discretion be exercised as well as compliance with specific standards. This definition includes permits previously referred to as "conditional use permits" or "special exceptions."

**Specified Anatomical Areas -** (1) Less than completely and opaquely covered: human genitals, pubic region, buttocks, or female breast below a point immediately above the top of the areola; or (2) Human male genitals in a discernibly turgid state, even if completely and opaquely covered.

**Specified Sexual Activities -** Includes any of the following: a) Human genitals in a state of sexual stimulation, arousal, or tumescence; or b) The fondling or other erotic touching of human genitals, pubic region, buttocks, anus, or female breasts; or c) Sex acts, actual or simulated, including intercourse, oral copulation or sodomy; or d) Masturbation, actual or simulated; or e) Sadomasochistic practices, including, but not limited to: flagellation or torture by or upon a person, clothed or naked, or the condition of being fettered, bound, or otherwise physically restrained on the part of one clothed or naked; or f) Erotic or lewd touching, fondling, or other contact with an animal by a human being; or g) Human excretion, urination, menstruation, vaginal or anal irrigation.

**Sexual Encounter Center -** A business or commercial enterprise that, as one of its principal business purposes, offers for any form of consideration physical contact in the form of wrestling or tumbling between two or more persons when one or more of the persons is in a state of nudity or semi-nude, or activities between two or more persons when one or more of the persons is in a state of nudity or semi-nude.

**Sexually Oriented Business -** An adult arcade, adult media store, adult cabaret, adult motel, adult mini motion picture theater, adult motion picture theater, adult theater, escort agency, nude model studio, sexual encounter center, or any combination of the foregoing. *(Refer to Section 17.8 for general standards)*

**Side Setback** - Any interior property line setback other than a rear setback.

**Sign** - Any object, device, display or structure, or part thereof, which is used to advertise, identify, display, direct or attract attention to any object, person, institution, organization, business, product, service, event or location by any means, including but not limited to words, letters, pennants, banners, emblems, trademarks, trade names, insignias, numerals, figures, designs, symbols, fixtures, colors, illumination or projected images or any other attention directing device.

**Sign Area** - Sign area shall be measured by the smallest square, rectangle, triangle, circle or combination thereof, which will encompass the entire advertising copy area, excluding architectural trim and structural members.  In computing area, only one side of a double-faced sign shall be considered.

**Single-Family Dwelling** - A separate, detached building designed for and occupied exclusively by one family.

**Sleeping Unit-** A room or space in which people sleep, which can also include permanent provisions for living, eating, and either sanitation or kitchen facilities but not both. Such rooms and spaces that are also part of a dwelling unit are not sleeping units.

**Solar Collector** - A device, structure or part of a device or structure (i.e. array, panel, etc.) installed for the sole purpose of the collection, inversion, storage, and distribution of solar energy.  This device may be roof-mounted or ground-mounted as an accessory use (Refer to Section 17.6 for general standards).

**Solar Energy** - Radiant energy received from the sun that can be collected in the form of heat or light by a solar collector.

**Solar Farm** - A use where a series of solar collectors are placed in an area for the purpose of generating photovoltaic power for an area greater than the principle use on the site or as the principle use on the site for off-site energy consumption.  The use of solar collectors for personal or business consumption that occurs on-site is not considered a solar farm.

**Specialized Horticulture** - The use of land for the propagation of ornamental plants and other nursery products, such as bulbs, florist greens, flowers, shrubbery, flower and vegetable seeds and plants and sod and fruits and vegetables grown primarily under cover, but does not meet the definition of a bona fide farm.

**Story** - That portion of a building included between the surface of any floor and the surface of the floor next above it, or if there is no floor above it, then the space between such floor and the ceiling next above it.

**Structure** - Anything constructed, erected, or placed.

**Taxed Value** - The official value assigned to real property by the Chatham County Tax Assessor for ad valorem tax purposes.

**Temporary Building** - Any building of an impermanent nature or which is designed for use for a limited time, including any tent or canopy. This includes the use of temporary construction

trailers where a building permit has been issued and remains valid during the construction process.

**Temporary Sign -** Any non-permanent sign designed to advertise a business or event (non-profit or for-profit) for a limited period of time. These can include portable signs, signs placed in or on the ground or signs placed on a vehicle. These do not include political signs as specified in Section 15.5(9).

**Temporary Structure -** Any structure of an impermanent nature or which is designed for use for a limited time, including any tent or canopy. This includes the use of temporary construction trailers where a building permit has been issued and remains valid during the construction process.

**Townhouse** (or Townhome) - Attached dwelling units with ground level access and on their own individual lot.

**Two-Family Dwelling (Duplex)** - A building arranged and designed to be occupied by two families living independently of each other.

**Use** - The purpose for which land or structures thereon is designed, arranged or intended to be occupied or used, or for which it is occupied, maintained, rented or leased.

**Variance** - Official permission from the Board of Adjustment to depart from the requirements of this Ordinance.

**Vested Right** – The right to undertake and complete the development and use of property under the terms and conditions of an approved site specific development plan or an approved phased development plan. Refer to the North Carolina General Statutes § 160D-108 for more information.

**Voluntary Agricultural District (VAD)** – Contiguous acres (initially) of agricultural land, or forestland, or horticultural land that is part of a qualifying farm or the number of qualifying farms deemed appropriate by the governing board of the county and reviewed by the Agricultural Advisory Board. The purpose of such agricultural districts shall be to increase identity and pride in the agricultural community and its way of life and to increase protection from nuisance suits and other negative impacts on properly managed farms. Refer to North Carolina General Statutes § 106-738 and -743 for more information.

**Wireless Facility or Wireless Facilities** - The set of equipment and network components, exclusive of the underlying Wireless Support Structure, including, but not limited to, Antennas, Accessory Equipment, transmitters, receivers, Base Stations, power supplies, cabling and associated equipment necessary to provide wireless telecommunications services.

**Wireless Support Structure** - A freestanding structure, such as a Monopole or Tower, designed to support Wireless Facilities. This definition does not include Utility Poles.

**Zoning Administrator and Official** - The person or persons designated by the Chatham County Manager to administer and enforce this Ordinance.

**SECTION 8   GENERAL PROVISIONS**

The following general provisions shall apply in all situations unless otherwise indicated.

**8.1.     Relationship of Buildings to Lot**

Every building hereafter erected, moved or placed shall be located on a lot and in no case shall there be more than one principal residential building on a lot except as may be permitted in a planned residential development and as provided for as follows:

1.  Two detached principal residential units may be situated on one lot provided: (a) at least one of the residential units is a manufactured dwelling, and (b) the lot is at least two times the required lot area for the district in which it is located.

2.  There may be more than one single family detached residential unit on a lot if the average area of the property per residence is greater than 10 acres and the residential units are situated in such a manner that the distance between units shall not be less than the applicable setback distances required under this Ordinance for residential units situated upon adjoining lots.

3.  More than one building of single family attached or detached units, where permitted, may be constructed on one lot provided:
    a.  the applicable zoning requirements of lot size and building setbacks are met,
    b.  a building permit is issued prior to construction,
    c.  a preliminary subdivision plat is submitted and  approved prior to construction,
    d.  the final plat is prepared and final approval certified by the appropriate agencies,
    e.  the property is subdivided according to the County  regulations prior to the sale of the individual building or units, and
    f.  a certificate of occupancy is issued prior to occupancy.

4.  Regulation of Recreational Vehicles (RV's).
    a.  Recreational Vehicles are permitted to be stored unoccupied on residential lots. Such storage of the Vehicle shall not be within any required setback. The unoccupied vehicle may not be used to store any materials, items, pets, farm animals, and the like. Recreational vehicles are not designed nor intended for permanent habitation, therefore an RV cannot be considered as a primary residence. A Recreational Vehicle stored in accordance with this ordinance shall:

        i. Not be connected to any permanent utility service. The use of extension cords for cleaning and/or repair is allowed on a temporary basis.

        ii. Have its wheels and axels remain at all times

        iii. Maintain proper insurance and registration being fully licensed and ready for highway use.

        iv. Have no accessory structures supported by the Vehicle, this includes decks, porches, and awnings.

b. Permanent habitation is not permitted. In order to provide for the health, safety, and welfare, the use of a recreational vehicle for permanent habitation shall be deemed unlawful.

c. A Recreational Vehicle can be utilized for temporary occupation for no more than 180 days if the following requirements are met:

        i. It is used during the construction of a single-family dwelling or placement of modular/mobile home.

        ii. It is used while a damaged/destroyed home is being replaced due to damage by fire, flood, hurricane, tornado, or other emergency event or natural disaster.

        iii. Extensions of the 180 day time period can be granted by the zoning official when work is ongoing with a valid building permit.

No commercial building may use fill to artificially raise the grade of a building site in such a way that the buildings cannot be screened from view of the public right-of-way per SECTION 11 LANDSCAPING AND BUFFERING **STANDARDS**.

## 8.2. Open Space Requirements

No part of a yard, court or other open space provided around any building or structure for the purpose of complying with the provisions of this Ordinance shall be included as a part of a yard or other open space required under this Ordinance for another building or structure. Every part of a required yard shall be open and unobstructed from its lowest level to the sky, except for the ordinary projection of sills, chimneys, flues and eaves; provided, however, that none of the aforesaid projections shall project into a minimum side yard more than 1/3 of the width of such yard nor more than 24 inches, whichever is the least. Open or lattice enclosed fire escapes, fire proof outside stairways, and balconies opening upon fire towers projecting into a yard not more than five feet shall be permitted where placed so as not to obstruct light and ventilation. Open, uncovered decks may project into required yards for up to 1/3 of the width of such yards. In addition, certain structures are permitted to be placed in the required yard area as provided for in the schedule of district regulations.

## 8.3. Reduction of Lot and Yard Areas Prohibited

No yard or lot existing at the time of passage of this Ordinance shall be reduced in size or area below the minimum requirements set forth in this Ordinance. Yards or lots created after the effective date of this Ordinance shall meet at least the minimum requirements established by this Ordinance.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 255 of 743

**8.4.     Access to Property**

No building, structure or use of land shall be established on a lot nor shall any lot be created that does not abut upon a public right-of-way to which it has legal access.  The public access requirement shall not apply to land exempt from the Chatham County Subdivision Regulations or to lots which might be created within a planned residential development where access may be through common area or otherwise provided, nor to situations otherwise exempt from public street access by this Ordinance or the Chatham County Subdivision Regulations.

**8.5.     Interpretation of District Boundaries**

See section 6.2.

**8.6.     Interpreting Permitted Uses**

The listings of permitted and conditional uses in the various districts in this Ordinance are considered to be specific.  Any use that is not specifically listed in a district shall be deemed to be prohibited.

**8.7.     Water and Sewer Requirements**

The lot sizes required for the various districts in this Ordinance were drawn based upon the assumption that adequate water supply and sewage disposal systems are available to each and every lot.  The lack of adequate systems for one or both facilities, however, may require larger lot areas or, in some instances, not permit development as proposed by a developer.

New development should also connect to the county water system or municipal equivalent where available.  If irrigation systems are to be included, they should use non-public water, treated wastewater or have the ability to be converted to recycled wastewater when it becomes available.  In addition, no homeowner's association rules, restrictive covenants, or other deed restrictions may prohibit the use and placement of rain barrels.

**8.8.     Height Limitation Exceptions**

Except as may otherwise be prohibited by the Federal Aviation Administration Regulations, the height limitations of this Ordinance shall not apply to public buildings, church spires, belfries, cupolas and domes not intended for residential purposes, or to water towers,  power transmission towers, silos, grain elevators, chimneys, smokestacks, derricks, conveyors, radio, television and communication towers, masts, aerials and similar structures, provided such structures meet the required NC Building Code.

**8.9.     Fees**

Reasonable fees sufficient to cover the costs of administration, inspection, technical review, publication of notice and similar matters may be charged to applicants for zoning permits, sign permits, special use permits, zoning amendments, variances and other administrative relief.  The amount of the fees charged shall be as set forth in the county's budget or as established by resolution of the Board of Commissioners.  Fees established in accordance herewith shall be paid upon submission of an application or notice of appeal.

## 8.10. Conflicts of Interest

**Administrative Staff.** No staff member shall make a final decision on an administrative decision required by G.S. 160D-109 if the outcome of that decision would have a direct, substantial, and readily identifiable financial impact of the staff member or the if the applicant or other person subject to that decision is a person with whom the staff member has close familial, business, or other associational relationship.


## NON-CONFORMING SITUATIONS

The purpose of this section is to avoid undue hardship by permitting the continued use of any building, structure, or property that was lawful at the time of the enactment of this Ordinance or any applicable amendment thereof, even though such use, structure or property does not conform with the provisions of this Ordinance. However, this section is also established to require that non-conforming situations be terminated under certain circumstances.

## 8.11. Definitions

See Section 7 Definitions.

## 8.12. Continuation of Non-conforming Situations

Non-conforming situations that were otherwise lawful on the effective date of this Ordinance may be continued, subject to the restrictions and qualifications set forth in Subsections 9.4 through 9.7 of this section.

## 8.13. Non-conforming Lots of Record

Where the owner of a non-conforming lot of record does not own sufficient land to enable him to conform to the area or lot width requirements, such lot may be used as a building site provided all other dimensional requirements are met and provided that the use to be made of the property is not one to which larger than minimum lot area requirements are called for in the list of permitted uses.

## 8.14. Extension or Enlargement of Non-conforming Situations

Non-conforming situations may be extended or enlarged as provided below:

   a) Subject to paragraph 4 of this subsection, a non-conforming use may be extended through any portion of a completed building. A non-conforming use may be extended to additional buildings or to land outside the original building. New buildings are allowed provided they meet the zoning district requirements or the zoning district requirements of their type of actual use, whichever is more stringent.
   b) A non-conforming use may be extended to cover more land than was occupied or manifestly designed and arranged to be occupied, by that use when it became non-conforming; provided it is not extended to additional parcels and applicable standards are met, i.e. setbacks, buffers.

c) A non-conforming situation may be changed if the changes amount only to changes in the degree of activity rather than changes in kind and no violations of other paragraphs of this subsection occur.

d) Physical alteration of non-conforming structure or structures containing a non-conforming use is unlawful if it results in greater non-conformity with respect to dimension restrictions such as yard requirements, height limitations, or density requirements.

e) Minor repairs to and routine maintenance of property where non-conforming situations exist are permitted and encouraged. Major renovation – i.e., work estimated to cost more than 10% of the taxed value of the structure to be renovated may be done provided that the work will not result in a violation of any other paragraphs of this subsection, particularly paragraph 5.

f) Non-conforming Signs: Any permanent, on-premise sign may be replaced, repaired or relocated on the property, provided that the replaced, repaired or relocated sign does not exceed the size (square footage) or height of the original sign.

### 8.15.  Reconstruction Limitations

Any non-conforming building or structure or any building or structure containing a non-conforming use which is destroyed or damaged to an extent equal to 60% or more of the taxed value of the building or structure by fire, flood, explosion, earthquake, winds, war, riot, act of nature or by any act not under the control of the owner, may be reconstructed and used as before, provided that no non-conforming situation is increased or extended and provided further that a zoning permit and building permit are received within two years of the event. This section shall not apply to non-conforming signs. See Section 9.4.

### 8.16.  Change in Kind of Non-conforming Use

A non-conforming use may be changed to a conforming use; thereafter, the property may not revert to a non-conforming use.

A non-conforming use shall not be changed to another non-conforming use.

If a non-conforming use and a conforming use or any combination of non-conforming uses exist on one lot, the use made of the property may be changed only to a conforming use.

Change in Use of Non-conforming Buildings - Conforming uses may be established or re-established in non-conforming buildings or structures provided that off-street parking is provided as required by this Ordinance and provided no other provisions of this Ordinance for the establishment of new uses is violated.

### 8.17.  Discontinuance of Non-conforming Uses

When active operation or occupancy of a non-conforming use is discontinued, regardless of the purpose or reason, for a consecutive period of 365 days, the property involved may thereafter be used only for conforming uses. The requirements of this subsection shall not apply to uses in buildings undergoing reconstruction in accordance with the provisions of Subsection 9.5.

For purposes of determining whether a right to continue a non-conforming situation is lost pursuant to this subsection, all of the buildings, activities, and operations maintained on a lot are generally to be considered as a whole. For example, the failure to rent one apartment in a non-conforming apartment building or one space in a non-conforming mobile home park for 365 days shall not result in a loss of the right to rent that apartment or space thereafter so long as the apartment building or mobile home park as a whole is continuously maintained. But if a non-conforming use is maintained in conjunction with a conforming use, cessation of operation or occupancy the non-conforming use for the required period shall terminate the right to maintain it thereafter.

### 8.18. Building on Subdivision Lots of Record

Where there exist platted subdivision lots of record, whether conforming or non-conforming according to the Zoning Ordinance, buildings may be situated on said lots according to the requirements in effect in the Zoning Ordinance at the time of recordation. If the Zoning Ordinance was not applicable to the subdivision at the time of recordation the setbacks of the most applicable zoning district within the pre-existing Ordinance shall apply when zoning becomes applicable.

**SECTION 9   SCHEDULE OF DISTRICT REGULATIONS**

Within the districts as established by this Ordinance, the requirements as set forth in this section shall be complied with in addition to any other general or specific requirements of this Ordinance.  Permitted uses for all districts, both by-right and conditional are listed in Table 1: Zoning Table of Permitted Uses.  Uses permitted by right are subject to obtaining a zoning permit from the Zoning Official; Uses permitted by conditional use are only permitted subject to the issuance of a special use permit by the Board of Commissioners as provided for in Section 15.  Certain uses as listed in the subsection may be subject to certain specific conditions as set forth in Section 15 and if permitted by the Board of Commissioners shall be subject to any such conditions as may be listed for that use.  In addition, in granting a special use permit the Board of Commissioners may impose such additional conditions and safeguards that the Board may deem as reasonable and appropriate.

When the conservation subdivision option of the Subdivision Ordinance is exercised, then the minimum lot area and setbacks listed for each district is superseded by the density bonus requirements of the conservation subdivision.  The minimum lot area used for the initial calculation of the density bonus is still based on the minimums listed here.

## 9.1.    R 5 - Residential District

**A.  Permitted Uses**
The following uses are permitted subject to obtaining a zoning and/or special use permit from the Zoning Official.  (See Table 1: Zoning Table of Permitted Uses on page 47)

**B.  Dimensional Requirements**
Minimum Required Lot Area -  Family subdivisions may have lots a minimum of two acres in size. Existing (as of December 31, 1990) lots of ten acres or less may be divided provided that no resultant lot is smaller than three acres.  New lots other than these previously described must average five acres in size with no lots smaller than three acres; lots larger than ten acres shall not be included in the averaging.

Lots to be created for the express purpose of minor utilities are exempted from the Required Minimum Lot Area, but must comply with the required setback of the district. Any noise producing equipment or generators must be stored within a structure, or must be setback a minimum fifty (50) feet from any public right-of-way or property line.

Minimum Required Lot Width   - 100 feet

Minimum Required Front Setback - 40 feet

Minimum Required Side Setback  - 25 feet

Minimum Required Rear Setback  - 25 feet

Maximum Building Height - 60 feet

Location of Accessory Buildings and Structures – Accessory buildings and structures must conform to the minimum required setbacks for the district.  Provided, however, well houses,

satellite dishes, and open structures may be located in the required yards provided they are located at least 10 feet from any street or property line. Fences are permitted within the front, side and rear yards with no minimum setback requirement.

**C. Visibility at Intersections**
On a corner lot nothing shall be erected, placed, planted or allowed to grow in such a manner as materially to impede vision between a height of 2 1/2 feet and 10 feet in a sight triangle as established by NCDOT.

**D. Off-Street Parking and Loading**
Off-street parking and loading shall be provided in accordance with the provisions set forth in Section 14.

**E. Signs**
Signs shall be governed by the provisions of Section 15.

**9.2.     R 2 - Residential District**

**A. Permitted Uses**
The following uses are permitted subject to obtaining a zoning and/or special use permit from the Zoning Official. (See Table 1: Zoning Table of Permitted Uses on page 47)

**B. Dimensional Requirements**
Minimum Required Lot Area - 90,000 square feet

Minimum Required Lot Area for a Two-Family Dwelling -except an accessory dwelling unit 180,000 square feet. Each unit of a two-family dwelling may be placed on a separate lot, provided that each lot consists of not less than 90,000 square feet, and provided that the common wall between the units is a fire wall as required by the building code.

Lots to be created for the express purpose of minor utilities are exempted from the Required Minimum Lot Area, but must comply with the required setback of the district. Any noise producing equipment or generators must be stored within a structure, or must be setback a minimum fifty (50) feet from any public right-of-way or property line.

Minimum Required Lot Width - 100 feet

Minimum Required Lot Width for a Two-Family Dwelling - 110 feet

Minimum Required Front Setback  - 40 feet

Minimum Required Side Setback  - 25 feet.  Where a two-family dwelling is placed such that the units are on separate lots with a common fire wall, no side yard shall be required at the common wall.

Minimum Required Rear Setback  - 25 feet

Maximum Building Height - 60 feet

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 261 of 743

Location of Accessory Buildings and Structures – Accessory buildings and structures must conform to the minimum required setbacks for the district. Provided, however, well houses, satellite dishes, and open structures may be located in the required yards provided they are at least 10 feet from any street or property line. Fences are permitted within the front, side and rear yards with no minimum setback requirement.

**C. Visibility at Intersections**
On a corner lot nothing shall be erected, placed, planted or allowed to grow in such a manner as materially to impede vision between a height of 2 1/2 feet and 10 feet in a sight triangle as established by NCDOT.

**D. Off-Street Parking and Loading**
Off-street parking and loading shall be provided in accordance with the provisions set forth in Section 14.

**E. Signs**
Signs shall be governed by the provisions of Section 15.

**9.3.    R 1 - Residential District**

**A. Permitted Uses**
The following uses are permitted subject to obtaining a zoning and/or special use permit from the Zoning Official. (See Table 1: Zoning Table of Permitted Uses on page 47)

**B. Dimensional Requirements**
Minimum Required Lot Area - 40,000 square feet or 65,340 square feet for lots with individual wells and individual wastewater disposal systems.

Minimum Required Lot Area for a Two-Family Dwelling - except an accessory dwelling unit 80,000 square feet. Each unit of a two-family dwelling may be placed on a separate lot, provided that each lot consists of not less than 40,000 square feet, and provided that the common wall between the units is a fire wall as required by the building code.

Lots to be created for the express purpose of minor utilities are exempted from the Required Minimum Lot Area, but must comply with the required setback of the district. Any noise producing equipment or generators must be stored within a structure, or must be setback a minimum fifty (50) feet from any public right-of-way or property line.

Minimum Required Lot Width - 100 feet

Minimum Required Lot Width for a Two-Family Dwelling - 110 feet

Minimum Required Front Setback  - 40 feet

Minimum Required Side Setback  - 25 feet. Where a two-family dwelling is placed such that the units are on separate lots with a common fire wall, no side yard shall be required at the common wall.

Minimum Required Rear Setback  - 25 feet

Maximum Building Height - 60 feet

Location of Accessory Buildings and Structures – Accessory buildings and structures must conform to the minimum required setbacks for the district.  Provided, however, well houses, satellite dishes, and open structures may be located in the required yards provided they are at least 10 feet from any street or property line.  Fences are permitted within the front, side and rear yards with no minimum setback requirement.

**C.  Visibility at Intersections**
On a corner lot nothing shall be erected, placed, planted or allowed to grow in such a manner as materially to impede vision between a height of 2 1/2 feet and 10 feet in a sight triangle as established by NCDOT.

**D.  Off-Street Parking and Loading**
Off-street parking and loading shall be provided in accordance with the provisions set forth in Section 14.

**E.  Signs**
Signs shall be governed by the provisions of Section 15.

**9.4.    O&I - Office and Institutional District**

**A.  Permitted Uses**
The following uses are permitted subject to obtaining a zoning and/or special use permit from the Zoning Official.  (See Table 1: Zoning Table of Permitted Uses on page 47)

**B.  Dimensional Requirements**
Minimum Required Lot Area - 40,000 square feet or 65,340 square feet for lots with individual wells and individual wastewater disposal systems.

Minimum Required Lot Area for a Two-Family Dwelling - 80,000 square feet each unit of a two-family dwelling may be placed on a separate lot provided that each lot consists of not less than 40,000 square feet, and provided that the common wall between the units is a fire wall as required by the building code.

Lots to be created for the express purpose of minor utilities are exempted from the Required Minimum Lot Area, but must comply with the required setback of the district. Any noise producing equipment or generators must be stored within a structure, or must be setback a minimum fifty (50) feet from any public right-of-way or property line.

Minimum Required Lot Width - 100 feet

Minimum Required Lot Width for a Two-Family Dwelling - 110 feet

Minimum Required Front Setback  - 40 feet

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 263 of 743

Minimum Required Side Setback  - 25 feet.  Where a two-family dwelling is placed such that the units are on separate lots with a common fire wall, no side yard shall be required at the common wall

Minimum Required Rear Setback  - 25 feet

Maximum Building Height - 60 feet

Location of Accessory Buildings and Structures – Accessory buildings and structures must conform to the minimum required setbacks for the district.  Provided, however, well houses, satellite dishes, and open structures may be located in the required yards provided they are at least 10 feet from any street or property line.  Fences are permitted within the front, side and rear yards with no minimum requirement

**C.  Visibility at Intersections**
On a corner lot nothing shall be erected, placed, planted or allowed to grow in such a manner as materially to impede vision between a height of 2 1/2 feet and 10 feet in a sight triangle as established by NCDOT.

**D.  Off-street Parking and Loading**
Off-street parking and loading shall be provided in accordance with the provisions set forth in Section 14.

**E.  Signs**
Signs shall be governed by the provisions of Section 15

**9.5.     B-1 - Business District**

**A.  Permitted Uses**
The following uses are permitted subject to obtaining a zoning and/or special use permit from the Zoning Official.  (See <u>Table 1: Zoning Table of Permitted Uses</u> on page 47)

**B.  Dimensional Requirements**
The minimum yard setbacks listed may be reduced to the minimum established in the most recent North Carolina building code for buildings that are part of a common plan of development, except along the exterior project boundary where the minimum yard setbacks shall be met.

Minimum Required Lot Area - 40,000 square feet or 65,340 square feet for lots with individual wells and individual wastewater disposal systems. Lots to be created for the express purpose of minor utilities are exempted from the Required Minimum Lot Area, but must comply with the required setback of the district. Any noise producing equipment or generators must be stored within a structure, or must be setback a minimum fifty (50) feet from any public right-of-way or property line.

Minimum Required Lot Width - 75 feet

Minimum Required Front Setback  - 50 feet

Minimum Required Side Setback  - 20 feet

Minimum Required Rear Setback  - 20 feet

Maximum Building Height - 60 feet

Location of Accessory Buildings and Structures – Accessory buildings and structures must conform to the minimum required setbacks for the district.  Provided, however, well houses, satellite dishes, open structures and telephone booths may be located in the required yards provided they are at least 10 feet from any street or property line.  Fences are permitted within the front, side and rear yards with no minimum setback requirement.

### C.  Visibility at Intersections
On a corner lot nothing shall be erected, placed, planted or allowed to grow in such a manner as materially to impede vision between a height of 2 1/2 feet and 10 feet in a sight triangle as established by NCDOT.

### D.  Off-Street Parking and Loading
Off-street parking and loading shall be provided in accordance with the provisions set forth in Section 14.

### E.  Signs
Signs shall be governed by the provisions of Section 15.

### 9.6.    NB - Neighborhood Business District

### A.  Permitted and Conditional Uses
The following uses are permitted subject to obtaining a zoning and/or special use permit from the Zoning Official (See <u>Table 1: Zoning Table of Permitted Uses</u> on page 47). Outdoor storage and sales are limited to one-tenth (1/10) of the interior sales space.

### B.  Dimensional Requirements
The minimum yard setbacks listed may be reduced to the minimum established in the most recent North Carolina building code for buildings that are part of a common plan of development, except along the exterior project boundary where the minimum yard setbacks shall be met.

Minimum Required Lot Area - 40,000 square feet or 65,340 square feet for lots with individual wells and individual wastewater disposal systems. Lots to be created for the express purpose of minor utilities are exempted from the Required Minimum Lot Area, but must comply with the required setback of the district. Any noise producing equipment or generators must be stored within a structure, or must be setback a minimum fifty (50) feet from any public right-of-way or property line.

Minimum Required Lot Width - 75 feet

Minimum Required Front Setback  - 50 feet

Minimum Required Side Setback  - 20 feet

Minimum Required Rear Setback  - 20 feet

Maximum Building Height - 60 feet

No building within this district shall exceed 40,000 square feet, including all floors, and the cumulative building square footage shall not exceed 160,000.

Location of Accessory Buildings and Structures – Accessory buildings and structures must conform to the minimum required setbacks for the district.  Provided, however, well houses, satellite dishes, open structures and telephone booths may be located in the required yards provided they are at least 10 feet from any street or property line.  Fences are permitted within the front, side and rear yards with no minimum setback requirement.

**C.  Visibility at Intersections**
On a corner lot nothing shall be erected, placed, planted or allowed to grow in such a manner as materially to impede vision between a height of 2 1/2 feet and 10 feet in a sight triangle as established by NCDOT.

**D.  Off-Street Parking and Loading**
Off-street parking and loading shall be provided in accordance with the provisions set forth in Section 14.

**E.  Signs**
Signs shall be governed by the provisions of Section 15.

### 9.7.    CB - Community Business District

**A.  Permitted and Conditional Uses**
The following uses are permitted subject to obtaining a zoning and/or special use permit from the Zoning Official (See <u>Table 1: Zoning Table of Permitted Uses</u> on page 47). Outdoor storage and sales are limited to one-tenth (1/10) of the interior sales space.

**B.  Dimensional Requirements**
The minimum yard setbacks listed may be reduced to the minimum established in the most recent North Carolina building code for buildings that are part of a common plan of development, except along the exterior project boundary where the minimum yard setbacks shall be met.

Minimum Required Lot Area - 40,000 square feet or 65,340 square feet for lots with individual wells and individual wastewater disposal systems. Lots to be created for the express purpose of minor utilities are exempted from the Required Minimum Lot Area, but must comply with the required setback of the district. Any noise producing equipment or generators must be stored within a structure, or must be setback a minimum fifty (50) feet from any public right-of-way or property line.

Minimum Required Lot Width - 75 feet

Minimum Required Front Setback  - 50 feet

Minimum Required Side Setback  - 20 feet

Minimum Required Rear Setback  - 20 feet

Maximum Building Height - 60 feet

 No building within this district shall exceed 80,000 square feet, including all floors, and the cumulative building square footage shall not exceed 320,000.

Location of Accessory Buildings and Structures – Accessory buildings and structures must conform to the minimum required setbacks for the district.  Provided, however, well houses, satellite dishes, open structures and telephone booths may be located in the required yards provided they are at least 10 feet from any street or property line.  Fences are permitted within the front, side and rear yards with no minimum setback requirement.

**C.  Visibility at Intersections**
On a corner lot nothing shall be erected, placed, planted or allowed to grow in such a manner as materially to impede vision between a height of 2 1/2 feet and 10 feet in a sight triangle as established by NCDOT.

**D.  Off-Street Parking and Loading**
Off-street parking and loading shall be provided in accordance with the provisions set forth in Section 14.

**E.  Signs**
Signs shall be governed by the provisions of Section 15.

**9.8.  RB - Regional Business District**

**A.  Permitted and Conditional Uses**
The following uses are permitted subject to obtaining a zoning and/or special use permit from the Zoning Official (See Table 1: Zoning Table of Permitted Uses on page 47).

**B.  Dimensional Requirements**
The minimum yard setbacks listed may be reduced to the minimum established in the most recent North Carolina building code for buildings that are part of a common plan of development, except along the exterior project boundary where the minimum yard setbacks shall be met.

Minimum Required Lot Area - 40,000 square feet or 65,340 square feet for lots with individual wells and individual wastewater disposal systems. Lots to be created for the express purpose of minor utilities are exempted from the Required Minimum Lot Area, but must comply with the required setback of the district. Any noise producing equipment or generators must be stored

within a structure, or must be setback a minimum fifty (50) feet from any public right-of-way or property line.

Minimum Required Lot Width - 75 feet

Minimum Required Front Setback  - 50 feet

Minimum Required Side Setback  - 20 feet

Minimum Required Rear Setback  - 20 feet

Maximum Building Height - 60 feet

Location of Accessory Buildings and Structures – Accessory buildings and structures must conform to the minimum required setbacks for the district.  Provided, however, well houses, satellite dishes, open structures and telephone booths may be located in the required yards provided they are at least 10 feet from any street or property line.  Fences are permitted within the front, side and rear yards with no minimum setback requirement.

**C.  Visibility at Intersections**
On a corner lot nothing shall be erected, placed, planted or allowed to grow in such a manner as materially to impede vision between a height of 2 1/2 feet and 10 feet in a sight triangle as established by NCDOT.

**D.  Off-Street Parking and Loading**
Off-street parking and loading shall be provided in accordance with the provisions set forth in Section 14.

**E.  Signs**
Signs shall be governed by the provisions of Section 15.

**9.9.    IL - Light Industrial District**

**A.  Permitted Uses**
The following uses are permitted subject to obtaining a zoning and/or special use permit from the Zoning Official.  (See Table 1: Zoning Table of Permitted Uses on page 47)

**B.  Dimensional Requirements**
The minimum yard setbacks listed, except along state maintained roads, may be reduced to the minimum established in the most recent North Carolina building code when the adjacent property has the same zoning district and an adjacent property owner provides a written affidavit allowing said reduction along the property line between the property in question and the property owned by the consenting property owner.

Minimum Required Lot Area - 40,000 square feet or 65,340 square feet for lots with individual wells and individual wastewater disposal systems. Lots to be created for the express purpose of minor utilities are exempted from the Required Minimum Lot Area, but must comply with the required setback of the district. Any noise producing equipment or generators must be stored

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 268 of 743

within a structure, or must be setback a minimum fifty (50) feet from any public right-of-way or property line.

Minimum Required Lot Width - 150 feet

Minimum Required Front Setback  - 50 feet

Minimum Required Side Setback  - 50 feet

Minimum Required Rear Setback  - 50 feet

Location of Accessory Buildings and Structures – Accessory buildings and structures must conform to the minimum required setbacks for the district.  Provided, however, well houses, satellite dishes, open structures and telephone booths may be located in the required yards provided they are at least 10 feet from any street or property line.  Fences are permitted within the front, side and rear yards with no minimum setback requirement.

**C.  Visibility at Intersections**
On a corner lot nothing shall be erected, placed, planted or allowed to grow in such a manner as materially to impede vision between a height of 2 1/2 feet and 10 feet in a sight triangle as established by NCDOT.

**D.  Off-Street Parking and Loading**
Off-street parking and loading shall be provided in accordance with the provisions set forth in Section 14

**E.  Signs**
Signs shall be governed by the provisions of Section 15.

**9.10.    IH - Heavy Industrial District**

**A.  Permitted Uses**
The following uses are permitted subject to obtaining a zoning and/or special use permit from the Zoning Official.  (See Table 1: Zoning Table of Permitted Uses on page 47) Uses noted in the Light Industrial Districts are also allowed in the Heavy Industrial District provided they shall meet the requirements of that district.

**B.  Dimensional Requirements**
The minimum yard setbacks listed, except along state maintained roads, may be reduced to the minimum established in the most recent North Carolina building code when the adjacent property has the same zoning district and an adjacent property owner provides a written affidavit allowing said reduction along the property line between the property in question and the property owned by the consenting property owner.

Minimum Required Lot Area - 80,000 square feet. Lots to be created for the express purpose of minor utilities are exempted from the Required Minimum Lot Area, but must comply with the required setback of the district. Any noise producing equipment or generators must be stored

within a structure, or must be setback a minimum fifty (50) feet from any public right-of-way or property line.

Minimum Required Lot Width - 300 feet

Minimum Required Front Setback  - 100 feet

Minimum Required Side Setback  - 100 feet

Minimum Required Rear Setback  - 100 feet

Location of Accessory Buildings and Structures – Accessory buildings and structures must conform to the minimum required setbacks for the district.  Provided, however, well houses, satellite dishes, open structures and telephone booths may be located in the required yards provided they are at least 10 feet from any street or property line.  Fences are permitted within the front, side and rear yards with no minimum setback requirement.

**C.  Visibility at Intersections**
On a corner lot nothing shall be erected, placed, planted or allowed to grow in such a manner as materially to impede vision between a height of 2 1/2 feet and 10 feet in a sight triangle as established by NCDOT.

**D.  Off-Street Parking and Loading**
Off-street parking and loading shall be provided in accordance with the provisions set forth in Section 14.

**E.  Signs**
Signs shall be governed by the provisions of Section 15.

**9.11.   CD-CC Conditional Use Compact Community**

The following use is permitted subject to obtaining a zoning permit from the Zoning Administrator.

**A.  Permitted Use:**
Compact Community

**B.  Requirements**:
The requirements for Compact communities are more specifically set forth in the separate Compact Community Ordinance which is hereby incorporated herein by reference.

**10.12   CD-MU Mixed Use**

**A.  Purpose**
The purpose of the Mixed Use Conditional District is to permit flexibility in the Ordinance by providing for a mix of residential, commercial, and light industrial uses to be developed on large tracts in accordance with a unified development plan.  These developments should be unified by distinguishable design features and provide pedestrian connections between all uses.  Mixed use

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 270 of 743

developments should provide a more efficient use of land while providing more on-site amenities and preserving open space. The mix of uses shall be designed to be mutually supporting so that traffic congestion is minimized and pedestrian circulation is enhanced.

**B. Minimum Size**

In order to qualify for a Mixed Use district the gross acreage for the development shall be a minimum of 50 acres.

**C. Maximum Net Density and Built Upon Area Allowed**

Within a Mixed Use district, the net density and built upon area for any portion of the development shall not exceed the requirements of the underlying watershed district as identified on the most recently adopted "Watershed Protection Map of Chatham County, North Carolina".

**D. Net Land Area Computation**

Net land area is obtained by taking the gross land area of the development and subtracting the following areas:

1. Land to be dedicated or set aside for public and private street right-of-way. As an option to measuring projected street right-of-way, the developer may subtract 20% gross area as street right-of-way allowance regardless of the amount of land actually required for streets.
2. Any area of the property located within a Special Flood Hazard Area, consistent with the Chatham County Flood Damage Prevention Ordinance.
3. Any area classified as wetlands or woody swamp by the U.S. Army Corps of Engineers.
4. Other areas determined by the Zoning Administrator, Planning Board or Board of Commissioners to be unbuildable due to either physical features or regulatory authority. Typical zoning setback areas shall be considered buildable for purposes of this determination.

**E. Permitted Uses**

The uses allowed within the Mixed Use district may be selected from the permitted uses or conditional uses from the following districts:

      R-1 Residential district
      O&I Office and Institutional district
      NB Neighborhood Business district
      CB Community Business district
      RB Regional Business district
      IND-L Light Industrial district

The site plan must show, and the final development must include, uses from at least two (2) of the zoning districts listed above. Multi-family dwellings shall also be permitted within the CD-MU district. Uses may be mixed within a building or within the development and the site plan must identify the location of the proposed uses.

At a minimum, twenty percent (20%) of the total built upon area of the development must be occupied by or used for non-residential uses, provided that at no time shall the cumulative amount of land developed for non-residential purposes exceed the cumulative amount of land developed for residential purposes.

**F. Dimensional and Off-Street Parking Requirements**

Standard dimensional and off-street parking requirements shall not apply. Proposed lot sizes, setbacks, building heights, and off-street parking must be specified on the site plan or accompanying text for a conditional rezoning application and be approved by the Board of Commissioners. In no circumstances shall a building have a height greater than sixty (60) feet.

Exterior Boundary Setbacks – A setback of one hundred (100) feet shall apply to all residential and non-residential buildings and structures along the exterior boundary of the mixed use development, including any existing street right-of-way.

**G. Signage**

Any proposed signage shall not exceed the standards set forth in this Ordinance for the respective zoning district from which a use is taken. All signs shall use a coordinated color, style, and lettering scheme.

**10.13 Table 1: Zoning Table of Permitted Uses** Notes:  Compact Communities (CC) uses are listed separately in the Compact Communities Ordinance

Many commercial activities that are otherwise prohibited in this table may be allowed as Home Occupations if they meet the requirements of that section.

Key:  P = Permitted; A = Accessory Only; SUP = Special Use Permit Only; PRD = Planned Residential Development Only; * = Historical district; (this district is no longer permitted for future rezonings)

| Zoning District | R5 | R2 | R1 | O&I | B-1* | NB | CB | RB | IL | IH |
|---|---|---|---|---|---|---|---|---|---|---|
| ABC stores | | | | | P | P | P | P | | |
| Accessory dwelling unit i.e. guest house, pool house, garage apartment and in-house apartment | P | P | P | | | | | | | |
| Accessory uses and structures clearly incidental to a permitted use | P | P | P | | | | | | | |
| Airports and landing fields for fixed and rotary wing aircraft | | | | | | | | | CU | SUP |
| Alcohol and alcoholic beverages manufacture | | | | | | | | | | P |
| Amusement enterprises such as pool, bowling, roller rink when housed entirely within a permanent structure | | | | | P | | P | P | | |
| Animal Husbandry Specialized with a minimum lot area and setback twice the minimum required of the zoning district.  Lot area and setback for the AG district measured as if R5 | SUP | SUP | SUP | | | | | | | |
| Antique shops | | | | | P | P | P | P | | |
| Apartment Complex or Residential Condominium Complex | PRD | PRD | PRD | | | | | | | |
| Appliance distributors for wholesale | | | | | | | | | P | |
| Appliance sales and service | | | | | P | P | P | P | | |
| Art supply retail sales | | | | | P | P | P | P | | |
| Arts and Crafts fabrication and related sales | SUP | | | | P | P | P | P | | |
| Asphalt manufacture or refining (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP |
| Assembly halls, coliseums, gymnasiums and similar structures | | | | | | | | SUP | SUP | SUP |
| Assembly of ammunition, for small arms only, from previously prepared parts | | | | | | | | | SUP | SUP |
| Assembly of machines, appliances and goods from previously prepared parts | | | | | | | | | P | P |
| Automobile and truck assembly | | | | | | | | | SUP | P |
| Automobile and automobile accessory sales and service | | | | | P | | SUP | P | | |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 273 of 743

| Zoning District | R5 | R2 | R1 | O&I | B-1* | NB | CB | RB | IL | IH |
|---|---|---|---|---|---|---|---|---|---|---|
| Automobile service stations including tune-ups, minor repairs, tire service, washing facilities both manual and automatic and similar services.[1] | | | | | P | P | P | P | P | P |
| Aviation/aerospace equipment, engine and instrument manufacturing and/or assembly. (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP[3] |
| Avocational farming | P | P | P | | | | | | | |
| Bait and tackle shops | | | | | P | P | P | P | P | P |
| Bake shops and similar food preparation intended primarily for retail sales on the premises for consumption either on or off premises | | | | | P | P | P | P | | |
| Bakeries or baking plants | | | | | | | | | P | P |
| Banks, savings and loans, finance companies, credit agencies and similar financial institutions | | | | P | P | P | P | P | | |
| Battery Manufacture (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP |
| Beauty Shops, Salons | | | | | P | P | P | P | | |
| Owner-occupied bed and breakfast homes with no more than two (2) rooms (units) for rent for stays no longer than seven (7) consecutive days and may be located on legal, non-conforming and conforming lots of record, on at least one and one half (1.5) acres, which may have standard setbacks as set in the district in which it is located | P | P | P | | | | | | | |
| Bed and breakfast inns with no more than six rooms for rent with a minimum lot area of three acres and provided that all buildings, structures and high intensity activity areas shall be set back a minimum of two times the minimum yard requirement for the district in which it is located | SUP | SUP | SUP | | | | P | P | | |
| Bedding, carpet and pillow manufacturing, cleaning and renovating | | | | | | | | | P | P |
| Bicycle sales and repair | | | | | P | P | P | P | | |
| Blacksmith or horseshoeing shops | | | | | | P | | | P | P |
| Blueprinting and Photostatting establishments | | | | | | | | P | P | P |
| Boarding kennels (See Section 17.5 for acreage requirements) | SUP | SUP | SUP | | | P | P | P | | |
| Boat, trailer and other utility vehicle sales and service | | | | | P | | SUP | P | | |
| Boat Storage Facility | | | | | SUP | SUP | SUP | SUP | SUP | SUP |

[1] Fuel, oil and similar pumps and appliances may be located in the minimum required front and side yards provided that none shall be located nearer than 15 feet to any street line and may be covered by an attached or free standing unenclosed canopy provided such canopy does not extend nearer than five feet to any property line and does not cover greater than 30% of the required yard area.

[3] When Chatham County Water or Town of Sanford Water and Sewer Infrastructure is utilized the use is allowed by right.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 274 of 743

| Zoning District | R5 | R2 | R1 | O&I | B-1* | NB | CB | RB | IL | IH |
|---|---|---|---|---|---|---|---|---|---|---|
| Book, stationery and office supply stores | | | | | P | P | P | P | | |
| Bookbindery | | | | | | | | | P | P |
| Bottling works for soft drinks | | | | | | | | | P | P |
| Breeding kennels with a minimum lot area of three acres and provided that all buildings, structures and high intensity activity areas shall be set back a minimum of two times the minimum yard requirement for the district in which it is located | SUP | SUP | | | | P | P | P | | |
| Brick, tile, clay pipe and other clay products manufacture (Craft pottery is not covered in this definition) | | | | | | | | | | P |
| Bus passenger stations | | | | | P | | | P | | |
| Cabinet shops | | | | | P | P | P | P | | |
| Campgrounds—SEE Public and Private recreation camps and grounds | | | | | | | | | | |
| Candy products manufacture | | | | | | | | | P | P |
| Canvas and burlap products manufacture, sales and storage | | | | | | | | | P | P |
| Carpeting, Flooring, Tile, and Stone Products Sales | | | | | P | P | P | P | | |
| Catering establishments | | | | | P | P | P | P | | |
| Cement, lime, plaster manufacture (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP |
| Cemeteries | SUP | SUP | SUP | P | | | | | | |
| Churches and other places of worship | SUP² | SUP² | SUP² | P | P | P | P | P | | |
| Circuses, carnivals, exhibition shows, sideshows, races, trade shows, flea markets, banquets, conventions, religious events, arts and crafts shows, stage shows, athletic events and other similar events, including temporary living quarters such as mobile homes and recreational vehicles provided that the stay of such temporary living quarters shall be limited to a period of not more than five days longer than the duration of the event and no more than 30 total days in any 12 month period for any one separate event | | | | | | | | CU | CU | CU |
| Clothing manufacture | | | | | | | | | P | P |
| Clothing shops | | | | | P | P | P | P | | |
| Clubs and other places of entertainment operated as commercial enterprises | | | | | | | | SUP | SUP | SUP |

---

[2] Provided such are located on a lot of not less than three acres and provided further that the minimum side and rear yards shall be 50 feet and the front yard setback a minimum of 25 feet greater than required for a single-family residence within the district.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 275 of 743

| Zoning District | R5 | R2 | R1 | O&I | B-1* | NB | CB | RB | IL | IH |
|---|---|---|---|---|---|---|---|---|---|---|
| Coal or coke yards (Subject to additional requirements of Section 17.9) | | | | | | | | | SUP | SUP |
| Coffee roasting | | | | | | | | | P | P |
| Cold storage plants | | | | | | | | | P | P |
| Computer and Electronic product manufacture | | | | | | | | | | SUP³ |
| Congregate care facilities | | | | P | P | P | P | P | | |
| Contractor's plants or storage yards and staging areas | SUP | SUP | SUP | SUP | SUP | SUP | SUP | SUP | SUP | SUP |
| Cooperage works | | | | | | | | | | P |
| Cosmetics and perfume manufacture(Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP³ |
| Dairy bars and ice cream shops intended primarily for retail sale on the premises for consumption either on or off premises | | | | | P | P | P | P | | |
| Dairy products, processing, bottling and distribution, ice-cream manufacture, all on a wholesale basis | | | | | | | | | P | P |
| Data processing, hosting and related services | | | | | | | | | | SUP³ |
| Day care centers for 15 or fewer children. | SUP | SUP | SUP | | | | | | | |
| Day Care Centers for more than 15 children. | | | | P | P | P | P | P | | |
| Day care centers in the principal residence to accommodate not more than 15 children at any one time, provided such are located on a lot of not less than one acre and provided further that all buildings, structures and high intensity activity areas shall be set back a minimum of two times the minimum yard requirement for the district in which it is located | SUP | SUP | SUP | | | | | | | |
| Drive-in or outdoor motion picture show | | | | | | | | | SUP | SUP |
| Drug stores | | | | | P | P | P | P | | |
| Dry cleaning, pressing, and related retail service counter | | | | | P | P | P | P | P | P |
| Dwellings, single-family, manufactured | P | P | P | | P | | | | | |
| Dwellings, single-family, site built and modular | P | P | P | | P | | | | | |
| Dwellings, single-family attached (Duplex) | | P | P | P | | | | | | |
| Dwellings, manufacture of | | | | | | | | | | P |
| Dye stuff manufacture and dyeing plants | | | | | | | | | SUP | SUP |
| Eating and drinking establishments | | | | | P | P | P | P | | |
| Electrical equipment, appliance, and component manufacturing | | | | | | | | | | SUP³ |
| Electric light or power generating station (Subject to additional requirements of Section 17.9) | | | | | | | | | SUP | SUP |
| Emory cloth or sandpaper manufacture | | | | | | | | | P | P |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 276 of 743

| Zoning District<br>Enameling, japanning, lacquering or the plating or galvanizing of metals | R5 | R2 | R1 | O&I | B-1* | NB | CB | RB | IL | IH |
|---|---|---|---|---|---|---|---|---|---|---|
| Enameling, japanning, lacquering or the plating or galvanizing of metals | | | | | | | | | | P |
| Event Center Limited (See Section 17.7) | | | | | P | P | P | P | | |
| Excelsior and fiber manufacture | | | | | | | | | | P |
| Fabric shops | | | | | P | P | P | P | | |
| Family Care Home (except that a Family Care Home may not be located within 1,125 feet of an existing Family Care Home) | P | P | P | P | | | | | | |
| Family Childcare Home located in a principal residence where not more than five (5) pre-school age children including the children of the operator are present. An additional three (3) school age children not including the school age children of the operator can be included. | P | P | P | | | | | | | |
| Feed and seed processing | | | | | | | | | P | P |
| Feed and seed wholesale | | | | | | | | | P | P |
| Feed, seed, fertilizer retail sales | | | | | P | SUP | SUP | P | P | P |
| Felt manufacture | | | | | | | | | | P |
| Fertilizer wholesale sales | | | | | | | | | P | P |
| Fire stations and emergency medical facilities with a minimum lot area of three acres and provided that all buildings, structures and high intensity activity areas shall be set back a minimum of two times the minimum yard requirement of the district in which it is located | P | P | P | | | | | | | |
| Fire stations, emergency medical service facilities, police stations and law enforcement offices (less than three acres in the residential districts) | SUP | SUP | SUP | P | P | P | P | P | P | P |
| Flammable liquids - bulk plants and storage (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP |
| Flea markets and rummage sales conducted either within a building or outdoors provided that no principal building or sales area shall be located in the required yard | | | | | | | | SUP | SUP | SUP |
| Florist - greenhouses, cultivation facilities and warehousing for wholesale and related retail sales | | | | | | | | | P | P |
| Florist shops | | | | | P | P | P | P | | |
| Food processing in wholesale quantities | | | | | | | | | P | P |
| Food stores, retail | | | | | P | P | P | P | | |
| Foundries casting nonferrous metals where conducted wholly within an enclosed structure, except for open air storage and having a total furnace | | | | | | | | | SUP | SUP |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 277 of 743

| Zoning District<br>capacity of not more than 1,000 aluminum pounds (Subject to additional requirements of Section 17.9) | R5 | R2 | R1 | O&I | B-1* | NB | CB | RB | IL | IH |
|---|---|---|---|---|---|---|---|---|---|---|
| Foundries producing iron and steel products (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP |
| Frozen food lockers | | | | | | | | | P | P |
| Funeral homes, undertaking establishments, embalming including crematoria | | | | P | P | | P | P | P | P |
| Fur storage (no sales) | | | | | P | | | | P | P |
| Furniture Manufacture | | | | | | | | | | SUP[3] |
| Furniture stores | | | | | P | P | P | P | | |
| Furrier, retail sales (can include storage) | | | | | P | P | P | P | | |
| Garbage and waste incinerators (except hazardous waste) (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP |
| Gas and Petroleum Processing (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP |
| Gas storage in bulk | | | | | | | | | | SUP |
| Gases or liquefied petroleum gases in approved portable metal cylinders | | | | | | | | | P | P |
| General, professional, and medical offices | | | | P | P | P | P | P | P | P |
| Gift shops | | | | | P | P | P | P | | |
| Golf courses and tennis clubs, public or private | | | | P | | | | P | | |
| Golf courses, tennis and recreation clubs with a minimum lot area of five acres and provided that all buildings, structures and high intensity activity areas shall be set back a minimum of two times the minimum yard requirements for the district in which it is located | SUP | SUP | SUP | | | | | | | |
| Government Offices and Facilities | P | P | P | P | P | P | P | P | P | P |
| Grain elevators | | | | | | | | | P | P |
| Grounds and facilities for hunting and fishing clubs with a minimum lot area of 20 acres and provided that all buildings, structures and high intensity activity areas shall be set back a minimum of two times the minimum yard requirement for the district in which it is located | SUP | SUP | SUP | | | | | | | |

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 278 of 743

| Zoning District<br>Grounds and facilities for non-profit clubs with a minimum lot area of three acres and provided that all buildings, structures and high intensity activity areas shall be set back a minimum of two times the minimum yard requirement for the district in which it is located | R5 | R2 | R1 | O&I | B-1* | NB | CB | RB | IL | IH |
|---|---|---|---|---|---|---|---|---|---|---|
| | SUP | SUP | SUP | P | | | | | | |
| Grounds and facilities for open air games or sports except the following: | | | | | | | | SUP | SUP | SUP |
| * Paintball Gaming Outdoor | | | | | | | | | P | P |
| * Shooting Range Indoor | | | | | | | | | SUP | P |
| * Shooting Range Outdoor | | | | | | | | | | SUP |
| Group Care Home | | | | P | | | | | | |
| Guest house, pool house, garage apartment meeting the same setback for the principal use | P | P | P | | | | | | | |
| Hardware, appliances, electrical and similar items retail sales | | | | | P | P | P | P | | |
| Heating, plumbing, electrical, cabinet and similar shops | | | | | P | P | P | P | | |
| Heavy manufacturing, processing or assembly not otherwise named herein provided no operations are carried on, or are likely to be carried on, which will create smoke, fumes, noise, odor or dust which will be detrimental to the health, safety or general welfare of the community (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP |
| Home occupations when conducted in accordance with the provisions of SECTION 16 | P | P | P | | | | | | | |
| Horticulture, specialized | | | | | P | P | P | P | | |
| Horticulture, specialized with a minimum lot area of three acres and provided that all buildings, structures and high intensity activity areas shall be set back a minimum of two times the minimum yard requirement for the district in which it is located | P | P | P | | | | | | | |
| Hosiery manufacture | | | | | | | | | P | P |
| Hospital, health and welfare centers, nursing homes and/or convalescent homes | | | | P | P | | | P | P | |
| Hotels, motels and inns (See definition for accessory use/s) | | | | | P | P | P | P | | |
| Ice manufacture, storage and sales | | | | | | | | | P | P |
| Industrial chemical manufacture (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP |
| Inert Debris Landfill | SUP | SUP | SUP | | | | | | | |
| Insulation material manufacture and sale | | | | | | | | | | P |

| Zoning District | R5 | R2 | R1 | O&I | B-1* | NB | CB | RB | IL | IH |
|---|---|---|---|---|---|---|---|---|---|---|
| Interior design shops | | | | | P | P | P | P | | |
| Jail and penal institutions | | | | | | | | | SUP | SUP |
| Jewelry and watch sales and service, goldsmith | | | | | P | P | P | P | | |
| Junk yards and auto wrecking, but only when conducted within an enclosure not less than six feet in height and with a solidity of not less than 60% outside any required yard area | | | | | | | | | SUP | SUP |
| Kindergartens and nurseries (See Daycares) | | | | | | | | | | |
| Laboratories for research and testing (Subject to additional requirements of Section 17.9) | | | | | | | | | SUP | SUP[3] |
| Laboratory - dental, medical, optical | | | | | P | | | P | | |
| Land clearing and inert debris landfill (For beneficial fill see "Inert Debris") | | | | | | | | SUP | SUP | SUP |
| Landscape design business | | | | | P | P | P | P | | |
| Landscaping and grading business | | | | | P | | | P | P | P |
| Laundries, Laundromats and dry cleaning establishments | SUP | SUP | | | P | P | P | P | | |
| Laundries, steam | | | | | | | | SUP | P | P |
| Lawn and garden shops | | | | | P | SUP | P | P | | |
| Leather goods manufacture excluding tanning | | | | | | | | | P | P |
| Leather goods sales and service including manufacture for retail sales on premises | | | | | P | P | P | P | | |
| Libraries, museums and art galleries | | | | P | SUP | SUP | P | P | | |
| Light manufacturing, processing, or assembly not otherwise named herein provided no operations are carried on, or are likely to be carried on, which will create smoke, fumes, noise, odor or dust which will be detrimental to the health, safety or general welfare of the community (Subject to additional requirements of Section 17.9) | | | | | | | | | SUP | SUP |
| Lock and gunsmiths | SUP | SUP | | | P | P | P | P | P | P |
| Lumberyards, building materials storage and sales | | | | | | | | | P | P |
| Machinery Manufacture | | | | | | | | | | SUP[3] |
| Machine shops | | | | | | | | | P | P |
| Meat processing and packing | | | | | | | | | | P |
| Meat processing and packing related to onsite raising of livestock | | | | | | | | | | |
| Medical clinics - inpatient and outpatient care | | | | P | P | SUP | P | P | | |
| Metal fabricating plants using plate and structural shapes and including boiler for tank works | | | | | | | | | | P |

Case 1:25-cv-00113-UA-JLW   Document 1   Filed 02/14/25   Page 280 of 743

| Zoning District | R5 | R2 | R1 | O&I | B-1* | NB | CB | RB | IL | IH |
|---|---|---|---|---|---|---|---|---|---|---|
| Mining[4] (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP |
| Major Utilities | | | | | | | | | P | P |
| Machinery Manufacture | | | | | | | | | | SUP[3] |
| Medical Equipment and Instrument Manufacture | | | | | | | | | | SUP[3] |
| Metal manufacturing for primary and fabricated materials | | | | | | | | | | SUP[3] |
| Minor Utilities (Any noise producing equipment must be stored within a structure, or must be setback a minimum fifty (50) feet from any public right-of-way or property line) | P | P | P | P | P | P | P | P | P | P |
| Mixed Use Building | | | | SUP | SUP | SUP | SUP | SUP | | |
| Mixing plants for concrete, or paving materials and manufacture of concrete products | | | | | | | | | | SUP |
| Mobile home sales and service | | | | | P | | SUP | P | P | P |
| Motorcycle sales and service | | | | | P | | SUP | P | P | P |
| Mulch – grinding, screening (sifting and separating of particles), mixing, blending, processing or dyeing of mulch | | | | | | | | | SUP | SUP |
| Music stores including repair and craft manufacture | SUP | SUP | | | P | P | P | P | | |
| Natural gas compressor station (Subject to additional requirements of Section 17.9) –. | SUP | SUP | SUP | SUP | SUP | SUP | SUP | SUP | SUP | SUP |
| Newsstands | | | | | P | P | P | P | | |
| Oil and Gas Exploration, Development and Production (Subject to additional requirements of Section 17.9) | SUP | SUP | SUP | SUP | SUP | SUP | SUP | SUP | SUP | SUP |
| Office – business and professional | | | | P | P | P | P | P | | |
| Office - engineering supply and similar sales and services including blueprinting, Photostatting and similar services | | | | P | P | P | P | P | | |
| Open air sales and service of accessory buildings and gazeboes and like free-standing structures | | | | | P | | SUP | P | | |
| Open-air sales or displays from a temporary building or structure | | | | | P | SUP | P | P | P | P |
| Optical and scientific instrument, jewelry and clock, musical instrument manufacture | | | | | | | | | P | P |

---

[4] Parcels used in whole or in part for mining operations or as to which mining permits are applicable in whole or in part as of April 17, 2017, are exempt from the conditional use permit requirement for mining uses, as are "accessory uses", as that term is defined in the Zoning Ordinance.

[3] When Chatham County Water and Town of Sanford Sewer Infrastructure is utilized the use is allowed by right.

| Zoning District | R5 | R2 | R1 | O&I | B-1* | NB | CB | RB | IL | IH |
|---|---|---|---|---|---|---|---|---|---|---|
| Owner-occupied bed and breakfast homes with no more than two (2) rooms (units) for rent for stays no longer than seven (7) consecutive days and may be located on legal, non-conforming and conforming lots of record, on at least one and one half (1.5) acres, which may have standard setbacks as set in the district in which it is located. | P | P | P | | | | | | | |
| Oxygen manufacture and/or storage | | | | | | | | | | P |
| Paint and enamel manufacture not employing a boiling process | | | | | | | | | | P |
| Paint retail shops | | | | | P | P | P | P | | |
| Paper, cardboard and building board manufacture | | | | | | | | | | SUP |
| Pawnshops and secondhand stores | | | | | P | P | P | P | | |
| Pet shops | | | | | P | P | P | P | | |
| Pharmaceutical products manufacture (Subject to additional requirements of Section 17.9) | | | | | | | | | SUP | SUP[3] |
| Photographic studios, camera shops | | | | | P | P | P | P | | |
| Planing or sawmills | | | | | | | | | P | P |
| Planned residential developments | SUP | SUP | SUP | | | | | | | |
| Plastics manufacture | | | | | | | | | | SUP |
| Plating works | | | | | | | | | | P |
| Plumbing shop and yard | | | | | | | | | P | P |
| Post offices | | | | P | P | | P | P | | |
| Pottery (hand crafted) and related retail | | | | | P | P | P | P | | |
| Pottery, porcelain and vitreous china manufacture | | | | | | | | | | P |
| Printing and publishing | | | | | P | P | P | P | | |
| Printing, publishing and reproduction establishments | | | | | | | | | P | P |
| Private recreation camps and ground with a minimum lot area of 10 acres and provided that all buildings, structures, spaces, and high intensity activity areas shall be set back a minimum of fifty (50) feet from all property line/boundary areas except in the Haw River Township, which shall meet the minimum setback requirements of the base zoning district | | | | | P | P | P | P | | |
| Public and private recreation camps and grounds (See Section 17.5 for acreage requirements) | SUP | SUP | SUP | | | | | | | |
| Public and private schools, training and conference centers | | | | P | P | SUP | SUP | P | SUP | SUP |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 282 of 743

| Zoning District | R5 | R2 | R1 | O&I | B-1* | NB | CB | RB | IL | IH |
|---|---|---|---|---|---|---|---|---|---|---|
| Public parks and recreation areas including marinas and concessions with a minimum lot area of three acres and provided that all buildings, structures and high intensity activity areas shall be set back a minimum of two times the minimum yard requirement for the district in which it is located | SUP | SUP | SUP | | | | | | | |
| Public utility transmission lines | P | P | P | P | P | P | P | P | P | P |
| Radio and television stations and their towers when the towers are located on the same site with the station | | | | | P | | | P | | |
| Rag, bag and carpet cleaning establishments | | | | | | | | | | P |
| Railroad freight yards, terminals or classification yards and rights-of-way | | | | | | | | | P | P |
| Railroad rights-of-way | | | | | | | | | P | P |
| Recreational Facilities (Gyms, yoga studios, et cetera) | | | | | P | P | P | P | | |
| Recreational Vehicle Storage Facility | | | | | SUP | SUP | SUP | SUP | SUP | SUP |
| Recycling industries that do not include the storage and/or processing of hazardous waste | | | | | | | | | | P |
| Repair and service of office and household equipment | SUP | SUP | SUP | | | | | P | P | P |
| Repair and servicing of industrial equipment machinery, except railroad equipment | | | | | | | | | P | P |
| Repair shops for jewelry, shoes, radios, televisions and other small office or household appliances | SUP | SUP | SUP | | P | P | P | P | | |
| Retail stores and personal service shops similar to those listed dealing in direct consumer and personal services | | | | | P | P | P | P | | |
| Rock crushers | | | | | | | | | | SUP |
| Rodenticide, insecticide and pesticide mixing plants (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP |
| Sanitary landfill excluding the burning of trash out of doors (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP |
| Schools, public and private with a minimum lot area of three acres and provided that all buildings, structures and high intensity activity areas shall be set back a minimum of two times the minimum yard requirement for the district in which it is located | SUP | SUP | SUP | | | | | | | |
| Scrap paper or rag storage, sorting or bailing when conducted within a building | | | | | | | | | P | P |
| Secretarial and job service offices | | | | | P | P | P | P | | |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 283 of 743

| Zoning District | R5 | R2 | R1 | O&I | B-1* | NB | CB | RB | IL | IH |
|---|---|---|---|---|---|---|---|---|---|---|
| Self-storage facility / mini-warehouse storage facility with related retail and services (i.e. moving truck rental) | | | | | SUP | | SUP | SUP | SUP | SUP |
| Semiconductor Manufacture (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP[3] |
| Sexually Oriented Businesses (see Section 17.8 for standards) | | | | | | | | | | P |
| Sheet metal shops | | | | | | | | | P | P |
| Sign manufacture, painting and maintenance | | | | | P | | | P | P | |
| Soap, detergent and washing compound manufacture | | | | | | | | | | SUP |
| Solar Farm <less than 2 acres follow Section 17.6 | P | P | P | P | | | | | P | P |
| Solar Farm >greater than 2 acres follow Section 17.6 | SUP | SUP | SUP | SUP | | | | | SUP | SUP |
| Sporting goods sales | | | | | P | P | P | P | | |
| Spray irrigation of tertiary tested wastewater (reclaimed water) | P | P | P | P | P | P | P | P | P | P |
| Stonecutting, monument manufacture and sales | | | | | | | | | P | P |
| Storage warehouses | | | | | | | | | SUP | SUP |
| Storage yards (outdoor storage) | | | | | | | | | SUP | SUP |
| Street and railway rights-of-way | P | P | P | | | | | | | |
| Swimming pool and related items sales and service | | | | | P | | P | P | | |
| Tannery or tanning operations (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP |
| Tar and waterproofing materials manufacture, treatment and storage (Subject to additional requirements of Section 17.9) | | | | | | | | | | SUP |
| Wireless Telecommunications Facilities and Wireless Support Structures — *Subject to the provisions of the Wireless Facilities Ordinance* — Wireless Support Structures that are sixty (60) feet or less in height | P* | P* | P* | P* | P* | P* | P* | P* | P* | P* |
| Concealed Wireless Facilities that are sixty (60) feet or less in height | P* | P* | P* | P* | P* | P* | P* | P* | P* | P* |
| Concealed Wireless Facilities one hundred fifty (150) feet or less in height but greater than sixty (60) feet in height | SUP* | SUP* | SUP* | P* | P* | P* | P* | P* | P* | P* |
| Wireless Support Structures that are less than one hundred ninety-nine (199) feet, but greater than sixty (60) feet in height | SUP* | SUP* | SUP* | SUP* | SUP* | SUP* | SUP* | SUP* | P* | P* |

Page 58

Case 1:25-cv-00113-UA-JLW   Document 1   Filed 02/14/25   Page 284 of 743

| Zoning District | | R5 | R2 | R1 | O&I | B-1* | NB | CB | RB | IL | IH |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Wireless Support Structures that are greater than one hundred ninety-nine (199) feet, but no more than four hundred (400) feet in height | SUP* | SUP* | SUP* | SUP* | SUP* | SUP* | SUP* | SUP* | SUP* | SUP* |
| Temporary construction trailers or structures  (See definitions for requirements) | | P | P | P | P | P | P | P | P | P | P |
| Textile machinery manufacture | | | | | | | | | | | P |
| Textile manufacture including spinning, dyeing, bleaching and other heavy processes (Subject to additional requirements of Section 17.9) | | | | | | | | | | | SUP |
| Tire recapping and re-treading | | | | | | | | | | P | P |
| Tobacco processing and storage | | | | | | | | | | P | P |
| Trailer sales areas | | | | | | | | | | P | P |
| Transportation equipment Manufacture | | | | | | | | | | | SUP[3] |
| Truck terminals, repair shops, hauling and storage yards | | | | | | | | | | P | P |
| Upholstery, paper hanging and decorator shops | | | | | | P | P | P | P | P | P |
| Uses and structures customarily accessory to any permitted use | | | | | | P | P | P | P | P | P |
| Veterinary clinics and hospitals with dog runs or equivalent facilities | | | | | | P | | SUP | SUP | SUP | SUP |
| Veterinary hospitals & clinics | | | | | | P | | P | P | P | P |
| Wastepaper and rags, collection and bailing | | | | | | | | | | P | P |
| Wholesale and jobbing establishments including incidental retail outlets for only such merchandise as is handled at wholesale | | | | | | | | | | P | P |
| Woodworking shops, mill work | | | | | | | | | | P | P |

Page 59

# SECTION 10    GENERAL ENVIRONMENTAL PERFORMANCE STANDARDS

## 10.1.    In General

All uses in any district shall comply with all the applicable performance requirements of the State of North Carolina regarding noise, glare, resource pollution, air pollution and/or other regulatory standards applicable to the environs and/or their protection.  All uses shall be so constructed, maintained and operated as to not be injurious to the use and occupation or enjoyment of the adjacent premises by reason of the emission or creation of noise, vibration, light, smoke, dust or other particulate matter, toxic or noxious waste materials, odors, radiation, fire, explosion hazard or glare, stormwater discharge, or other such matters or events.

## 10.2.    Specific Requirements

In addition to the above and not in conflict, the following specific standards shall apply to all uses unless otherwise indicated:

### A.  Noise

Noise generated by uses and operations permitted or regulated by this Ordinance shall be subject to the provisions of the Chatham County Noise Control Ordinance.

### B.  Vibration

No use shall be operated so as to produce ground vibration noticeable, without instruments, at the lot line of the premises, which the use is located.

### C.  Smoke and Other Particulate Matter

Every use shall be so operated as to prevent the emission of smoke from any source whatever, to a density greater than described as Number 1 on the Ringlemann Smoke Chart, provided, however, that smoke equal to, but not in excess of that shade of appearance described as Number 2 on the Ringlemann Chart may be emitted for a period or periods totaling four minutes in any 30 minutes.  For the purpose of grading the density of smoke, the Ringlemann Chart as published and used by the United States Bureau of Mines, and which is hereby made, by reference, a part of these regulations, shall be standard.  All measurements shall be made at the point of emission.

Every use shall be so operated as to prevent the emission into the air of dust or other solid matter which may cause damage to property and health of persons or animals at or beyond the lot line of the premises on which the use is located.

### D.  Odors

No use shall be operated so as to produce the emission of hazardous, objectionable or offensive odors in such concentration as to be readily perceptible at or beyond the lot line of the property on which the use is located.

### E.  Toxic, Noxious or Hazardous Matter

*No use shall for any period of time, discharge across the boundaries of a lot on which it is located, or into the waters of the State of North Carolina, toxic, noxious or hazardous matter in such concentrations as to be detrimental to or endanger the public health, safety, comfort, or general welfare, or cause injury or damage to persons, property or the use of property or land.*

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 286 of 743

**F.  Electromagnetic Interference**

No use, activity, or process shall be conducted which produces electromagnetic interference with normal radio or television reception beyond the lot line of the property on which the use is located.

**G.  Fire and Explosion Hazards**

Each use shall be operated so as to minimize the danger from fire and explosion and to comply with the regulations contained in the building code and fire prevention code.

**H.  Humidity, Heat or Glare**

Any activity producing humidity in the form of steam or moist air, or producing heat or glare, shall be carried on in such a manner that the steam, humidity, heat or glare is not perceptible at or beyond the boundary of the zoning district in which the use is located, or any residential, business or office and institutional zoning district boundary.

**I.  Light**

All lighting shall be beamed down and away from adjoining property.  To the extent practicable, all light produced on-site shall be contained within the perimeter of the site by design, orientation or shielding of the light source.  The following lighting shall be prohibited:

1.  No fixture shall be erected which is an imitation of an official highway or traffic control light or sign.

2.  No fixture shall be in a direct line of vision with any traffic control sign or light.

3.  No fixture shall have a flashing or intermittent pattern of illumination.

4.  No fixture shall be located within a public right-of-way.

5.  No fixture shall be erected which because of the design of the light source, orientation or intensity causes direct glare onto adjacent property or streets, creating a nuisance or a hazard or causing confusion to drivers.

6.  Search lights are prohibited except when used by Federal, State or local authority.

7.  No fixture shall violate any law of the State of North Carolina relative to outdoor lighting.

See **SECTION 13**, Lighting for additional requirements.

**J.  Stormwater Discharge**

No use shall for any period of time, discharge across the boundaries of a lot on which it is located, stormwater containing toxic or noxious matter in such concentrations as to be detrimental to or endanger the public health, safety, comfort, or general welfare, or cause injury or damage to persons, property or the use of property or land.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 287 of 743

## 10.3.  Environmental Impact Assessment

An Environmental Impact Assessment, as described in Section 6.2 (B) of the Subdivision Regulations and related guidelines, shall be required for a project which meets any criteria listed in A. through E. below and which consists of ten (10) or more contiguous acres in extent and that disturbs ten (10)  or more acres.  A project for which a detailed statement of the environmental impact of the  project is required pursuant to N.C. Gen. Stat. § 113A-4(2) or 42 U.S.C. § 4332(C), or for which  a functionally equivalent permitting process is required by federal or State law, regulation or  rule, is exempt from the requirement of this Section 11.3, provided that a copy of any such  detailed statement of environmental impact or of any application(s) for a functionally equivalent permitting process on which an exemption is claimed shall be provided to the County prior to any land-disturbing activity. A project for which no environmental document shall be required pursuant to N.C. Gen. Stat. § 113A-12 is exempt from the requirements of this Section 11.3.

This Section 11.3 applies to the following projects:

**A.** Any new project requiring a Special Use Permit or Conditional Zoning District.
**B.** Any physical expansion of project approved under an existing Special Use Permit or Conditional Zoning  District. A physical expansion that is less than ten (10) contiguous acres in extent or disturbs less than ten (10) acres shall be subject to the requirements of this Section 11.3 if no substantial work has begun on the approved project and the expansion together with the approved project will exceed ten (10) contiguous acres in extent and disturbs ten (10) or more acres.  Physical expansion means the addition of new property or acreage to an area  covered by an existing Special Use Permit or Conditional Zoning District.  This  requirement shall also apply to conversions of existing Conditional Use Zoning Districts  to Conditional Zoning Districts.
**C.** Any non-residential major subdivision development project, excepting bona fide farm activities;
**D.** Any residential subdivision development project that will include fifty (50) or more dwelling units, whether detached or attached single  family residences or in a multi-family structure or structures; or
**E.** Any residential subdivision project of fifty (50) or more lots.

## SECTION 11      LANDSCAPING AND BUFFERING STANDARDS

Attractive landscaping of a project is an essential component of overall visual appeal.  It affords an opportunity to soften the impact of new development.  Therefore, it is important that the landscape plan demonstrate clearly thought-out goals.  There are many possible approaches to achieving the degree of screening necessary for the various conditional zoning districts.  A clearly stated rationale should accompany the landscaping plan that explains how the plan both serves the needs of the project and fits in with the rural Chatham County setting.  For example, some factors that may be addressed are as follows:

· Site conditions such as the amount of sun or shade, slope, and wet or dry areas
· Representative native species of both canopy and under story trees to provide continuity with wooded areas nearby
· Plants that provide screening in cold seasons
· Cost and maintenance considerations
· Growth rates
· Flowering species that can benefit both passersby and beneficial insects.

Landscaping plants shall be selected from the Chatham County Design Guidelines that are, for the most part, a naturally occurring species and arrangement for the area. The use of non-naturally occurring and rare plantings is not discouraged for "specimen" and "contrast" plantings.

· A landscaping plan must be submitted to the County with every non-residential application. Landscaping refers to topography, trees, shrubs, grass, and vegetation.  The landscaping plan shall indicate where existing trees and vegetation are preserved.
· A buffer is a strip of land with the screening required thereon.  Screening may include landscaping, walls, fences, hedges, berms, and existing vegetation.
· Street trees shall be required along streets at intervals of 40 ft.  Each tree shall be of at least 2-1/2 inch caliper when installed and be a height of 30 ft. at maturity.
· Chain link fences are to be discouraged unless screened by vegetation.
· Plantings adjacent to building walls should be included along sides of buildings where devoid of architectural interest.
· The buffer width, height, and appropriate screening for commercial uses adjacent to other commercial uses, adjacent to residential/rural use, or to land zoned as such shall be in accordance with Table 2.

In situations where the property for which site plan or building permit approval is sought was timbered in violation of development regulations, and the timber harvest results in the removal of all or substantially all of the trees that were protected under County regulations governing development of that tract, the County may withhold approval for up to three (3) years after the completion of the timber harvest.

The County may refuse to approve a site plan or deny a building permit for up to five (5) years after the completion of a timber harvest if the harvest results in the removal of all or substantially all of the trees that were protected under County regulations governing development of the tract for which the approval is sought, and the harvest was a willful violation of County regulations.

**11.1.     Additional Requirements**

a.   Plantings as required by this chapter shall not be located in drainage, access or utility easements, under overhead power lines or in sight triangles.

b.   All developments shall provide secure, safe and sanitary facilities for the storage and pickup of refuse. Such facilities shall be convenient to collection and shall be appropriate to the type and size of the development being served. All dumpsters/refuse storage facilities shall be screened by a solid wall, fence, tight evergreen hedge, or a combination. Such screening shall be of sufficient height and design to effectively screen the facility from the view of adjacent properties and roads.

c.   Fences, walls and earth berms may be used in combination with trees and shrubs to fulfill required landscaping; provided, however, that these manmade features are designed and located in such a way that will not conflict with other site features and functions and will be in harmony with the surrounding landscape.

d.   All portions of the landscaping area not planted with shrubs and trees or covered by a wall or other barrier shall be planted in grass and/or ground cover, or covered by a natural mulch of a minimum depth of three inches.

**12.2.     Water Conservation Guidelines**

Given the finite resources for Chatham County, it is highly recommended that year round water conservation be practiced.  The purpose of the following recommendations is to preserve our limited natural resources and to foster good growth rates of plantings in the landscape.

**A.   Xeriscaping**

 Xeriscaping is recommended where possible to conserve water.  See *Chatham County Design Guidelines* for more about xeriscaping.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 290 of 743

## 12.3. Landscape Buffering Requirements and Screen Types



**Screen A:** This screen creates a year-round visual barrier such that there are no direct views from the street or from the adjacent properties to the development at any time of year. Plants are typically evergreen and can be used in combination with walls and berms. Minimum spacing shall generally be no wider than 20 feet between tree trunks (but may wider depending on tree type), with evergreen shrubs spaced five feet on center.

**Figure 1: Screen A Example**



**Screen B:** This screen breaks up the view such that some elements of the property can be seen from some views and/or during some seasons. 25 – 35% deciduous plants may be allowed. Minimum spacing shall generally be no wider than 30 feet between tree trunks (but may be wider depending on tree type), with evergreen shrubs spacing ranging from five to eight feet on center.



**Screen C:** This buffer area simply preserves existing vegetation. It is intended less as a visual barrier and more for a specific purpose. Examples could include, but are not limited to erosion control, providing continuity with nearby wooded areas, providing wildlife habitat, protecting existing vegetation, providing shade, and/or for aesthetic purposes. Minimum spacing shall generally be no wider than 40 feet between canopy tree trunks and no wider than 20 feet between ornamental tree trunks.

---

**Figure 3: Screen C Example**

---

Height and width of all screen types to be determined case-by-case depending on height of structure to be screened in combination with topography of site and of adjacent sites. Berms, walls, and/or building layout changes may also be necessary. Minimum widths and plant types for satisfying the screen requirements are in: Landscape Buffer Requirements. The plantings are to reach screening goals within 24 – 36 months of the installation and to be maintained as shown on any plans.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 292 of 743

**Table 2:  Landscape Buffer Requirements***

| | For adjacent property development | | | | | Land use across an adjacent street | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| *Proposed land use class* | *Com* | *O&I* | *Ind-L* | *Ind-H* | *R* | *Com* | *O-I* | *Ind-L* | *Ind-H* | *R* |
| *Commercial (NB, CB, RB)* | n/a | n/a | B 20' | B 20' | A 20' | C 20' | B 20' | C 20' | C 20' | B 20' |
| O&I:  Office & Institutional | n/a | n/a | B 20' | B 20' | A 30' | B 20' | B 20' | B 20' | B 20' | B 20' |
| Ind-L:  Light Industrial | B 40' | A 40' | n/a | n/a | A 50' | A 20' | A 20' | C 20' | C 20' | A 40' |
| Ind-H:  Heavy Industrial | B 60' | A 60' | n/a | n/a | A 80' | A 40' | A 40' | C 20' | C 20' | A 60' |
| R-A:  Residential & Agricultural | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a | n/a |

*Adjacent property (but not street) buffers may be waived for mixed-use projects as a condition of an approved Special Use Permit.

## 12.4    Screening of Storage Areas

This section addresses the outdoor storage, utility, and equipment areas often associated with commercial uses. Requirements herein do not apply to mercantile locations where commodities for sale are displayed on the sales site.

Preliminary site design for any project should include providing for adequate outdoor storage needs.  These areas include space where materials are temporarily stored, waste and recycling is handled and stored, mechanical/electrical equipment is located or loading and vehicular work yards are located.

Whenever possible storage areas should be concealed by site or building design.  Where such is not possible, screening should be provided as follows.

**Table 3:  Storage Area Screening Requirements**

| <u>Type of Item to be Screened</u> | <u>Screening Requirements</u> |
|---|---|
| Ground-mounted electrical transformer | Border plantings on the two most visible sides of the equipment <u>at least as high as the equipment</u>, such as evergreen shrubbery planted to achieve an approximate 80% visual obstruction |
| Waste and recycling outdoor containers, stored construction materials, utility supplies, etc.<br><br>(does not apply to temporary storage of six months or less) | A 95% solid treated wood fence at least 1' higher than the object to be screened and coming within 12" of the ground, with border plantings of evergreen shrubs that constitute an approximate 30% screen on the two most visible sides of the fence, <u>OR,</u> |

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 293 of 743

| | An approximate 95% dense planting of evergreen shrubs and/or small trees that reaches the screen density within 24 months of installation and is maintained in perpetuity or until a fence is erected. |
|---|---|
| Repair work, dismantling or servicing of vehicles | Conceal area using 8' high, 100% opaque fence, with evergreen border plantings that conceal 35% of the fence or equivalent screening |
| Satellite dish antennas that are 25" in diameter or greater | A 70% visual barrier that is the height of the dish or greater when viewed from the public right-of-way or adjacent residential usages. |

Storage areas that are deemed hazards to the public or stored items that could be windblown or require security shall be further enclosed on all sides by wall or fence with border plantings and shall include an operable gate. Gates shall not swing into any public way.

*Project landscaping shall be established prior to the facility earning a certificate of occupancy. It is the owner's responsibility to maintain the landscape plantings in good health and to replace any failed plants promptly.*

## 12.5 Screening of Loading Areas

The Chatham County zoning ordinance provides for loading and delivery areas for all buildings used for trade, or industry. A minimum dimension for loading spaces and a quantity requirement for providing spaces based on building area is included. Such spaces shall have access to a public service alley, private driveway, or, if necessary, a public street.

Whenever possible, all loading areas shall be located between the building and the rear lot line of the property, and/or shall be screened from the view of the street and adjacent properties. Developments that use loading areas extensively are encouraged to recess this functional area of the building into the mass of the building or creatively blend it into the landscape using building offsets, screen walls, berms, and other design techniques.

The following list of screening requirements is intended to protect the public and adjacent properties from views to loading areas.

**Table 4: Loading Area Screening Requirements**

| Type of Item to be Screened | Screening Requirements |
|---|---|
| Delivery door or overhead door without exterior dock and steps | None |
| Overhead delivery doors with loading docks and steps | 6' high screening device of solid structure (wall, fence, etc.) with low border plantings at corners or 25' on center areas of border plantings <br><br> OR |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 294 of 743

| | |
|---|---|
| | An approximate 95% dense planting of evergreen shrubs and/or small trees that reaches effective density within 24 months and is maintained in perpetuity or until a landscaped fence is erected. |
| Loading dock areas that are also used to store recycling waste containers or outdoor stored materials for any period of time | A 95% solid wooden fence or wall at least 1' higher than the tallest storage or equipment article.  Fence shall extend to within 12" of the ground and have border plantings of evergreen shrubs that constitute an approximate 30% screen on the two most visible sides of the loading area |
| | OR |
| | An approximate 95% dense planting of evergreen shrubs and/or small trees that reaches effective density within 24 months of installation and is maintained in perpetuity or until a landscaped fence is erected. |

Screening structures and landscaping may include breaks in the visual barrier for vehicular and pedestrian egress. There, openings in the screening shall be limited to a minimum practical width and located so as to obscure line of sight from the public way.

### 12.6.  Applicability

a.  Existing uses shall not be considered non-conforming for this section until expansion of the use is greater than ten percent (10%) of the footprint of the use (building(s), ancillary structures, parking, loading, et cetera.  Generally impervious surfaces; pervious areas that are actively engaged in the primary use or permitted ancillary uses are also included).

b.  Any expansion under ten percent (10%) within three (3) years of an additional expansion shall be counted toward the percentage of the total.

c. This shall apply to all non-residential applications and special use permits with the exception of wireless facilities and structures, which are subject to the landscaping provisions within the Wireless Facilities Ordinance and exempt from Appearance Commission Review.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 295 of 743

## SECTION 13     LIGHTING

### 13.1.    Intent and purpose

Outdoor lighting shall be designed to provide the minimum lighting necessary to ensure adequate safety, night vision, and comfort, reduce light pollution and not create or cause excessive glare on adjacent properties and street rights-of-way.

### 13.2.    Illuminating Engineering Society of North America (IESNA) Cutoff Classifications[3]

**Full Cutoff**—A fixture light distribution where no light intensity is emitted at or above a horizontal plane drawn through the bottom of the fixture and no more than 10% of the lamp's light intensity is emitted at or above an angle 10 degrees below that horizontal plane, at all lateral angles around the fixture.

**Cutoff**—A fixture light distribution where no more than 2.5% of a lamp's light intensity is emitted at or above a horizontal plane drawn through the bottom of the fixture and no more than 10% of the lamp's light intensity is emitted at or above an angle 10 degrees below that horizontal plane, at all lateral angles around the fixture.

**Semi-Cutoff**—A fixture light distribution where no more than 5% of a lamp's light intensity is emitted at or above a horizontal plane drawn through the bottom of the fixture and no more than 20% of the lamp's light intensity is emitted at or above an angle 10 degrees below that horizontal plane, at all lateral angles around the fixture

**Noncutoff**—A fixture light distribution where there is no light intensity limitation in the zone above the maximum distribution of light intensity.

---

[3] **with minimal wording modifications to provide non-technical clarity**

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 296 of 743



1. **Full Cutoff**—A fixture light distribution where no light intensity is emitted at or above a horizontal plane drawn through the bottom of the fixture and no more than 10% of the lamp's light intensity is emitted at or above an angle 10 degrees below that horizontal plane, at all lateral angles around the fixture.

2. **Cutoff**—A fixture light distribution where no more than 2.5% of a lamp's light intensity is emitted at or above a horizontal plane drawn through the bottom of the fixture and no more than 10% of the lamp's light intensity is emitted at or above an angle 10 degrees below that horizontal plane, at all lateral angles around the fixture.

3. **Semi-Cutoff**—A fixture light distribution where no more than 5% of a lamp's light intensity is emitted at or above a horizontal plane drawn through the bottom of the fixture and no more than 20% of the lamp's light intensity is emitted at or above an angle 10 degrees below that horizontal plane, at all lateral angles around the fixture

4. **Noncutoff**—A fixture light distribution where there is no light intensity limitation in the zone above the maximum distribution of light intensity.

### 13.3. Definitions

**Candela—** A measure of luminous or light intensity in a certain direction. Useful in determining how much light is shining out of a fixture and in what direction.

**Diffusing Panel (lens) –** A translucent material covering the lamps in a luminaire in order to reduce the brightness by distributing the light flux over an extended area.

**Direct Lighting –** Lighting involving luminaries that distribute 90 to 100% of the emitted light in the general direction of the surface to the illuminated.  The term usually refers to light emitted in a downward direction.

**Fixture—** An assembly that holds the lamp (bulb) in a lighting system. It includes the elements designed to give light output control, such as a reflector (mirror) or refractor (lens), the ballast, housing, and the attachment parts.

**Flood Lamp—** A form of lighting designed to direct its output in a specific direction with a reflector formed from the glass envelope of the lamp itself. Such lamps are so designated by the manufacturers and are typically used in residential outdoor area lighting.

**Flood Light—** A form of lighting designed to direct its output in a diffuse, more or less specific direction, with reflecting or refracting elements located external to the lamp.

**Footcandle (FC)—** A quantitative unit measuring the amount of light (illumination) falling onto a given point. One footcandle equals one lumen per square foot.

**Glare—** The effect produced by a light source within the visual field that is sufficiently brighter than the level to which the eyes are adapted, to cause annoyance, discomfort, or loss of visual performance and ability.

Page 71

**HID**— High intensity discharge lighting is a bulb type including mercury vapor, metal halide, high pressure or low-pressure sodium, which glow when an electric current is passed through a gas mixture inside the bulb.

**Holiday/Festive Lighting –** Lighting that is installed with the intent to operate during a designated temporary period of time where a specific theme or event is a focus of attention.

**IESNA**—The Illuminating Engineering Society of North America, a non-profit professional organization of lighting specialists that has established recommended design standards for various lighting applications.

**Illuminance—** The amount of light falling on a surface-measured in lux or footcandles.

**Internal Refractive Lens**— A glass or plastic lens installed between the lamp and the sections of the outer fixture globe or enclosure. Refractive refers to the redirection (bending) of the light as it goes through the lens, softening and spreading the light being distributed from the light source thereby reducing direct glare.

**Light Source**— The element of a lighting fixture that is the point of origin of the lumens emitted by the fixture.

**Light Trespass**— Light emitted by a lighting installation that falls outside the boundaries of the property on which the installation is sited. This has adverse effects on residents, vehicle operators and pedestrians, the natural environment.

**Lumen**— A quantitative unit used to identify the amount of light emitted by a light source. A lamp is generally rated in lumens.

**Maintained Footcandles—** Illuminance of lighting fixtures adjusted for a maintenance factor accounting for dirt build-up and lamp output depreciation. The maintenance factor used in the design process to account for this depreciation cannot be lower than 0.72 for high-pressure sodium and 0.64 for metal halide and mercury vapor.

**Medium Base**— The size of lamp socket designed to accept a medium or Edison base lamp.

**Natural Recreation Area –** An area that is intrinsically dark at night where electric lighting should be held to a minimum as designated by Chatham County.

**Outdoor Performance Area—** An area permanently dedicated to the public presentation of music, dance, theater, media arts, storytelling, oratory, or other performing arts, whether publicly or privately owned, including but not limited to amphitheaters and similar open or semi-enclosed structures.

**Outdoor Sports Field—** An area designed for recreation (public or privately owned). These areas include, but are not limited to baseball/softball diamonds, soccer fields, football fields, golf courses, golf driving ranges, tennis courts, racetracks, firearm shooting ranges, and swimming pools.

**Right-of-Way**— An interest in land to the county which provides for the perpetual right and privilege of the county, its agents, franchise holders, successors, and assigns to construct, install, improve, reconstruct, remove, replace, inspect, repair, maintain, and use a public *street*, including related and customary uses of street rights-of-way such as sidewalks, bike paths, landscaping, mass transit facilities, traffic control, traffic control devices and signage, sanitary sewer, storm water drainage, water supply, cable television, electric power, gas, and telephone transmission and related purposes in, upon, over, below, and across the rights-of-way.

**Temporary Lighting**— Lighting used for a limited duration, but in no case longer than thirty (30) days.

**Vehicular Canopy**— A roofed, open, drive-through structure designed to provide temporary shelter for vehicles and their occupants while making use of a business' services.

**Wall Pack**— A type of light fixture typically flush-mounted on a vertical wall surface.

**Wide-body Refractive Globe**— A translucent lamp enclosure used with some outdoor fixtures to provide a decorative look (including but not limited to acorn- and carriage light-style fixtures). "Wide-body" refers to a wider than average size globe (greater than 15.75" in diameter). "Refractive" refers to the redirection (bending) of the light as it goes through the lens, rendering the light fixture more effective. Wide-body refractive globes are intended to soften and spread the light being distributed from the light source thereby reducing direct glare.

## 13.4.   Light Measurement Technique

Light level measurements shall be made at the property line of the property upon which the light to be measured is being generated. If measurement on private property is not possible or practical, light level measurements may be made at the boundary of the right-of-way that adjoins the property of the complainant or at any other location on the property of the complainant. Measurements shall be made at finished grade (ground level), with the light-registering portion of the meter held parallel to the ground pointing up. The meter shall have cosine and color correction and have an accuracy tolerance of no greater than plus or minus five (5) percent. Measurements shall be taken with a light meter that has been calibrated within the previous two years. Light levels are specified, calculated and measured in footcandles (FC). All FC values are maintained footcandles unless specified otherwise. See the definition for maintained footcandles in section 13.3 for maximum allowed light loss factors.

## 13.5.   General Standards for Outdoor Lighting

1. Lighting Plan—A lighting plan shall be provided for review and must be approved prior to the issuance of the building permit.  The lighting plan shall demonstrate a consideration for reduced energy consumption through the selection of energy efficient fixtures.
2. Unless otherwise specified in the following subsections, the maximum light level shall be 0.5 maintained footcandle at any property line in a residential district, or on a lot occupied by a dwelling, congregate care or congregate living structure, unless otherwise approved by the county.
3. All floodlights shall be installed such that the fixture shall be aimed down at least forty-five (45) degrees from vertical. These lights shall be positioned such that any such fixture located within fifty feet (50) of a public street right-of-way is mounted and aimed perpendicular to the right-of-way, with a side-to-side horizontal aiming tolerance not to exceed fifteen (15) degrees from perpendicular to the right-of-way.  The Zoning Administrator may require shields to be installed on floodlights before, during or after the installation when needed to further reduce lighting trespass, glare and light pollution. Flood lights shall not be aimed at residential property.

  

4. All flood lamps emitting 1,000 or more lumens shall be aimed at least sixty (60) degrees down from horizontal or shielded such that the main

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 299 of 743

beam from the light source is not visible from adjacent properties or the public street right-of-way.

5. All wall pack fixtures shall be full cutoff fixtures.

6. All fixtures installed, owned, or leased by governmental or public agencies, or their agents, for the purpose of illuminating public streets are otherwise exempt from this regulation. Fixtures installed through private development are not exempt.

7. The lighting plan shall demonstrate a consideration for reduced energy consumption through the selection of energy efficient fixtures.

8. With the exception of essential all-night security lighting, the plan shall demonstrate lighting reduction procedures, implemented using timers or other methods (such as fixtures that automatically change wattage output). Said lighting reduction shall be active between approximately 12 midnight and dawn. For 24-hr commercial activities, this requirement may be adjusted by approval of the Board of County Commissioners.

**13.6.    Lighting in Outdoor Areas (Residential and Non-Residential)**

1. Other than flood lights and flood lamps, all outdoor area and parking lot lighting fixtures of more than 2,000 lumens shall be full cutoff fixtures, or comply with subsection (4) below.

2. The mounting height of all outdoor lighting, except outdoor sports field lighting and outdoor performance area lighting shall not exceed thirty-seven (37) feet above finished grade, unless approved by the Board of County Commissioners as having no adverse effect.

3. Security Lighting for Open Parking Facilities:  For lighted parking lots the minimum light level shall be no less than 0.2 footcandles. All light levels are measured at ground level. The minimum light level requirements vary depending on the activity classification. The specified minimum FC value above 0.2 FC as outlined in the following table means that the lowest light level point or location in the parking lot must not exceed the minimum stated FC value in the table (i.e. 0.9 FC for large shopping centers). An average to minimum uniformity ratio of 4:1 means that the average FC to minimum FC ratio cannot be worse (higher) than 4:1. See the following table:

| Security Light Levels for Open Outdoor Parking Facilities* | | |
|---|---|---|
| Use/Task | **Maintained Footcandles** | **Uniformity Avg/Min** |
| **Parking, residential, multi-family** Low to medium vehicular/pedestrian activity | Range from 0.2 Min to 0.6 Min | 4:1 |
| **Parking, industrial/commercial/ Institutional/municipal** High activity, i.e. large shopping centers/fast food facilities, major athletic/civic cultural events | 0.9 Min | 4:1 |
| Medium/low activity, i.e. community shopping, office parks, hospitals, commuter lots, cultural/civic/recreational events, residential neighborhood shopping, | Range from 0.2 Min to 0.7 Min | 4:1 |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 300 of 743

| industrial employee parking, schools, church parking | | |
|---|---|---|

*Source: IESNA 8th Edition Lighting Handbook; Modification: Medium and Low Activity Level recommendations have been combined.*

Notes:

a. Illumination levels are horizontal on the task, e.g. pavement or area surface.

b. Uniformity ratios dictate that average illuminance values shall not exceed minimum values by more than the product of the minimum value and the specified ratio. For example, for commercial parking medium/low activity, the average footcandles shall not be in excess of 2.8 (0.7 x 4).

c. A low/medium activity can be reclassified upward when appropriate and only with Chatham County Planning Department approval.

d. Examples of lighting measurements taken during the development of this ordinance are available from the Planning Department.

4. Exceptions:

a. Non-cutoff decorative post-mounted fixtures may be used but must be equipped with a solid top when available to direct the light downward or meet the cutoff classification. Mounting heights of 18 feet or less above ground are allowed when the maximum initial lumens generated by each fixture does not exceed 9500 initial lamp lumens.

1. All metal halide, mercury vapor, fluorescent, induction, white high pressure sodium and color improved high pressure sodium lamps used in non-cutoff fixtures shall be coated with an internal white frosting inside the outer lamp envelope.

2. All metal halide solid-top decorative post fixtures equipped with a medium base socket must use an internal refractive lens, a diffusing panel (lens) or a wide-body refractive globe as described in section 13.3 Definitions.

b. Dusk-to-dawn open bottom security lights must be fully shielded to provide a full cutoff light distribution.

c. Temporary lighting for special events of short duration. Typically these are low wattage or low voltage applications for public festivals, celebrations, and the observance of holidays, carnivals, and celebrations. Portable (non-permanent) internally-illuminated signs come under this classification and, as such, can be used for up to thirty (30) days only.

d. Airport lighting controlled by the Federal Aviation Administration (FAA).

e. Lighting of the United States of America and State of North Carolina flags and other flags or insignia of any governmental entity.

## 13.7.   Lighting for Vehicular Canopies

Areas under a vehicular canopy shall have an average maximum horizontal illuminance of twenty-four (24) maintained footcandles (FC). Areas outside the vehicular canopy shall be regulated by the standards of subsection 13.6 above. Lighting under vehicular canopies shall be designed so as not to create glare off-site. Acceptable methods include one or both of the following:

1. Recessed fixture incorporating a lens cover that is either recessed or flush with the bottom surface (ceiling) of the vehicular canopy that provides a full cutoff or fully-shielded light distribution.
2. Surface mounted fixture incorporating a flat glass that provides a full cutoff or fully-shielded light distribution.

**13.8. Outdoor Sports Field /Outdoor Performance Area Lighting**

1. The mounting height of outdoor sports field and outdoor performance area lighting fixtures shall not exceed eighty (80) feet from finished grade unless approved by the Chatham County Zoning Board of Adjustment.
2. All outdoor sports field and outdoor performance area lighting fixtures shall be equipped with a glare control package (louvers, shields, or similar devices).
3. The fixtures must be aimed so that their beams are directed and fall within the primary playing or performance area. The maximum light level shall be 0.5 maintained footcandles at any property line in a residential district, or on a lot occupied by a dwelling congregate care or congregate living structure.
4. As outdoor sport field/outdoor performance area lighting non-conforming fixtures fail, maintenance replacement fixtures must be installed that comply with the requirements of these lighting standards.
5. The hours of operation for the lighting system for any game or event shall not exceed one hour after the end of the event.

**13.9. Natural Recreation Areas**

These locations are intrinsically dark landscapes at night. Such areas include state and national parks, conservation areas, natural recreation areas, and areas adjacent to optical astronomical observatories. These places are used for camping, etc., where a naturally dark environment is desired and are designated by Chatham County.

1. Light reduction procedures begin at approximately 12 midnight with limited essential safety and security lighting.
2. All fixtures shall be full cut-off.

**13.10. Lighting of Outdoor Display Areas**

The following provisions apply to outdoor display areas except for car dealership parking lots, as specified in item (4), below:

1. Parking lot outdoor areas shall be illuminated in accordance with the requirements for subsection 13.6 above. Outdoor display areas shall have a maximum average maintained illuminance of twenty-four (24) maintained footcandles.
2. All light fixtures shall meet the IESNA definition of cutoff fixtures. Forward throw fixtures (type IV light distribution, as defined by the IESNA) are required within twenty-five (25) feet of any public street right-of-way. Alternatively, directional fixtures (such as floodlights) may be used provided they shall be aimed in accordance with subsections 13.5 (3) and 13.5 (4) of this ordinance.

3. The mounting height of outdoor display area fixtures shall not exceed thirty-seven (37) feet above finished grade.
4. For car dealership parking lots, the following provisions shall apply:

   a. Full cutoff fixtures shall be used.
   b. Mounting Heights: Up to a maximum of thirty-five (35) plus 2-foot raised base for parking areas as needed.
   c. Lighting at the first row, the car bumper may not exceed a maximum average maintained illuminance of 24 footcandles.
   d. Lighting in the non-display area of the parking lot after hours shall be no higher than 7 FC average maintained.

### 13.11. Lighting of Buildings

1. Lighting fixtures shall be selected, located, aimed, and shielded so that direct illumination is focused exclusively on the building façade, plantings, and other intended site features, and away from adjoining properties and the public street right-of-way.
2. Illumination on any vertical surface or angular roof shall not exceed 5.0 FC average maintained
3. To the extent practical and where possible, lighting fixtures shall be directed downward rather than upward
4. When upward aiming is used, placement of low wattage fixtures with shields (as needed) close to the building to graze the façade is required to minimize reflected light from windows and other surfaces. The Planning Department can waive this requirement in rare and unusual cases if it is demonstrated that the physical location of light fixtures close to the building to accomplish this design is not possible.

### 13.12. Permanent Sign and Billboard Lighting

External lighting fixtures illuminating signs and billboards shall be aimed and shielded so that direct illumination is focused exclusively on the sign. Externally lighted signs shall be lighted from the top of the sign downward. The Planning Department can waive this requirement in rare and unusual cases if it is demonstrated that the physical location of light fixtures for top down aiming is not possible. The maximum watts permitted to illuminate a sign are determined by multiplying the sign face area by 2 watts per square foot. Internally illuminated signs are permitted, provided that the message or letters of such sign consist of nonreflective material. For additional guidance, see the sign section of the County Zoning Ordinance.

Exception: Signs less than 7 feet (2 meters) in height above grade may be illuminated by ground mounted uplighting not exceeding 100 lamp watts per sign face.

NOTE: Refer to Section 13.6 (4)(c) regarding portable internally illuminated signs.

### 13.13. Holiday/Festive Lighting

Holiday/festive lighting is allowed provided it complies with the definition outlined in section 13.3. The connection of multiple holidays and/or festive events over a number of weeks and/or months is not permitted. Lamps below 7 watts are exempt and have no restrictions on use.

**13.14.** **Walkways, Bikeways and Parks (Section to be lighted)**

The walkway, pathway, or ground areas that are to be lighted shall be illuminated to a level of at least 0.2 and no more than 0.5 average horizontal maintained footcandles.

**13.15.** **Landscape Lighting**

All landscape and residential façade lighting systems shall employ shielded directional luminaires not to exceed 40 lamp watts. The luminaires shall be aimed such that the light source cannot be seen from any reasonable viewing point on an adjacent property.

**13.16.** **Permitting and Approval Process**

The following section applies generally to the Permitting and Approval Process and outlines requirements of the applicant seeking a permit for work involving outdoor lighting for residential subdivision single family and multi-family developments, commercial, multi-use, office, institutional and industrial projects. Specific permitting requirements are to be in compliance with the procedures established by the Chatham County Planning Department and the Chatham County Central Permitting Department. These aforementioned requirements shall serve as the framework by which this ordinance is implemented.

As with any permitting process, the applicant shall be required to submit the appropriate supporting documentation at the time the application is submitted for review. The documentation submitted shall contain, but not be limited to the following, all or part of which may be part of, or in addition to, the information required elsewhere in this Ordinance, and by the policies and procedures established by the Chatham County Planning Department and the Chatham County Central Permitting Department.

1. The applicant for any permit required for work involving outdoor lighting for commercial, office, institutional and industrial projects with a gross floor area of more than 5,000 square feet, residential projects other than detached single family dwellings of more than 6 units, all vehicular canopies and all outdoor display areas shall submit documentation at time of site plan or plot plan approval that the proposed lighting plan complies with the provisions of this lighting standard.

2. A lighting plan to scale is required that shows a point-by-point footcandle array on a 10' by 10' grid in a printout format indicating the location and aiming of illuminating devices. The printout shall include a summary table to indicate compliance with the average maintained and minimum footcandles and average to minimum uniformity ratios. FC point values in the appropriate areas to determine light trespass compliance is also required. The lighting plan shall include as a minimum an arrangement of the subject outdoor lighting, a fixture schedule detailing the mounting height & technique, fixture type, bulb type & wattage, controls, lenses, etc. The lighting plan shall demonstrate a consideration for reduced energy consumption through the selection of energy efficient fixtures as well as the implementation of the stated lighting practices as outlined throughout this ordinance.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 304 of 743

3. A point-by-point photometric footcandle array created from industry recognized lighting software systems and/or manual calculations created by a professional engineer, lighting certified professional, vendor or an individual that possesses the skills to perform such calculations. Methods used for calculating the lighting footcandle levels shall be indicated in the application documentation. The footcandle array shall be provided in a hardcopy printed format indicating the location and aiming of all applicable illuminating devices covered under the subject application based on the site and/or building arrangement plan complete with consideration of adjoining properties and roadways.

4. Description of the illuminating devices, fixtures, lamps, supports, reflectors, poles, raised foundations and other devices (including but not limited to manufacturers or electric utility catalog specification sheets and/or drawings, and photometric report indicating fixture classification [cutoff fixture, wall pack, flood light, etc.]).

Projects that are not required to submit items identified in sub-section (1) above are still subject to comply with the provisions of this ordinance and may be required to provide this information upon request.

The Chatham County Planning Department personnel may modify and/or waive any part(s) of the above referenced permit requirements, provided the applicant can otherwise demonstrate compliance with this Code.  Note:  An example of this provision might be where a contractor or utility repeatedly installs the same lighting equipment on different projects in the county.  One submittal containing the specification sheets of a particular group of fixtures may be sufficient for the Planning Department to modify the project requirement and require that only the other provisions of the ordinance be met since the fixture specification provisions have already been met.  This modification would conserve county personnel and lighting supplier/installer resources.

### 13.17.     Nonconformities

1. Any lighting fixture lawfully in place or approved by the county prior to the adoption of this ordinance shall be exempt from these requirements. At the time that a non-conforming fixture is replaced, moved, upgraded, or otherwise changed, the fixture must be brought into compliance with the requirements of this ordinance. Any expansion of, or addition to, an existing lighting system must conform to the requirements of this ordinance.
2. Routine maintenance, including changing the lamp, ballast, starter, photo control, lens, and other required components, is permitted for all existing fixtures. When the fixture housing is changed, the fixture must come into compliance.
3. Major renovation(s) of vehicular canopies (50% or more of the existing light fixtures) will require compliance with Section 13.7.
4. Property owners that install lighting fixtures after the effective date of this ordinance and are found to be in non-compliance shall receive written notification according to this ordinance.
5. See section 13.12 (h)(4) for nonconformity provisions for outdoor sports fields and performance areas.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 305 of 743

**SECTION 14**      <u>**OFF-STREET PARKING AND LOADING**</u>

**14.1.**         **Off-Street Parking Requirements**

There shall be provided at the time of the erection of any building, or at the time any principal building is enlarged or increased in capacity by adding dwelling units, guest rooms, seats, or floor area; or before conversion from one type of use or occupancy to another, permanent off-street parking space in the amount specified by this section.  Such parking space may be provided in a parking garage or properly graded open space.

**A.  Certification of Minimum Parking Requirements**
Each application for a zoning permit submitted to the Zoning Official as provided for in this Ordinance shall include information as to the location and dimensions of off-street parking and the means of entrance and exit to such space.  This information shall be in sufficient detail to enable the Zoning Official to determine whether or not the requirements of this section are met.

**B.  Definition of a Parking Space**
The storage space of one automobile.  The size of a parking space shall be in accordance with generally accepted geometric design principles for the type space and lot.

**C.  Minimum Off-Street Parking Requirements**
The following off-street parking space shall be required:

<div align="center">

**Classification Off-Street Parking Requirements**
</div>

*Note that any fractional space e.g. 47.3 shall be considered the next whole number, e.g., 48*

**RESIDENTIAL**:

| | |
|---|---|
| Housing designed for and used by the elderly | 1 space per 4 dwelling units |
| Incidental home occupations | 1 space in addition to the residential requirement |
| Multi-family residences | 1.5 spaces per dwelling unit |
| Rehabilitation homes | 1 space per two beds |
| Congregate care | 1 space per 2 dwelling units |
| Single-family and two-family residences (may be in a single drive with one car behind the other) | 2 spaces per dwelling unit |

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 306 of 743

**COMMERCIAL AND INDUSTRIAL**:

| | |
|---|---|
| Auto service station and/or repair shops | 4 spaces per service bay, plus 1 space per wrecker or service vehicle |
| Auto sales | 1 space per 400 square feet of building area devoted to sales |
| Bank and consumer financial services | 1 space per 200 square feet of gross floor area |
| Barber & beauty shops and other personal services | 2 spaces per operator |
| Car washes | 1 space per 2 employees |
| Delivery, ambulance and other similar services | 1 space per vehicle, plus 1 space for each 2 employees |
| Drive-through service such as banks, automobile service stations, dry cleaners, car washes and similar uses (in addition to use requirements) | Stacking for 4 vehicles at each bay, window or lane |
| Dry cleaners or laundries (self-service) | 1 space per 4 rental pieces of equipment |
| Eating establishments and nightclubs serving meals | 10 spaces, plus 1 for every 3 seats |
| Fire stations | 1 space per person on duty on a normal shift |
| Hotel, motel, motor court and similar uses | 1 space per unit, plus 2 spaces per 3 employees on a normal shift |
| Mobile home sales | 5 spaces, plus 1 space per 20,000 square feet of gross area |
| Manufacturing, industrial, warehousing and wholesaling | 1 space per 3 employees on the largest shift |
| Post Offices | 1 space per 200 square feet of public service area, plus 2 spaces per 3 employees on the largest shift |
| Retail sales except those listed below | 1 space per 200 square feet of gross floor area |
| Retail sales of bulky items which require high rates of floor space to the number of items offered for sale such as antiques, appliances, art, bicycles, carpet, floor covering, furniture, motorcycles, paint, upholstery and similar uses | 1 space per 300 square feet of gross floor area |
| Retail uses dealing primarily in service and/or repair | 1 space per 200 square feet of gross floor area |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 307 of 743

| Designed shopping centers | 5 spaces per 1,000 square feet of gross floor area (optional to computing parking on a store by store basis) |
|---|---|
| Radio, TV Stations | 2 spaces per 3 employees on the largest shift |
| Transportation terminals, such as airports, bus terminals and railroad passenger stations | 1 space per 4 seating accommodations for waiting passengers, plus 1 space for each 2 employees on the largest shift |
| Wholesale with related retail | 1 space per 3 employees on the largest shift, plus additional spaces per square foot of gross floor area devoted to retail sales as applicable from "retail sales" schedule above |

**OFFICE AND INSTITUTIONAL**:

| Child care and kindergarten, less than 6 children | 1 space per teacher or staff, plus space for 1 car drop-off and pickup |
|---|---|
| Child care and kindergarten, 6 or more children | 1 space per teacher or staff, plus stacking for 4 cars for drop-off and pickup or stacking for 1 car per 10 children, whichever is greater |
| Churches and other places of worship | 1 space per 4 seats in the largest assembly room |
| Dormitories | 1 space per 4 beds |
| Fraternity, sorority houses | 1 space per 2 beds |
| Elementary and junior high schools | 5 spaces, plus 1 space per teacher or staff |
| Funeral homes | 1 space per 4 seats in the main chapel |
| General offices | 1 space per 200 square feet of net rentable area (Net rentable area shall be considered to be 80% of gross floor area unless otherwise shown by applicant) |
| Hospital, nursing and convalescent homes | 1 space per 2 beds, plus 1 space per staff doctor on duty |
| Library, museum and art galleries | 1 space per 300 square feet of gross floor area |
| Medical, dental and similar offices | 7 spaces per doctor or practitioner |
| Nursing, convalescent homes designed and used primarily for the elderly | 1 space per 3 beds, plus 1 space per staff doctor on duty |
| Orphanage, juvenile homes | 1 space per 2 beds |
| Senior high schools, trade and vocational schools, colleges and universities | 7 spaces per classroom |
| Auditoriums, stadiums, assembly halls and gymnasiums located on a high school, college or university campus | 1 space per 12 fixed seats and 1 space per 12 movable seats in largest assembly room |

Page 82

**RECREATION**:

| | |
|---|---|
| Amusements, dance halls, nightclubs not serving meals | 1 space per 3 persons in designed capacity, plus 2 spaces per 3 employees on the largest shift |
| Auditoriums, stadiums, assembly halls, convention centers, gymnasiums, fraternal or social clubs or lodges, community recreation centers | 1 space per 3 fixed seats and 1 space per 3 movable seats in the largest assembly room |
| Bowling alleys | 4 spaces per lane |
| Golf courses | 4 spaces per tee |
| Indoor movie theaters | 1 space per 3 fixed seats and 1 space per 3 movable seats |
| Public swimming pools | 1 space per 100 square feet of water area |
| Recreation uses such as golf driving range, miniature golf, tennis, billiards or pool centers or similar recreation uses | 1 space per tee, green, court and/or other method of participation however styled |
| Recreation facilities such as community center, swimming pool, tennis courts, and similar activities when located in conjunction with a townhouse, condominium, group housing or homeowner association development | 1 space per 25 memberships or tenant |

**D.  Combination of Required Parking Spaces**
The required parking spaces for any number of separate uses may be combined in one lot or parking structure, but the required parking spaces assigned to one use may not be assigned to another use at the same time.

**E.  Day Time/Night Time Assignments**
One-half of the required parking spaces for places of worship, theaters, or assembly halls whose peak attendance is at night or weekends may be assigned to a use which will be closed at night or weekends.

**F.  Lighting**
Access ways, walkways and parking areas, if lighted, shall be lighted by fixtures which shall be so installed as to protect the street and neighboring properties from direct glare or hazardous interference of any kind.

**G.  Remote Parking**
On all off-street parking lots, the required space shall be provided on the same plot with the use or on a lot separated there from by not more than 400 feet, except for residential uses which must be provided on the same plot.

Where provision of required off-street parking for a building or other uses established subsequent to the adoption of this section involves one or more parcels or tracts of land that are

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 309 of 743

not a part of the plot on which the principal use is situated, the applicant for a permit for the principal use shall submit with his application for a zoning permit an instrument duly executed and acknowledged, which subjects the parcels or tracts of land to parking uses in connection with the principal use for which it is made available. The applicant shall cause said instrument to be registered in the office of the Register of Deeds upon the issuance of a zoning permit.

Parking in one zoning district in connection with a use not permitted in that district shall be permitted in accordance with the following:

- Business uses may park in Industrial Districts.

- Industrial uses may park in Business Districts.

- Office and Institutional uses may park in Business and Industrial Districts.

- Residential uses may park in Business, Industrial and Office and Institutional Districts.

In addition, any use located in one zoning district which is also a permitted use in another zoning district may also park in such other zoning district in which the use is permitted.

## 14.2.       Parking Lot Improvement, Design and Locational Requirements

All off-street parking lots including exits, entrances, drives and parking areas shall:

Be designed to allow for traffic movement in accordance with generally accepted geometric design principles;

- Have physical access to a public street;

- Be so designed that all access to public street is by forward motion;

- Be graded, properly drained, stabilized and maintained to prevent dust and erosion; and

- Be continuously provided and maintained as long as the use which they serve exists.

No parking lot designed or provided for more than six cars shall be located in the required front yard within the following districts:

R5 - Residential 5
R2 - Residential 2
R1 - Residential 1
O&I - Office and Institutional
IL - Light Industrial

Parking Lots for Neighborhood Business, Community Business, and Regional Business shall adhere to the <u>Chatham County Design Guidelines</u>. Front yard parking is discouraged in order to facilitate pedestrian and transit access from the public right-of-way. All other provisions (except

front yard parking) in the B-1 district (below) still apply.   No front yard parking space may be within 10 feet of any public right-of-way line.

In accordance with the principles set forth in the <u>Chatham County Design Guidelines</u>, within the B-1 Business District and IH Heavy Industrial District parking lots may be located in the front yard but not within 10 feet of any public right-of-way line.  When a parking lot with space for more than 10 cars adjoins any plot zoned for residential purposes, a buffer shall be provided to protect residences from light, glare, noise and fumes.  This buffer shall be a five foot wide strip of land on which is placed a four foot high, at least 50% opaque fence or a dense evergreen screen of equal height and opaqueness, provided that smaller evergreen plantings may be permitted where in the opinion of the County staff there is a reasonable expectation that such plantings will reach the required height and opaqueness within a two-year period.

Refer to the <u>Chatham County Design Guidelines for required interior plantings and planting island specifications for all off-street parking areas.</u>

## 14.3.        Off-Street Loading Requirements

Every structure or building used for trade, business or industry hereafter erected shall provide space as indicated herein for the loading, unloading and maneuvering space of delivery vehicles off the street or public alley.  Such space shall have access to a public alley, private driveway, or, if such cannot reasonably be provided, to a public street.  For the purpose of this section an off-street loading space (exclusive of adequate access drives and maneuvering space) shall have a minimum dimension of 12 feet by 40 feet and an overhead clearance of 14 feet in height above the alley or street grade.

### A.  Type of Use Required Off-Street Loading Space

Retail Business:  1 space for each 20,000 square feet of gross floor area or fraction thereof

Wholesale and Industries:  1 space for each 20,000 square feet of gross floor area or fraction thereof

Office and Institutions:  1 space for each 50,000 square feet of gross floor area or fraction thereof

Loading areas shall be screened in accordance with the Chatham County Design Guidelines and Section 12.5   Screening of Loading Areas.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 311 of 743

**SECTION 15** <u>REGULATIONS GOVERNING SIGNS</u>

The regulations governing the use of signs are set forth in this section. All signs shall be erected, altered, and maintained in accordance with the following provisions and only those signs as specified and as regulated shall be erected within the jurisdiction. Signs shall adhere to the <u>Chatham County Design Guidelines</u> as stated in Section 12 for items not directly addressed in this ordinance unless such adherence is unsafe due to site conditions or other extenuating circumstance. Any sign or type of sign not expressly mentioned in this section shall be prohibited.

### 15.1. Definitions

See Definitions, Section 7.

### 15.2. Non-conforming signs

See Section 9 for provisions for non-conforming signs.

### 15.3. Lighting of Signs

For lighting of signs, refer to Section 13 of the Chatham County Zoning Ordinance.

### 15.4. Prohibited Signs

1. Any sign that obscures a sign displayed by public authority for the purposes of giving traffic instruction or direction or other public information.

2. Any sign that uses the word "stop" or "danger" or otherwise presents or implies the need or requirement of stopping or caution or the existence of danger, or which is a copy or imitation of or which for any reason is likely to be confused with any sign displayed by a public authority. Provided, however, this provision is not intended to prevent the placement on private property of signs such as "stop" , "yield" or other such wording or design where such is necessary for traffic control or other such legitimate notice to the public.

3. Any sign that obstructs any window, door, fire escape, stairway, ladder or opening intended to provide light, air, ingress or egress for any building as required by law.

4. Any portable sign that is not considered a Temporary Sign as defined in Section 7.

5. Any sign that violates any provision of any law of the State relative to outdoor advertising.

6. Signs with flashing, intermittent or animated illumination except for official warning or regulatory signs. Provided, however, electronically or electrically controlled message centers or reader boards where different copy changes, involving alphabetical or numerical characters only, present messages of a public service or commercial nature on the same lamp bank shall not be considered to be flashing signs.

7. Signs affixed to trees, telephone poles, light poles, State-owned sign posts or public road right-of-way control fencing, except when used to post property or other such public purposes.

8. Signs erected in or over the public right-of-way except as permitted by the North Carolina Department of Transportation,  Enforcement of this provision shall be the responsibility of the North Carolina Department of Transportation.

9. Signs intentionally set in motion by wind, water, motor drive or otherwise.

10. Signs, banners, streamers, or pennants tied or consecutively strung together, but not including temporary holiday decorations.

11. Any sign with a sign area over 200 square feet.

12. Any sign which would constitute the sole and/or principal use of any lot, plot, parcel or tract of land.  This provision is intended to prohibit any sign which viewed within the context of its design, orientation, location on property, physical situation, relationship to surrounding property, streets and uses of land and other such factors would appear to constitute a principal use of land as regulated by this Ordinance.  However, no sign listed as "signs Permitted in Any Zoning District", Temporary Signs in this section, or Off-Premise Directional Signs are intended to be prohibited by this provision.

## 15.5.        Signs Permitted in Any Zoning District

The following signs are permitted in any zoning district:

1. Signs not exceeding four square foot in area and bearing only property numbers, post office box numbers, names of occupants of premises, or other identification of premises not having commercial connotations.

2. Flags and insignias of any government.

3. Legal notices, identification, information, or directional signs erected or required by governmental bodies.

4. Integral decorative or architectural features of buildings, except letters, trademarks, moving lights, or moving parts.

5. Signs directing and guiding traffic and parking on private property, but bearing no advertising matter.  On-premise signs pertaining to realty, such as for sale, rent or lease, not exceeding four square feet in area and not illuminated.  Signs up to 32 square feet are permitted for properties ten (10) acres in size or larger.  There shall be a limit of one such sign for each street abutting the lot.

6. Church, community or public building bulletin boards and identification sign, lighted or unlighted shall not exceed 32 square feet in area. There shall be a limit of two such signs for each street abutting the lot, or one such sign not exceeding 64 square feet in area.

7. Signs advertising agricultural products, produced on the premises, not exceeding 32 square feet in area. There shall be a limit of one such sign for each street abutting the lot.

8. Signs identifying, by name only, residential sub- division, planned housing development, recreational facility, permitted campgrounds or mobile home parks and not exceeding 32 square feet in area. There shall be a limit of one double-faced sign or two single-faced signs for each road or driveway entrance to the development named on the sign.

9. Signs of any political party or announcing the candidacy of any individual for any nomination or office; provided that in any residential district, no such sign shall exceed 32 square feet in area and in any district other than a residential district no sign shall exceed in area the maximum area of sign display permitted on any lot in that district; provided further, that all such signs, shall be removed not later than 10 working days after the date of the election to which they pertain.

10. Signs not exceeding 32 square feet in area, warning the public against hunting, fishing, or trespassing on the land on which the same are displayed.

11. Temporary signs may be allowed pursuant to the Temporary Signs Section (Section 15.10).

## 15.6.　　Signs Permitted in the O&I, Office and Institutional Districts

### A. Sign Area

Within the O&I District, each lot or parcel may have a maximum of 1 1/2 square feet of sign area for each linear foot of frontage on a private- or public-maintained street. Double frontage or corner lots or parcels shall be permitted an additional sign area computed at 1/2 the rate as above for the additional street frontage. Such additional sign area need not be proportionally directed toward such streets.

### B. Freestanding Signs

Not more than 1/2 the total sign area for any one lot may be in the form of freestanding signs. No part of any freestanding signs shall exceed a height of 10 feet above the ground at its base.

### C. Attached Signs

No sign shall be attached to a building in such a way as to extend above the roof line which forms the background of the sign.

### D. Sign Size

No one sign shall exceed a size of 50 square feet.

**15.7.        Signs Permitted in the B-1, NB, CB, and RB Districts**

**A.  Sign Area**
Within the B-1, NB, CB, and RB Districts, each lot or parcel may have a maximum of two square feet of sign area for each lineal foot of frontage on a private- or public-maintained street or highway.  Double frontage or corner lots or parcels shall be permitted an additional sign area computed at 1/2 the rate as above for the additional street frontage.  Such additional sign area need not be proportionally directed toward such streets.

**B.  Freestanding Signs**
Not more than 2/3 the total sign area for any one lot may be in the form of freestanding signs.  No part of any freestanding sign shall exceed a height of 30 feet above the ground at its base.

**C.  Attached Signs**
No sign shall be attached to a building in such a way as to extend above the roof line which forms the background of the sign.

**D.  Sign Size**
No one sign shall exceed a size of 150 square feet.

**15.8.        Signs Permitted in the IL, Light Industrial District**

**A.  Sign Area**
Within the Light Industrial District, each lot or parcel may have a maximum of two square feet of sign area for each linear foot of frontage on a private- or public-maintained street or highway.  Double frontage or corner lots or parcels shall be permitted an additional sign area computed at 1/2 the rate as above for the additional street frontage.  Such additional sign area need not be proportionally directed toward such streets.

**B.  Freestanding Signs**
No part of any freestanding sign shall exceed a height of 30 feet above the ground at its base.

**C.  Attached Signs**
No attached sign shall exceed a height of 30 feet from the average finished grade of the lot on which the structure to which the sign is attached is located.

**D.  Sign Size**
No one sign shall exceed a size of 200 square feet.

**15.9.        Signs Permitted in the IH, Heavy Industrial District**

**A.  Sign Area**
Within the Heavy Industrial District, each lot or parcel may have a maximum of two square feet of sign area for each lineal foot of frontage on a private- or public-maintained street.  Double frontage or corner lots or parcels shall be permitted an additional sign area computed at 1/2 the rate as above for the additional street frontage.  Such additional sign area need not be proportionally directed toward such streets.

**B. Freestanding Signs**

No part of any freestanding sign shall exceed a height of 30 feet above the ground at its base.

**C. Attached Signs**

No attached sign shall exceed a height of 30 feet from the average finished grade of the lot on which the structure to which the sign is attached is located.

**D. Sign Size**

No one sign shall exceed a size of 200 square feet.

### 15.10.    Temporary Signs

A. On-premise or off-premise signs promoting events sponsored by civic, charitable, educational, religious, community recreational, or other non-profit organizations may be erected up to two (2) weeks in advance of the event being promoted.  These signs shall be removed within two (2) days following the conclusion of the event.  The signs shall not exceed 32 square feet in size, and shall not exceed ten (10) feet in height, measured from ground level to the top of the sign.  Written permission shall be required for signs located on property other than the location of the event.  No such signs shall be permitted on public property or within public rights-of-way unless authorized by the responsible landowner or agency.  There shall be no more than one (1) sign per street or road frontage per parcel.

B. On-premise or off-premise signs promoting real estate open houses may be erected up to two (2) days prior to the open house and must be removed within 24 hours following the conclusion of the open house.  The signs shall not exceed four (4) square feet in size, and shall not exceed five (5) feet in height, measured from ground level to the top of the sign.  On-premise or off-premise auction signs may be erected up to two (2) weeks prior to the auction and must be removed within 24 hours following the conclusion of the event, shall not exceed 32 square feet in size, and shall not exceed ten (10) feet in height, measured from ground level to the top of the sign. Written permission shall be required for signs located on property other than the location of the event.  No such signs shall be permitted on public property or within public rights-of-way unless authorized by the responsible landowner or agency.  There shall be no more than one (1) sign per street or road frontage per parcel, and no more than three (3) signs per real estate open house or auction event.

C. All other temporary signs shall be on-premise and shall not be erected for more than 30 calendar days per year, shall not exceed 32 square feet in size, and shall not exceed ten (10) feet in height, measured from ground level to the top of the sign.  No such signs shall be permitted on public property or within public rights-of-way unless authorized by the responsible landowner or agency.  There shall be no more than one (1) sign per street or road frontage per parcel.

D. Banner signs shall be permitted as on-premise temporary signs, provided they do not exceed 32 square feet in size.  Banner signs shall be erected for no more 30 calendar days per year.  No banner signs shall be permitted on public property or within public rights-of-way unless authorized by the responsible landowner or agency.  There shall be no more than one (1) sign per street or road frontage per parcel.

E.  On-premise temporary signs giving information pertaining to construction taking place on the property for which a permit has been issued may remain throughout construction but shall be removed upon issuance of a certificate of occupancy.  These signs shall not exceed 32 square feet in size, and shall not exceed ten (10) feet in height, measured from ground level to the top of the sign.  No such signs shall be permitted on public property or within public rights-of-way unless authorized by the responsible landowner or agency. There shall be no more than one (1) sign per construction entrance.

F.  Off-premise signs promoting seasonal harvesting activities for bona fide farming operations shall not exceed 32 square feet in size, and shall not exceed ten (10) feet in height, measured from ground level to the top of the sign. There shall be no more than one (1) sign per street frontage or road frontage per parcel.

## 15.11.    Off-Premise Directional Signs

A.  Off-premise directional signs are permitted in any zoning district provided no sign is larger than 32 square feet and no part of the sign is higher than eight (8) feet above the ground at its base.
B.  Three off-premise directional signs are allowed per business, church, park, historic property, school, or other place of assembly.
C.  Only one (1) off-premise directional sign is permitted per property; however multiple uses are allowed to be identified on the sign.
D.  The square footage of the off-premise directional sign shall not be counted against the square footage of other signs allowed on the property.
E.  Written permission from the owner(s) of the property where the sign is proposed to be located is required to be submitted with the sign permit application.
F.  Verification from the North Carolina Department of Transportation that the sign will not be in violation of any State regulations at its proposed location must be submitted with the sign permit application.

## 15.12.    Permit Required

A.  No sign shall be erected, placed, attached, suspended, altered, remodeled, relocated or otherwise put into use or structurally changed except pursuant to a permit issued by the Planning Division.  Each application for a sign permit, whether permanent or temporary, shall include such information as the Planning Division may deem necessary in order to determine compliance with the provisions of this Ordinance.
B.  The following signs listed in Section 15.5 (signs permitted in any district) shall not require a permit: (1), (2), (3), (4), (5), (7), (9), (10)

## SECTION 16    <u>HOME OCCUPATIONS</u>

### 16.1.    Neighborhood Home Occupations

Customary home occupations are permitted in residential districts where such occupations are carried on in the residence and/or accessory buildings subject to the following limitations.

1.  Such occupations shall be engaged in only by residents of the premises and not more than three additional on-site employees who may be non-residents. The total number of resident and non-resident employees working on-site shall not exceed four. The use shall be clearly incidental and subordinate to its use for residential purposes by its occupants.

2.  No more than 25% percent of the heated living space, excluding basements, shall be used for home occupations. Basements may also be used for home occupations in addition to the 25% or a detached garage.

3.  No outdoor display of goods or materials shall be allowed on the property.

4.  One non-illuminated sign is allowed which shall not exceed four square feet in area.

5.  No equipment or process shall be used in such home occupation, which creates noise, vibration, glare, fumes, odors, or electrical interference detectable to the normal senses off the lot.  In the case of electrical interference, no equipment or process shall be used which creates visual or audible interference in any radio or television receivers off the premises, or which causes fluctuation in line voltage off the premises.

6.  Accessory buildings may be used for home occupations provided the building area is not larger than 1,000 square feet.  If multiple buildings are used, the total combined square footage shall not exceed 1,000 square feet.

7.  No traffic shall be generated by such home occupation in greater volumes than would normally be expected in a residential neighborhood, and any need for parking generated by the conduct of such home occupation shall be met off the street in an area other than in a required front yard.

The customary home occupations referred to in this subsection may include the merchandising and the sale of goods and products at retail, and the manufacture and assembly of goods and products.

Occupations that have no non-resident employees, no signs, no on-site retail sales, or no visits from the general public do not require a home occupation permit.

### 16.2.    Rural Home Occupations

Rural home occupations are those, which by their nature are not compatible on small lots near other residences, and may require an outdoor storage area for goods and materials associated with the business.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 318 of 743

1. Rural home occupations may be allowed on parcels, which are no smaller than three acres in size.

2. Such occupations shall be engaged in only by residents of the premises and not more than three additional on-site employees who may be non-residents. The total number of resident and non-resident employees working on-site shall not exceed four. The use shall be subordinate to its use for residential purposes by its occupants.

3. No more than 25% percent of the heated living space, excluding basements, shall be used for home occupations. Basements may also be used for home occupations in addition to the 25%.

4. One non-illuminated sign is allowed which shall not exceed four square feet in area.

5. No equipment or process shall be used in such home occupation, which creates noise, vibration, glare, fumes, odors, or electrical interference that is a nuisance off the lot. All operations must conform to the Chatham County Noise Ordinance. In the case of electrical interference, no equipment or process shall be used which creates visual or audible interference in any radio or television receivers off the premises, or which causes fluctuation in line voltage off the premises.

6. Accessory buildings may be used for home occupations provided the building is not larger than 2,500 square feet. If multiple buildings are used, the total combined square footage shall not exceed 2,500 square feet.

7. Commercial driveway permits may be required to assure traffic hazards are minimized. The driveway shall be located and improved such that it provides all weather access and does not interfere with other traffic using said drive. Any need for parking generated by the conduct of such home occupation shall be met off the street in an area other than in a required front yard.

8. Buildings, material storage and operations used for home occupations shall be setback from side and rear property lines a minimum of 50 feet except for noise generating operations, as determined by staff, in which case the setbacks shall be a minimum of 100 feet. The front setback shall be a minimum of 40 feet and shall be measured from the property line or the edge of the road right of way, which ever is greater.

9. To lessen the impact on adjacent properties, visual screening shall be installed to provide at a minimum a 15 foot wide opaque buffer. This may include but not be limited to a 6 foot high opaque fence and/or the planting of vegetation that at a minimum provides a continuous all season opaque screen at least 6 feet in height within 4 years of planting. Planting shall be a minimum of 3 gallon shrubbery or 10 gallon trees.

10. All required permits (i.e. Chatham County Central Permitting, Chatham County Environmental Health, North Carolina Department of Transportation or other local and state agencies) must be obtained prior to the issuance of the home occupation permit.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 319 of 743

Any person wanting to conduct a home occupation within their residence shall apply for a home occupation permit.  A home occupation permit approved by the Zoning Administrator must be received prior to beginning said occupation.  Permits are not transferable.  The home occupation permit is valid only as long as the use meets the provisions for home occupation specified herein and the permit may be revoked any time the use does not meet the provisions of this or other applicable ordinances.

## SECTION 17          SPECIAL USE PERMITS

Permits for special uses as provided for in this Ordinance may be authorized by the Board of Commissioners in certain circumstances and subject to certain procedures as set forth herein.  In some zoning districts certain listed uses are permitted only as conditional uses.

### 17.1.  Procedure

Requests for special use permits as authorized by this Ordinance shall be processed and considered in the same format as set forth in this Ordinance for conditional zoning district requests, but shall follow quasi-judicial procedures. A community meeting must be held by the applicant, following the same procedure described in Section 5.7 (A). No vote greater than a majority vote shall be required to issue such permits for the Board of Commissioners. For the purposes of this section, vacant positions on the board and members who are disqualified from voting on a quasi-judicial matter shall not be considered 'members of the board' for calculation of the requisite majority.  In considering an application for a special use permit the Board of Commissioners shall give due regard that the purpose and intent of this Ordinance shall be served, public safety and welfare secured and substantial justice done.  If the Board of Commissioners should find, after public hearing, the proposed Special Use Permit should not be granted, such proposed permit shall be denied.   Special Use Permits may include time limits for expiration if specified criteria are not met.  In granting a special use permit, the Board of Commissioners shall make the following affirmative findings:

1. The use requested is among those listed as an eligible special use in the district in which the subject property is located or is to be located.

2. The requested special use permit is either essential or desirable for the public convenience or welfare.

3. The requested permit will not impair the integrity or character of the surrounding or adjoining areas, and will not be detrimental to the health, safety, welfare or environment of the community.

4. The requested permit will be consistent with the objectives of the Land Use Plan.

5. Adequate utilities, access roads, storm drainage, recreation, open space, and other necessary facilities have been or are being provided consistent with the County's plans, policies and regulations.

In granting a special use permit, the Board of Commissioners may impose such additional restrictions and requirements upon such permit as it may deem necessary in order that the purpose and intent of this Ordinance are served, public welfare secured and substantial justice done.  If all requirements and conditions are accepted by the applicant, the Board of Commissioners shall authorize the issuance of the special use permit, otherwise the permit shall be denied.  Any Special Use Permit so authorized shall be perpetually binding upon the property included in such permit unless subsequently changed or amended by the Board of Commissioners, as provided for in this Ordinance.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 321 of 743

A member of the Board of Commissioners shall not participate in or vote on any quasi-judicial matter in a manner that would violate affected persons' constitutional rights to an impartial decision maker. Impermissible conflicts include, but are not limited to, a member having a fixed opinion prior to hearing the matter that is not susceptible to change, undisclosed ex parte communications, a close familial, business, or other associational relationship with an affected person, or a financial interest in the outcome of the matter. If an objection is raised to a member's participation and that member does not recuse himself or herself, the remaining members shall by majority vote rule on the objection.

### 17.2. Plans

Final plans for any development to be made pursuant to any special use permit shall be submitted to the Planning Department for review prior to the issuance of any permits. The EIA or special study, if required pursuant to Section 11.3 or Section 17.9 respectively, shall be completed and submitted to the Planning Department prior to the issuance of any permits. Such review shall be for the purpose of determining compliance with the permit conditions and other Ordinance requirements.

### 17.3. Violations

Any violation of a term or condition of a special use permit shall be treated the same as a violation of this Ordinance and shall be subject to the same remedies and penalties as any such violation.

### 17.4. Changes or Amendments

Upon request by the property owner, the Board of Commissioners may change or amend any special use permit, after a public hearing upon recommendation by the Planning Board and subject to the same consideration as provided for in this Ordinance for the original issuance of a special use permit. Minor modifications to special use permits that do not involve a change in uses permitted or the density of overall development may be reviewed and approved administratively.

### 17.5. Specific Conditions for Special Uses Listed in Residential Districts

The minimum requirements for the zoning district in which a special use is located shall be the minimum requirements for such special use. In addition, for the following special uses, which are listed as special uses in the residential districts, the listed conditions shall be imposed along with any additional conditions the Board of Commissioners may attach in the granting of a Special Use Permit.

**A. Boarding Kennels**
   1. Minimum lot area - 3 acres

   2. All buildings, structures and high intensity activity areas shall be set back a minimum of two times the minimum yard requirement for the district in which it is located.

**B. Public and Private Recreation Camps and Grounds**

1. Minimum Lot Area - 20 acres except within the zoned portions of the Haw River Township which may have a minimum lot area of 10 acres.

2. All buildings, structures and high intensity activity areas shall be set back a minimum of two times the minimum yard requirement for the district in which it is located.

**C. Planned Residential Development**

Planned residential developments are special uses within the R5, R2 and R1 zoning districts.

1. Purpose
   The purpose of the Planned Residential Development is to permit maximum flexibility in lot creation and residential unit placement within larger planned residential projects while at the same time preserving open space in more usable and environmentally sensitive units. Planned residential developments are not bound by typical minimum lot sizes, housing development types and dimensional requirements as set forth in the district in which the development is located but are subject to the standards as set forth in this section and any additional conditions and safeguards as may be attached by the Board of Commissioners in authorizing a special use permit.

2. Area Required
   In order to qualify for a planned residential development, the following minimum gross areas are required by zoning districts:

   R5      200 acres
   R2      100 acres
   R1      50 acres

3. Maximum Net Density Allowed
   Within a planned residential development, the following net densities by zoning districts shall not be exceeded:

   R5      One dwelling unit for each five acres of net land area
   R2      One dwelling unit for each 90,000 square feet of net land area
   R1      One dwelling unit for each 40,000 square feet of net land area

4. Net Land Area Computation
   Net land area is obtained by taking the gross land area of the development and subtracting the following areas:

   a. Land to be dedicated or set aside for public and private road rights-of-way. As an option to measuring projected road rights-of-way the developer may subtract 20% of gross area as road right-of-way allowance regardless of the amount of land actually required for roads.

Page 97

     b.   Land subject to flooding by the 100 year flood.

     c.   Land and water classified as wetlands or wooded swamp by the U.S. Army Corps of Engineers.

     d.   Water areas over one acre

     e.   Other areas determined to be unbuildable due to other regulatory authority. However, typical zoning setback areas and riparian buffer areas shall be considered to be buildable areas for purposes of this net land area determination.

5. Exterior Boundary Setbacks and Development
   Setbacks along the exterior boundary of the planned residential development or on any existing public street shall not be less than that required for the district in which the project is located. In addition, the Board of Commissioners may require, in addition to any other conditions or safeguards, other special screening, setbacks, and/or lotting sizes and building arrangements along the exterior boundary of the project in order to mitigate any potential adverse effects upon surrounding property.

6. Gross Site Use
   Within a planned residential development all land that is not used for public or private street rights-of-way, building lots, or plots for other residential developments shall be placed in common area and an entity created for its perpetual ownership and maintenance. There may be more than one common area and more than one level of common area rights within a planned residential development. Common areas may be used for recreational facilities and similar uses for the development.

7. Site Plan Required
   A site plan is required for a planned residential development in the same form as required for a subdivision sketch design. The Planning Board may also require additional drawings and information in order to make its determination and recommendation.

## 17.6.   Standards for Solar Energy Uses

This section is intended to provide the opportunity for solar energy to serve as a viable form of energy generation while protecting public health, safety and general welfare. All regulations in the zoning ordinance shall apply unless expressly allowed or modified in the below standards.

### A.  Solar Collectors

Solar collectors shall be permitted as an accessory use to existing structures or facilities in any zoning district under the following standards:

1. Roof mounted solar systems shall not extend beyond the exterior perimeter of the building on which the system is mounted or built.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 324 of 743

2. Ground mounted solar systems shall meet the minimum zoning setbacks from property lines for the zoning district in which it is located.

3. The maximum height for a ground mounted solar system under this standard is 15 feet as measured from the grade of the base of the collector to its highest point.

**B. Solar Farms on Less than Two (2) Acres**
Solar farms on <u>**less than two (2) acres**</u> in size shall meet the following standards:

1. Collectors and all their components shall not exceed 25 feet in height as measured from the grade of the base of the collector to its highest point.

2. All structures and collectors shall meet a 50 foot minimum perimeter setback from all property lines.

3. In cases where buffers do not exist, a modified version of the Type B buffer as described in Section 12 of the Zoning Ordinance shall be appropriate to the location of the site, the adjacent land use, and the area topography.

**C. Solar Farms on Greater than Two (2) Acres**
Solar farms on <u>**greater than two (2) acres**</u> in size shall meet the following standards:

1. A Special Use Permit shall be applied for and approved before any activity may proceed on the proposed solar farm site and must comply with Section 17.1 Procedures for Special Use Permits.

2. Collectors and their components shall not exceed 25 feet in height as measured from the grade of the base of the collector to its highest point.

3. All structures and collectors shall meet a 50 foot minimum perimeter setback from all property lines with a 100 foot minimum setback from any public roadway where applicable.

4. In cases where buffers do not exist, a modified version of the Type B buffer as described in Section 12 of the Zoning Ordinance shall be appropriate to the location of the site, the adjacent land use, and the area topography.

**D. General Standards for All Solar Farms**
All solar farms shall comply with the following:
- Shall comply with all Building and Electrical codes.
- Shall not create a visual safety hazard for passing motorist or aircraft.
- Shall be removed, at the owner's expense, within one hundred and eighty (180) days of determination by the Planning Department the facility is no longer being maintained in an operable state of good repair or no longer supplying solar power.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 325 of 743

**17.7.    Standards for Events Center Limited**

This section is intended to provide the opportunity for smaller scale event centers to serve as a venue for business opportunities and gathering space in the county while protecting the health, safety, and welfare of the community. All regulations in the Zoning Ordinance shall apply unless expressly allowed or modified in the below standards:

**A.  Size and Capacity Limits-**
1. Gathering, meeting or hosting area event space shall be limited to no more than 5,000 square feet in size.

**B.  Accessory Uses Permitted-**
   Accessory and/or ancillary uses shall be those directly related to the event being held. Examples are food and beverages service, dance floors, outdoor speakers, music, festive lighting, decorations, tents, etc.

**C. Signage Allowed-**
   1. Event advertising shall be limited to the permanent on premise signage as allowed in Section 15 of the Zoning Ordinance.

**17.8.    Standards for Sexually Oriented Businesses**

A. Separation Requirements
1. Sexually oriented business(es) shall not be located in any building, or portion thereof, that is:
   Within 1,000 feet of a:
   (i)   Existing sexually oriented business.
   (ii)  Residential zoning district or any residential land use including any open space established as part of the residential subdivision approval process,
   (iii) A place of worship or building which is used primarily for religious worship and related religious activities,
   (iv)  K-12 Schools (public, private, or specialty),
   (v)   Public or private library,
   (vi)  State licensed child care facility, or
   (vii) A Public or private park or recreational area which has been designated for park or recreational activities including but not limited to: a park, playground, nature trails, swimming pool, reservoir, athletic field, basketball or tennis courts, pedestrian/bicycle paths, wilderness areas, or other similar land.
   (b)  Measurement shall be made in a straight planar line, without regard to the intervening structures or objects, from the nearest portion of the building or structure used as the part of the premises where a sexually oriented business is conducted to the nearest portion of a building, structure, or open space area of a use listed above.

**17.9. Additional Information for Certain Special Use Permits**

This Section 17.9 applies to those uses designated in Section 10.13 as being subject to additional requirements of Section 17.9.  For uses subject to this Section, the County may determine in certain cases that it needs more information to determine whether a use is consistent with the findings required in Section 17.1.  When such a determination is made, the County may retain the services of a consultant that is mutually acceptable to the County and the applicant to conduct a study to

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 326 of 743

provide such additional information. Upon making a determination that an additional study is needed, notice shall be given to the applicant, and the applicant shall meet with the County staff to determine the scope of the study and to select a consultant. The applicant shall pay a fee as part of the Special Use Permit application for the reasonable costs of the consulting services incurred by the County. The report of the study results shall be approved by the County staff and shall become part of the Special Use Permit application submitted to the Board of Commissioners. This Section 17.9 is also applicable to an applicant for a Special Use Permit for which an environmental impact assessment is required by Section 11.3 of this Ordinance.

**17.10 Quasi-Judicial Procedure**

A. Process Required. - Boards shall follow quasi-judicial procedures in determining appeals of administrative decisions, special use permits, and certificates of appropriateness, variances, or any other quasi-judicial decision.

B. Notice of Hearing. - Notice of evidentiary hearings conducted pursuant to this Chapter shall be mailed to the person or entity whose appeal, application, or request is the subject of the hearing; to the owner of the property that is the subject of the hearing if the owner did not initiate the hearing; to the owners of all parcels of land abutting the parcel of land that is the subject of the hearing; and to any other persons entitled to receive notice as provided by the local development regulation. In the absence of evidence to the contrary, the local government may rely on the county tax listing to determine owners of property entitled to mailed notice. The notice must be deposited in the mail at least 10 days, but not more than 25 days, prior to the date of the hearing. Within that same time period, the local government shall also prominently post a notice of the hearing on the site that is the subject of the hearing or on an adjacent street or highway right-of-way. The board may continue an evidentiary hearing that has been convened without further advertisement. If an evidentiary hearing is set for a given date and a quorum of the board is not then present, the hearing shall be continued until the next regular board meeting without further advertisement.

C. Administrative Materials. - The administrator or staff to the board shall transmit to the board all applications, reports, and written materials relevant to the matter being considered. The administrative materials may be distributed to the members of the board prior to the hearing if at the same time they are distributed to the board a copy is also provided to the appellant or applicant and to the landowner if that person is not the appellant or applicant. The administrative materials shall become a part of the hearing record. The administrative materials may be provided in written or electronic form. Objections to inclusion or exclusion of administrative materials may be made before or during the hearing. Rulings on unresolved objections shall be made by the board at the hearing.

D. Presentation of Evidence. - The applicant, the local government, and any person who would have standing to appeal the decision under G.S. 160D-1402(c) shall have the right to participate as a party at the evidentiary hearing. Other witnesses may present competent, material, and substantial evidence that is not repetitive as allowed by the board.

Objections regarding jurisdictional and evidentiary issues, including, but not limited to, the timeliness of an appeal or the standing of a party, may be made to the board. The board chair shall rule on any objections, and the chair's rulings may be appealed to the full board. These rulings are also subject to judicial review pursuant to G.S. 160D-1402. Objections based on jurisdictional issues may be raised for the first time on judicial review.

E. Appearance of Official New Issues. - The official who made the decision or the person currently occupying that position, if the decision maker is no longer employed by the local

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 327 of 743

government, shall be present at the evidentiary hearing as a witness. The appellant shall not be limited at the hearing to matters stated in a notice of appeal. If any party or the local government would be unduly prejudiced by the presentation of matters not presented in the notice of appeal, the board shall continue the hearing.

F. Oaths. - The chair of the board or any member acting as chair and the clerk to the board are authorized to administer oaths to witnesses in any matter coming before the board. Any person who, while under oath during a proceeding before the board determining a quasi-judicial matter, willfully swears falsely is guilty of a Class 1 misdemeanor.

G. Subpoenas. - The board making a quasi-judicial decision under this Chapter through the chair or, in the chair's absence, anyone acting as chair may subpoena witnesses and compel the production of evidence. To request issuance of a subpoena, the applicant, the local government, and any person with standing under G.S. 160D-1402(c) may make a written request to the chair explaining why it is necessary for certain witnesses or evidence to be compelled. The chair shall issue requested subpoenas he or she determines to be relevant, reasonable in nature and scope, and not oppressive. The chair shall rule on any motion to quash or modify a subpoena. Decisions regarding subpoenas made by the chair may be immediately appealed to the full board. If a person fails or refuses to obey a subpoena issued pursuant to this subsection, the board or the party seeking the subpoena may apply to the General Court of Justice for an order requiring that its subpoena be obeyed, and the court shall have jurisdiction to issue these orders after notice to all proper parties.

H. Appeals in Nature of Certiorari. - When hearing an appeal pursuant to G.S. 160D-947(e) or any other appeal in the nature of certiorari, the hearing shall be based on the record below, and the scope of review shall be as provided in G.S. 160D-1402(j).

I. Voting. - The concurring vote of four-fifths of the board shall be necessary to grant a variance. A majority of the members shall be required to decide any other quasi-judicial matter or to determine an appeal made in the nature of certiorari. For the purposes of this subsection, vacant positions on the board and members who are disqualified from voting on a quasi-judicial matter under G.S. 160D-109(d) shall not be considered members of the board for calculation of the requisite majority if there are no qualified alternates available to take the place of such members.

J. Decisions. - The board shall determine contested facts and make its decision within a reasonable time. When hearing an appeal, the board may reverse or affirm, wholly or partly, or may modify the decision appealed from and shall make any order, requirement, decision, or determination that ought to be made. The board shall have all the powers of the official who made the decision. Every quasi-judicial decision shall be based upon competent, material, and substantial evidence in the record. Each quasi-judicial decision shall be reduced to writing, reflect the board's determination of contested facts and their application to the applicable standards, and be approved by the board and signed by the chair or other duly authorized member of the board. A quasi-judicial decision is effective upon filing the written decision with the clerk to the board or such other office or official as the development regulation specifies. The decision of the board shall be delivered within a reasonable time by personal delivery, electronic mail, or first-class mail to the applicant, landowner, and any person who has submitted a written request for a copy prior to the date the decision becomes effective. The person required to provide notice shall certify to the local government that proper notice has been made, and the certificate shall be deemed conclusive in the absence of fraud.

K. Judicial Review. - Every quasi-judicial decision shall be subject to review by the superior court by proceedings in the nature of certiorari pursuant to G.S. 160D-1402. Appeals shall be filed within the times specified in G.S. 160D-1405(d). (2019-111, s. 2.4.)

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 329 of 743

**SECTION 18**          <u>**BOARD OF ADJUSTMENT**</u>

## 18.1.  Board of Adjustment Created

There is hereby created a Board of Adjustment to be known as the Chatham County Board of Adjustment, consisting of five (5) regular members and two (2) alternate members, and referred to herein as the Board of Adjustment. All members of the Board of Adjustment shall be residents of Chatham County and appointed by the Board of Commissioners. The Chatham County Board of Commissioners hereby finds and determines that even though the Board of Commissioners does not zone the entire territorial jurisdiction of Chatham County that due to the number of designated zoning areas it is not practicable to have one resident from each designated area as a member of the Board of Adjustment and that therefore the Board of Adjustment should consist of five (5) regular members and two (2) alternate members. There shall be five (5) Board of Adjustment districts which shall be identical to the Board of Commissioner districts, as the same are redrawn, modified, or changed from time to time, and one regular member shall be appointed from each Board of Adjustment district, unless there are no applicants from a Board of Adjustment district, or the Board of Commissioners determines that an applicant from another district possesses superior skills and qualifications. If the Board of Commissioner districts (and therefore the Board of Adjustment districts) are redrawn, modified, or changed such that a regular member of the Board of Adjustment is no longer a resident of the district he or she was appointed from, such member, provided he or she continues to be a resident of Chatham County, shall nevertheless continue to serve on the Board of Adjustment until his or her term expires notwithstanding that such member no longer resides in the district. The alternate members shall be residents of Chatham County but shall be appointed at large and not from districts. An alternate member may sit in lieu of a regular member who is unable to sit on any matter coming before the Board of Adjustment, and when so seated, an alternate member shall have the same powers and duties as a regular member. The regular and alternate members shall be appointed for three (3) year staggered terms, but both regular members and alternate members shall continue to serve until their successors have been duly appointed and qualified. If a regular or alternate member ceases to be a resident of Chatham County his or her term shall expire effective as of the date a replacement member is duly appointed and qualified. The Board of Commissioners shall fill all vacancies on the Board of Adjustment.

## 18.2.  Meetings

Meetings of the board shall be held at the call of the Chairman or any two (2) other members of the board, and at such other times as the board may determine. The board shall adopt rules governing its organization and all proceeding coming before the board.  All meetings of the board shall be open meeting in accordance with the North Carolina Open Meeting law, and its records shall show the vote of each member upon every question or his or her absence or failure to vote.   The board shall also keep records of its hearings and any other official action. Proceedings of the Board of Adjustment shall be in accordance with G.S. 160D-302.

## A.  Oath
The chair of the board or any member acting as chair and the clerk to the board are authorized to administer oaths to witnesses in any matter coming before the board. Any person who, while under oath during a proceeding before the Board of Adjustment, willfully swears falsely is guilty of a Class 1 misdemeanor.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 330 of 743

**B. Hearing Notice**

Notice of hearings conducted pursuant to this section shall be mailed to the person or entity whose appeal, application, or request is the subject of the hearing; to the owner of the property that is the subject of the hearing if the owner did not initiate the hearing; to the owners of all parcels of land abutting the parcel of land that is the subject of the hearing; and to any other persons entitled to receive notice as provided by the zoning ordinance. In the absence of evidence to the contrary, the county may rely on the county tax listing to determine owners of property entitled to mailed notice. The notice must be deposited in the mail at least 10 days, but not more than 25 days, prior to the date of the hearing. Within that same time period, the county shall also prominently post a notice of the hearing on the site that is the subject of the hearing or on an adjacent street or highway right-of-way.

**C. Subpoenas**

The Board of Adjustment through the chair, or in the chair's absence anyone acting as chair, may subpoena witnesses and compel the production of evidence. To request issuance of a subpoena, persons with standing under G.S. 160D 1402 (c) may make a written request to the chair explaining why it is necessary for certain witnesses or evidence to be compelled. The chair shall issue requested subpoenas he or she determines to be relevant, reasonable in nature and scope, and not oppressive. The chair shall rule on any motion to quash or modify a subpoena. Decisions regarding subpoenas made by the chair may be appealed to the full Board of Adjustment. If a person fails or refuses to obey a subpoena issued pursuant to this subsection, the Board of Adjustment or the party seeking the subpoena may apply to the General Court of Justice for an order requiring that its subpoena be obeyed, and the court shall have jurisdiction to issue these orders after notice to all proper parties.

## 18.3. Powers and Duties of the Board of Adjustment

The Board of Adjustment hears and decides requests for variances and appeals of decisions of administrative officials charged with enforcement of the ordinance. As used in this section, the term "decision" includes any final and binding order, requirement, or determination. The Board of Adjustment shall follow quasi-judicial procedures when deciding appeals and requests for variances. The board shall hear and decide all matters upon which it is required to pass under any statute or ordinance that regulates land use or development.

**A. Administrative Review**

To hear and decide appeals where it is alleged there is error in any decision made by any administrative official in the enforcement of this Ordinance.

**B. Variance**

Where there are unnecessary hardships in the way of carrying out the strict letter of this Ordinance, the Board of Adjustment is empowered in passing upon appeals in specific cases, to vary or modify any of the regulations or provisions of this Ordinance relating to the construction or alteration of buildings or structures so that the spirit of the Ordinance shall be observed, public safety and welfare secured, and substantial justice done. The Board of Adjustment may not, however, grant variances for the use of land or structures.

1. Variances from the provisions of this Ordinance may be granted only upon appeal from a decision, action, determination, or order of the Zoning Official and shall demonstrate substantially the following:

   a. Unnecessary hardship would result from the strict application of the ordinance. It shall not be necessary to demonstrate that, in the absence of the variance, no reasonable use can be made of the property.

   b. The hardship results from conditions that are peculiar to the property, such as location, size, or topography. Hardships resulting from personal circumstances, as well as hardships resulting from conditions that are common to the neighborhood or the general public, may not be the basis for granting a variance.

   c. The hardship did not result from actions taken by the applicant or the property owner. The act of purchasing property with knowledge that circumstances exist that may justify the granting of a variance shall not be regarded as a self-created hardship.

   d. The requested variance is consistent with the spirit, purpose, and intent of the ordinance, such that public safety is secured, and substantial justice is achieved.

2. Furthermore, the board of adjustment must make such findings of fact to substantiate all of these requirements. In considering applications for variances from the provisions of this Ordinance, demonstration of financial disadvantage alone shall not constitute conclusive evidence of unnecessary hardship.

3. Appropriate conditions may be imposed on any variance, provided that the conditions are reasonably related to the variance. Any other ordinance that regulates land use or development may provide for variances consistent with the provisions of this subsection.

4. Departure from or violation of any of those conditions or safeguards shall be deemed a violation of this Ordinance, and shall be subject to the penalties, as provided in Section 21.

5. A variance, once granted, shall continue for an indefinite period of time unless otherwise specified at the time granted.

6. No change in permitted uses may be authorized by a variance.

## C. Quasi-Judicial Decisions

For all Quasi-Judicial Procedures see Section 17.10 of this ordinance. The board shall determine contested facts and make its decision within a reasonable time. Every quasi-judicial decision shall be based upon competent, material, and substantial evidence in the record. Each quasi-judicial decision shall be reduced to writing and reflect the board's determination of contested facts and their application to the applicable standards. The written decision shall be signed by the chair or other duly authorized member of the board. A quasi-judicial decision is effective upon filing the written decision with the clerk to the board or such other office or official as the

ordinance specifies. The decision of the board shall be delivered by personal delivery, electronic mail, or by first-class mail to the applicant, property owner, and to any person who has submitted a written request for a copy, prior to the date the decision becomes effective. The person required to provide notice shall certify that proper notice has been made.

## 18.4. Appeal Procedure

The Board of Adjustment shall hear and decide appeals from decisions of administrative officials charged with enforcement of the Zoning Ordinance and may hear appeals arising out of any other ordinance that regulates land use or development, pursuant to all of the following:

1. Any person who has standing under G.S. 160D 1402(c) or the county may appeal a decision to the Board of Adjustment. An appeal is taken by filing a notice of appeal with the county clerk. The notice of appeal shall state the grounds for the appeal.

2. The official who made the determination shall give written notice to the owner of the property that is the subject of the determination and to the party who sought the decision, if different from the owner. The written notice shall be delivered by personal delivery, electronic mail, or by first-class mail.

3. The owner or other party shall have 30 days from receipt of the written notice within which to file an appeal. Any other person with standing to appeal shall have 30 days from receipt from any source of actual or constructive notice of the decision within which to file an appeal. In the absence of evidence to the contrary, notice pursuant to 160D-403(b) given by first class mail shall be deemed received on the third business day following deposit of notice for mailing with the United States Postal Service.

4. It shall be conclusively presumed that all persons with standing to appeal have constructive notice of the decision from the date a sign containing the words "Zoning Decision" in letters at least six inches high and identifying the means to contact an official for information about the decision is prominently posted on the property that is the subject of the decision, provided the sign remains on the property for at least 10 days. Posting of signs is not the only form of constructive notice. Any such posting shall be the responsibility of the landowner or applicant. Verification of the posting shall be provided to the official who made the decision. Absent an ordinance provision to the contrary, posting of signs shall not be required.

5. The official who made the decision shall transmit to the board all documents and exhibits constituting the record upon which the action appealed from is taken. The official shall also provide a copy of the record to the appellant and to the owner of the property that is the subject of the appeal if the appellant is not the owner.

6. An appeal of a notice of violation or other enforcement order stays enforcement of the action appealed from unless the official who made the decision certifies to the Board of Adjustment after notice of appeal has been filed that because of the facts stated in an affidavit, a stay would cause imminent peril to life or property or because the violation is transitory in nature, a stay would seriously interfere with enforcement of the ordinance. In that case, enforcement proceedings shall not be stayed except by a restraining order,

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 333 of 743

which may be granted by a court. If enforcement proceedings are not stayed, the appellant may file with the official a request for an expedited hearing of the appeal, and the Board of Adjustment shall meet to hear the appeal within 15 days after such a request is filed. Notwithstanding the foregoing, appeals of decisions granting a permit or otherwise affirming that a proposed use of property is consistent with the ordinance shall not stay the further review of an application for permits or permissions to use such property; in these situations the appellant may request and the board may grant a stay of a final decision of permit applications or building permits affected by the issue being appealed.

7. Subject to the provisions of subdivision (6) of this subsection, the Board of Adjustment shall hear and decide the appeal within a reasonable time.

8. The official who made the decision shall be present at the hearing as a witness. The appellant shall not be limited at the hearing to matters stated in the notice of appeal. If any party or the county would be unduly prejudiced by the presentation of matters not presented in the notice of appeal, the board shall continue the hearing. The Board of Adjustment may reverse or affirm, wholly or partly, or may modify the decision appealed from and shall make any order, requirement, decision, or determination that ought to be made. The board shall have all the powers of the official who made the decision.

## 18.5. **Vote Required - Judicial Appeal**

The Board of Adjustment, by a vote of 4/5 of its members shall be necessary to grant a variance. A majority of the members shall be required to decide any other quasi-judicial matter or to determine an appeal made in the nature of certiorari. For the purposes of this subsection, vacant positions on the board and members who are disqualified from voting on a quasi-judicial matter shall not be considered 'members of the board' for calculation of the requisite supermajority if there are no qualified alternates available to take the place of such members.

Every quasi-judicial decision shall be subject to review by the superior court by proceedings in the nature of certiorari pursuant to G.S. 160D-1402. A petition for review shall be filed with the clerk of superior court by the later of 30 days after the decision is effective or after a written copy thereof is given in accordance with Section 18.3(c) of this Ordinance. When first-class mail is used to deliver notice, three days shall be added to the time to file the petition.

 A member of the Board of Adjustment shall not participate in or vote on any quasi-judicial matter in a manner that would violate affected persons' constitutional rights to an impartial decision maker. Impermissible conflicts include, but are not limited to, a member having a fixed opinion prior to hearing the matter that is not susceptible to change, undisclosed ex parte communications, a close familial, business, or other associational relationship with an affected person, or a financial interest in the outcome of the matter. If an objection is raised to a member's participation and that member does not recuse himself or herself, the remaining members shall by majority vote rule on the objection.

## SECTION 19          AMENDMENT TO ZONING ORDINANCE

### 19.1.   Statement of Intent

For the purpose of establishing and maintaining sound, stable and desirable development within Chatham County this Ordinance shall not be amended except to correct an error in the Ordinance or, because of changed or changing conditions in a particular area or in the County generally, or to extend the boundary of an existing zoning district or to rezone an area to a different zoning district, or to change the regulation and restrictions of the Zoning Ordinance.  These amendments shall be reasonably necessary to promote the public health, safety and general welfare and to achieve the purposes of the adopted Land Use Plan.

### 19.2.   Amendment Initiation

Subject to the limitations of the foregoing statement of intent an amendment to this Ordinance may be initiated by:

1. Text Amendment
   a. The Board of Commissioners on its own motion;
   b. The Planning Board;
   c. Application by any person who owns property or resides in the area of jurisdiction of this Ordinance.
2. Map Amendment
   a. The Board of Commissioners on its own motion;
   b. The Planning Board;
   c. The owner or authorized agent of the owner;

### 19.3.   Conditional Zoning District Rezoning

It is the intent of this section that the applicant for rezoning to any district other than a conditional zoning district shall be prohibited from offering any testimony or evidence concerning the specific manner in which he/she intends to use or develop the property.  If the applicant believes that the development of his property in a specific manner will lessen adverse effects upon surrounding properties or otherwise make the rezoning more in accordance with principles underlying the County's comprehensive zoning plan, he/she shall apply for rezoning to the appropriate conditional zoning district specifying the nature of his proposed development.  Conditional Zoning District requests shall follow the requirements in Section 5.  No permit shall be issued for any development within a conditional zoning district except in accordance with the approved conditional zoning district.

### 19.4   Procedure for Submission and Consideration of Applications for Text Amendment or General Use Zoning Map Amendment

### A.  County-Initiated Amendments
All applications for amendments to this Ordinance initiated by the Planning Board or County

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 335 of 743

departments/agencies shall be in writing, signed and filed with the Planning Department. The Board of Commissioners can initiate an amendment upon on their own motion.

The Planning Department, shall, before scheduling any amendment on the application for public hearing, ensure that it contains all the required information, as specified, in this Ordinance and on the application. Applications which are not complete, or otherwise do not comply with the provisions of this Ordinance shall not be scheduled by the Planning Department, but shall be returned to the applicant with a notation of the deficiencies in the application. Completed applications shall be received a minimum of 30 days prior to the public hearing at which the proposed amendment is scheduled to be heard.

## B. Citizen-Initiated Amendments

All applications for text or map amendments initiated by a property owner or citizen shall be required to submit an application containing the following information and follow the procedure outlined in Section 5.7. Applications for these amendments shall not require a Community Meeting or be required to meet with the Chatham County Appearance Commission.

No amendment to zoning regulations or a zoning map that down-zones property shall be initiated nor shall it be enforceable without the written consent of all property owners whose property is the subject of the down-zoning amendment, unless the down-zoning amendment is initiated by the county. For purposes of this section, "down-zoning" means a zoning ordinance that affects an area of land in one of the following ways:

(1) By decreasing the development density of the land to be less dense than was allowed under its previous usage.

(2) By reducing the permitted uses of the land that are specified in a zoning ordinance or land development regulation to fewer uses than were allowed under its previous usage.

## C. Contents of Application

All applications for amendments to this ordinance without limiting the right to file additional material shall contain at least the following:

1. If the proposed amendment would require a change in the zoning map, a map to scale showing the land which would be covered by the proposed amendment. If the proposed amendment does not affect the entire property, a boundary survey and vicinity map showing the property's total acreage, parcel number, current zoning classification(s) and the general location in relation to major streets, railroads, and/or waterways.

2. A legal description of such land or adequate description to define the area to be rezoned.

3. The alleged error in this Ordinance, if any, which would be remedied by the proposed amendment with a detailed explanation of such error in the Ordinance and detailed reasons how the proposed amendment will correct the same.

4. The changed or changing conditions, if any, in the area or in the County generally, which make the proposed amendment reasonably necessary to the promotion of the public health, safety and general welfare.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 336 of 743

5. The manner in which the proposed amendment will carry out the intent and purpose of the adopted Land Use Plan or part thereof.

6. All other circumstances, factors and reasons which the applicant offers in support of the proposed amendment.

7. Information required on the application form received from the Planning Department.

## 19.5   Joint Public Hearing for County-Initiated Amendments

The Board of Commissioners and the Planning Board shall receive public comment on applications for amendments to this Ordinance in a public hearing at a County Commissioners meeting upon proper notice.  The lack of quorum of the Planning Board at such meetings shall not affect the proceedings nor require further hearings.

## 19.6   Public Hearing and Notice Thereof

A public hearing shall be held by the Board of Commissioners before adoption of any proposed amendment to this Ordinance.  Notice of the public hearing shall be given according to State law. When a zoning map amendment is proposed, a notice of the public hearing shall be prominently posted on the site proposed for rezoning or on an adjacent public street or highway right-of-way. When multiple parcels are included within a proposed zoning map amendment, a posting on each individual parcel is not required, but sufficient notices shall be posted to provide reasonable notice to interested parties.

Mailed notice shall be required in compliance with State law when the County initially zones property.

## 19.7   Planning Department Prepares Final Analysis and Recommendation

Following the public hearing the Planning Department shall prepare an analysis of the application and a recommendation to approve, deny, or defer action on the application. This information shall be presented to the Planning Board at least by the second regular meeting following the public hearing.

## 19.8   Planning Board Action on the Amendment Application

The Planning Board shall consider the amendment upon receipt of the Planning Department recommendation beginning no later than the second regular meeting following the public hearing. The Planning Board shall provide a written recommendation to the Board of Commissioners that addresses consistency with the adopted comprehensive plan and other matters as deemed appropriate. A recommendation by the Planning Board that a proposed amendment is inconsistent with the comprehensive plan shall not preclude consideration of approval of the proposed amendment by the governing board.

The Planning Board has a maximum of three regularly scheduled meetings to consider the request, following receipt of the Planning Department recommendation. Failure of the Planning Board to make a recommendation to the Board of Commissioners following the Planning Board's third regular meeting shall be considered a favorable recommendation without conditions.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 337 of 743

A Planning Board member shall not vote on recommendations regarding any zoning map or text amendment where the outcome of the matter being considered is likely to have a direct, substantial, identifiable financial impact on the member. See the Planning Board Code of Ethics for more detail.

## 19.9    Board of Commissioners Receives Recommendation of Planning Board

The Board of Commissioners shall not consider the adoption of the proposed amendment until after the Planning Board makes a recommendation, or fails to make a recommendation within the time allowed. A member of the Board of Commissioners shall not vote on any zoning map or text amendment where the outcome of the matter being considered is reasonably likely to have a direct, substantial, identifiable financial impact on the member. Prior to adopting or rejecting any zoning amendment, the Board of Commissioners shall adopt a statement describing whether its action is consistent with an adopted comprehensive plan, is reasonable, and in the public interest. The requirement for a plan consistency statement may also be met by a clear indication in the minutes of the board that at the time of action on the amendment the board was aware of and considered the planning board's recommendations and any relevant portions of the comprehensive plan. Should the Board of Commissioners adopt a zoning amendment after finding that such an action is not consistent with an adopted comprehensive plan the zoning amendment shall have the effect of also amending any future land use map in the comprehensive plan, and no additional request or application for a plan amendment shall be required. A plan amendment and a zoning amendment may be considered concurrently. When adopting or rejecting any petition for a zoning text or map amendment, a brief statement explaining the reasonableness of the proposed rezoning shall be approved by the board. The statement of reasonableness may consider, among other factors: (i) the size, physical conditions, and other attributes of any areas proposed to be rezoned; (ii) the benefits and detriments to the landowners, the neighbors, and the surrounding community; (iii) the relationship between the current actual and permissible development and the development under the proposed amendment; (iv) why the action taken is in the public interest; and (v) any changed conditions warranting the amendment.

## 19.10        Withdrawal of Application

An applicant may withdraw his application at any time by written notice to the Planning Department. However, any withdrawal of an application after the giving of the first notice as required in Subsections 5.7(C) and 19.5 shall be considered, for the purposes of Subsection 19.10, a denial of the petition and any fees paid are non-refundable.

## 19.11        Effect of Denial on Subsequent Petitions

When the Board of Commissioners shall have denied a map application or the application shall have been withdrawn after the first notice of the public hearing thereon, the Board of Commissioners shall not entertain another application for the same or similar map amendment, affecting the same property or a portion of it until the expiration of a one year period, extending from the date of denial or withdrawal, as applicable. Provided, however, one additional application may be made before the expiration of the one year period for the same property or a portion of it if the second application is for a zoning district designated as a conditional district.

**19.12        Vested Rights and Permit Choice**

Requests to establish vested rights according to G.S. 160D-108 shall provide the information required for a conditional zoning or special use permit request and shall follow the amendment procedure specified in Section 5.7 of the Chatham County Zoning Ordinance.

A. **Permit Choice**

If a land development regulation is amended between the time a development permit application was submitted and a development permit decision is made or if a land development regulation is amended after a development permit decision has been challenged and found to be wrongfully denied or illegal, G.S. 143-755 applies.

**B. Vested Rights**

Amendments in land development regulations are not applicable or enforceable without the written consent of the owner with regard to any of the following:

> (1) Buildings or uses of buildings or land for which a development permit application has been submitted and subsequently issued in accordance with G.S. 143-755.
> (2) Subdivisions of land for which a development permit application authorizing the subdivision has been submitted and subsequently issued in accordance with G.S. 143-755.
> (3) A site-specific vesting plan pursuant to G.S. 160D-108.1.
> (4) A multi-phased development pursuant to subsection (f) of this section.
> (5) A vested right established by the terms of a development agreement pursuant to 160D-403.

The establishment of a vested right under any subdivision of this subsection does not preclude vesting under one or more other subdivisions of this subsection or vesting by application of common law principles. A vested right, once established as provided for in this section or by common law, precludes any action by a local government that would change, alter, impair, prevent, diminish, or otherwise delay the development or use of the property allowed by the applicable land development regulation or regulations, except where a change in State or federal law mandating local government enforcement occurs after the development application is submitted that has a fundamental and retroactive effect on the development or use.

**C. Duration of Vesting**.

Upon issuance of a development permit, the statutory vesting granted by subsection (B) of this section for a development project is effective upon filing of the application in accordance with G.S. 143-755, for so long as the permit remains valid pursuant to law. Unless otherwise specified by this section or other statute, local development permits expire one year after issuance unless work authorized by the permit has substantially commenced. A local land development regulation may provide for a longer permit expiration period. For the purposes of this section, a permit is issued either in the ordinary course of business of the applicable governmental agency or by the applicable governmental agency as a court directive. Except where a longer vesting period is provided by statute or land development regulation, the statutory vesting granted by this section, once established, expires for an uncompleted development project if development work is intentionally and voluntarily discontinued for a period of not less than 24 consecutive months, and the statutory vesting period granted by this section for a nonconforming use of property expires if the use is intentionally and voluntarily discontinued for a period of not less than 24 consecutive months. The 24-month discontinuance period is automatically tolled during the pendency of any board of adjustment proceeding or civil action in a State or federal trial or appellate court regarding the validity of a development permit, the use of the property, or the existence of the statutory vesting period granted by this section. The 24-month discontinuance

period is also tolled during the pendency of any litigation involving the development project or property that is the subject of the vesting.

**D. Multiple Permits for Development Project**

Subject to subsection (C) of this section, where multiple local development permits are required to complete a development project, the development permit applicant may choose the version of each of the local land development regulations applicable to the project upon submittal of the application for the initial development permit. This provision is applicable only for those subsequent development permit applications filed within 18 months of the date following the approval of an initial permit. For purposes of the vesting protections of this subsection, an erosion and sedimentation control permit or a sign permit is not an initial development permit.

**E. Multi-Phased Development**

A multi-phased development is vested for the entire development with the land development regulations then in place at the time a site plan approval is granted for the initial phase of the multi-phased development. A right which has been vested as provided for in this subsection remains vested for a period of seven years from the time a site plan approval is granted for the initial phase of the multi-phased development

**F. Continuing Review**

 Following issuance of a development permit, a local government may make subsequent inspections and reviews to ensure compliance with applicable land development regulations in effect at the time of the original application.

**G. Process to Claim Vested Right**

A person claiming a statutory or common law vested right may submit information to substantiate that claim to the zoning administrator or other officer designated by a land development regulation, who shall make an initial determination as to the existence of the vested right. The decision of the zoning administrator or officer may be appealed under G.S. 160D-405. On appeal, the existence of a vested right shall be reviewed de novo. In lieu of seeking such a determination or pursuing an appeal under G.S. 160D-405, a person claiming a vested right may bring an original civil action as provided by G.S. 160D-1403.1.

**H. Miscellaneous Provisions**

The vested rights granted by this section run with the land except for the use of land for outdoor advertising governed by G.S. 136-131.1 and G.S. 136-131.2 in which case the rights granted by this section run with the owner of a permit issued by the North Carolina Department of Transportation. Nothing in this section precludes judicial determination, based on common law principles or other statutory provisions, that a vested right exists in a particular case or that a compensable taking has occurred. Except as expressly provided in 160D-108, nothing in this section shall be construed to alter the existing common law.


**19.13   Vested Rights and Site Specific Vesting Plans**

**A. Site-Specific Vesting Plan** –

Consists of a plan submitted to a local government in which the applicant requests vesting pursuant to this section, describing with reasonable certainty on the plan the type and intensity of use for a specific parcel or parcels of property. The plan may be in the form of, but not be limited to, any of the following plans or approvals: a planned unit development plan, a subdivision plat, a preliminary or general development plan, a special use permit, a conditional district zoning plan, or any other land-use approval designation as may be utilized by a local government. Unless otherwise expressly provided by the local government, the plan shall include the approximate boundaries of the site; significant topographical and other natural features affecting

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 340 of 743

development of the site; the approximate location on the site of the proposed buildings, structures, and other improvements; the approximate dimensions, including height, of the proposed buildings and other structures; and the approximate location of all existing and proposed infrastructure on the site, including water, sewer, roads, and pedestrian walkways. What constitutes a site-specific vesting plan under this section that would trigger a vested right shall be finally determined by the local government pursuant to a development regulation, and the document that triggers the vesting shall be so identified at the time of its approval. A variance does not constitute a site-specific vesting plan, and approval of a site-specific vesting plan with the condition that a variance be obtained does not confer a vested right unless and until the necessary variance is obtained. If a sketch plan or other document fails to describe with reasonable certainty the type and intensity of use for a specified parcel or parcels of property, it may not constitute a site-specific vesting plan.

**B. Establishment of Vested Right** –
A vested right is established with respect to any property upon the valid approval, or conditional approval, of a site-specific vesting plan as provided in this section. Such a vested right confers upon the landowner the right to undertake and complete the development and use of the property under the terms and conditions of the site-specific vesting plan, including any amendments thereto.

**C. Approval and Amendment of Plans** –
If a site-specific vesting plan is based on an approval required by a local development regulation, the local government shall provide whatever notice and hearing is required for that underlying approval. A duration of the underlying approval that is less than two years does not affect the duration of the site-specific vesting plan established under this section. If the site-specific vesting plan is not based on such an approval, a legislative hearing with notice as required by G.S. 160D-602 shall be held. A local government may approve a site-specific vesting plan upon any terms and conditions that may reasonably be necessary to protect the public health, safety, and welfare. Conditional approval results in a vested right, although failure to abide by the terms and conditions of the approval will result in a forfeiture of vested rights. A local government shall not require a landowner to waive the landowner's vested rights as a condition of developmental approval. A site-specific vesting plan is deemed approved upon the effective date of the local government's decision approving the plan or another date determined by the governing board upon approval. An approved site-specific vesting plan and its conditions may be amended with the approval of the owner and the local government as follows: any substantial modification must be reviewed and approved in the same manner as the original approval; minor modifications may be approved by staff, if such are defined and authorized by local regulation.

**D. Continuing Review** –
Following approval or conditional approval of a site-specific vesting plan, a local government may make subsequent reviews and require subsequent approvals by the local government to ensure compliance with the terms and conditions of the original approval, provided that these reviews and approvals are not inconsistent with the original approval. The local government may, pursuant to G.S. 160D-403(f), revoke the original approval for failure to comply with applicable terms and conditions of the original approval or the applicable local development regulations.

**E. Duration and Termination of Vested Right** –
(1) A vested right for a site-specific vesting plan remains vested for a period of two years. This vesting shall not be extended by any amendments or modifications to a site-specific vesting plan unless expressly provided by the local government.

(2) Notwithstanding the provisions of subdivision (1) of this subsection, a local government may provide for rights to be vested for a period exceeding two years but not exceeding five years where warranted in light of all relevant circumstances, including, but not limited to, the size and phasing of development, the level of investment, the need for the development, economic cycles, and market conditions or other considerations. These determinations are in the sound discretion of the local government and shall be made following the process specified for the particular form of a site-specific vesting plan involved in accordance with subsection (a) of this section.

(3) Upon issuance of a building permit, the provisions of G.S. 160D-1111 and G.S. 160D-1115 apply, except that a permit does not expire and shall not be revoked because of the running of time while a vested right under this section is outstanding.

(4) A right vested as provided in this section terminates at the end of the applicable vesting period with respect to buildings and uses for which no valid building permit applications have been filed.

**F. Subsequent Changes Prohibited; Exceptions–**

(1) A vested right, once established as provided for in this section, precludes any zoning action by a local government which would change, alter, impair, prevent, diminish, or otherwise delay the development or use of the property as set forth in an approved site-specific vesting plan, except under one or more of the following conditions:

    a. With the written consent of the affected landowner.

    b. Upon findings, by ordinance after notice and an evidentiary hearing, that natural or man-made hazards on or in the immediate vicinity of the property, if uncorrected, would pose a serious threat to the public health, safety, and welfare if the project were to proceed as contemplated in the site-specific vesting plan.

    c. To the extent that the affected landowner receives compensation for all costs, expenses, and other losses incurred by the landowner, including, but not limited to, all fees paid in consideration of financing, and all architectural, planning, marketing, legal, and other consulting fees incurred after approval by the local government, together with interest as provided under G.S. 160D-106. Compensation shall not include any diminution in the value of the property which is caused by the action.

    d. Upon findings, by ordinance after notice and an evidentiary hearing, that the landowner or the landowner's representative intentionally supplied inaccurate information or made material misrepresentations that made a difference in the approval by the local government of the site-specific vesting plan or the phased development plan.

    e. Upon the enactment or promulgation of a State or federal law or regulation that precludes development as contemplated in the site-specific vesting plan or the phased development plan, in which case the local government may modify the affected provisions, upon a finding that the change in State or federal law has a fundamental effect on the plan, by ordinance after notice and an evidentiary hearing.

(2) The establishment of a vested right under this section does not preclude the application of overlay zoning or other development regulations which impose additional requirements but do not affect the allowable type or intensity of use, or ordinances or regulations which are general in nature and are applicable to all property subject to development regulation by a local government, including, but not limited to, building, fire, plumbing, electrical, and mechanical codes. Otherwise applicable new regulations become effective with respect to property which is subject to a site-specific vesting plan upon the expiration or termination of the vesting rights period provided for in this section.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 342 of 743

(3) Notwithstanding any provision of this section, the establishment of a vested right does not preclude, change, or impair the authority of a local government to adopt and enforce development regulations governing nonconforming situations or uses.

**G. Miscellaneous Provisions** –

(1) A vested right obtained under this section is not a personal right, but attaches to and runs with the applicable property. After approval of a site-specific vesting plan, all successors to the original landowner are entitled to exercise these rights.

(2) Nothing in this section precludes judicial determination, based on common law principles or other statutory provisions, that a vested right exists in a particular case or that a compensable taking has occurred. Except as expressly provided in this section, nothing in this section shall be construed to alter the existing common law.

(3) In the event a local government fails to adopt a development regulation setting forth what constitutes a site-specific vesting plan triggering a vested right, a landowner may establish a vested right with respect to property upon the approval of a zoning permit, or otherwise may seek appropriate relief from the Superior Court Division of the General Court of Justice."

**SECTION 20**          <u>**ENFORCEMENT**</u>

### 20.1.  Zoning Administrator

This Ordinance shall be administered and enforced by the Zoning Administrator or designee.  If the Zoning Administrator or designee shall find that any of the provisions of this Ordinance are being violated, he/she shall notify in writing the person responsible for such violation, indicating the nature of the violation and ordering the action necessary to correct it. The notice of violation shall be delivered to the holder of the development approval and/or the current landowner of the property involved, if the landowner is not the holder of the development approval, by personal delivery, electronic delivery, or first-class mail and may be provided by similar means to the occupant of the property or the person undertaking the work or activity. The notice of violation may be posted on the property.  He/she shall order discontinuance of illegal use of land, buildings, or structures; removal of illegal buildings or structures or addition, alterations, or structural changes thereto; discontinuance of any illegal work being done; or shall take any other action authorized by this Ordinance to insure compliance with or to prevent violations of its provisions. Administrative staff may inspect work undertaken pursuant to a development approval to assure that the work is being done in accordance with applicable State and local laws and of the terms of the approval. In exercising this power, staff are authorized to enter any premises within the jurisdiction of the local government at all reasonable hours for the purposes of inspection or other enforcement action, upon presentation of proper credentials; provided, however, that the appropriate consent has been given for inspection of areas not open to the public or that an appropriate inspection warrant has been secured.

### 20.2.  Certificate of Zoning Compliance

No land shall be used or occupied and no building hereafter structurally altered, erected, or moved, shall be used, or its use changed until a certificate of zoning compliance shall have been issued by the Zoning Administrator or Zoning Official stating that the building and/or the proposed use thereof complies with the provisions of this Ordinance.  No building shall be occupied until that certificate is approved.  A record of all certificates shall be kept on file in the office of the Planning Department and copies shall be furnished upon request.

### A.  Application Procedures

Each application for certificate of zoning compliance shall be accompanied by a plan, one copy of which shall be returned to the owner upon approval.  The plan shall show the following:

1.  The shape and dimensions of the lot on which the proposed building or use is to be erected or conducted;

2.  The location of the said lot with respect to adjacent rights-of-way;

3.  The shape, dimensions, and location of all buildings, existing and proposed on the said lot;

4.  The nature of the proposed use of the building or land, including the extent and location of the use on the said lot;

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 344 of 743

5. The location and dimensions of off-street parking and the means of ingress and egress to such space; and

6. Any other information which the Zoning Administrator may deem necessary for consideration in enforcing the provisions of this Ordinance.

**B. Right of Appeal**

If the certificate of zoning compliance is denied, or not acted upon within 15 days of submittal, the applicant may appeal the action of the Zoning Administrator to the Board of Adjustment.

**20.3.  Duties of Zoning Administrator, Zoning Official, Board of Adjustment, and Courts as to Matters of Appeal**

It is the intention of this Ordinance that all questions arising in connection with the enforcement of this Ordinance shall be presented first to the Zoning Administrator or Official and that such questions shall be presented to the Board of Adjustment only on appeal from the Zoning Administrator or Official; and that from the decision of the Board of Adjustment recourse shall be to courts as provided by law.

## SECTION 21    <u>PENALTY FOR VIOLATIONS</u>

When staff determines work or activity has been undertaken in violation of a development regulation adopted pursuant to this Chapter or other local development regulation or any State law delegated to the local government for enforcement purposes in lieu of the State or in violation of the terms of a development approval, a written notice of violation may be issued.

Upon determination of a violation of any section of this Ordinance, the penalty for which is a civil penalty, Chatham County may cause a warning citation (aka Notice of Violation) to be issued to the violator setting out the nature of the violation, the section violated, the date of the violation, an order to immediately cease the violation, or if the violation is in the nature of an infraction for which an order or abatement would be appropriate in a civil proceeding, a reasonable period of time is stated in which the violation must be abated. The notice of violation shall be delivered to the holder of the development approval and to the landowner of the property involved, if the landowner is not the holder of the development approval, by personal delivery, electronic delivery, or first-class mail and may be provided by similar means to the occupant of the property or the person undertaking the work or activity. The notice of violation may be posted on the property.  The warning citation shall specify that a second citation shall incur a civil penalty, together with costs, and attorney fees if applicable.

The person providing the notice of violation shall certify to the local government that the notice was provided, and the certificate shall be deemed conclusive in the absence of fraud. Except as provided by G.S. 160D-1123 or G.S. 160D-1206 or otherwise provided by law, a notice of violation may be appealed to the Board of Adjustment within 30, an appeal may be made as described in Section 18.5 Appeal Procedures, pursuant to G.S. 160D-405.

Upon failure of the violator to obey the warning citation a civil citation may be issued by the Zoning Administrator or designee and either served directly on the violator, his duly designated agent, or registered agent if a corporation, either in person or posted in the United States mail service by first class mail addressed to the last known address of the violator as contained in the records of the County or obtained from the violator at the time of issuance of the warning citation.  The violator shall be deemed to have been served upon the mailing of said citation. The citation shall direct the violator to pay the citation to the Planning Department of Chatham County within 15 days of the date of the citation, or alternatively to pay the citation by mail.  The violation for which the citation is issued must have been corrected by the time the citation is paid otherwise further citations may be issued.  Citations may be issued for each day the offense continues until the prohibited activity is ceased or abated. Each day's continuing violation of any provision of this Ordinance shall be a separate and distinct offense. This means that on the 16th day of non-compliance, civil penalties will accrue on a daily basis as long as the violation continues.

The civil penalty, if not paid to the Planning Department within 15 days of the issuance of a citation, may be recovered by the County in a civil action in the nature of debt. Said civil penalties shall be assessed in the amount of $50.00 per day for the first violation. If the same violation occurs on the same property within six (6) years after the initial violation is remedied, a civil penalty in the amount of $100.00 per day shall automatically apply. If the same violation occurs on the same property within six (6) years after the second occurrence of the violation is remedied, a civil penalty in the amount of $200.00 per day shall automatically apply. If the same violation occurs on the same property within six (6) years after the third or any subsequent

Page 120

occurrence of the violation is remedied, a civil penalty in the amount of $500.00 per day shall automatically apply. Civil penalties will continue to accrue until compliance has been met on the property. The Zoning Administrator has the discretion to waive the escalation of the penalty if the violator is working to correct the violation in good faith and has made tangible progress during the grace period.

In addition to the penalties set out above, any provision of this Ordinance may be enforced by an appropriate equitable remedy issuing from a court of competent jurisdiction. In such case, the general court of justice shall have jurisdiction to issue such orders as may be appropriate, and it shall not be a defense to the application of the County for equitable relief that there is an adequate remedy at law.

In addition to the penalties set out above, any provision of this Ordinance that makes unlawful a condition existing upon or use made of real property may be enforced by injunction and order of abatement by general court of justice. When a violation of such a provision occurs, the County may apply to the appropriate division of the general court of justice for a mandatory or prohibitory injunction and order of abatement commanding the defendant to correct the unlawful condition upon or cease the unlawful use of the property. The action shall be governed in all respects by the laws and rules governing civil proceedings, including the Rules of Civil Procedure in general and Rule 65 in particular.

In addition to an injunction, the County may seek an order of abatement as a part of the judgment in the cause. An order of abatement may direct that buildings or other structures on the property be closed, demolished or removed; that fixtures, furniture or other movable property be removed from buildings on the property; that improvements or repairs be made; or that any other action be taken that is necessary to bring the property into compliance with this Ordinance. If the defendant fails or refuses to comply with an injunction or with an order of abatement within the time allowed by the court, he/she may be cited for contempt, and the County may execute the order of abatement. The County shall have a lien on the property for the cost of executing an order of abatement in the nature of a mechanic's and material man's lien. The defendant may secure cancellation of an order of abatement by paying all costs of the proceedings and posting a bond for compliance with the order. The bond shall be given with sureties approved by the Clerk of Superior Court in an amount approved by the judge before whom the matter is heard and shall be conditioned on the defendant's full compliance with the terms of the order of abatement within a time fixed by the judge. Cancellation of an order of abatement shall not suspend or cancel an injunction issued in conjunction therewith. The provisions of the Ordinance may be enforced by one, all or a combination of the remedies authorized and prescribed by this section.

Revocation of Development Approvals. - In addition to initiation of enforcement actions under G.S. 160D-404, development approvals may be revoked by the local government issuing the development approval by notifying the holder in writing stating the reason for the revocation. The local government shall follow the same development review and approval process required for issuance of the development approval, including any required notice or hearing, in the review and approval of any revocation of that approval. Development approvals shall be revoked for any substantial departure from the approved application, plans, or specifications; for refusal or failure to comply with the requirements of any applicable local development regulation or any State law delegated to the local government for enforcement purposes in lieu of the State; or for false statements or misrepresentations made in securing the approval. Any development approval

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 347 of 743

mistakenly issued in violation of an applicable State or local law may also be revoked. The revocation of a development approval by a staff member may be appealed pursuant to G.S. 160D-405. If an appeal is filed regarding a development regulation adopted by a local government pursuant to this Chapter, the provisions of G.S. 160D-405(e) regarding stays shall be applicable.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 348 of 743

**SECTION 22    EFFECTS UPON OUTSTANDING BUILDING PERMITS**

Nothing herein contained shall require any change in the plans, construction, size or designated use of any building, structure or part thereof for which a building permit has been granted   prior to the time of passage of this Ordinance and said permit remains valid. However if a building permit expires, any further construction or use shall be in conformity with the provisions of this Ordinance.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 349 of 743

**SECTION 23      EFFECTS UPON OUTSTANDING SPECIAL USE PERMITS**

Nothing herein contained shall require any change in the plans, size or designated use of any valid Special Use Permit which has been granted by the Board of Commissioners prior to the time of the adoption of this Ordinance.  It is the intent of this Ordinance that all outstanding valid Special Use Permit shall survive the same as if such permits, as issued and including any and all limitations and conditions, were each and every one fully described and set out herein.

**23.1      Cancellation by surrender of a Special use permit**

A.  Any Special Use Permit, which has been previously approved, may be offered for surrender by the property owner or his agent by submitting a written application to the Zoning Administrator.

B.  The Zoning Administrator will accept the offer of surrender and cancel the Special use permit if all of the following conditions are met:

 1.  There are no existing zoning violations on the Special use permit
 2.  The property is undeveloped or the existing use is permitted in the underlying zoning district
 3.  The underlying zoning district is a general use district listed in Section 4 of this Ordinance.

C.  Approval of the application will result in the special use permit being cancelled and the property becoming subject to the underlying zoning district.  Upon cancellation of the special use permit, any expansion of an existing use or any new development must conform to all requirements of the underlying zoning district.

D.  The Zoning Administrator shall submit a report to the Board of Commissioners upon the cancellation of a special use permit.

E.  Following the cancellation, the designation of the previously approved special use permit will be removed from the Zoning Map and the property will be shown to be in the appropriate underlying zoning district.

**23.2.      Termination of a Special Use Permit**

Any special use permit, which does not meet the conditions for cancellation established by Section 23.1, can be terminated by a reclassification of the property in accordance with the procedures set forth in Sections 5 and 19.  The granting of a zoning re-classification will terminate the previously approved special use permit.

**23.3      Violations of an Approved Special Use Permit**

Any violation of a term or condition of a special use permit shall be treated the same as a violation of this Ordinance and shall be subject to the same remedies and penalties as any such violation.

Case 1:25-cv-00113-UA-JLW      Document 1      Filed 02/14/25      Page 350 of 743

**SECTION 24**      <u>**REENACTMENT AND REPEAL OF EXISTING ZONING ORDINANCE**</u>

This Ordinance in part carries forward by reenactment some of the provisions of the existing Zoning Ordinance of Chatham County for Baldwin, Williams, New Hope and portion of Cape Fear (North of U.S. 1) Townships adopted April 13, 1973 as amended and it is not intended to repeal but rather to reenact and continue in force such existing provisions so that all rights and liabilities that have accrued are preserved and may be enforced.  All provisions of the Zoning Ordinance which are not reenacted herein are hereby repealed.  All suits at law or in equity and/or all prosecutions resulting from the violation of any Zoning Ordinance in effect, which are now pending in any of the courts of this State or of the United States, shall not be abated or abandoned by reason of the adoption of this Ordinance, but shall be prosecuted to their finality the same as if this Ordinance had not been adopted; and any and all violations of the existing Ordinance, prosecutions for which have not been instituted, may be filed and prosecuted; and nothing in this Ordinance shall be so construed as to abandon, abate, or dismiss any litigation or prosecution now pending and/or which may have instituted or prosecuted.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 351 of 743

**SECTION 25**     <u>**INTERPRETATION, PURPOSE AND CONFLICT**</u>

In interpreting and applying the provisions of this Ordinance they shall be held to be the minimum requirements for the promotion of the public safety, health, convenience, prosperity, and general welfare.  It is not intended by this Ordinance to interfere with or abrogate or annul any easements, covenants, or other agreements between parties; provided, however, that where this Ordinance imposes a greater restriction upon the use of buildings or premises or upon the height of buildings, or requires larger open spaces than are imposed or required by other ordinances, rules, regulations, or by easements, covenants, or agreements, the provisions of this Ordinance shall govern.

**SECTION 26      <u>VALIDITY</u>**

If any section, subsection, sentence, clause, or phrase of this Ordinance is for any reason held to be invalid, such decision shall not affect the validity of the remaining portions of this Ordinance. The Board of Commissioners hereby declares that it would have passed this Ordinance and each section, subsection, clause, and phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses or phrases be declared invalid.

Case 1:25-cv-00113-UA-JLW      Document 1      Filed 02/14/25      Page 353 of 743

**SECTION 27**   <u>**EFFECTIVE DATE**</u>

This Ordinance shall be in full force and effect from and after the 31st day of December, 1990.

_____   _____

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 354 of 743

**SECTION 28**   <u>**AMENDMENTS**</u>
Reserved

_____  _____

Case 1:25-cv-00113-UA-JLW   Document 1   Filed 02/14/25   Page 355 of 743

# EXHIBIT 5

# Herndon Farms

*An Active-Adult Compact Community*

## Introduction to the Development – Executive Summary

Herndon Farms is a uniquely conceived, multi-use, active-adult community on 97.86 acres located on Highway 15-501 between Chapel Hill and Pittsboro. The Development will provide residents the opportunity to comfortably age-in-community in a vibrant, amenity-rich environment. This active-adult community is designed to meet the specific needs of active seniors but also affords comfortable living for all laterin-life stages with maximum independence.

The project incorporates many of Chatham County's expressed goals of providing for the older segment of the population, as specified in Chatham County's adopted Comprehensive Plan (Plan Chatham) and reflected in the Chatham County Council on Aging Vision statement:

> *"Our vision is a Chatham County that offers older adults …, a safe, affordable, accessible, and inclusive community that promotes wellness, presents, and respects choices, values diversity, recognizes and uses people's strengths, and supports individuals aging in community with dignity."*

While already a growing demographic Triangle-wide, "Empty Nesters" ready to downsize have particularly targeted Chatham County for its proximity to quality healthcare and accessibility to cultural and recreational activities in the Chatham County area.

The look and feel of Herndon Farms will be designed to create a unique and livable community. It will combine mindful design, environmentally friendly components, and a small farming operation, features that will come together to positively impact the quality of life of all residents. The proposed farm honors the agrarian history of Chatham County and the current and former residents of the property. There will be community gardens dedicated to ornamental plants, flowering fragrant plants, and native North Carolina plants. A community dog park, a koi pond, and other water features that use reclaimed water are also planned as parts of the landscape. These

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 357 of 743

amenities will facilitate healthy engagement for the residents and visitors to the community and provide opportunities to connect with one another.


**General Application Requirements**

Conditional Zoning Application – **Exhibit A**

**Property Owners**

| Parcel(s) # | Property Owner Name |
|---|---|
| 93852 | Herndon Farms One LLC |
| 2752, 18750, 18897, 18896 | James Bunn Riggsbee |
| 18909 | M Travis & Margaret T Blake |

**Adjacent Owners**

| Parcel(s) # | Adjacent Owner Name |
|---|---|
| 2750 | Alfred and Norma Richardson |
| 70278 | Andrew and Brigitte Haight |
| 2722 | Aqua North Carolina Inc. |
| 87621 | Briar Chapel Community Associates |
| 2753 | Crown Estate Holding LLC |
| 66568, 67287 | Donna M. Bass Life Estate |
| 90768, 90770 | Eco Bc Building II, LLC |
| 90769 | Fadz Properties LLC |
| 18869 | Hoyt Collins |
| 63574 | James L and Elizabeth M Griffin |
| 2749 | Jason Thompson |
| 1593 | John and Marion Haywood |
| 79956 | Kath and Edmund Pettis Trustees of Kath A. Pettis Liv Trust |
| 18908 | Keith Allen and Ruth Williams |

| | |
|---|---|
| **2751** | Michael Bishop |
| **70746** | Mustafa Abdelkarim and Tahani Kheir Farah |
| **72944, 85632** | NNP Briar Chapel LLC |
| **63060** | Ramon and Cecilia Sotelo |
| **18637** | Sandy Pond Enterprises LLC |
| **70762** | Timothy Brian Perry and Elizabeth Henderson Perry |
| **2821, 2824, 2828** | William and Brenda Griffin |

## Property Information

### *Property Location and Description*

The proposed Herndon Farms project is located approximately 10 miles north of the center of Pittsboro and 7.5 miles south of the center Chapel Hill.

**Vicinity Map**



The project area is split by 15-501 and sits to the north of both Vickers Road and the Briar Chapel Parkway.  Approximately 56 acres of the project are located on the east side of 15-501 and north of Vickers Road, with about 42 aces located to the west of 15501 and north of the Briar Chapel Parkway. The site encompasses 5 parcels. There are 2 residences and associated buildings, both located on the east side parcels.

## Parcel Map
### Chatham County Tax Map



## Current Zoning, Use, and Prominent Features

All parcels making up the project site are currently zoned R-1.  Current uses are residential and tree farming.  The property does not contain any identified wildlife areas. A Duke Power easement runs east to west across the property, bisecting the east side and crossing the southern portion of the west side.   Existing Conditions are displayed in **Exhibit B.1**.

## Description of Use

Herndon Farms is a proposed active-adult community for individuals age 55 and over on 97.86 acres in northern Chatham County, North Carolina.  In keeping with the history of both the property and the county, the project includes a working farm as an integral part of the community design.  The farming operations are part of the overall goal to make the project reflective of the area in which it is located and serve as an amenity for residents.  Although the rural landscape is impacted by the housing component, this impact is minimized and the area enhanced by the buffer and internal landscaping, farm, planned gardens, and unique water features designed for this development.

**Planned Maximum Number**
  **Residential Units**

---

47 Single Family Homes NE Section
16 Duplex Homes (8 Bldg.) NE Section
34 Detached Rowhomes (also referred to as "high-density single-family homes") NE Section
45 Single Family Homes SE Section
<u>19 Townhomes SE Section</u>
**161 Residential Units**

**Commercial Buildings**

---

Congregant Care Facility 120-140 Unit Congregant Care Facility, planned as Independent Living, Anticipated Hours of Operation: 24 hours
Single Story Office/Daycare 10,000 Square Foot Daycare (Alternate Use - Fitness or Traditional Office), Anticipated Hours of Operation: 7am-6pm

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 361 of 743

**Site Plan Discussion**

   Exhibit B.2 is the proposed site plan for Herndon Farms.  Exhibit B.3 is the detailed site plan for the east side where all the major grading and building will take place.

   Most of the site is graded to a maximum of 5% grade.  Grading the site in this way encourages walkability and accessibility for the senior residents, which further encourages community.  A grade of 5% or lower is considered relatively flat and easily navigated by those with mobility issues or mobility impairments.

   In addition to accessibility, the general 5% grade will also slow the movement of stormwater allowing the pervious surfaces to better absorb the water. The slowing of runoff has multiple benefits such as groundwater recharging, high nutrient removal, and high suspended solids removal.

   However, because of this balanced grading plan, the grading activity will encroach on the perimeter buffers around the property.  The Developer will replant these buffers using native plants to make a natural transition to neighboring properties.  In addition, the Developer will use some of the current plants and trees on the site to replant the buffer area.  Several specimen quality American hollies maples and oak trees have already been identified and marked for this purpose.

   The Duke Power easement that splits the east side parcels into north and south sections is being utilized for a recreation field, pasture, pervious parking, and wastewater spray irrigation.  As the development is populated, there will be additional allowable uses of this open space such as specified in the Chatham County Compact Community Ordinance, the utility easement is not counted towards the project's open space.

   The focus of the project is its urban village center.  This area is comprised of the farm animals, barn, pastures, community event center and pavilion.  The community event area with the covered pavilion will include space for outdoor events such as a community farm stand or farmers' market.  There will be appropriate space for community-enriching events such as food truck rallies open to residents and visitors alike.

**Motivation for 5 Findings**

    The case for the Herndon Farms project has been organized according to the 5 findings required in the Conditional Use Permit.  While these points are in a slightly different order than in the outline provided on the application, the Developer has taken great care to cross reference each section to ensure that the information is comprehensive across both documents.  The Developer ordered the case for Herndon Farms as follows:

    **Finding #1** – Is the project eligible for the zoning requested.

    **Finding #2** – Is the project desirable for the public convenience or welfare. **Finding #3** – Will the project impair the integrity or character of the surrounding or adjoining areas, and will not be detrimental to the health, safety, welfare, or environment of the community.

    **Finding** #4 – Is the project consistent with the objectives of the Land Use Plan

    **Finding #5** – Are there adequate utilities, access roads, storm drainage, recreation, open space, and other necessary facilities planned to be consistent with the County's plans, policies, and regulations.


**Finding #1 – Eligibility**

    Chatham County has experienced substantial growth in the last thirty years, particularly along the 15-501 corridor.  This growth has led Chatham to consider how to retain its character as an agrarian community while welcoming new residents and businesses.  By concentrating growth along the 15-501 corridor, Chatham is better able to balance these two, sometimes competing, demands on the county.

    Chatham County has identified an area along the 15-501 corridor as desirable for Compact Community development, as highlighted below:

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 363 of 743



*Source: Plan Chatham

Section 5. D. of the Chatham County Zoning Ordinance specifies the Conditional Zoning District, Compact Community- CD-CC, referencing the Compact Communities Ordinance (CCO). The project site for Herndon Farms falls within the area identified as eligible for Compact Community designation.  In the figure below, the project site has been highlighted.



*Source: Plan Chatham

**Finding #2 – Project is desirable for the public convenience or welfare.**

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 364 of 743

**Need and Desirability.**

The Herndon Farms Project is planned to meet current and projected future senior housing demand in the region, as demonstrated in the Market Study for this project, found in **Exhibit C**.  As shown in the Market Study, census data for the NC Triangle Region overwhelming demonstrates a migration into the area from around the country, with the population of seniors in Chatham County growing approximately twice as fast as the general population in the area.  While existing developments will absorb some of the senior housing demand, they will fall well short of meeting total demand for the area.

The project capture rate, the amount of housing demand the project will be able to meet, is approximately 3.5% of potential housing demand within a 10-mile radius.  This is a conservative number as it bases both variables used to calculate housing demand - population growth and household formation - on a population-wide basis.  Rates for individuals over the age of 55 are higher on both dimensions.  For example, non-age segregated households tend to have 2.42 people per household while 55+ households tend to have 1.4 people per household.  Furthermore, the project capture rate drops to well under 1% when considering the entire NC Triangle Region.

It is a stated goal of Chatham County to concentrate development to preserve the rural character of the county and support existing farms.  The proposed project is in an area designated for this concentrated growth.  Furthermore, the combination of residential and commercial properties proposed on this site complements existing uses of adjacent properties with their own commercial and residential makeup.  The Developer of Herndon Farms has intentionally sought noncompeting commercial activities to help with commercial survivability in the area.

Herndon Farms, like surrounding developments, has a relatively compact, walkable form with open space and amenities open to the broader community.  The project site is planned to offer low-maintenance yards and smaller housing options, which Plan Chatham identifies as attractive to seniors.  Concentrating development in the manner done on the project site also allows for residents to access ample open space, receiving proven health benefits from access to the outdoors.  Also, by concentrating development on the east side, all but a de minimis amount of the west side is left as continuous open and natural space. All told, approximately half of the proposed development is devoted to open and natural space.

By creating a development for active adults, the proposed project further supports the daytime population, increasing demand for retail and restaurants in the county. The increase in daytime demand in tandem with the additional residential units, may also help attract national retailers, which has been identified as a barrier according to the Plan Chatham.

Additionally, the Chatham County Comprehensive Plan states that a key challenge for Chatham County is "Providing safe and affordable transit for an aging population." Locating a senior community along the 15-501 corridor will help make public transportation more economical, by providing a larger potential user base in a concentrated area along a well-developed corridor. The Developer spoke with Chatham County Transit to identify the preferred location for a transit stop. A letter of endorsement is included in **Exhibit E.2.**

## Survey of Similar Uses

Herndon Farms is the second development to submit a request for a conditional use district under the Compact Communities Ordinance; Briar Chapel was the first to use the Ordinance. Herndon Farms is a much smaller project but is able to accomplish the stated goals of the Ordinance; specifically, to allow for compact village-style development, at a size that is easily walkable and bikeable by residents and visitors of all ages. The Project also addresses several other points regarding environmental concerns and wastewater infrastructure, and overall represents the highest beneficial use for these parcels.

There are a variety of options for seniors in Chatham County, but there is a limited number of facilities within each category. Several of the existing options have been so successful, they have more demand than they are able to meet. For example, there has been at times a years-long wait list for Carolina Meadows, and the residential units in Encore by David Weekly sold exceedingly well. (That development is reportedly currently projected to be fully built-out in the next year, if not sooner.) Chatham continues to be a preferred destination for active adults and retirees.

Herndon Farms fills a niche different from existing communities. The project pairs an active-adult community where residents own their units, with a congregant care facility, designed to be independent living and operated independently from the residential units. Such a combination, which gives residents the option to gracefully age in place or age with as much autonomy as possible, is not offered by any projects in the NC Triangle. The majority of what is offered is structured as a continuing care

retirement community which often require expensive buy-ins. In addition, aside from Fearrington Village to a limited extent, no other community in the area offers residents access to community farming and extensive community gardens.

Active Adult Communities – Units owned by residents, HOA fees but no other membership fees:

- Fearrington Village (not officially age segregated but specifically marketed to and attracts a large concentration of retirees so included for completeness.)

- Encore by David Weekly Active Adult Apartment Rentals:

- Liberty Senior Living (project to be built) Congregant Care – Independent Living:

- Twin Rivers Independent Senior Living Congregant Care – Assisted Living:

- Chatham Ridge Assisted Living

- The Laurels of Chatham

Continuing Care Retirement Community:

- Carolina Meadows

- Galloway Ridge at Fearrington

## **Public Provided Improvement**

The Developer hired DPFG to conduct a Fiscal Impact Analysis on the Herndon Farms project. This report is found in **Exhibit D**. The conclusions on Public Provided Improvements are as follows:

*The fiscal analysis has not identified any public infrastructure needs other than utilities and transportation.*

Herndon Farms will be connected to public water sources existing along the 15-501 corridor. The Developer has confirmed with Chatham County that there is sufficient capacity to supply the proposed project, **Exhibit I.** Further information on this is provided below. No other public improvements will be required, and Herndon Farms will be paying Chatham County for this service.

**Tax considerations**

   Tax considerations were also addressed by the Fiscal Impact Analysis on the Herndon Farms project.  The conclusions on tax revenues are as follows:

   *At buildout, Herndon Farms is expected to increase the real property tax base of Chatham County by $78.2. million and generate annual real property tax revenues of approximately $538,000.  The project is also expected to generate annual real property tax revenues of $86,000 for the North Chatham Volunteer Fire Department.*

**Employment**

   It is estimated that at least 44 jobs will be created in the Herndon Farms project, potentially more depending on the Congregant Care operator.  All jobs created will be in the commercial uses, with a breakdown as follows:

Congregate Care (Independent Living)        15 employees

Jobs Include: Managers
                         Assistant Managers
                         Activities Directors
                         Chefs
                         Additional Service Providers

Daycare                                    29 Employees

Jobs Include: Director
                         Teachers
                         Assistants
                         Additional Service Providers

**Finding #3 – The Project will not impair the integrity or character of the surrounding or adjoining areas, and will not be detrimental to the health, safety, welfare, or environment of the community.**

**Traffic**

As shown in **Exhibit E**, the full traffic report provided by Kimley-Horn, minor improvements by the Developer will be required at the entries. No major improvements are required.

## Visual Impact & Screening

The Landscape Plan for the Herndon Farms project is shown in **Exhibit B.4**.  The plan shows all the buffers as required, accounting for a requested variance to 50' in some areas.  However, the effective buffer due to site design, is still 100' and more for most of the view shed buffer area along 15-501.  If any of the buffers are disturbed, they will be reestablished in a manner that as desirable or even more desirable and effective than they originally existed.  They will be replanted to achieve a natural, yet well maintained transition to neighboring properties.

Adjacent residential property owners were shown the planned buffer and grading plans at the Development Input meeting.  There were no objections to the plan at that meeting however, the Developer will again submit these plans to adjacent property owners to ensure they continue to have no objections to the planned activity adjacent to their properties.

The Landscape Plan specifically identifies the pastures and gardens throughout the project that are highly visible.  The Developer has already sourced numerous farm animals, namely goats, chickens, and ducks, for Herndon Farms.  Additional farm animals will be introduced as the project progresses.

As part of the wastewater treatment system, there are also several aesthetically pleasing water features throughout the project. They include a rock-exposed waterfall, meandering stream, aeration fountains in the stormwater ponds, and fountain at the main entry, as shown on the Landscape Plan in **Exhibit B.4.**

## Lighting

The Lighting Plan provided by Duke Power is provided in **Exhibit B.5**.  Below is the information provided by ECAC's Environmental Impact Assessment, also shown in **Exhibit F.**

*6.3. Lighting Levels*

   *Lighting will meet or exceed all of Chatham County's lighting requirements. In addition, although the proposed project contains an excess of 100,000 square feet of commercial space, the space will require little area lighting and there is no planned retail space that uses excessive lighting. The Developer is committed to providing a lighting plan and fixtures to make the proposed project safe but with as little impact as possible on offsite wildlife and neighboring properties.* **Exhibit B.5**– Duke Power Lighting Plan *shows the lighting which demonstrates the intent by the Developer with Duke Power to meet or exceed the Chatham County Lighting Ordinance that regulating offsite land and sky lighting impacts.*

## Noise

   Noise impact is discussed in Section 6.2 of the Environmental Impact Assessment, **Exhibit F**.

*6.2 Noise Level*

   *The only times of significantly elevated noise levels will be during the temporary period of horizontal construction to prepare the project site and vertical construction of the proposed buildings. Once construction is completed there is no noise-generating activity that would be detectable offsite that is not already in place namely farming and landscape maintenance of the current 40 acres.  The on-site wastewater treatment system produces only minimal noise created by the internal aeration motors and is located well beyond where this noise can be detected by surrounding development. EIA* **Exhibit F**, *page 26 AquaPoint "aeration blower packages" – AquaPoint Noise Controls.*

## Chemicals, Biological and Radioactive Agents

   There are no hazardous materials currently on the project site nor will there be any used or stored.  The Homeowners Association rules and regulations will prohibit the use of pesticides unless it is an acceptable chemical on a HOA Board approved list. The project's landscaping is planned towards low maintenance plants and features, reducing the need for chemical maintenance.

   Site and stormwater runoff are covered below.  In addition, the onsite wastewater system uses land disposal of the effluent.  This method is more efficient in treating household chemicals and medication disposals that normally make it to surface waters than most municipal treatment systems.

**Emergency Services - Fire Protection, Police Protection, Rescue 911**

   While this section is optional, the Developer has reached out to each department about service to Herndon Farms.  Given the location of the project site along the 15-501 corridor, proximity to Briar Chapel and other large developments, and the construction of a new substation for EMS response at Jack Bennett Road, it is anticipated that all three departments will have no issue responding to emergencies in the Herndon Farms community.  A letter of verification is included in **Exhibit G**.

**Signs**

   Sign locations are identified on the Landscaping Plan for the development, **Exhibit B.4**.  The signs are planned to be a cut-rock from some of the boulders that will be excavated from the site, with black backlite lettering of the community's name and identifying information.  It is the strong intention of the Developer to be aesthetically consistent with the surrounding community with any signage.  The size of these signs has not been determined but will meet the Chatham County Sign Ordinance requirements.
   An interior sign theme has not been decided.  The Developer will choose a theme that compliments the Project and meet all of Chatham's sign and lighting requirements.  There will be little interior signage as the Project is planned around urban and rural community activities rather than typical commercial.

**Impact to surrounding Land Values.**

   RM REIM LLC, an NC Real Estate Brokerage Company, provided the Developer with a Broker's Opinion on impact to surrounding land values.  The report included an analysis of comparable residential developments and leveraged data from commercial resources, to look at both the impact on residential and commercial properties surrounding the project site.  The analysis concluded there will be no negative impact on surrounding properties and that, in fact, Herndon Farms has the potential to increase property values of surrounding properties.  The full Broker's Opinion is included in **Exhibit H**.

**Finding #4 – Consistency with the Objectives in the Land Use Plan**

**Chatham County Comprehensive Plan Adherence and Implementation**

The following sections detail how the Herndon Farms project will implement the indicated goals of the Chatham County Comprehensive Plan. As requested in the application, these sections address each of the cited chapters and content on the application for CU-CC rezoning, in the Comprehensive Plan.

## Issues and Opportunities

The Herndon Farms project specifically addresses several points in the Chatham County Comprehensive Plan document in the Issues and Opportunities section. Specific pages of the Plan are noted in parathesis in this section.

Key points are as follows:

- **Employment and Income:**
  - As per the Fiscal Impact Analysis, **Exhibit D**., the project increases employment in the area by creating an estimated 44 jobs on site (page 15).

- **Retail Sales Leakage:**
  - The project increases both residential density and daytime population, which will help attract national retailers and increase demand for local retail, restaurants, and other service businesses (page 16).

- **Rural Character:**
  - The project reflects the rural character of Chatham County, by incorporating a community farm and extensive community gardens throughout the project site. Preserving the rural character was identified as the most important goal during the planning process (page 18). Additionally, the project site is situated along the 15-501 corridor, which has been identified as highly desirable for residential development as shown in the Plan Chatham Land Use Suitability Analysis (appendix to Plan Chatham). Concentrating development this way relieves pressure from increasing land values on the rural parts of the county.

- **Mix of housing styles and compact, walkable form:**
  - The project concentrates the site development to approximately a little more than half of the overall project site. The site will be graded to a 5% grade and sidewalks installed, facilitating resident access to the entire community. Four single family

housing styles will be offered, creating options for residents (page 23).

- **Preferences of Seniors:**
  - o Herndon Farms will be designed with an eye for low to no maintenance. While individual yards will be relatively small and maintained by the HOA, the community will provide residents with at least two community gardens and a community farm to participate in as they like (page 25).

- **Support for Agriculture:**
  - o The proposed Herndon Farms project is designed around a working community farm. It is anticipated that production from the farm will be enjoyed by the residents and the commercial users in the development. A community farm stand will be encouraged (page 26). While this will be a small community operation, the reflection of the county and education opportunities will further community support for agriculture throughout the county.

- **Providing safe and affordable transit for an aging population:**
  - o Locating an active-adult community with a commercial component along the 15-501 corridor increases the potential user base for future bus transportation, making such an offering more financially viable. The Developer has spoken with Chatham County Transit and received their input and support of the planned transit stop location and overall plan.

- **Access to Open Space can improve health outcomes:**
  - o The open space types incorporated throughout the development will encourage residents and the community to participate in outside activities and create social connectivity (pages 36 & 37).

## Goals and Objectives

**Goals:**

1) **Preserve the rural character and lifestyle of Chatham County.**

   - As stated, the Herndon Farms project is oriented around a community farm, several community gardens, and a koi pond. By orienting the

project around these amenities, Herndon Farms can reflect the rural character of Chatham County.

- The community farm is also anticipated to produce food and materials, namely eggs, honey, and goat-milk, to be used by residents.

2) **Preserve, protect, and enable agriculture and forestry.**

- By concentrating residential and commercial development, Herndon Farms allows for larger scale farming operations to remain unaffected by development and increased tax values.

3) **Promote a compact growth pattern by developing in and near existing towns and communities and in designated, well planned, walkable, mixed-use centers.**

- The project is located within the rapidly developing 15-501 corridor, earmarked by Plan Chatham as a desirable location for future density. The project is directly across from the existing Briar Chapel commercial development and directly north of the proposed Vickers Bennett project. Additionally, Herndon Farms is directly adjacent to two existing commercial uses, a veterinary clinic, and a selfstorage/RV-storage business, both complementary uses to an activeadult community.

- The project will itself be interconnected by streets and sidewalks. Most of the site will be graded to an approximately a 5% grade, facilitating accessibility by the residents.

4) **Diversify the tax base and generate more quality, in-county jobs to reduce dependence on residential property taxes, create economic opportunity, and reduce out-commuting.**

- Herndon Farms is expected to generate at least 44 new jobs. The project will also diversify the tax base by drawing tax revenue from over 150,000 square feet of commercial use.

- It is anticipated that residents of the project will likely contribute to small business creation, as many retirees either continue to consult in their respective fields of expertise or pick up "twilight careers," often in the arts.

5) **Conserve natural resources**

- The wastewater system for the project will generate a <u>Type 2</u> effluent, clean enough to be used for irrigation of some food crops and in water features. This is cleaner than the effluent produced by most of the

county's wastewater systems and can be cleaner than some of the runoff and discharge that runs into Jordan Lake.

- By concentrating development on one side of the total property area, the Developer has left close to 40 acres of the site as open space, largely undisturbed, though the Developer will work to connect trails created in this space to the other adjacent developments. The Developers of the proposed Vickers-Bennett project have already agreed to this connectivity.

- The Developer is working with a local concrete company to retrofit equipment to create "Carbon Sequestered" concrete, reducing the carbon footprint of the construction of the project and Chatham County in general.

6) **Provide recreational opportunities and access to open space.**

- The community farm, community event center with pavilion, community gardens, dog park, koi pond and trails will be open to individuals beyond the residents of the project.
    - o Daycare clients will benefit from access to recreation on the farm before and after pickup. Surrounding residents will be welcome to enjoy the farming atmosphere and community farm stand, as well as potential farmers' markets and community events.
    - o Trails will be provided to facilitate access to farming and gardening activities.

- The project's design will welcome and encourage non-residents to visit, particularly families of the residents. Creating an environment that people of all ages like to visit is a core motivation of the Herndon Farms project.

7) **Provide infrastructure to support desired development and meet economic and environmental objectives.**

- By concentrating residential and commercial development along the 15-501 corridor, the project bolsters potential public transit ridership, making a 15-501 North-South route more desirable.

- Additionally, the high-density of residents will help with local retail survivability.

- The compactness of the development, with the comparably low impervious and large open space creates environmental efficiency.
    - o Stormwater is easier to mitigate.

      o   Natural areas are left to evolve.

- By meeting the criteria of EPA's WaterSense program the project will achieve a more than 50% reduction of water and wastewater design loads.

✦ Concentration of developments in this corridor increases the likelihood of new technologies extending services to the area. While the Developer is unable to forecast which new technologies may be on the horizon, previous experience through the gradual installation of broadband and high-speed internet, indicate that concentrating development along a major corridor encourages installation of new technologies and access by the community.

8) **Become more resilient by mitigating, responding, and adapting to emerging threats.**

- As mentioned, the Developer is working with a local concreate company to create "carbon sequestered" concrete.

- Additional environmental initiatives include:

  o Solar power at the wastewater treatment plant and potentially over some parking areas.

  o Reduction in vehicle miles through concentration of development and connectivity.

  o Farm-to-table initiatives through use of community farm-grown foods and animal products

  o Educational opportunities to residents and the broader community through involvement in the community farm.

9) **Provide equitable access to high-quality education, housing, and community options for all.**

- The Herndon Farms project will incorporate a variety of housing sizes and styles to open opportunities to a broad set of active adults.

- The community mix between residential units and commercial uses has been thoughtfully put together to allow for age-in-place living for a variety of budgets. The community does not require a "buyin" which often excludes access by many seniors.

- By concentrating active adults, the community will support incremental in-home care, making such care commercially viable by providers and cost-effective for residents.

10) **Foster a healthy community**

- The Herndon Farms project is founded around two philosophies:

  o Individuals benefit from an increased quality of life by having access to community and an outdoor lifestyle facilitated by the farming and gardening components.

  o Individuals benefit from increased quality of life by having autonomy and control over their lives by aging-in-place and by participating in a community where they can leverage limited support yet retain independence.

- The commercial and residential mix, as well as the overall site design influenced by these two philosophies, creates a unique development that not only benefits residents and participants but Chatham County as a whole. o One key element in creating a community integrated in the surrounding County is including a daycare in the development. Research has demonstrated the benefits to seniors to see and be nearby younger people. In addition, the inclusion of a daycare can provide volunteer opportunities to seniors in the community, draw families into the community during the day, particularly those who may have grandparents living in Herndon Farms, and over all contribute to an environment where all ages may thrive.

## Economic Development

Additional opportunities, as seen by the Developer, that are a benefit to the Economic Development of Chatham County.

As mentioned, by increasing the daytime population of the County, the Developer anticipates a positive impact on commercial centers surrounding the Herndon Farms project. Specifically, there will be an increase in daytime demand, which is essential for the success of the many existing restaurants and service-based businesses in the County (ED policy 4). Additionally, by increasing the County's daytime senior population, the project will potentially highlight the discretionary income of many of Chatham's seniors, which in turn will support Chatham County's business-attraction efforts.

As part of Chatham's efforts to support small businesses and cottage industries, Plan Chatham highlights support of home-based businesses (Recommendation 01, Strategy 1.1). Plan Chatham also highlights the County's goal of supporting entrepreneurship and arts (Recommendation 03), areas that often go together with one another. As previously mentioned, it is not uncommon for seniors to pick up "twilight careers," such as in the arts, or to consult in fields they are expert in, long after they retire. Bringing new senior residents into the County is anticipated to have an economic boost from small-business creation, as newly-arrived seniors pursue these endeavors.

Also related to Recommendation 03, a key component of Herndon Farms is the desire to make it inviting to the community at large. While the farms, gardens, and dog park all serve as an amenity for residents, by design these features are open to the community to visit and enjoy as well. It is the goal of the Developer to create a vibrant destination that families enjoy visiting. This encourages connectivity of residents with their families and the communities surrounding the project. Given how Herndon Farms reflects the culture of Chatham County and is open to the public, a desire of the Developer is that Herndon Farms will encourage local tourism and cultural opportunities, through sponsoring events and making resources within the project available to the public.

Perhaps one of the biggest contributions Herndon Farms will make to the County, however, is recognized in recommendation 03, Strategy 6.4 (page 58) – "Recognize and take greater advantage of Chatham County's experienced, welleducated senior population in economic development activities." It is likely the residents of the project will contribute to this strategy in the following ways:

- The Herndon Farms project lies 1 mile north of a new campus for the Chatham County Community College. This location will allow for retirees in the project to easily access programming at the community college, which may include student mentoring and teaching.

- By bringing additional active adults to Chatham County, Herndon Farms increases the pool of individuals who may participate in additional economic development programs such as SCORE (Service Corps of Retired Executives).

In support of Recommendation 04, Provide equitable access to high-quality education and workforce training, it is the vision and the desire of the Developer for both the residents and the amenities to be tightly connected to the Chatham County

Community College. The potential benefits of a deep relationship between the project and the community college population are numerous. Whether through mentorship programs, job training, particularly in the field of healthcare, agriculture, and environmental education training through access to the farm and gardens, or participation in continuing education and academic seminars from the future Herndon Farms residents. Proximity to the Chatham County Community College campus in Briar Chapel has the potential to beneficially impact the economic development of the County and its residents.

## Land Use Policies

The Herndon Farms project is a well-designed Compact Community. As specified in both **Land Use Policy 3** and **Land Use Policy 5,** Herndon Farms will support a mix of commercial and residential uses, within a site that is both walkable and reflective of the rural character of Chatham County.

The focus of the community's village center will be the Community Event Center with a covered pavilion, barn, small farm stand, and space suitable for events, which will encourage residents and the public to visit Herndon Farms. Additional uses of this area include a seasonal farmers' market, market for crafts and foods produced by the community farm (eggs, products made from goat milk, etc.), live music events, and other small-scale festivals.

Additionally, the project site is ideally located along the 15-501 corridor, encouraging, and supporting **Land Use Policy 4**, supporting future transit through land use decisions. By concentrating development on a main corridor, the development contributes potential demand/ridership for public transportation projects.

The Developer has worked with the NCDOT to fulfill **Land Use Policy 6**, specifically strategy 6.4, to manage access to the site. The site has two access points along 15-501N and one additional access via Vickers Road.

As stated, the proposed development is designed around a community farm with other outdoor opportunities through community gardens, trails, and a koi pond, thus fulfilling **Recommendation 03**, Bringing open space in its many forms to the forefront, making it a key/integral component of the development pattern. Not only is this good design, but the Developer believes access to the outdoors is vital to the quality of life of future Herndon Farms residents.

**Specific Land Use Description for the proposed Herndon Farms project is as follows:**

Land Use Description: Community Center (p47)/Compact Community (p66)

- Commercial use of at least 150,000 square feet as a Daycare and Congregate Care facility. The Congregant Care facility, specifically an Independent Living facility, will be encouraged to include a coffee shop or stand, and open amenities such as dining and services to the residents in the Herndon Farms residential units.

- Residential concentration of 161 units. Residential unit diversity includes:

  o One and two level, single family homes o Two and three level (inclusive of a basement garage), high-density single-family homes ("Rowhomes")

  o One and two level, duplex homes o Two level town homes

- Herndon Farms will be anchored by a community farm and community event center, open to public enjoyment. The focus of the community event center will be a pavilion, barn, and farm stand as well as seating options encouraging residents and community members to congregate and enjoy community. As stated, there are multiple community-oriented options for use of this space and the Developer anticipates it will be central to the fabric of the project.

- The project will also feature a koi pond and at least two community gardens. These features are also integral in stormwater and wastewater management.

- The project site is directly across from the existing Briar Chapel commercial area and adjacent to the proposed Vickers-Bennett project. The project site is also immediately adjacent to existing commercial properties, currently operating as a veterinary clinic and a U-Haul Self-Storage facility with RV storage.

<u>**Natural Resources**</u>

A discussion of the impact of the development of the project site is found in the Environmental Impact Assessment, **Exhibit F., F.1** and **F.2.** In addition, the Developer provides the following information, which identifies some of the initiatives planned for Herndon Farms as it progresses, either by design or planned HOA statements. This

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 380 of 743

information addresses a few the points raised in the Chatham County Comprehensive Plan in the section on Natural Resources and the section on Resiliency.

- Encourage birds in the community by growing plants that provide food for foraging.

- Educational programs for suburban-habitats creation and maintenance will be offered.

- Final lighting plan leaves areas darkened next to natural areas for transient animals and to increase bat populations.

- Use native plants in the permanent landscaping wherever possible and transplant trees and plants already on site to new locations after grading.

- Establish artificial wetlands and augmenting existing wetlands using the Type 2 wastewater generated by the treatment facility.

- Use the Type 2 effluent for irrigation and other water features.

- Wastewater treatment facility will have solar panels to help offset operation cost.

**Parks and Recreation**

The Herndon Farms project includes several features encouraged by Plan Chatham's recommendations on Parks and Recreation. The community gardens, farm, dog park, and koi pond will all be open to the public, addressing several points in PR Policy 4. Parking facilities will exist specifically for most of these amenities and will be designed with a mind toward accessibility, like the rest of the project (Strategy 1.2 and 1.4). It is the hope of the Developer that a strong connection is fostered between the Chatham County Community College and the Herndon Farms community, encouraging research and education in ecology and environmental programing (Strategy 1.5 and 1.6).

As previously mentioned, the project site spans 15-501 leaving the west side of the project site largely undisturbed (Strategy 2.3). However, this area is adjacent to the Briar Chapel trail system, which currently connects to the property. It is the intention of the Developer to create additional single tract trails in this area as an interconnecting trail system and to expand this valuable natural resource (PR Policy 3). *(It should be noted, expansion of the Briar Chapel trail system will require explicit approval of the Briar Chapel HOA and will not occur should the proposal be turned down. The Developer may reach out to the Parks and Recreation department for assistance per Strategy 3.3.)*

Case 1:25-cv-00113-UA-JLW   Document 1   Filed 02/14/25   Page 381 of 743

The community farm and related structures; pastures, barn, farm stand, covered areas, and any additional seating, is the Village Center for Herndon Farms. The creative use of the easement for the farm, and additional parking for accessibility, allows some of the designated open space to be available for events open to the public (Strategy 4.3) though, as mentioned, this is not the only area of open space within the project.

Finally, the Herndon Farms community is designed with maximum walkability, enabling connectivity to future development adjacent to the property. Such connectivity will further encourage the broader community to visit the amenities at Herndon Farms, benefitting both the residents of Herndon Farms and of Chatham County.

**Finding #5 – Adequate utilities, access roads, storm drainage, recreation, open space, and other necessary facilities have been or are being provided consistent with the County's plans, policies, and regulations.**

## Water Source and Requirements

Herndon Farms will have a buildout water design requirement of approximately 44,820 GPD (after 50% calculated reduction) and the project will tap onto the Chatham County water supply system. The availability of water for the development is verified by a letter from the Chatham County Utility Department, **Exhibit I**.

## Wastewater Management

Hendon Farms has a design load of approximately 90,000 gallons per day (GPD). The Developer's application to NC Department of Water Quality (DWQ) requests a 50% reduction for the installation of water saving devices in all the homes and businesses, making the actual expected water use and wastewater needs to be about 45,000 GPD. The goals and guidelines of EPA's WaterSense program will be required for all buildings.

The Wastewater Request being submitted by Herndon Farms to NCDWQ for permitting is for a non-discharge permit needed for the onsite treatment system; see **Exhibit J**. for the preliminary calculations for this permit. The AquaPoint system uses

an aerobic treatment technology, which is much more efficient than typical anaerobic treatment and has low odor and noise production. The treatment facility located on the west side parcels will produce a Type 2 effluent that is cleaner and has more usages than Type 1. The attached citation, **Exhibit J.5** "15A NCAC 02U .0301 RECLAIMED WATER EFFLUENT STANDARDS" from the NC Division of Water Quality specifies the difference between the two effluents.

Irrigation water needs for farming will be provided by the onsite wastewater treatment system, which will be producing Type 2 effluent suitable for some crops, landscape irrigation, and onsite water features. Water for the farm operations will be augmented by an onsite well and not use water from the Chatham County water supply. The excess onsite treatment capacity for wastewater is currently projected to be 20,000 GPD. The excess capacity will not be used offsite, but the land application plan for the approximately 45,000 GPD will rotate through the areas to promote a healthier landscape.

## Water/Sewer Impact Statement

Water and Sewer Impacts are detailed in the EIA Exhibit **F**. In addition, Herndon Farms will be treating its own wastewater onsite and there is no impact to a Public Utility for this use. Chatham County Utilities has agreed to supply the potable water of approximately 45,000 GPD and did not relay that there was any negative impact to Chatham potable water supply system,

## Access Roads

As previously discussed, Herndon Farms will have three access points as shown on the site plans. The southern access point will lead directly to the commercial buildings and will have approximately 100' of storage along 15-501N. The northern access point will lead to residential lots and will provide a right-in-right-out access. One additional access point will be to Vickers Road, providing access to a signaled intersection on 15501 by the community. The layout, upgrades, and flow details are further detailed in the Traffic Impact Analysis in **Exhibit E** from Kimley-Horn and **E.1.1** is the DOT access point analysis for the development's access points.

**Stormwater Runoff**

The clearing and grading for the proposed project will result in soil disturbance on the east side and a small area on the west side for the wastewater facility. The balanced-site grading process will move earth and rocks from the higher elevations to the lower elevations and, when completed, stored topsoil will be placed back on areas to be landscaped. In addition, a mix of suitable soils, organic matter, and off-site material will be applied to areas for gardening, animal pastures, and landscaping. During clearing and grading, some soils will be eroded, but the impacts from this will be minimized by following an approved stormwater plan that conforms to the requirements of the North Carolina Sedimentation Pollution Control Act of 1973. No contamination of soils is expected from the development of the proposed project.

Drawings shown in **Exhibit B.6.1, B.6.2** and **B.6.3** show the location of the planned stormwater retention ponds and other preliminary components. Additional details required will be submitted for the required Land Disturbance Permit from Chatham County before the final plat is approved.

In order to meet the watershed protection ordinance and the Nutrient Sensitive Waters (NSW) requirement for the Herndon Farms project, the site will provide stormwater management facilities that meet the requirements of the high-density option from the NPDES Phase II stormwater regulations. The main criteria that will be addressed are as follows:

1.      The measures shall control and treat the difference in stormwater runoff volume leaving the project site between the pre- and post-development conditions for the 1-year / 24-hour storm. Runoff drawdown time shall be between 2 to 5 days.

2.      All structural stormwater treatment devices will be designed to provide a minimum of 85% average annual removal for Total Suspended Solids from stormwater runoff generated from proposed impervious surfaces.

<u>**Conclusion**</u>

The Developer of Herndon Farms offer these submission documents for approval by Chatham County for rezoning from Residential 1 to a Compact Community.

The Herndon Farms Development will:

- Create a unique and vibrant community that will meet the growing demand for Senior housing in Chatham County.
- Meets or exceeds all requirements for the "Five Findings" required for rezoning.
- Make the highest and best use of the property by using the Compact Communities Ordinance's more dense housing allowances mixed with commercial space to create a viable and sustainable community.
- Support the goals expressed in the Chatham County Comprehensive Plan.

The Developer believes that Herndon Farms best represent the rural core values of Chatham County, of which many people are drawn, while allowing for mindful expansion and welcoming new residents to the Chatham community.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 385 of 743

# EXHIBIT 6

# Compact Communities Adherence Validation for

# Herndon Farms

*An Active-Adult Compact Community*

**Below is a section-by-section narrative of the Developer's acknowledgement and requirements for adherence to the Compact Communities Ordinance.**

## SECTION 1.  ENACTMENT

This ordinance is enacted pursuant to the authority granted by the General Statutes of North Carolina in the following chapters:  Chapter 153A, Article 6 for the purpose of promoting the public health, safety, or welfare; Chapter 113A for the purpose of assessing environmental impacts; Chapter 143, Article 21 for the purpose of protecting water supply watersheds; Chapter 460, Title III of the 1987 Session Laws regarding mitigating financial impacts on public facilities; and Chapter 153A, Article 18, Sections 153A-330 to 153A-335 and Chapter 153A, Article 18, Sections 153A-340 to 153A-348 for the regulation of development.  This ordinance establishes supplementary regulations to allow for the development of compact communities in Chatham County.

- **The Developer understands and acknowledges the purpose, goals, and history of this Ordinance.**

## SECTION 2.  TITLE

This ordinance shall be known and be cited as the "Compact Communities Ordinance" except as referred to herein where it shall be known as "this ordinance".

- **The Developer will use the abbreviation CCO when referring to this Ordinance.**

1

## SECTION 3.  PURPOSE

This ordinance is found to be necessary and appropriate in order to:

A.  Help implement the *Chatham County Land Conservation and Development Plan*;

B.  Protect Chatham County's rural character by adequately buffering compact communities from neighboring properties and roadways;

C.  Promote new communities that support mixed-use development, anchored by a village center composed of commercial, civic, and residential uses that add to Chatham County's tax base, help residents meet their daily needs, and preserve Chatham County's small town atmosphere;

D.  Allow for compact village-style development surrounded by protected green space, at a size that is easily walkable and bikeable by residents of all ages;

E.  Help meet the need for community facilities such as schools, stations for police, fire and EMS, recreation facilities, solid waste/recycling collection centers, libraries, and community centers on sites that are physically integrated into the community;

F.  Ensure sustainable water provision and wastewater treatment in a way that does not create a future economic burden for the taxpayers of Chatham County;

G.  Protect Chatham County's water quality and water resources, minimize its energy use, reduce household transportation costs, and protect its air quality;

H.  Establish a grid network of streets that provides multiple connections to different destinations, includes safe places for pedestrians and bicyclists to travel throughout the community, and allows for efficient transit service when and if it becomes available;

I.  Include a mix of housing types that are architecturally consistent, designed to promote safe, walkable neighborhoods, and affordable to a range of residents in Chatham County;

J.  Include neighborhood parks, active recreation areas, and larger open spaces throughout the community that are linked together by sidewalks and trails;

K.  Provide greater environmental, economic, and social benefits to Chatham County when compared with conventional development.

- **The Developer believes the Herndon Farms project meets or exceeds the intended purpose of the CCO and adds a much needed and desirable senior community to Chatham County.**

- **The following point by point narrative of the CCO, the accompanying submission of the required five findings narrative and exhibits support this assertion.**

## SECTION 4.  JURISDICTION

The provisions of this ordinance shall be applicable in all zoned areas of Chatham County, exclusive of the municipalities located therein and their extraterritorial jurisdictions, subject to the location provisions contained in Section 6.1 of this ordinance.

- **The Developer acknowledges this Section as applicable to the Herndon Farms Project.**

## SECTION 5.  SEVERABILITY

Should any section, sentence or clause of this ordinance be held invalid or unconstitutional, such decision shall not affect, impair or invalidate the validity of the remaining parts of this ordinance that can be given effect without the invalid provision.

- **The Developer acknowledges this Section as applicable to the Herndon Farms Project**

## SECTION 6.  LOCATION AND SIZE

### 6.1 Location

Compact communities shall only be allowed in areas that meet all of the following conditions:

A.    Currently zoned for RA-40 Residential-Agricultural;

3

- **All the parcels which collectively make up the project site for Herndon Farms, are currently zoned R-1 (R40).**

- 

B.   Designated as either:
   - WSIII – BW (Balance of Watershed)
   - WS IV – PA (Protected Area)
   - Local Watershed Area (LWA)

   - **Herndon Farms is in the Jordan Lake WS IV-PA watershed area.**

C.   Have at least one access point that is within one (1) mile from a four-lane principal or minor arterial, as measured along the centerline of area roadways; and

   - **Herndon Farms has 2 access points on 15-501 and 1 access point to Vickers Road that leads to a stoplight on 15-501.  See Exhibit B.3 Site Plan.**

D.   Are located within the portion of Northeast Chatham County that is generally described as follows:
   - In the area of U.S. 15-501 on the east, Andrews Store Road on the south, and Mann's Chapel Road on the west and north;
   - Within 1,700 feet of U.S. 15-501 on its eastern side, and is south of the U.S.15501 intersection with Mann's Chapel Road, and north of a line one-half mile south of Andrews Store Road; and
   - Within one-half mile of Andrews Store Road on its southern side and is east of the intersection with Andrews Store Road and Mann's Chapel Road and is west of a line 1700 feet east of U.S. 15-501.

4



- **The above map shows that the project site for Herndon Farms (highlighted/outlined and hashed) is within the approved location for compact communities (as indicated in green).**

**6.2 Maximum Size**

No compact community shall include more than two thousand six hundred fifty (2,650) dwelling units.

- **There are 161 residential units planned in Herndon Farms.**

**6.3 Residential Density (Maximum and Minimum)**

Each compact community shall be allowed a maximum overall residential density of no more than two (2) dwelling units for each acre of gross land area in the project. Accessory units shall count as one half (1/2) a dwelling unit for the purposes of this calculation. Spray fields located off the project area shall not count as part of the project for the purposes of the maximum residential density calculation.

- **Acres in Project= 96.86**
- **Maximum allowed density (Gross)= 193 Dwelling Units**
- **Planned residential dwelling units= 161**
- **See Exhibit for B.7.7 for calculation areas.**

The minimum net residential density shall be at least five (5) units per net acre as measured by the total number of residential units divided by the total area excluding community facilities, street rights of way, buffers, open space, and non-residential areas.

- **Residential acres in Project= 16.3 Acres**
- **Residential Units= 161**
- **Density= 10.06**
- **See Exhibit for B.7.7 for calculation areas.**

**6.4 Maximum Built-upon Area**

To maintain a base level of watershed protection, the overall maximum built-upon or impervious area for a compact community shall be no greater than twenty-four percent (24%) of the total project area.

- **Exhibit B.2 shows preliminary calculated impervious area in the project to be 19.7%.**
  - **Final impervious will be stated on the final plat and not exceed the 24% limit.**
- **Once the finial plat is approved, a tracking system of impervious area will be submitted so that impervious can be tracked by the Chatham County Planning and Inspection offices.**

## 6.5 Minimum Commercial Area

Each compact community shall include not less than one hundred thousand (100,000) square feet of commercial development.

At least twenty-five percent (25%) of the total planned commercial area) shall be developed before seventy-five percent (75%) of the maximum allowable dwelling units shall receive final subdivision plat approval.

At least fifty percent (50%) of the total planned commercial area) shall be developed before ninety percent (90%) of the maximum allowable dwelling units shall receive final plat approval.

- **Herndon Farms has a planned 120–140-unit congregate care facility of 140,000 square feet and a daycare of 10,000 square feet for a total of 150,000 square feet.  The CCO requires a minimum of 100,000 square feet.  Both of these uses are specified as permitted uses in commercial type districts as per Exhibit B.7.9, Table 10.13. of the Chatham County Zoning Ordinance.**

## SECTION 7.  WATER AND WASTEWATER

## 7.1 Water Provision

Each compact community shall be served by public water provided by Chatham County that is adequate to serve the reasonable needs of the community and that complies with all applicable regulations of the County.

- **Exhibit I verifies that Chatham Utilities has the capacity and acknowledges the Developer's request.**

### 7.2 Wastewater Treatment

**General Design Standards**

Wastewater treatment shall occur at centralized wastewater treatment facilities either on-site or at existing, previously permitted off-site facilities as permitted by the State of North Carolina Department of Environmental and Natural Resources (NCDENR). Spray irrigation may occur off-site provided that said use conforms to the uses allowed in the applicable zoning district.

- **The entire treatment system will be contained within the development. The wastewater received from the veterinary practice and boarding kennel will be returned as Type 2 treated effluent to be land applied.**

Wastewater collection, treatment, distribution, and storage systems for compact communities must apply technologies approved by the State of North Carolina, with facilities and operating programs approved by the State of North Carolina, and with operations that are effectively monitored by the State.

- **The Developer will comply with this Section for the Herndon Farms Project.**

**Location, Ownership, and Sizing of Wastewater Facilities and Spray Fields**

Compact communities shall be served by wastewater collection, treatment, distribution, and storage systems that are adequate to serve the reasonable needs of the community and service area (as defined by the North Carolina Utilities Commission) and comply with all applicable regulations. The wastewater facilities may also serve neighboring areas. Compact communities shall:

- Show the location of all wastewater facilities needed for the compact community at build out in the sketch design submitted to Chatham County.

In the determination of adequacy, the County may consider any alternatives that provide reserve capacity in the wastewater system above the state required minimum, including but not limited to the following:

- Increasing the amount of wet weather storage to provide reserve capacity;
- Setting aside additional open space acreage for future spray irrigation to provide reserve capacity; and/or
- Limiting spray irrigation on a certain portion of open space acreage during specified times in order that the remaining capacity of the acreage to accept wastewater spray results in reserve capacity.

- **Wet weather storage is planned to be approximately 25% greater than requirements.**
- **There is almost 50% more land application capacity above needed area.**

**Wastewater Treatment System Operation and Management**

Wastewater collection, treatment, distribution and storage systems for compact communities shall be managed by an operator appropriately licensed by the State of North Carolina.

Provisions shall be made for sludge management and odor control that eliminates to the maximum extent possible, adverse impacts to the compact community's residents and neighbors.

- **Where applicable, these requirements will be meet by Herndon Farms.**

**Financial Guarantee**

A financial guarantee shall be required if final subdivision plat approval is requested prior to completion. Any such financial assurance shall satisfy the requirements of the subdivision regulations.

- **Where applicable, these requirements will be meet by Herndon Farms.**

**Public Filing of Wastewater Documents**

To allow for ongoing public review, the developer of each proposed compact community shall furnish Chatham County an as-built copy of the plans and specifications for wastewater treatment facilities, infrastructure, and disposal or irrigation system, including all documents related to the location, sizing, ownership, and management of the disposal and irrigation sites used for the compact community, as well as any operational performance reports and data for water quality monitoring conducted for the treatment, disposal, and irrigation facilities and receiving waters surrounding them prior to final plat approval  The developer shall require the operator of such systems to furnish the County with copies of any approved plans modifying said systems and to notify the County and the residents of the compact community of any violations or citations issued in connection with the operation within 30 days thereof.

- **Exhibits J.1 shows the preliminary location of the wastewater treatment facility and spray/drip areas for the wastewater treatment system.  The plant area indicated is being rezoned as Light Commercial because the development will accept 1,000 GPD of wastewater from the adjacent veterinary facility on the east side, southern boundary, of the property (the Dogwood Veterinary Hospital and Pet Resort).  Wastewater from other offsite locations is not planned or anticipated at this time.**
- **The wastewater treatment facility and the land applications systems will be permitted by the NC Division of Water Quality and meet all existing regulations required for this permit.  The current technical details and permit information is contained in Exhibit J to J.6.**
- **The wastewater treatment system is currently planned to be owned and managed by Aqua America, a licensed NC Public Utility Company.  Aqua will be responsible for maintenance of the plant, sludge, debris disposal and the land application systems.**

- **After completion of the wastewater treatment plant and disposal systems, as-built plans will be submitted to the County and provided to NCDEQ as per permit requirements.**

**SECTION 8.  STORMWATER**

- **Developer's response to all points under the stormwater section is summarized end of the entire Section 8.  The preliminary stormwater plans are supplied as Exhibits B.6.1, B.6.2 and B.6.3.**

**8.1 Guiding Principles**

Compact communities are strongly encouraged to use low impact development design techniques as part of the stormwater management system.  Low impact development design techniques emphasize the use of many smaller integrated stormwater controls that are distributed throughout the site, near the source of each impact.  Some references for how to learn more about low impact development design are included in Attachment A.

A compact community shall not discharge stormwater received during and after development at a rate or volume greater than that discharged prior to development in order that adjacent properties shall not be unreasonably burdened with surface waters as a result of the development. Likewise, compact communities shall not unreasonably impede the natural flow of surface waters from adjacent properties across the development, thereby unreasonably causing substantial damage to such properties.

**8.2 Stormwater Management Plan**

The developer for each proposed compact community shall have a Stormwater Management Plan approved by Chatham County prior to approval of a final subdivision plat.  This plan shall include the information specified in the *Stormwater Management and Maintenance Plan Requirements* displayed in Attachment A of this ordinance.  The plan shall be certified to be in conformity with the North Carolina Stormwater BMP Manual by a North Carolina registered stormwater professional.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 397 of 743

## 8.3 Stormwater Controls

Engineered stormwater management controls required in the approved Stormwater Management Plan shall be designed and constructed in order to satisfy the following requirements:

- Control and treat the first inch of stormwater runoff from the project site and from any offsite drainage routed to an on-site control structure;
- Ensure that the draw down time for this treatment volume is a minimum of forty-eight (48) hours and a maximum of one hundred and twenty (120) hours; and
- Maintain the discharge rate for the treatment volume at or below the pre-development discharge rate for the 1-year, 24-hour storm.

## 8.4 Maintenance and Upkeep of Stormwater Controls

The developer for each proposed compact community shall have a Stormwater Operation and Maintenance Plan approved by Chatham County prior to approval of a final subdivision plat. This plan shall include the information specified in the *Stormwater Management and Maintenance Plan Requirements* in Attachment A of this ordinance. Maintenance and upkeep of stormwater controls shall be consistent with *Stormwater Best Management Practices* as documented by the State of North Carolina.

The developer of each compact community and all subsequent owning entities and parties responsible for the stormwater management system shall have an annual maintenance inspection conducted by a certified professional engineer on each control structure in the compact community. The maintenance inspection shall assess whether the structure is functioning according to its design specifications, and recommend any repairs needed to ensure that it meet these specifications. The maintenance inspection report shall detail any functional deficiencies in each control structure and how they are to be fixed, along with any other relevant information. The professional engineer shall submit a copy of each maintenance inspection report to Chatham County within thirty (30) days after the inspection is completed.

The maintenance, repairs, or reconstruction recommended in the maintenance inspection report shall be made within thirty (30) days of the completion of the report. A

professional engineer shall submit a maintenance repair report to Chatham County within thirty (30) days after the repairs are made.

- **Herndon Farms will adhere to these guidelines.**

 8.5 Posting of Financial Guarantee

All engineered stormwater controls shall be conditioned upon adequate financial assurance in favor of the compact community's property owner's association for the purpose of maintenance, repairs or reconstruction necessary for adequate performance of the control structures for not less than ten (10) years after completion that shall be satisfactory to the County Attorney and approved by the Board of Commissioners.

- **This assurance will be provided.**

**8.6 Public Filing of Stormwater Documents**

To allow for ongoing public review, the developer of each proposed compact community shall submit to Chatham County a copy of the final version of the Stormwater Management Plan, Stormwater Operation and Maintenance Plan, Stormwater Operation and Maintenance Agreement, and stormwater control designs used in the compact community.  These documents shall be submitted in electronic and hard copy format to the Chatham County Public Works Department prior to final plat approval for the project.  In addition, the developer and all subsequent owning entities and responsible parties of the stormwater management system shall submit any updates to these documents within thirty (30) days of when the documents are updated.

- **The CCO encourages the use of low impact development design principles.  The preliminary stormwater plans are provided in Exhibits B.6.1, B.6.2 and B.6.3.  Herndon Farms will utilize the most update technologies to meet or exceed all County and State stormwater control requirements and obtain the appropriate permits before the final plat is submitted.**

- **As-built documents, maintenance plans, and financial guarantees will be provided at each appropriate benchmark in the construction schedule.**
- **In addition to the preliminary stormwater plans provided, the following are features of the development that significantly reduce stormwater runoff:**
  - **Homes are to be built on slabs and will not have gutters. This feature will significantly slow rainwater runoff as it will have more time to be absorbed by the landscape and reduce velocity of runoff for each lot.**
  - **One purpose of a compact community is to concentrate development and make it easier to control environmental impacts such as stormwater.**
  - **The 30% open space required by the CCO, and exceeded by Herndon Farms, reduces runoff potential as compared to other developments.**
  - **The 24% impervious limit, of which the impervious area of Herndon Farms is less than, reduces runoff potential as compared the other developments.**
  - **The following controls will be considered when designing the stormwater management system and implemented when possible into the final stormwater, site, and landscape plans:**
    - **Portions of the parking will be pervious. Shown in the site plan Exhibit B.3.**
    - **The parking around the Pavilion may be switched to pervious before final plat.**
    - **When practical, final stormwater plans will incorporate turn down curbing or curb cuts.**
    - **The project is planned to be balanced to approximately 5% grade. When practical, swales and berms will be incorporated into the landscape to additionally slow runoff and reduce cost. Exhibit B.6.4 EPA Document.**

14

## SECTION 9:  BUFFERS

### 9.1 Riparian Buffers

In all residential, commercial, and civic areas in each compact community, vegetative buffers of the following widths shall be permanently protected along each side of the following streams:

- At least one hundred (100) feet along all perennial streams;
- At least fifty (50) feet along all intermittent streams;
- At least fifty (50) feet along all ephemeral streams shown on the Soil Survey maps and having a drainage area of more than twenty-five (25) acres;
- At least thirty (30) feet along all ephemeral streams shown on the Soil Survey maps and having a drainage area of between ten (10) acres and twenty-five (25) acres.

- **Where applicable, these requirements will be meet by Herndon Farms.**

**Uses Within the Buffer**

No new development is allowed in the buffer area except for the following:
- Water dependent structures;
- Other structures such as flag poles;
- Signs and security lights which result in only diminutive increases in impervious area;
- Projects such as road crossings and greenways where no practical alternative exists;
- Desirable artificial stream bank or shoreline stabilization, as determined by Chatham County.

These activities should minimize built-upon surface area, direct runoff away from the surface waters (except sheet flow directed into a buffer), and maximize the utilization of stormwater best management practices.

To avoid a loss of effectiveness in protecting streams, the stream buffer shall remain in natural undisturbed vegetation, except as provided below.

Clearing, grading or other land disturbing activities that would reduce the effectiveness of the buffer shall be revegetated.

Buildings and other features that require grading and construction shall be set back at least ten (10) feet from the edge of the buffer.

Crossings by streets, driveways, culverts, railroads, recreational features, intakes, docks, utilities, bridges or other facilities shall be designed to minimize the amount of intrusion into the buffer.

- **Where applicable, these requirements will be meet by Herndon Farms.**

The following are prohibited within riparian buffers:
- Wastewater treatment, disposal, and reuse components, including any wastewater spray fields. Water and sewer lines are allowed to cross the buffer if no available alternative exists, provided that they are designed to minimize disturbance to the buffer (e.g. by running under bridges or crossing at right angles to the extent possible).
- Receiving areas for toxic or hazardous waste or other contaminants;
- Hazardous or sanitary waste landfills;
- Stormwater features, except in limited circumstances in buffers along ephemeral streams if the developer implements low impact development design techniques and/or other stormwater controls that meet or exceed the stormwater treatment and management performance provided by fully functioning ephemeral stream buffers in that location.

Stream buffers can be used for passive recreational activities with very low impact walking trails, with no impervious surface. Highly erosive activities such as use by bicycles should be discouraged. The service facilities for such activities, including but not limited to parking, picnicking and sanitary facilities, shall be located outside the buffer.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 402 of 743

Horses and motorized all-terrain vehicles are prohibited within the buffer, except for maintenance vehicles, emergency vehicles, and motorized wheelchairs for disabled persons.

Unpaved trails running parallel to the stream shall be located at least thirty (30) feet from the edge of the stream.

Paved trails up to eight (8) feet in width are allowed along any streams provided they are at least fifty (50) feet from the edge of perennial and intermittent streams, and provided that the buffer as a whole is extended a distance equal to the width of the trail. Bicycles are expressly allowed on paved trails.

Water oriented recreational facilities, such as boat or fishing piers shall require an approved use permit from the Watershed Administrator.

Clearing and re-vegetating the stream buffer for the purposes of improving its pollutant removal efficiency may be permitted, except within thirty (30) feet of a stream.

Invasive species listed by the North Carolina Botanical Garden may be removed from the buffer.

Natural regeneration of forest vegetation and planting of trees, shrubs, or ground cover plants to enhance the riparian buffer shall be allowed provided that soil disturbance is minimized. Plantings shall consist primarily of native species.

Tracked or wheeled vehicles are not permitted within the riparian buffer, except for the purpose of maintaining utility corridors and providing emergency services. Bicycles are expressly allowed on paved trails.

- **Exhibit B.7.1, page 5 shows the potential wetlands and streams. If any of these areas are judged jurisdictional, appropriate buffers will be delineated and no activities as per the CCO will be allowed in these areas. Note that all the areas indicated in the exhibit are either on the west side of the development, where**

**construction is not taking place or predominately in the Duke Power easement, where no building is planned.**

## 9.2 Perimeter Buffer

Perimeter buffers shall be utilized to minimize the impacts of each compact community on adjacent properties along the entire perimeter of the compact community. Table 9.2 lists the minimum buffer width allowable, depending on the proposed land use along the edge of the compact community and the existing land use in the adjacent property at any point along the perimeter.

Chatham County may allow a reduction in the perimeter buffer width required by this ordinance of up to fifty percent (50%) if it determines that the impact of the compact community is adequately mitigated by community design or topography. In addition, Chatham County may allow a reduction in the perimeter buffer from fifty-one percent (51%) up to one hundred percent (100%) after giving the adjoining landowners an opportunity to comment and Chatham County determines that the impact of the compact community is adequately mitigated by the community design or topography. A developer of a Compact Community may request of the Board of Commissioners such a waiver or reduction at any time.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 404 of 743

**Table 9.2   Width of Vegetative Perimeter Buffers**

|  |  | Land Use Adjacent to Compact Community Perimeter | | | | |
|---|---|---|---|---|---|---|
|  |  | Residential – large lot | Residential – small lot | Commercial | Recreational | Agricultural [2] |
| Compact Community Perimeter Land Use | Residential large lot | 0 feet | 0 feet | 0 feet | 0 feet | 0 feet |
|  | Residential - small lot | 100 feet | 100 feet | 0 feet | 0 feet | 100 feet |
|  | Commercial | 200 feet | 200 feet | 0 feet | 200 feet [3] | 200 feet |
|  | Recreational | 200 feet | 200 feet | 200 feet [3] | 0 feet | 200 feet |
|  | Agricultural [2] | 0 feet | 0 feet | 0 feet | 0 feet | 0 feet |

[1]      The perimeter buffer requirements only apply to areas along the boundary of the compact community where no public road exists.  In areas where a public road forms the boundary of the compact community, then the viewshed buffer requirements specified in Section 9.3 apply instead.

[2]      Any bona fide farming operation, including land enrolled in the use value assessment program for agricultural, horticultural, forest, or conservation purposes, or part of a Voluntary Agricultural District.

[3]      A barrier that assures the safety of recreational activity participants in the compact community may be substituted for a buffer at the discretion of Chatham County.

- **Herndon Farms will request a 50% reduction in the perimeter buffer and a 50% reduction to some sections of the viewshed buffer.  As shown in Exhibit B.3.**


**Dedication of the Buffer**

The perimeter buffers required in this section only apply to areas along the boundary of the compact community where no public road exists.  In areas where a public road forms

the boundary of the compact community, then the viewshed buffer requirements specified in Section 9.3 apply instead. Once the perimeter buffer has been delineated, a deed restriction satisfactory to the County Attorney shall be filed with the Chatham County Register of Deeds that permanently protects this land as a buffer and identifies the maintenance responsibility that rests with the homeowners association.

- **Herndon Farms will adhere to these guidelines.**

**Perimeter Buffer Vegetation and Land Uses**

To the extent practicable, existing native forest vegetation shall be utilized for the perimeter buffer.  Farms, pastures, and other traditional rural land uses owned by the developer or protected with a permanent conservation easement may be used to meet this requirement.  Topographic features such as hills, valleys, and planted berms owned by the developer may also be used to meet this requirement.

Vegetative plantings in the buffer shall produce the effect of a natural forested area, using native species.  The planting does not have to be opaque but should function to significantly soften the visual impact of buildings, both initially and in the longer term. The visual buffering provided by vegetative plantings shall be effective in all seasons.

- **Any perimeter buffer that is impacted by initial grading will be replanted and maintained with native plants to provide a natural looking transition to neighboring properties.**

**9.3 Viewshed Buffers**

Viewshed buffers shall be utilized in order to minimize the impacts of compact communities on pre-development roadway views.

The developer shall map all roadway views into the project and delineate a continuous buffer of at least one hundred (100) feet in width.  The buffer shall be measured at right angles to the edge of the roadway right of way into the compact community.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 406 of 743

The Chatham County Board of Commissioners may allow a reduction in the viewshed buffer width required by this ordinance of up to fifty percent (50%) if it determines that the impact of the compact community is adequately mitigated by community design, topography, and/or guidelines for outdoor lighting such as those included in the proposed Chatham County lighting ordinance.

**Dedication of the Buffer**

Once the viewshed buffer has been delineated, a deed restriction satisfactory to the County Attorney shall be filed with the Chatham County Register of Deeds that permanently protects this land as a buffer and identifies the maintenance responsibility that rests with the homeowners association.

**Viewshed Buffer Vegetation and Land Uses**

To the extent practicable, existing native forest vegetation shall be utilized for this buffer, except that this requirement is optional for the developer where the use adjoining the applicable roadway is a commercial, institutional, or office use. Farms, pastures, and other traditional rural land uses owned by the developer or protected with a permanent conservation easement may be used to meet this requirement. Topographic features such as hills, valleys, and planted berms owned by the developer may also be used to meet this requirement. Before any native vegetation is removed, a revised landscaping plan detailing what is proposed to be removed and the extent and type of replanting must be reviewed by the Chatham County Planning Department and the Chatham County Appearance Commission. Selective removal may be recommended in lieu of clearing the site of all existing native forested or vegetated areas.

Vegetative plantings in the buffer shall produce the effect of a natural forested area, using native species. The planting does not have to be opaque but should function to significantly soften the visual impact of buildings, both initially and in the longer term. The visual buffering provided by vegetative plantings shall be effective in all seasons.

- **The Viewshed buffer along Highway 15-501 will be 100' for the majority of the frontage. The Developer will request a 50% reduction for a portion from the project's northern entry on the east**

**side to the northern most boundary on the east side of the project, as per the site plan, [Exhibit B.3](#).  This section is the back of the detached residential units with a private alleyway that will not be lighted with area lights.  There is an approximately 20′ elevation difference from the first floor of the units and 15-501 street level which will further mitigate the reduced viewshed buffer for this section.  In addition, even though the indicated viewshed buffer in this section is requested to be 50′ the effective buffer is much more than 100′ for the majority of 15-501 viewshed buffer because of the design of this section of the site.**

## SECTION 10.  RECREATION AND OPEN SPACE

### 10.1 Passive Open Space

**Amount of Open Space Required**

Each compact community shall permanently protect a minimum of thirty percent (30%) of the gross project area as open space in order to maintain rural character and provide for passive recreation.

All of the land in neighborhood parks, active recreation, perimeter buffer, viewshed buffer, streams, wetlands, natural buffers, and major below-ground utility easements such as underground pipelines may be counted toward meeting this requirement.  Major aboveground utility easements such as high-tension power lines cannot be counted toward meeting this requirement.

- **Exhibits [J.1](#) and [J.2](#) show the open space areas and calculations by Arcadia Engineering.  These exhibits show that the open space is approximately 39.5 acres of the 96.86 acres submitted for the compact community approval.  (Note: one acre of the total project area of 97.86 acres has been removed from the CCO rezoning submission to be rezoned as light industrial for the wastewater**

**treatment plant.)  This gives the project 40% open space.  The required open space is 30%.  This does not include approximately 8 acres taken up by the Duke Power easement.  While this area is not allowed under the CCO to qualify as open and not used for construction, this area will be used as pasture, dog park and pervious parking.**

**Use of Local and Regional Open Space Plans**

Priority for protection as open space shall be given to lands identified in the *Chatham County Inventory of Natural Areas and Wildlife Habitats*, *Chatham County Parks and Recreation Master Plan*, and the *Triangle GreenPrint Regional Open Space Assessment*.  Nonalluvial wetlands including seeps, bogs, and vernal pools shall also be systematically inventoried in each proposed compact community and shall be given priority for conservation.

The Chatham County Planning Director and the Chatham County Parks & Recreation Director shall be consulted when making the determination as to which lands in the compact community are shown in the plans and inventories listed above, and which lands shall be protected.

If the developer thinks that any of the lands identified in these documents that are found in the compact community cannot be protected, he/she shall provide a written technical justification to the Chatham County Planning Board from an appropriately certified professional as to why not, and propose that they not be included as open space.

- **There are no protected lands in the development.  A small portion of the [Bennett Mountain SMHA](#) is in the western most portion of the west side of the development.  This area will remain forested and be part of the project's trail system.**

**Open Space Plan**

At the time of submission of an application for sketch design, the developer shall submit an open space plan showing the network of passive open space, recreational facilities, and neighborhood parks in the compact community.

- **Open space areas are shown on Exhibits J.1 and J.2, and amenities are also shown on the proposed landscape plans Exhibit B.4.**

**Ownership and Maintenance of Open Space**

All lands designated as open space land shall not be further subdivided, and shall include no permanent buildings or structures, except in connection with uses permitted thereon. In addition, all of these lands shall be:

A. Deeded to an incorporated property owners association for permanent protection as open space; or
B. Granted to a non-profit land trust or other qualified conservation overseer for permanent protection as open space; or
C. Conveyed to Chatham County for permanent protection as open space, provided that the land is accepted by Chatham County.

If open space is granted to an incorporated property owners association or to Chatham County, a deed restriction satisfactory to the County Attorney shall be filed with the Chatham County Register of Deeds that permanently restricts the use of the land to passive open space.  If granted to a non-profit land trust or other qualified conservation overseer, a conservation easement shall be granted that protects the land in perpetuity as open space.

When the open space is transferred from the developer to one of the three types of recipients listed above, the transfer shall include specific contractual arrangements to provide for the ongoing maintenance of these lands.

- **Open space, community amenities, sidewalks, landscaping including gardens, and any other common element will be owned**

**and maintained by the residents of Herndon Farms through a
homeowners association. The entity will most likely be named the
Herndon Farms Homeowners Association or HFHOA. The
Developer will setup and operate this entity until the project is
mostly completed and it will meet the requirements for community
control and ownership as stated throughout the CCO.**

**Open Space Uses**

To protect water quality and help ensure that passive recreational uses can be maintained
on open space in the compact community even in wetter years, developers must select
<u>one</u> of the following two options:

A. Designate twenty percent (20%) of the open space in the compact community as
unsprayable with wastewater or reclaimed water. The location of this area can
be rotated so that all areas can be irrigated as necessary to keep them healthy,
but the spray field must be sized with this assumption so that even in wetter
years there is always dry, open land appropriately located and suitable for
passive recreational uses such as throwing a football or playing catch. Wetlands
and riparian buffers designated in this ordinance cannot be counted toward
meeting this twenty percent (20%) requirement; or

B. Base the size of all irrigation ponds and wet weather storage ponds used in the
wastewater or reclaimed water irrigation system on a mass water balance based
upon the following data:

- Monthly precipitation from the 80th percentile year or greater for a recent
25year period;
- Potential evapotranspiration; and
- Soil drainage.

These data must be taken from, or representative of, the proposed site for the compact
community.

To help eliminate any potential conflicts between irrigation of reclaimed water and use of active recreational areas in the compact community, a management plan shall be developed for all active recreational areas that includes the following:

- A spray schedule for any reclaimed water used to irrigate it; and
- A public education program that includes written brochures, permanent postings in prominent public locations, and/or other appropriate means determined by Chatham County to educate potential users about the proper uses of reclaimed water and to notify them that the water is not potable.

The use of recreational motorized vehicles such as motorcycles or all-terrain vehicles shall be prohibited within open space.

- **The reclaimed wastewater system that uses portions of the open space will be designed to not interfere with the designated passive open space uses as per the CCO guidelines for an effluent land application management plan.**

## 10.2 Active Recreational Facilities

Land dedication and fees in lieu of dedication for active recreational facilities shall be provided in accordance with the applicable Chatham County regulations.

The County shall consult with the Chatham County Parks & Recreation Director and the Chatham County Planning Director before selecting which option to use in meeting these requirements.

Any land proposed for dedication for active recreation shall be physically integrated into the design of the community and be easily and safely accessible by pedestrians.

- **If required by other regulations, Herndon Farms will use the fee in lieu option to meet this requirement.**

## SECTION 11.  COMMUNITY FACILITIES

### 11.1 Impact Assessment

The developer of each compact community shall conduct each of the following impact assessments:

A. Fiscal impact assessment.  This shall address all fiscal impacts on the county including those related to schools, police protection, fire protection, emergency medical services, and all other county services.

- **This assessment is Exhibit D, Fiscal Impact Assessment**

B. Transportation impact assessment.

- **This Assessment is Exhibit E., Traffic Report**

C. Environmental impact assessment. Where potential negative impacts have been identified, it shall be the responsibility of the developer to provide plans and methods of how such impacts may be alleviated or minimized to the satisfaction of the Board of County Commissioners.

- **This Assessment is Exhibit F.**

Chatham County shall provide study parameters and criteria to be used.   Chatham County shall also require the developer to pay for a consultant(s) selected by Chatham County to conduct a peer review of each impact assessment.

All impact assessments by the developer shall be completed and submitted with sketch plan submission for each proposed compact community.

The peer review results shall be available prior to the Planning Board's deliberations.

- **All assessments and reports have been peer reviewed and accepted and fees paid.**

**11.2 Impact Mitigation**

The developer of each compact community shall satisfy the impacts created by the development for adequate public facilities and identified in the assessments required in Section 11.1 above. These impacts may be satisfied by providing fees or dedicating land sufficient to offset the impact of the development on schools, parks, recreational facilities, police protection, fire protection, emergency services, libraries, community centers, recycling and waste collection centers, and/or other public facilities.

Any land proposed for dedication shall be physically integrated into the design of the community and be easily and safely accessible by pedestrians.

- **The Fiscal Impact Assessment indicates a net fiscal benefit to the County of about $479,000.**
- **The Traffic Study reveals little impact to the traffic flow in the area of the project. This is primarily because the project is predominantly for retires, who generally have fewer members per household. In addition, a bus stop along 15-501 is planned to be installed to help future traffic impact.**
- **The Environmental Impact Assessment shows all the different mitigations to handle stormwater, wastewater and other development impacts.**

**SECTION 12. COMMUNITY DESIGN**

**12.1 Performance Standards**

The intent of this ordinance is to encourage a vibrant mix of residential, civic, retail, office, and open space uses that adhere to the following performance standards:

**Performance Standards:**

*Town center.* Each project shall include an identifiable town center (not necessarily located in the geographic center of the project) -- a square, a green, and/or transit stop with shops, retail, and offices that are connected to the mix of residential uses in a practical way.

- **The intention of the CCO requirement for a town center is to create an enriching place that draws residents from the entire County, where residents both inside and outside the development enjoy going, spending time, and creating community. The suggested content of the town center is listed as retail, office, green space, transit stop, etc. The Developer has concentrated on creating community-focused space rather than small retail-focused space for a number of important reasons:**
- **The Developer feels that the residents of this community and Chatham are best served through community-oriented shared space. This will foster a vibrant social option that will draw unique visits to the area and will complement, not compete with the commercial uses in the surrounding developments. Town centers in the surrounding developments will have their own unique character, allowing each to thrive in connection with one another.**
- **Creating multiple small retail and office "pockets" dilutes the success of other commercial areas that are often underpopulated. Dotting the landscape with small commercial centers often results in uniformity of use and the County becomes "the land of the strip malls," wiping out the rural character many Chatham residents expressly wish to preserve. As clearly and repeatedly expressed in Plan Chatham, Herndon Farms is designed to create a unique character reflective of the urban culture of the community and the surrounding County.**

- **Dilution of commercial demand is of particular concern, the Developer has spoken at length with existing and planned adjacent communities, who have made it clear of their concerns that multiple commercial centers each containing retail will tend to dilute existing commercial traffic rather than adding additional commercial traffic.**

- **The commercial areas surrounding Herndon Farms currently encompasses medical, retail, restaurant, veterinary services, and self-storage. This leaves space for the Herndon Farms town center to fulfill the second intent of the ordinance and focus on community-building design through green space and alternative uses not currently represented.**

- **What is not well represented in the surrounding commercial areas is space for outdoor events such as farmers' markets, craft shows, live-music events, and other small-scale festivals, such as the uses that can occur at the proposed for Herndon Farms' "Community Event Center". Seasonally and locally-oriented farm stands are attractive to individuals in Chatham County as many people move to the County for the rural lifestyle. On any given day, the Herndon Farms Community Event Center will attract individuals inside and outside the community to spend time with the community's farm animals, enjoy the products produced on the farm or possibly from surrounding agricultural operations, and enjoy the Herndon Farms atmosphere. Accessible parking is an integral part of the design, as will be the community transit stop.**

*Housing mix and development pattern.* Each project shall provide a mix of three housing types: single-family detached dwellings; single-family attached dwellings such as duplexes and townhouses; and multi-family dwellings such as apartments. The inclusion of rental housing as part of the multi-family component is strongly encouraged. The three housing types shall be fully integrated into the overall project design, with the highest residential densities occurring adjacent to civic-commercial uses, extending to lower

residential densities at the periphery of the development.  The use of a grid pattern of streets for the majority of the development is required to the extent feasible, based on topographic considerations.

- **Herndon Farms has 92 single family units, 16 duplex units, 34 detached row units and 19 attached townhomes.**
- **The layout for the development best suits the parcel sizes, lot sizes, graded topography, and potential buffer requirements.**
- **The multifamily housing specification is met by the congregate care facility.  As part of the commercial area of the project, this facility will house 140 to 200 seniors.**

*Commercial component.*  Each project shall include a commercial area or areas to serve the community, with establishments that are less than ten thousand (10,000) square feet in size allowed inside the community, and larger establishments allowed on the periphery in proximity to a four-lane principal or minor arterial.   All commercial establishments shall be pedestrian accessible to community residents.

- **Herndon Farms has a proposed 140,000 square foot congregate care building planned for the commercial area which directly connects to 15-501 via a commercial drive and road to Vickers to 15-501 via a stoplight.**
- **A 10,000 square foot children's daycare also directly connects to these access points.**

*Community/neighborhood gathering points.*  All residential units shall be within walking distance of a neighborhood gathering point, such as an active recreational facility, community center, school, or neighborhood park.

- **The community center, community event center and both commercial buildings are accessible via sidewalks.**

*Open Space.*  The design must, to the extent possible, preserve and protect prominent and/or significant natural features and, where appropriate, utilize them as areas for passive recreation.  In addition, open space must be integrated into the plan for development, and include some flat dry land that is appropriate for passive recreational activities such as playing catch and throwing a football.  To the extent practicable, the open space shall also be designed to connect with existing or planned open space on adjacent parcels to help form a connected network of open space throughout the county.

- **The three pasture areas, two on the east section and one on the west section, are intended as passive open space, although the areas are not counted towards the 30% open space requirements as they are in Duke Power's easement.**
- **Herndon Farms will have a sidewalk to Vickers.  If DOT approves the pedestrian crossing across 15-501, this sidewalk will extend to 15-501.  The crosswalk will safely connect Herndon Farms with Briar Chapel's northern commercial area and the Herndon Farm's western side.**
- **The Herndon Farms trail system will go to Vickers Road, and at an appropriate connecting point, to the propose Vickers-Bennett project.**

*Passive and active recreational opportunities.*  Each project shall include the provision of both passive and active recreational opportunities.  Small playgrounds and neighborhood parks shall be scattered throughout the community within walking distance of most homes.

- **Because Herndon Farms is a 55+ community is not slated to have children's' playgrounds other than the private playgrounds on the daycare property.   However, the farm animals, dog park, pastures, wooden areas on the west side, and gardens will be open to individuals outside the community and these areas will be easily accessible along the planned trails, sidewalks, and adjacent parking areas.**

*Interconnectivity.*  Residential units, the town center, and community gathering points must be interconnected not only by roadways, but also through a network of pedestrian and bicycle pathways.  At least thirty-three percent (33%) of these pathways must be completed before final plat approval of the final fifty percent (50%) of the maximum allowable dwelling units in the compact community are built One hundred percent (100%) of the pathways must be completed before final plat approval of the final ten percent (10%) of maximum approved dwelling units in the compact community.

- **Developer understands and will comply as needed for this Section.**

*Narrow streets.*  Streets shall be relatively narrow, with trees.  Pedestrian walkways may be required on both sides of the street.

- **As per Exhibit B.3. the development's interior roads will meet NCDOT road specifications and dedicated to the state upon completion.  The Developer noted in a meeting with Chatham that there were some issues with emergency vehicles accessing some areas of the Briar Chapel's narrow streets.  The Herndon Farms site engineers have sought to alleviate this issue with standard streets, sidewalks on both sides, and purposes turndown curbs for emergency rollover.**

*Transit.*  Park-and-ride spaces shall be set aside and identified in parking lots in the commercial center(s).

- **The Developer engaged Chatham County Transit in discussion on optimal transit stop placement.  It was mutually concluded that a bus stop be located on 15-501 and connected to the Community Event Center.  This was based on the likely ridership for the various transit options offered through Chatham Transit.  Exhibit E.2 and E.2.1 is the support letter from Chatham Transit and the purposed bus shelter.**

*Botanical preservation and diversity.*  A landscape master plan shall be submitted with initial application for development.  The developer shall be required to identify and retain major trees, and to identify and preserve natural areas, to the extent practicable.

- **Exhibit B.4 are the proposed Landscape Plans.  The balanced grading plan on the east side will result in the majority of the existing trees and vegetation being removed.  Replanted buffers will be replanted with native NC piedmont vegetation to blend into neighboring properties.  In addition, a number of specimen native plants that are transplantable have already been identified for transplanting within the project.  In particular, a number of American hollies, red maple and oaks.**
- **The entire west portion of the property except for the wastewater treatment and holding pond will be left as is.**

## 12.2 Streets and Other Specifications

**Streets**

All streets shall be public and constructed to North Carolina Department of Transportation (NCDOT) standards. Upon completion, the streets shall be offered for dedication to the NCDOT for maintenance. In exceptional circumstances, a very limited number of private roads may be allowed as dead-end minor residential streets for lengths not more than one thousand (1,000) feet in order to address topographic characteristics of a site.

Developers are strongly encouraged to use NCDOT's *Traditional Neighborhood Development Guidelines* displayed in Exhibit B of this ordinance when designing the street system.

Alleys and private roads shall be dedicated to the incorporated property owners association or equivalent entity for the compact community.

- **Developer understands and will comply as needed for this Section.**

**Building Height**

No building in the compact community shall have a height greater than sixty (60) feet. Chatham County may require buildings to have a lower height if it deems appropriate to help preserve the small-town character of the development.

- **Developer understands and will comply as needed for this Section. No building is currently planned to be over 60 feet and the residential sections will not have any maximum building height over 35 feet.**

**Additional Guidelines**

Additional guidelines and options for how to meet the standards in this section are included in the *Compact Community Design Guidelines* contained in Attachment C of this ordinance.

**12.3 Housing**

**Construction Standards**

Manufactured homes built to the U.S. Department of Housing and Urban Development Code are not permitted in compact communities. Factory-built modular homes constructed to the standards of the North Carolina Building Code are permitted, provided that the site and building design, and exterior finishes and materials are compatible with surrounding dwellings.

- **All homes are planned to be site-built and meet or exceed all NC Building Codes**.

**Accessory Dwellings**

Accessory dwellings are encouraged on lots containing single-family detached housing. Each accessory dwelling shall count as one half (½) a dwelling unit toward the maximum allowable number of dwelling units for the project.

There may be not more than one accessory dwelling unit per lot.

The accessory dwelling unit may be attached or detached.

Each accessory dwelling unit shall not exceed one thousand (1,000) square feet or two-thirds (2/3) of the heated space in the principal dwelling unit, whichever is more limiting.

Accessory dwellings shall be designed to be harmonious with the primary dwelling on the same lot and with neighboring dwellings.

- **Developer understands and will comply as needed for this Section.**

**Moderate Income Residents**

All compact communities shall either (i) provide housing for low and moderate-income households as provided in Subsection A below, or (ii) enter into a contract with the County which provides for payments to the County to be used to fund (a) construction of affordable housing or land for construction of affordable housing to address the needs of low and moderate income residents of Chatham County, (b) programs which are designed to address family violence and issues related to the abuse of women, including without limitation buildings and facilities for such programs, (c) programs which are designed to address the needs of adults with intellectual and developmental disabilities, including without limitation buildings and facilities for such programs, and (d) programs which are designed to address the needs of low and moderate income persons, including without limitation buildings and facilities for such programs, as provided in Subsection B below.  A "low-income person" is a person or family whose income is fifty percent (50%) or less of the Area Median Family Income and a "moderate income person" is a person or family whose income is eighty percent (80%) or less of the Area Median Family Income.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 422 of 743

Each compact community shall address the needs of low and moderate income persons by either the Moderately Priced Dwelling Option or the Payment-in-lieu Option:

- **The Developer has chosen the payment lieu option in addition to providing 19 town homes that will be offered at a lower price point than the other residential units in the community.**

A.    **Moderately Priced Dwellings Option**

1.  A minimum of five percent (5%) of the total residential units in the development shall be held by and be affordable to buyers whose household incomes are no greater than sixty percent (60%) of the Area Median Family Income by family size if title to the lots so designated is donated to a nonprofit community agency designated by the County whose mission is to expand and preserve housing for low-income households.  The designated agency(ies) will hold title to the land in perpetuity and lease it to qualifying households.  The agency(ies) have a right of first refusal to purchase any home constructed by the qualifying family at any time the owner decides to sell it; or

2.  A minimum of ten percent (10%) of the total dwellings in the development shall be sold and affordable to buyers whose household incomes are not greater than sixty percent (60%) of the Area Median Family Income by family size.  The sale price and incomes of buyers shall remain limited according to the terms of this ordinance for at least thirty (30) years; or

3.  Upon approval of Chatham County, the developer may meet this provision through an alternative means, provided that it does both of the following at a minimum:
    - Ensure the development and sale of moderately priced dwellings in a manner equivalent to that in Option A or Option B above; and
    - Ensure that at least 5% of the total dwellings in the compact community are affordable housing.

**Compliance with Moderately Priced Dwellings Option**

The subdivision preliminary and final plats for each compact community shall designate the lots for Moderately Priced Dwellings, and the developer, builder(s), and purchaser(s) shall be bound by this restriction according to the terms of this ordinance.

Upon final plat approval, the applicant shall execute and record a deed restriction satisfactory to the County Attorney binding the applicant and all other parties that receive title to the property on all lots for dwellings designated as "Moderately Priced."

Moderately Priced Dwelling unit lots shall be incorporated into the compact community in proportion to the development of dwelling unit lots without affordable housing restrictions.
Subsequent final residential subdivision phase plats shall not be approved until such time as completion of at least 90% of the affordable units in preceding residential phases.

**B.    Payment–in–lieu Option**

1.  A compact community developer may provide assistance to low and moderate income residents of Chatham County by entering into a contract with the County that provides a payment-in-lieu of lots within the development to fund (i) construction of affordable housing or land for construction of affordable housing to address the needs of low and moderate income persons and families, (ii) programs which are designed to address family violence and issues related to the abuse of women, including without limitation buildings and facilities for such programs, (iii) programs which are designed to address the needs of adults with intellectual and developmental disabilities, including without limitation buildings and facilities for such programs, and (iv) programs which are designed to address the needs of low and moderate income persons, including without limitation buildings and facilities for such programs.  The payment to be made shall be calculated on a per lot basis based on the market value of a buildable single-family lot within the compact community.  The per lot rate shall be based on the greater of an appraisal made by a North Carolina certified appraiser approved by the County, or the average primary building site value for the most recent tax valuation made by the County.  Any appraisal cost shall be paid by the developer; or

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 424 of 743

2. A compact community developer may provide assistance to low and moderate income residents as well as other residents of Chatham County by entering into a contract with the County that provides payment to the County based on a formula mutually agreeable to the County and the developer to fund (i) construction of affordable housing or land for construction of affordable housing, (ii) programs which are designed to address family violence and issues related to the abuse of women, including without limitation buildings and facilities for such programs, (iii) programs which are designed to address the needs of adults with intellectual and developmental disabilities, including without limitation buildings and facilities for such programs, and (iv) programs which are designed to address the needs of low and moderate income persons, including without limitation buildings and facilities for such programs.

**Compliance with Payment- in-lieu Option**

The compliance with the payment-in-lieu option shall be memorialized by a contract between the County and the applicant or any developer holding a conditional use permit previously issued under the Compact Communities Ordinance. A contract entered into under this provision shall not supersede the provisions of a previously issued conditional use permit unless the contract expressly so provides. No contract shall be entered into under this provision until the public hearing and procedural requirements for the issuance or amendment of a conditional use permit have been complied with.

- **As stated previously, the Developer has chosen the payment lieu option in addition to providing 19 town homes that will be offered at a lower price point than the other residential units in the community.**

**12.4 Appearance**

All standards in the *Chatham County Design Guidelines for Commercial, Industrial, and Conditional Use Projects* shall apply to compact communities.

As part of the project review process, the developer of each compact community shall submit integrated Architectural Guidelines and Contextual Guidelines for review by Chatham County.

Utilities shall be placed underground in order to improve sight lines, open up sidewalks, and minimize the danger of interruptions in utility service during inclement weather.

Storage areas and loading areas reached by rear alleyways in storefront neighborhoods shall be opaquely screened.

- **Developer understands and will comply as needed for this Section. Details of compliance will be provided at final plat submission.**

**12.5 Green Building**

**Energy Conservation and Renewable Energy**

No compact community development shall deny or prohibit the installation of solar panels, either electric or thermal.
Additional guidelines for energy conservation and green building are included in the *Green Building Guidelines* contained in Attachment C of this ordinance.

- **Developer intends to cover the proposed pavilion with solar panels, install solar panels over the wastewater treatment plant, and encourage homeowners to install solar systems.**
- **All water fixtures will meet or exceed the EPA's WaterSense Program.  This requirement is the bases for the 50% flow reduction request from NCDEQ.**
- **Developer is working with local concrete suppliers to provide CO2 entrained concrete to reduce the development's carbo footprint.**

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 426 of 743

## SECTION 14. RELATIONSHIP TO EXISTING ORDINANCES.

It is the intent of the Board of Commissioners that this ordinance shall supplement the Chatham County Zoning, Subdivision, and Watershed Protection Ordinances with respect to Compact Communities as defined therein.

To the extent the provisions of this ordinance are the same in substance as previously adopted provisions of the Chatham County Zoning, Subdivision, and Watershed Protection Ordinances, they shall be considered as continuations thereof and not as new enactments, unless as otherwise specified.

To the extent the provisions of this ordinance conflict with any other ordinance or law or where the provisions hereof impose conflicting regulations, the most restrictive provision or the one which imposes the highest standards or requirements shall prevail, except as otherwise specified."

- **Developer understands and will comply as needed for this Section.**

**Section 15. Waiver.** With the approval of the Board of Commissioners, the requirements of this ordinance may be adjusted, modified, reduced or waived based upon the absence of any reasonable relationship or nexus between the impact of the compact community development and the inclusionary or other requirements set forth herein.

**Waivers Requested**
1. **Partial viewshed buffer reduction from 100′ to 50′ as indicated on Exhibit B.3 Site Plan.**
2. **Perimeter buffer reduction from 100′ to 50′.**
3. **Commercial mix as proposed. Developer seeks to avoid small retail that would compete with existing nearby developments.**

# EXHIBIT 7



**Qunity**
**16 Consultant Place Suite 201**
**Durham, NC 27707**
**919.490.4990**
**hello@qunity.com**
**qunity.com**

# CONDITIONAL REZONING

**DESIGN NARRATIVE:  SUMMIT CHURCH CHATHAM COUNTY CAMPUS**

Chatham County's rural heritage is woven into the fabric of its geographic location. Within the very names of its roads one can see how public centered entities of past generations, such as mills, ferries, churches, chapels, & farms that defined the landscape of generations past. When looking at the subject parcels on Chatham County's Map of Future Land Use and Conservation, one sees evidence of the cultural impact, specifically in the names of nearby Briar Chapel and Martha's Chapel roads.  Traditionally, churches have served as catalysts for healthy communities, bringing people together for fellowship, support, and a sense of belonging. Chatham County's Comprehensive Plan has a clear vision for this stretch of US 15/501 N, with development patterns of compact communities and mixed-use commercial centers that will further strengthen its community focus, while seeking to preserving the rural character of the landscape.  Along with new homes and businesses in this area, weaving in landmark support infrastructure such as churches and community centers is integral to the health and success of a growing community.

Summit Church has a proven record of positively impacting communities across North Carolina's Piedmont Region, with multiple thriving locations in Alamance, Durham, Orange and Wake Counties.  As growth and development moves south and west of the Triangle, Summit Church seeks to do the same with a new location in Chatham County.  This site matches their vision of the future along a major vehicular corridor adjacent to both residential and commercial land uses.

The project site is 50.12 acres, comprised of three parcels located along on the east side of US 15/501 N corridor:  parcel #18750 (18.35 acres), parcel #18896 (6.3 acres) & parcel #18897 (25.47 acres).  The site is in the WS-IV PA Watershed District, limiting impervious surface area to 24% of the total parcel acreage.  A 325' wide Electrical Transmission Easement dissects the parcel assemblage, limiting development on nearly 8 acres of cleared land.  The proposed development is primarily located on the Northern-most parcel (#18750), with some associated parking within the power easement and a multipurpose grass field located south of the easement.  This site plan proposes approximately one third of the parcel acreage to remain undisturbed.

Beyond the benefits the church will provide to the people of the local community, there are ample benefits for the landscape as well.  The site plan for the church will preserve or enhance forest buffers whenever possible, maintaining the rural character of the site, and limited the visual impact from the roadway.  The development's wastewater facility below ground, fitting with the county's rural aesthetic.  Above ground Stormwater management facilities will be woven into the surrounding environmental fabric, creating wildlife habitat while

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 429 of 743

improving water quality and recharging groundwater supplies. Beyond the rural aesthetics of forests and fields, the proposed site plan creates outdoor recreation opportunities for the community, through a multipurpose field, communal areas, and play spaces and acres of undisturbed lands.

**FIVE FINDINGS**

**1.** The alleged error in this Ordinance, if any, which would be remedied by the proposed amendment with a detailed explanation of such error in the Ordinance and detailed reasons how the proposed amendment will correct the same. There is no alleged error in the Ordinance.

N/A - No error alleged.

**2.** Changed or changing conditions, if any, of the area or in the County generally, which make the proposed amendment reasonably necessary to the promotion of the public health, safety and general welfare.

A. Need and desirability

Churches bring community members together. The population of Chatham County is growing and compact communities, similar to Fearrington Village and Briar Chapel, will continue to appear along the US 15/501 Corridor as outlined in the Comprehensive Plan. The proposed church will serve the immediate and regional community as it continues to grow. Attendees of the Neighborhood meeting were excited to see a project proposed that will benefit the community and limit environmental impacts, with limited density.

B. Survey of similar uses

There are other churches in this area of different denominations. Evergreen United Methodist Church is on US 15/501, 1.4 miles North of this property. Mt Zion Baptist Church is on Fellowship Rd, 1.1 miles Northeast. Lystra Baptist Church is also on Fellowship Rd, 0.2 miles farther. Both have been part of the community for over 150 years. Iglesia Bautista Monte Carmelo is 1.6 miles Southeast of this property, on Jack Bennett Rd. These are the closest existing churches. No churches are located on any adjacent properties.

C. Public provided improvements

While the proposed development is a public resource, no public improvements are required for this project.

D. Tax considerations

The proposed community resource hold Tax Exempt status.

E. Employment

The church will create a limited number of onsite jobs, both full-time and part-time.


Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 430 of 743

**3.** The manner in which the proposed amendment will carry out the intent and purpose of any adopted plans or part thereof.

A. Comprehensive plan, chapter two:

1. Issues and opportunities:

Land use: settlement patterns and features (comprehensive plan p.18)

Chatham County's Comprehensive Plan notes that Churches "remain central gathering places in towns and rural townships in the County." As development continues in the Chatham County, new churches should accompany new residential and commercial development. This property is adjacent to both residentially and commercially zoned properties. Per the UDO use table (5.1.2), churches are allowable in both residential and non-residential zoning.

Land use: rural character (Comprehensive Plan p.18)

This section of the Comprehensive Plan notes: "In Chatham County, rural character is manifested in a backdrop of forests and fields, dotted with natural features such as creeks and hills and structures such as barns, silos, churches" (Page 18). This conditional rezoning proposes a church, and will preserve approximately 18 acres of forested land on the Southern end of the assemblage and as natural perimeter buffers. The proposed plan sites the building back from the road, with the septic field and stormwater ponds closer to the road, giving the look and feel of pastureland and natural habitat. Existing forest buffers are maintained along the road frontage wherever possible, preserving and enhancing the rural character of the land.

Environment: water quality (Comprehensive Plan p.32)

The Comprehensive Plan identifies protecting water quality as a driving force of land use recommendations and notes a "growing concern over groundwater availability." Within the proposed site plan, stormwater from new impermeable surfaces will be treated onsite and stormwater control measures will ensure that post-development hydrological flows will remain equal to or better than the existing pre-development condition, ensuring continued groundwater infiltration after rain events. Approximately one-third of the property will remain as undisturbed land, which provide the best water quality credit.

Environment: unique assets (Comprehensive Plan p.33)

The Comprehensive Plan states that 'Chatham County's forests and streams are home to at least 49 rare, threatened or endangered species," and the majority of these assets are on private land facing development pressures. The proposed plan maintains twice the recommended 50' buffer from the small intermittent stream found onsite and 18 acres of native lands. These areas include many mature shag-bark hickories, oaks, maple and other native trees that provide valuable habitat for native, threatened, and/or endangered species.


Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 431 of 743

Environment: open space (Comprehensive Plan p.35)

According to the Comprehensive Plan, "The farms and forests that line rural roads contribute to the lifestyle that residents value." This proposed plan leaves 18 acres undisturbed land post development and over 3 acres of septic field will be maintained as grassland visible from the road.

B. Comprehensive plan, chapter three:

1. Goals and objectives

Goal #1: preserve the rural character and lifestyle of Chatham County (p.41)

• Preserve farms and "lifestyle" in the western part of the County as well as forests and open space in the eastern part of the County.

The proposed plan preserves forest and provides open space by locating the building approximately 500' back from the road and retaining existing trees along the road as a natural buffer. Behind these trees, required site infrastructure footprint as a grassy field and wildlife habitat area when seen from the road (septic field and stormwater pond read). Overall, the plan preserves 18 acres of the +50-acre site as undisturbed existing forest.

Goal #5: conserve natural resources (p.42)

• Maintain and restore the quality and quantity of groundwater and surface water resources.

Proposed stormwater control measures will maintain pre-development hydrological patterns, create additional surface waters that provide wildlife habitat, and help stormwater infiltrate to recharge groundwater supplies.

• Preserve and protect the ecosystem services provided by green infrastructure

This site plan preserves 18 acres as undisturbed forest to maintain mature native trees as wildlife habitat.

• Avoid or minimize landscape fragmentation.

In the proposed site plan, the preserved acreage links this parcel with adjacent offsite forested lands thereby maintaining the existing wildlife corridor.

• Preserve night skies by minimizing light pollution.

The proposed site lighting plan meeting the regulatory criteria and is designed minimize to minimize light pollution and preserve night skies.



Case 1:25-cv-00113-UA-JLW   Document 1   Filed 02/14/25   Page 432 of 743

Goal #6: provide recreational opportunities and access to open space  (p.42)

• Provide expanded recreation opportunities and improve access to parks, community facilities, trails, and open space.

The proposed development will create recreational opportunities on private land, that is open to the public, while maintained and managed by the landowner.  The included multipurpose grass field and playground, and existing forest provide the surround community with increased access to park-like lands.

2. Land use description = Compact Residential

- Location:  The property is located between the Chatham Downs and Briar Chapel Commercial Centers (indicated by the blue star on the Future Land Use Map below), within a larger 'Compact Residential' area.

- The Comprehensive Plans states that "Community centers, amenities, recreational uses, schools, and **churches** may be part of the fabric." (p.47)

- Building:  The proposed building includes both 1-story and 2-story portions.

- Streets:  The proposed site plan utilizes existing roads as it connects to US 15/501 N.

- Wastewater:  The project will use a private onsite, underground drip septic system.





C. Comprehensive plan, chapter four:

1. Economic development (page 53)

Strategy 3.4 of the Comprehensive Plan seeks "to create attractive work environments with amenities to compete with other employment location options in the Southeastern United States. The mix of uses, development configuration and quality, variety of amenities, and connectivity affect the attractiveness—and competitiveness— of employment centers." (p.56) The proposed church community, along with the recreational open spaces of the site design, will serve as an amenity to enhance the appeal of the area, to help attract high-quality workers to other jobs in this area.

2. Land use (page 61)

The Design Details sidebar (p.63) notes that Compact Communities should include: "A mix of land uses, with residential, commercial, and civic components." The proposed church adds a civic component to the healthy mix of land uses within the community and will serve as a hub of community activity for the surrounding area.

STRATEGY 2.1: Allow areas within and near Community and Neighborhood Centers, as shown on the Future Land Use Map, to be developed for larger scale commercial, office and mixed use developments.

On the map, this property is located between two community centers and the proposed plan is an office & institutional use. Within the Comprehensive Plan, Churches are encouraged as part of the 'fabric' within the Comprehensive Plan

STRATEGY 5.1: Encourage context-sensitive development design. This type of design includes elements such as architectural features that resemble historical structures and local vernacular, site design that reduces impacts on historical structures, working landscapes and viewsheds from public roadways, integrated open space, and preservation of unique natural features such as heritage trees and mature forests.

The proposed plan considers the viewshed from the road by setting the building back 500 feet. Existing trees will be preserved as a natural buffer and the placement of new site infrastructure (septic and stormwater) uses these features as additional visual buffers. The septic area will be maintained as grasslands, yielding the appearance of over 3 acres of fields when viewed from the road. The stormwater pond will be planted as wildlife habitat, creating additional natural area between the new building and the road. Dozens of heritage trees will be preserved in the 18 acres of mature forest that will remain undisturbed during the proposed development. Both natural open space and recreation open space are incorporated into the design. This project will include a 240'x400' multipurpose grass field and retain large areas of existing forest as open space that is open to the public, while maintained and managed by the landowner.

3. Natural resources (page 103)

This project aligns with the following strategies listed in the Comprehensive Plan:



Strategy 1.1: Maintain riparian buffers in Watershed Protection Ordinance and minimize stream crossings in new developments.

There is a small intermittent stream onsite, in the Northeast corner of the property, which has a required 50' buffer. The proposed plan maintains twice the required buffer and all existing trees in this corner of the property.

Strategy 2.1: Encourage development design that preserves unique natural features on sites, including mature forest and riparian areas.

The proposed plan maintains approximately 18 acres of mature forest (roughly a third of the +50 acre site). The mature forest includes many mature shag-bark hickory, maple and oak trees that provide forage for native wildlife. An intermittent stream is also preserved.

Strategy 2.2: Encourage development design to preserve forest cover and additional uplands.

The proposed plan maintains approximately 18 acres of mature forest (roughly a third of the 50 acre site). Wherever possible, existing forest cover is preserved as a natural buffer around the entire perimeter of the property.

4. Parks and recreation (page 117)

The primary goal listed on page 117 is "Provide recreational opportunities and access to open space." This project includes multiple types of recreational amenities: children's play space, multipurpose grass field, outdoor communal areas, gathering spaces, and nature undisturbed lands. These areas will be open to the public, while maintained and managed by the landowner.

Strategy 4.1: Provide more outdoor recreational opportunities and open space.

The proposed plan provides recreational space for the community in three ways. First, it includes an outdoor children's play space adjacent to the building. Second, it includes a 2-acre multipurpose grass field that will be open to the community. Third, the preserved forest areas provide a natural play space for exploration and outdoor natural plan.

**4.** The requested amendment is either essential or desirable for the public convenience or welfare. (i.e., tell how and for what purpose/s the amendment would provide to the County as a whole)

A. Traffic:

See attachment A for the preliminary Traffic Summary letter.

B. Visual Impact & Screening

The church building is set back from both the road frontage and adjoining properties, while retaining natural forested buffer areas wherever possible. Areas of grading at the two entries



will have new tree and shrub buffer plantings. Additional plantings will serve to screen parking areas and service areas such as solid waste storage. The solid waste storage and mechanical areas will be screened with both fencing and evergreen shrubs. Parking areas will have shrub plantings and to mitigate potential glare from headlights along with shade trees within planting islands. See attachment B for Visual Impact Assessment.

C. Lighting

There will be three primary types of lighting: 1. Exterior lighting on the buildings; 2. Pole mounted lights within parking areas; 3. Pedestrian level lighting along paved pathways for safety and wayfinding. Lights will be oriented downward to minimize light pollution to the night sky. All site lighting is located away from the property lines and oriented towards the center of the property. Lighting in parking areas will be 150 watt 'shoebox' LEDs mounted 25' high, per design by Duke Energy. These are standard Duke Energy lights used throughout Chatham County along roadways and shopping centers. Proposed Pedestrian lighting along walkways ±47.9 watt LEDs atop approximately 12' tall posts. These lights will be international dark-sky approved, and the light casts downwards from a circular hood. Proposed Pedestrian wayfinding/safety lighting which are 15.9 watt LEDs on 10' tall posts. Lighting plans are included in the submittal drawings with additional detail.

D. Noise

No unusual noise will be generated by the church. Noise generation will be common sources such as cars within a parking area or hvac units for the building. There may occasionally be recreational activities or gatherings on the grass field.

E. Chemicals, Biological and Radioactive Agents.

N/A: No unusual chemical or biological agents are associated with the proposed use.

F. Signs.

Signage is proposed for each of the two entries, to identify the church. Plan and Elevation drawings for the proposed signage are included in the submittal. The signs will both be under 10 feet in height, and have a footprint of 14'-6" x 2'-4".

G. Emergency Services <Optional>

The proposed site plan is design to meet emergency services access requirements. Design coordination has been initiated with the County Fire Marshal, see Attachment C.

**5.** All other circumstances, factors and reasons which the applicant offers in support of the proposed amendment. (i.e. watershed classification, impervious surface, utilities, infrastructure, etc.)

A. Water Source and Requirements



The proposed project will connect to the existing main located in the US-15 51 right-of-way. See Attachment D for preliminary flow requirements for the development.

## B. Wastewater Management

Domestic wastewater at the facility will be treated on-site using a drip type underground septic system. Septic system permits will be requested from the Chatham County Environmental Health Department once more detailed design allows proper sizing of the facilities. An NPDES permit may be required from the NC Department of Environmental Quality Western Intake Partnership.

## C. Water/Sewer Impact Statement.

Water: The proposed project will connect to the existing main located in the US-15 51 right-of-way. See Attachment D for preliminary flow requirements for the development.

Sewer: The proposed project will use a private septic system and NOT impact the sewer system.

## D. Access Roads

Proposed plans show two access drives to/from the Northbound lanes of US 15/501 N. This public road is a four-lane divided by highway, limiting vehicular access to right-in and right-out movements. Righthand turn lanes are proposed for both access points, as shown in the submittal drawings.

## E. Stormwater Runoff

The project will not increase stormwater runoff to neighboring properties. During construction, stormwater will be controlled using temporary sediment and erosion control devices as outlined in a sediment and erosion control plan that will be submitted to the North Carolina Department of Environmental Quality. After pos-construction, stormwater will be managed using a stormwater control measure to collect and treat all stormwater onsite, helping recharge groundwater supplies. Stormwater permit applications for these measures will be submitted to Chatham County. The preliminary stormwater management plan is shown on the grading plans that are part of the submittal drawings.

Signed,

Jael Wagoner, PLA, ASLA
Assistant Vice President | Landscape Architect
Qunity, P.A.





One Glenwood Avenue
Suite 900
Raleigh, NC 27603
919-420-7660
NC Lic. No. F-0270

| **MEMORANDUM**

| **Date:** | **May 20, 2024** |
|---|---|
| **To:** | Jael Wagoner, PLA, ASLA<br>Qunity |
| **From:** | Baohong Wan, PhD, PE<br>Gannett Fleming |
| **RE:** | Summit Church Chatham County Traffic Summary Letter |

Gannett Fleming is contracted with Qunity to prepare the Summit Church Chatham County Traffic Impact Analysis (TIA) in accordance with the North Carolina Department of Transportation (NCDOT) Congestion Management Capacity Analysis Guidelines and Chatham County Unified Development ordinance (UDO) requirements.

The proposed development is located in Chatham County, North Carolina, and it encompasses approximately 30 acres of land with the assemblage properties of Chatham County parcel numbers 0018750, 0018896, and 0018897. The preliminary plan is to construct an 88,460 square foot (SF) church with a 1,200-seating capacity sanctuary. Construction of the site is assumed to occur in 2026.

This Technical Memorandum outlines Gannett Fleming's preliminary findings and observations concerning the proposed development, while data collection and coordination with the NCDOT and Chatham County is underway with the final TIA anticipated to be competed in June 2024.

## Trip Generation

The amount of traffic generated by a new development is a function of the size and type of development. Trip generation data for this report was conducted in accordance with the procedures outlined in the Institute of Transportation Engineers (ITE) report entitled **Trip Generation 11th Edition**[1]. Table 1 illustrates the total number of weekday daily, weekday AM peak hour, weekday PM peak hour, Sunday daily, and Sunday peak hour trips expected to be generated by the proposed development.

As shown in Table 1, the proposed Summit Church Chatham County is projected to generate approximately 669 vehicular trips on a typical weekday, with 28 trips expected to occur during the AM peak hour and 43 trips during the PM peak hour; it is projected to generate approximately 2,768 trips on a typical Sunday, with 912 trips expected to occur during the Sunday peak hour.

Due to the proposed land use, majority of vehicular tips are anticipated to be passenger vehicles. ITE Trip Generation doesn't contain truck trip generation data for church; for comparison purposes, an 88 KSF general office building is projected to generate 9 truck trips on a typical weekday. Based on the ITE data, the proposed site is projected to generate approximately 51 Walk + Bike + Transit trips during the Sunday peak hour.

## Preliminary Roadway Capacity Assessment

The proposed Summit Church Chatham County is planned to be accessed via two new driveways along US 15-501 (Chapel Hill Road). Other secondary roadways that may be impacted by site traffic include Lystra Road (SR 1721), Briar Chapel Parkway (SR 1690), Vickers Road (SR 1719), and Jack Bennett Road (SR 1717).



_US 15-501_ is maintained by NCDOT as part of the US Highway System. US 15-501 is a north/south corridor that connects Chatham County with Chapel Hill in Orange County. Under the existing conditions, US 15-501 is a median divided four-lane roadway with little or moderate access control. The speed limit along US 15-501 is 55 miles per hour (mph). Potential capacity along US 15-501 is 35,700 vehicles per day (VPD), while the 2022 AADT along US 15-501 was measured at 22,000 vehicles per day (VPD) north of Briar Chapel Parkway/Vickers Road, and 17,000 VPD south of the same location. The annual average daily truck traffic (AADTT) along US 15-501 was at 550 VPD north of and 430 south of Briar Chapel Parkway/Vickers Road.

_Lystra Road (SR 1721)_ is maintained by NCDOT as a secondary roadway. Under the existing conditions, Lystra Road is a two-lane, undivided roadway with 45 mph speed limit. Potential capacity along Lystra Road is 12,700 vehicles per day. The 2022 AADT was measured at 6,000 VPD along Lystra Road between US 15-501 and Jack Bennett Road.

_Briar Chapel Parkway (SR 1690)_ is maintained by NCDOT as a secondary roadway. Under the existing conditions, Briar Chapel Parkway is a two-lane, partially divided roadway with 35 mph speed limit. Potential capacity along Briar Chapel Parkway is 12,900 vehicles per day. There was no AADT information provided by NCDOT along Briar Chapel Parkway.

_Vickers Road (SR 1719)_ is maintained by NCDOT as a secondary roadway. Under the existing conditions, Vickers Road is a two-lane, undivided roadway with 35 mph speed limit. Potential capacity along Vickers Road is 11,600 vehicles per day. There was no AADT information provided by NCDOT along Vickers Road.

_Jack Bennett Road (SR 1717)_ is maintained by NCDOT as a secondary roadway. Under the existing conditions, Jack Bennett Road is a two-lane, undivided roadway with 45 mph speed limit. Potential capacity along Jack Bennett Road is 12,700 vehicles per day. The 2022 AADT was measured at 3,600 VPD along Jack Bennett Road east of US 15-501.

## Anticipated Transportation Improvements

The section of US 15-50 was specified as a synchronized street in the DCHC MPO 2050 Metropolitan Transportation Plan (MTP). Conversion of remaining non-synchronized sections to synchronized street along US 15-501 from Smith Level Road to US 64 Bypass in Chatham County is planned with NCDOT TIP U-6192 as part of 2024-2033 State Transportation Improvement Program (STIP). The right-of-way year for TIP U-6192 is anticipated to be 2028, and construction is expected to start in 2031. With the completion of TIP U-6192, capacity along US 15-501 is expected to improve to 43,900 VPD with moderate access control in place.

In the DCHC MPO 2050 MTP, the section of Jack Bennet Rd/Lystra Rd from US 15-501 to Farrington Mill/Point Road was recognized as candidate roadway section for potential modernization improvements, although the project funding has not been identified.

Since the proposed Summit Church Chatham County is projected to generate minimal trips on a typical weekday (less than 700 VPD), mitigation measures along off-site roadways are not anticipated, as the roadways should be

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 439 of 743



able to operate under capacity after buildout of the proposed site.  Nevertheless, due to potential large amounts of inbound and outbound trips during Sunday peak hour (over 900 trips), dedicated turn lanes along US 15-501 will likely be required. Final mitigation determinations and turn lane decisions will be updated with the completion of TIA.



| Table 1 – ITE Trip Generation Summary | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Weekday Site Trips** | | | | | | **Weekday** | | **AM** | | | **PM** | |
| **LUC** | **Description** | **Density** | **Variable** | **PK HR** | **METHOD** | **Daily** | **In** | **Out** | **Total** | **In** | **Out** | **Total** |
| 560 | Church [Data Range: 10-50] | 88 | 1000 GFA | Adjacent | RATE* | 669 | 17 | 11 | 28 | 19 | 24 | 43 |
| | Church Total | | | | | 669 | 17 | 11 | 28 | 19 | 24 | 43 |
| **Sunday Site Trips** | | | | | | **Sunday** | | **Sunday Peak** | | | | |
| **LUC** | **Description** | **Density** | **Variable** | **PK HR** | **METHOD** | **Daily** | **In** | **Out** | **Total** | | | |
| 560 | Church [Data Range: 10-50] | 88 | 1000 GFA | Adjacent | RATE* | 2,768 | 438 | 474 | 912 | | | |

–



## Legend

- Project Site
- Intersection
- Site Access
- Cross Connection

0    600    1,200
Feet

Figure 1

Summit Church Chatham County
Study Area Map

Chapel Hill, NC

NCDOT
Division 8 District 1:
Chatham County

GANNETT
FLEMING

5/20/2024

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 442 of 743



## GENERAL SITE NOTES

1. BUILDING AND ROADWAY STAKE OUT TO BE PERFORMED BY A REGISTERED LAND SURVEYOR. NOTIFY THE ENGINEER OF ANY DISCREPANCY.
2. ALL PARKING LOT DIMENSIONS ARE TO BACK OF CURB AND FACE OF SIDEWALK, UNLESS OTHERWISE NOTED ON THE PLANS.
3. ALL ON SITE PERIMETER CURB & GUTTER SHALL BE 24" UNLESS OTHERWISE NOTED.
4. CURB & GUTTER TO SLOPE (NEGATIVE OR POSITIVE) SAME AS PAVEMENT EDGE. PONDING OF WATER IN THE GUTTER IS PROHIBITED.
5. ALL CURB & GUTTER RADII SHALL BE 3' (TO BC) UNLESS OTHERWISE NOTED.
6. ALL SIDEWALKS ARE 5' WIDE WITH EXPANSION JOINTS @ 30' OC UNLESS OTHERWISE NOTED ON THE DRAWINGS.
7. ANY WORK WITHIN THE PUBLIC RIGHT-OF-WAY SHALL BE IN STRICT ACCORDANCE WITH CHATHAM COUNTY STANDARDS AND SPECIFICATIONS.
8. THE ESTABLISHMENT OF FIRE LANES, IN ACCORDANCE WITH SECTION 503.3 OF THE 2012 NC FIRE CODE, MAY BE REQUIRED WHERE IT BECOMES APPARENT AFTER OCCUPANCY OF THE DEVELOPMENT THAT PARKING WITHIN ROADWAYS CREATES DIFFICULTIES FOR THE PASSAGE OF FIRE EQUIPMENT.
9. CONTRACTOR TO VERIFY THE WORK TAKING PLACE RELATED TO THE CHANGES IN THIS SITE PLAN WILL BE FULLY COMPLIANT WITH THE NORTH CAROLINA ACCESSIBILITY CODES (ANSI 117.1 -2009 AND CHAPTER 11 OF THE NCBC) UNLESS AND EXCEPT IN AREAS WHERE AN APPROVED STATEMENT FROM A SITE ENGINEER, SURVEYOR OR ARCHITECT VERIFIES THAT SITE CONDITIONS EXIST WHERE THE TOPOGRAPHY OF THE SITE IS EXTREME AND ONLY ALTERNATE METHODS OF COMPLIANCE ARE POSSIBLE. AN ANALYSIS AND CERTIFICATION OF THE SITE, PERFORMED BY THE DESIGN PROFESSIONAL OR DESIGNEE, MUST BE SUBMITTED TO THE BUILDING INSPECTIONS DEPARTMENT CERTIFYING THAT ALL SITE ACCESSIBILITY CODE REQUIREMENTS SUCH AS CURB CUTS, RAMP SLOPES, SIDEWALK SLOPES AND WIDTHS, AND CROSS SLOPES MEET THE REQUIREMENTS OF THE NC ACCESSIBILITY CODE PRIOR TO CO ISSUANCE.
10. THE PROPER PROCEDURE FOR COMPACTED SOIL REMEDIATION IS AS FOLLOWS.
    a. REMOVE ALL IMPERVIOUS SURFACES FROM THE SUBJECT AREA.
    b. TILL THE AREA TO A DEPTH OF 12" BELOW THE TOP OF COMPACTED SUBGRADE.
    c. SUITABLE RATES AND TYPES OF SOIL AMENDMENTS SHOULD BE DETERMINED THROUGH SOIL TESTS. LIMESTONE AND FERTILIZER SHOULD BE APPLIED UNIFORMLY DURING SEEDBED PREPARATION AND MIXED WELL WITH THE TOP 4 TO 6 INCHES OF SOIL.

**1 / C100 SITE PLAN**
SCALE: 1"=100'

0 50 100 200
SCALE: 1" = 100'

N

### LEGEND (PROPOSED CONDITIONS)

LOD — LIMITS OF DISTRUBANCE
TPF — TREE PROTECTION FENCE
TP/LD — LIMITS OF DISTRUBANCE/ TREE PROTECTION FENCE
Z1 — RIPARIAN BUFFER - ZONE 1 (30')
Z2 — RIPARIAN BUFFER - ZONE 2 (20')
50' STREAM BUFFER
MULTIPURPOSE FIELD (GRASS)

### DEVELOPMENT SUMMARY:

**SITE SUMMARY**

| | |
|---|---|
| GROSS LAND AREA: | 2,183,097 SF (50.117 AC) |
| PROJECT AREA: | 1,303,268 SF (29.92 AC) |
| AREA OF DISTURBANCE: | 1,303,268 SF (29.92 AC) |
| EXISTING ZONING: | CD-CC COMPACT COMMUNITY |
| PROPOSED ZONING: | O&I: OFFICE & INDUSTRIAL |
| EXISTING USE: | RESIDENTIAL / VACANT |
| PROPOSED USE: | CHURCH |
| WATERSHED: | HAW / CAPE FEAR |
| RIVER BASIN: | CAPE FEAR |
| CITY LIMIT: | OUTSIDE |

**LOT SUMMARY**

| | |
|---|---|
| MAXIMUM BUILDING HEIGHT: | 60' (CHURCH SPIRES ARE EXEMPT) |
| STREET YARD SETBACK: | 40' |
| SIDE SETBACK: | 25' |
| REAR SETBACK: | 25' |

**BUILDING SUMMARY**

| | |
|---|---|
| EXISTING BUILDING AREA: | 4,525 SF |
| PROPOSED BUILDING AREA: | 88,460 SF |

**PARKING SUMMARY**

| | | | |
|---|---|---|---|
| REQUIRED PARKING CHURCH: | 1 SPACE / 4 SEATS | | |
| | 1,200 SEATS = | 300 | SPACES |
| REQUIRED ADA PARKING: | | 6 | SPACES |
| REQUIRED LOADING ZONE: | 1 SPACE / 50,000 SF | | |
| | 88,460 SF = | 2 | SPACES |
| STANDARD PARKING PROVIDED (9' X 18') | | 511 | SPACES |
| ADA PARKING PROVIDED: | | 16 | SPACES |
| TOTAL PARKING PROVIDED: | | 527 | SPACES |

**IMPERVIOUS SUMMARY**

| | |
|---|---|
| MAXIMUM ALLOWABLE IMPERVIOUS AREA: | 523,943 SF (12.03 AC) (24.0%) |
| EXISTING IMPERVIOUS AREA: | 4,525 SF ( 0.10 AC) |
| TOTAL PROPOSED IMPERVIOUS AREA: | 470,250 SF (10.80 AC) (21.5%) |

Quinity
CIVIL ENGINEERING | LANDSCAPE ARCHITECTURE

16 CONSULTANT PLACE, SUITE 201
DURHAM, NORTH CAROLINA 27707
P 919.490.4990
www.quinity.com
NORTH CAROLINA BOARD OF EXAMINERS FOR ENGINEERS AND SURVEYORS LICENSE NO.: C-0676

# SUMMIT CHURCH CHATHAM COUNTY

9780 US 15-501 N.
CHAPEL HILL, NC 27517

Figure 2

## SITE PLAN OVERALL

NORTH CAROLINA LANDSCAPE ARCHITECTURE C-200 QUINITY, P.A.

PRELIMINARY
DO NOT USE FOR CONSTRUCTION

811 - CALL BEFORE YOU DIG

DRAWN BY: SBM
CHECKED BY: JEW
DATE 05/07/2024
PROJECT NO. 2339
SHEET NO. C100
CONDITIONAL REZONING

©COPYRIGHT 2024 THIS DOCUMENT AND THE DESIGN ARE THE PROPERTY OF QUINITY, P.A. ANY REPRODUCTION WITHOUT PRIOR WRITTEN CONSENT IS PROHIBITED

# <u>SUMMIT CHURCH | CHATHAM CAMPUS</u>
*VISUAL IMPACT ANALYSIS MEMO*

US 15 – 501 N
Chapel Hill, Chatham County, North Carolina

Qunity Project Number: 2339

April 12, 2024



16 Consultant Place, Suite 201, Durham, NC 27707
OFFICE: 919.490.4990 / http://www.qunity.com

**Table of Contents**

1   **Introduction** ......................................................................................................................................1

2   **Site Inventory** ...................................................................................................................................1

    2.1   Location and Description ............................................................................................................1

    2.2   Existing Site Summary ................................................................................................................1

    2.3   Existing Visual Impacts ...............................................................................................................1

3   **Project Description** ..........................................................................................................................1

    3.1   Proposed Project ........................................................................................................................1

    3.2   Proposed Visual Impacts ...........................................................................................................1

4   **Visual Impact Assessment Conclusions** ......................................................................................2

# 1   Introduction

Visual Impact assessments (VIA) document the existing visual quality of the surrounding environment and evaluate the expected visual change caused by a project, assess public reaction to the expected change, identify visual impacts, and recommend measures to avoid, minimize or mitigate adverse visual impacts to protect and preserve scenic, aesthetic, and environmental resources.

The purpose of this VIA memorandum is to document potential visual change in the Area of Visual Effect (AVE) for the Summit Church | Chatham County.

# 2   Site Inventory

## 2.1   Location and Description

The proposed project is located at 9780 US 15-501 N, Chape Hill, NC, between Vickers Rd and Hidden Oaks Dr in Chatham County, North Carolina. The project assigned Chatham County PIDs 0018750, 0018896, and 0018897 and subject to the Chatham County Jurisdictional requirements. This parcel assemblage is located approximately 10 miles north of the center of Pittsboro NC and 7.5 miles south of the center of Chapel Hill, NC.

## 2.2   Existing Site Summary

The parcel assemblage is located within the Jordan Lake Watershed or the Cape Fear River Basin. The current land uses are residential and tree farming. The site is primarily wooded, with an electrical power easement dissects the site east/west. The parcels largely slope to the easement and west toward US 15-501N. An existing farmhouse with out buildings is present south of the electrical easement. A buffered stream is present in the northeast corner.

## 2.3   Existing Visual Impacts

The existing landscape is characterized by undulating, rolling topography that is primarily wooded. There is approximately 80 feet of vertical change in the area of development. There are no visually dominant landforms. The surrounding area is rural.

# 3   Project Description

## 3.1   Proposed Project

The proposed project includes a 1,200 seat church with outdoor gathering area(s), playgrounds, paved sport court, maintenance shed, open field area, required utility infrastructure, required stormwater control measure(s), and provision for a future accessory structure.

## 3.2   Proposed Visual Impacts

The proposed church structure sits back from the road to best fit in within the fabric of the surrounding community, reduce the visual impact of the massing/scale of the building, and placement of the sanitary sewer infrastructure where soil percolation allows. Building facade materials and color pallet have been intentionally selected to blend in with the rural aesthetic.

The proposed site development strategically responds to the challenging existing site topography, minimizes environmental impacts, and maximizes the use of existing trees. Natural perimeter buffers will be utilized to the extent possible. These buffers will be augmented with native plants as needed, to ensure a natural transition to neighboring properties. Where possible,

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 446 of 743

existing specimen quality trees will be relocated to support this effort. Any areas of the perimeter buffers that require augmentation will be planted with native tree species. These areas will be maintained to achieve a natural, yet well vegetative transition to neighboring properties.

Parking has been positioned to surround the proposed building to reduce site walls and maximize pedestrian safety. Vehicle Use and Site Lighting is preliminarily shown, in keeping with the required Chatham County lighting requirements and matching with the building materials. The Developer is committed to providing lighting and fixtures that suit the developments aesthetic and make the proposed project safe with as little impact as possible on offsite wildlife and neighboring properties.

Monument sign locations are identified on the Site Plan. The proposed monument sign meet the Chatham County Sign Ordinance requirements and will be aesthetically consistent with the proposed builds and the surrounding community.

## 4    Visual Impact Assessment Conclusions

The following are standard VIA considerations;

The project's aesthetic approach appear to be consistent with applicable laws, ordinances, regulations, policies, or standards? The current design strategically considered landform, environmental preservation, and screening through the site development and conceptual layout phases. The final site plan meets the intent of the Chatham County UDO.

Will permits be required by outside regulatory agencies (i.e., federal, state, or local)? An existing US Army Corps of Engineering Jurisdictional Stream Determination was founded in July 2021. NCDOT Encroachment Agreements are anticipated.

Will the project character be compatible with the visual character of the existing landscape? The design team has taken steps to utilize the existing landscape and limit environmental impacts to the extent practical. Additionally, the team has considered the building placement, materiality and visual consistency and relationships with those of the surrounding area.

Will the project contrast adversely with the memorability (vividness), natural harmony and/or cultural order (unity) of the existing landscape? The design team has taken steps to utilize the existing landscape and limit environmental impacts to the extent practical. Additionally, the team has considered the building placement, materiality and visual consistency and relationships with those of the surrounding area.

Will the project, when viewed together with other past or foreseeable projects, result in a cumulative adverse change in the visual quality or character of the existing landscape? The design team has taken steps to utilize the existing landscape and limit environmental impacts to the extent practical. Additionally, the team has considered the building placement, materiality and visual consistency and relationships with those of the surrounding area. There are no known new projects adjacent to the site.

Will the project produce a new source of substantial light or glare, which will adversely affect daytime or nighttime views within the area? Final site lighting will be in accordance with the Chatham County UDO will be included as part of this project.

What is the potential that the project proposal will be controversial within the community? Based on the current feedback from the Pre-Application Meeting held with the Chatham County Reviewers and current discussions with surrounding neighbors, little to no public objection is anticipated. The neighborhood meeting is scheduled for 4/29.

How sensitive are potential key stakeholder likely to be regarding visible changes proposed by the project? Based on the current feedback from the Pre-Application Meeting held with the Chatham County Reviewers and current discussions with surrounding neighbors, little to no public objection is anticipated. The neighborhood meeting is scheduled for 4/29.

What level of local concern is there for the types of specific project features and construction impacts that are proposed? There are no known concerns with the proposed land use or current design. The current design strategically considered landform, environmental preservation, and screening through the site development and conceptual layout phases of this site plan.

Are there federally, state, locally designated scenic or historic resources, or other visual resources within the project area of visual effect (i.e., viewshed)? None

Will the public benefit from a more detailed visual analysis in order to help reach consensus on a course of action to address potential visual impacts? The design team has worked diligently to reduce any visual or environmental impacts, within the requirements of the UDO.

Will the project likely require design changes to reduce the extent of visual resource impacts? The design team has worked diligently to reduce any visual or environmental impacts, within the requirements of the UDO.


Based on the information presented above, there area no visual resource related regulatory requirements. No or negligible visual changes to the environment are proposed. None or minimal public concern has been identified. It is our professional opinion that all Visual Impacts have been mitigated to the extent practical.

**Jael  Wagoner**

| | |
|---|---|
| **From:** | Scott Muir |
| **Sent:** | Monday, April 15, 2024 8:30 AM |
| **To:** | William Judson |
| **Cc:** | Jael  Wagoner |
| **Subject:** | RE: Fire Lane Design Questions |

Well, Jael has the answer – wall mounted – I'm still curious of your preference?

Thanks,

**Scott Muir, PLA**
**Landscape Architect**



16 CONSULTANT PLACE, SUITE 201
DURHAM, NORTH CAROLINA 27707
(919) 490-4990
**www.qunity.com**

---

**From:** Jael Wagoner <JWagoner@Qunity.com>
**Sent:** Friday, April 12, 2024 10:46 AM
**To:** William Judson <william.judson@chathamcountync.gov>; Scott Muir <smuir@Qunity.com>
**Subject:** RE: Fire Lane Design Questions

Billy,
Good morning. Thank you so much for your continued dialog with Scott on this project. The Civil Engineer provided me with the attached is the preliminary utility plan. The current design shows wall mounted FDC for the buildings. Please let me know if you have any questions.

Jael Wagoner, PLA, ASLA
Assistant Vice President | Landscape Architect



16 CONSULTANT PLACE, SUITE 201
DURHAM, NORTH CAROLINA 27707
**O** (919) 490-4990  **M** (919) 274-9288
**www.Qunity.com**

---

**From:** William Judson <william.judson@chathamcountync.gov>
**Sent:** Friday, April 12, 2024 10:29 AM
**To:** Scott Muir <smuir@Qunity.com>
**Cc:** Jael Wagoner <JWagoner@Qunity.com>
**Subject:** RE: Fire Lane Design Questions

You don't often get email from william.judson@chathamcountync.gov. Learn why this is important

Good morning Scott,

I appreciate you sending this over. Based on this preliminary design, it appears to meet the intent of the code. I noticed you added the grass pavers by the gym to meet the hose lay distances.

The one question I have is if you know if the FDC will be remote or wall mounted on both buildings?

Billy Judson
Chatham County Fire Marshal
80-D East St.
Pittsboro NC 27312
919.548.1770 -c

*In keeping with the NC Public Records Law, e-mails, including attachments, may be released to others upon request for inspection and copying*

---

**From:** Scott Muir <smuir@Qunity.com>
**Sent:** Tuesday, April 9, 2024 2:37 PM
**To:** William Judson <william.judson@chathamcountync.gov>
**Cc:** Jael Wagoner <JWagoner@Qunity.com>
**Subject:** RE: Fire Lane Design Questions

Billy,

Your past communications have been so helpful that we wanted to send you a Preliminary Draft of our Fire Safety Exhibit. We're specifically interested in your feedback on the layout of Fire Lanes, which are shown in light red on the attached plan drawing – particularly between the two buildings on the left side of the drawing.

Thanks in advance,

Scott Muir, PLA
Landscape Architect



16 CONSULTANT PLACE, SUITE 201
DURHAM, NORTH CAROLINA 27707
(919) 490-4990
www.qunity.com

---

**From:** William Judson <william.judson@chathamcountync.gov>
**Sent:** Monday, April 1, 2024 4:18 PM
**To:** Scott Muir <smuir@Qunity.com>
**Cc:** Jael Wagoner <JWagoner@Qunity.com>
**Subject:** RE: Fire Lane Design Questions

Yes sir,

Appendix D references this, while not currently a requirement as it has not been adopted into the fire protection ordinance, we will typically request that designer's try to meet these. Most of it is based on the height of the building and the required response vehicle (aerial/ladder truck). Many times the width of the aerial is much wider with the outriggers (jacks) out. That's a short background on why the request for 26 feet.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 450 of 743

## SECTION D105
## AERIAL FIRE APPARATUS ACCESS ROADS

**D105.1 Where required.**

Where the vertical distance between the grade plane and the highest roof surface exceeds 30 feet (9... apparatus access roads shall be provided. For purposes of this section, the highest roof surface shall be... the eave of a pitched roof, the intersection of the roof to the exterior wall, or the top of parapet walls, which...

**D105.2 Width.**

Aerial fire apparatus access roads shall have a minimum unobstructed width of 26 feet (7925 mm), exclusive... vicinity of the building or portion thereof.

**D105.3 Proximity to building.**

At least one of the required access routes meeting this condition shall be located within a minimum of 15 fee... 30 feet (9144 mm) from the building, and shall be positioned parallel to one entire side of the building. The si... aerial fire apparatus access road is positioned shall be approved by the *fire code official.*

**D105.4 Obstructions.**

Overhead utility and power lines shall not be located over the aerial fire apparatus access road or betwee... and the building. Other obstructions shall be permitted to be placed with the approval of the *fire code official.*

Billy Judson
Chatham County Fire Marshal
80-D East St.
Pittsboro NC 27312
919.548.1770 -c

*In keeping with the NC Public Records Law, e-mails, including attachments, may be released to others upon request for inspection and copying*

---

**From:** Scott Muir <smuir@Qunity.com>
**Sent:** Monday, April 1, 2024 4:11 PM
**To:** William Judson <william.judson@chathamcountync.gov>
**Cc:** Jael Wagoner <JWagoner@Qunity.com>
**Subject:** RE: Fire Lane Design Questions

Billy,

   Thank for the quick response and helpful information.  For the building height:  though the architecture is still being refined, I believe it will indeed be above 30' in height, Yes.  We're planning for (2) separate entry drives that connect around both sides of the primary building.  Are there other implications related to the height??

Thanks again,
Scott Muir, PLA
Landscape Architect



3

16 CONSULTANT PLACE, SUITE 201
DURHAM, NORTH CAROLINA 27707
(919) 490-4990
**www.qunity.com**

---

**From:** William Judson <william.judson@chathamcountync.gov>
**Sent:** Monday, April 1, 2024 4:03 PM
**To:** Scott Muir <smuir@Qunity.com>
**Cc:** Jael Wagoner <JWagoner@Qunity.com>
**Subject:** RE: Fire Lane Design Questions

You don't often get email from william.judson@chathamcountync.gov. Learn why this is important

Good afternoon Mr. Muir,

I appreciate you reaching out to me during the design phase of your project. I have attached the truck specs for North Chatham Fire Department's aerial apparatus. I added the turning performance of their older truck for you – this would be best to use for your design. It shows a 25 ft + turn radius see below.

Will the proposed building exceed 30 feet at its highest point?

I would also ask that you provide a fire truck exhibit for the project, showing truck routing, proposed hydrants, FDC location (wall mounted or remote), hose lay distances and proposed fire lanes on that plan as well.

Hope this helps and please let me know if you have any other questions.



**Parameters**

*Inside Cra...
Axle Track:
Wheel Offse...
Tread Width
Chassis Ov...
Additional B...
Front Overh...
Wheelbase:

**Calculated**

Inside Turn:
Curb to curb
Wall to wall:

---

Billy Judson
Chatham County Fire Marshal
80-D East St.
Pittsboro NC 27312
919.548.1770 -c

*In keeping with the NC Public Records Law, e-mails, including attachments, may be released to others upon request for inspection and copying*

---

**From:** Scott Muir <smuir@Qunity.com>
**Sent:** Monday, April 1, 2024 2:13 PM
**To:** thomas.bender@chathamnc.org; William Judson <william.judson@chathamcountync.gov>
**Cc:** Jael Wagoner <JWagoner@Qunity.com>
**Subject:** Fire Lane Design Questions

age originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and kn

Hello Thomas / William,

We're working on designs for a proposed Church Building in Chatham County and would like to confirm some design criteria related to fire safety in our preliminary parking layout.  The project site is on US 15/501 N, near Vickers Rd.

Our past projects have primarily been in Durham, which has a few design criteria that differ slightly from North Carolina State Fire Code based on the trucks used by the local department, and we'd like to confirm requirements for Chatham County.  The project will include a primary Church Building (62,000 sf), as well as a separate Gym and small maintenance building.  The buildings will be all be single story, but with tall ceilings in the gym and church sanctuary.  We've used a **26' wide fire lane** and would like to confirm what sort of fire truck to accommodate and its related turning radius.  Will a **20' inside turning radius** be sufficient on the fire lanes where they curve??  We appreciate your feedback in ensuring this design meets the safety requirements for Chatham County.  We will be submitting site plans later this month for conditional rezoning, so if there are any other specifics we should include, such as fire-related notes, please let us know.

Thanks so much,

Scott Muir, PLA
Landscape Architect



16 CONSULTANT PLACE, SUITE 201
DURHAM, NORTH CAROLINA 27707
(919) 490-4990
www.qunity.com

Flow Estimation                Mt Summit Church                3/4/2024    SRG

| | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday | Sunday |
|---|---|---|---|---|---|---|---|
| Total Seating - Adult | 1200 | 1200 | 1200 | 1200 | 1200 | 1200 | 1200 |
| Total Seating - Children | 1200 | 1200 | 1200 | 1200 | 1200 | 1200 | 1200 |
| Adult Utilization (%) | 0 | 20 | 0 | 100 | 0 | 0 | 100 |
| Children Utilization (%) | 0 | 16 | 0 | 80 | 0 | | 80 |
| Adult Attendance | 0 | 240 | 0 | 1200 | 0 | 0 | 1200 |
| Child Attendance | 0 | 192 | 0 | 960 | 0 | 0 | 960 |
| Total Occupancy | 0 | 432 | 0 | 2160 | 0 | 0 | 2160 |
| Sewer flow for Church (GPD) | 0 | 1296 | 0 | 6480 | 0 | 0 | 6480 |
| Flow from other Buildings (GPD) | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 | 1000 |
| | | | | | | | |
| Total Daily Flow (GPD) | 1000 | 2296 | 1000 | 7480 | 1000 | 1000 | 7480 |

Assumptions

1   Services at the Church will be held onl;y twice per week on Sunday Morning and Thursday evening.
2   Eight (8) out of Ten (10) families will attend with a child - on average. Childrens occupancy will be 80% of the adult occupancy.
3   Children will be at the church only when accompanied by parents(s). A dayvacre is not part of this estimation.
4   Occasional meetings will be held. This is assumed to be a maximum of once per week with a 20% occupancy rate.
5   Occasional meetings will tentatively occur on Tuesday.
6   Low-flow fixtures will be utilized to reduce projected flow by 20%.
7   A flow of 3 gpd/seat is used for the estimatiuon assuming a medium sized kitchen is included.
8   A previously calculated flow of 5,000 gal/week has been rounded to 1000 gpd and is assumed sufficient for the ancillary buildings and structures
9   Assumed allowable infiltration rate is 0.1 gpd/ft2
10  Repair area to has same infiltration rate as pplication area.
11   The total area reccomended has a safty factor of 1.2 to account for unusable areas due to elevation or unforseen conditions.

| | | | |
|---|---|---|---|
| Total Weekly Flow | 21,256 | gallons | per week |
| Reduction for Low-Flow Fixtures | 17,005 | gallons | per week |
| Equilibrated Daily Flow | 2,429 | gallons | per day |
| | | | |
| Estimated ft$^2$ needed for Infiltration | 24,293 | ft$^2$ | |
| Estimated ft$^2$ needed for Repair Area | 24,293 | ft$^2$ | |
| Total Area Required | 48,585 | ft$^2$ | |
| Total Area Suggested for Preliminary Planning | 58,302 | ft$^2$ | |
| | 1.3 | Acres | |

# EXHIBIT 8



# Chatham County Planning Board Minutes
## September 3, 2024

The Chatham County Planning Board met in regular session on the above date and the meeting were as follows:

<u>Present</u>                                                                                    <u>Absent</u>

Jon Spoon, Chair                Mary Roodkowsky, Vice-Chair
Tony Mayer                      Eric Andrews
Elizabeth Haddix                Clyde Frazier
Shelley Colbert                 Nelson Smith
Amanda Roberson

<u>Planning Department</u>
Jason Sullivan, Director, Angela Plummer, Zoning Administrator, Kimberly Tyson, Subdivision Administrator, and Daniel Garrett, Clerk to the Planning Board.

I.    <u>CALL TO ORDER:</u>
      Chair Spoon called the meeting to order at 6:35 p.m.

II.   <u>DETERMINATION OF QUORUM:</u>
      Chair Spoon stated there was a quorum, 9 members were present.

III.  <u>APPROVAL OF AGENDA:</u>
      Approval of the Agenda – Chair spoon said there are two zoning items on the agenda, but they are part of the same project. Chair Spoon asked to switch the order of the zoning items because a lot of people signed up for the conditional district rezoning item and would like to discuss that item first. There was some Board discussion about the two zoning items and it was agreed the Planning Board will be discussing both zoning items before taking any action on either one of them and the order of the two items would be switched. Motion made by Vice-Chair Roodkowsky to approve the amended agenda, seconded by Ms. Robertson. The agenda was approved, 9-0, unanimously.

IV.   <u>APPROVAL OF THE MINUTES:</u>
      Consideration of the August 6, 2024 meeting minutes. Motion by Ms. Haddix to approve the August 6th minutes and seconded by Mr. Mayer, the minutes were approved 6-0, Ms. Colbert, Mr. Smith, and Ms. Robertson did not vote because they were absent during the August 6th meeting. Ms. Colbert said even though she was absent from the meeting she did watch it via Zoom and is aware of the discussions that took place.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 457 of 743

V.   PUBLIC INPUT SESSION:
There was not anyone who signed up to speak.


VI.   SUBDIVISION ITEMS:


1.   Request by Mark Ashness, P.E. on behalf of SRE NC Landco, LLC for subdivision **Preliminary Plat** review and approval of **Parks at Meadowview Phases 2-4**, consisting of 453 lots on 261.23 acres, located off Parks Meadow Drive (SR-1680), parcels 61935, 10893, 89726.


Mr. Sullivan said During the prior Planning Board meeting there were several public comments questioning the role of the Planning Board in reviewing The Parks at Meadowview preliminary plat. There were also comments requesting additional review of the preliminary plat based on the length of time between sketch plan and submittal of the preliminary plat. Those were good questions and I am going to take a few minutes to explain the county regulations that apply to this project and the limitations imposed on local governments by the Legislature. The Parks at Meadowview was submitted through the major subdivision process and there was no corresponding zoning process required.

The subdivision process is ministerial meaning that if someone submits a layout in conformity with the regulations, they have a legal expectation of approval. If the local government does not like the project the appropriate remedy is to change the regulations for future applications. The reason the subdivision process is ministerial or administrative comes from the Legislature. In North Carolina, local governments are formed by the state meaning that locally elected officials do not have broad discretion when the Legislature has created specific statutes governing a particular activity. For subdivision applications, the Legislature has mandated specific parameters for local governments to use when drafting subdivision regulations. For example, the Planning Board can request an updated Traffic Impact Analysis but cannot require it under the current regulations. The reason being the regulations do not mandate a TIA for every project. However, the NC Department of Transportation can require a TIA when they deem it is necessary and, in this instance, did not require an update prior to issuing their permit for this project.

At the preliminary plat stage, the applicant has received all the regulatory permits for the project and the Planning Board and Commissioners are reviewing the application to ensure it generally conforms to the approved sketch plan. Some may say that the boards should still apply mandatory conditions to the approval and they can, but it will likely be frowned upon by the court system and Legislature. Additionally, the Legislature has mandated that if the courts rule against a local government, the local government must reimburse all the appellants legal costs. In recent years, the Legislature has also scrutinized many local governments based on land use decisions that have been made at the local level. Hopefully, this helps everyone better understand the constraints the Planning Board is operating under as they review this item.

Ms. Tyson said the Planning Board reviewed this application during their August 6, 2024 meeting. Staff informed the board that the county does not have authority over private matters between the developer and the Chapel Ridge HOA. Mr. Mark Ashness, P.E. with CE Group and John Ward with TruHomes were present. Mr. Ashness stated during his presentation this project started in the early 2000's, development has stopped and re-started multiple times, and it has been a significant juggling act. He also commented that Chapel Ridge has private roads, Parks at Meadowview did not have an amenity and their roads were gated in the existing phase. The compromise was to redesign phases 2-4 of the development and compact it, leaving more open space inside the Parks at Meadowview, and agree to build an amenity to serve the existing residents as well as the new residents. Mr. Ashness stated they also provided direct access to the portion that is gated, so the existing homeowners within the original phase have access to the amenity. Phases 2-4 will have two access points that will tie to the existing public road. All permits are in hand, as a pre-'08 subdivision Mr. Ashness stated, they are meeting and exceeding current buffer regulations and current stormwater regulations.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 458 of 743

Mr. Ward stated two years ago Sangerman had an agreement, but the agreement had a deadline, and the deadline has since lapsed. It is not clear why the lawyers placed a time duration on the agreement. The project owner is working with the current HOA board of Chapel Ridge to enter into a new agreement.

Several Chapel Ridge residents and adjacent property owners expressed their concerns about spray fields, completing a traffic analysis due to heavy traffic, road agreement between Parks at Meadowview and Chapel Ridge, and paying as much in taxes and utilities as a mortgage and/or rent.

Board discussion included:

- Clarification on the two access points. Response: The two access points both connect to a state-maintained road and Mr. Ashness added that a TIA was completed in 2022.

- Why are the spray fields located close to residents? Response: Per Mr. Ashness, there is a 50' perimeter buffer around Chapel Ridge, and there is also a 50' perimeter buffer around Park at Meadowview. They also located the spray nozzles 90' back from the edge of the spray field, so they have provided 190' buffer from any resident and spray reclaimed water. Currently, they are spraying on the other side of the road in Chapel Ridge that sprays right up to the lots, so when designing the plan, it was not seen to be an issue.

- Is TruHomes working to extend the agreement? Response: Mr. Ward stated, yes, they hope to come to an agreement within a few days.

- Traffic study was completed in 2022, but data was most likely from 2021 during the pandemic when traffic was lighter.

- Chair Spoon reminded the board they are reviewing the preliminary plat and its consistency with the sketch plan. The Board recommended proposing the vote and encourage the developer to work with Chapel Ridge HOA.

Ms. Tyson said the Planning Department recommends granting approval of the road names Hampstead Street, Cherry Branch Drive, Gardenview Drive, Owls Branch Drive, Goldenleaf Drive, Freemont Avenue, Misty Pine Street, Burkdale Drive, Hidden Pond Place, and Hawks View Point and granting approval of subdivision Preliminary as submitted with the following conditions:

1. The final plat shall provide setbacks.

2. The county attorney shall review and approve the contract and performance guarantee prior to final plat recordation.

3. Prior to final plat recordation the engineer shall certify to the county that there is all weather access for emergency vehicles and the certification must be approved by the Fire Marshal.

Ms. Tyson also informed the Planning Board that she received an email that stated the Chapel Ridge HOA and the Parks at Meadowview developer TruHomes are close to a signed agreement.

- Mr. Mark Ashness with the CE Group touched on what Mr. Sullivan had earlier said, the applicant agreed to meet all of the current environmental regulations even though this project falls under the pre-2008 regulations. This project has been modified to create more open space for the overall project. In terms of stormwater and erosion control requirements we are meeting all of the current mandates. We are also not only meeting but exceeding the buffer regulations and chose to use the most restrictive buffers. We have all of the necessary permits in hand to proceed with the project for these phases. Mr. Ashness said since the last Planning Board meeting our client has met with Ms. Karen Styres who is with the Chapel Ridge HOA and other HOA members. Ms. Styres is in attendance tonight and she will be able to inform the Board of the discussions. Mr. Ashness also said they had provided the Planning staff with exhibits outlying all of the spray areas for not only Parks at Meadowview, but also Chapel Ridge which were based off of 2006 and 2008 soils reports.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 459 of 743

- Mr. David Kaherl of 557 The Parks Drive said he lives in the Parks at Meadowview and this community is dependent on this work to be completed and in full support of the work they are doing. A lot of the remaining infrastructure in phase 1 is dependent on these phases to be completed. Our roads are not fully paved, there is also some pond work that needs to be done, and we have been told once this next phase is under construction we will see the improvements in our infrastructure. We are also looking forward to the amenities with the swimming pool and the other community centers. Mr. Kaherl said he is sure there is opposition, but we need to do what is in the best interest of Chatham County and allow different price points of housing to be available to potential residents. Mr. Kaherl thanked the Planning Board.

- Mr. James Crawford of 56 S. Holiday Drive said he lives in the Parks at Meadowview for 9 years and has seen a lot that has happened and what has not happened. As this Board knows, this land was purchased, but then sold and took a while for an investor to purchase the property to finish the development. This developer has partnered with TruHomes and wants to finish this subdivision which is decades old. This is an opportunity for this project to move forward and completed, I spoke two years ago and it is difficult to understand why we are still here addressing the same issues. It is time to finish and it will be great for the community. Even though these will not be considered affordable housing it is much less than Chapel Ridge and I am in full support of this project and getting it completed. Mr. Crawford thanked the Planning Board.

- Mr. Nazmul Bhuyan of 896 The Parks Drive said he lives in the Parks at Meadowview and is in support of this project. I just moved here last year with my wife and my daughter and we have to drive to Chapel Hill to teach my daughter how to swim. We are looking forward to this community to be completed so we have the amenities like the swimming pool. We can have a good life here. This is also a good project for Pittsboro with housing options and more infrastructure. Our future generations will have a better life here. Mr. Bhuyan thanked the Planning Board.

- Ms. Karen Styre a representative of the Chapel Ridge HOA thanked the Planning Board members for an additional month to work an agreement out with the Parks at Meadowview developer. Ms. Styre said the Chapel Ridge HOA has been in conversations with TruHomes and we have an agreement on the table in which we are working out the details and very optimistic as to where it stands now. Ms. Styre thanked the Planning Board for working with the Chapel Ridge HOA.

- Ms. Jameka Richardson of 512 The Parks Drive said my husband and I just moved the Parks at Meadowview in April of this year and it is very important that we do have the proposed amenities completed because it will provide my kids memories. The amenities will also allow other children in the whole community to come together. Currently, if we want to take our children to go swimming we need to go to another subdivision and it is not always open. Ms. Richardson said when they purchased their home she asked the real estate agent if they were allowed to use the pool in Chapel Ridge and the real estate agent said that pool does not belong to Parks at Meadowview, but they have been talking about constructing a pool for years. Ms. Richardson said it all boils down to our kids, we moved from Georgia in a neighborhood without many children and they only amenity there was a fishing pond, and my children do not fish. This addition of the amenities would be great for our community and the children. Ms. Richardson thanked the Planning Board.

- Mr. Michael (last name is unclear) said he lives in the Parks at Meadowview and is unsure why we are having these discussions because two years ago there was an agreement and everything was all worked out. It has not been explained what happened, what is the cause of the friction, what is the new agreement,

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 460 of 743

and does it impact the Parks at Meadowview in any way? Chair Spoon said the agreement that was in place between the Chapel Ridge HOA and the Parks at Meadowview developer expired this March of this year. They are currently working on a new agreement so both parties feel comfortable as the construction begins.

- Mr. Craig Brown of 1036 The Parks Drive said amongst most of the Parks at Meadowview I am probably one of the youngest homeowners. I come from eastern North Carolina from a town called Tarboro and I took a liking to Pittsboro because I wanted to look up and see the stars. If you had asked me years ago if I would be here today I would have said no. The house I grew up in was the size of my current living room. To be able to be a part of a community such as this is a great thing for me and my family. Mr. Brown said he understands that with a community this size there is going to be a lot of push and pull and a lot of stress, but the biggest thing for me remember is my three daughters can walk out the front door and have a street full of other little girls. To have my children grow up in a community such as this is something I pride myself on. I have one job, one role, and one career and that is to provide for my daughters. As adults and human beings, I believe we can come to an agreement and I am in full support of this project just like my neighbors who have spoken tonight. Mr. Brown thanked the Planning Board.

- Mr. Partrick Smith at 92 S. Parkside Drive said I have lived in the Parks at Meadowview for two years and had moved from Colorado and where I lived it was pretty homogeneous, everyone looked just like me. Coming to the Parks at Meadowview that has been so amazing for our four children there are people of all walks of life. I married a woman who is Ecuadorian so my kids look much different than I do and where we lived before they stood out like a sore thumb. Coming here and seeing people of all different nationalities in my neighborhood was a wonderful thing to see. I fully support that we expand this community with all the different price points for houses is going to bring so many more people who will help us expand our knowledge, or understanding, and our caring for people who may not be the same as us. Mr. Smith said I am in full support of finishing this project and thanked the Planning Board.

<u>Board Discussion</u>

- Ms. Colbert asked if the agreement between the two parties could be reached before the next Board of Commissioners (BOC) meeting and can that be a promise to this Board. Mr. Ashness said he cannot make that promise because he has not been part of the negotiations but feels that an agreement has almost been reached and that is the plan.

- Chair Spoon said this is the second meeting to discuss this subdivision and we will need to make a recommendation one way or the other. This is a much different discussion than last meeting and there seems a lot of progress has been made between the HOA and the developer.

- Vice-Chair Roodkowsky said one of the big concerns expressed at the last meeting was about traffic. Has there been any progress made in working with NCDOT to possibly have another traffic study conducted? Mr. Ashness said the traffic study that was conducted anticipated not only the delay in the project, but also the growth of the project and anticipated a background growth of transportation traffic on Hwy 87. When the study was done two years ago all of that was fully calculated, it is not a snapshot of two years ago. These studies look out through the whole growth of the project until its full buildout.

- Ms. Robertson said she was absent during the last meeting but did read through the meeting minutes and the public comments from that meeting and Mr. Bell indicated that the traffic study projected 3% annual growth, yet Chapel Ridge increased by 29% over the past two years and there are 788 lots now opposed to 715 lots. Ms. Roberton asked to elaborate on that and there were some scary concerns about how

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 461 of 743

dangerous Hwy 87 is just trying to turn onto it. Mr. Ashness said beyond the traffic study itself NCDOT set the parameters for that study and the sight distance on Hwy 87 is not the greatest, and there are sight distance issues all over the county, just like on Hwy 751, but they cannot all be corrected. NCDOT has strict requirements to install an intersection, but there are areas where NCDOT allowed a mirror to be placed in a position so oncoming traffic can be seen and we would be willing to discuss that with NCDOT, but we do not control that property on the other side of the highway. Mr. Ashness said in the end this is a NCDOT public road and NCDOT is in charge of that road, monitor and maintain those connections.

- Ms. Robertson asked what about the discrepancy between the 3% annual growth from the study verses the 29% Chapel Ridge is experiencing? Mr. Ashness said the 3% growth is not only Chapel Ridge, but also referring to the entire region and 3% growth on Hwy 87, Chapel Ridge is a subset of that growth. Ms. Robertson asked what is the 29% growth being related to? Mr. Ashness said Chapel Ridge is a large contributor of the traffic, but there is a larger base of users on Hwy 87 and much bigger than Chapel Ridge. Ms. Robertson said she understands and that information was helpful.

- Ms. Styres said she is speaking on behalf of Chapel Ridge HOA and one of the items we have discussed in the new agreement is working together on the traffic situation with NCDOT. This is an important thing for all of us because we recognize the safety needs for our children and residents. Ms. Colbert asked if Ms. Styres is asking the Planning Board to recommend approval of this subdivision. Ms. Styres said yes, we are close to an agreement and we want a recommendation for approval.

- Mr. Frazier said he would have been happy to vote for approval if the agreement had been reached, but it has not been reached. If we choose to table this item that sends a message to the commissioners. Chair Spoon said this is the second meeting for this item and we need to take action on this item tonight. It is also not the county governments duty to interfere with private entities negotiating contracts. It sounds like both sides are asking us to recommend approval. Mr. Andrews said he is okay with having a motion tonight as long as the commissioners are aware that an agreement should be reached before their October BOC meeting.

- Ms. Colbert said she disagrees about the HOA and the agreement because she read the meeting minutes from the original submission back 2022 and that agreement was part of addressing the traffic situation. Ms. Colbert said if they do not come to an agreement then the applicant has not met the original plan as far as addressing the traffic. Ms. Colbert said that is why she asked Ms. Styres how they felt about a recommendation for approval and with her assurance, we should move forward with a vote tonight.

Motion made by Vice-Chair Roodkowsky to recommend approval of this item where the Planning Board encourage/suggest an updated TIA for the traffic around Parks at Meadowview and encourage/suggest having an agreement finalized between Chapel Ridge HOA and developer (TruHomes) prior to BOC meeting on October 21, 2024. The motion was seconded by Chair Spoon.


- Mr. Andrews asked if we were going to vote on a motion without the recommendations. Ms. Colbert said there is a motion and a second and we need to take a vote, we cannot change the motion. Ms. Haddix thanked Mr. Sullivan the Planning Director for the piece he had said at the beginning of this meeting which is very important for everyone to understand the limitations on this Boards authority. There are times where it is necessary to slow things down to obtain more information and have a good public debate and then there are times when we have all the information we are going to get and it looks like some progress is being made and we have limitations as to what we can do. Slowing things down or confusing things for the

BOC is not good civic duty. Ms. Haddix said she respects all my colleagues and we are all concerned about the traffic and when she casts her vote she is conscious of all of these limitations we have and the clarifications we are giving or not giving to the BOC when we make a recommendation. It is not a vote against the traffic concerns on Hwy 87 or hoping that an agreement has been reached.

- Mr. Mayer said he is not enthusiastic of this development, and he will vote for approval tonight but would rather vote with only the recommendation for the agreement to be reached; the traffic study request is beyond this Board. Chair Spoon said we have a motion and second, if it is not approved then we might have a motion without those recommendations.

- Ms. Colbert asked for a restatement of the motion with the conditions. There was some discussion about the motion and what was said to be recommended or encouraged, but not conditions for approval, are the traffic study and the HOA/developer agreement. It was agreed that the motion that was made earlier and what would be voted on now was to approve this item where the Planning Board encourage/suggest an updated TIA for the traffic around Parks at Meadowview and encourage/suggest having an agreement finalized between Chapel Ridge HOA and developer (TruHomes) prior to BOC meeting on October 21, 2024.

There was a vote taken and the item was recommended for approval with the two suggestions noted with a vote of 6-1, opposed by Mr. Andrews and abstained by Mr. Frazier and Mr. Smith.

2. Request by K. Luke Turner, P.E. on behalf of David Weekley Homes for subdivision **First Plat** review of **Hamlet's Forest Subdivision**, consisting of 47 lots on 118.76 acres, located off Hamlets Chapel Road (SR-1525), parcels 1806, 2035, & 95989.

Mr. Andrews recused himself from this item.

Ms. Tyson said the request is for First Plat review and recommendation of Hamlet's Forest, consisting of 47 lots on 118.76 acres, located off Hamlets Chapel Road, S.R. 1525. Per the Subdivision Regulations, Section 5.2C(4), a Public Hearing shall be held at the first Planning Board meeting to receive comments on the proposed subdivision. Item (b) states that following the Public Hearing, the Planning Board shall review the proposal, staff recommendation, and public comments and indicate their recommendation for approval, disapproval, or approval subject to modifications. As stated above, the Planning Board has two (2) meetings to act on the proposal. The road is to be built as a 20-foot-wide travel way with a 60-foot-wide public right-of-way.

The applicant received comments during the Concept Plan TRC Meeting. The Chatham County Historical Association recommended the developer to look into a possible cemetery on the proposed project or in the vicinity of the project. The developer contacted North Carolina Department of Natural and Cultural Resources, a letter provided by this state agency stated, we have conducted a review of the project and are aware of no historic resources which would be affected by the project." CCHA requested the history of the property be honored by road names and requested if there were any historic features be identified.

Notification of the proposed development was provided to the Chatham County School System. Chris Blice, Chatham County Schools Assistant Superintendent for Operations was contacted by email dated June 12, 2024. Mr. Blice stated, for school buses to enter the neighborhood an amenity location with parking area off the main road would be needed. Otherwise, the bus stop will be at the entrance of the subdivision.

A Trip Generation Letter was provided a letter dated January 23, 2024, from Exult Engineering stated "the proposed site is expected to generate 494 external daily trips, 37 AM peak hour external trips (9 entering, 28 existing), and 48 PM peak

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 463 of 743

hour external trips (30 entering, 18 existing). The anticipated trip generation of the proposed site is well below NCDOT's threshold (3,000 vehicles per day) for requiring a Traffic Impact Analysis. The proposed site is expected to have minimal impact on the surrounding roadway network."

The developer submitted the General Environmental Documentation, and a letter dated June 18, 2024, from North Carolina Department of Natural and Cultural Resources Natural Heritage Program to Chatham County Land & Water Resources Division for review. The letter states "A query of the NCNHP database, indicates that there are no records of rare species, important natural communities, natural areas, and/or conservation/managed areas within the proposed project boundary. Please note that although there may be no documentation of natural heritage elements within the project boundary, it does not imply or confirm their absence; the area may not have been surveyed." Taylor Burton, Senior Watershed Specialist, reviewed the information submitted. Ms. Burton replied in a letter dated July 9, 2024, that the requirement has been met. Additional comments included any Allowable uses and Allowable with Mitigation uses in the protected riparian buffer will require a Buffer Authorization from Chatham County, all permits with wetland and stream impacts from NC Division of Water Resources and the US Army Corps of Engineers will need to be obtained prior to receiving approval from Chatham County for a Grading Permit and Land Disturbing Permit.

A community meeting was held on March 7, 2024, at Chatham County Agricultural and Conference Center, 1192 US Hwy 64 West, Pittsboro. Approximately twenty-four people attended the meeting. Items/issues discussed included the following:

•	Perimeter buffer along the west side of the proposed subdivision Response: Developer provided a 20' voluntary landscape buffer along the western portion of the subdivision.

•	Water allocation, erosion control, flooding, wetland impacts. Response: Construction documents will account for existing drainage to route water away from new pads.

The TRC met on August 14, 2024 to review the First Plat submittal. Mr. Luke Turner, P.E. with McKim & Creed and Charlie Yokley with David Weekley Homes were present. Mr. Turner stated the parcel is mostly wooded with some water features and the design is with a main street with three cul-de-sacs. NCDOT roads, one stream crossing to be permitted, public water and private septic.

Discussion included:

•	The Water Dept. stated the utility plan was reviewed, split taps are not allowed, and individual service lines will be needed. Maintain a 5-feet offset and no valves in the road. Fire hydrants need to be every 500-feet, would like the hydrants before the bulbs in the cul-de-sacs, and the Water Dept. may ask for a hydrant on Hamlet's Chapel Road. Depending on the placement of the home on lot 16, an incasement pipe may be needed for the extension.

•	The Watershed Protection Dept. stated the wetlands and streams need to be labeled in accordance with the riparian buffer report. Be mindful of the SCM's and stream buffers because maintenance cannot be conducted within the buffer.

A soils report and map were submitted to James Tiger, Chatham County Environmental Health Supervisor II, for review. Mr. Tiger stated, "The proposed subdivision appears adequate based on the information provided. The ability to permit these lots will largely depend on final house location and footprint, desired bedroom number, driveway location, grading activities, soil suitability, topography, and available space. Additionally, SCM setbacks may reduce reported septic area on some lots." County water will serve the subdivision. The road names Hamlets Forest Way, Whistle Stop Court, Chantry Court, and Chancel Court has been approved by Chatham County Emergency Operations Office as acceptable for submittal to the Board of Commissioners for approval.

AJ Kamal with Soil & Environmental Consultants, PA (S&EC) completed a site visit on October 12, 2023, and identified fifteen (15) surface waters within the review area that were potentially subject to riparian buffers. AJ Kamal, with S&EC completed the on-site riparian buffer visit with Drew Blake, Asst. Director Watershed Protection Dept., and Phillip Cox, Senior Watershed Specialist on March 31, 2024, to verify the consultant's findings. A confirmation letter dated April 9, 2024, stated three (3) ephemeral streams, three (3) intermittent streams, one (1) perennial stream, six (6) potential wetlands, and one (1) beaver impoundment. A 30-ft buffer from top of bank landward on both sides of the feature for all ephemeral streams, a 50-ft buffer will be required beginning at the flagged boundary and proceeding landward on all wetlands, a 50-ft buffer from top of bank landward on both sides of the feature for all intermittent streams, and a 100-ft buffer from top of bank landward on both sides of the feature for all perennial streams. On-site determination expires five years from the date of the riparian buffer report. The Jurisdictional Determination has been submitted to the Army Corp of Engineers.

Case 1:25-cv-00113-UA-JLW      Document 1      Filed 02/14/25      Page 464 of 743

There are three (3) proposed stormwater devices and as part of the stormwater permitting process additional information will be provided to the Watershed Protection Department during the permitting process. A Stormwater Permit and Sedimentation & Erosion Control Permit will be obtained from the Chatham County Watershed Protection Department prior to Construction Plan submittal. No land disturbing activity can commence on the property prior to obtaining Construction Plan approval. Site visits were scheduled for August 28, 2024, for Planning Department staff and various board members to attend.

Ms. Tyson said the Planning Department recommends granting approval of the road names Hamlets Forest Way, Whistle Stop Court, Chantry Court, and Chancel Court granting approval of the First Plat for **Hamlet's Forest** with the following conditions:

1. Approval of the First Plat shall be valid for a period of twenty-four (24) months following the date of approval by the Board of Commissioners and the Construction Plan approval shall be valid for a period of twenty-four (24) months from the date of approval by the Technical Review Committee or Board of Commissioners

2. The county attorney shall review and approve the contract and performance guarantee prior to final plat recordation.

- Mr. Charlie Yokley with David Weekley Homes said that we are one of the largest private home builders in the country and have been in the Triad since 1996 and as a company our goal is to make our customers happy. We are currently in Chatham County located within Chatham Park. Mr. Yokley gave a brief overview of the project and said this project has 47 lots on approximately 118 acres. This project will have public water and served with individual septic systems. There will not be any mass grading, we will only clear for the Right-of-Ways and the home site. There will be existing landscape on each lot. We are only proposing one stream crossing. Planning staff asked for a 60-foot Right-of-Way between lots 27 and 28 for future connectivity. We are also providing a 30-foot utility easement between lots 15 and 16. We held a community meeting March 7th, their concerns were for the trees, and they wanted us to look at the topography to make sure none of the community members will have water draining onto their property. Mr. Yokley said they did research the topography and found the best location for all the drainage and worked with the Watershed department for an approved stormwater treatment plan. Mr. Yokley said Mr. Chris Seamster with McKim & Creed is here as well if the Board has any questions.

There was not anyone signed up for public comments.

<u>Board Discussion</u>

- Ms. Robertson said she went on the site visit but was not able to go further down because the property was so dense and asked if any of the other members were able to see where the collection ponds will be located and how that is intergrading with the streams and buffers because they seem very close. Mr. Seamster said this display showing the ponds on the plat do not show the fine details like the grading plan will show. On this plat the ponds do seem close to the stream buffers, but we will not be grading within the buffer or the no build buffer and we will protect them.

- Chair Spoon asked if this project would have any off-site septic systems and will there be any stream crossing for septic utilities. Mr. Seamster said all the individual septic systems are on-site and there will not be any stream crossings for septic utilities.

- Ms. Colbert asked about the proposed Right-of-Way between lots 27 and 28, will that not have a stream crossing? Mr. Seamster said yes, we have put a reservation on that future 60-foot Right-of-Way that was requested from county staff during the Concept Plan review because the property behind this parcel is landlocked. At this point we do not know if that road will be build or not, so we have the future reservation for that and placed a gap between the lots if it is required in the future. As of right now we will not make an impact on the stream and we do not know if it will happen or not. Ms. Colbert asked what would be the plan to deal with that and who would be making that determination for an impact assessment? Mr. Seamster said that is to be determined whether the developer chooses to develop that parcel, if so, it would be up to them to coordinate the impact to cross the stream.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 465 of 743

- Chair Spoon said this is zoned R1 with over 2-acres per lot, all the septic is handled on-site with minimal stream crossing. Mr. Mayer said it is a simple plan and the walk out there was beautiful. Ms. Colbert said she felt like there were a few too many lots on this plan and would have been more pleasing to see a few less lots and the stormwater ponds pulled away a little more from the stream buffers.

Motion made by Mr. Mayer to recommend approval of this item, second by Ms. Haddix. There was a vote and the item was approved 7-0, Mr. Smith abstained and Mr. Andrews recused himself.


VII.   <u>ZONING</u>:

- Chair Spoon said this is a little different than normal because we have two applications for essentially the same project. We did switch the order in how we will discuss them, but everyone will have an opportunity to speak during the public input. Chair Spoon said he knows there has been a lot of broader discussions about this item in the community, we will be evaluating this project based on the use, the site map, traffic, and environmental impacts. We cannot discuss the broader topics whether or not religion or churches are needed in this area, that will not be part of our discussion. The Planning Board will be focusing purely on the zoning designation and whether or not this is designated for that part of Chatham County. Chair Spoon said we will have Ms. Plummer give the staff presentation then the applicant is allotted fifteen minutes for their presentation, then we will open public comments. After that, the Board will discuss both applications before taking action because they are linked.

- Ms. Colbert wanted to echo Chair Spoon and said when we are looking at this zoning we are referring to the 2017 adopted Plan Chatham and for any rezoning application we will be applying those standards, and we are going to be doing that in a way that is consistent with every rezoning case. We will not be talking about the specific use except as it relates to the zoning designation.


1. A legislative request by Qunity, PA to rezone Parcels 18750, 18896, 18897 from CD-CC Conditional District Compact Community to CD-O&I Conditional District Office & Institutional for a church/place of worship, being a total of 50.117 acres, located at 9780 US 15-501 N, Williams Township.


Ms. Plummer stated a legislative public hearing was held August 19, 2024. Planning staff presented the request, and the applicants also made a presentation and were available for questions. No one from the public spoke. The applicant stated they will be utilizing an underground drip system for the wastewater so there will nothing visible from the ground surface, they are designing the facility to complement existing commercial in the area, they have added additional buffering and are working with NCDOT on creating the safest traffic flow possible. These parcels were rezoned in February 2022 for a Conditional District Compact Community use for a 55+ development with 151 single family dwellings, a congregate care facility, daycare/offices, community garden, and barn for event space.

The main concern voiced by the Commissioners during the public hearing was that the Traffic Impact Analysis (TIA) referenced up to 3,000 total trips one day a week on Sundays, concerned that the design wasn't in keeping with the surrounding area (rural character and existing businesses), preservation, number of parking spaces needed, the size of the main building, and what the benefit to the county would be since they are not required to pay property taxes under the non- profit exemption law.

Based on the traffic analysis provided with the Herndon Farms rezoning in 2022, the expected trips per day at build out would be 1,616. Over the seven-day period, that would equate to 11,312 total trips per week. The development was

proposed to have 150,000 sf of non-residential buildings. Since the public hearing, the Planning Department has received numerous emails both in support of and opposed to the rezoning for a church. A majority of the emails are from residents that are not adjacent to or adjoining the site but from Fearrington Village, Governor's Club, Briar Chapel, and other areas.

When determining whether a rezoning request should be approved under Section 5 Conditional Zoning Districts, the following findings must be supported.

1. **The alleged error in the Ordinance, if any, that would be remedied by the proposed amendment with a detailed explanation of such error in the Ordinance and detailed reasons how the proposed amendment will correct the same.** No errors are being claimed.

2. **The changed or changing conditions, if any, of the area or in the County generally, which make the proposed amendment reasonably necessary to the promotion of public health, safety, and general welfare.** Population growth in the county has risen considerably over the last five years. It is expected to continue to increase with new developments already in the que and more on the horizon. There are four other churches one mile or more from this site. They are all denominations and a couple have served the community for over 150 years. This facility has a team of people to ensure traffic movement into and on the site to make safety a top priority. At build out, the busiest day will be Sundays. There will be smaller anticipated weekly meetings and events during the week.

   A property owner adjacent to the northern property line in Hidden Oaks has requested they maintain at least the 100 ft buffer that was provided with the Herndon Farms rezoning. The property owner adjacent to the eastern property line, where an existing solar farm is located, has also requested a 100 ft buffer.

   A community meeting was held April 29, 2024 and the applicant received general questions about site development. The Planning Department has received one specific concern about outdoor noise such as music. Staff advised that is something that, if the Commissioners want, can be conditioned if approved. Also, the county has a Noise Ordinance which would apply. There will be general outdoor recreational activities or gatherings on the grass field as part of their activities.

3. **The manner in which the proposed amendment will carry out the intent and purpose of any adopted plans or part thereof.**
   - Chapter 2, Issues and Opportunities, the plan notes that churches remain central gathering places in towns and rural townships in the County. This property is adjacent to residential and commercial uses. Per the definition of Compact Residential seen below, churches are specifically mentioned as part of the community fabric. Pg. 18 under Rural Character also specifically mentions churches as supporting rural character and preservation of natural features. The site will preserve approximately 18 acres of forested land, they have set the building back approximately 500 ft from US 15-501 and will have the stormwater ponds and underground drip septic system exposed to provide the look and feel of open pastureland and natural habitat. The site plan also shows a greater than 50 ft buffer off the intermittent stream located in the northeast corner of the site in an effort to protect unique assets and native species of the area.
   - Chapter 3, Goal 5, Conserve Natural Resources by maintaining and restoring quality and quantity of groundwater and surface water resources. The proposed stormwater control measures will maintain pre-development hydrological patterns, create additional surface waters that provide wildlife habitat, and help stormwater infiltrate to recharge groundwater supplies. The existing wildlife corridor will also be maintained.
   - Chapter 4, page 61, Land Use notes that Compact Community nodes should include a mix of land uses, with residential, commercial, and civic components. The church would add a civic component to the healthy mix of land uses in the area.

4. The requested amendment is either essential or desirable for the public convenience or welfare. The church will provide a specific service to the community and surrounding areas, especially in areas that are becoming very populated with residential development. Because the applicants want to be respectful of the viewshed from the roadway and to soften the appearance of commercial in a rural setting, they have located the building approximately 500 ft from the 15-501 road frontage. The zoning district which has been applied for only requires a 40 ft front setback. They will be preserving existing mature woods around the northern and easter property line

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 467 of 743

and installing approved landscaping in areas as noted on the submitted landscape plan. That plan was reviewed by the Appearance Commission on April 24, 2024, and recommended for approval.

There are two signs proposed at the two entrances of the property that will be under 10 ft in height and have a sign copy of area that will not exceed the Ordinance limit of 50 sf.

5. All other circumstances, factors, and reasons which the applicant offers in support of the proposed amendment. The property will be served by county water and a private underground drip septic system. NCDOT will be required to review, approve, and issue commercial driveway permits for both entrances.

The site is within the WSIV-Protected Area watershed of Jordan Lake and is limited to no more than 36% impervious surface (BUA). The site plan show 21.5% proposed.

Ms. Plummer said the Planning Board has up to three meetings in which to make a recommendation to approve or deny to the Board of Commissioners. If recommended for approval, a consistency statement has been provided for consideration:

- The rezoning request is consistent with the comprehensive plan by being located within a compact community node where churches are specifically mentioned as part of the fabric of development.

Also, if recommended for approval, the following conditions shall be considered and approved as part of any approval going forward:

**Site Specific Conditions**

1. The recommendations from the Chatham County Appearance Commission (CCAC) shall be followed as stated in the minutes and as shown on the site plan. The planning staff and CCAC may conduct routine inspections of the property to ensure compliance with the landscaping requirements.
2. A building permit shall be applied for and approved for construction within two years from the date of this approval or the use becomes null and void. Should an extension be needed, a timely revision to this approval must be filed with the Planning Department and go through the revision process.
3. Events that provide outdoor music, whether live, DJ or otherwise, shall comply with the Chatham County noise ordinance and be turned off no later than 10pm following said outdoor event.
4. A 100 ft buffer shall be provided from the northern property line that abuts the Hidden Oaks residential housing.

**Standard Site Conditions**

5. The application, standards and adopted regulations of the applicable ordinances and policies, and the approved recommendations as provided for and/or conditioned, are considered to be the standards as set forth and shall comply as stated. Changes to or variations from any requirements of this permit must be approved through the Planning Department or other approving board before any such changes can take place.
6. All required local, state, or federal permits (i.e., NCDOT commercial driveway permits, NCDWQ, Chatham County Land and Water Resources, and Environmental Health Division, etc.) shall be obtained, if required, and copies submitted to the Planning Department as part of the platting process.

**Standard Administrative Conditions:**

7. Fees - Applicant and/or landowner shall pay to the County all required fees and charges attributable to the development of its project in a timely manner, including, but not limited to, utility, subdivision, zoning, and building inspections.
8. Continued Validity – The continued validity and effectiveness of this approval was expressly conditioned upon the continued compliance with the plans and conditions listed above.
9. Non-Severability – If any of the above conditions is held to be invalid, this approval in its entirely shall be void.
10. Non-Waiver – Nothing contained herein shall be deemed to waive any discretion on the part of the County as to further development of the applicant's property and this permit shall not give the applicant any vested right to develop its property in any other manner than as set forth herein.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 468 of 743

- Ms. Colbert said it was mentioned that there were four other places of worship within a mile or so of this proposed rezoning, what are the size of those parcels? Ms. Plummer said she is not aware of the size of the parcels but could find out. Ms. Colbert said she believes they are approximately 5 acres. Ms. Colbert also asked about what Ms. Plummer mentioned referring to the U-6192 project, it is Ms. Colbert's understanding that those implementations are not supposed to happen before 2036, is that correct? Ms. Plummer said that is when the buildout is supposed to be finished. Ms. Colbert asked when is it supposed to start. Ms. Plummer said in 2028, but this is where our legislature and our commissioners need to be pushing NCDOT, saying we need to get everything set up. We have staff that are members of the RPO and NPO and if we have urgent matters that is where they are addressed and get done. Ms. Colbert said just to clarify, when we are talking about this buildout, it will start at some point in the future and it is going to take some time to get it all implemented. So, whatever the current conditions are that is what we are going to be dealing with for at least some foreseeable point. Ms. Plummer said yes, that is correct.

- Ms. Robertson said during the public hearing Commissioner Dasher brought up and asked is can loss of significant revenue could be used as the bases for recommending denial for a zoning application. Mr. Sullivan said that is getting into a legal question. Yes, generally, when you are evaluating a rezoning case, you are looking at the comprehensive plan and other adopted plans. You have broad discretion in making recommendations, and ultimately, commissioners whether or not they decide to approve or deny the rezoning request, legally it is not clear. It would be a County Attorney question.

- Ms. Colbert said in the staff presentation it was said that there were a lot of responses both for and against this rezoning request. She counted the comments on the webpage and said there were 24 total comments at the time. There were 4 comments in support and 20 comments were in opposition, it was not even, unless more comments were received later this afternoon. Ms. Plummer said she received emails both in support and against, a number was not given and the public comments were spread out around the county.

- Ms. Jael Wagoner with Qunity gave a brief presentation and said one of the things that was heard from the public hearing last month was concerns about the type of programming that would be available or not be available. Over the course of the summer, we did some additional programming that was finer tuned during the month of August, but it was not quite ready when we went to the joint public hearing. Currently, they are anticipating 2 services on Sunday that will grow over time to have a maximum of 1,200 seats in the building. They are going to be anticipating 2 to 3 evening youth services during the week with approximately 50 people attending those. Once a month there might be a college event utilizing the multi-purpose field to provide added services to the local community. Ms. Wagoner said another item she wanted to point out was they are already working with NCDOT to try to optimize a plan that they have in place that was referenced during the staff presentation. We have already had some initial discussions with them about how to place the driveways to make sure that we are addressing their future buildout. So, we have already engaged in conversations this early in the project with NCDOT, the first meeting we had with them was in July.

- Ms. Wagoner said, additionally to address traffic until the buildout is in place, at the very first church meeting there is going to be a traffic safety plan in place. Summit Church has safety personnel at their other locations with traffic safety plans in place, they will also be working with municipal first responders to be able to ensure safety is taken into consideration. It is the goal during the time of services to not have issues with traffic. Ms. Wagoner said there is 18 acres of preserved land with this project, we are not clear cutting and that does not include the land for the power line easement which will not be disturbed. Ms. Wagoner said she understands traffic is a major concern and they brought the traffic engineer with them tonight if the Board has any questions.

Public Input

- Ms. Bonnie McCarthy of 73 Tyner Loop Circle said I live in Briar Chapel and I am here to express my strong opposition to the construction of an 88,000 sqft megachurch in our community along with a 525-vehicle parking lot. This project is simply out of place in our rural county and bring several significant concerns I

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 469 of 743

would like to highlight. First, the size and scale of this development conflicts with the rural nature of Chatham County. Briar Chapel and the surrounding areas are primarily residential with small businesses and green spaces that align with the county's rural atmosphere. An 88,000 sqft building would be more fitting in urban environment not a rural county where we value open spaces. Secondly, it is important to consider the financial impact on the county and its residents. Churches as a non-profit organization do not pay property taxes. This means that while our property taxes continues to rise we will be losing out on revenue for this piece of land. As homeowners, we are already shouldering the increasing taxes and now to be faced with the prospect of losing potential revenue, while enduring the disruptions this structure will bring.  Additionally, the traffic patterns are profound, the traffic analysis projects 3000 trips on a typical Sunday and 600 to 700 trips on a weekday basis, totaling 3600 to 3700 vehicular trips per week. This level of traffic will strain our local roads, increase congestion, and affect our daily use and quality of life. With briar Chapel so close to the proposed site will bear the brunt of this increased traffic. Finally, there is a significant transparency issue. Briar Chapel did not receive formal notice of this proposed development until August 13th, meanwhile adjacent landowners to the site were informed much earlier and had the opportunity to meet with the developer face to face. The fact that briar Chapel was excluded from these early discussions despite the clear impact this project will have on our community is concerning. Briar Chapel owns the land that is adjacent to the R1 parcel and according to Ms. Plummer this is a package deal so I would assume the R1 parcel would be part of that. We should have been notified because Brair Chapel owns property adjacent to that. In conclusion, this project is out of character with our county, it will not add tax revenue, cause significant traffic disruption, and it lacks the transparency our community deserves. I urge the Planning Board to reconsider this proposal. Thank you for your consideration.

- Mr. Mark Weedon of 249 Tobacco Farm Way said he is a resident of Briar Chapel and I have some questions to ask about the change that was made to the agenda. You made a change to the agenda are you treating these two applications as the same thing? Chair Spoon said we will have two seperate votes on them, but we will have both discussions before we take action on those votes. Mr. Weedon said there is a project on one side of Hwy 15/501 and there is another project on the other side of Hwy 15-501, is that correct. Chair Spoon said yes, currently we are discussing the east side, which is where the church would be located. Mr. Weedon said this seems to be a different description of what we are talking about tonight and it makes it difficult to understand your agenda. As I understand it one of the projects has two parcels on one side of the highway add 1 parcel on the other side of the highway, and the second project has three parcels on that side of the highway. Chair Spoon asked Mr. Weedon to move forward with his comments because there are a lot of other residents who have signed up to speak as well.

- Mr. Weedon said he thought about asking the news media to come out, but I decided against it because I trusted Chatham County. I trusted what you have done all the way through, and your kind of messing it up. I guess I should have asked them to come. First of all, the integrity of the community is affected by taking 100 acres on each side of Hwy 15/501 and turning it over to one particular operation with an 88,000 sqft building who wants to have 500 parking spots and 3000 visits which is probably not enough parking. I walk my dog today right along the R1 side where it could be changed from R1 to pavement because there was not enough parking allocated. Now about transparency, you folks have got that off from day one. On April 22nd there was a community meeting of some sort and that was followed up on April 29th with another community meeting. Those meetings look like a complete sham from here. I tried to get additional information about it. The pictures in your presentation that took place at the Board of Commissioner meeting on August 19th showed one line of chairs and a few people there, it did not include the people on the other side of the room. The first notification that the VCCA received was on August 2nd and it did not get through to the homeowners until August 13th. On August 19th, the Board of Commissioner meeting was held and we could not ask any questions.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 470 of 743

- Ms. Stephanie Powell of 114 Beacon Ridge Boulevard said I am here to request that you do not recommend the rezoning of the three parcels along Hwy 15/501 for the use of their church. I have a number of reasons, but for the limitation on time I am going to give you three. First, the major increase in traffic along the 15/501 corridor is detrimental to the health, safety, and welfare of the public. Everyone who drives in this area is aware of the traffic problems that already exist and the high accident rate. You need to consider along the whole corridor, not just one particular intersection. An additional 3000 trips on Sunday, plus over 700 well during the week will only worsen the current situation. I want to note I do not believe that these numbers take into account the use of the future growth plan and do not rationally consider the fact that many of these will be for the evening and late afternoon programs that are during rush hour. To say that this is a minor additional burden and will not negatively impact traffic is absurd. It is further absurd to base an agreement on this on the fact that improvements may come in another 12 years at the very earliest, we have to live with the project now. Who knows what the NCDOT will do when they ultimately improve that corridor. Second, the rezoning is not necessary or required for the public welfare as required by the code. Think about this, 50 acres, not 5, not 10, will be taken out of the tax base forever, we cannot get that back. Who bears the burden of the cost of taxes and the drain on the infrastructure, we do, all of the taxpayers in Chatham County. There are no economic benefits to offset this, no services or goods are included, revenue sales, tax, no employment opportunities. Sorry, very little based on the applicants findings, and no place for people to live. This rezoning would put the county in the negative. Third, this project is simply not consistent with the rural areas simply because it is a church, churches are allowed in rural areas and that is okay. This megachurch is profoundly different from churches that exist now and contemplated in rural Chatham County. Compare this mega church with the four churches mentioned in the applicant's findings, and ask yourself, are they really even comparable. Of course, they are not none of them are even close to 88,000 sqft. None of them are situated even close to 50 acres, or situated near a major corridor, or generate this amount of traffic. This mega church is simply not a church in context and requires a defined community. In fact, the locations listed on their website are listed as campuses. Even more, the mission statement on the website is to plant 1,000 churches by 2050. This is simply not consistent with preserving the world nature of Chatham County. It is a means to an end. Ms. Powell thanked the Planning Board.

- Mr. David Kaherl of 557 The Parks Drive said I am a member of Summit Church. I chose Summit Church because I am aligned with their principles and their beliefs. Prior to 2023 I lived in Durham County and attended their Durham location. This is what I can tell you about Summit. Summit invests in the lives of people and they invest in the community that they are in. They reach out to those in need in their local towns. They serve schools, teachers, they hold back to school programs for kids. The people that attend Summit are generous and loving people and live in the community around the church. Many probably from Briar chapel. They shop and they dine in local establishments, you cannot put a price on the investment those people are going to make in this community. It is going to exceed any tax revenue you might be losing. People at Summit, they live and worship within this community. I wanted this project mainly because I want to live 10 minutes away from my church not 30 minutes away. I urge this board to consider Summit to be located here. Ms. Kaherl thanked the Planning Board.

- Mr. James Copland of 4328 Millcreek Circle said I have lived in Fearrington Village for 6 years. In brief, my objections to this project has to do with the tax base, traffic, and scale. I am all for comparable size churches, 150 to 200 families that serve the people who live locally to the church or house of worship. I would like to remind you that Chatham County is already number 5 in the highest property tax in the state, and by giving away a huge chunk of tax revenue you are not helping ourselves in that dubious race. I would like to read to you something from Wikipedia, Summit Church is a Baptist evangelical multi-site church formed in Durham, North Carolina with 12 campuses across the triangle. Tenants average nearly 11,564 per week. Now I would like to read from the Summit Church website, in December 2023 we were able to gather as one church at one location for Christmas with Summit at the Durham Performing Arts Center with 16,000 people to hear the

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 471 of 743

Gospel proclaimed. I do not think anyone can guarantee that Summit Church would never have a joint event with their other 12 churches across the triangle. Think about 16,000 people once a year, I would not want to buy into that. Lastly, coming back to scale, again I am reading from the Summit Church website, Summit Church directional elders recommended a budget for the 2024/2025 fiscal year with a total of $51.7 million. Now, they are entitled to do that and tithing is great and I am all for tithing, but I would just take this to underscore the tax revenue we would be kissing away. Mr. Copland thanked the Planning Board.

- Ms. Stacy Donelan of 112 Treywood Lane said I live in Briar Chapel and my concerns and objections about Summit Church is traffic which we have heard already and I do not think they can completely predict what happens when the place is fully built out. They will hold services, training, and seminars with be offered. People will not just be coming to one service on Sunday, programs and group meetings and whatnot, they will evolve into weekly gatherings from people coming from all different directions. I think this is evidenced by multiple times for opportunity documents saying these are currently no development plans for the 2 western parcels. The proposed plan also allows for future accessory building, currently only right in and right out. The builds final design has not yet been determined. Currently there are no plans for development and these properties will remain undisturbed. I just do not think we have the knowledge of the impact this church will bring being built. When I Google it Summit Church is described as a Baptist and evangelical church, I am trying to keep my objection separate from my personal thoughts and religion. My observation, however, is that Baptist Churches abound in Chatham County. I Google searched and there are 21 Baptist churches listed. Why is another one needed and at such a grand scale. Why not attend and support any of the other Baptist churches that are already here in Chatham County. One of the missions of Summit Church is to plant more churches. Summit Church has a goal of planting 1000 churches in a generation and they are up to 538 worldwide, 75 churches in North America, and 13 in the triangle. On their website it states, North America church planting is one of the primary ways we love our world is by planting the churches beginning right here in our backyard and reaching strategic cities all over the world. Today we have planted 75 North American churches through Summit collaborative believing that the most beneficial things for every community is a church to proclaim and live out the gospel of Jesus. From some collaborative, they say a family of churches that work together to help each other thrive and multiply. We started the church planting vision of the Summit Church in Raleigh. Now we are an international movement of 70 churches who believe thriving churches developing thriving leaders is the path to church multiplication. So that makes me wonder, does the church really help Chatham County, or is it just a check box on Summit's planting plan? Chatham County character and taxes, I do not believe a megachurch really matches the character of Chatham County. The tax-exempt status of a church on 6 parcels is not ideal with rising taxes, can we afford to turn over 100 acres to a tax-exempt entity. Environmental impacts, impervious surface with a portion of 2/3rds of the 50 acres is environmentally bad. Why are the eastern and western parcels contingent on the sale of the Herdon Farms parcels? What long tern plans does the church have for the areas that directly border Briar Chapel, what does R1 allow? Adjacent land owners actually have no sense whatsoever what is planned in the future for the western parcels and the eastern parcel adjacent to the O&I rezoning request. Finally, I just have to submit my disapproval for this project and hope that you and the Board of Commissioners eventually will concur.

- Mr. William Lawrence of 211 Bennett Mountain Trail said I live in the Briar Chapel community. I speak in opposition to the request for rezoning 50 acres in Williams Township looking for a church and place of worship. This proposal will create the largest privately owned auditorium in Chatham County with 1,200 seats which will make it 5 times the size of the Hugh Chapin auditorium in Galloway Ridge. The primary use may be worship on Sunday mornings and regular church activities on Sundays, but it would be a privately owned space whose use would be controlled by the owners and could be occupied, rented, or made available at the owners discretion to other activities and gatherings. The capacity of 1,200 persons could be more than one service that we heard from the presentation, thereby drawing groups of people 2 or 3 services on Sunday. The events could be on other days and other times, whether they are church events or activities by groups

that have been permitted to use the space. The nearest traffic control intersections to this location are sites of many collisions that has already been recorded, but the traffic patterns for this proposed site would all be northbound and that creates problems of traffic patterns trying to make U-turns through crossovers and so forth. The proposed parking area in this site is approximately twice as many spaces as the Chatham Downs site, which is north of the proposed site, meaning, exiting northbound traffic would conflict with traffic trying to enter Chatham Downs shopping center. Unlike Chatham Downs where vehicles enter and exit scattered throughout the day, the arrivals and departures for this proposed site would be concentrated and congested in blocks of time. Whether it is wise to remove 50 acres from the taxable property rules is one issue. Whether it is wise to remove 50 acres from the taxable rules and create server traffic congestion is another issue. It would impose a burden on the existing road system and it would impose traffic control burdens on county personnel, county traffic control technology, possible State Trooper controls, and on county tax payers. Mr. Lawrence thanked the Planning Board for their time.

- Ms. Erin Carter of 34 Hunters Way said I am the closest person to this site we have heard from tonight. The neighbors and I are horrified. It is going to create so much danger for us, many of us cross the street to go to the shops at the veranda and the restaurants. That is going to be incredibly dangerous. I am a mother to very young children and there are several families with very young children, I know of 4 other families with children under 4 years old on the street. You cannot walk down Vickers Road without seeing somebody having a walk with a stroller being pushed or kids on hoverboards. This is going to take that away from us. An 88,000 sqft megachurch is going to take up our evening, our weekends, our ability to get in and out of our neighborhood. The only thing I can think of that is comparable along Hwy 15/501 would be St. Thamos Moore and if you have ever driven through Chapel Hill at the wrong time then you will know what I am talking about when I say you can wait up to 30 minutes in traffic just based on just that church being let out. This is a really bad fit for the area. We accept that it cannot be our way forever, but let us do a compact community, we made our peace with Vickers Village. We are not anti-development, but this is wildly out of character with the rest of the area. It is going to create so many problems and we are very much opposed to it. Ms. Carter thanked the Planning Board.

- Ms. Marinda Cossid (sp) said my husband and I have lived in Fearrington Village for a decade now. When we first moved to Fearrington Village we loved the rural atmosphere the preponderance of green, and trees, and deer, and all the animals in our neighborhood. Of course, development is going to happen, there is Chatham Park and the roads have become more and more congested in the decade that we have lived here, and I am vehemently opposed to a megachurch. It is simply out of character and I wanted to add my voice to this, and there are only two of us from Fearrington Village here, I do not think they knew about this.

- Mr. Brian Perry said I am on the northern site which is right at the top of the green area. My neighbor on the closest side to the green area had a big concern about the buffer areas because that property line runs right through his backyard. It was mentioned that the buffer was increased from 25 feet to 50 feet, it is still not enough. The battle that we fought with Herndon Farms earlier was that the tall buildings were going to look directly into his second-floor bedrooms, I understand that this is a different setup, that is the irrigation side of the property, but it literally runs through his backyard. It will be a burden on Him, I live at the end, so it is less on me, but I am here speaking on behalf of all of our neighbors especially for him, he was not able to attend tonight. I second the motion on everything that was said today, it just does not fit, it is not our community, it is not needed. We have the churches that are here, find one of those little churches and have fun with those. This would be a sore thumb in the middle of a great area that is already very busy. Mr. Perry thanked the Planning Board.

- Ms. Diane Cashin of 214 Serenity Hill Circle said I live in Briar Chapel and I want my voice heard as well. I agree completely with the other folks who are against this development and my husband does too. I only found out about this meeting on Next Door. I should not have to find out about this very important meeting on

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 473 of 743

Next Door. Something is wrong with the communication here. The people, the residents who are offended and deeply affected by this development must be given a chance to know about it and react to the proposal. Otherwise, you folks have no idea what we who will be in close proximity will be going through. As far as I am concerned and so do other that are here, this should all be put on hold and tabled and proper notification given to all the people who would be nearby and impacted by this before you make any decision.

- Chair Spoon said we will now close the public input session for this item and move onto the general use rezoning item for this project.

2. A legislative request by Qunity, PA to rezone Parcels 2752, 93852, 18909 from CD-CC Conditional District Compact Community to R-1 Residential, being a total of approximately 46.607 acres, located of US 15-501 N, Baldwin Township.

Ms. Plummer said a legislative public hearing was held on August 19, 2024. Planning staff presented the request. One person spoke and expressed concern about larger areas of the county being developed and commented that the county did not need more churches. These parcels were historically zoned R-1 Residential. In February 2022, they were rezoned for Conditional District Compact Community for a project called Herndon Farms. These parcels were slated to be utilized for the wastewater treatment facility that was to serve the 151 - 55+ residential units, congregate care facility, one-story daycare/office, community gardens, and barn for events on the opposite side of US 15-501 where the actual compact community was to be located. These parcels would not be needed for the proposed conditional district rezoning case submitted by the applicant. Therefore, they wish to rezone these parcels, 2752 and 93852 on the west side of US 15-501 and 18909 on the east side, back to R-1 Residential zoning.

When considering a general use rezoning, all uses listed in Section 10.13 of the Chatham County Zoning Ordinance listed under the proposed zoning classification are permitted by right or require a special use permit. Uses listed as SUP[3] are permitted uses by right if connected to public water and sanitary sewer. However, due to possible limitations such as wastewater capacity, access to public utilities, built upon area limits, etc., not all uses are feasible. The decision to approve a general use rezoning shall be determined by the following criteria.

1. **Any alleged error in the Ordinance, if any, which would be remedied by the proposed amendment.** No errors in the Ordinance are being claimed.

2. **The changed or changing conditions, if any, make the proposed rezoning reasonably necessary.** Since the approved compact community, Herndon Farms, is no longer going to be developed, the applicants wish to revert these parcels to their original zoning of R-1 Residential. These properties would not be needed in connection with their other conditional district rezoning request. The adjacent parcels are zoned R-1 Residential and Conditional District Compact Community (Briar Chapel) and across the highway is Conditional District Compact Community. There is no development planned for these properties.

3. **The manner in which the proposed rezoning will carry out the intent and purpose of the adopted Land Use Plan or part thereof.**

- Chapter 2, page 18, encourages preserving rural character as one of the most important goals during the planning process. Returning to R-1 Residential would steer potential future use to residential, lower density development.
- Chapter 3, Goals & Objectives, encourages helping to preserve rural character as well as conserve natural resources. These parcels are undeveloped, undisturbed areas therefore maintaining rural character.
- Chapter 4, page 61, land use goal is to preserve rural character and lifestyle in the county. Returning these properties back to R-1 Residential is consistent with the majority of the surrounding parcels and will help maintain that rural character. These parcels are also within the Compact Community node of the

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 474 of 743

Comprehensive Plan Map where a mix of uses could effectively be approved. Future development of the site should be encouraged to preserve as much open space and natural areas as possible. The property has access from US 15-501 and Oak Island Drive. There is no development planned for these parcels.

4. **Other factors/reasons for supporting the rezoning request.** There is no development planned for these parcels therefore no visual impacts or changes to the undisturbed state at this time.

5. **All other information required on this application or as offered by the applicant in support of the request.** There are no water or sewer needs, access roads, stormwater control measures, etc. required or needed as these are being rezoned back to R-1 Residential and no development of the parcels is planned at this time.

Ms. Plummer said the Planning Board has up to three meetings in which to make a recommendation to approve or deny to the Board of Commissioners. Should there be a recommendation to approve, a consistency statement has been provided for consideration.

- The general use rezonings are consistent with the Comprehensive Plan by preserving rural character and protecting environmental resources as outlined in Chapters 2 and 3.

- Ms. Plummer said when the applications are submitted and accepted by the county, we are required to send notice to adjacent property owners by North Carolina general statutes which was done in the timeframe in which we are required by law. Anyone that is outside of that requirement may hear about the application or may not, but the county notified everyone we were required to notify. Ms. Plummer said when the applicant approached the current developer, Herndon Farms, they did have to agree to involve all the parcels that was already rezoned to conditional district compact community to move forward, as the applicant did not need all these parcels, that is why the parcels we are discussing now will be rezoned back to R1. Ms. Colbert said to clarify, we have two separate zoning applications here. Because they are separate rezoning applications, they are required to be notified separately as well, so it will be two different groups of adjacent landowners that are going to get two different notices, one for one rezoning and the second set for the second rezoning. Ms. Plummer said that is correct. Ms. Colbert asked if the county sends out those notices, or does the applicant send them out to the homeowner? Ms. Plummer said the county sends out the notices once we accept and approve the application submittal. We mail notices to the adjacent property owners for each rezoning case, we post the properties with public hearing signs, and we place a legal ad in the newspaper that runs for two weeks and it is also placed on our Planning department website. Ms. Colbert asked if the letters are mailed certified mail. Ms. Plummer said no, they are mailed regular mail. Ms. Colbert asked if the county is required to have proof of delivery or anything like that. Ms. Plummer said no.

- Ms. Colbert said okay, the county has met the basic requirement which is to mail a notice to each set of homeowners. What date were the western notices mailed out? Ms. Plummer said we received both applications at the same time and both sets of notices went out on the same date. Ms. Colbert said the notices went out in April and people did show up on the western side rezoning. Ms. Plummer asked if Ms. Colbert was referring to the community meeting. Ms. Plummer said the county is not involved in the community meeting at all. The community meeting is between the applicant and the adjacent landowners, Planning does not get involved in that. Ms. Plummer asked Mr. Garrett when the notices were mailed out for the August 19th public hearing. Mr. Garrett said the ordinance requires staff to mail public hearing notices to the adjacent landowners no more than 25 days and no less than 10 days from the scheduled public hearing. Mr. Garrett said he mailed out both sets of notices on August 2, 2024.

- Ms. Colbert said this is where the confusion is and that is why the question was asked. So, the county is sending out the legal notices for the rezoning, but there is a separate set of notices from the applicant for the community meeting, is that correct? Ms. Plummer said that is correct, and the community meeting has to happen before the submitted application, that is why it was held in April. Ms. Colbert said there were two notices; one went out in April from the applicant, and the second notices went out on August 2nd by the county. Ms. Colbert said she thinks that is a little dissonance there, people were mistaking the notices for the

community meetings and the notices the county sent out. People were thinking the county was sending out the notices in April and that is not the case. Ms. Plummer said the applicant has to use the same set of adjacent property owners that the county uses; it is the same group of people. Whether or not someone else notifies an HOA and they notify their subdivision that something is coming, it is not on the county.

Board Discussion

- Ms. Haddix said Ms. Wagoner suggested that there would be athletic fields or some other amenities that would be available to the community, is that right? Ms. Wagoner said at this time there is no plan to close them off to the community and there is no publication to say that they are for public use at this point. Ms. Haddix said she would like some more time with this and the community probably needs more time with it as well. Ms. Haddix said she thinks staff did an excellent job presenting the applications, but she just does not have enough information and this is a huge undertaking and very different from the churches that we have in the community and there seems to be strong feelings from both sides. Ms. Haddix said the gentleman that mentioned this will be the largest private auditorium really resonated. Just what this facility would be used for by itself is enough to give pause.

- Ms. Colbert said she has a suggestion about how to proceed on this without getting into some of the details. We have heard from the applicant, we have heard from staff, and we have heard from the public, it would be helpful if we would each go around the table in order to briefly summarize their concerns and after we heard from everyone we offer a motion to table this item until the next Planning Board meeting so we can go back and look at the materials and look at some of the issues that had been raised and then bring it to a vote at our next meeting. That would allow us to give this our full attention and a full discussion.

- Mr. Andrews asked if that was a motion to table this item. Ms. Colbert said no, it was just a suggestion but will make the motion as long as we have a general discussion. Chair Spoon asked the Board if that sounded like a reasonable way to handle these applications. Ms. Haddix asked for clarification about the two rezoning cases, because it does not seem to be problematic to agree to the rezoning on the western side back to R1. Ms. Colbert said we really need to vote on each one of these applications at the same time because you may create a condition that causes one application not to be able to meet its zoning. Currently, these parcels are all zoned conditional district compact community and if we were to rezone just those parcels back to R1 it would create a condition where they do not have enough land to offset the built upon area. Ms. Colbert said it is unlikely it can be separated and done that way.

Motion made by Ms. Colbert to table this item until the October 1, 2024 Planning Board meeting after a short preliminary discussion from each person on the Board regarding these rezoning cases. The motion was seconded by Ms. Robertson.

- Chair Spoon said we have a motion and a second to table this item. We will go around the table to share our opinions and if there is anyone who does not wish to share them right now just say, pass. However, if you do want a chance to express your initial thought on things you will be able to do that.

- Mr. Frazier said the bulk of the traffic will be on Sunday, which is a fairly light traffic day compared to other days. It would be beneficial to look at the traffic on different days and get a sense of that. Mr. Frazier said he is concerned about tax and potential events. This seems less impactful than the compact community in many ways. Mr. Frazier said he is in favor of preserving the rural character of Chatham County but does not think Hwy 15/501 is the place where that is going to happen.

- Mr. Smith stood up and said he wanted to stand so the audience could see him. Mr. Smith said he arrived in North Carolina on January 1, 1953. During those 71 years there have been a lot of people that has moved into my community and state with varying opinions of what they want done within the community and state.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 476 of 743

Mr. Smith said this seem odd to him. He was baptized in 1961 and does not attend church, it is not the institution, but rather the people inside the institution. Traffic impact, and taxes, for every dollar taken in as tax revenue it costs a dollar and a quarter, that is a losing proposition. But all of those parishioners pay taxes, property taxes, income tax, sales tax, we all do that. It seems to be a problem with this one institution because of its size. Mr. Smith said a lot of people in his family are educators and ministers. Some of the family members had some of the biggest churches in their communities, which was not favorable with a lot of people, whether it was in Fayetteville, Harnett County, or Wilmington. Mr. Smith said this has been a problem with his entire life. We have a job to do here and that is to protect both interests and it is a hope that we get a chance to do that, we know when we make that decision we are still going to offend someone. Mr. Smith said remember one good thing about all of this, you are still neighbors and you should be willing to help one another instead of being so divisive.

- Mr. Andrews said he will pass because he is not sure if we will vote to table the item or not. Chair Spoon said there is a motion and a second to table the item.

- Chair Spoon said he hears the tax loss argument, but also feels that churches can bring a great deal of civic value to a community, so discounting something solely on the loss of tax is not fair. Chair Spoon said his main concern for this is just the two times a day when it is going to be putting out up to 400 to 500 cars directly onto Hwy 15/501 without any traffic lights. St. Thomas Moore was brought up early in the discussion and how that works, and how it can completely shut down a major road on certain periods of the day. Chair Spoon said his major concern is that it will hinder the traffic.

- Vice-Chair Roodkowsky said she has several concerns and one of them is that churches are consistent with the rural nature of our plans for Chatham County, but it was pointed out that this proposed church is not like the other churches we have in the county. When she thinks of a rural church it looks something like Lighthouse church or Martha's Chapel, this is a very large building as one person mentioned maybe better suited in a more urban environment. It is not a rural church when you picture a rural church. Vice-Chair Roodkowsky agrees Hwy 15/501 is not the most rural area in Chatham County, but we are trying not to have mega stores there, and we should not group a megachurch into the same group as much smaller churches. Vice-Chair Roodkowsky said her second point is traffic, the peak time on Sunday there will be 900 trips, so 450 trips in and 450 trips out in 1 hour, that is 15 trips in a minute. St. Thomas Moore is about 80% in size of the proposed church in terms of seats and we all know what that is like when that church is let out. St. Thomas Moore school has 390 students and we know when school is let out what that does to traffic. That would be about 300 trips, siblings probably ride in the same car with their parents, so it is most likely less than 390 trips. Vice-Chair Roodkowsky said she is deeply concerned about the traffic, especially when we know that this improvement that NCDOT has proposed will not be made until mid-2030's. What Mr. Lawrence said about the traffic needing to travel south, with the turnarounds you need to cross a couple lanes of traffic just to turn around and that raises extreme concern. Vice-Chair Roodkowsky said to her third point, there is nothing wrong with non-profits not paying taxes, but this is a large piece of land that will incur very large costs. Finally, it is interesting to hear that this will be the largest private auditorium, most churches like to recoup some of their own costs and the use of an auditorium for purposes they deem useful and charge people for it. An auditorium is not going to sit vacant and the concern is that we would have other peak times of heavy traffic. Vice-Chair Roodkowsky said there were a lot of comments on Next Door and there are people who showed up tonight to share their concerns. She could vote tonight, but if we want to table it, she could vote to do that too, but we do have quite a bit of information here.

- Ms. Robertson said she shared all the same points as Vice-Chair Roodkowsky mentioned. Ms. Roberton said she heard loud and clear what a lot of the residents in the area had to share and their concerns, this Board does listen and we do care what is said and thanked the public for coming out to the meeting tonight. Ms. Robertson said she attended the Board of Commissioner meeting when Commissioner Mike Dasher spoke about the enormous amount of tax base revenue that the county would lose and also heard the concerns from the public about the taxes considering where our taxes are right now. Certainly, that is a concern and it is a concern of our commissioners. Ms. Robertson said she had sent an email to the County

Attorney concerning the tax loss and the Planning Director Mr. Sullivan and asked if the County Attorney replies to forward it to the Planning Board.

- Ms. Colbert said she would like to talk about Plan Chatham and the current zoning of the compact community and the proposed changes because that is what is before us as a board. She wants to address some of the discrepancies she sees and does not care that this is a proposal for a church and the design of the church does not bother her, she feels it is attractive and what comes from the pulpit does not figure into anything whatsoever. Ms. Colbert said Commissioner Howard is the Chair of the Board of Commissioners and at their August 19th meeting Commissioner Howard had said the Board has not abandoned the idea that there still needs to be a balance along northeast Chatham and preserving the rural aspect. The current compact community zoning also allows for some exempt uses that are not religious institutions, but there is a tradeoff, because what happens is, for example, if you have open space, that is an exempt use, we do not receive tax revenue for it, but it adds to the rural character. In taking a look at was proposed and approved back in 2022, what we have at that point is some exempt use but offset by the fact that we would be adding additional open space, which she believes is 30% for the compact community.

- Ms. Colbert said the other thing about the current use is it is required to have a minimum of 100,000 sqft of commercial space. Ms. Colbert said she had run some numbers in terms of the completed parcels that are currently in the compact community ordinance (CCO), this excludes some of the parcels where construction has not been completed on them, or they have not gone through the tax process, mostly on the eastern side of Briar Chapel. That involves 8 parcels on 31 acres, and the total 2024 tax value for the CCO commercial was $445,000. Projecting that over a 10-year period that is 4.5 million dollars, and when we talk about in a general way, balancing the need for commercial development and residential development, that is what makes up the CCO. If we are talking about changing that, then it is a simple analysis of, is this better or worse? Is it more or less? How are we comparing the apples to apples on this? If we are going to be making a change to the compact community, will we be getting more or less open space? Will we be getting more or less rural feeling to it, and those are the kinds of comparisons we as a board should be thinking about.

- Ms. Colbert said this is the reason why she wanted to frame it this way and why she wanted to time to think on this for a little while and vote on it at our next meeting, as well as additional time to look at the details in this package. The traffic situation clearly is something that does need to be addressed, and even when you look at the numbers on a weekly basis, it is not quite fair, because you are going to get surges at certain times and at other times no, but it will create problems and there be an undefined period of time where current infrastructure supports expansion and was never designed to handle this growth. Whether that happens sooner or later, we do not have an answer for that today about how likely or unlikely that is. Ms. Colbert also said whether it is preserving open space, the rural character, promoting business in the community, a general tax revenue, any of those things, it is not about any single one. It is not even about the specific uses being presented in these applications, is it more than one thing, what is the big picture here? Is the current zoning a better fit not only for that specific area, but compared to what we would get in exchange for that? Lastly, traffic in general, it is a little tedious to hear that if you are not immediately across from something that it does not impact you. A lot of people drive up and down that corridor at different times, so it is not fair to say that other citizens do not have a reason to be concerned, just because they do not live across from something does not mean that we should not be looking at those concerns. Ms. Colbert said if we do a rezoning like this there is a lost opportunity cost because if you go from the Orange County line down Hwy 15/501 to Hwy 64, it is almost exactly 8 miles, and that is our main commercial corridor in the northeast. We cannot create more space on Hwy 15/501, even if it is widened, it is still 8 miles long. All of the opportunities of things that support the services that we require, if it does not go there, it is going to be more disruptive in other places. This particular type of Office & Institutional use, you might be able to get something of that scale to work in Chatham County, but Hwy 15/501 is not the right place for it because that is not a great location to meet the needs of the entire community, but rather just the needs of a specific applicant.

- Mr. Mayer said there are many great opinions and thoughts and it is complicated. However, in his opinion, there are not any really clear reasons to object this. What stands out with this megachurch does not feel in fitting with the rural character, there are some megachurches in Burlington that are just giant metal building surrounded by asphalt. On the other hand, there are beautiful church campuses that have large trees and forested areas, and he is trying to imagine this project more on that side of things. Someone could also try to put in a big box store here, or a school, or a giant Goodwill. There are other things that do not pay taxes that increases traffic and there are all kinds of things developers would like to put on this site. This does not seem like a particular bad one. It is nice that there is a lot of woods left on this proposal and they did not max out their impervious surface. Mr. Mayer said he is opposed to objecting to a development because of the type of use would be different than what he personally would like to see there, it is the developer that is putting the money down gets to say what they would like to see there. If the county wants to buy it and put a park up there, let us do that. Ms. Colbert has a good point and would like to look at the current zoning and compare it to the proposed zoning and get a sense of what we are trading for or giving up. Along those lines it would be helpful to have more time to research.

- Chair Spoon said we have heard from everyone and we do have a motion and a second to table this item. Chair Spoon took a vote, and the vote was 8-1 to table both the conditional district application and the general use application until the October 1, 2024 meeting. Opposed by Mr. Andrews. Chair Spoon encouraged all the Planning Board members to do their research and comparisons of the current zoning and the proposed rezoning request.

- Mr. Garrett addressed the public and informed them that the October 1, 2024 meeting will be located at the Old Agriculture building located at 65 E. Chatham St., Pittsboro.

VIII. <u>NEW BUSINESS:</u>

No new business to report.

IX. <u>BOARD MEMBERS ITEMS:</u>

1. Update from the Planning Board liaisons.

   - Chair Spoon asked Mr. Mayer about the Agriculture Advisory Board. Mr. Mayer said their October meeting is coming up and will report.

   - Ms. Colbert said she had volunteered to be the backup to the primary liaison for Siler City and said she is going to withdraw as the liaison until we as a Board have new members and can split those responsibilities. Chair Spoon said if there are any Board members that would like to take that responsibility on for Siler City to let him know.

   - Ms. Robertson said the Pittsboro meeting had the Alston Chapel item on their agenda, but they recommended denial for it.

   - Chair Spoon said he has been in conversations with Mr. Mullis about the UDO and they have not finalized any dates as of yet, but we are reaching out to the consultants to see what their availability is. If the Planning Board were to hold a special meeting with the consultants it would need to be a remote meeting or a meeting after the BOC meeting when the consultants are in town.

   - Ms. Colbert asked if the Planning Board could hold a special meeting without the consultants to discuss the UDO document as a whole now that the full draft is completed in preparation for the meeting with the consultants? There was some Board discussion on holding a special meeting to discuss the final draft of the UDO as a whole and it was agreed to have a remote meeting on September 24, 2024 at 6:30pm.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 479 of 743

- Mr. Sullivan sent the final draft to each of the Planning Board members via email for them to review.

2. Discuss and decide the September Planning Board meeting location.
   The Board discussed and agreed the October meeting will be held in person at the Chatham County Old Agriculture building.

X. <u>PLANNING DIRECTOR'S REPORTS:</u>
Mr. Sullivan reported on the following:

1. Minor Subdivisions / Exempt Maps - See Attachments.

2. Unified Development Ordinance Update.

3. September Public Hearing Items.

   o Vickers Village Conditional District Revision

XI. <u>ADJOURNMENT:</u>
Motion made by Vice-Chair Roodkowsky to adjourn the Planning Board meeting, seconded by Mr. Smith. There being no further business, the meeting was adjourned at 9:35 p.m.

Signed: _____/_____

                Jon Spoon, Chair                                Date

Attest: _____/_____

                Dan Garrett, Clerk to the Board                Date

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 480 of 743

# EXHIBIT 9



Chatham County Planning Board                                    September 19, 2024
80-A East Street
Pittsboro, NC 27312


Re:     September 3rd, 2024 Chatham County Planning Board Meeting Follow Up/Clarifications Letter
        **Summit Church Chatham Campus Conditional Rezoning and General Rezoning Cases**

Dear Planning Board Chairman and Board Members,

After listening to the public input session and hearing the planning board discuss these two zoning cases, we thought it might be beneficial to provide the following clarifications in advance of the October 1st Planning Board meeting.

The following is a list of the primary concerns we heard in the September 3rd Planning Board meeting, in no particular order;

- Considering the General Rezoning Case as dependent on the Conditional Rezoning Case
- Potential Tax Revenue loss
- Inconsistent with the rural character
- Architectural Façade, massing, and proximity to the roadway
- Massing/buffers related to existing adjacent residential buildings
- Potential property tax revenue loss
- Concerns the 'Mega' church is not right for the immediate community
- Concerns the largest auditorium in the county will lead to rentals and huge events
- Traffic and pedestrian safety
- Lack of public notification regarding the project

The following Clarifications are included in this narrative;

- Rezoning Cases Overview
  - Conditional Rezoning vs General Rezoning
  - Neighborhood Meeting Clarifications
  - Potential Economic Impact
- Rural Character
  - Rural Character Defined
  - Existing and Proposed Viewshed Comparison along US 15-501
    - Architectural Façade, massing, and proximity to the roadway
    - Massing/buffers related to existing adjacent residential buildings
    - Inconsistent with the rural character
  - Proposed Site Sections
    - Northern Boundary Adjacent to Hidden Oaks Drive
    - Main Entrance at US 15-501
  - Proposed Development Comparison to Existing and Proposed Regulations
    - Comprehensive Plan 2017 & Proposed Development
    - Current UDO, Proposed Development & Recode Chatham
- Land Use
  - Planned Uses (also see Attachments I + II)
  - Wastewater Clarifications (also see Attachment III)
  - Traffic Clarifications (also see Attachment IV)
- Project Updates Summary

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 482 of 743

## REZONING CASES OVERVIEW

### Rezoning Case Comparison

As you consider the published materials, please keep in mind there are two separate zoning cases; a General Rezoning to return to R-1 for Parcel Numbers 2752, 93852, 18909 and a Conditional Rezoning to OI for Parcel Numbers 18750, 18896 & 18897. The General Rezoning case is not impacted by the decision of the Conditional Rezoning case. The General Rezoning of the parcels included in the General Rezoning case is a direct recommendation Chatham County Staff, made in October 2023 pre-application meeting. Because all the parcels referenced above are currently tied to an expired Conditional Rezoning, coupled with the desire to exclude them from the proposed development project considered as the Conditional Rezoning Case, the best course of action for the parcels included in the General Rezoning is to return them to the original zoning.

### Neighborhood Meeting Notifications

For General Rezonings, a Community Meeting is not required. However, in addition to the minimum requirement of notifying the landowners adjacent to the Conditional Rezoning case parcels, we also sent notifications of the Conditional Rezoning Neighborhood Meeting to the landowners adjacent to the General Rezoning case parcels. This was done in an effort to be transparent and hear from all those that may have been directly engaged in the now expired Conditional Rezoning approved as part of the Herndon Farms Compact Community (which included all of the parcel numbers reference above).



*Image 1.1 – Summit Church Rezoning Cases*


Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 483 of 743

**Potential Economic Impact**

The previously approved Conditional Rezoning does not necessarily provide better Tax Revenue, it provides Potential Tax Revenue differently. The Herndon Farms 1st Plat Submittal includes 53.63 ac ± of Tax-Exempt acreage, whereas the Summit Church Rezoning Cases includes 50.117 ac± Tax-Exempt acreage. The Herdon Farms 1st Plat Submittal includes 20.75 ac ± of taxable Commercial/Office and Residential acreage, while the Summit Church Rezoning Cases include 43.67 ac of taxable undeveloped R-1 residential and 2.9 ac ± of taxable developed R-1 residential. The Herndon Farms 1st Plat Submittal does not include consumer-based services as a potential tax revenue option. While the Summit Rezoning cases also do not offer consumer-based services, the conditional rezoning case has the significant potential to impact the surrounding consumer-based developments due to the increased demand to support the parishioner base before and after the planned program events.



*Image 1.2 – Areas show in green represent Tax Exempt Open Space included in the Herndon Farms 1st Plat Submittal*

The Chapel Hill Campus is planned to relocate to this permanent facility. Currently there are approximately 800 parishioners that attend the Chapel Hill Campus transient location at East Chapel Hill High School. Of these parishioners, approximately 15% are Chatham County residents that travel out of Chatham County for services. This location will keep Chatham County residents local and promotes spending tax dollars at the adjacent commercial developments. The relocation of this service center will bring with it residents of neighboring Orange County, Chapel Hill, Carrboro, and Dogwood Acres and with them consumer-based spending. An increase in consumer-based spending will support the Chatham County vision of growing the US 15-501 Commercial corridor.


Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 484 of 743

| Herndon Farms 1st Plat Submittal | Summit Church Rezoning Cases |
|---|---|
| **Land Use Categories for Potential Tax Revenue** ||
| Tax Exempt Open Space= 53.630 ac ± | Tax Exempt= 50.117 ac |
| Commercial/office= 5.540 ac ± | R-1, Undeveloped=43.67 ac |
| Residential=15.231 ac ± | R-1, Developed=2.9 ac |
| **Potential Tax Revenue Sources** ||
| Property Taxes: North Chatham 107: $0.853/ $100 of Assessed Value, annually Sales Tax: 7% (State + County)<br><br>Chatham County Manager's Office is focused on boosting sales tax Revenues to prevent boosting other taxes and fees<br><br>Chatham County Sales tax revenues will support:<br>• Local schools<br>• Law enforcement<br>• Parks and recreation<br>• Public libraries<br>• Economic development<br><br>Chapel Hill Campus will relocate to this facility<br>• This will keep Chatham County parishioners in Chatham County<br>• This will bring parishioners from immediate area to Chatham County, meeting The Summit Church vision of having a campus within 20 minutes of everyone in the Triangle<br><br>Supply and Demand when the facility is in use will drive consumerism Increased Consumerism will attract businesses to this corridor, further developing the compact community region shown on the Future Land Use Plan, while the project limits residential density, retains undisturbed open space, and limits overall traffic impacts ||

*Table 1.1 – Potential Tax Revenue Analysis*

## RURAL CHARACTURE

### Rural Character Defined

The Comprehensive Plan notes preserving the rural character and lifestyle of Chatham County as its number one goal. The comprehensive plan reflects the Chatham County community's desire to preserve the rural character and lifestyle by diversifying the tax base and encouraging compact growth in concentrated areas. This is achieved through development in and around existing towns, communities, and designated, well-planned, walkable, mixed-use centers. This project falls within the Compact Community located along US 15-501, which is the only designated Compact Community in the Comprehensive Plan.

The Future Land Use and Conservation Plan illustrates the Chatham County vision of concentrated growth and density in portions of the county along major road networks and adjacent to existing developments. This approach promotes promote the preservation of the vast majority of undeveloped and natural land areas Chatham County has to offer. As shown below on the Future Land Use and Conservation Plan, the various shades of green are the areas as designated as preserved rural character, with the multi-color nodes/circles and yellow areas representing designated areas of growth. The Conditional Rezoning site is located within the only Compact Community District shown on the Plan, between two Community Center nodes which is the second to most growth designated areas in the County; second only to the municipal areas such as Pittsboro and Siler City.





*Image 2.1 – Location of Project on Future Land Use and Conservation Plan*

In the April 2024 Neighborhood Meeting, the August 2024 Joint Public Hearing, and the September 2024 Planning Board Meeting we heard the Chatham County leaders and residents express their desire to preserve the rural character of this project area. The layout of this project presents an opportunity to bridge the gap between the desires of the Chatham County community and the goals of the Comprehensive Land Use plan by retaining a substantial acreage of natural areas, limiting land disturbance and grading to the extent practical, carefully selecting building materials and color palates, and providing a low density community asset within an area marked for future dense growth.

**Existing and Proposed Viewshed Comparison along US 15-501**

We understand the concerns for architectural façade, massing, proximity of the building to the roadway, buffers related to existing adjacent residential buildings, material selections, and ensuring the building type meets its surrounding character. We have developed a series graphics to show the existing development adjacent to or within close-proximity to the project site (within the same development corridor shown on the Future Land use and Conservation Plan).

Included as Exhibit A are images showing the comparison of existing viewshed showing the build environment adjacent to the site and viewsheds within 2 miles of the site, along US 15-501. These images demonstrate that the proposed architectural façade, building type, and material selections are in keeping with the surrounding development(s). Additionally, these graphics demonstrate that the surrounding existing development building massing is substantially more pronounced due to their proximity to the road than that of the proposed building.

Included as Exhibit B are images showing the comparison of existing views to the proposed development model, adjacent to the site traveling along US 15-501. These graphics demonstrate that the existing viewshed is generally preserved above the minimum regulatory requirements. Additionally, on exhibit B 3 or 3, we show that additional view protections could be implemented to further retain the existing views across the powerline easement if desired.



Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 486 of 743

## Proposed Site Sections

Image 2.2 below shows the view from an adjacent parcel to the north through the future building, which is closest to the northern parcel line. This section view demonstrates the vertical elevation change and the retained existing vegetation that will serve as a visual barrier between the residential lot and the church facilities. The 100' no-build zone is a proffered solution to resolve the adjacent landowners concerns regarding privacy and building massing, not required by the current or future regulations.





*Image 2.2 – Proposed Section From Northern Parcel Boundary south through Future Accessory Building*

Image 2.3 below shows the view from the main entrance at US 15-501 east along the access drive to the proposed church building. This section view demonstrates the vertical elevation change from the road to the proposed building, and the viewshed/massing insolation the distance from the road offers.



*Image 2.3 – Proposed Section US 15-501 east along the main entrance drive to Proposed Church Building*


Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 487 of 743

**Proposed Development Comparison to Existing and Proposed Regulations**

The comprehensive plan for the location of this Conditional Rezoning supports High Density Development as well as incentivizes conservation design and the preservation of unique natural features. The Compact Community/High Density Development designation for the Conditional Rezoning parcels meet Goals 3, 4, & 9 of the Comprehensive Land Use Plan; it promotes strategic compact growth, diversification of tax base to be less dependent on residential property taxes, and provide equitable access to high-quality education, housing, and community options. The Conditional Rezoning project meets Goals 1, 3, 5, 6, & 10 of the Comprehensive land Use Plan; it preserve the rural character of Chatham County by preserving the natural resources to the extent possible and controlling density, provides access to recreational facilities and access to open space, fosters a healthy community by providing valuable support and resources, and promotes and controls compact growth due to its location within a designated development corridor and within a compact community area.

The project sits within the Compact Residential + Community Center designations. Churches are listed as part of the fabric of the development of these designated areas, falling within the desire to implement a range of complimentary used in the identified development nodes, near existing communities and neighborhood centers. This project balances the high density development strategies of developing these existing communities and neighborhood centers with the vision of the community by breaking up future dense development along the entire extent of the identified US 15-501 commercial corridor, it conforms to Land Use Strategy 6.2 of improving aesthetics by careful material selection to fit the existing and improved aesthetic also responding to context-sensitive architectural design features. It also provides much needed civic and support services components the growing compact community needs (Land use Strategies 2.1, 2.2, 3.4, 5.1, 6.1, 6.2, Sidebar on page P63).

This project honors the ideals outlined for conservation design, by protecting and maintaining key natural resources, preserving unique natural features, and limiting density, without the need to involve density transfers for natural resource protection/preservation (Natural Resources Strategies 1.1, 2.1, 2.2, 3.2, & 3.3) This project provides access to recreational opportunities and open space (Park and Recreation Strategy 4.1).

This Conditional Rezoning project does NOT require the density transfers allowed for High Density Development (Agriculture Strategy 5.2, Natural Resources Strategy 3.3). Due to the type of development, it also does not directly support key housing strategies of high density development regions (Strategy 1.1 and 2.1).


Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 488 of 743

| Plan Chatham Comprehensive Plan 2017 | |
|---|---|
| **High Density Development** | **Summit Church Development** |
| **Chapter 3 Goals & Objectives Pg. 41-42** | |
| Goal 3<br>Goal 4<br>Goal 9 | Goal 1    Goal 6<br>Goal 3    Goal 10<br>Goal 5 |
| **Chatham Future Land Use Descriptions Pg. 47** | |
| Site within both Compact Residential & Community Center | Churchs are listed as part of the fabric |
| **Chapter 4 Plan Elements Pg. 51** | |
| Economic Development Pg. 53<br>Strategy 2.2 | Economic Development Pg. 53<br>Strategy 3.4 |
| Land Use Pg. 61<br>Strategy 2.1<br>Strategy 2.2<br>Strategy 6.1<br>Strategy 6.2<br>Strategy 6.3<br>Strategy 6.4 | Land Use Pg. 61<br>Side Bar Description<br>Strategy 2.1<br>Strategy 5.1<br>Strategy 6.4<br>Strategy 10.2 |
| Natural Resources Pg. 103<br>Strategy 3.3 | Natural Resources Pg. 103<br>Strategy 1.1<br>Strategy 2.1 |
| Agriculture Pg. 93<br>Strategy 5.2 | Strategy 2.2<br>Strategy 3.2 |
| Housing Pg. 71<br>Strategy 1.1<br>Strategy 2.1 | Parks and Recreation Pg. 117<br>Primary Goal<br>Strategy 4.1 |

*Table 2.1 – Comparison of High Density Development and Proposed Conditional Rezoning Development*

In addition to the Comprehensive Land Use Plan 2017, Chatham County is currently working through the last steps required to publish an updated Unified Development Ordinance as project 'Recode Chatham'. This UDO update is necessary to better support the initiatives and goals set forth in the Comprehensive Land Use Plan. The final draft of updated UDO was published in August 2024. The official updated UDO is anticipated to be release during the first quarter of 2025. Table 2.2 is a matrix that shows the current regulations the Condition Rezoning project is required to meet, how the proposed plan aligns with the current regulations, and it will compare to the future regulation requirements. The proposed development data shows that the minimum/maximum requirements set forth in the current UDO are achieved or greatly exceeded.

| August 2024 UDO Final Draft Comparison | | | |
|---|---|---|---|
| Section 2.2.7 R1  Section 2.2.9 OI  Section 2.2.11 CB  Section 2.2.12 RB  Section 8.4.1 Watershed Intensity | | | |
| | **Current Regulations**<br>OI Zoning | **Proposed Plan**<br>OI Zoning | **Future Recommended Zonings**<br>OI, CB, RB, R1 zoning |
| Building Setbacks | Front- 40 Ft.<br>Side- 25 Ft.<br>Rear- 25 Ft. | Front ≥ 440 Ft.<br>Side ≥ 295 Ft.<br>Rear ≥ 155 Ft. | Along 15/501- 75Ft.<br>OI/RB : Side- 25 Ft.  Rear- 25 Ft.<br>CB/RB: Side- 25 Ft.  Rear- 20 Ft. |
| Height Maximum | 60 Ft. | 40 Ft. | ⭐ 75 Ft. |
| Watershed Built Upon Area | 36% | < 36% | ⭐ Compact Residential 50%<br>Community Center 60% |

*Table 2.2 – Comparison of Current Regulations, Proposed Development, and Future Regulations*



The comprehensive plan identifies this project area as a zone to support high density development and growth. The update to the UDO will adjust the minimum/maximum requirements to better meet the goals set forth in the Comprehensive Land Use Plan. This project aims to bridge the gap the allowed future development of this project site will create between the community vision for rural character and the density goals of the Comprehensive Plan.

## LAND USE

### Planned Uses Clarifications

The Summit Church is committed to making a local impact on Triangle communities. A primary focus of the church leadership is to place a 'Summit Campus within 20 minutes of everyone in the Triangle" (see Attachment I). As part of this initiative, leadership is proposing Summit Church relocate the Chapel Hill Campus that meets at East Chapel Hill High School relocate to the facility included in the Conditional Rezoning.

In addition to providing a campus within 20 minutes of everyone in the Triangle, the Summit Church is committed to making an impact in the communities where they locate a campus. Attachment II provides a summary of the impact the current Chapel Hill Campus has had since its inception in 2013. The overall Summit Church Goals of assisting Community Organizations, Public Schools, Area Families, and Triangle Universities have been realized in great detail over the last decade. The Summit Church plans to continue these efforts and will implement or provide these resources to Chatham County with the relocation of the Chapel Hill Campus. As part of this effort, The Summit Church has confirmed the privately owned playground, sport court, and open field will be open for public use. As is standard of publicly owned facilities, hours of operation and other safety regulations may be implemented.

The Summit Church does not offer its facilities as rental space and has no plans to change this church wide policy. Even if this policy were to change in the future, the use of the building is limited to the on-site wastewater capacity. Any change to the current planned usage will require permitting approvals, costly utility system upgrades, and/or additional transportation improvements in the future (see Wastewater Clarifications and Traffic Clarifications below for more).

### Wastewater Clarifications

The previously approved Herdon Farms Compact Community included a Wastewater Treatment Plant located on the parcels West of US 15-501 (included in the Summit Church General Rezoning Case). This design included aboveground treatment ponds/lagoons and an aboveground spray field located along US 15-501, with an underground septic field at the rear of the parcels. The WWTP was sized to handle the wastewater flow generated from the dense compact community, which was approved to be routed from the east side of US 15-501 under US 15-501 to this large treatment plant.

The wastewater treatment methodology for the Summit Church Conditional Rezoning proposes a subsurface holding facility and a subsurface septic drip facility. The methodology implements an equalization approach, sizing the facilities to handle the rate of use for specific capacity using the programming provided by the client. This approach limits the equalized gallons per day to 2,999 gpd. This limitation does not allow for increased use, beyond the programming and capacity outlined in Attachment III.

The more detailed wastewater design has revealed a reduced subsurface field is required than previously anticipated. The result is an opportunity to provide a 100' no build area along northern parcel line, as requested by the adjacent landowners. This area will not be cleared as a portion of this project and the installation of buildings or infrastructure in the future without obtaining a conditional rezoning approval.



Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 490 of 743

**Traffic Clarifications**

As we worked the finalize the programming and services, the preliminary Traffic Impact Analysis (TIA) has been honed. NCDOT and the County have reviewed the documents. The current TIA substantially meets DOT criteria. NCDOT has agreed the NCDOT TIP U-6192 project should work with this development design and surrounding existing community as the project progresses.

The Traffic Analysis Addendum included as attachment IV summarizes the TIA changes and provides a simplified approach to sharing trip generation results, capacity analysis result, and a list of recommendations. Increased use beyond the programmed capacities outlined in Attachment IV will not be allowed without additional analysis.

**PROJECT UPDATES SUMMARY**

The design team heard the concerns and the desires of the community leaders and residents. To that end, the following plan and document adjustments/ clarifications have been included for your consideration prior to and during the October 1st 2024 Chatham County Planning Board Meeting;

- Plans have been updated to include:
    - A further developed the wastewater treatment design to hone minimum treatment area required
    - A 100 ft no build setback from northern parcels shown as a result of the reduction of the wastewater treatment requirement
- Assessed additional screening options, prepared to include additional plantings to screen building if desired
- The Summit Church is committed to:
    - Providing public access to playground, sport court, and open field
    - Making an impact in the Chatham County Community by offering support for Community Organizations, Schools, Families, Colleges, and Universities.
- An addendum to the TIA Memo has been generated to concisely summarize requirements, study area, and recommendations while refining calculations based on updated programing commitments

Please do not hesitate to contact me at **jwagoner@qunity.com** if you have any questions regarding these clarifications.


Respectfully,

Jael Wagoner, PLA, ASLA

Assistant Vice President | Landscape Architect
Qunity, P.A.


*EXHIBITS*
*Exhibit A – Existing Adjacent Development Viewsheds*
*Exhibit B – Existing Site + Proposed Development Model Viewshed Comparison*

*ATTACHMENTS*
*Attachment I – The Summit Church Chapel Hill Public Statement*
*Attachment II – The Summit Church Chapel Hill Community Impact Overview*
*Attachment III – MacConnell Associates Technical Memorandum (wastewater)*
*Attachment IV – Gannett Flemming Traffic Analysis Addendum | Memorandum*



Qunity # 2339
20240903 Planning Board Meeting Clarifications

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 491 of 743

## Rural Character: Viewsheds Adjacent to Site Along 15/501



The Veranda looking South, 0.1 mi. from Site, ~85' setback from road



15-501/Briar Chapel Pkwy Int. looking North, 0.2 mi. from Site, ~85' setback from road



UHAUL Storage looking North, 0.4 mi. from Site, ~180' setback from road



# Rural Character: Viewsheds within 2 Miles from Site along 15/501



N Chatham Village looking South, 1.7 mi. from Site, ~60' setback from road



Polks Village looking West, 1 mi. from Site, ~150' setback from road



15-501/Taylor Rd Int. looking North, 2.1 mi. from Site, ~150' setback from road

# Rural Character: Existing & Proposed Viewsheds Traveling South on 15/501



Existing view, looking East



Proposed view, looking East

# Rural Character: Existing & Proposed Viewsheds Traveling North on 15/501



Existing view, looking East



Proposed view, looking East

# Rural Character: Easement Viewsheds





Existing view, looking East



Proposed view, looking East, Code Compliant Planting Plan



Proposed view, looking East, with supplemental trees

At The Summit Church, we believe that the local church is God's "plan A" and therefore our local campuses are our primary focus for executing the mission that God has given us. Because of this, it is our vision to have a Summit Campus within 20 minutes of everyone in the Triangle.

Launching new campuses helps us more effectively make disciples in our communities, city, and throughout the world. Not just a way to increase our seating capacity, launching a new Summit campus multiplies leadership opportunities while facilitating the vision for our people to "stay where you are; serve where you live; let's be the church in your community."

In 2013, we launched in East Chapel Hill High School and have built relationships in the surrounding area as well as on the UNC campus. With this new facility will be able to continue partnering with this group as we reach the broader areas of Pittsboro and beyond.



# Summit Chapel Hill Community Impact Overview

## Community Organizations

### Hargraves Community Center
- Members and staff from our church provided tutoring services to students in all grades.
- We were able to provide backpacks and school supplies to around 200 kids every fall for the past 4 years through this partnership.
- We were able to help impact around 300 families through collecting Thanksgiving meals for families.

### Brookdale Assisted Living
Our staff had a weekly devotional and time of worship with the men and women at this facility for over a year.

### ServeRDU
ServeRDU was a service project (2013-2019) that we have participated in as a church in the past. Through partnerships with *Empowerment*, a local non-profit organization focused on low-incoming housing, we were able to provide free labor and materials to renovate homes for needy families.

### Prison Ministry
Over the past several years we have had church members involved in ministry opportunities in local prisons, while also helping men and women with re-entry into the community at the end of their sentences.

---

## Public Schools

### FCA
Over the past one year, we have had a consistent presence at the Fellowship of Christian Athletes clubs at both Chapel Hill High School and Jordan High School. We have been able to help provide snacks for the clubs and weekly encouragement  for the office staff and club advisors. Additionally, we provide mentorship and guidance for their student leaders. We have seen the club consistently reach close to 50 students at Chapel Hill High School and grow from an average of 20 to 75 students at Jordan High School.

### Tutoring



In the past our church has participated in tutoring services for high school students at ECHHS as needed.

### ServeRDU
ServeRDU was a service project (2013-2019) that we have participated in as a church in the past. Through partnerships with East Chapel Hill High School, Phillips Middle School, and Ephesus Elementary school we were able to provide free labor and materials to renovate classrooms, paint bathrooms, restore playground spaces, and provide meals for staff of all levels at each school.

### Gift Bags and Meals for Teachers and Athletes
Our church has catered meals on many different occasions for the football team. We have also provided breakfast for the teachers and put together beginning of the year appreciation gift bags.

---

# Families

### Foster and Adoption
We have helped support families who have had 12 foster kids over the past 4 years.  Some of these experiences with families have also led to adoption by families from our local church.

### Care and Counsel
Our pastors provide resources and support for 25 to 50 individuals a year going through crisis situations from difficulty in marriage to mental health struggles. Because we have access and relationships to so many community resources, we are able to help individuals get the care they need more quickly than if they were seeking it on their own. We also provide a support network for those individuals as they navigate crises.

### Benevolence
Our church is always and has many examples of ways that we have helped out non-church members in the community who needed help in crisis situations from job loss and financial turmoil, to unsuspected sickness and funeral services for community members.

---

# UNC

### Promoting engagement with mental health resources
The leader of the UNC Student Life Engagement Department recently told us that "loneliness is



one of the biggest problems facing campus. He thinks that religious organizations like Summit's college ministry on campus provide a sense of belonging for students. This is good for mental health.

Our organization has helped countless students battling mental health over the last 12 years. One of our students that is a senior at UNC recently said this: "I do not think I would be alive today if it was not for Summit Church and the Summit College ministry."

***Career and Live Coaching***
We do not just provide spiritual care. Our staff engages in conversations regarding finances, relationships, careers and major life decisions. We want to help mentor our students in every aspect of life.

***Our students volunteer with many non-profits***
Some of these organizations include the Jackson Center, Hargreaves Community Center, Community Foster Care and the International Justice Mission protecting people from human trafficking and abuse.

P.O. Box 129
Morrisville, NC 27560

(919) 467-1239

501 Cascade Pointe Lane
Suite 103
Cary, NC 27513
www.macconnellandassoc.com

**MacCONNELL & Associates, P.C.**

*"Engineering Today For Tomorrow's Future"*

# Technical Memorandum

To:        Chatham Planning Board
From:      David Barcal, Project Manager/MacConnell & Associates, PC
Date:      September 17, 2024
Client:    Qunity
Subject:   Summit Church Chatham Campus
Project No.:  C26302.00

## Introduction:

Summit Church is proposing to develop the property at 9780 US 15-501 North Chatham County, NC. An Auditorium with a seating capacity of 1,200 seats within the auditorium and 905-person capacity for the youth ministry area is proposed along with a proposed gymnasium. The site will utilize an onsite treatment and disposal system for its wastewater disposal. The system is currently proposed to be a pretreated subsurface drip system and utilize flow equalization. An estimated weekly schedule of waste generation is provided below.

## Estimated Flows

Table 1 below is the current estimated weekly schedule. It is estimated that there will be two Sunday services with maximum capacity of 2,105 people per service, three meetings during the week that will have a maximum capacity of 75 people, one additional full service that will happen quarterly with a maximum capacity of 1,200 people and the gymnasium with a maximum capacity of 739 people will be used three times week. The facility is assumed to have a warming kitchen only and utilizes flow equalization and flow reduction based on low-flow fixtures to reduce the drain field area. The drain field is preliminary sized based on the equalized flow of 2,999-gallons and the weekly uses will be limited to keep the flow below 3,000-gallons of equalized flow per day.

**Table 1: Estimated Flow Equalized Total Flow**

| | Number of Attendees | Design Daily Flowrate - Warming Kitchen (Attendees) | Flow From Gymnasium (GPD) | Unreduced GPD | Reduced Flow (25% Flow Reduction) | Equalized GPD | Balance (GAL) |
|---|---|---|---|---|---|---|---|
| Sunday | 4210 | 3 | 0 | 12630 | 9472.5 | 2999 | 6474 |
| Monday | 75 | 3 | 3695 | 3920 | 2940 | 2999 | 6415 |
| Tuesday | 1200 | 3 | 3695 | 7295 | 5471 | 2999 | 8887 |
| Wednesday | 75 | 3 | 3695 | 3920 | 2940 | 2999 | 8828 |
| Thursday | 75 | 3 | 0 | 225 | 169 | 2999 | 5998 |
| Friday | 0 | 3 | 0 | 0 | 0 | 2999 | 2999 |
| Saturday | 0 | 3 | 0 | 0 | 0 | 2999 | 0 |
| **(1) Two services on Sunday (1,200 seats each), Plus Two Children Service (905) (3 gal/person)** | | | | | | | |
| **(2) Three 75 People services throughout the week (3 gal/person)** | | | | | | | |
| **(3) Quarterly 1,200-person service during the week (3 gal/person)** | | | | | | | |
| **(4) 739 Person Gymnasium used Three times per week (5 gal/person)** | | | | | | | |

## Treatment and Disposal System

The treatment system uses E-Z Treat recirculating media filters for biological treatment of the wastewater. The E-Z Treat technology has the following NSF certifications: 40, 245, and 350. The treatment and disposal system design has not been finalized but typically includes the following components:

- Surge tanks with effluent filters.
- Septic tank with effluent filters.
- Equalization tanks with equalization pumps.
- Recirculation tanks in series with one effluent bypass valve per tank, and pod dosing pumps.
- E-Z Treat filter pods
- Field dosing tank with pumps.
- subsurface drip irrigation fields with initial drip tubing.
- Controls and electrical components for the above equipment.

The surge tank has a settling compartment which is approximately equal to 2/3rd of the tank volume and the second chamber is approximately 1/3rd of the tank volume. Wastewater from the surge tank flows by gravity through effluent filters into the septic tank. The description below describes the flow movement of an example system. The final number of recirculation tanks and treatment pods will be determined during final design.

From the septic tank the wastewater enters the flow equalization tank where the equalized volume provides sufficient emergency and peak capacity for the treatment system. The submersible equalization pumps will convey the wastewater into the first recirculation tank where wastewater

will be pumped into E-Z Treat filter pods for secondary treatment. Then, the flow is returned by gravity into the first recirculation tank or to the second recirculation tank through a bypass valve. Similarly, the second recirculation tank pumps the treated water through E-Z Treat filter pods for tertiary treatment before the water returns to the second recirculation tank or flows by gravity into the field irrigation tank.

The field irrigation tank will dose the treated water to the subsurface drip irrigation fields. One pump will run to dose the zones depending on the size of the fields. The zones will be dosed according to the dose group number in the Design Calculations. Each filter has provisions to backwash at the desired intervals and return the water to the surge tanks. Automatic flushing of the fields should take place a minimum of once a month.

## **Operation and Maintenance**

To ensure a smooth operating system, regular maintenance shall be performed on each treatment unit. The maintenance for each unit is displayed in the following table.

## **Operation and Maintenance Tasks**

| Unit | Frequency | Task |
|---|---|---|
| Septic Tank: damage | 3 – 6 months | Check for solids accumulation, blockages, or baffle damages, in/exfiltration, pump septage. |
| Septic Tank: solids and scum | 12 months | Pump out accumulated solids if necessary, remove scum layer. |
| Effluent Filter: Testing | 3 – 6 months | Check and clean as needed. |
| Effluent Filter: Replacement | 12 months | Replace each time septic tank is pumped. |
| E-Z Treat Treatment Unit | monthly | Inspect control/alarm panel, recirculation tank, and E-Z Treat treatment unit (filter pod). |
| Ultraviolet Disinfection | weekly | Wipe (clean) UV lamp, check intensity and replace lamp when required. |
| Pump Tanks: Pumps and Controls | weekly | Check pumps, controls, alarms, elapsed time meters. |
| Pump Tanks: Solids and Potential Leaks | 3 – 6 months | Check for solids accumulation, or infiltration and exfiltration. |
| Pump Tanks: Scum Accumulation | 12 months | Remove scum layer when septic tank is pumped. |
| Drip Field: Vegetation | 2 – 4 weeks | Weed Eat vegetative cover to a minimum height of 4 inches if applicable to ensure vegetation does not interfere with the system operation. |
| Drip System: Piping and Distribution Equipment | 3 – 6 months | Check for leaks in force mains, odors, ponding, and erosion to ensure runoff does not occur in drip area. |

| Pumps, Distribution Piping, and Alarm System | monthly | Check flow meter readout and compare to recorded flows, check pumps for leaks. |
|---|---|---|
| Pumps, Distribution Piping, and Alarm System | quarterly | Remove filter covers and inspect for accumulation of debris. |
| Pumps, Distribution Piping, and Alarm System | semiannually | Remove and lubricate O-Rings on filter canister, replace if damaged. Clean filter discs at hydraulic tubing feed. |
| Pumps, Distribution Piping, and Alarm System | annually | Remove filter disc cartridge and replace, clean cartridge and store for next annual replacement. Dig along side dripper line and remove small section with emitter, repair with "RAM" couplings and new tubing, inspect removed tubing for excess slime or buildup. Flush dripper lines with chemical solution as needed. Check and or replace batteries in flow meter. |
| Control Panel and Pump Efficiency | 6 – 12 months | Check amp readout and compare to manufacturers instructions. |



**| MEMORANDUM**

| Date: | September 17, 2024 |
|---|---|
| **To:** | Jael Wagoner, PLA, ASLA, Qunity |
| **From:** | Baohong Wan, PhD, PE, Gannett Fleming |
| **RE:** | Summit Church Chatham County Traffic Analysis Addendum |

Gannett Fleming is contracted with Qunity to prepare the Summit Church Chatham County Traffic Impact Analysis (TIA) in accordance with the North Carolina Department of Transportation (NCDOT) Congestion Management Capacity Analysis Guidelines and Chatham County Unified Development ordinance (UDO) requirements. A quick summary of the traffic analysis timeline is provided below:

- A Traffic Summary Letter (outlining trip generation results and adjacent roadway conditions) was completed on 5/20/2024 as part of the rezoning application submittal for staff review.
- Gannett Fleming started TIA scoping coordination with NCDOT in July 2024. The final TIA scoping document (MOU, dated 8/9/2024) was approved by NCDOT on August 12, 2024.
- The Summit Church Traffic Impact Analysis was completed on 8/16/2024 and submitted to the County and NCDOT for review and comment. NCDOT issued preliminary review on 9/13/2024, indicating the TIA substantially meet DOT's criteria for further review and comments.

In addition to preparing the TIA, Gannett Fleming staff attended public hearings on 8/19 during the Chatham County Board of Commissioners (BOC) meeting and on 9/3 during the Planning Board (PB) meeting.

This Technical Memorandum provides a summary of Gannett Fleming's responses to some of the comments we received during the public hearings, particularly concerning traffic analysis results of the proposed development.

## Trip Generation Comparisons

Some residents and board members expressed concerns regarding the total number of trips to be generated by the proposed Summit Church Chatham County development.

The preliminary plan of Summit Church Chatham County is to construct an 88,460 square foot (SF) church with a 1,200-seating capacity sanctuary. Trip generation was conducted in accordance with the procedures outlined in the Institute of Transportation Engineers (ITE) report entitled *Trip Generation 11th Edition*. In summary, the proposed Summit Church is projected to generate approximately 669 vehicular trips on a typical weekday, with 28 trips expected to occur during the AM peak hour and 43 trips during the PM peak hour; it is projected to generate approximately 2,768 trips on a typical Sunday, with 912 trips expected to occur during the Sunday peak hour.

Compared to the current Conditional District Compact Community designation (TIA prepared by Kimley-Horn and Associates in May 2021), the proposed Summit Church is expected to generate 59% less vehicular traffic on a typical weekday (669 trips compared to 1,616 trips). Admittedly, the church is projected to cause a significant traffic increase (over 2000 vehicles per day) on a Sunday. Nevertheless, in terms of the total weekly trips (weekdays x 5 + Saturday + Sunday), the proposed Summit Church is anticipated to generate 26% less traffic than Herdon Farm (6,539 trips compared to 8,792 trips).

**| 1**


| Project | Land Use | Weekday | | | Sunday | |
|---------|----------|---------|-----|-----|--------|------|
| | | Daily | AM | PM | Daily | Peak |
| Summit Church | 88.5 KSF church | 669 | 28 | 43 | 2768 | 912 |
| Herndon Farm (CDCC) | 170 SA Housing, 125 Cong Care, 10 ksf Daycare | 1616 | 192 | 209 | 640 | 74 |
| Womble Parcel (Catalyst) | 243 MF, 15 ksf MOB | 1653 | 139 | 153 | 933 | 81 |
| Vickers Village TIA | 225 SF, 25 ksf Office, 50 ksf Commercial | 6230 | 375 | 402 | 4060 | 428 |
| Vickers Village Site Plan | 189 SF, 25 ksf Commercial | 2283 | 159 | 283 | 2463 | 252 |

In comparison to a couple other recently approved developments along the US 15-501 corridor, the proposed Summit Church is projected to generate significantly less weekday trips (79% less than Vickers Village Site Plan, 59% less than Womble/Catalyst) and weekly total trips (70% less than Vickers Village Site Plan, 38% less than Womble/Catalyst).

## Roadway Capacity Assessment

In accordance with the anticipated traffic patterns, capacity analysis was conducted for the proposed Summit Church during Sunday peak hours. Here is a quick summary of the analysis results:

- The intersection of US 15-501 at Lystra Road (with existing geometrics and signal control) is found to operate LOS B under the No-Build conditions and LOS C under the Build conditions. Additional improvements are not required.
- The intersection of US 15-501 at Briar Chapel Parkway/Vickers Road (with existing geometrics and signal control) is found to operate LOS B under the future year conditions, with or without the proposed Summit Church. Additional improvements are not required.
- The intersection of US 15-501 at Jack Bennett Road (with RCI improvements to be constructed with Vickers Village) is found to operate LOS A under the future year conditions, with or without the proposed Summit Church. Additional improvements are not required.
- The intersection of US 15-501 at Poplar Street and Hidden Oaks Court (with existing geometrics and traffic control) is found to operate LOS F at the stop-controlled approaches under the Build conditions. A traffic signal is not expected to be warranted. Dedicate turn lanes are already in place, and the storage lengths appear sufficient to accommodate vehicle queues. No feasible improvements are not identified through the TIA. Nevertheless, traffic should be monitored at this location during large events (full occupancy or near capacity of the Church sanctuary), and traffic management plan elements may be considered to improve traffic operations and safety at this location.
- Both site accesses are projected to operate at LOS C under the Buildout conditions. Dedicated right-turn lanes are recommended based on the NCDOT turn lane warrant analysis results.

Based on discussions with NCDOT, a TIP year (2036) analysis was included in the TIA to account for future year conditions with the reduced conflict intersection (RCI) improvements in place (to be constructed with TIP U-6192). Note that capacity analysis was conducted during the weekday AM and PM peak hours to be consistent with NCDOT traffic forecasts and capacity analysis standards. Below is a quick summary of the analysis results:

- No significant LOS decline or traffic delay increase is found at any of the intersections of US 15-501 at Lystra Road, US 15-501 at Briar Chapel Parkway/Vickers Road, and US 15-501 at Jack Bennett Road.

| 2



- The intersection of US 15-501 at Poplar Street and Hidden Oaks Court (with existing geometrics and traffic control) is found to operate LOS F at the stop-controlled approaches under the Build conditions with reduced traffic delay (than 2026 conditions). Storage lengths of the existing dedicate turn lanes are found to be adequate to accommodate future vehicle queues.
- **A supplement analysis (after the TIA submittal)** was conducted in this addendum to address traffic conditions in case small group activities (such as college bible study groups, etc.) are planned during weekdays. To be conservative, 75 inbound and 75 outbound vehicular trips were added to the PM peak analysis of the TIA. Based on the supplemental analysis results, the addition of small group activities will only lead to minimal increases of traffic delay at the study intersections. No significant LOS decline, or delay increase is found at any of the adjacent roadways or intersections in the study area.

## Roadway Improvement Recommendations

The proposed Summit Church is anticipated to generate significantly less weekday traffic than the current zoning designation or in comparison to other new developments along the US 15-501 corridor. Based on the capacity analysis results, the proposed Church is anticipated to have minimal traffic impact on adjacent roadways and study intersections.

Although the Church is expected to generate significant amount of traffic on a Sunday, total traffic within the study area could be less since baseline traffic on adjacent streets is typically much lower on a Sunday (60% to 75% of weekday traffic volumes). Nevertheless, due to the project location, coordination with the NCDOT is recommended to ensure consistencies between this project and roadway improvements planned by TIP U-6192.

The roadway improvements recommended by the TIA is summarized below:

*US 15-501 at Site Access #1 (future right-in/right-out)*
- Construct Site Access #1 with one inbound and one outbound lane under STOP control.
- Provide a dedicated right-turn lane with 150 feet of storage and appropriate taper along northbound US 15-501 at this location.
- Provide sufficient internal protection stem length at Site Access #1.

*US 15-501 at Site Access #2 (future right-in/right-out)*
- Construct Site Access #2 with one inbound and one outbound lane under STOP control.
- Provide a dedicated right-turn lane with 100 feet of storage and appropriate taper along northbound US 15-501 at this location.
- Provide sufficient internal protection stem length at Site Access #2.

*Coordination with NCDOT TIP*
- Gannett Fleming recommends the proposed development coordinate with the NCDOT to ensure consistent design between this project and the roadway improvements planned by TIP U-6192, and to provide sufficient spacing between Site Access #1 and Site Access #2 so locations of U-turn bulbs with the TIP project can be shifted and aligned with the planned site driveways to improve community access while maintaining traffic operations and safety along the site frontage of US 15-501.

## Additional Traffic Management Considerations

During the public hearings, residents and board members expressed concerns regarding traffic management plans during Sundy peak hours. Following discussions with the project development team, evidently Summit Church has significant experience in implementing traffic management strategies and forming dedicated traffic control teams at various other locations.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 507 of 743



Some of the common traffic management strategies may include:

- Adopt **transportation demand management (TDM) strategies**, including carpooling and ridesharing, to connect key gathering points like downtown Pittsboro, Chapel Hill, and other church locations with the project site.
- Deploy **signage** ahead of large events to alert drivers of anticipated traffic and ensure smoother traffic flow.
- During large events with full occupancy at the Church sanctuary, implement **traffic management** measures and station **traffic control** staff at key locations where significant vehicular and pedestrian traffic conflicts occur.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 508 of 743



STATE OF NORTH CAROLINA
# DEPARTMENT OF TRANSPORTATION

ROY COOPER                                                    J.R. "JOEY" HOPKINS
GOVERNOR                                                            SECRETARY

September 13, 2024

**MEMORANDUM**                                          In reply, refer to
                                                        File No. SC-2024-160

TO:      Jeron Monroe, District Engineer          ┌─────────────────────────────┐
         Division 8, District 1                   │ Document Sent Electronically │
                                                  └─────────────────────────────┘
FROM:    Madonna Saleh, Design Engineer
         Congestion Management Section

SUBJECT: Preliminary Review for the Summit Church Chatham County in Chapel Hill, Chatham
         County

The Congestion Management Section has performed a preliminary review of the Traffic Impact Analysis
(TIA) for the subject site.  The key dates regarding this development are as follows:

Date Received by This Office          08/19/24          Date of Site Plan              05/07/24
                                                        Date of Sealed TIA             08/16/24

| | |
|---|---|
| **X** | We consider the Traffic Impact Analysis to substantially meet our criteria for further review and comments.  This review has been added to our queue of projects to perform a more detailed review that will be submitted under separate cover at a later date. |
| | We require additional information from the TIA preparer as noted on the attached list.  We are unable to perform a thorough review until we receive this information. |
| | We have concerns with the Traffic Impact Analysis.  The attached list includes inconsistencies or other questionable aspects that vary from our recommended practices and require further explanation or justification.  A revised TIA should be submitted before a thorough review can be completed. |

**Based on this preliminary review, the TIA is "Complete" according to N.C.G.S.136-93.1A**

Please refer to the Driveway Manual and the Capacity Analysis Guidelines available via
https://connect.ncdot.gov/resources/safety/Pages/Congestion-Management.aspx for additional
information.  This letter is only being distributed electronically and should be considered as the official
documentation. If we can provide further assistance with this project or if you require a paper copy of
this letter, please contact me or Nicholas C. Lineberger, P.E.

NCL:ms

cc:      R. Blakley, P.E.              D.B. Willett
         B. K. Mayhew, P.E.
         T. J. Fowler, P.E.
         D. Y. Ishak
         A. Kluttz, P.E.
         J. H. Grant, P.E.
         B. Wan, P.E.               (Gannett Fleming)

*Mailing Address:*                          *Telephone:* (919) 814-5000                        *Location:*
NC DEPARTMENT OF TRANSPORTATION              *Fax:* (919) 771-2745                    750 N. GREENFIELD PARKWAY
TRANSPORTATION MOBILITY & SAFETY DIVISION    *Customer Service:* 1-877-368-4968              GARNER, NC 27529
TRAFFIC MANAGEMENT UNIT
1561 MAIL SERVICE CENTER
RALEIGH, NC 27699-1561                          *Website:* www.ncdot.gov

| Project | LUC | Density | Weekday | Saturday | Sunday | SunPeak | Weekly |
|---------|-----|---------|---------|----------|--------|---------|--------|
| Summit Church | 560 | 88 | 669 | 431 | 2768 | 912 | |
| | Total | | 669 | 431 | 2768 | 912 | 6544 |
| | | | | | | | |
| Herndon Farm | 251 | 170 | 733 | 483 | 423 | 41 | |
| | 253 | 125 | 276 | 182 | 159 | 15 | |
| | 565 | 10 | 476 | 62 | 58 | 18 | |
| | Total | | 1485 | 727 | 640 | 74 | 8792 |
| | | | | | | | |
| Vickers Village TIA | 210 | 225 | 2128 | 2133 | 1908 | 187 | |
| | 710 | 25 | 347 | 55 | 18 | 5 | |
| | 820 | 50 | 1851 | 2330 | 949 | 118 | |
| | 821 | 50 | 4725 | 5808 | 4244 | 380 | |
| | 821 | 50 | 3376 | 4053 | 2134 | 236 | |
| | Total | | 5851 | 6241 | 4060 | 428 | 39556 |
| | | | | | | | |
| Vickers Village Site Plan | 210 | 189 | 1782 | 1792 | 1603 | 157 | |
| | 822 | 25 | 1361 | 1634 | 860 | 95 | |
| | Total | | 3143 | 3426 | 2463 | 252 | 21604 |
| | | | | | | | |
| Womble/Catalyst | 221 | 243 | 1103 | 1111 | 916 | 78 | |
| | 720 | 15 | 540 | 207 | 17 | 3 | |
| | Total | | 1643 | 1318 | 933 | 81 | 10466 |



# NCDOT
## 0530000479  Weekly Volume Report - Mon 08/26/2024 - Sun 09/01/2024

| Location ID: | 0530000479 | | Type: | SPOT |
|---|---|---|---|---|
| Located On: | US 1 | | NORTH OF: | NC 42 |
| Direction | 2-WAY | | | |
| Community: | - | | Period: | Mon 08/26/2024 - Sun 09/01/2024 |
| AADT: | | | | |

| Start Time | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Avg |
|---|---|---|---|---|---|---|---|---|
| 12:00 AM | 146 | 161 | 170 | 181 | 273 | 338 | 226 | 214 |
| 1:00 AM | 104 | 129 | 134 | 147 | 159 | 228 | 155 | 151 |
| 2:00 AM | 94 | 124 | 121 | 143 | 143 | 123 | 94 | 120 |
| 3:00 AM | 136 | 132 | 138 | 154 | 167 | 101 | 96 | 132 |
| 4:00 AM | 415 | 398 | 379 | 393 | 349 | 154 | 121 | 316 |
| 5:00 AM | 1075 | 1163 | 1191 | 1155 | 877 | 324 | 217 | 857 |
| 6:00 AM | 2040 | 2061 | 2031 | 1974 | 1772 | 580 | 340 | 1543 |
| 7:00 AM | 2814 | 2915 | 2962 | 2907 | 2656 | 832 | 534 | 2231 |
| 8:00 AM | 2119 | 2116 | 2263 | 2152 | 1974 | 1134 | 844 | 1800 |
| 9:00 AM | 1757 | 1749 | 1772 | 1857 | 1842 | 1495 | 1096 | 1653 |
| 10:00 AM | 1751 | 1671 | 1681 | 1747 | 1919 | 1761 | 1448 | 1711 |
| 11:00 AM | 1704 | 1713 | 1794 | 1817 | 2051 | 1847 | 1574 | 1786 |
| 12:00 PM | 1791 | 1823 | 1856 | 1964 | 2244 | 1853 | 1685 | 1888 |
| 1:00 PM | 1862 | 1919 | 1957 | 1963 | 2292 | 1916 | 1668 | 1940 |
| 2:00 PM | 2109 | 2162 | 2187 | 2357 | 2643 | 1831 | 1686 | 2139 |
| 3:00 PM | 2262 | 2377 | 2439 | 2582 | 2823 | 1804 | 1625 | 2273 |
| 4:00 PM | 2659 | 2669 | 2664 | 2802 | 2684 | 1829 | 1593 | 2414 |
| 5:00 PM | 2650 | 2662 | 2808 | 2703 | 2729 | 1586 | 1554 | 2385 |
| 6:00 PM | 1830 | 1889 | 1989 | 1933 | 2199 | 1499 | 1327 | 1809 |
| 7:00 PM | 1173 | 1181 | 1328 | 1401 | 1606 | 1241 | 1105 | 1291 |
| 8:00 PM | 821 | 932 | 1019 | 1045 | 1108 | 1037 | 902 | 981 |
| 9:00 PM | 592 | 624 | 722 | 797 | 793 | 832 | 281 | 663 |
| 10:00 PM | 416 | 416 | 469 | 583 | 706 | 609 | 370 | 510 |
| 11:00 PM | 285 | 227 | 254 | 395 | 510 | 414 | 287 | 339 |
| Total | 32605 | 33213 | 34328 | 35152 | 36519 | 25368 | 20828 | |
| 24HrTotal | | 32605 | 33213 | 34328 | 35152 | 36519 | 25368 | 31145 |
| AM Pk Hr | 7:00 | | 7:00 | | 7:00 | | 7:00 | | 7:00 | | 11:00 | | 11:00 | | |
| AM Peak | 2814 | | 2915 | | 2962 | | 2907 | | 2656 | | 1847 | | 1574 | | 2525 |
| PM Pk Hr | 4:00 | | 4:00 | | 5:00 | | 4:00 | | 3:00 | | 1:00 | | 2:00 | | |
| PM Peak | 2659 | | 2669 | | 2808 | | 2802 | | 2823 | | 1916 | | 1686 | | 2480 |
| % Peak Hr | 8.63% | | 8.78% | | 8.63% | | 8.27% | | 7.73% | | 7.55% | | 8.09% | | 8.43% |
| % Peak Hr | | 8.63% | | 8.78% | | 8.63% | | 8.27% | | 7.73% | | 7.55% | | 8.24% |



24-Hour Total Volumes

20828  Sunday
34803  Weekday Avg
 0.598  Ratio

# NCDOT

## 0190000004 Weekly Volume Report - Mon 04/29/2019 - Sun 05/05/2019

| Location ID: | 0190000004 | | Type: | SPOT |
|---|---|---|---|---|
| Located On: | US 64 | | EAST OF: | SR 1716 BIG WOODS RD |
| Direction | 2-WAY | | | |
| Community: | - | | Period: | Mon 04/29/2019 - Sun 05/05/2019 |
| AADT: | | | | |

| Start Time | Mon | Tue | Wed | Thu | Fri | Sat | Sun | Avg |
|---|---|---|---|---|---|---|---|---|
| 12:00 AM | 89 | 61 | 72 | 115 | 118 | 170 | 151 | 111 |
| 1:00 AM | 60 | 45 | 56 | 52 | 52 | 104 | 91 | 66 |
| 2:00 AM | 34 | 28 | 48 | 37 | 51 | 60 | 62 | 46 |
| 3:00 AM | 65 | 64 | 79 | 62 | 65 | 58 | 47 | 63 |
| 4:00 AM | 134 | 111 | 129 | 137 | 113 | 70 | 69 | 109 |
| 5:00 AM | 440 | 416 | 394 | 396 | 375 | 199 | 109 | 333 |
| 6:00 AM | 1340 | 1291 | 1227 | 1339 | 1198 | 612 | 208 | 1031 |
| 7:00 AM | 2013 | 2006 | 1920 | 1992 | 1920 | 876 | 375 | 1586 |
| 8:00 AM | 1694 | 1722 | 1837 | 1726 | 1801 | 1126 | 586 | 1499 |
| 9:00 AM | 1317 | 1322 | 1569 | 1300 | 1415 | 1350 | 862 | 1305 |
| 10:00 AM | 1125 | 1078 | 1226 | 1223 | 1286 | 1498 | 1175 | 1230 |
| 11:00 AM | 1076 | 1070 | 1201 | 1164 | 1303 | 1542 | 1203 | 1223 |
| 12:00 PM | 1092 | 1164 | 1249 | 1263 | 1369 | 1641 | 1489 | 1324 |
| 1:00 PM | 1086 | 1250 | 1336 | 1387 | 1640 | 1506 | 1545 | 1393 |
| 2:00 PM | 1224 | 1242 | 1549 | 1488 | 1801 | 1624 | 1491 | 1488 |
| 3:00 PM | 1453 | 1680 | 1603 | 1737 | 2034 | 1616 | 1644 | 1681 |
| 4:00 PM | 1728 | 1824 | 1992 | 2015 | 2303 | 1754 | 1713 | 1904 |
| 5:00 PM | 1936 | 1986 | 2149 | 2258 | 2272 | 1566 | 1390 | 1937 |
| 6:00 PM | 1428 | 1417 | 1539 | 1570 | 1739 | 1308 | 1180 | 1454 |
| 7:00 PM | 848 | 830 | 953 | 1018 | 1142 | 1009 | 976 | 968 |
| 8:00 PM | 599 | 582 | 659 | 727 | 836 | 761 | 732 | 699 |
| 9:00 PM | 388 | 473 | 507 | 544 | 659 | 617 | 430 | 517 |
| 10:00 PM | 226 | 245 | 342 | 357 | 543 | 428 | 261 | 343 |
| 11:00 PM | 124 | 158 | 225 | 181 | 306 | 285 | 160 | 206 |
| Total | 21519 | 22065 | 23861 | 24088 | 26341 | 21780 | 17949 | |
| 24HrTotal | | 21519 | 22065 | 23861 | 24088 | 26341 | 21780 | 22515 |
| AM Pk Hr | 7:00 | 7:00 | 7:00 | 7:00 | 7:00 | 11:00 | 11:00 | |
| AM Peak | 2013 | 2006 | 1920 | 1992 | 1920 | 1542 | 1203 | 1799 |
| PM Pk Hr | 5:00 | 5:00 | 5:00 | 5:00 | 4:00 | 4:00 | 4:00 | |
| PM Peak | 1936 | 1986 | 2149 | 2258 | 2303 | 1754 | 1713 | 2014 |
| % Peak Hr | 9.35% | 9.09% | 9.01% | 9.37% | 8.74% | 8.05% | 9.54% | 9.00% |
| % Peak Hr | | 9.35% | 9.09% | 9.01% | 9.37% | 8.74% | 8.05% | 9.02% |



24-Hour Total Volumes

17949 Sunday
24089 Weekday Avg
0.745 Ratio



US Highway 501

Lystra Rd.

(265) [402]

[1119] (222) (0) [0]
(2230) [352]

11 — 1

(42) [56]
(2088) [1327] (96) [57]

Poplar St.

[6] (4)
[956] (2) (5)
(2268) [3] [7]

[10] (7)

5 — 6

(4) [5]

Hidden Oaks Ct.

(14) [4]
(0) [0]
(1353) [1902]
[1] (1)

(961) (6) [9]
(2283)

17 — 19

Bulb-out

(1359) [1901]

7

(5) [49]

Site Access #1

(1319) [1902]
[56] (10)

Bulb-out

(961) (2283)

20 — 18

[63] (13)
(1366) [1906]

(974) [2346]

8

(6) [50]

Site Access #2

(1379) [1913]
[38] (7)

Briar Chapel Pkwy.

[70] [292]
[851] [28] (25) [55]
(1977) (22)

[240] (295)

2 — 3

(45) [36]

Vickers Rd.

(162) [74]
[79] (43)
(1326) [1850]
[12] (9)

(980) [1568]
[92] (249) [239]
(201)

14 — 4

(172) [330]

Jack Bennett Rd.

(0) [0]
[0] (1011) [93] (86)
(972)

US Highway 501

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 513 of 743

LEGEND

DIRECTIONAL MOVEMENT
(xxx) AM PEAK HOUR TRAFFIC
[xxx] PM PEAK HOUR TRAFFIC

SCALE: NONE

2036 TIP SCENARIO A BUILDOUT TURNING MOVEMENT VOLUMES

FIGURE 14*

CHATHAM COUNTY NORTH CAROLINA

TRANSYSTEMS

GANNETT FLEMING



US Highway 501

Lystra Rd.

Poplar St.

Hidden Oaks Ct.

Site Access #1

Bulb-out

Bulb-out

Site Access #2

Briar Chapel Pkwy.

Vickers Rd.

Jack Bennett Rd.

US Highway 501

LEGEND

DIRECTIONAL MOVEMENT
(xxx) AM PEAK HOUR TRAFFIC
[xxx] PM PEAK HOUR TRAFFIC

SCALE: NONE

2036 TIP SCENARIO B BUILDOUT TURNING MOVEMENT VOLUMES

FIGURE 15*

CHATHAM COUNTY
NORTH CAROLINA

TRANSYSTEMS

GANNETT FLEMING

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | | | | | | | | | | | | |
| Traffic Volume (vph) | 4 | 352 | 0 | 0 | 0 | 402 | 0 | 1327 | 57 | 0 | 0 | 0 |
| Future Volume (vph) | 4 | 352 | 0 | 0 | 0 | 402 | 0 | 1327 | 57 | 0 | 0 | 0 |
| Ideal Flow (vphpl) | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 |
| Storage Length (ft) | 0 | | 0 | 0 | | 0 | 0 | | 225 | 0 | | 0 |
| Storage Lanes | 0 | | 0 | 0 | | 1 | 0 | | 1 | 0 | | 0 |
| Taper Length (ft) | 100 | | | 100 | | | 100 | | | 100 | | |
| Lane Util. Factor | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 0.95 | 1.00 | 1.00 | 1.00 | 1.00 |
| Frt | | | | | | 0.865 | | | 0.850 | | | |
| Flt Protected | | 0.999 | | | | | | | | | | |
| Satd. Flow (prot) | 0 | 1861 | 0 | 0 | 0 | 1611 | 0 | 3539 | 1583 | 0 | 0 | 0 |
| Flt Permitted | | 0.999 | | | | | | | | | | |
| Satd. Flow (perm) | 0 | 1861 | 0 | 0 | 0 | 1611 | 0 | 3539 | 1583 | 0 | 0 | 0 |
| Right Turn on Red | No | | No | | | No | | | No | | | No |
| Satd. Flow (RTOR) | | | | | | | | | | | | |
| Link Speed (mph) | | 45 | | | 55 | | | 55 | | | 55 | |
| Link Distance (ft) | | 217 | | | 1097 | | | 805 | | | 1004 | |
| Travel Time (s) | | 3.3 | | | 13.6 | | | 10.0 | | | 12.4 | |
| Peak Hour Factor | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 |
| Adj. Flow (vph) | 4 | 391 | 0 | 0 | 0 | 447 | 0 | 1474 | 63 | 0 | 0 | 0 |
| Shared Lane Traffic (%) | | | | | | | | | | | | |
| Lane Group Flow (vph) | 0 | 395 | 0 | 0 | 0 | 447 | 0 | 1474 | 63 | 0 | 0 | 0 |
| Turn Type | Perm | NA | | | | Perm | | NA | Perm | | | |
| Protected Phases | | 7 | | | | | | 2 | | | | |
| Permitted Phases | 7 | | | | | 4 | | | 2 | | | |
| Detector Phase | 7 | 7 | | | | 4 | | 2 | 2 | | | |
| Switch Phase | | | | | | | | | | | | |
| Minimum Initial (s) | 7.0 | 7.0 | | | | 7.0 | | 14.0 | 14.0 | | | |
| Minimum Split (s) | 14.0 | 14.0 | | | | 14.0 | | 21.0 | 21.0 | | | |
| Total Split (s) | 44.0 | 44.0 | | | | 44.0 | | 56.0 | 56.0 | | | |
| Total Split (%) | 44.0% | 44.0% | | | | 44.0% | | 56.0% | 56.0% | | | |
| Maximum Green (s) | 37.0 | 37.0 | | | | 37.0 | | 49.0 | 49.0 | | | |
| Yellow Time (s) | 5.0 | 5.0 | | | | 5.0 | | 5.0 | 5.0 | | | |
| All-Red Time (s) | 2.0 | 2.0 | | | | 2.0 | | 2.0 | 2.0 | | | |
| Lost Time Adjust (s) | | -2.0 | | | | -2.0 | | -2.0 | -2.0 | | | |
| Total Lost Time (s) | | 5.0 | | | | 5.0 | | 5.0 | 5.0 | | | |
| Lead/Lag | | | | | | | | | | | | |
| Lead-Lag Optimize? | | | | | | | | | | | | |
| Vehicle Extension (s) | 3.0 | 3.0 | | | | 3.0 | | 3.0 | 3.0 | | | |
| Recall Mode | None | None | | | | None | | C-Max | C-Max | | | |
| Act Effct Green (s) | | 33.8 | | | | 33.8 | | 56.2 | 56.2 | | | |
| Actuated g/C Ratio | | 0.34 | | | | 0.34 | | 0.56 | 0.56 | | | |
| v/c Ratio | | 0.63 | | | | 0.82 | | 0.74 | 0.07 | | | |
| Control Delay | | 31.9 | | | | 43.0 | | 20.4 | 12.0 | | | |
| Queue Delay | | 0.0 | | | | 0.0 | | 0.0 | 0.0 | | | |
| Total Delay | | 31.9 | | | | 43.0 | | 20.4 | 12.0 | | | |
| LOS | | C | | | | D | | C | B | | | |
| Approach Delay | | 31.9 | | | 43.0 | | | 20.1 | | | | |
| Approach LOS | | C | | | D | | | C | | | | |

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 515 of 743

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Queue Length 50th (ft) | | 205 | | | | 253 | | 361 | 18 | | | |
| Queue Length 95th (ft) | | 285 | | | | 356 | | 495 | 41 | | | |
| Internal Link Dist (ft) | | 137 | | | 1017 | | | 725 | | | 924 | |
| Turn Bay Length (ft) | | | | | | | | | 225 | | | |
| Base Capacity (vph) | | 725 | | | | 628 | | 1988 | 889 | | | |
| Starvation Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Spillback Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Storage Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Reduced v/c Ratio | | 0.54 | | | | 0.71 | | 0.74 | 0.07 | | | |

**Intersection Summary**

| | |
|---|---|
| Area Type: | Other |
| Cycle Length: 100 | |
| Actuated Cycle Length: 100 | |
| Offset: 0 (0%), Referenced to phase 2:NBT, Start of Green | |
| Natural Cycle: 60 | |
| Control Type: Actuated-Coordinated | |
| Maximum v/c Ratio: 0.82 | |
| Intersection Signal Delay: 26.4 | Intersection LOS: C |
| Intersection Capacity Utilization 92.8% | ICU Level of Service F |
| Analysis Period (min) 15 | |

Splits and Phases:    1: US Highway 15-501 & Lystra Road

| Ø2 (R) | Ø4 |
|---|---|
| 56 s | 44 s |
| | Ø7 |
| | 44 s |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 516 of 743

| | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | | | ↗ | | ↰ | | | | | | ↑↑ | ↗ |
| Traffic Volume (vph) | 0 | 0 | 240 | 162 | 73 | 0 | 0 | 0 | 0 | 0 | 1977 | 292 |
| Future Volume (vph) | 0 | 0 | 240 | 162 | 73 | 0 | 0 | 0 | 0 | 0 | 1977 | 292 |
| Ideal Flow (vphpl) | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 |
| Storage Length (ft) | 0 | | 0 | 0 | | 0 | | 0 | | 0 | | 125 |
| Storage Lanes | 0 | | 1 | 0 | | 0 | | 0 | | 0 | | 1 |
| Taper Length (ft) | 100 | | | 100 | | | 100 | | | 100 | | |
| Lane Util. Factor | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 0.95 | 1.00 |
| Frt | | | 0.865 | | | | | | | | | 0.850 |
| Flt Protected | | | | | 0.967 | | | | | | | |
| Satd. Flow (prot) | 0 | 0 | 1611 | 0 | 1801 | 0 | 0 | 0 | 0 | 0 | 3539 | 1583 |
| Flt Permitted | | | | | 0.967 | | | | | | | |
| Satd. Flow (perm) | 0 | 0 | 1611 | 0 | 1801 | 0 | 0 | 0 | 0 | 0 | 3539 | 1583 |
| Right Turn on Red | | | No | No | | | No | | | No | | No |
| Satd. Flow (RTOR) | | | | | | | | | | | | |
| Link Speed (mph) | | 25 | | | 25 | | | 55 | | | 55 | |
| Link Distance (ft) | | 1010 | | | 356 | | | 1194 | | | 359 | |
| Travel Time (s) | | 27.5 | | | 9.7 | | | 14.8 | | | 4.5 | |
| Peak Hour Factor | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 |
| Adj. Flow (vph) | 0 | 0 | 267 | 180 | 81 | 0 | 0 | 0 | 0 | 0 | 2197 | 324 |
| Shared Lane Traffic (%) | | | | | | | | | | | | |
| Lane Group Flow (vph) | 0 | 0 | 267 | 0 | 261 | 0 | 0 | 0 | 0 | 0 | 2197 | 324 |
| Turn Type | | | Perm | Perm | NA | | | | | | NA | Perm |
| Protected Phases | | | | | 3 | | | | | | 6 | |
| Permitted Phases | | | 8 | 3 | | | | | | | | 6 |
| Detector Phase | | | 8 | 3 | 3 | | | | | | 6 | 6 |
| Switch Phase | | | | | | | | | | | | |
| Minimum Initial (s) | | | 7.0 | 7.0 | 7.0 | | | | | | 14.0 | 14.0 |
| Minimum Split (s) | | | 14.0 | 14.0 | 14.0 | | | | | | 21.0 | 21.0 |
| Total Split (s) | | | 26.0 | 26.0 | 26.0 | | | | | | 74.0 | 74.0 |
| Total Split (%) | | | 26.0% | 26.0% | 26.0% | | | | | | 74.0% | 74.0% |
| Maximum Green (s) | | | 19.0 | 19.0 | 19.0 | | | | | | 67.0 | 67.0 |
| Yellow Time (s) | | | 5.0 | 5.0 | 5.0 | | | | | | 5.0 | 5.0 |
| All-Red Time (s) | | | 2.0 | 2.0 | 2.0 | | | | | | 2.0 | 2.0 |
| Lost Time Adjust (s) | | | -2.0 | | -2.0 | | | | | | -2.0 | -2.0 |
| Total Lost Time (s) | | | 5.0 | | 5.0 | | | | | | 5.0 | 5.0 |
| Lead/Lag | | | | | | | | | | | | |
| Lead-Lag Optimize? | | | | | | | | | | | | |
| Vehicle Extension (s) | | | 3.0 | 3.0 | 3.0 | | | | | | 3.0 | 3.0 |
| Recall Mode | | | None | None | None | | | | | | C-Max | C-Max |
| Act Effct Green (s) | | | 20.2 | | 20.2 | | | | | | 69.8 | 69.8 |
| Actuated g/C Ratio | | | 0.20 | | 0.20 | | | | | | 0.70 | 0.70 |
| v/c Ratio | | | 0.82 | | 0.72 | | | | | | 0.89 | 0.29 |
| Control Delay | | | 59.5 | | 47.1 | | | | | | 18.3 | 6.7 |
| Queue Delay | | | 0.0 | | 0.0 | | | | | | 0.0 | 0.0 |
| Total Delay | | | 59.5 | | 47.1 | | | | | | 18.3 | 6.7 |
| LOS | | | E | | D | | | | | | B | A |
| Approach Delay | | 59.5 | | | 47.1 | | | | | | 16.8 | |
| Approach LOS | | E | | | D | | | | | | B | |

Chatham County Summit Church TIA  2036 TIP U-6192 Scenario A PM Peak Hour Addendum
2: US Highway 15-501 & Briar Chapel Parkway

Lanes, Volumes, Timings

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Queue Length 50th (ft) | | | 162 | | 162 | | | | | | 530 | 71 |
| Queue Length 95th (ft) | | | #288 | | 251 | | | | | | 677 | 110 |
| Internal Link Dist (ft) | | 930 | | | 276 | | | 1114 | | | 279 | |
| Turn Bay Length (ft) | | | | | | | | | | | | 125 |
| Base Capacity (vph) | | | 338 | | 378 | | | | | | 2471 | 1105 |
| Starvation Cap Reductn | | | 0 | | 0 | | | | | | 0 | 0 |
| Spillback Cap Reductn | | | 0 | | 0 | | | | | | 0 | 0 |
| Storage Cap Reductn | | | 0 | | 0 | | | | | | 0 | 0 |
| Reduced v/c Ratio | | | 0.79 | | 0.69 | | | | | | 0.89 | 0.29 |

## Intersection Summary

| | |
|---|---|
| Area Type: | Other |

Cycle Length: 100

Actuated Cycle Length: 100

Offset: 5 (5%), Referenced to phase 6:SBT, Start of Green

Natural Cycle: 70

Control Type: Actuated-Coordinated

Maximum v/c Ratio: 0.89

| | |
|---|---|
| Intersection Signal Delay: 23.2 | Intersection LOS: C |
| Intersection Capacity Utilization 94.8% | ICU Level of Service F |

Analysis Period (min) 15

\#   95th percentile volume exceeds capacity, queue may be longer.

   Queue shown is maximum after two cycles.

Splits and Phases:    2: US Highway 15-501 & Briar Chapel Parkway

| | Ø3 |
|---|---|
| | 26 s |
| Ø6 (R) | Ø8 |
| 74 s | 26 s |

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 518 of 743

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | | ↱ | | | | ↱ | | ↑↑ | ↱ | | | |
| Traffic Volume (vph) | 55 | 22 | 0 | 0 | 0 | 36 | 0 | 1326 | 12 | 0 | 0 | 0 |
| Future Volume (vph) | 55 | 22 | 0 | 0 | 0 | 36 | 0 | 1326 | 12 | 0 | 0 | 0 |
| Ideal Flow (vphpl) | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 |
| Storage Length (ft) | 0 | | 0 | 0 | | 0 | 0 | | 100 | 0 | | 0 |
| Storage Lanes | 0 | | 0 | 0 | | 1 | 0 | | 1 | 0 | | 0 |
| Taper Length (ft) | 100 | | | 100 | | | 100 | | | 100 | | |
| Lane Util. Factor | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 0.95 | 1.00 | 1.00 | 1.00 | 1.00 |
| Frt | | | | | | 0.865 | | | 0.850 | | | |
| Flt Protected | | 0.965 | | | | | | | | | | |
| Satd. Flow (prot) | 0 | 1798 | 0 | 0 | 0 | 1611 | 0 | 3539 | 1583 | 0 | 0 | 0 |
| Flt Permitted | | 0.965 | | | | | | | | | | |
| Satd. Flow (perm) | 0 | 1798 | 0 | 0 | 0 | 1611 | 0 | 3539 | 1583 | 0 | 0 | 0 |
| Right Turn on Red | No | | No | | | No | | | No | | | No |
| Satd. Flow (RTOR) | | | | | | | | | | | | |
| Link Speed (mph) | | 25 | | | 25 | | | 55 | | | 55 | |
| Link Distance (ft) | | 389 | | | 1031 | | | 328 | | | 1072 | |
| Travel Time (s) | | 10.6 | | | 28.1 | | | 4.1 | | | 13.3 | |
| Peak Hour Factor | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 |
| Adj. Flow (vph) | 61 | 24 | 0 | 0 | 0 | 40 | 0 | 1473 | 13 | 0 | 0 | 0 |
| Shared Lane Traffic (%) | | | | | | | | | | | | |
| Lane Group Flow (vph) | 0 | 85 | 0 | 0 | 0 | 40 | 0 | 1473 | 13 | 0 | 0 | 0 |
| Turn Type | Perm | NA | | | | Perm | | NA | Perm | | | |
| Protected Phases | | 7 | | | | | | 2 | | | | |
| Permitted Phases | 7 | | | | | 4 | | | 2 | | | |
| Detector Phase | 7 | 7 | | | | 4 | | 2 | 2 | | | |
| Switch Phase | | | | | | | | | | | | |
| Minimum Initial (s) | 7.0 | 7.0 | | | | 7.0 | | 14.0 | 14.0 | | | |
| Minimum Split (s) | 14.0 | 14.0 | | | | 14.0 | | 21.0 | 21.0 | | | |
| Total Split (s) | 19.0 | 19.0 | | | | 19.0 | | 81.0 | 81.0 | | | |
| Total Split (%) | 19.0% | 19.0% | | | | 19.0% | | 81.0% | 81.0% | | | |
| Maximum Green (s) | 12.0 | 12.0 | | | | 12.0 | | 74.0 | 74.0 | | | |
| Yellow Time (s) | 5.0 | 5.0 | | | | 5.0 | | 5.0 | 5.0 | | | |
| All-Red Time (s) | 2.0 | 2.0 | | | | 2.0 | | 2.0 | 2.0 | | | |
| Lost Time Adjust (s) | | -2.0 | | | | -2.0 | | -2.0 | -2.0 | | | |
| Total Lost Time (s) | | 5.0 | | | | 5.0 | | 5.0 | 5.0 | | | |
| Lead/Lag | | | | | | | | | | | | |
| Lead-Lag Optimize? | | | | | | | | | | | | |
| Vehicle Extension (s) | 3.0 | 3.0 | | | | 3.0 | | 3.0 | 3.0 | | | |
| Recall Mode | None | None | | | | None | | C-Max | C-Max | | | |
| Act Effct Green (s) | | 11.8 | | | | 11.8 | | 82.0 | 82.0 | | | |
| Actuated g/C Ratio | | 0.12 | | | | 0.12 | | 0.82 | 0.82 | | | |
| v/c Ratio | | 0.40 | | | | 0.21 | | 0.51 | 0.01 | | | |
| Control Delay | | 46.1 | | | | 41.8 | | 2.3 | 1.8 | | | |
| Queue Delay | | 0.0 | | | | 0.0 | | 0.0 | 0.0 | | | |
| Total Delay | | 46.1 | | | | 41.8 | | 2.3 | 1.8 | | | |
| LOS | | D | | | | D | | A | A | | | |
| Approach Delay | | 46.1 | | | 41.8 | | | 2.3 | | | | |
| Approach LOS | | D | | | D | | | A | | | | |

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Queue Length 50th (ft) | | 51 | | | | 23 | | 56 | 1 | | | |
| Queue Length 95th (ft) | | 96 | | | | 54 | | 81 | m2 | | | |
| Internal Link Dist (ft) | | 309 | | | 951 | | | 248 | | | 992 | |
| Turn Bay Length (ft) | | | | | | | | | 100 | | | |
| Base Capacity (vph) | | 251 | | | | 225 | | 2901 | 1297 | | | |
| Starvation Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Spillback Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Storage Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Reduced v/c Ratio | | 0.34 | | | | 0.18 | | 0.51 | 0.01 | | | |

### Intersection Summary

| | |
|---|---|
| Area Type: | Other |
| Cycle Length: 100 | |
| Actuated Cycle Length: 100 | |
| Offset: 10 (10%), Referenced to phase 2:NBT, Start of Green | |
| Natural Cycle: 40 | |
| Control Type: Actuated-Coordinated | |
| Maximum v/c Ratio: 0.51 | |
| Intersection Signal Delay: 5.6 | Intersection LOS: A |
| Intersection Capacity Utilization 60.8% | ICU Level of Service B |
| Analysis Period (min) 15 | |
| m    Volume for 95th percentile queue is metered by upstream signal. | |

Splits and Phases:     3: US Highway 15-501 & Vickers Road

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 520 of 743

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | | ↰ | | | | ↱↱ | | ↟↟ | ↱ | | | |
| Traffic Volume (vph) | 239 | 201 | 0 | 0 | 0 | 330 | 0 | 1011 | 93 | 0 | 0 | 0 |
| Future Volume (vph) | 239 | 201 | 0 | 0 | 0 | 330 | 0 | 1011 | 93 | 0 | 0 | 0 |
| Ideal Flow (vphpl) | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 |
| Storage Length (ft) | 0 | | 0 | 0 | | 400 | 0 | | 375 | 0 | | 0 |
| Storage Lanes | 0 | | 0 | 0 | | 1 | 0 | | 1 | 0 | | 0 |
| Taper Length (ft) | 100 | | | 100 | | | 100 | | | 100 | | |
| Lane Util. Factor | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 0.88 | 1.00 | 0.95 | 1.00 | 1.00 | 1.00 | 1.00 |
| Frt | | | | | | 0.850 | | | 0.850 | | | |
| Flt Protected | | 0.974 | | | | | | | | | | |
| Satd. Flow (prot) | 0 | 1814 | 0 | 0 | 0 | 2787 | 0 | 3539 | 1583 | 0 | 0 | 0 |
| Flt Permitted | | 0.974 | | | | | | | | | | |
| Satd. Flow (perm) | 0 | 1814 | 0 | 0 | 0 | 2787 | 0 | 3539 | 1583 | 0 | 0 | 0 |
| Right Turn on Red | No | | No | | | No | | | No | | | No |
| Satd. Flow (RTOR) | | | | | | | | | | | | |
| Link Speed (mph) | | 25 | | | 25 | | | 55 | | | 55 | |
| Link Distance (ft) | | 222 | | | 1065 | | | 1061 | | | 1064 | |
| Travel Time (s) | | 6.1 | | | 29.0 | | | 13.2 | | | 13.2 | |
| Peak Hour Factor | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 |
| Adj. Flow (vph) | 266 | 223 | 0 | 0 | 0 | 367 | 0 | 1123 | 103 | 0 | 0 | 0 |
| Shared Lane Traffic (%) | | | | | | | | | | | | |
| Lane Group Flow (vph) | 0 | 489 | 0 | 0 | 0 | 367 | 0 | 1123 | 103 | 0 | 0 | 0 |
| Turn Type | Perm | NA | | | | Perm | | NA | Perm | | | |
| Protected Phases | | 7 | | | | | | 2 | | | | |
| Permitted Phases | 7 | | | | | 4 | | | 2 | | | |
| Detector Phase | 7 | 7 | | | | 4 | | 2 | 2 | | | |
| Switch Phase | | | | | | | | | | | | |
| Minimum Initial (s) | 7.0 | 7.0 | | | | 7.0 | | 14.0 | 14.0 | | | |
| Minimum Split (s) | 14.0 | 14.0 | | | | 14.0 | | 21.0 | 21.0 | | | |
| Total Split (s) | 47.0 | 47.0 | | | | 47.0 | | 53.0 | 53.0 | | | |
| Total Split (%) | 47.0% | 47.0% | | | | 47.0% | | 53.0% | 53.0% | | | |
| Maximum Green (s) | 40.0 | 40.0 | | | | 40.0 | | 46.0 | 46.0 | | | |
| Yellow Time (s) | 5.0 | 5.0 | | | | 5.0 | | 5.0 | 5.0 | | | |
| All-Red Time (s) | 2.0 | 2.0 | | | | 2.0 | | 2.0 | 2.0 | | | |
| Lost Time Adjust (s) | | -2.0 | | | | -2.0 | | -2.0 | -2.0 | | | |
| Total Lost Time (s) | | 5.0 | | | | 5.0 | | 5.0 | 5.0 | | | |
| Lead/Lag | | | | | | | | | | | | |
| Lead-Lag Optimize? | | | | | | | | | | | | |
| Vehicle Extension (s) | 3.0 | 3.0 | | | | 3.0 | | 3.0 | 3.0 | | | |
| Recall Mode | None | None | | | | None | | C-Max | C-Max | | | |
| Act Effct Green (s) | | 34.5 | | | | 34.5 | | 55.5 | 55.5 | | | |
| Actuated g/C Ratio | | 0.34 | | | | 0.34 | | 0.56 | 0.56 | | | |
| v/c Ratio | | 0.78 | | | | 0.38 | | 0.57 | 0.12 | | | |
| Control Delay | | 27.9 | | | | 25.0 | | 17.1 | 12.8 | | | |
| Queue Delay | | 0.0 | | | | 0.0 | | 0.0 | 0.0 | | | |
| Total Delay | | 27.9 | | | | 25.0 | | 17.1 | 12.8 | | | |
| LOS | | C | | | | C | | B | B | | | |
| Approach Delay | | 27.9 | | | 25.0 | | | 16.7 | | | | |
| Approach LOS | | C | | | C | | | B | | | | |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 521 of 743

Chatham County Summit Church TIA  2036 TIP U-6192 Scenario A PM Peak Hour Addendum
4: US Highway 15-501 & Jack Bennett Road

Lanes, Volumes, Timings

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Queue Length 50th (ft) | | 269 | | | | 97 | | 236 | 30 | | | |
| Queue Length 95th (ft) | | m265 | | | | 125 | | 349 | 66 | | | |
| Internal Link Dist (ft) | | 142 | | | 985 | | | 981 | | | 984 | |
| Turn Bay Length (ft) | | | | | | 400 | | | 375 | | | |
| Base Capacity (vph) | | 761 | | | | 1170 | | 1964 | 878 | | | |
| Starvation Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Spillback Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Storage Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Reduced v/c Ratio | | 0.64 | | | | 0.31 | | 0.57 | 0.12 | | | |

## Intersection Summary

| | |
|---|---|
| Area Type: | Other |

Cycle Length: 100
Actuated Cycle Length: 100
Offset: 0 (0%), Referenced to phase 2:NBT, Start of Green
Natural Cycle: 50
Control Type: Actuated-Coordinated
Maximum v/c Ratio: 0.78

| | |
|---|---|
| Intersection Signal Delay: 20.8 | Intersection LOS: C |
| Intersection Capacity Utilization 75.8% | ICU Level of Service D |

Analysis Period (min) 15

m    Volume for 95th percentile queue is metered by upstream signal.

Splits and Phases:    4: US Highway 15-501 & Jack Bennett Road

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 522 of 743

| Intersection | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Int Delay, s/veh | 0.8 | | | | | | | | | | | |

| Movement | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | | | ↗ | | ◀ | | | | | | ↟↟ | ↗ |
| Traffic Vol, veh/h | 0 | 0 | 10 | 14 | 4 | 0 | 0 | 0 | 0 | 0 | 2268 | 6 |
| Future Vol, veh/h | 0 | 0 | 10 | 14 | 4 | 0 | 0 | 0 | 0 | 0 | 2268 | 6 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Stop | Stop | Stop | Stop | Free | Free | Free | Free | Free | Free |
| RT Channelized | - | - | None | - | - | None | - | - | None | - | - | None |
| Storage Length | - | - | 0 | - | - | - | - | - | - | - | - | - |
| Veh in Median Storage, # | - | 0 | - | - | 0 | - | - | 0 | - | - | 0 | - |
| Grade, % | - | 0 | - | - | 0 | - | - | 0 | - | - | 0 | - |
| Peak Hour Factor | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 |
| Heavy Vehicles, % | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| Mvmt Flow | 0 | 0 | 11 | 16 | 4 | 0 | 0 | 0 | 0 | 0 | 2520 | 7 |

| Major/Minor | Minor2 | | | Minor1 | | | | | | Major2 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Conflicting Flow All | - | - | 1260 | 1260 | 2527 | - | | | | - | - | 0 | |
| Stage 1 | - | - | - | 0 | 0 | - | | | | - | - | - | |
| Stage 2 | - | - | - | 1260 | 2527 | - | | | | - | - | - | |
| Critical Hdwy | - | - | 6.94 | 7.54 | 6.54 | - | | | | - | - | - | |
| Critical Hdwy Stg 1 | - | - | - | - | - | - | | | | - | - | - | |
| Critical Hdwy Stg 2 | - | - | - | 6.54 | 5.54 | - | | | | - | - | - | |
| Follow-up Hdwy | - | - | 3.32 | 3.52 | 4.02 | - | | | | - | - | - | |
| Pot Cap-1 Maneuver | 0 | 0 | 162 | 127 | 27 | 0 | | | | 0 | - | - | |
| Stage 1 | 0 | 0 | - | - | - | 0 | | | | 0 | - | - | |
| Stage 2 | 0 | 0 | - | 180 | 55 | 0 | | | | 0 | - | - | |
| Platoon blocked, % | | | | | | | | | | | - | - | |
| Mov Cap-1 Maneuver | - | - | 162 | 118 | 27 | - | | | | - | - | - | |
| Mov Cap-2 Maneuver | - | - | - | 118 | 27 | - | | | | - | - | - | |
| Stage 1 | - | - | - | - | - | - | | | | - | - | - | |
| Stage 2 | - | - | - | 168 | 55 | - | | | | - | - | - | |

| Approach | EB | | WB | | | SB | | |
|---|---|---|---|---|---|---|---|---|
| HCM Control Delay, s | 28.9 | | 80.1 | | | 0 | | |
| HCM LOS | D | | F | | | | | |

| Minor Lane/Major Mvmt | EBLn1 | WBLn1 | SBT | SBR |
|---|---|---|---|---|
| Capacity (veh/h) | 162 | 67 | - | - |
| HCM Lane V/C Ratio | 0.069 | 0.299 | - | - |
| HCM Control Delay (s) | 28.9 | 80.1 | - | - |
| HCM Lane LOS | D | F | - | - |
| HCM 95th %tile Q(veh) | 0.2 | 1.1 | - | - |

| Intersection | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Int Delay, s/veh | 0.3 | | | | | | | | | | | |

| Movement | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | | ↲ | | | | ↱ | | ↑↑ | ↱ | | | |
| Traffic Vol, veh/h | 7 | 4 | 0 | 0 | 0 | 5 | 0 | 1353 | 4 | 0 | 0 | 0 |
| Future Vol, veh/h | 7 | 4 | 0 | 0 | 0 | 5 | 0 | 1353 | 4 | 0 | 0 | 0 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Stop | Stop | Stop | Stop | Free | Free | Free | Free | Free | Free |
| RT Channelized | - | - | None | - | - | None | - | - | None | - | - | None |
| Storage Length | - | - | - | - | - | 0 | - | - | 200 | - | - | - |
| Veh in Median Storage, # | - | 0 | - | - | 0 | - | - | 0 | - | 1084969472 | - | - |
| Grade, % | - | 0 | - | - | 0 | - | - | 0 | - | - | 0 | - |
| Peak Hour Factor | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 |
| Heavy Vehicles, % | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| Mvmt Flow | 8 | 4 | 0 | 0 | 0 | 6 | 0 | 1503 | 4 | 0 | 0 | 0 |

| Major/Minor | Minor2 | | | Minor1 | | | Major1 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Conflicting Flow All | 752 | 1507 | - | - | - | 752 | - | 0 | 0 | | | |
| Stage 1 | 0 | 0 | - | - | - | - | - | - | - | | | |
| Stage 2 | 752 | 1507 | - | - | - | - | - | - | - | | | |
| Critical Hdwy | 7.54 | 6.54 | - | - | - | 6.94 | - | - | - | | | |
| Critical Hdwy Stg 1 | - | - | - | - | - | - | - | - | - | | | |
| Critical Hdwy Stg 2 | 6.54 | 5.54 | - | - | - | - | - | - | - | | | |
| Follow-up Hdwy | 3.52 | 4.02 | - | - | - | 3.32 | - | - | - | | | |
| Pot Cap-1 Maneuver | 299 | 120 | 0 | 0 | 0 | 353 | 0 | - | - | | | |
| Stage 1 | - | - | 0 | 0 | 0 | - | 0 | - | - | | | |
| Stage 2 | 368 | 182 | 0 | 0 | 0 | - | 0 | - | - | | | |
| Platoon blocked, % | | | | | | | - | - | | | | |
| Mov Cap-1 Maneuver | 294 | 120 | - | - | - | 353 | - | - | - | | | |
| Mov Cap-2 Maneuver | 294 | 120 | - | - | - | - | - | - | - | | | |
| Stage 1 | - | - | - | - | - | - | - | - | - | | | |
| Stage 2 | 362 | 182 | - | - | - | - | - | - | - | | | |

| Approach | EB | | WB | | NB | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HCM Control Delay, s | 24.9 | | 15.4 | | 0 | | | | | | | |
| HCM LOS | C | | C | | | | | | | | | |

| Minor Lane/Major Mvmt | NBT | NBR | EBLn1 | WBLn1 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Capacity (veh/h) | - | - | 193 | 353 | | | | | | | | |
| HCM Lane V/C Ratio | - | - | 0.063 | 0.016 | | | | | | | | |
| HCM Control Delay (s) | - | - | 24.9 | 15.4 | | | | | | | | |
| HCM Lane LOS | - | - | C | C | | | | | | | | |
| HCM 95th %tile Q(veh) | - | - | 0.2 | 0 | | | | | | | | |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 524 of 743

| Intersection | | | | | | |
|---|---|---|---|---|---|---|
| Int Delay, s/veh | 0.6 | | | | | |

| Movement | WBL | WBR | NBT | NBR | SBL | SBT |
|---|---|---|---|---|---|---|
| Lane Configurations | | ⌐ | ↑↑ | ⌐ | | |
| Traffic Vol, veh/h | 0 | 49 | 1319 | 56 | 0 | 0 |
| Future Vol, veh/h | 0 | 49 | 1319 | 56 | 0 | 0 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Free | Free | Free | Free |
| RT Channelized | - | None | - | None | - | None |
| Storage Length | - | 0 | - | 150 | - | - |
| Veh in Median Storage, # | 0 | - | 0 | - | 1084271104 | |
| Grade, % | 0 | - | 0 | - | - | 0 |
| Peak Hour Factor | 90 | 90 | 90 | 90 | 90 | 90 |
| Heavy Vehicles, % | 2 | 2 | 2 | 2 | 2 | 2 |
| Mvmt Flow | 0 | 54 | 1466 | 62 | 0 | 0 |

| Major/Minor | Minor1 | | Major1 | | | |
|---|---|---|---|---|---|---|
| Conflicting Flow All | - | 733 | 0 | 0 | | |
| Stage 1 | - | - | - | - | | |
| Stage 2 | - | - | - | - | | |
| Critical Hdwy | - | 6.94 | - | - | | |
| Critical Hdwy Stg 1 | - | - | - | - | | |
| Critical Hdwy Stg 2 | - | - | - | - | | |
| Follow-up Hdwy | - | 3.32 | - | - | | |
| Pot Cap-1 Maneuver | 0 | 363 | - | - | | |
| Stage 1 | 0 | - | - | - | | |
| Stage 2 | 0 | - | - | - | | |
| Platoon blocked, % | | | - | - | | |
| Mov Cap-1 Maneuver | - | 363 | - | - | | |
| Mov Cap-2 Maneuver | - | - | - | - | | |
| Stage 1 | - | - | - | - | | |
| Stage 2 | - | - | - | - | | |
| | | | | | | |

| Approach | WB | | NB | |
|---|---|---|---|---|
| HCM Control Delay, s | 16.7 | | 0 | |
| HCM LOS | C | | | |
| | | | | |

| Minor Lane/Major Mvmt | | NBT | NBR | WBLn1 |
|---|---|---|---|---|
| Capacity (veh/h) | | - | - | 363 |
| HCM Lane V/C Ratio | | - | - | 0.15 |
| HCM Control Delay (s) | | - | - | 16.7 |
| HCM Lane LOS | | - | - | C |
| HCM 95th %tile Q(veh) | | - | - | 0.5 |

Gannett Fleming                                                           Synchro 11 Report

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 525 of 743

| Intersection | | | | | | |
|---|---|---|---|---|---|---|
| Int Delay, s/veh | 0.6 | | | | | |

| Movement | WBL | WBR | NBT | NBR | SBL | SBT |
|---|---|---|---|---|---|---|
| Lane Configurations | | ↱ | ↑↑ | ↱ | | |
| Traffic Vol, veh/h | 0 | 50 | 1379 | 38 | 0 | 0 |
| Future Vol, veh/h | 0 | 50 | 1379 | 38 | 0 | 0 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Free | Free | Free | Free |
| RT Channelized | - | None | - | None | - | None |
| Storage Length | - | 0 | - | 100 | - | - |
| Veh in Median Storage, # | 0 | - | 0 | - | 1083228160 | |
| Grade, % | 0 | - | 0 | - | - | 0 |
| Peak Hour Factor | 90 | 90 | 90 | 90 | 90 | 90 |
| Heavy Vehicles, % | 2 | 2 | 2 | 2 | 2 | 2 |
| Mvmt Flow | 0 | 56 | 1532 | 42 | 0 | 0 |

| Major/Minor | Minor1 | | Major1 | | | |
|---|---|---|---|---|---|---|
| Conflicting Flow All | - | 766 | 0 | 0 | | |
| Stage 1 | - | - | - | - | | |
| Stage 2 | - | - | - | - | | |
| Critical Hdwy | - | 6.94 | - | - | | |
| Critical Hdwy Stg 1 | - | - | - | - | | |
| Critical Hdwy Stg 2 | - | - | - | - | | |
| Follow-up Hdwy | - | 3.32 | - | - | | |
| Pot Cap-1 Maneuver | 0 | 345 | - | - | | |
| Stage 1 | 0 | - | - | - | | |
| Stage 2 | 0 | - | - | - | | |
| Platoon blocked, % | | | - | - | | |
| Mov Cap-1 Maneuver | - | 345 | - | - | | |
| Mov Cap-2 Maneuver | - | - | - | - | | |
| Stage 1 | - | - | - | - | | |
| Stage 2 | - | - | - | - | | |
| | | | | | | |

| Approach | WB | | NB | | | |
|---|---|---|---|---|---|---|
| HCM Control Delay, s | 17.4 | | 0 | | | |
| HCM LOS | C | | | | | |

| Minor Lane/Major Mvmt | | NBT | NBRWBLn1 | | | |
|---|---|---|---|---|---|---|
| Capacity (veh/h) | | - | - | 345 | | |
| HCM Lane V/C Ratio | | - | - | 0.161 | | |
| HCM Control Delay (s) | | - | - | 17.4 | | |
| HCM Lane LOS | | - | - | C | | |
| HCM 95th %tile Q(veh) | | - | - | 0.6 | | |

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 526 of 743

| Intersection | | | | | | |
|---|---|---|---|---|---|---|
| Int Delay, s/veh | 0.1 | | | | | |

| Movement | EBL | EBR | NBL | NBT | SBT | SBR |
|---|---|---|---|---|---|---|
| Lane Configurations | ⅂ | | | ↑↑ | | |
| Traffic Vol, veh/h | 9 | 0 | 0 | 1359 | 0 | 0 |
| Future Vol, veh/h | 9 | 0 | 0 | 1359 | 0 | 0 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Free | Free | Free | Free |
| RT Channelized | - | None | - | None | - | None |
| Storage Length | 0 | - | - | - | - | - |
| Veh in Median Storage, # | 0 | - | - | 1084 | 417536 | - |
| Grade, % | 0 | - | - | 0 | 0 | - |
| Peak Hour Factor | 90 | 90 | 90 | 90 | 90 | 90 |
| Heavy Vehicles, % | 2 | 2 | 2 | 2 | 2 | 2 |
| Mvmt Flow | 10 | 0 | 0 | 1510 | 0 | 0 |

| Major/Minor | Minor2 | | Major1 | | | |
|---|---|---|---|---|---|---|
| Conflicting Flow All | 755 | - | - | 0 | | |
| Stage 1 | 0 | - | - | - | | |
| Stage 2 | 755 | - | - | - | | |
| Critical Hdwy | 6.84 | - | - | - | | |
| Critical Hdwy Stg 1 | - | - | - | - | | |
| Critical Hdwy Stg 2 | 5.84 | - | - | - | | |
| Follow-up Hdwy | 3.52 | - | - | - | | |
| Pot Cap-1 Maneuver | 345 | 0 | 0 | - | | |
| Stage 1 | - | 0 | 0 | - | | |
| Stage 2 | 425 | 0 | 0 | - | | |
| Platoon blocked, % | | | | - | | |
| Mov Cap-1 Maneuver | 345 | - | - | - | | |
| Mov Cap-2 Maneuver | 345 | - | - | - | | |
| Stage 1 | - | - | - | - | | |
| Stage 2 | 425 | - | - | - | | |
| | | | | | | |

| Approach | EB | | NB | | | |
|---|---|---|---|---|---|---|
| HCM Control Delay, s | 15.7 | | 0 | | | |
| HCM LOS | C | | | | | |
| | | | | | | |

| Minor Lane/Major Mvmt | | NBT | EBLn1 | | | |
|---|---|---|---|---|---|---|
| Capacity (veh/h) | | - | 345 | | | |
| HCM Lane V/C Ratio | | - | 0.029 | | | |
| HCM Control Delay (s) | | - | 15.7 | | | |
| HCM Lane LOS | | - | C | | | |
| HCM 95th %tile Q(veh) | | - | 0.1 | | | |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 527 of 743

Chatham County Summit Church TIA  2036 TIP U-6192 Scenario A PM Peak Hour Addendum
20: US Highway 15-501 & U-turn N. of Briar Chapel

HCM 6th TWSC

| Intersection | | | | | | |
|---|---|---|---|---|---|---|
| Int Delay, s/veh | 1.2 | | | | | |

| Movement | WBL | WBR | NBT | NBR | SBL | SBT |
|---|---|---|---|---|---|---|
| Lane Configurations | ⬏ | | | | | ↑↑ |
| Traffic Vol, veh/h | 63 | 0 | 0 | 0 | 0 | 2283 |
| Future Vol, veh/h | 63 | 0 | 0 | 0 | 0 | 2283 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Free | Free | Free | Free |
| RT Channelized | - | None | - | None | - | None |
| Storage Length | 0 | - | - | - | - | - |
| Veh in Median Storage, # | 0 | - | 0 | - | - | 0 |
| Grade, % | 0 | - | 0 | - | - | 0 |
| Peak Hour Factor | 90 | 90 | 90 | 90 | 90 | 90 |
| Heavy Vehicles, % | 2 | 2 | 2 | 2 | 2 | 2 |
| Mvmt Flow | 70 | 0 | 0 | 0 | 0 | 2537 |

| Major/Minor | Minor1 | | | Major2 | | |
|---|---|---|---|---|---|---|
| Conflicting Flow All | 1269 | - | | - | - | |
| Stage 1 | 0 | - | | - | - | |
| Stage 2 | 1269 | - | | - | - | |
| Critical Hdwy | 6.84 | - | | - | - | |
| Critical Hdwy Stg 1 | - | - | | - | - | |
| Critical Hdwy Stg 2 | 5.84 | - | | - | - | |
| Follow-up Hdwy | 3.52 | - | | - | - | |
| Pot Cap-1 Maneuver | 160 | 0 | | 0 | - | |
| Stage 1 | - | 0 | | 0 | - | |
| Stage 2 | 228 | 0 | | 0 | - | |
| Platoon blocked, % | | | | - | | |
| Mov Cap-1 Maneuver | 160 | - | | - | - | |
| Mov Cap-2 Maneuver | 160 | - | | - | - | |
| Stage 1 | - | - | | - | - | |
| Stage 2 | 228 | - | | - | - | |
| | | | | | | |

| Approach | WB | | SB | | | |
|---|---|---|---|---|---|---|
| HCM Control Delay, s | 43.9 | | 0 | | | |
| HCM LOS | E | | | | | |
| | | | | | | |

| Minor Lane/Major Mvmt | WBLn1 | SBT | | | | |
|---|---|---|---|---|---|---|
| Capacity (veh/h) | 160 | - | | | | |
| HCM Lane V/C Ratio | 0.438 | - | | | | |
| HCM Control Delay (s) | 43.9 | - | | | | |
| HCM Lane LOS | E | - | | | | |
| HCM 95th %tile Q(veh) | 2 | - | | | | |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 528 of 743

| Intersection | | | | | | |
|---|---|---|---|---|---|---|
| Int Delay, s/veh | 0.9 | | | | | |

| Movement | WBL | WBR | NBT | NBR | SBL | SBT |
|---|---|---|---|---|---|---|
| Lane Configurations | ↰ | | | | | ↑↑ |
| Traffic Vol, veh/h | 56 | 0 | 0 | 0 | 0 | 2230 |
| Future Vol, veh/h | 56 | 0 | 0 | 0 | 0 | 2230 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Free | Free | Free | Free |
| RT Channelized | - | None | - | None | - | None |
| Storage Length | 0 | - | - | - | - | - |
| Veh in Median Storage, # | 0 | - | 0 | - | - | 0 |
| Grade, % | 0 | - | 0 | - | - | 0 |
| Peak Hour Factor | 90 | 90 | 90 | 90 | 90 | 90 |
| Heavy Vehicles, % | 2 | 2 | 2 | 2 | 2 | 2 |
| Mvmt Flow | 62 | 0 | 0 | 0 | 0 | 2478 |

| Major/Minor | Minor1 | | | Major2 | | |
|---|---|---|---|---|---|---|
| Conflicting Flow All | 1239 | - | | - | - | |
| Stage 1 | 0 | - | | - | - | |
| Stage 2 | 1239 | - | | - | - | |
| Critical Hdwy | 6.84 | - | | - | - | |
| Critical Hdwy Stg 1 | - | - | | - | - | |
| Critical Hdwy Stg 2 | 5.84 | - | | - | - | |
| Follow-up Hdwy | 3.52 | - | | - | - | |
| Pot Cap-1 Maneuver | 168 | 0 | | 0 | - | |
| Stage 1 | - | 0 | | 0 | - | |
| Stage 2 | 236 | 0 | | 0 | - | |
| Platoon blocked, % | | | | - | | |
| Mov Cap-1 Maneuver | 168 | - | | - | - | |
| Mov Cap-2 Maneuver | 168 | - | | - | - | |
| Stage 1 | - | - | | - | - | |
| Stage 2 | 236 | - | | - | - | |
| | | | | | | |

| Approach | WB | | SB | | | |
|---|---|---|---|---|---|---|
| HCM Control Delay, s | 38.5 | | 0 | | | |
| HCM LOS | E | | | | | |
| | | | | | | |

| Minor Lane/Major Mvmt | WBLn1 | SBT | | | | |
|---|---|---|---|---|---|---|
| Capacity (veh/h) | 168 | - | | | | |
| HCM Lane V/C Ratio | 0.37 | - | | | | |
| HCM Control Delay (s) | 38.5 | - | | | | |
| HCM Lane LOS | E | - | | | | |
| HCM 95th %tile Q(veh) | 1.6 | - | | | | |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 529 of 743

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | | ↰ | | | | ↱ | | ↑↑ | ↱ | | | |
| Traffic Volume (vph) | 4 | 352 | 0 | 0 | 0 | 402 | 0 | 1327 | 57 | 0 | 0 | 0 |
| Future Volume (vph) | 4 | 352 | 0 | 0 | 0 | 402 | 0 | 1327 | 57 | 0 | 0 | 0 |
| Ideal Flow (vphpl) | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 |
| Storage Length (ft) | 0 | | 0 | 0 | | 0 | 0 | | 225 | 0 | | 0 |
| Storage Lanes | 0 | | 0 | 0 | | 1 | 0 | | 1 | 0 | | 0 |
| Taper Length (ft) | 100 | | | 100 | | | 100 | | | 100 | | |
| Lane Util. Factor | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 0.95 | 1.00 | 1.00 | 1.00 | 1.00 |
| Frt | | | | | | 0.865 | | | 0.850 | | | |
| Flt Protected | | 0.999 | | | | | | | | | | |
| Satd. Flow (prot) | 0 | 1861 | 0 | 0 | 0 | 1611 | 0 | 3539 | 1583 | 0 | 0 | 0 |
| Flt Permitted | | 0.999 | | | | | | | | | | |
| Satd. Flow (perm) | 0 | 1861 | 0 | 0 | 0 | 1611 | 0 | 3539 | 1583 | 0 | 0 | 0 |
| Right Turn on Red | No | | No | | | No | | | No | | | No |
| Satd. Flow (RTOR) | | | | | | | | | | | | |
| Link Speed (mph) | | 45 | | | 55 | | | 55 | | | 30 | |
| Link Distance (ft) | | 217 | | | 1097 | | | 805 | | | 1004 | |
| Travel Time (s) | | 3.3 | | | 13.6 | | | 10.0 | | | 22.8 | |
| Peak Hour Factor | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 |
| Adj. Flow (vph) | 4 | 391 | 0 | 0 | 0 | 447 | 0 | 1474 | 63 | 0 | 0 | 0 |
| Shared Lane Traffic (%) | | | | | | | | | | | | |
| Lane Group Flow (vph) | 0 | 395 | 0 | 0 | 0 | 447 | 0 | 1474 | 63 | 0 | 0 | 0 |
| Turn Type | Perm | NA | | | | Perm | | NA | Perm | | | |
| Protected Phases | | 7 | | | | | | 2 | | | | |
| Permitted Phases | 7 | | | | | 4 | | | 2 | | | |
| Detector Phase | 7 | 7 | | | | 4 | | 2 | 2 | | | |
| Switch Phase | | | | | | | | | | | | |
| Minimum Initial (s) | 7.0 | 7.0 | | | | 7.0 | | 14.0 | 14.0 | | | |
| Minimum Split (s) | 14.0 | 14.0 | | | | 14.0 | | 21.0 | 21.0 | | | |
| Total Split (s) | 44.0 | 44.0 | | | | 44.0 | | 56.0 | 56.0 | | | |
| Total Split (%) | 44.0% | 44.0% | | | | 44.0% | | 56.0% | 56.0% | | | |
| Maximum Green (s) | 37.0 | 37.0 | | | | 37.0 | | 49.0 | 49.0 | | | |
| Yellow Time (s) | 5.0 | 5.0 | | | | 5.0 | | 5.0 | 5.0 | | | |
| All-Red Time (s) | 2.0 | 2.0 | | | | 2.0 | | 2.0 | 2.0 | | | |
| Lost Time Adjust (s) | | -2.0 | | | | -2.0 | | -2.0 | -2.0 | | | |
| Total Lost Time (s) | | 5.0 | | | | 5.0 | | 5.0 | 5.0 | | | |
| Lead/Lag | | | | | | | | | | | | |
| Lead-Lag Optimize? | | | | | | | | | | | | |
| Vehicle Extension (s) | 3.0 | 3.0 | | | | 3.0 | | 3.0 | 3.0 | | | |
| Recall Mode | None | None | | | | None | | C-Max | C-Max | | | |
| Act Effct Green (s) | | 33.8 | | | | 33.8 | | 56.2 | 56.2 | | | |
| Actuated g/C Ratio | | 0.34 | | | | 0.34 | | 0.56 | 0.56 | | | |
| v/c Ratio | | 0.63 | | | | 0.82 | | 0.74 | 0.07 | | | |
| Control Delay | | 31.9 | | | | 43.0 | | 20.4 | 12.0 | | | |
| Queue Delay | | 0.0 | | | | 0.0 | | 0.0 | 0.0 | | | |
| Total Delay | | 31.9 | | | | 43.0 | | 20.4 | 12.0 | | | |
| LOS | | C | | | | D | | C | B | | | |
| Approach Delay | | 31.9 | | | 43.0 | | | 20.1 | | | | |
| Approach LOS | | C | | | D | | | C | | | | |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 530 of 743

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Queue Length 50th (ft) | | 205 | | | | 253 | | 361 | 18 | | | |
| Queue Length 95th (ft) | | 285 | | | | 356 | | 495 | 41 | | | |
| Internal Link Dist (ft) | | 137 | | | 1017 | | | 725 | | | 924 | |
| Turn Bay Length (ft) | | | | | | | | | 225 | | | |
| Base Capacity (vph) | | 725 | | | | 628 | | 1988 | 889 | | | |
| Starvation Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Spillback Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Storage Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Reduced v/c Ratio | | 0.54 | | | | 0.71 | | 0.74 | 0.07 | | | |

| Intersection Summary | |
|---|---|
| Area Type: | Other |
| Cycle Length: 100 | |
| Actuated Cycle Length: 100 | |
| Offset: 0 (0%), Referenced to phase 2:NBT, Start of Green | |
| Natural Cycle: 60 | |
| Control Type: Actuated-Coordinated | |
| Maximum v/c Ratio: 0.82 | |
| Intersection Signal Delay: 26.4 | Intersection LOS: C |
| Intersection Capacity Utilization 92.8% | ICU Level of Service F |
| Analysis Period (min) 15 | |

Splits and Phases:     1: US Highway 15-501 & Lystra Road

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 531 of 743

Lanes, Volumes, Timings

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | | | ↗ | | ↰ | | | | | | ↑↑ | ↗ |
| Traffic Volume (vph) | 0 | 0 | 240 | 162 | 73 | 0 | 0 | 0 | 0 | 0 | 1967 | 292 |
| Future Volume (vph) | 0 | 0 | 240 | 162 | 73 | 0 | 0 | 0 | 0 | 0 | 1967 | 292 |
| Ideal Flow (vphpl) | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 |
| Storage Length (ft) | 0 | | 0 | 0 | | 0 | | 0 | 0 | 0 | | 125 |
| Storage Lanes | 0 | | 1 | 0 | | 0 | | 0 | 0 | 0 | | 1 |
| Taper Length (ft) | 100 | | | 100 | | | 100 | | | 100 | | |
| Lane Util. Factor | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 0.95 | 1.00 |
| Frt | | | 0.865 | | | | | | | | | 0.850 |
| Flt Protected | | | | | 0.967 | | | | | | | |
| Satd. Flow (prot) | 0 | 0 | 1611 | 0 | 1801 | 0 | 0 | 0 | 0 | 0 | 3539 | 1583 |
| Flt Permitted | | | | | 0.967 | | | | | | | |
| Satd. Flow (perm) | 0 | 0 | 1611 | 0 | 1801 | 0 | 0 | 0 | 0 | 0 | 3539 | 1583 |
| Right Turn on Red | | | No | No | | No | | | No | | | No |
| Satd. Flow (RTOR) | | | | | | | | | | | | |
| Link Speed (mph) | | 25 | | | 25 | | | 25 | | | 55 | |
| Link Distance (ft) | | 1010 | | | 356 | | | 1194 | | | 359 | |
| Travel Time (s) | | 27.5 | | | 9.7 | | | 32.6 | | | 4.5 | |
| Peak Hour Factor | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 |
| Adj. Flow (vph) | 0 | 0 | 267 | 180 | 81 | 0 | 0 | 0 | 0 | 0 | 2186 | 324 |
| Shared Lane Traffic (%) | | | | | | | | | | | | |
| Lane Group Flow (vph) | 0 | 0 | 267 | 0 | 261 | 0 | 0 | 0 | 0 | 0 | 2186 | 324 |
| Turn Type | | | Perm | Perm | NA | | | | | | NA | Perm |
| Protected Phases | | | | | 3 | | | | | | 6 | |
| Permitted Phases | | | 8 | 3 | | | | | | | | 6 |
| Detector Phase | | | 8 | 3 | 3 | | | | | | 6 | 6 |
| Switch Phase | | | | | | | | | | | | |
| Minimum Initial (s) | | | 7.0 | 7.0 | 7.0 | | | | | | 14.0 | 14.0 |
| Minimum Split (s) | | | 14.0 | 14.0 | 14.0 | | | | | | 21.0 | 21.0 |
| Total Split (s) | | | 26.0 | 26.0 | 26.0 | | | | | | 74.0 | 74.0 |
| Total Split (%) | | | 26.0% | 26.0% | 26.0% | | | | | | 74.0% | 74.0% |
| Maximum Green (s) | | | 19.0 | 19.0 | 19.0 | | | | | | 67.0 | 67.0 |
| Yellow Time (s) | | | 5.0 | 5.0 | 5.0 | | | | | | 5.0 | 5.0 |
| All-Red Time (s) | | | 2.0 | 2.0 | 2.0 | | | | | | 2.0 | 2.0 |
| Lost Time Adjust (s) | | | -2.0 | | -2.0 | | | | | | -2.0 | -2.0 |
| Total Lost Time (s) | | | 5.0 | | 5.0 | | | | | | 5.0 | 5.0 |
| Lead/Lag | | | | | | | | | | | | |
| Lead-Lag Optimize? | | | | | | | | | | | | |
| Vehicle Extension (s) | | | 3.0 | 3.0 | 3.0 | | | | | | 3.0 | 3.0 |
| Recall Mode | | | None | None | None | | | | | | C-Max | C-Max |
| Act Effct Green (s) | | | 20.2 | | 20.2 | | | | | | 69.8 | 69.8 |
| Actuated g/C Ratio | | | 0.20 | | 0.20 | | | | | | 0.70 | 0.70 |
| v/c Ratio | | | 0.82 | | 0.72 | | | | | | 0.88 | 0.29 |
| Control Delay | | | 59.5 | | 47.2 | | | | | | 18.0 | 6.7 |
| Queue Delay | | | 0.0 | | 0.0 | | | | | | 0.0 | 0.0 |
| Total Delay | | | 59.5 | | 47.2 | | | | | | 18.0 | 6.7 |
| LOS | | | E | | D | | | | | | B | A |
| Approach Delay | | 59.5 | | | 47.2 | | | | | | 16.5 | |
| Approach LOS | | E | | | D | | | | | | B | |

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Queue Length 50th (ft) | | | 162 | | 162 | | | | | | 523 | 71 |
| Queue Length 95th (ft) | | | #288 | | 251 | | | | | | 668 | 110 |
| Internal Link Dist (ft) | | 930 | | | 276 | | | 1114 | | | 279 | |
| Turn Bay Length (ft) | | | | | | | | | | | | 125 |
| Base Capacity (vph) | | | 338 | | 378 | | | | | | 2471 | 1105 |
| Starvation Cap Reductn | | | 0 | | 0 | | | | | | 0 | 0 |
| Spillback Cap Reductn | | | 0 | | 0 | | | | | | 0 | 0 |
| Storage Cap Reductn | | | 0 | | 0 | | | | | | 0 | 0 |
| Reduced v/c Ratio | | | 0.79 | | 0.69 | | | | | | 0.88 | 0.29 |

## Intersection Summary

| | |
|---|---|
| Area Type: | Other |

Cycle Length: 100

Actuated Cycle Length: 100

Offset: 5 (5%), Referenced to phase 6:SBT, Start of Green

Natural Cycle: 70

Control Type: Actuated-Coordinated

Maximum v/c Ratio: 0.88

| | |
|---|---|
| Intersection Signal Delay: 23.0 | Intersection LOS: C |
| Intersection Capacity Utilization 94.5% | ICU Level of Service F |

Analysis Period (min) 15

\#   95th percentile volume exceeds capacity, queue may be longer.
    Queue shown is maximum after two cycles.

Splits and Phases:    2: US Highway 15-501 & Briar Chapel Parkway

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 533 of 743

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | | ↵ | | | | ↗ | | ↟↟ | ↗ | | | |
| Traffic Volume (vph) | 27 | 22 | 0 | 0 | 0 | 36 | 0 | 1317 | 12 | 0 | 0 | 0 |
| Future Volume (vph) | 27 | 22 | 0 | 0 | 0 | 36 | 0 | 1317 | 12 | 0 | 0 | 0 |
| Ideal Flow (vphpl) | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 |
| Storage Length (ft) | 0 | | 0 | 0 | | 0 | 0 | | 100 | 0 | | 0 |
| Storage Lanes | 0 | | 0 | 0 | | 1 | 0 | | 1 | 0 | | 0 |
| Taper Length (ft) | 100 | | | 100 | | | 100 | | | 100 | | |
| Lane Util. Factor | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 0.95 | 1.00 | 1.00 | 1.00 | 1.00 |
| Frt | | | | | | 0.865 | | | 0.850 | | | |
| Flt Protected | | 0.973 | | | | | | | | | | |
| Satd. Flow (prot) | 0 | 1812 | 0 | 0 | 0 | 1611 | 0 | 3539 | 1583 | 0 | 0 | 0 |
| Flt Permitted | | 0.973 | | | | | | | | | | |
| Satd. Flow (perm) | 0 | 1812 | 0 | 0 | 0 | 1611 | 0 | 3539 | 1583 | 0 | 0 | 0 |
| Right Turn on Red | No | | No | | | No | | | No | | | No |
| Satd. Flow (RTOR) | | | | | | | | | | | | |
| Link Speed (mph) | | 25 | | | 25 | | | 55 | | | 30 | |
| Link Distance (ft) | | 389 | | | 1031 | | | 328 | | | 1072 | |
| Travel Time (s) | | 10.6 | | | 28.1 | | | 4.1 | | | 24.4 | |
| Peak Hour Factor | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 |
| Adj. Flow (vph) | 30 | 24 | 0 | 0 | 0 | 40 | 0 | 1463 | 13 | 0 | 0 | 0 |
| Shared Lane Traffic (%) | | | | | | | | | | | | |
| Lane Group Flow (vph) | 0 | 54 | 0 | 0 | 0 | 40 | 0 | 1463 | 13 | 0 | 0 | 0 |
| Turn Type | Perm | NA | | | | Perm | | NA | Perm | | | |
| Protected Phases | | 7 | | | | | | 2 | | | | |
| Permitted Phases | 7 | | | | | 4 | | | 2 | | | |
| Detector Phase | 7 | 7 | | | | 4 | | 2 | 2 | | | |
| Switch Phase | | | | | | | | | | | | |
| Minimum Initial (s) | 7.0 | 7.0 | | | | 7.0 | | 14.0 | 14.0 | | | |
| Minimum Split (s) | 14.0 | 14.0 | | | | 14.0 | | 21.0 | 21.0 | | | |
| Total Split (s) | 19.0 | 19.0 | | | | 19.0 | | 81.0 | 81.0 | | | |
| Total Split (%) | 19.0% | 19.0% | | | | 19.0% | | 81.0% | 81.0% | | | |
| Maximum Green (s) | 12.0 | 12.0 | | | | 12.0 | | 74.0 | 74.0 | | | |
| Yellow Time (s) | 5.0 | 5.0 | | | | 5.0 | | 5.0 | 5.0 | | | |
| All-Red Time (s) | 2.0 | 2.0 | | | | 2.0 | | 2.0 | 2.0 | | | |
| Lost Time Adjust (s) | | -2.0 | | | | -2.0 | | -2.0 | -2.0 | | | |
| Total Lost Time (s) | | 5.0 | | | | 5.0 | | 5.0 | 5.0 | | | |
| Lead/Lag | | | | | | | | | | | | |
| Lead-Lag Optimize? | | | | | | | | | | | | |
| Vehicle Extension (s) | 3.0 | 3.0 | | | | 3.0 | | 3.0 | 3.0 | | | |
| Recall Mode | None | None | | | | None | | C-Max | C-Max | | | |
| Act Effct Green (s) | | 10.7 | | | | 10.7 | | 83.1 | 83.1 | | | |
| Actuated g/C Ratio | | 0.11 | | | | 0.11 | | 0.83 | 0.83 | | | |
| v/c Ratio | | 0.28 | | | | 0.23 | | 0.50 | 0.01 | | | |
| Control Delay | | 44.3 | | | | 43.6 | | 2.0 | 1.5 | | | |
| Queue Delay | | 0.0 | | | | 0.0 | | 0.0 | 0.0 | | | |
| Total Delay | | 44.3 | | | | 43.6 | | 2.0 | 1.5 | | | |
| LOS | | D | | | | D | | A | A | | | |
| Approach Delay | | 44.3 | | | 43.6 | | | 2.0 | | | | |
| Approach LOS | | D | | | D | | | A | | | | |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 534 of 743

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Queue Length 50th (ft) | | 32 | | | | 24 | | 48 | 1 | | | |
| Queue Length 95th (ft) | | 68 | | | | 55 | | 74 | m2 | | | |
| Internal Link Dist (ft) | | 309 | | | 951 | | | 248 | | | 992 | |
| Turn Bay Length (ft) | | | | | | | | | 100 | | | |
| Base Capacity (vph) | | 253 | | | | 225 | | 2941 | 1315 | | | |
| Starvation Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Spillback Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Storage Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Reduced v/c Ratio | | 0.21 | | | | 0.18 | | 0.50 | 0.01 | | | |

## Intersection Summary

| | |
|---|---|
| Area Type: | Other |

Cycle Length: 100

Actuated Cycle Length: 100

Offset: 11 (11%), Referenced to phase 2:NBT, Start of Green

Natural Cycle: 40

Control Type: Actuated-Coordinated

Maximum v/c Ratio: 0.50

| | | |
|---|---|---|
| Intersection Signal Delay: 4.5 | | Intersection LOS: A |
| Intersection Capacity Utilization 60.6% | | ICU Level of Service B |

Analysis Period (min) 15

m    Volume for 95th percentile queue is metered by upstream signal.

Splits and Phases:    3: US Highway 15-501 & Vickers Road

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 535 of 743

Lanes, Volumes, Timings

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | | ↰ | | | | ↱↱ | | ↟↟ | ↱ | | | |
| Traffic Volume (vph) | 229 | 201 | 0 | 0 | 0 | 330 | 0 | 1012 | 93 | 0 | 0 | 0 |
| Future Volume (vph) | 229 | 201 | 0 | 0 | 0 | 330 | 0 | 1012 | 93 | 0 | 0 | 0 |
| Ideal Flow (vphpl) | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 | 1900 |
| Storage Length (ft) | 0 | | 0 | 0 | | 400 | 0 | | 375 | 0 | | 0 |
| Storage Lanes | 0 | | 0 | 0 | | 1 | 0 | | 1 | 0 | | 0 |
| Taper Length (ft) | 100 | | | 100 | | | 100 | | | 100 | | |
| Lane Util. Factor | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 0.88 | 1.00 | 0.95 | 1.00 | 1.00 | 1.00 | 1.00 |
| Frt | | | | | | 0.850 | | | 0.850 | | | |
| Flt Protected | | 0.974 | | | | | | | | | | |
| Satd. Flow (prot) | 0 | 1814 | 0 | 0 | 0 | 2787 | 0 | 3539 | 1583 | 0 | 0 | 0 |
| Flt Permitted | | 0.974 | | | | | | | | | | |
| Satd. Flow (perm) | 0 | 1814 | 0 | 0 | 0 | 2787 | 0 | 3539 | 1583 | 0 | 0 | 0 |
| Right Turn on Red | No | | No | | | No | | | No | | | No |
| Satd. Flow (RTOR) | | | | | | | | | | | | |
| Link Speed (mph) | | 25 | | | 25 | | | 55 | | | 30 | |
| Link Distance (ft) | | 222 | | | 1065 | | | 1061 | | | 1064 | |
| Travel Time (s) | | 6.1 | | | 29.0 | | | 13.2 | | | 24.2 | |
| Peak Hour Factor | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 | 0.90 |
| Adj. Flow (vph) | 254 | 223 | 0 | 0 | 0 | 367 | 0 | 1124 | 103 | 0 | 0 | 0 |
| Shared Lane Traffic (%) | | | | | | | | | | | | |
| Lane Group Flow (vph) | 0 | 477 | 0 | 0 | 0 | 367 | 0 | 1124 | 103 | 0 | 0 | 0 |
| Turn Type | Perm | NA | | | | Perm | | NA | Perm | | | |
| Protected Phases | | 7 | | | | | | 2 | | | | |
| Permitted Phases | 7 | | | | | 4 | | | 2 | | | |
| Detector Phase | 7 | 7 | | | | 4 | | 2 | 2 | | | |
| Switch Phase | | | | | | | | | | | | |
| Minimum Initial (s) | 7.0 | 7.0 | | | | 7.0 | | 14.0 | 14.0 | | | |
| Minimum Split (s) | 14.0 | 14.0 | | | | 14.0 | | 21.0 | 21.0 | | | |
| Total Split (s) | 47.0 | 47.0 | | | | 47.0 | | 53.0 | 53.0 | | | |
| Total Split (%) | 47.0% | 47.0% | | | | 47.0% | | 53.0% | 53.0% | | | |
| Maximum Green (s) | 40.0 | 40.0 | | | | 40.0 | | 46.0 | 46.0 | | | |
| Yellow Time (s) | 5.0 | 5.0 | | | | 5.0 | | 5.0 | 5.0 | | | |
| All-Red Time (s) | 2.0 | 2.0 | | | | 2.0 | | 2.0 | 2.0 | | | |
| Lost Time Adjust (s) | | -2.0 | | | | -2.0 | | -2.0 | -2.0 | | | |
| Total Lost Time (s) | | 5.0 | | | | 5.0 | | 5.0 | 5.0 | | | |
| Lead/Lag | | | | | | | | | | | | |
| Lead-Lag Optimize? | | | | | | | | | | | | |
| Vehicle Extension (s) | 3.0 | 3.0 | | | | 3.0 | | 3.0 | 3.0 | | | |
| Recall Mode | None | None | | | | None | | C-Max | C-Max | | | |
| Act Effct Green (s) | | 34.0 | | | | 34.0 | | 56.0 | 56.0 | | | |
| Actuated g/C Ratio | | 0.34 | | | | 0.34 | | 0.56 | 0.56 | | | |
| v/c Ratio | | 0.77 | | | | 0.39 | | 0.57 | 0.12 | | | |
| Control Delay | | 28.0 | | | | 25.4 | | 16.8 | 12.6 | | | |
| Queue Delay | | 0.0 | | | | 0.0 | | 0.0 | 0.0 | | | |
| Total Delay | | 28.0 | | | | 25.4 | | 16.8 | 12.6 | | | |
| LOS | | C | | | | C | | B | B | | | |
| Approach Delay | | 28.0 | | | 25.4 | | | 16.4 | | | | |
| Approach LOS | | C | | | C | | | B | | | | |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 536 of 743

Chatham County Summit Church TIA  2036 TIP U-6192 Scenario B PM Peak Hour Addendum
4: US Highway 15-501 & Jack Bennett Road

Lanes, Volumes, Timings

| Lane Group | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Queue Length 50th (ft) | | 263 | | | | 98 | | 233 | 30 | | | |
| Queue Length 95th (ft) | | m257 | | | | 125 | | 350 | 66 | | | |
| Internal Link Dist (ft) | | 142 | | | 985 | | | 981 | | | 984 | |
| Turn Bay Length (ft) | | | | | | 400 | | | 375 | | | |
| Base Capacity (vph) | | 761 | | | | 1170 | | 1981 | 886 | | | |
| Starvation Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Spillback Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Storage Cap Reductn | | 0 | | | | 0 | | 0 | 0 | | | |
| Reduced v/c Ratio | | 0.63 | | | | 0.31 | | 0.57 | 0.12 | | | |

Intersection Summary

| | |
|---|---|
| Area Type: | Other |

Cycle Length: 100

Actuated Cycle Length: 100

Offset: 0 (0%), Referenced to phase 2:NBT, Start of Green

Natural Cycle: 45

Control Type: Actuated-Coordinated

Maximum v/c Ratio: 0.77

Intersection Signal Delay: 20.7                    Intersection LOS: C

Intersection Capacity Utilization 75.3%            ICU Level of Service D

Analysis Period (min) 15

m    Volume for 95th percentile queue is metered by upstream signal.

Splits and Phases:    4: US Highway 15-501 & Jack Bennett Road

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 537 of 743

| Intersection | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Int Delay, s/veh | 0.8 | | | | | | | | | | | |

| Movement | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | | | ⬈ | ⬈ | ⬈ | | | | | | ⬈⬈ | ⬈ |
| Traffic Vol, veh/h | 0 | 0 | 10 | 14 | 4 | 0 | 0 | 0 | 0 | 0 | 2267 | 6 |
| Future Vol, veh/h | 0 | 0 | 10 | 14 | 4 | 0 | 0 | 0 | 0 | 0 | 2267 | 6 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Stop | Stop | Stop | Stop | Free | Free | Free | Free | Free | Free |
| RT Channelized | - | - | None | - | - | None | - | - | None | - | - | None |
| Storage Length | - | - | 0 | - | - | - | - | - | - | - | - | - |
| Veh in Median Storage, # | - | 0 | - | - | 0 | - | - | 0 | - | - | 0 | - |
| Grade, % | - | 0 | - | - | 0 | - | - | 0 | - | - | 0 | - |
| Peak Hour Factor | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 |
| Heavy Vehicles, % | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| Mvmt Flow | 0 | 0 | 11 | 16 | 4 | 0 | 0 | 0 | 0 | 0 | 2519 | 7 |

| Major/Minor | Minor2 | | | Minor1 | | | | | | Major2 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Conflicting Flow All | - | - | 1260 | 1260 | 2526 | - | | | | - | - | 0 | |
| Stage 1 | - | - | - | 0 | 0 | - | | | | - | - | - | |
| Stage 2 | - | - | - | 1260 | 2526 | - | | | | - | - | - | |
| Critical Hdwy | - | - | 6.94 | 7.54 | 6.54 | - | | | | - | - | - | |
| Critical Hdwy Stg 1 | - | - | - | - | - | - | | | | - | - | - | |
| Critical Hdwy Stg 2 | - | - | - | 6.54 | 5.54 | - | | | | - | - | - | |
| Follow-up Hdwy | - | - | 3.32 | 3.52 | 4.02 | - | | | | - | - | - | |
| Pot Cap-1 Maneuver | 0 | 0 | 162 | 127 | 27 | 0 | | | | 0 | - | - | |
| Stage 1 | 0 | 0 | - | - | - | 0 | | | | 0 | - | - | |
| Stage 2 | 0 | 0 | - | 180 | 55 | 0 | | | | 0 | - | - | |
| Platoon blocked, % | | | | | | | | | | | - | - | |
| Mov Cap-1 Maneuver | - | - | 162 | 118 | 27 | - | | | | - | - | - | |
| Mov Cap-2 Maneuver | - | - | - | 118 | 27 | - | | | | - | - | - | |
| Stage 1 | - | - | - | - | - | - | | | | - | - | - | |
| Stage 2 | - | - | - | 168 | 55 | - | | | | - | - | - | |

| Approach | EB | | WB | | | SB | | | |
|---|---|---|---|---|---|---|---|---|---|
| HCM Control Delay, s | 28.9 | | 80.1 | | | 0 | | | |
| HCM LOS | D | | F | | | | | | |

| Minor Lane/Major Mvmt | EBLn1 | WBLn1 | SBT | SBR |
|---|---|---|---|---|
| Capacity (veh/h) | 162 | 67 | - | - |
| HCM Lane V/C Ratio | 0.069 | 0.299 | - | - |
| HCM Control Delay (s) | 28.9 | 80.1 | - | - |
| HCM Lane LOS | D | F | - | - |
| HCM 95th %tile Q(veh) | 0.2 | 1.1 | - | - |

Chatham County Summit Church TIA  2036 TIP U-6192 Scenario B PM Peak Hour Addendum
6: US Highway 15-501 & Hidden Oaks Court

HCM 6th TWSC

| Intersection | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Int Delay, s/veh | 0.3 | | | | | | | | | | | |

| Movement | EBL | EBT | EBR | WBL | WBT | WBR | NBL | NBT | NBR | SBL | SBT | SBR |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lane Configurations | | ↲ | | | | ↰ | | ↑↑ | ↰ | | | |
| Traffic Vol, veh/h | 7 | 4 | 0 | 0 | 0 | 5 | 0 | 1353 | 4 | 0 | 0 | 0 |
| Future Vol, veh/h | 7 | 4 | 0 | 0 | 0 | 5 | 0 | 1353 | 4 | 0 | 0 | 0 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Stop | Stop | Stop | Stop | Free | Free | Free | Free | Free | Free |
| RT Channelized | - | - | None | - | - | None | - | - | None | - | - | None |
| Storage Length | - | - | - | - | - | 0 | - | - | 200 | - | - | - |
| Veh in Median Storage, # | - | 0 | - | - | 0 | - | - | 0 | - | 1084970496 | - |
| Grade, % | - | 0 | - | - | 0 | - | - | 0 | - | - | 0 | - |
| Peak Hour Factor | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 | 90 |
| Heavy Vehicles, % | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 |
| Mvmt Flow | 8 | 4 | 0 | 0 | 0 | 6 | 0 | 1503 | 4 | 0 | 0 | 0 |

| Major/Minor | Minor2 | | | Minor1 | | | Major1 | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Conflicting Flow All | 752 | 1507 | - | - | - | 752 | - | 0 | 0 | | | |
| Stage 1 | 0 | 0 | - | - | - | - | - | - | - | | | |
| Stage 2 | 752 | 1507 | - | - | - | - | - | - | - | | | |
| Critical Hdwy | 7.54 | 6.54 | - | - | - | 6.94 | - | - | - | | | |
| Critical Hdwy Stg 1 | - | - | - | - | - | - | - | - | - | | | |
| Critical Hdwy Stg 2 | 6.54 | 5.54 | - | - | - | - | - | - | - | | | |
| Follow-up Hdwy | 3.52 | 4.02 | - | - | - | 3.32 | - | - | - | | | |
| Pot Cap-1 Maneuver | 299 | 120 | 0 | 0 | 0 | 353 | 0 | - | - | | | |
| Stage 1 | - | - | 0 | 0 | 0 | - | 0 | - | - | | | |
| Stage 2 | 368 | 182 | 0 | 0 | 0 | - | 0 | - | - | | | |
| Platoon blocked, % | | | | | | | | - | - | | | |
| Mov Cap-1 Maneuver | 294 | 120 | - | - | - | 353 | - | - | - | | | |
| Mov Cap-2 Maneuver | 294 | 120 | - | - | - | - | - | - | - | | | |
| Stage 1 | - | - | - | - | - | - | - | - | - | | | |
| Stage 2 | 362 | 182 | - | - | - | - | - | - | - | | | |

| Approach | EB | | WB | | NB | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| HCM Control Delay, s | 24.9 | | 15.4 | | 0 | | | | | | | |
| HCM LOS | C | | C | | | | | | | | | |

| Minor Lane/Major Mvmt | NBT | NBR | EBLn1 | WBLn1 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Capacity (veh/h) | - | - | 193 | 353 | | | | | | | | |
| HCM Lane V/C Ratio | - | - | 0.063 | 0.016 | | | | | | | | |
| HCM Control Delay (s) | - | - | 24.9 | 15.4 | | | | | | | | |
| HCM Lane LOS | - | - | C | C | | | | | | | | |
| HCM 95th %tile Q(veh) | - | - | 0.2 | 0 | | | | | | | | |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 539 of 743

| Intersection | | | | | | |
|---|---|---|---|---|---|---|
| Int Delay, s/veh | 0.6 | | | | | |

| Movement | WBL | WBR | NBT | NBR | SBL | SBT |
|---|---|---|---|---|---|---|
| Lane Configurations | | ↗ | ↑↑ | ↗ | | |
| Traffic Vol, veh/h | 0 | 49 | 1319 | 56 | 0 | 0 |
| Future Vol, veh/h | 0 | 49 | 1319 | 56 | 0 | 0 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Free | Free | Free | Free |
| RT Channelized | - | None | - | None | - | None |
| Storage Length | - | 0 | - | 150 | - | - |
| Veh in Median Storage, # | 0 | - | 0 | - | 1084310528 | |
| Grade, % | 0 | - | 0 | - | - | 0 |
| Peak Hour Factor | 90 | 90 | 90 | 90 | 90 | 90 |
| Heavy Vehicles, % | 2 | 2 | 2 | 2 | 2 | 2 |
| Mvmt Flow | 0 | 54 | 1466 | 62 | 0 | 0 |

| Major/Minor | Minor1 | | Major1 | | | |
|---|---|---|---|---|---|---|
| Conflicting Flow All | - | 733 | 0 | 0 | | |
| Stage 1 | - | - | - | - | | |
| Stage 2 | - | - | - | - | | |
| Critical Hdwy | - | 6.94 | - | - | | |
| Critical Hdwy Stg 1 | - | - | - | - | | |
| Critical Hdwy Stg 2 | - | - | - | - | | |
| Follow-up Hdwy | - | 3.32 | - | - | | |
| Pot Cap-1 Maneuver | 0 | 363 | - | - | | |
| Stage 1 | 0 | - | - | - | | |
| Stage 2 | 0 | - | - | - | | |
| Platoon blocked, % | | | - | - | | |
| Mov Cap-1 Maneuver | - | 363 | - | - | | |
| Mov Cap-2 Maneuver | - | - | - | - | | |
| Stage 1 | - | - | - | - | | |
| Stage 2 | - | - | - | - | | |
| | | | | | | |

| Approach | WB | | NB | | | |
|---|---|---|---|---|---|---|
| HCM Control Delay, s | 16.7 | | 0 | | | |
| HCM LOS | C | | | | | |
| | | | | | | |

| Minor Lane/Major Mvmt | NBT | NBRWBLn1 | | | | |
|---|---|---|---|---|---|---|
| Capacity (veh/h) | - | - | 363 | | | |
| HCM Lane V/C Ratio | - | - | 0.15 | | | |
| HCM Control Delay (s) | - | - | 16.7 | | | |
| HCM Lane LOS | - | - | C | | | |
| HCM 95th %tile Q(veh) | - | - | 0.5 | | | |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 540 of 743

| Intersection | | | | | | |
|---|---|---|---|---|---|---|
| Int Delay, s/veh | 0.6 | | | | | |

| Movement | WBL | WBR | NBT | NBR | SBL | SBT |
|---|---|---|---|---|---|---|
| Lane Configurations | | ↗ | ↑↑ | ↗ | | |
| Traffic Vol, veh/h | 0 | 50 | 1342 | 38 | 0 | 0 |
| Future Vol, veh/h | 0 | 50 | 1342 | 38 | 0 | 0 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Free | Free | Free | Free |
| RT Channelized | - | None | - | None | - | None |
| Storage Length | - | 0 | - | 100 | - | - |
| Veh in Median Storage, # | 0 | - | 0 | - | 108322816 0 | |
| Grade, % | 0 | - | 0 | - | - | 0 |
| Peak Hour Factor | 90 | 90 | 90 | 90 | 90 | 90 |
| Heavy Vehicles, % | 2 | 2 | 2 | 2 | 2 | 2 |
| Mvmt Flow | 0 | 56 | 1491 | 42 | 0 | 0 |

| Major/Minor | Minor1 | | Major1 | | | | |
|---|---|---|---|---|---|---|---|
| Conflicting Flow All | - | 746 | 0 | 0 | | | |
| Stage 1 | - | - | - | - | | | |
| Stage 2 | - | - | - | - | | | |
| Critical Hdwy | - | 6.94 | - | - | | | |
| Critical Hdwy Stg 1 | - | - | - | - | | | |
| Critical Hdwy Stg 2 | - | - | - | - | | | |
| Follow-up Hdwy | - | 3.32 | - | - | | | |
| Pot Cap-1 Maneuver | 0 | 356 | - | - | | | |
| Stage 1 | 0 | - | - | - | | | |
| Stage 2 | 0 | - | - | - | | | |
| Platoon blocked, % | | | - | - | | | |
| Mov Cap-1 Maneuver | - | 356 | - | - | | | |
| Mov Cap-2 Maneuver | - | - | - | - | | | |
| Stage 1 | - | - | - | - | | | |
| Stage 2 | - | - | - | - | | | |
| | | | | | | | |

| Approach | WB | | NB | |
|---|---|---|---|---|
| HCM Control Delay, s | 17 | | 0 | |
| HCM LOS | C | | | |
| | | | | |

| Minor Lane/Major Mvmt | | NBT | NBR | WBLn1 |
|---|---|---|---|---|
| Capacity (veh/h) | | - | - | 356 |
| HCM Lane V/C Ratio | | - | - | 0.156 |
| HCM Control Delay (s) | | - | - | 17 |
| HCM Lane LOS | | - | - | C |
| HCM 95th %tile Q(veh) | | - | - | 0.5 |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 541 of 743

Chatham County Summit Church TIA  2036 TIP U-6192 Scenario B PM Peak Hour Addendum
19: US Highway 15-501 & U-turn S. of Hidden Oaks

HCM 6th TWSC

| Intersection | | | | | | |
|---|---|---|---|---|---|---|
| Int Delay, s/veh | 0.6 | | | | | |

| Movement | EBL | EBR | NBL | NBT | SBT | SBR |
|---|---|---|---|---|---|---|
| Lane Configurations | ⅂ | | | ↑↑ | | |
| Traffic Vol, veh/h | 46 | 0 | 0 | 1329 | 0 | 0 |
| Future Vol, veh/h | 46 | 0 | 0 | 1329 | 0 | 0 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Free | Free | Free | Free |
| RT Channelized | - | None | - | None | - | None |
| Storage Length | 0 | - | - | - | - | - |
| Veh in Median Storage, # | 0 | - | - | 1083 | 892736 | - |
| Grade, % | 0 | - | - | 0 | 0 | - |
| Peak Hour Factor | 90 | 90 | 90 | 90 | 90 | 90 |
| Heavy Vehicles, % | 2 | 2 | 2 | 2 | 2 | 2 |
| Mvmt Flow | 51 | 0 | 0 | 1477 | 0 | 0 |

| Major/Minor | Minor2 | | Major1 | | | |
|---|---|---|---|---|---|---|
| Conflicting Flow All | 739 | - | - | 0 | | |
| Stage 1 | 0 | - | - | - | | |
| Stage 2 | 739 | - | - | - | | |
| Critical Hdwy | 6.84 | - | - | - | | |
| Critical Hdwy Stg 1 | - | - | - | - | | |
| Critical Hdwy Stg 2 | 5.84 | - | - | - | | |
| Follow-up Hdwy | 3.52 | - | - | - | | |
| Pot Cap-1 Maneuver | 353 | 0 | 0 | - | | |
| Stage 1 | - | 0 | 0 | - | | |
| Stage 2 | 433 | 0 | 0 | - | | |
| Platoon blocked, % | | | | - | | |
| Mov Cap-1 Maneuver | 353 | - | - | - | | |
| Mov Cap-2 Maneuver | 353 | - | - | - | | |
| Stage 1 | - | - | - | - | | |
| Stage 2 | 433 | - | - | - | | |
| | | | | | | |

| Approach | EB | | NB | | | |
|---|---|---|---|---|---|---|
| HCM Control Delay, s | 16.9 | | 0 | | | |
| HCM LOS | C | | | | | |
| | | | | | | |

| Minor Lane/Major Mvmt | | NBT | EBLn1 | | | |
|---|---|---|---|---|---|---|
| Capacity (veh/h) | | - | 353 | | | |
| HCM Lane V/C Ratio | | - | 0.145 | | | |
| HCM Control Delay (s) | | - | 16.9 | | | |
| HCM Lane LOS | | - | C | | | |
| HCM 95th %tile Q(veh) | | - | 0.5 | | | |

Chatham County Summit Church TIA  2036 TIP U-6192 Scenario B PM Peak Hour Addendum
20: US Highway 15-501 & U-turn N. of Briar Chapel

HCM 6th TWSC

## Intersection

| Int Delay, s/veh | 1.1 |
| --- | --- |

| Movement | WBL | WBR | NBT | NBR | SBL | SBT |
| --- | --- | --- | --- | --- | --- | --- |
| Lane Configurations | ↘ | | | | | ↑↑ |
| Traffic Vol, veh/h | 63 | 0 | 0 | 0 | 0 | 2245 |
| Future Vol, veh/h | 63 | 0 | 0 | 0 | 0 | 2245 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Free | Free | Free | Free |
| RT Channelized | - | None | - | None | - | None |
| Storage Length | 0 | - | - | - | - | - |
| Veh in Median Storage, # | 0 | - | 0 | - | - | 0 |
| Grade, % | 0 | - | 0 | - | - | 0 |
| Peak Hour Factor | 90 | 90 | 90 | 90 | 90 | 90 |
| Heavy Vehicles, % | 2 | 2 | 2 | 2 | 2 | 2 |
| Mvmt Flow | 70 | 0 | 0 | 0 | 0 | 2494 |

| Major/Minor | Minor1 | | | Major2 | | |
| --- | --- | --- | --- | --- | --- | --- |
| Conflicting Flow All | 1247 | - | | - | - | |
| Stage 1 | 0 | - | | - | - | |
| Stage 2 | 1247 | - | | - | - | |
| Critical Hdwy | 6.84 | - | | - | - | |
| Critical Hdwy Stg 1 | - | - | | - | - | |
| Critical Hdwy Stg 2 | 5.84 | - | | - | - | |
| Follow-up Hdwy | 3.52 | - | | - | - | |
| Pot Cap-1 Maneuver | 166 | 0 | | 0 | - | |
| Stage 1 | - | 0 | | 0 | - | |
| Stage 2 | 234 | 0 | | 0 | - | |
| Platoon blocked, % | | | | - | | |
| Mov Cap-1 Maneuver | 166 | - | | - | - | |
| Mov Cap-2 Maneuver | 166 | - | | - | - | |
| Stage 1 | - | - | | - | - | |
| Stage 2 | 234 | - | | - | - | |
| | | | | | | |

| Approach | WB | | SB | | | |
| --- | --- | --- | --- | --- | --- | --- |
| HCM Control Delay, s | 41.6 | | 0 | | | |
| HCM LOS | E | | | | | |
| | | | | | | |

| Minor Lane/Major Mvmt | WBLn1 | SBT |
| --- | --- | --- |
| Capacity (veh/h) | 166 | - |
| HCM Lane V/C Ratio | 0.422 | - |
| HCM Control Delay (s) | 41.6 | - |
| HCM Lane LOS | E | - |
| HCM 95th %tile Q(veh) | 1.9 | - |

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 543 of 743

Chatham County Summit Church TIA 2036 TIP U-6192 Scenario B PM Peak Hour Addendum
32: US Highway 15-501 & U-turn S. of Lystra

HCM 6th TWSC

## Intersection

| Intersection | |
|---|---|
| Int Delay, s/veh | 0.9 |

| Movement | WBL | WBR | NBT | NBR | SBL | SBT |
|---|---|---|---|---|---|---|
| Lane Configurations | ⅂ | | | | | ↑↑ |
| Traffic Vol, veh/h | 56 | 0 | 0 | 0 | 0 | 2229 |
| Future Vol, veh/h | 56 | 0 | 0 | 0 | 0 | 2229 |
| Conflicting Peds, #/hr | 0 | 0 | 0 | 0 | 0 | 0 |
| Sign Control | Stop | Stop | Free | Free | Free | Free |
| RT Channelized | - | None | - | None | - | None |
| Storage Length | 0 | - | - | - | - | - |
| Veh in Median Storage, # | 0 | - | 0 | - | - | 0 |
| Grade, % | 0 | - | 0 | - | - | 0 |
| Peak Hour Factor | 90 | 90 | 90 | 90 | 90 | 90 |
| Heavy Vehicles, % | 2 | 2 | 2 | 2 | 2 | 2 |
| Mvmt Flow | 62 | 0 | 0 | 0 | 0 | 2477 |

| Major/Minor | Minor1 | | | Major2 | | |
|---|---|---|---|---|---|---|
| Conflicting Flow All | 1239 | - | | - | - | |
| Stage 1 | 0 | - | | - | - | |
| Stage 2 | 1239 | - | | - | - | |
| Critical Hdwy | 6.84 | - | | - | - | |
| Critical Hdwy Stg 1 | - | - | | - | - | |
| Critical Hdwy Stg 2 | 5.84 | - | | - | - | |
| Follow-up Hdwy | 3.52 | - | | - | - | |
| Pot Cap-1 Maneuver | 168 | 0 | | 0 | - | |
| Stage 1 | - | 0 | | 0 | - | |
| Stage 2 | 236 | 0 | | 0 | - | |
| Platoon blocked, % | | | | - | | |
| Mov Cap-1 Maneuver | 168 | - | | - | - | |
| Mov Cap-2 Maneuver | 168 | - | | - | - | |
| Stage 1 | - | - | | - | - | |
| Stage 2 | 236 | - | | - | - | |
| | | | | | | |

| Approach | WB | | SB | | | |
|---|---|---|---|---|---|---|
| HCM Control Delay, s | 38.5 | | 0 | | | |
| HCM LOS | E | | | | | |
| | | | | | | |

| Minor Lane/Major Mvmt | WBLn1 | SBT |
|---|---|---|
| Capacity (veh/h) | 168 | - |
| HCM Lane V/C Ratio | 0.37 | - |
| HCM Control Delay (s) | 38.5 | - |
| HCM Lane LOS | E | - |
| HCM 95th %tile Q(veh) | 1.6 | - |

Case 1:25-cv-00113-UA-JLW   Document 1   Filed 02/14/25   Page 544 of 743

## US Highway 15-501 & Lystra Road - Level of Service

| Intersection and Approach | Measue of Effectiveness | 2024 Existing Sunday Peak | 2026 Background Sunday Peak | 2026 Future Build Sunday Peak | 2036 TIP Scenario A AM Peak | 2036 TIP Scenario A PM Peak | 2036 TIP Scenario A PM Peak* | 2036 TIP Scenario B AM Peak | 2036 TIP Scenario B PM Peak | 2036 TIP Scenario B PM Peak* |
|---|---|---|---|---|---|---|---|---|---|---|
| **Intersection Level of Service (LOS)** | | B | B | C | C | C | C | C | C | C |
| **Total Intersection Delay (Seconds/Vehicle)** | | 18.1 | 18.4 | 23.3 | 29.3 | 26.1 | 26.4 | 29.3 | 26.1 | 26.4 |
| Leftover to Lystra Eastbound | LOS | - | - | - | D | C | C | D | C | C |
| | Approach Delay | - | - | - | 45.3 | 32.2 | 31.9 | 45.3 | 32.2 | 31.9 |
| Lystra Road Westbound | LOS | D | D | D | E | D | D | E | D | D |
| | Approach Delay | 37.0 | 36.6 | 37.7 | 67.0 | 42.9 | 43.0 | 67.0 | 42.9 | 43.0 |
| US Highway 15-501 Northbound | LOS | A | B | B | C | B | C | C | B | C |
| | Approach Delay | 9.9 | 10.4 | 20.0 | 23.1 | 19.5 | 20.1 | 23.1 | 19.5 | 20.1 |
| US Highway 15-501 Southbound | LOS | B | B | C | - | - | - | - | - | - |
| | Approach Delay | 18.1 | 18.4 | 22.4 | - | - | - | - | - | - |

Delay Decrease or LOS Improvement
Delay Increase > 25% or LOS Decrease by 1 Letter Grade
LOS "F"

## US Highway 15-501 & Briar Chapel Parkway/Vickers Road - Level of Service

| Intersection and Approach | Measue of Effectiveness | 2024 Existing Sunday Peak | 2026 Background Sunday Peak | 2026 Future Build Sunday Peak | 2036 TIP Scenario A AM Peak | 2036 TIP Scenario A PM Peak | 2036 TIP Scenario A PM Peak* | 2036 TIP Scenario B AM Peak | 2036 TIP Scenario B PM Peak | 2036 TIP Scenario B PM Peak* |
|---|---|---|---|---|---|---|---|---|---|---|
| **Intersection Level of Service (LOS)** | | A | B | B | - | - | - | - | - | - |
| **Total Intersection Delay (Seconds/Vehicle)** | | 9.9 | 10.2 | 12.8 | - | - | - | - | - | - |
| Briar Chapel Parkway Eastbound | LOS | D | D | D | - | - | - | - | - | - |
| | Approach Delay | 41.5 | 41.7 | 45.2 | - | - | - | - | - | - |
| Vickers Road Westbound | LOS | D | D | D | - | - | - | - | - | - |
| | Approach Delay | 44.1 | 44.2 | 44.5 | - | - | - | - | - | - |
| US Highway 15-501 Northbound | LOS | A | A | B | - | - | - | - | - | - |
| | Approach Delay | 7.2 | 6.7 | 11.3 | - | - | - | - | - | - |
| US Highway 15-501 Southbound | LOS | A | A | A | - | - | - | - | - | - |
| | Approach Delay | 6.9 | 8.3 | 9.5 | - | - | - | - | - | - |
| **Intersection Level of Service (LOS)** | | - | - | - | B | C | C | B | C | C |
| **Total Intersection Delay (Seconds/Vehicle)** | | - | - | - | 19.2 | 22.0 | 23.2 | 19.2 | 22.0 | 23.0 |
| Briar Chapel Parkway Eastbound | LOS | - | - | - | D | E | E | D | E | E |
| | Approach Delay | - | - | - | 41.4 | 57.8 | 59.5 | 41.4 | 57.8 | 59.5 |
| Leftover to Briar Chapel Westbound | LOS | - | - | - | C | D | D | C | D | D |
| | Approach Delay | - | - | - | 23.8 | 48.0 | 47.1 | 23.8 | 48.0 | 47.2 |
| US Highway 15-501 Southbound | LOS | - | - | - | B | B | B | B | B | B |
| | Approach Delay | - | - | - | 11.5 | 15.4 | 16.8 | 11.5 | 15.4 | 16.5 |
| **Intersection Level of Service (LOS)** | | - | - | - | A | A | A | A | A | A |
| **Total Intersection Delay (Seconds/Vehicle)** | | - | - | - | 6.7 | 4.8 | 5.6 | 6.5 | 4.6 | 4.5 |
| Leftover to Vickers Eastbound | LOS | - | - | - | D | D | D | D | D | D |
| | Approach Delay | - | - | - | 49.6 | 44.5 | 46.1 | 48.4 | 44.3 | 44.3 |
| Vickers Road Westbound | LOS | - | - | - | D | D | D | D | D | D |
| | Approach Delay | - | - | - | 50.0 | 43.0 | 41.8 | 50.0 | 43.6 | 43.6 |
| US Highway 15-501 Northbound | LOS | - | - | - | A | A | A | A | A | A |
| | Approach Delay | - | - | - | 4.4 | 2.0 | 2.3 | 4.4 | 2.0 | 2.0 |

Delay Decrease or LOS Improvement
Delay Increase > 25% or LOS Decrease by 1 Letter Grade
LOS "F"

## US Highway 15-501 & Jack Bennett Road - Level of Service

| Intersection and Approach | Measue of Effectiveness | 2024 Existing Sunday Peak | 2026 Background Sunday Peak | 2026 Future Build Sunday Peak | 2036 TIP Scenario A AM Peak | 2036 TIP Scenario A PM Peak | 2036 TIP Scenario A PM Peak* | 2036 TIP Scenario B AM Peak | 2036 TIP Scenario B PM Peak | 2036 TIP Scenario B PM Peak* |
|---|---|---|---|---|---|---|---|---|---|---|
| **Intersection Level of Service (LOS)** | | A | A | A | B | C | C | B | C | C |
| **Total Intersection Delay (Seconds/Vehicle)** | | 7.5 | 6.3 | 6.9 | 18.3 | 20.4 | 20.8 | 18.3 | 20.3 | 20.7 |
| Leftover to Jack Bennett Eastbound | LOS | - | - | - | C | C | C | C | C | C |
| | Approach Delay | - | - | - | 31.8 | 28.4 | 27.9 | 31.9 | 28.4 | 28.0 |
| Jack Bennett Road Westbound | LOS | D | D | D | C | C | C | C | C | C |
| | Approach Delay | 42.4 | 35.3 | 37.1 | 26.5 | 25.7 | 25.0 | 26.5 | 25.7 | 25.4 |
| US Highway 15-501 Northbound | LOS | A | A | A | B | B | B | B | B | B |
| | Approach Delay | 5.8 | 5.1 | 5.8 | 12.7 | 15.7 | 16.7 | 12.6 | 15.7 | 16.4 |
| US Highway 15-501 Southbound | LOS | A | A | A | - | - | - | - | - | - |
| | Approach Delay | 0.6 | 1.1 | 0.9 | - | - | - | - | - | - |

| | |
|---|---|
| 🟩 | Delay Decrease or LOS Improvement |
| 🟧 | Delay Increase > 25% or LOS Decrease by 1 Letter Grade |
| 🟥 | LOS "F" |

## US Highway 15-501 & Poplar Street/Hidden Oaks Court - Level of Service

| Intersection and Approach | Measure of Effectiveness | 2024 Existing Sunday Peak | 2026 Background Sunday Peak | 2026 Future Build Sunday Peak | 2036 TIP Scenario A AM Peak | 2036 TIP Scenario A PM Peak | 2036 TIP Scenario A PM Peak* | 2036 TIP Scenario B AM Peak | 2036 TIP Scenario B PM Peak | 2036 TIP Scenario B PM Peak* |
|---|---|---|---|---|---|---|---|---|---|---|
| **Intersection Level of Service (LOS)** | | - | - | - | - | - | - | - | - | - |
| **Total Intersection Delay (Seconds/Vehicle)** | | - | - | - | - | - | - | - | - | - |
| Poplar Street Eastbound | LOS | C | D | F | - | - | - | - | - | - |
| | Approach Delay | 24.6 | 29.6 | 617.3 | - | - | - | - | - | - |
| Hidden Oaks Court Westbound | LOS | C | D | F | - | - | - | - | - | - |
| | Approach Delay | 22.8 | 26.7 | 445.9 | - | - | - | - | - | - |
| US Highway 15-501 Northbound | LOS | - | - | - | - | - | - | - | - | - |
| | Approach Delay | 0.2 | 0.1 | 5.1 | - | - | - | - | - | - |
| US Highway 15-501 Southbound | LOS | - | - | - | - | - | - | - | - | - |
| | Approach Delay | 0.1 | 0.1 | 0.1 | - | - | - | - | - | - |
| **Intersection Level of Service (LOS)** | | - | - | - | - | - | - | - | - | - |
| **Total Intersection Delay (Seconds/Vehicle)** | | - | - | - | - | - | - | - | - | - |
| Poplar Street Eastbound | LOS | - | - | - | B | D | D | B | D | D |
| | Approach Delay | - | - | - | 12.4 | 28.2 | 28.9 | 12.4 | 28.2 | 28.9 |
| Leftover to Poplar Westbound | LOS | - | - | - | C | F | F | C | F | F |
| | Approach Delay | - | - | - | 17.8 | 90.1 | 80.1 | 17.8 | 90.1 | 80.1 |
| US Highway 15-501 Southbound | LOS | - | - | - | - | - | - | - | - | - |
| | Approach Delay | - | - | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| **Intersection Level of Service (LOS)** | | - | - | - | - | - | - | - | - | - |
| **Total Intersection Delay (Seconds/Vehicle)** | | - | - | - | - | - | - | - | - | - |
| Leftover to Hidden Oaks Eastbound | LOS | - | - | - | F | C | C | F | C | C |
| | Approach Delay | - | - | - | 54.2 | 24.3 | 24.9 | 54.2 | 24.3 | 24.9 |
| Hidden Oaks Court Westbound | LOS | - | - | - | C | C | C | C | C | C |
| | Approach Delay | - | - | - | 21.6 | 15.1 | 15.4 | 21.6 | 15.1 | 15.4 |
| US Highway 15-501 Northbound | LOS | - | - | - | - | - | - | - | - | - |
| | Approach Delay | - | - | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |

Delay Decrease or LOS Improvement
Delay Increase > 25% or LOS Decrease by 1 Letter Grade
LOS "F"

## US Highway 15-501 & Site Access #1 - Level of Service

| Intersection and Approach | Measue of Effectiveness | 2024 Existing Sunday Peak | 2026 Background Sunday Peak | 2026 Future Build Sunday Peak | 2036 TIP Scenario A AM Peak | 2036 TIP Scenario A PM Peak | 2036 TIP Scenario A PM Peak* | 2036 TIP Scenario B AM Peak | 2036 TIP Scenario B PM Peak | 2036 TIP Scenario B PM Peak* |
|---|---|---|---|---|---|---|---|---|---|---|
| **Intersection Level of Service (LOS)** | | - | - | - | - | - | - | - | - | - |
| **Total Intersection Delay (Seconds/Vehicle)** | | - | - | - | - | - | - | - | - | - |
| Eastbound | LOS | - | - | - | - | - | - | - | - | - |
| | Approach Delay | - | - | - | - | - | - | - | - | - |
| Site Access #1 Westbound | LOS | - | - | C | C | C | C | C | C | C |
| | Approach Delay | - | - | 19.4 | 21.7 | 15.3 | 16.7 | 21.7 | 15.3 | 16.7 |
| US Highway 15-501 Northbound | LOS | - | - | - | - | - | - | - | - | - |
| | Approach Delay | - | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| US Highway 15-501 Southbound | LOS | - | - | - | - | - | - | - | - | - |
| | Approach Delay | - | - | 0.0 | - | - | - | - | - | - |

Delay Decrease or LOS Improvement
Delay Increase > 25% or LOS Decrease by 1 Letter Grade
LOS "F"

## US Highway 15-501 & Site Access #2 - Level of Service

| Intersection and Approach | Measue of Effectiveness | 2024 Existing Sunday Peak | 2026 Background Sunday Peak | 2026 Future Build Sunday Peak | 2036 TIP Scenario A AM Peak | 2036 TIP Scenario A PM Peak | 2036 TIP Scenario A PM Peak* | 2036 TIP Scenario B AM Peak | 2036 TIP Scenario B PM Peak | 2036 TIP Scenario B PM Peak* |
|---|---|---|---|---|---|---|---|---|---|---|
| **Intersection Level of Service (LOS)** | | - | - | - | - | - | - | - | - | - |
| **Total Intersection Delay (Seconds/Vehicle)** | | - | - | - | - | - | - | - | - | - |
| Eastbound | LOS | - | - | - | - | - | - | - | - | - |
| | Approach Delay | - | - | - | - | - | - | - | - | - |
| Site Access #2 Westbound | LOS | - | - | C | C | C | C | C | C | C |
| | Approach Delay | - | - | 16.3 | 22.0 | 15.4 | 17.4 | 21.8 | 15.4 | 17.0 |
| US Highway 15-501 Northbound | LOS | - | - | - | - | - | - | - | - | - |
| | Approach Delay | - | - | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| US Highway 15-501 Southbound | LOS | - | - | - | - | - | - | - | - | - |
| | Approach Delay | - | - | 0.0 | - | - | - | - | - | - |

Delay Decrease or LOS Improvement
Delay Increase > 25% or LOS Decrease by 1 Letter Grade
LOS "F"

# EXHIBIT 10



# NC DOT: Total crash frequency by intersection, 1/1/2019-12/31/2023

https://ncdot.maps.arcgis.com/home/webmap/viewer.html?webmap=dc944f1c834f49a18479c17df1f783b9

**Proposed campus**

Number of Accidents (y-axis: 5 to 50)

- High School: 17
- Russel Chapel Rd: 12
- Durham Eubanks Rd [Bynum]: 12
- Hamlin's Chapel Rd: 13
- Mt. Gilead Church Rd: 43
- Wethersfield Rd: 12
- Vill. Way: 31
- Andrews Store Rd: 20
- Taylor Rd: 5
- Jack Bennett Rd: 16
- BC Pkwy / Vickers Rd [Briar Chapel]: 29
- Lystra Rd [Harris Teeter]: 37
- Mann's Chapel Rd [Cole Park Plaza]: 45
- Old Lystra Rd: 16

Fearrington Village

Rte15501

*N*

J. Coplan
rev 24092



# NC DOT: Total crash frequency by intersection, 1/1/2019-12/31/2023

https://ncdot.maps.arcgis.com/home/webmap/viewer.html?webmap=dc944f1c834f49a18479c17df1f783b9

**15-501 & Mann's Chapel Road is the 3rd most accident-prone intersection in Chatham County**

J. Coplan
rev 24092



**Map.** *Left:* "Transient" campus at East Chapel Hill HS slated to transfer to Chatham; "approximately 15%" are Chatham residents. Summit maintains another "transient" campus at Green Level HS in West Cary. Summit's long-term plan for this campus is unknown. *Right:* Per NC DOT ("Total Crash Frequency by Intersection"), the intersection of Mann's Chapel Road and 15-501 is already the third-most hazardous intersection in the county. Even under the best of circumstances, overflow traffic will seek alternative routes, right through the heart of Briar Chapel. The intersection of Briar Chapel Parkway / Vickers Road and 15-501 will become a nightmare



# PUBLIC COMMENTS as of 9/30/24

https://www.chathamcountync.gov/home/showpublisheddocument/70037

**In Favor: 31 (25%)**



Summit Member **28**

Membership unstated **3**

Opposed, BC: 35

Opposed, Other: 36

Opposed, FV: 20

**Opposed 91 (75%)**

| In Favor | 31 (25%) | Summit member: | 28 |
|---|---|---|---|
| | | Unstated: | 3 |
| Opposed | 91 (75%) | Summit member: | 0 |
| Total | 122 (100%) | | |

*By household; excludes duplicates*
*"Member" includes one parent of a member*

J. Coplan
rev 240930

| **Selected comments** |
|---|

**In Favor:**
- We have been Summit church members since 2015... We pray this is a go!
- We would be thrilled to attend a campus that was closer to our home, rather than traveling over 20 minutes to the nearest location.

**Opposed:**
- We are also people of faith and regularly attend worship [but] ministries this size are a form of "Big Business."
- It will be detrimental to our quality of life, deprive the county of much needed taxes, and serve thousands of people who don't even live here.
- Traffic would be equivalent to having a sports facility in the middle of a residential area.
- Approval of this request will create a predictable traffic hazard that will lead to serious injuries or even deaths.
- A few years ago, I had a medical emergency that required an ambulance, and every minute counted. The EMTs were able to get me to the hospital in time, and if they had not, I might not be here today.
- The residents of...Briar Chapel and Fearrington Village need to pass through this area to access grocery stores, medical services, shopping, and downtown Chapel Hill. There is no alternative route. A large facility such as this could back up traffic for miles and it won't just be on Sunday. As a retired Realtor, I can assure you that isolating these two communities will cause a drop in property values. If this becomes a reality, I personally will sell & move.

James Coplan
Jcoplan48@comcast.net
10/1/2024



Hi Dan,

A neighbor asked me to convey my concerns directly to you about the new "megachurch" planned for our county off of 15-501, as I won't be able to attend the meeting on the subject.

I'm sure you're hearing from a lot of people, so I'll keep it brief. My opinion is that we should not be allowing a church of that size to be built in that location, or probably any other in this county. Reasons:

1. Traffic: If you've ever been traveling on 15-501 near either of the large churches on that road on a Sunday (St. Thomas More or Grace Church), you must know that it creates traffic snarls where/when there otherwise wouldn't be. That is practically guaranteed to happen here if that new church is built. Plus, the extra wear & tear on the roads.
2. Taxes: Any infrastructure was built to accommodate the excess (traffic, utilities, etc.) will not be paid for by the church, as they're exempt from paying property taxes, as I'm sure you know. For those of us that worship at reasonably-sized churches or do not worship at all, this seems an unfair tax burden, especially in light of the near yearly reassessments and property tax increases that all of us in Chatham County must already pay.

Feel free to forward this to whomever it may concern.

Thanks for your consideration,

Jason Botwick
34 Glen Eden Ct
Chapel Hill, NC 27516
919-434-7594


Dear Mr. Garrett,

We are ten-year residents of Chatham County and have been thoroughly pleased with our move. One of the reasons for our move was to be in a more country-like setting and to cut down on traffic.

We learned of the Summit Church development several weeks ago and were sorely disappointed. We already have to deal with the traffic on NC54 (Fordham Boulevard) due to St. Thomas Moore and its continued expansion. We do not want to have to deal with similar traffic going into Pittsboro.

This is a very large development for a very large church which we are completely against. They do not bring substantial revenue to the surrounding area businesses or to the county. As a taxpayer I am against having to pay a likely increase in taxes for this development. I urge you and the other respective decision makers to vote no on the rezoning proposal.
Kind regards,
Lynda & Scott Bryant-Comstock
Highland Forest residents


**From:** Kay Williams <hollyzmum@icloud.com>
**Sent:** Wednesday, October 2, 2024 9:23 AM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Megachurch

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Good Morning. I'll keep this short, you've probably received numerous lengthy complaints regarding the proposed megachurch on 15-501.

We haven't lived in Chatham County very long, but we've already seen the traffic increase drastically on 15-501 between Chapel Hill and Pittsboro with all the new businesses and apartment buildings. This is a lovely "rural" area and we hate to see it become choked with further traffic. We oppose the building of this business and hope they can find a more suitable place to build.

Kay Williams
235 Emily Lane

**From:** Sharon M <smessina51@gmail.com>
**Sent:** Wednesday, October 2, 2024 8:46 AM
**To:** Jenifer Johnson <jenifer.johnson@chathamcountync.gov>; clyde.frazier@retiree.meredith.edu; amandarob@gmail.com; sugarcreek1953@gmail.com; lobelia6@gmail.com; eric@ericandrewsrealtor.com; Mary R <mroodkowsky@gmail.com>; jmspoon5@gmai.com; shelleychathamplan@gmail.com; emclhaddix@gmail.com; Daniel Garrett <dan.garrett@chathamcountync.gov>; Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** We are opposed to the Mega Church rezoning requests

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear County Decision Makers,

We are asking you to deny the rezoning applications for Summit Church for its 6 parcel "package deal" that crosses over 15/501 in North Chatham near Dogwood Vet and Briar Chapel neighborhood. The detrimental impacts are many, and very serious to our community.

Immediate Impact to Our Quality of Life and Tax Base:  We moved into Chatham County in 2017 but just became aware that a "2017 Plan Chatham" set of goals exists for our county. David Delaney mentioned in a recent informational NextDoor post that this "Plan" was created to help "**preserve Chatham's rural preservation and maintain consistent low scale econ/residential development**." We are miffed at understanding how rezoning 6 large parcels (almost 100 acres) of undeveloped/tree-filled land by an entity that will not be paying their fair share of taxes - is in keeping with the current and future goals for our county. Further, if they do not pay taxes we tax paying citizens will no doubt have an increase in our taxes to cover the added infrastructure costs. Do we not need every penny

we can get from real estate taxes to improve our current safety and infrastructure? We need to build more schools, increase teacher salaries, build more fire stations and police stations, build an additional post office, improve wastewater management for North Chatham by building a county wastewater facility and stop relying on developers to build individual neighborhood wastewater facilities. The sheer size of this mega church building is similar to that of a super large "Wegmans" grocery store building but the difference is this church entity would not be providing hundreds of jobs or paying their fair share of property, payroll and sales taxes into our county.

Immediate Impact on Traffic and Safety: Now, to the impact this entity will have on our local traffic. The 6 parcels in question are located directly between two intersections that have already experienced a large number of bad accidents (Lystra & 15/501 and Briar Chapel Parkway/Vickers & 15/501). Add several hundred cars on weekdays and a few thousand cars on Sundays between these two intersections pouring out onto 15/501 and it is a recipe for more disastrous traffic accidents. Synchronized intersections are not a solution. The turn lanes for these synchronized intersections are typically not long enough for this huge volume of traffic which means there will be an inevitable and dangerous back up into one of the travel lanes on 15/501 causing cars to jockey around them while going 55 mph. Not to mention the existing synchronized traffic lights on 15/501 have the dreaded flashing yellow light which adds to the danger, leaving drivers to use their own judgement when making their U-turns. We are super concerned about this traffic impact essentially right outside our Briar Chapel neighborhood. As you know, 15/501 is a primary corridor running north and south in Chatham County. It is our main route to access I-40 to the north, and Highway 64 to the south. This huge increase in traffic condensed between two already accident prone intersections could definitely impact our quality of life by making everyday driving a lot more difficult. In addition, this heavy load of traffic could potentially cause difficulty in accessing emergency services to hospitals and slow down the ability of police and fire trucks to respond to calls.

Long Term Impact of Future Development: Our other concerns are regarding the parcels on the west side of 15/501. The mega church R-1 Rezoning Application for these parcels says *several* times "there are no current plans for development" - our question is then why ask for rezoning of these parcels if they truly have no plans for developing them. This ambiguity causes us great concern. Will we be blind-sided in the future if this entity decides they are going to build on these parcels. What will they be allowed to build: dorms, apartments, yurts, bunkers, duplexes, etc. all with associated parking lots. Will environmental impact studies be required? Will they be allowed to clear all the trees and create a concrete jungle? We certainly cannot rely on their word that "there are no current plans for development" can we? That would not be prudent!

Please recommend the denial of these rezoning applications and consider maintaining Chatham's rural preservation and character - which we are losing rapidly with all the growth in this county.

Thank you for your consideration.

Sincerely,
Sharon and Fred Messina
1431 Briar Chapel Parkway
Chapel Hill, NC 27516


Dear County Decision Makers,

We are asking you to deny the rezoning applications for Summit Church for its 6 parcel "package deal" that crosses over 15/501 in North Chatham near Dogwood Vet and Briar Chapel neighborhood. The detrimental impacts are many, and very serious to our community.

Immediate Impact to Our Quality of Life and Tax Base:  We moved into Chatham County in 2017 but just became aware that a "2017 Plan Chatham" set of goals exists for our county. David Delaney mentioned in a recent informational NextDoor post that this "Plan" was created to help "**preserve Chatham's rural preservation and maintain consistent low scale econ/residential development**." We are miffed at understanding how rezoning 6 large parcels (almost 100 acres) of undeveloped/tree-filled land by an entity that will not be paying their fair share of taxes - is in keeping with the current and future goals for our county. Further, if they do not pay taxes we tax paying citizens will no doubt have an increase in our taxes to cover the added infrastructure costs. Do we not need every penny we can get from real estate taxes to improve our current safety and infrastructure? We need to build more schools, increase teacher salaries, build more fire stations and police stations, build an additional post office, improve wastewater management for North Chatham by building a county wastewater facility and stop relying on developers to build individual neighborhood wastewater facilities. The sheer size of this mega church building is similar to that of a super large "Wegmans" grocery store building but the difference is this church entity would not be providing hundreds of jobs or paying their fair share of property, payroll and sales taxes into our county.

Immediate Impact on Traffic and Safety: Now, to the impact this entity will have on our local traffic. The 6 parcels in question are located directly between two intersections that have already experienced a large number of bad accidents (Lystra & 15/501 and Briar Chapel Parkway/Vickers & 15/501). Add several hundred cars on weekdays and a few thousand cars on Sundays between these two intersections pouring out onto 15/501 and it is a recipe for more disastrous traffic accidents. Synchronized intersections are not a solution. The turn lanes for these synchronized intersections are typically not long enough for this huge volume of traffic which means there will be an inevitable and dangerous back up into one of the travel lanes on 15/501 causing cars to jockey around them while going 55 mph. Not to mention the existing synchronized traffic lights on 15/501 have the dreaded

flashing yellow light which adds to the danger, leaving drivers to use their own judgement when making their U-turns. We are super concerned about this traffic impact essentially right outside our Briar Chapel neighborhood. As you know, 15/501 is a primary corridor running north and south in Chatham County. It is our main route to access I-40 to the north, and Highway 64 to the south. This huge increase in traffic condensed between two already accident prone intersections could definitely impact our quality of life by making everyday driving a lot more difficult. In addition, this heavy load of traffic could potentially cause difficulty in accessing emergency services to hospitals and slow down the ability of police and fire trucks to respond to calls.

<u>Long Term Impact of Future Development:</u> Our other concerns are regarding the parcels on the west side of 15/501. The mega church R-1 Rezoning Application for these parcels says *several* times "there are no current plans for development" - our question is then why ask for rezoning of these parcels if they truly have no plans for developing them. This ambiguity causes us great concern. Will we be blind-sided in the future if this entity decides they are going to build on these parcels. What will they be allowed to build: dorms, apartments, yurts, bunkers, duplexes, etc. all with associated parking lots. Will environmental impact studies be required? Will they be allowed to clear all the trees and create a concrete jungle? We certainly cannot rely on their word that "there are no current plans for development" can we? That would not be prudent!

Please recommend the denial of these rezoning applications and consider maintaining Chatham's rural preservation and character - which we are losing rapidly with all the growth in this county.

Thank you for your consideration.

Sincerely,
Sharon and Fred Messina
1431 Briar Chapel Parkway
Chapel Hill, NC 27516


I previously emailed my strong OBJECTION to the rezoning request by Qunity, PA to rezone Parcels 18750, 18896, 18897 but as I listen to the Oct 1 meeting via Zoom, I wanted to make something clear. Mine, and I'm sure most of the objections, have absolutely nothing to do with the fact that it is a church proposing to go in. The actual use of the land is irrelevant. My objections have to do with the
1) scale of the project- size of buildings and parking lots and the subsequent 500-1000 number of people coming into the area at 1 time
2) traffic- massive number of cars during services, which the proposal team admitted themselves in their presentation would increase car trips into the 1000's
3) increased accidents, especially at all of the U-turns

4) lack of wastewater plans
5) noise
6) lack of revenue for Chatham County- no jobs provided, little to no revenue going into local businesses
7) lack of property taxes being paid
8) environmental impact
9) maintaining rural character
10) effect on residential property values

The people who spoke in favor of the proposal told personal stories, which I'm sure are true and important to them, but does not reflect any benefit for the average Chatham County resident unless they have the same beliefs and wish to become members of Summit Church. This establishment would serve the few, not the majority, and the negative impact would be more of a burden to the residents of the area than any benefit.

Please consider DENYING this rezoning proposal.
Thank you
Gina M. Donato, Ph.D.
112 Treywood Lane
Chapel Hill, NC 27516
Briar Chapel subdivision


Dan:

I heard about the Planning Board meeting tonight at 6:30 but was unable to attend due to work. The email gave your name and email as a contact to share comments and/or concerns about the proposed large project, so I am writing to share my concerns with you and others in Chatham County government.

I have been a resident of Chatham County since the Fall of 1977 after my wife and I purchased a multi-acre forested tract off of Jack Bennett Rd.in what was a small community of homes also built on a larger forestest tract. This land adjoins the headwaters of Herndon Creek, which formally begins below where my property begins. Across the creek are many other multi-acre lots with homes, and there are 8 homes in total on my side of the creek in our smaller community. Back then, I could walk a mile in two directions and not see another home or road, so as you can imagine, I have seen some major growth changes over the years.

The reason we chose to buy land and build a home out here was because of the rural wild beauty of north Chatham county back then. All who moved here then had strong interests in living in low-density forested communities, including the home of a former long-serving District Court Judge. We of course expect growth, but we would like the growth to be

balanced between offering some newer home communities that respect the land and habits, supporting smaller shopping areas, and schools as well as a county effort to zone in such a way as to maintain many of the rural and semi-rural qualities that attracted people to move here to live.

I do not see that view of development being implemented in Chatham Country. To most of us who have lived here for a long time, we only see rapid growth to the point of exploitation of the remaining available land. Four laning 15-501 literally paved the way for that, which I know was by intent starting with the change in the board membership in the early 2000s.

The proposed Summit Church has been described as what is commonly referred to as a mega-church. As I understand it, Summit already has 12 churches in the RDU-Chapel Hill area as well as many across the country. As pointed out by many long-term residents on local discussion boards, there is no shortage of older, smaller churches in Chatham, so most of us do not see the need for a mega-church designed to seat huge congregations. The very large church would permanently change the character of this area, increase traffic on multiple days on an already stressed thoroughfare, and as I understand it, not pay county taxes.

Most of the residents I've spoken with about this do not see any need for such a large intrusive structure that will bring a lot more traffic to the area, which few of us want. We have understood that there is already a proposed housing/apartment, small shopping community to be built at the intersection of Jack Bennett and 15-501, so that would already bring a lot more traffic and change the area.

If you have ever driven down the Chapel Hill-Durham Blvd, then I would think that you would see the future of 15-501 if the Planning Board and Commissioners approve this very large, unnecessary, intrusive, and non-revenue-generating project.

My hope is that Chatham County will pursue a balanced growth plan for our county, something that was originally planned in the early 2000s until developers and other growth interests took over the Board and had their way.

When does their way stop or at least embrace respect for the qualities of the county that made folks originally want to live here?

David Carlton
112 Wild Ginger Ridge, Chatham County since 1977


We need development that will enhance our tax flow, not eat at it. Development is inevitable but it should make sense. There are few shops and minimal restaurants near Briar Chapel and Highland Forest.

While I would prefer a housing development with eateries and shops — all tax generating — even a Target would be preferable to a church as its traffic would be spaced out over the week.

Thank you for any consideration of not moving forward on the mega church. We have many small underused in Chatham now.

Hello Mr Garrett

NO MEGACHURCH IN CHATHAM!!!!
That's just TOTALLY WRONG in Chatham!!
Studies, planning, or not, we ALL KNOW it's nonsense.

Thank you
Maria Howard
Chatham Resident

I am a resident of Chatham County. I am opposed to the Rezoning Request by the Summit Church and request that it be turned down.

My opposition is based on a number of factors.

**Traffic Impact:**
It is projected that with its initial use, 3,000 cars will drive to the church each Sunday, with 600-700 more cars during the week for such things as Bible study and other church activities, many of these at rush hour. In addition, they are going to be offering the largest for rent auditorium space in Chatham County so the effect on our community will happen on more than just the days of church services.

This section of 15/501 is the primary corridor that runs north and south in Chatham County and is our most direct access to Highway 64 and Pittsboro to the south and to Chapel Hill and I-40 to the north. This increase in traffic could create bottlenecks all along the 15-501 corridor and not only adversely affect our every-day driving but cause difficulty in accessing emergency services to hospitals and slow down the ability of police and fire trucks to respond to calls, not to mention the impossibility of that many cars safely pulling in and out of the entrance.

**Infrastructure/Revenue Impacts:**
The proposed use of the property and the increased traffic will have an impact on the County's infrastructure and expenses. Such a burden is likely to increase our taxes.

This church would have tax-exempt status and would not be adding to county revenues.  Furthermore, there are no economic benefits to the area with no property, payroll and sales and use taxes being collected.

Thank you for your consideration of my comments.

Eileen McCorry
4103 The Knolls Close, 4103 Fearrington Post
Pittsboro, NC 27312

I live in Briar Chapel. It is my opinion the building of a mega church the size of Mar A Lago is without question a terrible idea. I could list all the reasons but you have already heard them. Perhaps you should check the number of wrecks on 15/501 in that area. I repeat, this mega church is just plainly and simply a terrible idea. Just say NO.
Respectfully,
Linda Fleishman

October 1, 2024
Angela Plummer, Chatham County Zoning Administrator
12 East Street
PO Box 1809
Pittsboro, NC 27312
Angela.plummer@chathamcountync.gov
Dear Ms. Plummer,
Zoning regulations aim to create organized, efficient, and livable communities with diverse businesses to support a growing population. Churches are important anchors for a growing community. Summit Church already has 12 different locations and there are therefore no compelling arguments that allowing rezoning to combine not just two but three large tracts of land will align with Chatham County's goal to be organized, efficient and livable. Nor does this development appear to be necessary for the ongoing growth of Summit Church. The proponents of the megachurch development argue that much of their 50 acre plot would be "community space" but I argue that this space is intended for their own group's use and there are no regulations which provide for any guarantee of this being a true public space for the general population's use. Also, there are already thoughts of expansion of buidings on the property as noted in their proposal. Many such megachurches develop private schools later on after their development and the current design leaves 18 acres undeveloped. Nice idea for greenspace now, but likely to be utilized for other purposes in the future. Think about the area around St. Thomas More in Chapel Hill and how congested it has become.

This large structure is not characteristic at all of local churches or in keeping with Chatham County's more rural asthetic. If such a large change in zoning is to be considered, placing it along a highway with clear inlets and outlets would be more appropriate. For instance, along 64 rather than 15-501 with it's rapidly expanding traffic usage between Pittsboro and Chapel Hill. Moreover, these extra two parcels would be better used to benefit the entirety of the community; i.e. for development of diverse businesses which will generate employment opportunities and diverse tax revenue. Chatham County revenue is 80% dependent on property taxes from residents, thus the increased infrastructure costs and needs over time including road maintenance, police, fire, water, etc for such a large facility will be borne by all the citizens of Chatham County, not just by Summit Church's worshippers which would come from a number of surrounding counties. Though diverse religious facility development is very important to the spiritual health of the community, praising Jesus does not actually require the development of a 50 acre, 88,000 sq foot, 3000 parishoner megachurch. This gargantuan church facility's size does not appear to be in line with the current development and zoning aims in Chatham County and would serve to diminish the livability of the immediate community while serving only a subsection of it. My family and I have lived here for over a decade and argue to limit the development of Summit Church on 15-501 to one parcel and are opposed to rezoning in this case.

Sincerely yours,
Christine Williams
Chatham County Resident since 2013


**From:** Williams, Christine <Christine.Williams@unchealth.unc.edu>
**Sent:** Tuesday, October 1, 2024 4:43 PM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Cc:** Nathan Williams <telen8@gmail.com>
**Subject:** Megachurch rezoning

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Good afternoon, Ms. Plummer.

Please find attached a letter discussing our family's opposition to the proposed megachurch development/rezoning across from Briar Chapel on 15-501. Looking forward to the meeting this evening.

Thanks for your ongoing service to the community,
Chris

Christine Williams, MD

she/her/hers
Assistant Professor of Internal Medicine, UNC School of Medicine
Associate Medical Director, UNC Clinical Case Management and Resource Utilization
Cell 919-943-7266
Office 984-974-1931

Dear Dan Garrett,  I write to express considerable concern regarding the building of any development that would accommodate 3,000 cars on the 15/501 within a short time frame. The proposed Summit Church would transform the 15/501 into a parking lot during hours of operation. I hope the county will encourage the church to build in one of the many parts of the county where traffic isn't already dense. Thank you, Nora Haenn (Pittsboro resident)

Hello Mr. Garrett,

I live in the Briar Chapel Development and I wanted to express my deep concern about the proposal of building a megachurch on Route 15-501.  The impact of this huge project will adversely the ability to exit our development, increase commuter traffic through our neighborhood and may slow down emergency police and fire responses - all this without contributing to the tax base. I urge you to oppose this project.

Thank you for your consideration,

Christina Dong

Dear Mr. Garrett,

I am writing to state my opposition to the planned rezoning of parcels 18909, 2752 and 93852 located near my neighborhood at Briar Chapel.

As a Christian and ordained minister myself, I have no opposition to a church but there are already a plethora of churches within a 10 minute drive of Briar Chapel and already two churches at the entrances to the neighborhood - we do not need a third.

As a resident, business owner, and tax payer in Chatham County I strongly oppose the rezoning of prime location commercial real estate in order to attract a non-taxpaying entity of any kind.  Chatham County continues to raise the sales tax and property tax on its residents in order to provide the needs and services that our growing community needs and I fail to see how this rezoning will do nothing but hinder that goal.

Thank you for your time,

Kevin McHugh

2410 Briar Chapel Pkwy

**From:** Glenna Todd <glennatodd87@yahoo.com>
**Sent:** Tuesday, October 1, 2024 2:58 PM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Opposition to Conditional Rezoning for Summit Church Mega-Church

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Hi there,
As a recent resident of Chatham County, I'm writing to express my strong opposition to the proposed rezoning request from Summit Church for the construction of an 88,421-square-foot mega-church on 50 acres of land along 15-501 across from The Verandah.
This county is known for its progressive, LGBTQ-friendly, and open-minded atmosphere, which is why many of us have chosen to call it home. Building a mega-church in this area runs contrary to these values, and many residents, including myself, are deeply concerned. A mega-church is not just a place of worship—it functions as a large-scale business, and it should be taxed and regulated as such. Additionally, most of the attendees would likely be commuting from outside the area, further undermining the small-town, rural lifestyle that makes this community special.
This development will significantly impact our infrastructure. The traffic generated by 3,000 Sunday trips will create severe bottlenecks along the 15-501 corridor. This is the primary connection between Chapel Hill and I-40, and the increased traffic will affect not only Chatham County but also surrounding areas. Emergency services will struggle to respond to urgent calls, and we are already experiencing a high number of accidents in this area. Moreover, there is no guarantee that the church won't schedule additional services or activities, further increasing the traffic burden.
Beyond traffic concerns, there is the financial impact. Chatham County residents will be forced to shoulder higher property taxes due to increased road maintenance costs, while the church, exempt from property taxes, provides no financial benefit to our community. It is unfair for Chatham County residents to bear the burden of this development, which primarily benefits people from outside our county.
In light of these concerns, I respectfully urge you to deny the Summit Church's request for conditional rezoning. This project does not align with the needs or values of our community and would create unnecessary strain on our infrastructure and resources.
Thank you for your time and consideration, I'll be at the meeting tonight.
Sincerely,
Glenna Cline

As a resident of Fearrington Village, I request for the re- zoning of the property off 15/501, across from Veranda, to construct this mega church be denied.
I believe churches are an important part of all communities, but this proposal of a huge structure is not beneficial for Chatham County.
I have practiced the Christian faith my whole life and know there are

many good churches already serving this community.

Virginia Rogers

Dear Angela,

I hope this email finds you well.

I am writing to express my strong opposition to the proposed rezoning for the Summit Church on Parcels 18750, 18896, and 18897 in Williams Township. As a Briar Chapel resident, I am deeply concerned about the potential negative impacts this mega church could have on our community and property values.

The proposed church's scale and design do not align with the rural character of our area, and the increased traffic congestion, especially on Sundays, could significantly impact our quality of life. Additionally, the potential for noise pollution, limited parking, and negative effects on property values are serious concerns. The traffic impact analysis suggests a significant increase in traffic, and the discrepancy between this projection and the previous development raises concerns about the accuracy of the planning.

Furthermore, the proposed church's non-profit status means it won't pay property taxes, raising questions about the net benefit to the county. The community has expressed strong opposition to the rezoning, and adjacent property owners have concerns about buffer zones and their impact. While I understand the importance of religious institutions, I believe that this particular proposal does not adequately address the needs of our community and could have detrimental consequences.

I urge you to carefully consider the potential negative impacts of this rezoning and to explore alternative solutions that would better serve the needs of our community without compromising its character and quality of life. Thank you for your attention to this important matter.

Dan,

I am writing to you to express my opposition to the proposed mega church planned for the 15-501 corridor near Briar Chapel.

The reality of how much increased traffic this would cause and the duress on residents, motorists and infrastructure is significant- all without tax dollars to counter this. To get a view on what this would look like one need not go further than travel past St Thomas More campus on any given day to see the log jam and congestion this causes anyone using this essential corridor.

I appreciate you considering all of the above in this important decision.

Diane Crompton
Chatham county and Briar Chapel resident

--
Diane Crompton
(M) 770-401-1663

How am I opposed to this? Let me count the ways.
1. Traffic impact.
2. Noise pollution.
3. Light pollution.
4. Quality of life.
5. Protection of wildlife.
6. Protection of environment.
7. Protection of watershed.
8. Loss of revenue due to tax status of church.

I see no benefit that could come from the building of a mega church and destruction of our peaceful lives. I can no longer drive at night so I will not be there in person. I ask you;  Please do not allow this desecration.

Thank you.
Judy Fitzgerald
718 Spindlewood
Pittsboro NC 27312
1 October 2024

Hello,

My husband and I are residents of Fearrington Village, and we are opposed to the proposed placement of the mega church. That part of the corridor already has serious car accidents on a regular basis. We are concerned about the amount of congestion along Northern 15-501 already, and a project of this size would have a very negative impact on traffic and safety.

Driving South on 15-501 between Fearrington and Pittsboro, there appears to be a large number of land sales planned on currently low density lots. Signs are everywhere.

Of course we accept and are supportive of planned development that contributes to enhancing life in Chatham County. We need to expand our tax base, and Chatham is attracting people with its natural beauty and rural feel. Looking at the future development already planned for our county, we feel that rezoning in order to allow a major traffic generating , non tax paying church, is a mistake.

Please vote no.

Thank you,
Stephanie Hair
John Divine


Hey Dan,

I live off of Jack Bennett Rd, and just recently learned of tonight's meeting at the Ag building regarding the rezoning request for the 88,000sqft church on 15/501 across from Briar Chapel. I am not able to attend tonight's meeting, but as someone who lives nearby, I wanted to share my thoughts.

As you probably know, the road infrastructure in northern Chatham County is already pretty taxed, especially by the growth in Pittsboro. Taking kids to school in the mornings around here is enough to illustrate our lack of stoplights at many intersections that probably need them, complete lack of bike lanes, or even serviceable shoulders, and speed limits that are often too high for the current character of the roads (55mph running past Westfall on Jack Bennett?).

I feel like the proposed scale of this church is completely out of step with the area of Chatham County. 3,000 cars trying to navigate the area every Sunday would be crazy to me. I will also admit that while I certainly harbor no ill will towards churchgoers, as the grandson of an Episcopal minister, this particular brand of "modern" Evangelical church, with its ostentatious flavor, certainly seems to capitalize on their tax exempt status.

In other words, a very large building that places very real strains on our infrastructure, which already needs growth, while not contributing a dime to the local tax base that funds such infrastructure. Throw in the political work Evangelical churches view as central to their mission, and we end up in a situation where the citizens of Chatham County are forced to carry the tax and infrastructure burden of what amounts to a political organization. No matter what the political persuasion, that wouldn't sit well with me.

I also want to say that in the past, I have found the decisions of the Planning Board and Board of Commissioners to be very fair, and in many ways deferential to the concerns of normal Chatham County folk like me, and not merely a rubber stamp for developers, which I greatly respect and appreciate. I grew up in Charlotte, and in Union and other surrounding

counties those boards were essentially co-opted by developers, and a lot of normal folk lost out due to rampant and poorly planned expansion.

Hope this gets through in time, and I'm sorry I'm unable to attend tonight. I look forward to following up on it.

Ben Maschal
Owner/Head Luthier
www.pre-warguitars.com

I oppose the rezoning for the construction of Summit Church on 15/501. I think this will negatively impact traffic, and cause bottlenecks and a possible slow down to emergency services. All this without any tax benefit to the people of the county.

Thank you for your consideration.

Scott Campbell
70 Woollyworm Drive
Pittsboro, NC, 27312

Dear Mr. Garrett,

I wish to briefly express my concerns about the rezoning proposal that would allow for the construction of the Summit Church on 15-501. My understanding of the size of the crowds that would be accommodated in this facility on weekdays as well as Sunday causes me concern about about the traffic impact on this section of 15/501, as it is the traffic already is heavy, especially at rush hour and school pickup/dropoff times. This increase in traffic could create bottlenecks all along the 15-501 corridor and not only adversely affect our every-day driving but cause difficulty in accessing emergency services to hospitals and slow down the ability of police and fire trucks to respond to calls.
Not only will 15-501 be affected by the proposed facility, but so will the smaller two lane roads that feed it. Jack Bennett Road already carries a very heavy load of traffic and is a two lane, curvy, hilly road (with no shoulders) that also hosts a large number of cyclists. A large

mixed-use development already is in the works for the corner of Jack Bennett Road (where I and my husband live) and 15-501. We haven't even seen the impact of that yet.

The proposed use of the property and the increased traffic also will have an impact on the County's infrastructure. Such a burden is likely to increase our taxes, as this church would have tax-exempt status and would not be contributing to the cost. Furthermore, there are no economic benefits to the area with no property, payroll and sales and use taxes being collected.

Thank you for hearing my concerns,

Susan Fowler

110 Wild Ginger Ridge

Chapel Hill NC 27517

Hello. As an 18 year resident of Pittsboro I have become increasingly concerned about traffic and accidents on 15+501.

I believe that a church this size where it is currently planned is a bad idea. It should be built somewhere further from main traffic roads. The church will produce enough of its own traffic. Please don't add it directly to our current main route.

Thank you. Karen Shectman

Hello David,

I wanted to voice my concerns and the concerns of my neighbors who I have spoken with about the traffic that the proposed mega church would generate on the already brisk traffic on 15/501.

I live at the Fearrington Village and I am older, the traffic for turning left, right and just navigating 15/501 is currently a concern, and I believe that cars coming and going from a church of the size that a mega church would bring will make future traffic more dangerous.

The information I have read says the church proposes 900 parking spaces and 1200 seat capacity, that is a concern to me.

I oppose this plan and I hope the county will also see that an endeavor this size is more than the proposed area and neighboring communities can safely integrate, and the county will oppose this plan.

Sincerely,

Sandy Spiegel

Dear Mr. Garrett,

Two more voices here in opposition to plans for a mega church on 15/501 in Chatham County. The church brings no economic advantages to our county, instead will command uses of our resources without any tax contributions. The traffic situation at the proposed intersection is already fraught and does not need the influx of a multitude of cars several times a week.  The impervious nature of the planned parking spaces seems not to be an environmentally strong suggestion. Please do not recommend approval of this proposal. Thank you for consideration.

Donna Mergliano



Dear Mr. Garrett,

I just learned of the proposal to re-zone an area off of 15-501 for the building of a megachurch. I am definitely opposed to this proposal . This proposal will definitely cause more traffic congestion on 15-501,which is getting worse with all the apartments and proposed home construction that are going on now and in the future along the 15-501 Chapel Hill-Pittsboro corridor. I do not know why this megachurch needs to be constructed along this corridor in Chatham County. I have had some experience with the congestion Megachurches have on traffic when I lived in San Diego, CA. A good example of what the traffic would be like closer to home is Sunday church services at St. Thomas More on 15-501 which probably has only a thousand cars. Just imagine having 2000 to 3000 cars trying to get in and out of the church on 15-501on Sunday and 3-4 hundred cars during the week!!!!  I believe it would pose a traffic nightmare which needs to be considered. Also, since this church is tax exempt, the cost of any public services this church encounters would be borne by the local taxpayers.

Sincerely,

Lester Kwock
Emeritus Professor of Radiology
Department of Radiology
University of North Carolina
School of Medicine
CB#7510
Chapel Hill, NC 27599-7510
E-mail: kwock@med.unc.edu



Dear Mr. Garrett,

By now, you have heard from many, many of our neighbors regarding our opposition to the approval of zoning changes for the land the Summit Church wishes to build on.

We will not bore you with a repetition of the valid reasons why we are opposed to this approval. From no tax benefit for our county to very probable traffic issues—you have heard it all.

We strongly lend support to all of our neighbors who have taken so much of their time to do the research so that the rest of us can make an informed decision. We hope that you will come to the same conclusion. This project should not be approved.

Thank you so much for YOUR time!
Bucky & Christine Cox
Residents of Briar Chapel

Dear Dan, I am seriously concerned about the addition of a church as large as this one proposed for a site in North Chatham. The driving situation on 15/501 is already dangerous. To add an edifice of this significance and size would make driving even more difficult and hazardous. Please consider the safety of those living in this area who use the highway daily. And oppose this building. Suzanne Burke

Hi Dan,

My name is Sally Bethune and I 100% support this project but not where it is currently being proposed.

I live off 15/501 and at certain times of the day it is really hard to get on to the highway now. I cannot imagine adding such a large project.

My son lives very close to St Thomas Moore and forget free passage before and after church and before and after school.

I support churches being built but this is too big for an already bustling highway.

Thank you,

Sally

Before approving this new church, the entire plan should be carefully vetted for impact on the neighborhood: traffic, sewage, pollution, safety, increase in taxes because of tax exempt status, and what benefit to the neighborhood is predicted. All in all, my wife, I, and many of our neighbors in the area see no benefit to our community.

In an election year, we strongly recommend that this plan be denied.

Sally & Fred Chesek


Dear Ms. Plummer and Mr. Garrett,

I am hopeful that Chatham County will not allow the redistricting of parcels 18750, 18896, and18897 from CD-CC Conditional District Compact Community to O&I Conditional District Office & Institutional for a church/place of worship (Summit Church).

I do not want a mega-church positioned on 15-501 in Chatham County. My reasons are:

This church will not increase our tax base; and in fact will be a burden to the tax-paying citizens in Chatham County. The purpose of allowing 15-501 to become commercialized was to increase our tax base; this simply allows more development with no revenue.

I drive on 15-501 almost daily; I do not welcome the increased traffic that this church will draw around church service hours. I understand that the traffic study for this church was conducted during COVID; at the least I would hope for a new one.

Only an estimated 15% of Summit Church members are residents of Chatham County, which is a small percentage of our population weighed against the tax revenue lost on such a valuable property.


Sincerely,

Anne Kachergis



Dear Mr. Garrett,

I am writing to express my strong opposition to the rezoning proposal for the construction of a mega church at 9780 US Highway 15-501. My wife and I regret that we are unable to attend the County Planning Board meeting tonight, but we feel it is important to speak out against this proposal.

We moved to the Highland community just over a year ago, looking to get away from the large concrete malls and mega churches of Durham. We were drawn here by the peaceful and secluded atmosphere that the area provides, which we thought would be the perfect place to raise our young twin boys. My wife is the medical director of the Dogwood Veterinary Hospital immediately beside the proposed site, and we have concerns about the significant negative impact this development would have on our small community.

While I fully support the freedom of religion and the right of all individuals to practice their faith, the scale of a mega church is incompatible with the character and needs of our close-knit community. The influx of attendees, along with the associated traffic and infrastructure demands, would disrupt the quiet, rural nature of our neighborhood. This development would likely strain local infrastructure and diminish the sense of peace that we—and many others—moved here to enjoy.

Additionally, Chatham County already has a rich diversity of church communities that serve local residents. In-between Chapel Hill and Fearrington there are no less than 17 churches. A mega church would not only draw attendees away from these smaller churches but could potentially lead to their decline, as resources and members shift toward the larger institution. The existence of

numerous churches in the area indicates that our religious needs are already being met without the need for such a massive development.

A mega church would disrupt the very essence of what makes our community special and would have long-term, negative consequences for the area's infrastructure, local businesses like my wife's clinic, and the small church communities that have thrived here for years.

I urge you and the board to consider the substantial negative impact this project will have on our community and to vote against the rezoning proposal.

Thank you for your time and consideration.

Sincerely,
Dennis Douthett
Highland Community Resident


**From:** Cathi James <cjames629@gmail.com>
**Sent:** Monday, September 30, 2024 5:23 PM
**To:** Jason Sullivan <jason.sullivan@chathamcountync.gov>; Daniel Garrett <dan.garrett@chathamcountync.gov>; Angela Plummer <angela.plummer@chathamcountync.gov>
**Cc:** mike peele <mpeele65@gmail.com>
**Subject:** Qunity Rezoning Application Parcels 18750, 18897, and 18896

<div style="border:2px solid red; background:yellow;">

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

</div>

Dear Mr. Sullivan, Mr. Garrett, and Ms. Plummer,

My husband and I have lived in Chatham County for decades.  He is a 48-year resident and I'm a 30-year resident.  We both prefer that the parcels 18750, 18897, and 18896 retain their current zoning of CD-CC, Conditional District Compact and not rezoned to CD-O&I, O&I Conditional District Office & Institutional as requested in the Qunity application.

Objective 4 in the Goals Section from the Chatham County Comprehensive Plan of 2017/2020 is what we wish to address. The objective states the need to "Diversify the tax base and generate more high-quality, in-county jobs to reduce dependence on residential property taxes, create economic opportunity and reduce out-commuting."  Approval of the Qunity request for rezoning does not support this objective.

The request to rezone to CD-O&I does not:
- Increase non-residential share of the tax base.
- Increase significantly in-county jobs.

- Increase the number of small businesses
- Provide work experience for Chatham County Schools.
- Decrease the out-commuting of residents.

The current zoning of CD-CC with its mixed commercial requirements will provide additional taxable revenue that will help diversity our tax base by creating businesses and providing jobs which may provide work experience for students and decrease out-commuting of residents. The tax base, as of the 2016 study, was made up of 84% of residential taxes. This is an unsustainable situation. Increase in the commercial and industrial tax bases are sorely needed to maintain infrastructure as Chatham County continues to grow.

Adhering to the Chatham County Comprehensive Plan of 2017/2020 and resulting zoning is important to reach the planned goal of diversifying the tax base, strengthening our businesses, or improving our workforce of Chatham County. For that reason, we request that you deny the application for rezoning.

Thank you for your consideration,
Cathi James and Michael Peele
563 Weathersfield
Fearrington Village

From: Judith Martin <wildflower28716@yahoo.com>
Sent: Monday, September 30, 2024 5:06 PM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: Summit church rezoning

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

I am confused. I zoomed the last meeting and could not understand most of the meeting and other times it completely cut out. Hope this next meeting will be better.
I never heard anyone say about big parcels adjacent to Briar Chapel Parkway!! Very upset. Plus I am now hearing about more parcels that are involved across 15/501.
I am adamantly against all of this.
Chatham County is a beautiful rural county with many lovely churches. We don't need a mega church complex on two sides of the highway . That is prime real estate and it would not generate revenue for the county . We desperately need good restaurants, medical facilities , shops and businesses that will actually service the community and create revenue for the tax base!

The placement of a mega church there would create a nightmare for the traffic situation.   I honestly would consider moving away if this is approved.  What a horrible idea!
Please vote NO!
Judith Martin
246 Salt Cedar lane
Chapel Hill NC 27516


**From:** Brad Holt <brad@ricesglasscompany.com>
**Sent:** Monday, September 30, 2024 1:18 PM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Summit Church

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Good Afternoon,

        I am a resident of Briar Chapel(2014) and I lived off Manns Chapel before that.  Briar Chapel has 5 different routes to get out of the neighborhood. I really don't think the proposed church across from Food Lion is going to hinder our Sunday morning commute.  I am really surprised at the resistance to the church.  I see way more benefits than negatives. I saw on one post that Chatham would lose 70 million in tax revenue. I am not sure what business you could put there and get 70 million per year in taxes(maybe cisco). This is America. Americans are supposed to have freedom to worship. I am perplexed with all the negativity surrounding this church. I feel they will be a benefit to our community. Let us not forget that Briar Chapel had to be approved by someone or we would not be here

Brad Holt



**Brad Holt**
Service Coordinator at Rice's Glass Company

**Phone** 919-967-9214 **Mobile** 919-291-5084
**Web** Rice's Glass Company
**Email** Brad@Ricesglasscompany.com

**DISCLAIMER: The low-e coating may exhibit a hue or a difference in coloration; as well as, a temporary pattern of ripples/ waves in the appearance.  These variances can change throughout the time of day, season and under different lighting.  This coloration is inherent to the coating process.**

**DISCLAIMER:** **If you are not an Open Account Holder with Rice's Glass Company All orders will require a 50% deposit and signed copy of the provided estimate returned to your sales representative to proceed with the work order. All deposit payments can be made via phone, mail or in person at the Carrboro office. Remaining balances are due upon completion of the proposed work (COD).**

Please reject this idea!
I live near 15-501 and I predict this proposal will result in mega traffic accidents and traffic jams! There are already enough traffic accidents as it is.
Sincerely,
Margay Whitlock
Fearrington Resident

Dan,

I want to express my concern about the proposed mega church on 15-501 in Chatham County. Due to its negative impact on the county's infrastructure and the associated increase in taxes that will be required to support it, I am AGAINST the proposal. Since the church is tax-exempt, it will not help to ameliorate the financial burden that it will place on our community. I do not see the benefit of adding this non-tax supporting mega church in our community. Maybe it would be better placed out in the rural country somewhere where it will not impact traffic and emergency services. We are already dealing with increased collisions in many areas of 15-501 due to the increased traffic, which have yet to be resolved / improved.

Sincerely,
Josh Cohen

I am very concerned about the proposal for the summit church. Why would the county give up property tax income? This is not a good business decision for the county or the people who live in the county. Isn't your job to do what is best for the county and the people who live here?

I also am very concerned about the traffic that will be happening in an area that already has many accidents. Will there be a changes to the traffic lights or u-turns. If this is to happen who pays for this?

I believe this is a poor decision on the part of the county to allow this to go ahead.

Lynn Caparelli
11 Heatherwood dr
Chapel hill, NC

Dear Mr Garrett:

I am strongly against the building of the proposed Summit mega-church along 15/501 across from the Veranda. It will do little to add to the tax base, it will provide few jobs for Chatham residents, it will not increase the amount of needed housing, it will not help maintain the rural nature of the area, it will destroy much needed habitat for animals that are already starving in this area. Please VOTE AGAINST approval of this church at this location.

Aside from environmental impact, my main concerns are:
• **Traffic** – will increase greatly, not just after services are over on Sundays. This church has constant small group meetings, day care, after school activities, etc. Traffic increase will NOT be just on Sundays. What will be done to ensure that thru-traffic safety/speed is maintained? Who will pay for this? • **Cost of wear and tear on infrastructure** caused by increased traffic – who will pay for wear and tear to roads since this church will not pay taxes • **Sewage** – what are plans for treatment? Remember that similar sewage plans have resulted in many spills in Briar Chapel • **Cost of fire protection, sheriffs, etc.** – since this church will not local pay taxes, who will pay for these services?

**Again, I am strongly against the building of this church at this location. It will do little to add to the tax base, it will provide few jobs for Chatham residents, it will not increase the amount of needed housing, it will not help maintain the rural nature of the area, it will destroy much needed habitat for animals that are already starving in this area. Please VOTE AGAINST approval of this church at this location.**
**Sincerely,**
**Jeanne Hillson**
**404 Brampton Close**
**Piitsboro, NC 27312**
**jeanne.hillson@gmail.com**
**919-932-7234**

From:   James Coplan
        4328 Fearrington Post
        Pittsboro, NC  27312
To:     Chatham County Planning Board
Re:     Summit Church Conditional District Rezoning
Date:   September 30, 2024

Please register my objection to the proposal before the planning board for Summit Church Conditional District Rezoning. As a resident of Chatham County, I am concerned about the traffic on 15-501 and loss of tax revenue that this project would entail (including a decline in residential property values within Briar Chapel, Herndon Woods, Fearrington, and surrounding communities). There is scant offset to these downsides, because as the data show, *this project is not primarily for the benefit Chatham County residents*.

Summit maintains a "transient" campus at East Chapel Hill High School (**Map**). The applicant's "[Clarifications letter](#)" of September 19, 2014, states (page 3)

> *"The Chapel Hill Campus is planned to relocate to this permanent facility* [i.e., the proposed campus on 15/501]. *Currently there are approximately 800 parishioners that attend the Chapel Hill Campus transient location at East Chapel Hill High School. Of these parishioners, approximately 15% are Chatham County residents."*

In other words, **by the applicant's own declaration, *85% of the initial nucleus of 800 parishioners will not be Chatham County residents***. (Most, presumably, will be residents of Orange County.)



**Map.** *Left*: Summit church plans to decommission its "transient" campus at East Chapel Hill HS and transition those parishioners to the proposed Chatham campus. Summit maintains another "transient" campus at Green Level HS in West Cary. Some of these parishioners would transition on their own to the Chatham campus. Exactly how many, and Summit's long-term plan for this campus, are unknown at this time. *Right*: Per NC DOT ("[Total Crash Frequency by Intersection](#)"), the intersection of Mann's Chapel Road and 15-501 is already the third-most hazardous intersection in the county, in terms of accidents per year, and will predictably become even more hazardous if this project goes through. Even under the best of circumstances, overflow traffic will seek alternative routes, right through the heart of Briar Chapel. The intersection of BC Parkway/Vickers Road and 15-501 will become a nightmare.

Summit's ultimate goal is [2,400 parishioners](#). Where will the additional 1,600 parishioners come from, and how will this affect the numerical imbalance between Chatham and non-Chatham residents? I envision three scenarios:

1. The initial imbalance ***persists* or *grows*** due to the relative population size of Orange County ([148,696 as of the 2020 census](#)) vs. Chatham County ([76,285 as of 2020](#)).

2. The initial imbalance is ***ameliorated by a recruitment campaign within Chatham County***. This would devastate Chatham County's established, rural churches, which would have to collectively lose approximately ***1000 members*** in order for Summit to achieve parity between Chatham and non-Chatham members.

3. Chatham County experiences the ***worst of both worlds***: The composition of Summit remains dominated by out-of-county residents, ***and*** our existing rural churches suffer a decline in membership, but numerically too small to appreciably move the needle at Summit in terms of congregational composition.

(In my opinion this is the most likely outcome, but all three are losing propositions insofar as Chatham County is concerned.)

### *Where do the residents of Chatham County stand on this proposal?*

I have reviewed all of the posts to the "Public Comments" section of the Chatham County web through end of business 9/30/24. I have counted each household as one vote, whether posted by a single individual, or spouses/partners posting jointly or separately. A few individuals posted more than once. I have counted them only once.

As of 9/30/24, 122 households have commented: 31 (25%) are in favor, and 91 (75%) are opposed to the application.

- Of the 31 in favor, 28 identify themselves as members (27) or parents of a member (1); three made no statement one way or the other about an affiliation with Summit.

- Of the 91 opposed, 35 are from Briar Chapel, 20 from Fearrington Village and the remainder come from throughout the county. None are Summit members.



## PUBLIC COMMENTS as of 9/30/24
https://www.chathamcountync.gov/home/showpublisheddocument/70037

**In Favor: 31 (25%)**
Summit Member 28
Membership unstated 3
Opposed, BC: 35
Opposed, Other: 36
Opposed, FV: 20
**Opposed 91 (75%)**

| In Favor | 31 (25%) | Summit member: | 28 |
|---|---|---|---|
| | | Unstated: | 3 |
| Opposed | 91 (75%) | Summit member: | 0 |
| Total | 122 (100%) | | |

*By household; excludes duplicates*
*"Member" includes one parent of a member*

J. Coplan
rev 240930

---

**Selected comments**

**In Favor:**
- We have been Summit church members since 2015... We pray this is a go!

- We would be thrilled to attend a campus that was closer to our home, rather than traveling over 20 minutes to the nearest location.

**Opposed:**
- We are also people of faith and regularly attend worship [but] ministries this size are a form of "Big Business."

- It will be detrimental to our quality of life, deprive the county of much needed taxes, and serve thousands of people who don't even live here.

- Traffic would be equivalent to having a sports facility in the middle of a residential area.

- Approval of this request will create a predictable traffic hazard that will lead to serious injuries or even deaths.

- A few years ago, I had a medical emergency that required an ambulance, and every minute counted. The EMTs were able to get me to the hospital in time, and if they had not, I might not be here today.

- The residents of...Briar Chapel and Fearrington Village need to pass through this area to access grocery stores, medical services, shopping, and downtown Chapel Hill. There is no alternative route. A large facility such as this could back up traffic for miles and it won't just be on Sunday. As a retired Realtor, I can assure you that isolating these two communities will cause a drop in property values. If this becomes a reality, I personally will sell & move.

The Planning Board has sought to discount these responses, stating (Agenda Notes of 9/3/24 , p2) "A majority of the emails are from residents that are not adjacent to or adjoining the site but from Fearrington Village, Governor's Club, Briar Chapel and other areas." At the same time, however, the rationale put forward by the Planning Board for approving the application (Agenda Notes, p4) is "The church will provide a specific service to the community and surrounding areas, *especially in areas that are becoming very populated with residential development.*" [emphasis added]. But *the Planning Board cannot have it both ways*: discounting emails from residents of Fearrington Village, Governor's Club, Briar Chapel etc. on one hand, *while invoking these same areas as justification for approving the project* on the other. (If proximity matters, the majority of those speaking in favor of the application live much further away than those speaking against it.) In truth, the fact that the respondents do not physically abut the proposed project is irrelevant. 15/501 is a major artery; anything that affects traffic on 15/501 is a concern to all residents of Chatham County – as the comments above make clear.

Just as the Planning Board cannot have it both ways on the merits of the public comments based on physical proximity to the proposed project, neither can the Planning Board have it both ways on the religious nature of the application, giving the applicant an implicit "pass" on many problematic aspects of the application simply because it is a religious institution, while turning a blind eye to the fact that the fact that the only people speaking on its behalf are its own parishioners. The applicant acknowledges that only a slim minority of parishioners ("approximately 15%") will be Chatham residents, and this disparity is likely to grow over time, *even as the applicant saps our local rural churches of members*.

Despite its claim that it would be an asset to the entire community, in reality this entity would primarily benefit its own members. If this project were to be approved, Chatham County would in effect be "colonized" – relinquishing irreplaceable environmental and material assets (rural quality of life, tax base, property values) while assuming significant burdens (traffic) - primarily for the benefit of its own members, most of whom would be residents of adjoining counties, not Chatham.

Surely we do better. Other suitors for this highly desirable property will not be hard to find.

Thank you for your time and attention.
James Coplan

The traffic problems that may be created by the erection of this mega church are of concern to me. How do these plans address this issue? I reside in Fearrington Village.

Sincerely,
Dublin Popov
Fearrington Village


Good Evening Mr. Garret, Sir,

I strongly oppose a recent rezoning request by Qunity, PA to rezone Parcels 18750, 18896, 18897 from CD-CC Conditional District Compact Community to CD-O&I Conditional District Office & Institutional for a church/place of worship, being a total of 50.117 acres, located at 9780 US 15-501 N, Williams Township.

I object to any tax-exempt organization building a project as large as this one without taking any fiscal responsibility for the impact it would have on Chatham County's infrastructure and tax base.

This proposal **offers absolutely no economic benefits** to Chatham County, while burdening the area with increased traffic, and likely, an increased burden on tax payers.

Please represent us well and make sure any new construction in our area is a net gain for the county and not a net loss, such as this project.

Sincerely,
Lani Chaves
167 Wintersage
Pittsboro, NC 27312
919-414-6003


Hello,

As a resident of Chatham County I wanted to voice my concern for the proposal for a mega church off of 15-501. Chatham County has allowed too many major construction projects that are drastically changing the environmental landscape. We do not need more concrete infrastructure. My family moved to Chatham County to get away from traffic. 15-501 is not equipped to handle an influx of cars.

Please consider the residents who will be negatively impacted by this project.

Aviva Tulasi

With regards to the above.

We strongly advise NO!

People moved to this neighborhood to raise families, because of job opportunities, and positive growth on all levels.

This is not positive growth. This will cause major havoc and demand more of our roads which will eventually have to be updated to withstand the traffic issues that come with such a large, scaled project such as this.

We need growth that will affect our communities in a positive way. This will be a nightmare. Traffic congestion from morning till night. There are many families abutting up to this project where they want to build. It will affect people who have lived here for years and people who have come here to have a better life for their kids and themselves. My husband & I moved here to Briar Chapel to be near our son & daughter in law and 3 grandchildren. There are many like us. We don't need something like this. We are here 8 years, and traffic has exploded already with this project.

Also, we see tons of money this will cost Chatham County and us the residents. Who will pay for the new roads, traffic studies & traffic adjustments with lights, signs, etc. This is a church. Are they paying taxes???

I am familiar with this type of Ministry. There is constantly things going on. It is just not in the right location. We need more of the same development we have going on now. This will be a great upset both in quality of life for us and also in our and Chatham County's pockets.

We say NO! No rezoning and no allowing this happen to us.

Thank you for reading this email.
Robert & Lillian Tramantano
78 Juneberry Dr
Chapel Hill, NC   27516
516-678-6648

Dear Dan,

Please do not approve the rezoning.
That is a lot of extra cars added to an already busy area. We already have too many extra stop lights added.

Thank you!
Pam Malek

Mr. Garrett,

I am writing to oppose rezoning for the purpose of permitting the construction of an 88,416 square foot building with a 1200 seat auditorium as well as a "future" building on 50 acres of land. At a minimum, the church has projected 3,000 trips on Sunday and between 600-700 trips on weekdays. Additions to and expansion of number and scope of activities, services, and uses on the property will dramatically increase the trips and after the rezoning the County will have no control over this. The impact of this traffic will cause bottlenecks along the entire 15-501 corridor, increase the already high number of accidents and create problems not only with our ability to use the roads, but for emergency vehicles. Our taxes will increase since the church has tax exempt status and will not generate other revenue sources while creating a burden and increasing costs to our infrastructure. For all of these reasons our property values will most likely decrease.

I oppose rezoning so the church can be built.

Thank you,

Elizabeth T. Chang
49 Salt Cedar Lane
Chapel Hill, NC 27516

Dear Neighbors/Planning Board members/Commissioner:

I recently retired after 18 years with the North Carolina Biotechnology Center, one of the nation's most successful life science economic development organizations. Now in its 40th year, NCBiotech has fostered the development of the life sciences statewide. This includes the 38 firms currently providing jobs and tax revenue to Chatham County, from production facilities such as the medical device company Gilero in downtown Pittsboro to human health and agricultural consulting and support companies. You can find them in the NCBiotech Company Directory, at NCBiotech.org.

Please understand, however, that I'm not acting here as a representative of NCBiotech. I'm representing myself, my family, and my neighbors, as a 35-year resident of the Triangle, the latter portion of which I've enjoyed as a Chatham County renter, homeowner and taxpayer. Based on my professional experience I am concerned that some of Chatham County's most important and valuable real estate may be squandered with a single bad decision.

I draw your attention to this comprehensive fiscal impact study done for the Town of Davidson in Mecklenburg County four years ago, which shows that institutional land use is

the only type that results in a net fiscal deficit. It's made especially clear in the graphs on Pages 46 and 51 (PDF scans attached below). The same conditions apply here, and Chatham County has clearly documented its own guidance for its fiscal impact analysis. The Plan Chatham document recognizes "Comparable City" methodology as "helpful when there is no precedent in the local community for the proposed type of project."

Upending current zoning on the Summit property to accommodate this unfair and unnecessary push for developing this prime location would be a bad idea. Chatham County has more-appropriate alternative sites. This rezoning would be an improper giveaway of a precious taxing opportunity, in perpetuity, to a nonprofit with no mandate or promise to return the favor with greater or even equal value to those of us who would be forced to foot the bill and make it possible. That's me, my family and neighbors who, I hope, include you. This proposed rezoning would undermine and in numerous ways devalue all of us -- every taxpayer in Chatham County.

I implore those of you in our beloved Chatham County to whom we've entrusted these kinds of decisions -- our planners and commissioners -- to recognize the unique value of every beautiful, taxable, developable acre of land along 15/501 connecting Chapel Hill and Pittsboro.

The possibilities are greatest in this corridor for maximizing tax revenues and for parlaying our best quality-of-life benefits including employment, housing, retail and more – and not a rezoning for this Summit development that would be much more appropriate elsewhere in Chatham County, such as the fast-growing area along Route 64 or the northeast corner adjacent to Research Triangle Park.

 And let's please not lose sight of the fact that our best-practice planning also requires that we embrace and retain some of the natural beauty of this stretch of 15/501 roadway, perhaps applying some of the tax revenue from its high-value development to buy, maintain and display county-owned rural buffer areas in this driveway between our front doors.

Thank you for your time and consideration.

James (Jim) Shamp
1391 Bradford Place
1391 Fearrington Post
Pittsboro, NC 27312

**Figure 52. Institutional Land Uses: Fiscal Impact Analysis Results per Acre**



**Figure 49. Institutional Land Uses: Fiscal Impact Analysis Results Aggregated by Prototype Area Percent Surplus or Deficit**



Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 590 of 743

Hi,

I live in Chatham County at 1102 Highland Trail and am opposed to the rezoning for the mega church on 15 -501.

My friend in Durham has one near her home and the noise pollution from it is really bad- so much so that their neighborhood is involved in a lawsuit with the church about it.

I can't imagine that would go over very well near Fearrington where they have weddings, etc., sometimes, not to mention just disturbing the peace and quiet for the neighborhoods around it.

I am also concerned about the traffic/ congestion/ infrastructure burden of this, but mostly concerned about the noise.

I go to church but am not in favor of this huge church in this location.

Thanks for listening,
Lena Caison
919-636-1595

## Statement of Opposition to Rezoning Application by Quinty, PA

I am writing to formally oppose the rezoning application submitted by Quinty, PA to Chatham County. The request seeks to rezone three parcels currently designated as CD-CC Conditional District Compact Community to CD-O&I Conditional District Office and Institutional for the construction of a church/place of worship. These parcels include:

- Parcel 18909, located across 15-501, north of Vickers Road.
- Parcels 2752 and 93852, adjacent to Briar Chapel, north of Briar Chapel Parkway.

To view the exact location of these parcels, please refer to the Chatham County Tax & Land Information website.

The applicant, Summit Church, is proposing a large-scale complex that includes a sanctuary capable of accommodating up to 1,200 people, along with parking facilities for approximately 600 vehicles.

**Key Concerns:**

1. **Traffic Impact:**
   The addition of a facility of this scale will significantly increase traffic in the surrounding area, particularly along 15-501 and Briar Chapel Parkway. With a sanctuary capacity of 1,200 attendees and parking for 600 vehicles, the influx of traffic during events, services, and gatherings will likely cause congestion and safety concerns for residents and commuters. These roads are already heavily used, and the increased volume may lead to delays, increased accidents, and potential road deterioration.

2. **Environmental Concerns:**
   The rezoning and subsequent development will inevitably disrupt the local environment. Briar Chapel and the surrounding areas are known for their green spaces, and additional construction risks degrading natural habitats, increasing stormwater runoff, and contributing to potential flooding or erosion issues. The environmental impact of paving over significant portions of land for a 600-space parking lot and large building footprint should not be underestimated.

3. **Community Character and Compatibility:**
   Rezoning these parcels for a large-scale institutional use is inconsistent with the character of the Briar Chapel community, which is largely residential and focused on fostering a close-knit neighborhood atmosphere. The development of a large church complex does not align with the current land use and will likely disrupt the peace and character of the surrounding areas. The noise, traffic, and increased activity will degrade the quality of life for residents nearby.

4. **Infrastructure Strain and Potential Tax Increases:**
   A facility of this size will place additional strain on local infrastructure, including water, sewage, and emergency services. This increased demand could lead to increased maintenance costs, which may result in higher property taxes for residents to fund the required infrastructure improvements. Local taxpayers should not be burdened with the financial responsibility of supporting the infrastructure needs of a large institutional complex, especially one that does not directly serve the broader community.

5. **Concerns Regarding Applicant's Anti-LGBTQ+ Views:**
   Summit Church, the applicant for this rezoning, has publicly known views that oppose LGBTQ+ rights and inclusion. Approving the construction of a large-scale institution led by an organization with these discriminatory views sends a message of exclusion and intolerance. Chatham County prides itself on being a welcoming, inclusive community, and the establishment of a church that promotes exclusionary values would be harmful to the social fabric of the area. This rezoning would essentially endorse the church's presence and potentially marginalize LGBTQ+ residents who should feel safe and respected in their own community.

6. **Overdevelopment and Long-Term Precedents:**
   There are concerns that rezoning for a large-scale development like this sets a precedent for further overdevelopment in the area. The Chatham County community should carefully consider whether there are alternative locations that are better suited to

accommodate such a project without detracting from the residential nature and environmental sensitivity of the area.

Given these concerns, I strongly urge Chatham County officials to deny this rezoning application. The increased traffic congestion, environmental degradation, community disruption, potential tax hikes, and support for an organization with anti-LGBTQ+ views all pose significant risks to the area's residents and their quality of life. This development is not in the best interests of the community.

Thank you.
Sincerely-
Shana E. Perry
Briar Chapel Resident

Dear Mr. Sullivan, Mr. Garrett, and Ms. Plummer,

My husband and I have lived in Chatham County for decades. He is a 48-year resident and I'm a 30-year resident. We both prefer that the parcels 18750, 18897, and 18896 retain their current zoning of CD-CC, Conditional District Compact and not rezoned to CD-O&I, O&I Conditional District Office & Institutional as requested in the Qunity application.

Objective 4 in the Goals Section from the Chatham County Comprehensive Plan of 2017/2020 is what we wish to address. The objective states the need to "Diversify the tax base and generate more high-quality, in-county jobs to reduce dependence on residential property taxes, create economic opportunity and reduce out-commuting." Approval of the Qunity request for rezoning does not support this objective.

The request to rezone to CD-O&I does not:
- Increase non-residential share of the tax base.
- Increase significantly in-county jobs.
- Increase the number of small businesses
- Provide work experience for Chatham County Schools.
- Decrease the out-commuting of residents.

The current zoning of CD-CC with its mixed commercial requirements will provide additional taxable revenue that will help diversify our tax base by creating businesses and providing jobs which may provide work experience for students and decrease out-commuting of residents. The tax base, as of the 2016 study, was made up of 84% of

residential taxes. This is an unsustainable situation. Increase in the commercial and industrial tax bases are sorely needed to maintain infrastructure as Chatham County continues to grow.

Adhering to the Chatham County Comprehensive Plan of 2017/2020 and resulting zoning is important to reach the planned goal of diversifying the tax base, strengthening our businesses, or improving our workforce of Chatham County. For that reason, we request that you deny the application for rezoning.

Thank you for your consideration,
Cathi James and Michael Peele
563 Weathersfield
Fearrington Village

Dear Dan,

This church is a TERRIBLE idea for many reasons! Please know no one but this church is interested in having them develop a Mega anything. It will ruin the entire area by creating congestion and traffic problems for the entire populace. I am a new home owner and do not approve of this proposed project at all. Save Pittsboro from this unneeded disaster of a development. Especially on 15/501 where every person will be greatly put out by this.

Barbara Jurasik

Please add our voices to the opposition of the Mega Church being planned on 15/501. This is not an appropriate location for such a huge facility that will not add to the tax base and will only increase congestion in the area, among numerous other negative impacts.

Donald & Pamela Bonin
Fearrington Village

We cannot afford to have this built at the proposed location period.
Infrastructure does not exist to support it and likely cannot be added even if there were the money and the manpower to do so.

Please let the record show - no one in the community wants this, and we request to be heard.

Thank you.


VIII. ZONING: 1. A legislative request by Qunity, PA to rezone Parcels 18750, 18896, 18897 from CD-CC Conditional District Compact Community to CD-O&I Conditional District Office & Institutional for a church/place of worship, being a total of 50.117 acres, located at 9780 US 15-501 N, Williams Township


As someone who lives right off of 15/501 and has been rerouted several times in the last month because of road closures due to accidents, I am very concerned about the additional traffic and thus potential for more accidents this rezoning request would create. I urge the planning board to reject this request.

Pamela Nicholson
3000 Galloway Ridge A305
Pittsboro, NC 27312



September 29, 2024

To: The Chatham County Planning Board
Re: proposal to rezone three parcels along 15/501
From: Esther Thyssen

As a resident who must access 15/501 to go anywhere out of Fearrington Village, I write to object to the rezoning of parcels #18750 #18897 and #18896, as described in the Qunity application. This application is in conflict with the Chatham County Comprehensive Plan of 2017 updated in 2020, on many fronts. I wish to address the impact on the environment and visual character of the 15/501 corridor as defined in the Plan Chatham- 15/501 Corridor Study, which is part of the Comprehensive Plan.
Preserving the rural and natural character of Chatham County is a primary goal laid out in the Comprehensive Plan. The current rezoning application on behalf of Summit Church, for the non-commercial development of 3 large parcels along the east side of the 15/501 corridor should be rejected. On these parcels, the Qunity plan intends to reconfigure the environment, remove significant concentrations of trees, tear up and rearrange the topography, and significantly alter the viewsheds along 15/501.
The plan submitted by Qunity would erase densely forested areas exactly on those

parts of the parcels that are the most wooded. (See the Summit Church – Chatham Campus pdf dated Sept 19, 2024, especially pages 3 and 4 and figures 1 and 2 below). The Qunity plan locates the underground septic area and the excavated basin for storm water control exactly where most of the trees are currently growing on parcel #18750. In addition the plan locates a new "open field" on parcels #18897 and #18896 where the tree cover is dense, and not in areas where the tree cover is scant.

The variance application should be denied because the plan locates the "children's play area" and "sport court" adjacent to the high voltage power lines which may present radiation danger. Furthermore, high voltage power lines present other hazards for children playing in the area, for example climbing the scaffolding or throwing things into the wires, and would create a new health hazard in Chatham County.

The application should be rejected because it locates substantial parking surfaces under the Duke Energy power lines where the planting of screening trees is not allowed. Thus the parking areas and lighting structures on Duke Energy's right of way on parcel #18750 would be fully illuminated and distracting traffic on 15/501 when traveling in either direction, both south and north.

The application for rezoning should be denied because the plan disregards the objective to maintain the natural character of the environment including wildlife habitats, which are not only important in the Chatham Comprehensive Plan but are also included as objectives of the Summit Church. Despite that, the addendum filed on September 19, 2024 by Qunity invokes recently built commercial sites along 15/501 that kept the narrowest strips of natural tree lines close to the 15/501 corridor when bulldozing adjacent forests behind them. These locations include *501 Landing* and *Chatham Professional Park* at 10441 15/501.

Qunity cites these and other badly executed viewsheds along 15/501 as the chief precedents for allowing the proposed destruction of remaining forested land along the 15/501 corridor. However, allowing further removal of large sections of the natural tree cover, and the destruction of natural view sheds, to the extent and in the configuration proposed by Qunity, would create further precedent, for the continued maiming of treed viewsheds along the 15/501 corridor.

Therefore I urge the Planning Board to reject the rezoning application for parcels #18750 #18897 and #18896 in conjunction with the application for locating the Summit Church - Chatham Campus along 15/501. The Qunity plans, and the commercial developments used for justifying the rezoning application are contrary to the desired character of the 15/501 corridor and require that the current application for rezoning be rejected.

Figure 1_Summit Church Chatham Campus detail of pdf. p.3. Edited with green color to show extent of tree cover to be removed



Figure 2_Summit Church Chatham Campus detail of pdf. p.4. Edited to show
remaining trees along 15/501 viewshed



Respectfully submitted,
Esther Thyssen, 273 Quail Run, Pittsboro, NC 27312


I'm sure you've done studies on the number of accidents that have been occurring at the intersection of 15/501 and Briar Chapel Parkway.   We don't need to add to that danger.  A development of the size and type which is in the offing across the road would certainly add to it.

In addition, our infrastructure is too fragile to support a development of that type.  The sewers alone will not be able to handle it.   A proper tax-paying development might be excused but this "MEGA-CHURCH" will not pay its way.

We moved to Briarchapel because it was a safe, quiet, residential development which would afford us many years of worry-free living.  With this development our property values will tank.

And was there a draft environmental impact study done and made available to the public?
Please don't let this happen.  A beautiful community is in danger of becoming a ghost town and we certainly can't afford to support a development of that type & size.

Thank you.
Leslie Stewart
414 Dark Forest Drive
Chapel Hill 27516


From: Deb Plewacki <debplewacki@gmail.com>
Sent: Monday, September 30, 2024 10:52 AM

To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: Mega church rezoning

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

I am very strongly opposed to allowing this entity to build next to the Briar Chapel neighborhood. We already have traffic issues and accidents, waste treatment issues, and they will not pay taxes to help support roads, schools, etc. Chatham needs to deny the rezoning for the present time and perhaps we can get a tax paying business that we can ALL enjoy in the future.
Thank you for your consideration,
Debra Plewacki
Sent from my iPhone

## ATTN:  County Planning Board

Dear Mr. Garrett and The County Planning Board:

I am writing to you to express my deepest concern over the potential for rezoning of a large section of land across from our main entrance (15-501) to the Briar Chapel Community.

First, I am not against religion and growing churches, but I am against taking such an important piece of land for rezoning and which is situated on our main highway toward Chapel Hill proper and
large parts of Durham, to build such a large entity on it (with the potential to grow even larger on 50+ acres).  This entity will not produce any meaningful level of county tax revenue for Chatham (if any really), not to mention the burden on our current infrastructure, increased real estate taxes for current residents, to support it as it builds and grows -- and the potential for impacting emergency services which may be needed at any time in our community.  And equally important, the level of traffic will be horrendous for our community, as I have witnessed the impact of a megachurch such as this while living in Northern Virginia, and it was no fun, as it reached the level of beastly when the church grew even larger than had been forecast originally.  Not only did it grind traffic to a halt many and at unpredictable times, it took numerous of the county's policemen to control the traffic in the area, just for the church to hold its many weekly events and services on any given number of days.

Our North East Chatham County corridor is plagued with lower levels of much more needed county/community infrastructure, with a known host of individual community sewer and wastewater systems that need to be consolidated into one central processing system before more communities or large entities are added to the corridor, more than it needs a church of this size impacting us all in many additional negative ways.

Please do not approve the rezone application for this particular land parcel and instead ask the church to consider another area to build.

Sincerely,

Dennis R. Will and Richard E. Johns
99 Post Oak Rd
Chapel Hill, NC 27516

Dear sirs/madam,

We live in Briar Chapel off Hwy 15/501 located in Chatham county. I'm learning that there is a proposal for another mega church to be built in our neighborhood. Why? There's plenty of churches in our area and we are not in need of another one. The amount of traffic this will bring to our lovely neighborhood, the additional accidents that will occur off 15/501, and the fact that this church will not have to pay taxes burdens the current residents to have to pay for their use of this property! This is not fair, and I...and others in this area, vehemently oppose this proposed building of another church in this area.

If this proposal goes through, many of us will likely consider leaving Chatham county to live in areas where our local government considers and listens to our needs.

With Respect,
Brenda Scott-Fong

September 27, 2024
Ms. Angela Plummer & Mr. Dan Garrett
Subject: Proposed Rezoning for Summit Church
As a resident of Chatham County for over 15 years, I am very concerned about the proposed rezoning of parcels 18750, 18896, 18897 from CD-CC Conditional District Compact Community to O&I Conditional District Office & Institutional for a church/place of worship (Summit Church).
I have read most of the statements submitted regarding this issue. After reviewing the Chatham County Comprehensive plan (Plan Chatham - updated 2020), I believe the

rezoning for Summit Church is in conflict with the plan's goals, and the rezoning request should be denied.

On a personal note, I live south of the proposed site for Summit Church off Mt. Gilead Church Rd. US Hwy 15/501 is our main access to Chapel Hill and UNC hospital. A few years ago, I had a medical emergency that required an ambulance, and every minute counted. The EMTs were able to get me to the hospital in time, and if they had not, I might not be here today. Therefore, increased traffic on 15/501 is of utmost concern for me, my husband, and other Chatham County residents. Respectfully, the Summit Church proposed plan seems to be underestimating the traffic that will be generated over time.

**(1) Summit Mega Church differs from smaller, rural, and township churches, referenced in the Comprehensive Plan.**

Referencing "Chatham County Planning Board Agenda Notes" dated 9/3/24, under Discussion & Analysis, Summit Church applicants suggest that the since churches remain central gathering places, this property (because it is a church) supports the rural fabric of Chatham County. This is disingenuous.

Please see the following quotes from the **Comprehensive Plan**, page 18:

*"In Chatham County, rural character is manifested in a backdrop of forests and fields, dotted with natural features such as creeks and hills and structures such as barns, silos, churches,…" "…Churches, however remain central gathering places in towns and rural townships in the County"*

These quotes evoke picturesque scenes of churches dotting a rural landscape, or towns, they do not evoke visons of a mega 88,000 sq. ft. church, with 3000 attendees. Churches that are "fabrics of communities", are hard won over time, a mega church that supplants itself along 15/501 is not.

As others have noted, there are 12 Summit Churches in the triangle area, if this mega church does not become a reality, the parishioners can easily commute to other locations, including Chapel Hill and Apex.

Additionally, this proposed church may draw parishioners away from the very churches the Comprehensive Plan views as important gathering places in Chatham County.

Therefore, Summit Church is the opposite of what the Comprehensive Plan envisioned regarding churches in Chatham County's rural landscape, and this rezoning request should be denied.

**(2) Chatham County's tax base is almost exclusively from residential properties, and one of the goals of the Comprehensive Plan is to change this tax base to be more diverse, taking the burden off the less lucrative tax income from residential properties.**

The quote below is from the **"Goals"** section, page 40, of the Comprehensive Plan.

*"4. Diversify the tax base and generate more quality, in-county jobs to reduce dependence on residential property taxes, create economic opportunity and reduce out-commuting."*

This huge church with its arena style auditorium will not generate any tax revenue for Chatham County, and is in conflict with the goals as specified in the Comprehensive Plan, to generate a tax

base other than residential. See the graph below, at the time of this study (2016) the residential tax base was 84%.



*"Chatham County's total tax base, by dollar value, is approximately 84% residential, 8% agricultural and forestry land; and 8% commercial or industrial (Chatham Co. Tax Office 2016). By comparison, adjacent counties Lee, Durham, and Wake have commercial and industrial segments of the tax base in the range of 20% to 40%. The relatively low level of non-residential tax base means that the County is more reliant on residential property owners to raise revenue for needed county services. **For example, if the County decides to spend more on teachers, or law enforcement, or to expand services by providing a new fire station or school, the burden of funding those improvements in Chatham will largely fall on residents rather than the business community."**

In closing, approval of the O&I zoning for this particular church will set precedent, possibly setting a cycle of other mega churches in Chatham County's future, which could further negatively impact our residential tax base burden.

Thank you for your consideration.

Best Regards,
Robin Lyons
96 Hamamelis Lane
Pittsboro, NC, 27312

This group doesn't pay taxes, yet yields ALL the rewards from those of us that do.

Love hiking those trails, not gonna love all that traffic from a building the size of a giant grocery store

PLEASE BLOCK THIS
Grant Leonard
919-949-4002

**From:** Grant Leonard <grant.leonard@gmail.com>
**Sent:** Monday, September 30, 2024 9:38 AM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Re: No mega church on 15-501

Thanks!

Can I add I would be in favor of anything there that is more community friendly and does not discriminate? 100% in favor of anything that isn't a divisive religious organization? Especially one that contributes taxes

All the best
Grant Leonard
919-949-4002

**From:** Michelle Edwards <michellesedwards@gmail.com>
**Sent:** Monday, September 30, 2024 6:47 AM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Summit Campus Chapel Hill

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Good morning, Angela!

I just wanted to write a short note of encouragement about the possible land purchase of Summit Church in Chapel Hill. We live nearby and have attended the Summit Church for 15 years and have only the most positive things to say about the impact that our church is having in the communities it has been part of. We are so excited to meet the needs of people nearby us here in Chapel Hill. Please know that we can't wait to be in the Briar Chapel Area to love the people of our community.

My best,
Michelle

"...our refusal to give grace to others reveals how much we still need grace ourselves."
--Paul David Tripp


**From:** Georgia Ayers <georgiaayers04@gmail.com>
**Sent:** Sunday, September 29, 2024 3:29 PM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Summit Church in Chatham County

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi, my name is Georgia Ayers and I have lived in Chatham County my entire life. I now attend UNC Chapel Hill and the Summit Chapel Hill Campus. I am writing to talk about my experience with Summit and my complete support of building the new Summit Campus in Chatham County.

As a new college student, I was scared to be thrown into a new community where I knew absolutely no one. I didn't know how I would make friends or belong in this new place. I didn't know that the Summit community would welcome me with open arms and provide the best friendships I could have ever asked for. This church changed my life and gave me an outlet in college. Since attending, I have seen student after student commit their lives to Jesus and get plugged into this community. It has created a safe place for college students to gather together outside of campus and their school environment. Just this past weekend we held a college retreat with over 600 college students. As a sophomore student leader, I was able to foster relationships with 18 freshmen girls who are new to campus and nervous about making friends. This could never have happened without Summit, and with the growth we've experienced, a permanent campus is vital to continue this growth.

This church also gives back to the community in invaluable ways. At our college retreat that was originally supposed to be in Black Mountain, North Carolina, we were devastated to continue learning about the hurrican's effects in our state. Our teams quickly created a way to give back by collecting water for people affected, collecting over 250 cases of water that will be taken there. Our church often gives back to our Chapel Hill community in many ways, such as drives to collect supplies for schools and teachers, outreach opportunities for lonely grad students, and support for local families in need. We also host events for parents who are currently fostering or in the midst of adoption. Our church also sends teams overseas to work with the underserved populations there. These are just a few examples of how Summit works in important ways for our community. If Summit were able to have their new location, this outreach would be able to be magnified

in larger ways to benefit even more people. We are a thriving church and want the opportunity to give to as many as possible, and we will if we are given the chance.

I know that I have found a home in Summit, and I will continue to attend this church far beyond my graduation. I hope to be able to continue giving back and reaching the community after I graduate, and this new building will allow for so many important opportunities for Chapel Hill.

Thank you for your consideration!
Georgia Ayers

From: Tina Ayers <ayers4heels@hotmail.com>
Sent: Sunday, September 29, 2024 3:01 PM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: Chatham County Planning

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Angela,

Hi! First, thank you for all that you do to support planning in Chatham County. Our family has lived here for 20 years, and the growth around us has been beyond what we could have imagined. We appreciate that all types of establishments have been welcomed into Chatham Country. We frequent many of them regularly and others we don't because they don't offer something we need or want, but we appreciate that others may want or need that service or mission.

We are very excited about the potential for a Summit church in our local area. We currently participate in both the Chapel Hill and Apex campuses, as each is about 35 mins from us. We love the large, vibrant, involved congregations of these churches. We also appreciate the positive impact we've seen in the community. We've served in Summit-supported and -funded opportunities such as a block party for the UNC graduate students, many of whom are not from the US and often have a hard time finding a sense of community. The children were welcomed with bounce houses and games while the adults were engaged with badminton, volleyball and corn hole. All were served a meal and all were welcomed. Recently a group from Summit spent a Saturday cleaning, painting, and making improvements to Apex High School. On an ongoing basis, Summit offers weekly opportunities for youth to connect to find community; counseling for marriages, support for dealing with loss, and skills for overcoming addictions; and support of the community through missions such as backpack buddies. These are just a few examples of investing in the community in which Summit is planted.

This weekend our NC mountain neighbors were devastated by Hurricane Helene. Hundreds of Summit College students, many of whom attend Chapel Hill Summit, were supposed to be in Black Mountain this weekend. With the forecast, their weekend was moved locally. One of the first things they did was pray and collect much needed items for this devastated community. Summit already has people on the

ground helping. Many more are scheduled in the coming weeks. They will be rolling up their sleeves to help these communities rebuild.

Summit represents what I want in my community. I'm hopeful Chatham Country will continue to support a variety of plans to support the diverse community in which we live.

Thank you for your consideration.

Brett and Tina Ayers


From: Sam Cranford <secranfo@gmail.com>
Sent: Saturday, September 28, 2024 12:27 AM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: Summit Church Land Proposal

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Chatham Planning Board,

My name is Sam, and my wife and I have lived in Powell Place in Pittsboro for the last 9 years. During that time (and before) we have been members of The Summit Church and wanted to write to you to share our experiences there and how they can impact our Chatham community.

Even though we have driven 30 minutes to a Summit campus for the last 9 years, we have also led small groups here in Pittsboro leading to deepening relationships with other members in our city. Although most people see The Summit as a "mega church" we see it as a large extended family made up of smaller, more intimate families all throughout the Triangle. Even though we "lead" this family, we have witnessed all of the following within our group since we moved here:

-A young woman driving with my wife at 4am to take our sick child to the hospital -A dad of 4 watching our son when my wife had an emergency.
-A mom volunteering to do our laundry after my wife had a miscarriage.
-A mom of 3 watching our 2-year old when my wife went into unexpected labor -Meals provided for by numerous people in our group  after the births of our 3 children -Our group supporting us when our son was in the NICU for 30 days.
-Our group raising $1,000 to give to a family whose dad lost his job.
-A friend of mine driving to Raleigh to help me drop a car off that I was donating to a partner ministry.
-One man driving another who can't drive to his PT appointments -Our entire group throwing a surprise 40th birthday for a single guy whose whole family lives in Costa Rica.

This is the love that people who love Christ and are members of The Summit share with others inside and outside the church. Outside of it, I personally have been involved volunteering with Chatham Literacy and Chatham Habitat in the past. However, my wife and I have had way more opportunities to serve through a local Summit campus including landscaping/painting at local schools and ministries, leading summer VBS meetings in neighborhoods, tutoring local students, helping refugees move into

new apartments, participating in all-inclusive trunk-or-treats, donating to Angel Trees during the holidays, hosting international college students for holiday meals, to name a few.

While we have been leading for 8 years, one of my prayers has been how we can invest in and care for Pittsboro and this county. One recent opportunity that another couple brought to us was with volunteering time with local food panty. I/we have been yearning for opportunities to care for those closer to us, and I know having a Summit campus nearby will help provide resources and manpower to serve those who need it in our community.

Thank you for your time and consideration of the The Summit having its presence to Pittsboro and Chatham County. Please let us know if you have any questions or if there is anything I can do to help in this process.

Sincerely,
Sam (and Lauren) Cranford


**From:** Bethany Harris <blwharris@gmail.com>
**Sent:** Friday, September 27, 2024 11:18 PM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Support for Summit church proposal

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Angela,

I wanted to take the time to write and show support to the Summit church and its' proposal for the land in Chatham County. I understand the prospect of a church that size may be intimidating. I have attended Summit for many years and have seen the heart its' campuses have for their communities. I hope that we have a chance to share that heart with the people in Chatham.

Thank you,
Bethany Harris


**From:** Laurie Fisher <laurie7221981@gmail.com>
**Sent:** Friday, September 27, 2024 11:56 AM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Summit Church Feedback

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Planning Board,

I am writing in support of rezoning the parcel of land for Summit Church. I have been a member & weekly attendee of the Summit Church for 10+ years and have lived in Briar Chapel for 12.5 years. The Summit Church community has been a constant support and blessing to my life and my family's life over the years. They have walked with us and carried us through the loss of a child and have loved us well during both happy and challenging times.  Both of our children attend weekly events at the church that are open to all children and we participate in weekly small group get together to build up and support members of our community.

We have a community of over 50+ people that currently travel out of Chatham County to attend Summit Campuses and that give our time and talents to serve the communities surrounding these campuses through such events a backpack drives to support local schools, supporting community outreach centers and the international community in our area. Having a local Chatham campus will greatly benefit our community through continued events that seek to love our neighbors well.

I trust the Summit Church leadership to build a church and surrounding property that will be an asset to Chatham county for decades to come and that the church is the best possible use of the land.  I look forward to being able to attend and being able to serve the community of Chatham county through the Summit Church.

Laurie Fisher

**From:** Jake Hollenbeck <jakehollenbeck@gmail.com>
**Sent:** Friday, September 27, 2024 11:41 AM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Summit Church

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Hello,

I am writing regarding the proposed Summit Church building and development. I have been attending The Summit Church for approximately 15 years. During my time with The Summit, I have seen the positive impact it has on the triangle region. I have been a part of numerous events where we help serve the community in which we live. I have also experienced and seen first hand how lives and families are reunited and encouraged based on the power of the Gospel.

Having the Summit Church in Chatham County would benefit the community in which it will be located. It will provide a loving, encouraging, uplifting, and safe place for individuals

and families to connect and live life together. It will also be a positive place for college students to attend, as UNC's campus is only a few miles away.

Thank you for your time,
Jake Hollenbek, Briar Chapel

From: Kristi Hollenbeck <kristimhollenbeck@gmail.com>
Sent: Friday, September 27, 2024 11:31 AM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: Summit Church- planning board

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning to whom this may reach and concern,

I personally wanted to contact Chatham County's Planning Board regarding the potential Summit Campus build in Chatham County. I live right across from the potential lot in Briar Chapel and have been attending The Summit Church since 2006. I have visited and attended many churches over the years, but the people of Summit stand out in the way they love each other and love our community.

 Through Summit initiatives I have been able to paint classrooms in elementary schools, provide backpacks and school supplies, plant flowers and pick weeds in front of our neighborhood schools, spend time weekly with kids in low income housing sharing the love of Jesus, eating with them and playing after school. I have been challenged to not just talk about Jesus, but live out the call to be His hands and feet in the community that I live in.
Having the Summit Church here in Chatham County would be a huge blessing for our community, I've seen first hand how they love and serve where they are planted.

My family moved to Chatham County 3 years ago and have been praying for a church community near where we live. We currently attend Summit Chapel Hill, but having a campus so close to where we live would be such a blessing for us and our 3 kids. We need more churches in this area. Having a church community to serve and do life with where we live is huge!! As our kids grow and get older I get excited about the possibilities of youth events, small groups, and having a building where community can grow deeper together and wider to our community in serving our neighbors.

Thank you for considering adding a campus here and approving this Summit Campus build, our family would be SO excited for this next chapter of having a church community where we live!!

Sincerely,
Kristi Hollenbeck

**From:** Heather Elmore <heelmos@aol.com>
**Sent:** Friday, September 27, 2024 10:57 AM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Summit Church

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Dear Board,

I hope this email finds you doing well! The first day that we walked into Summit, much younger and with only one baby, we were meeting at Riverside High School. I remember thinking, "There's no way I'm doing church in a high school!" However, the doors opened and with every person we met, every warm greeting and smile, I knew that this church was an extension of the Lord's love. Hearing the gospel preached by Pastor J.D. Greear, with nothing taken away and nothing added to it, just Bible truths, changed my heart.

We've raised 4 children in the Summit Church and also in the Chatham County School system. Summit has been our partner in parenting, helping shape and grow our children into people who love their community and want to give back. The thought of having a church right here in our community is very exciting for us! Our family has been greatly impacted by all of the resources and programs offered by the Summit. We've been there 18+ years and cannot wait to share our church home with our friends and neighbors.

Many thanks,
Chris & Heather Elmore
(Theryn 19, Cade 17, Banks 14 & Brooks 11)
919-768-2061


**From:** Erica Hoskins <erica.hoskins87@gmail.com>
**Sent:** Friday, September 27, 2024 10:51 AM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** The Summit Church in Pittsboro

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Good morning !

One of the things I love most about Summit is how involved they are in the community. Whether it's food drives, work in prison ministries, helping teen moms, volunteering at shelters, painting schools, or just organizing events to bring people together, they're always focused on giving back. I've seen firsthand how much they help people in need and create a real sense of belonging.

I'm really excited about the idea of a new campus here because I know it would be a great way for even more people to experience what Summit has to offer. It's been exhausting driving to Apex or Mebane each week. I'd love for our community to grow locally, which is difficult to do outside of Chatham. Personally, I'd definitely be there—attending services and getting involved however I can. It would be great to have a space closer to home where more of us could come together.

Thanks for considering this, and I really hope you'll support the plan to bring The Summit to our community in a bigger way!

Have a nice weekend!

Erica Hoskins

From: randall brooks <randall.brooksncfb@gmail.com>
Sent: Thursday, September 26, 2024 7:09 AM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: New Summit Campus

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

I just wanted to send this email in support of the proposed Chatham County Campus of the Summit Church. My family has been attending the Briar Creek Campus in RTP for 8 years. I could go into detail about the many benefits that this church has had on my family and the surrounding community. Through giving and volunteerism this church provides many services that are also provided by local Government, but at no cost, and I feel this Campus will be a blessing to our community in Chatham as well. Thank You

To the Chatham County Planning Board,

I am writing to convey my very strong opposition to rezoning land on 15-501 in order to accommodate the construction of the Summit mega church. An operation of this size is completely inappropriate for Chatham County and clearly is intended to serve mostly people from outside the county.

I have lived in Chatham County for 10 years now and intend to spend the rest of my life here. I (along with many others) rely on 15-501 to get pretty much anywhere I need to go, whether it's my work, grocery shopping, dining out, or seeing my doctor. There are no viable alternate routes I can take to avoid the massive traffic jams that will be caused by this church. If you

have ever been on highway 54 in Chapel Hill when St. Thomas More school lets out, you will have had a taste of just how disruptive this type of entity can be, and that school has only 379 attendees. Imagine how much worse the traffic will be on 15-501 if the predicted 667 - 2768 vehicles daily descend on us. The traffic pattern will be further snarled by the fact that the plans as designed will require everyone to make at least one U-turn on 15-501 as a part of their trip to or from the church which will lead to even more accidents on an already hazardous stretch of road. Worse, it will impact the ability of emergency services to reach those in need and hospitals and firetrucks to respond to emergency calls.

The church will inevitably require additional infrastructure support to be provided by the county but will not pay for it themselves. My understanding from the Summit Church updated documents is that only a small minority of their congregants are from our county. This church is being built for the benefit of non-residents. This imbalance seems inherently unfair to Chatham citizens who must shoulder the burden without enjoying wide benefit and for that reason alone the proposed re-zoning should be rejected. As a tax-exempt entity, this church will reap the advantages of its location and of county support without having to pay for its costs, even worse, robbing Chatham County of needed tax revenues by occupying land that would otherwise generate income for the county. Likely the residents of Chatham County will even bear the burden of increased property taxes as a result of the use of the road and the loss of tax revenue since the church is exempt from property taxes and is not conducting activity which generates taxes. This facility will benefit the great number of people from outside of Chatham County attending the church with no benefit to the residents, who will absorb the burden. It is not for Chatham County.

Finally, Summit Church's methods and beliefs are problematic. One of the first goals stated on their official website is that they want to build 1,000 (!) churches by the end of this generation. They have already constructed 12 churches in the greater research triangle area. Massive growth is their main goal, but they are making others pay for it. I fail to see why residents of Chatham County should be forced to subsidize such an operation.

Thank you for your work on this issue. I hope the board will choose what is clearly best for Chatham County and vote no on this rezoning request.

Yours sincerely,
Kristen Skipper
914 Fearrington Post
Pittsboro, NC 27312

Dear Mr. Garrett,
I am writing in strong opposition to the rezoning application that has been submitted by Quinty, PA to Chatham County. The request seeks to rezone three parcels in the area from CD-CC Conditional District Compact Community to CD-O&I Conditional District Office

and Institutional for a church/place of worship. Parcel 18909 is across 15-501, north of Vickers Road. Parcels 2752 and 93852 are adjacent to Briar Chapel, north of Briar Chapel Parkway.

The applicant, known as Summit Church, is proposing a complex with a large sanctuary for up to 1,200 people and parking with approximately 600 spaces. The traffic impact of this -- near an already busy and dangerous intersection -- is immeasurable.

And the implication for the tax base of allowing a large big business masquerading as a house of worship is considerable. You want high income workers living and paying taxes in Chatham County? Then you'd better not invite a churchful of ignorant zealots with outstanding sexual abuse charges to ruin traffic and consume resources tax free. We'd rather pay the higher taxes in Orange County than subsidize these high-earning homophobes.

Regards,

Perry Hewitt



Traffic is already bad around briar Chapel. This proposed church would make it worse.
Sent from my iPhone

Joan H Bullard
79006 Hawkins, Chapel Hill,
NC 27517
joanhbullard@gmail.com
919-622-7944



Hello Mr. Garrett,

My name is Ylce Irizarry and I am Chatham Country personal and small business tax payer. I am writing to voice my opposition to the building of the 88,000 square foot proposed church (location on 15-501 near Briar Chapel).

The grounds for my opposition are these:
1-This will not increase county tax revenues; in fact, it may increase the tax burden on residents as the county will have to maintain roads, lights, sewage, and other items supported by property taxes. Churches do not pay such taxes.

2-Chatham County will continue to grow because it is a great place to live. That growth needs to be controlled. As I understand it, this church may also hold for-profit, non church, external group events. This will increase the traffic for working people like myself on weeknight evenings in addition to weekends. I already have a 30 minute commute; I don't

mind it much because it is scenic. That will change if more trees are stripped to make a giant parking lot.

3-Environmental impact. While we cannot stop all growth in Chatham County, we should distribute it so that it does not affect any one area disproportionately. I chose to live in Chatham County, in Pittsboro, because it had trees, a lot of parks, and access to Lake Jordan. It has significantly more forested areas than Durham or Orange Counties. If this mega-church is built, I will seriously consider moving somewhere else.

Thank you for presenting this opinion at the October 1 meeting. I am traveling out of town for work and cannot be present.

Regards,
Ylce Irizarry, Ph.D.
271 Mindees Lane
Pittsboro, NC 27312

This letter is to request that the Chatham County Planning Board deny the request of Summit Church for the conditional rezoning of 50 acres on 15-501 across from The Veranda for use as a 88,421 square foot megachurch.

The traffic generated by this facility - 3000 trips on Sunday  will create high-volume bottlenecks (especially when noting that the traffic will come in surges and the requisite u-turns across traffic) and cause problems along the entire corridor of 15-501. This corridor is the sole connection between Chapel Hill and I-40 and will result in further back- ups even beyond Chatham County. It will impact the ability of emergency services to reach those in need and hospitals and firetrucks to respond to emergency calls. We already receive too many notices of accidents in the immediate area. The residents of Briar Chapel will be greatly impacted.  There is no assurance that the church will not schedule additional services and other activities on Sundays, thereby increasing the projected trips.

Although 600-700 trips during weekdays are used in the traffic report, this number could also increase substantially due to use of the facility and its "future building." The County has no control over the number and extent of activities that could occur in the church, its auditorium, the open space and the future building.

In addition, the residents of Chatham County will bear the burden of increased property taxes as a result of the use of the road and the loss of tax revenue since the church is exempt from property taxes and is not conducting activity which generates taxes.

This facility will benefit the great number of people from outside of Chatham County attending the church with no benefit to the residents, who will absorb the burden.  It is not for Chatham County.

We urge you to deny this request.
Jenn & Ben Sherman
54 Tarwick Ave, Chapel Hill, NC 27516

To the members of the Chatham County Planning Board:

I have reviewed the information submitted by the applicant in this matter and am familiar with the record.

I am concerned about the traffic based on the trips generated by this project as submitted. However, there is another significant problem . I am concerned about the traffic of the future because you can not rely on the traffic report for the trip numbers once the property is rezoned and the applicant owns the property.

This is because the trips generated in the report are based on the limited activities provided by the applicant at this one point in time. It is simply a subjective snapshot created by the applicant. That snapshot could look very different at any and multiple points in time after the rezoning and purchase of the property. There is no accounting for one-off events or later changes, expansions or additions to the initially planned use or activities.

This property is unique in that it is a 50 acre tract with an 88,000 square foot building, a proposed future building and open space. There is plenty of opportunity for flexibility and activities that are not yet planned or stated in the materials submitted to the planning department and which are impossible to predict. In this case, once the applicant owns the property the activities can expand in frequency, scope and type and as a result the trips generated will change dramatically. Once the tract becomes private property, the County will have no control over any changes in scope, frequency or activities and thereby no control over the traffic on this critical corridor.

Consider -

Impact on traffic if the applicant adds additional services - evenings, holidays, Saturdays or even weekdays.

Impact on traffic resulting from weddings, funerals and baptisms for parishioners of this facility and of other locations of the applicant.

Impact on traffic if the applicant holds other events, gatherings, festivals, conferences in the building or even outdoors at times when services are not held.

Impact on traffic if the applicant holds regional events among its multiple locations such as joint services and conferences .

Impact on traffic if additional classes, childcare, teen activities and other programs are added during the weekdays and/or week nights.

Impact on traffic if retreats are held on the property.

Impact on traffic by use of the auditorium ( although applicant states this will not be rented this statement is not binding), use by the parishioners of the auditorium and by applicant's other facilities or or even gratuitous use by others.

Impact on traffic if the applicant holds or permits others to hold outdoor concerts and activities or sports events on the property.

The above are only examples of potential activities. It is not a final list because we cannot predict what we don't know may happen in the near and distant future.

All we know is that when the property is transferred to the applicant the County has no control and that the trips as currently calculated will be irrelevant. The applicant, like any other property owner, will seek to maximize its use of the property.

The traffic based on the current assumptions is already a huge problem. However, it does not even begin to illustrate the disaster that could occur in the future.

I urge you to deny the Summit Church request for rezoning. .

Stephanie Powell
114 Beacon Ridge Blvd.


**This letter is to request that the Chatham County Planning Board deny the request of Summit Church for the conditional rezoning of 50 acres on 15-501 across from The Verandah for use as a 88,421 square foot megachurch.**

**The traffic generated by this facility - 3000 trips on Sunday will create high-volume bottlenecks (especially when noting that the traffic will come in surges and the requisite u-turns across traffic ) and cause problems along the entire corridor of 15-501. This corridor is the sole connection between Chapel Hill and I-40 and will result in further back- ups even beyond Chatham County. It will impact the ability of emergency services to reach those in need and hospitals and firetrucks to respond to emergency calls. We already receive too many notices of accidents in the immediate area. The residents of Briar Chapel will be greatly impacted. There is no assurance that the church will not schedule additional services and other activities on Sundays, thereby increasing the projected trips.**

Although 600-700 trips during weekdays are used in the traffic report, this number could also increase substantially due to use of the facility and its "future building". The County has no control over the number and extent of activities that could occur in the church, its auditorium, the open space and the future building.

In addition, the residents of Chatham County will bear the burden of increased property taxes as a result of the use of the road and the loss of tax revenue since the church is exempt from property taxes and is not conducting activity which generates taxes.

This facility will benefit the great number of people from outside of Chatham County attending the church with no benefit to the residents, who will absorb the burden. It is not for Chatham County.

We urge you to deny this request.

Alexa and David Moore
96 Treywood Lane
Chapel Hill NC 27516
Chatham County

Hello Mr. Garrett,
I live at 156 Old Piedmont Circle in Briar Chapel.

I moved here in 2015 to enjoy the quality of life. It was amazing to find a community that was accessible to UNC and relatively affordable for m.
I am not opposed to growth and development. But, I think it should be considered in terms of the quality of life in Chatham County. I have appreciated the new restaurants, grocery stores, and other businesses that have located near Briar Chapel.

I don't think the mega church that is proposed to be another location for Summit Church is a fit for our county. Besides the pressure on the infrastructure of the 15-501 highway, this church discriminates against >50% of the residents of our county.
The theology is consistent with Complementarianism. This is a belief that
- Only men should hold leadership positions in the church.
- Women may hold other positions, but not those of authority over men.
The text below is directly from the Summit Church website:
https://summitchurch.com/Content/ExternalWebsite/Documents/one-in-christ-role-of-women-in-ministry.pdf

B. Women Are Complementary Partners
While Scripture makes it plain that women are equal partners with men in God's mission, it also teaches that God made men and women with gender distinctives. God created the woman as an ezer kenegdo, which means she is equal in essence to the man without being identical in function (Gen 2:18). God created men and women to reflect his image together, which means that the two genders

reflect the image of God more fully than one gender would alone. By God's design, men and women complement each other in his mission, providing unique ministry value. In fact, had God designed men and women to be completely interchangeable—the position known as egalitarianism—we would have less motivation (not more) for encouraging women to be involved in the life of the church. The complementarian position recognizes that women offer value to the church that men, by themselves, never can. The focus of Scripture, after all, is not on what women cannot do, but on what they can, and must, do. As complementary partners in mission, men and women flourish best when aligning with God's prescribed order. Scripture teaches that God has established certain positions that he reserves only for qualified men. In the Old Testament, the primary role that was limited to certain men was that of the priest (Leviticus 21). In the New Testament, the role limited to certain men is that of the pastor-elder (1 Timothy 2:12–3:1). We no longer abide by the Old Testament system of worship, but we do follow the example of leadership outlined in the New Testament, reserving the title of "pastor" or "elder" for those men that meet the qualifications of Scripture. Recognizing these roles, however, does not lead us to believe that women can only serve in a secondary or diminutive capacity in the church. Nor do the distinct ministry roles that God outlines need create a dichotomy between those who do "real ministry" (the men) and those who merely support the ministry (the women). Women are expected to exercise the spiritual gifts of teaching, leading, and prophecy, just as men are. Often those gifts will be exercised in the single-gender environment we call "women's discipleship," but not always. When both men and women exercise their spiritual gifts, they fulfill rather than subvert God's order. The body of Christ thrives only when both our sons and daughters thrive. We believe that women can exercise all of the gifts mentioned in Scripture while still honoring the biblical pattern of complementarity. Moreover, we believe that women can exercise these gifts while still reserving the distinct role of pastor-elder for qualified men.


As an elected leader, I know you realize that women have the right to vote. It would behove you to recognize that you represent women AND men in Chatham County. I would never expect you to support an organization that would repress people based on their sex, creed, color or sexual orientation.

I urge you to vote "no" for this project.

Sincerely,
Deborah L Givens
156 Old Piedmont Circle
Chapel Hill, NC 27516


I strongly implore the county commissioners to prevent the change of building codes, ordinances and permits that would allow a Mega Church to occupy 50 acres across from Briar Chapel's Veranda on US 15–501. The impact of an estimated. 3,000 church attendees on Sunday and 700+/- cars during the week are more than our traffic patterns, our first responders, and our roads can handle. The scale and scope of this type of initiative is not something that will benefit the majority of North Chatham residents. The increase burden on resources as noted above, and the fact that this church will not pay any taxes to support this increased burden means that all the citizens will be paying for something that most of us will not use, do not need, and should not be allowed. A smaller nonprofit/church enterprise is something that can be accommodated and I am not opposing the construction of a

church, but it needs to be able to fit with the population, and the natural and community resources that we have to support the broader community. I strongly urge the commissioners to turn down this plan.

Thank you.

Sincerely,
Colleen Sharp
176 Roads End
Pittsboro, NC 27312

**From:** Joseph Wright <joseph@wright-contracting.com>
**Sent:** Wednesday, September 25, 2024 3:21 PM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Letter in Support of Summit Church Rezoning

Members of the Planning Board,

I am writing you in favor of the Summit Church. I love the Lord, I love my Country, my state and my community. I believe my church will love and bless our community here in Chatham county.

I grew up in a rural county in Western NC, seeing growth in an area is tough, but inevitable. I am an Eagle Scout, a pilot and a business owner. I moved to Raleigh where I attended and graduated from NC State. While a student I was impacted by the outreach of the Summit Church where I have been attending since 2007. Upon graduating I was able to start an environmental restoration company based in Chatham County. I had the privilege of some of my earliest projects being located in Chatham County. I ultimately moved my business, my family and my life to Chatham County. I am proud to live here! Not only do I live here, I serve here. I am a firefighter, Captain and President of the Board of a local volunteer fire department. I have volunteered for over 22 years.

There is no doubt growth is coming to Chatham County, from all directions. Major factories Vinfast, Wolfspeed, Toyota is in the area, Chatham Park to name a few are impacting Chatham County. Chatham County is growing, faster than most realize. People are moving here, to live work and play. That's not something that's going to stop, its already in motion. There will be more pedestrians, traffic, traffic lights, environmental impacts, infrastructure and people. The county is going to need more police, firefighters, paramedics, utility workers, schools, teachers and this list goes on. People are going to need jobs and all the retail needs that keep our society moving forward. The reality is that growth and all that comes with it is almost unstoppable. The influx of people is coming. The question facing you as board members in this decision is simple, who is going to serve all these people?

I think the Summit Church is part of the answer to serving the existing and the new citizens of our county. As a member of the church, I know that we are a "Mega Church," but we meet in many locations and we serve the areas where we live. We aren't looking to build the PNC arena and meet in one location. Something will ultimately occupy this land, why not a church? Our church handles traffic control, safety and all the infrastructure needed to operate without being a burden to the community. They do it with paid staff and volunteers. It is well thought out and fits the aesthetics of the area. The

building is just a building, public meetings can be held, schools, charities and the community can use the space. It won't be empty six days and only full on Sunday!

The reality is we're not talking about a building, that's not the church. The people that attend are the church. Citizens of Chatham County attend this church. The members of the Summit Church serve, they give back, they help. I would encourage board members to reach out other cities and inquire to the impacts our church has on their citizens.

Thank You,
Joseph Wright
Wright Contracting, LLC
PO Box 545
Siler City, NC 27344

866.809.9276 (Main)
919.663.0810 (Office)

866.260.0921 (Fax)

From: Rick Wilkie <rickgwilkie@gmail.com>
Sent: Wednesday, September 25, 2024 9:53 AM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: Summit Church

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning,

My name is Rick Wilkie. My wife and I have lived at 441 Chatham Forest Drive in Pittsboro since 2019. I am writing to voice my support for approval of the proposed campus for a new Summit church in northern Chatham County.

We currently attend Sunday services at the Summit campus in Apex and are also members of a small group in Pittsboro that consists of Summit members from the Apex and Chapel Hill campus locations. We are very excited about the proposed new location just a few miles north of Pittsboro.

Summit has been a huge blessing to our family. It has brought us closer together while also providing many service opportunities in and around the Apex community. We look forward to the possibility of serving at a campus nearer to our home.

I believe having a Summit campus in the Pittsboro area would be a huge benefit to the community at-large. Our experience at the Apex campus certainly backs that up. I appreciate your time and good work in this matter.

Best regards,
Rick Wilkie

**From: Whitney Mabry <<u>wsmabry@gmail.com</u>>**
**Sent: Wednesday, September 25, 2024 9:37 AM**
**To: Angela Plummer <<u>angela.plummer@chathamcountync.gov</u>>**
**Subject: In favor of The Summit Church Coming to Chatham County**

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

**Hi Angela and Board Planning Members,**
   **I hope that you are all doing well! I wanted to send an email in favor of The Summit Church Campus coming to Chatham County. I understand that there may be some differing opinions on this, but rest assured that this church will be nothing but a huge blessing to our county. I am a resident and a previous teacher within the Chatham County School district. I am currently a Summit Church member and have been praying for God to send us a local campus that my family can worship and serve in. The Summit Church has been such a positive influence and experience in mine and my family's life and I know many others that have the same experience. I pray that other Chatham County residences will also have the unique opportunity to experience the Summit church. Having experience in both attending the Summit Church and previously teaching in Chatham County Schools, I can speak first hand on how this church would bless this community. The schools and children would benefit from not only having local members praying over and for them and the staff members of this district, but also watching the way that Summit has poured into other schools in Durham County. I can only imagine that they will bless Chatham in the same way. Many in our church are lunch buddies and provide lunch breaks for teachers within the school, they send school supplies, etc.. they love on and bless the teachers/staff.     The church also provides many family/kid opportunities along with weekly worship services to help support growing in your faith. This faith is what sustains us through our daily lives and there is no way that that cannot impact every other aspect of our lives (work, businesses, the way we treat others within the community, etc..) Not only would the Summit Church be a blessing to this community, it would also provide eternal value to Chatham County. I will continue to pray and trust that God's will be done in Chatham County as it is in heaven.**
   **Thank you for the time to voice my opinions on this matter.**

**Blessings,**
**Whitney Wright**

**From:** Alex Harris <<u>daharris6527@gmail.com</u>>
**Sent:** Wednesday, September 25, 2024 9:08 AM
**To:** Angela Plummer <<u>angela.plummer@chathamcountync.gov</u>>
**Subject:** Support for Summit Church proposal

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Hi Angela,

Hope you are doing well. I'm writing to express my support for the proposed Summit Church location at 15-501 and Vickers Rd. My wife and I have been attending and involved with Summit for 6+ years now and it has been a great blessing for our family. Summit takes very seriously the idea of "seeking the good of the city," meaning the community around it. We've been blown away by the various programs and outreach the church undertakes to reach the neighborhoods and communities in which it is located. For the last several years we've been driving to the current Chapel Hill location, and have been hoping and waiting an opportunity might open in Chatham. I know there are many others in the same situation.

I am a Chatham County native and current resident, and I've seen the trajectory the county has been on for a quite a while now. I think the Summit would be a great addition to our community and hope the Planning Board will recommend it for approval.

Thank you,
Alex Harris


September 25, 2024
To: Chatham County Planning Department and Board Attn: Jim Garrett; Jason Sullivan; Angela Plummer We are writing in opposition to the proposed re-zoning for a Summit Church property.

While there are many compelling reasons noted by our neighbors and others concerned about the proposed development, our focus is on two issues:

1) **inevitable traffic problems and potential negative impacts on public safety that this proposed re-zoning will create.** 2). **Tax base Loss in context of Forever Chemicals issue and related tax liabilities for all Chatham County residents**
   **Re Traffic—** Our request to Planning Board members and the County Commissioners is that you ponder this issue as you do the unusual turnaround to head West from Andrews Store Road on 15-501. Please picture cars attempting that turnaround in slow-moving gridlock conditions as church members arrive to or leave services, or in any number of special events the proposed entity might elect to have. This is just one example of the traffic flow strains we can expect.

   Ingress and egress— potentially with more than 4X the traffic density —- will be difficult on and off 15 -501. There is no grid system of roads here— there is no bypass. Alternate feeder roads to/from the church site inevitably pour into 15-501.

As Fearrington residents we have only one road in/out (Village Way) and imagined scenarios of ambulances and the like attempting to serve our community during the expected gridlock are very troublesome.

We have heard that the traffic studies done re: this rezoning are out of date and performed when effects of the pandemic lockdown were still lightening traffic. Indeed, just this past week another major US Company (Amazon) announced its reversal on remote workers. Above and beyond the population growth in our area, the return to pre-pandemic traffic patterns is still in progress. Sundays are cited by some as light traffic days. This flies in the face of our experience—- we have been stuck on 15-501 in Chapel Hill on late Sunday mornings on several occasions. The 15-501 Chapel Hill traffic is NOT light at that time.

**Re: Tax Implications** The loss of tax revenue by allowing such a large 501c3 organization to build out this proposed site has been widely noted. Our understanding from the Summit Church updated documents is that a small minority of their congregants are from our County. This imbalance seems inherently unfair to Chatham citizens who must shoulder the burden without enjoying wide benefit and for that reason alone the proposed re-zoning should be rejected.
See report on Flint Water tax liabilities for Michiganders—
https://www.freep.com/story/news/local/michigan/flint-water-crisis/2016/02/20/flint-water-crisislawsuits/80514276/

Moreover, this drain on tax revenue comes at a time when our County and County officials are very vulnerable to legal action by plaintiffs adversely affected by Forever Chemical pollution (See above article re Flint water, e.g.). While the most salient aspect of our currently poor water quality might be moral in nature (viz. allowing children to drink unsafe water), this is NOT a time to compromise potential County revenues, and especially for a site developments with predictable needs for additional resources, e.g. for traffic safety.
Thank you for your time and consideration of these issues. Sincerely, Amy Munice and Peter Kachergis, 638 Fearrington Post, Pittsboro, 27312

**From: Gary & Etta <garyetta96@gmail.com>**
**Sent: Wednesday, September 25, 2024 8:33 AM**
**To: Angela Plummer <angela.plummer@chathamcountync.gov>**
**Subject: Summit Church-letter of support**

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

**To the Chatham County Planning Board Members:**

**We wanted to send an email in support of the Summit Church and its request to purchase the land off 15-501/Vickers Road to build their Chapel Hill campus.   We live**

in Pittsboro and have been attending the Summit Apex campus since 2017.  We are also Summit Small Group leaders and weekly host of group of Pittsboro residents in our home or local restaurants.  We are aware of numerous Chatham County residents who currently attend various Summit campus' outside Chatham County each weekend.

Since 2017, we have personally witnessed and have been amazed at the generosity of the Summit Church in the communities where they are located. The Summit Church invests in the lives of the people in their community and have outreach programs for those in need (such as-the homeless, widows, teenage pregnancy centers, and local food banks).  Summit serves local schools by providing supplies for back-to-school campaigns and adopting local schools to assist and support teachers.  Summit also has local mission projects that help schools with landscape and painting needs.

The people of Summit are very generous and loving people who also give back to the community where they attend through shopping and dining at local restaurants.

The overall investment that the Summit Church will make in this community will have a far greater positive impact for the citizens and children of this county than any negative effect.  We know that you have done your due diligence to weigh the pros and cons of allowing the Summit Church to build on this property and we trust that you take letters of support also into consideration.

Thank you for your attention!


Gary and Etta
_____
Gary and Etta Blankenship
610 Log Barn Road
Pittsboro, NC 27312
Gary's cell-919-741-3325
Etta's cell-919-619-2395
Email: garyetta96@gmail.com



From: Karen Butler <karen.butler.e@gmail.com>
Sent: Wednesday, September 25, 2024 7:11 AM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: New Summit Campus in Chatham County

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Dear Ms. Plummer and Chatham County Planning Board,

I joined Summit Church, at the Chapel Hill campus in Orange County, in 2018 shortly after moving to Briar Chapel in Chatham County. Since that time, the Summit Church body has been a source of encouragement and support as I pursue spiritual growth and in turn learn to engage in community.

Summit Church pastors and our home fellowship leaders in Briar Chapel are instrumental in cheering me on in my faith and guiding me on my journey to be more generous, loving, and compassionate to the world around me. This has been incredibly impactful in my life; I am grateful to those in the church who have and do pour into my life so that ,hopefully, I can do the same for others.

The Summit Church family is dedicated to caring and investing in community—here in North Carolina and around the world. I am excited at the possibility of finally being able to contribute more intentionally to the support of the Chatham County community. A Summit Church campus here in Chatham County would help direct my efforts and outreach to those closer to home—a community I love and to which I feel closest.

Thank you for your consideration and support.
Blessings,
Karen E. Butler


Hello there Mr. Garrett,

I wanted to write to the planning department to express my opposition to the planned mega church site within Pittsboro per Summit Church Conditional District Rezoning. My aim here is two fold, one to express my reasoning for being against this rezoning and allowing this to be built and two to allude to better alternatives that would be better uses of the land parcels. To my first point, mega churches, especially in this instance do not promote the values that they put forth. Having dealt with similar instances where I used to live in the past, I have found that these kinds of institutions are actually a downgrade compared to comparative developments that could be built instead. To my second, there are many alternatives that not only serve a similar purpose, but other religious buildings we already have within the county with which we could accomplish the same thing.

To expound on this, two point two of the **discussion and analysis document**, while noise could be concerning the location would actually be more detrimental to the traffic conditions on the road. Yes, Chatham county is growing, but a specific build in this instance is not something the community at large would need. Taking faith out of the equation, a more positive change for the longevity and growth of the county would be multiple small business locations within the area or additional public land grants for parks and other positive public institutions that promote the things families in this area would want to see. This is further pushed by looking at point 3. While this kind of location is a "gathering place" realistically it is a privatized gathering institution where not all public members may be welcome.

Unfortunately, to explore that idea further I do have to bring faith back into it. A church of this kind would ultimately be a Baptist institution. Realistically not everyone within this county believes that way. There is nothing wrong with a church, we have many within the county and they are all great places of worship and public gathering. But Churches of this kind are not the same. They do not expound the same benefits as other religious churches we have. These institutions are about one thing, profit. I have seen this first hand back on Long Island, NY (where I lived). A large church of a similar nature ruined the neighborhood it was built, discrimination, for lack of better wording...overly religious individuals spread misinformation and targeted attacks against others, and taxpayer dollars went into funding/keeping up with a church that catered solely to one group of people that did not, that is the key here, DID NOT lead to growth and gathering within the community. I am by no means saying that this institution or the individuals who will make up its congregation will behave the same. Just pointing to what I have seen in the past.

Finally to my second point. As mentioned this land use could be better used for more public projects that would not only be more central in building this amazing community up long term wise, but serve to gather and preserve the land we all love in a better way. Additional public parks for the many families that now make up the community, with small business locations nearby would be one example to better serve the community. These kinds of things will also bring in additional funding to Chatham County rather than one private institution.

Thank you for your time,
Thomas Valerio

From: Lauren VanHook <**lmvanhook@gmail.com**>
Sent: Tuesday, September 24, 2024 6:00 PM
To: Angela Plummer <**angela.plummer@chathamcountync.gov**>
Subject: Summit Church Chatham County Rezoning

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Dear Planning Board,

I am reaching out to you regarding the proposed rezoning of land in Chatham County for the Summit Church campus. I am a resident of Chatham County and have lived near the proposed site since 2018. I also have attended Summit Church since 2018 and have witnessed the positive impact the Church community can have on its surrounding area. The Summit as a church is a "good neighbor" and that would continue when we transition to Chatham County.

There are many ways we contribute to the community, but I have personally helped provide backpacks for kids for the last 4 years and have contributed meals to those in need. I've seen the benefit Chatham County children in foster care receive when they are placed in a home of friends that are Summit members. I've celebrated in a Chatham County courthouse when a child was adopted by a Summit family.

In addition, for the last 6 years we've held a weekly club for elementary school students to have a place to learn and play safely with each other. Summit also has a Prison Ministry where members can become trained to serve in North Caroline Prisons meeting needs the Prisons share. I am taking steps to be trained to participate in this. All of these would not be possible without our Summit Campus and have made a difference in the life of my family.

The Summit Chapel Hill campus moving to Chatham County is attended by other Briar Chapel and Chatham County residents. We would welcome a campus that does not pull us from Chatham County into Orange and Durham Counties regularly. We love our community and would like to have an organization like the Summit to serve Chatham County with and through.

We believe that the church would bring a stronger sense of community, with minimal negative impact to the surrounding area and am confident we will be good neighbors for Chatham County.

As such we encourage our community leaders to vote to rezone in favor of the campus and appreciate their support.


Sincerely


Lauren VanHook

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Planning Board,

I am writing to you regarding the proposed rezoning of land in Chatham County for the Summit Church campus. I am a resident of Chatham County and have lived near the proposed site since 2018. I also have attended Summit Church since 2018 and know the positive impact the Church community can have on its surrounding area. Currently, members of the Summit Church volunteer in the greater Chapel Hill and Chatham County community in a variety of ways. Specifically, members of the church provide tutoring services for children in the Chapel Hill community, as well as help in providing backpacks for kids in need each year and taking meals to those who are in need. There are countless other ways members of the Church have led efforts to be a blessing to members of these communities in need, which has been a tool to teach our children that helping others can often be done in simple ways.

One of the most impactful ways members of the Summit Church has impacted the greater Chapel Hill and Chatham County communities is through the work of foster care and adoption of children in need of healthy homes. I can recall the smiles on the faces of some of the children directly helped by the kind-hearted members of the Summit Church and their servant mindsets towards local foster children. I believe that Summit Church members and attendees have been involved in countless ways to be a blessing to these communities and will be able to expand those efforts in the greater Chatham County area, forging fresh partnerships with other organizations that are serving those in need here.

I would like to mention that the Summit Church campus which would be relocating to Chatham County is attended by numerous residents of Briar Chapel and surrounding Chatham County areas. Many of these residents could also attest to the blessing the Church has given to the community. This church has had a positive impact on my family's life as we have created a community that cares for each other and spends time weekly with each other. where we have established friendships over the last 6 years.

With the move to the County, our family and many others plan to attend the Church's weekly services and be active in a campus here in Chatham County. We believe that the church would bring a stronger sense of community, with minimal negative impact

to the surrounding area. We believe that Summit would be active as a body, invested in this community being a good neighbor to others.
As such we encourage our community leaders to vote to rezone in favor of the campus and appreciate their support.

Sincerely,
William VanHook

From: Ashley Powell <powell.ashleyh@gmail.com>
Sent: Tuesday, September 24, 2024 3:03 PM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: Summit Church-Chatham County

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi,

I hope this email finds you well!

My name is Ashley Powell and I've lived in Pittsboro with my family since 2016. We have loved Pittsboro's charm and have watched as it has grown over the years we've lived here. I can think of no better new addition than a campus of the Summit Church! We were thrilled to hear this was a possibility!

My husband and I, along with our children, have attended the Summit since we returned to NC in 2015. We have had to drive out to campuses in Brier Creek, Chapel Hill and Apex over the years, but it has absolutely been worth the drive! We have several other friends and families who also live in Chatham county and drive out to other campuses of the church. Together we have dreamed of having a convenient location to attend services and have our children's activities. This new location would offer that, but also help provide a way for us to reach out to our own local community here in Pittsboro more effectively.

The Summit is known for its mentality of service. There have been so many opportunities to help serve in local schools or with other service organizations through our church-but nothing really local to where we live. If this campus proceeds, we'd love to know of service opportunities in Pittsboro and all of Chatham county!

Please strongly consider this new campus for Chatham County. I'm confident our church will have a positive impact on the community!

Thank you for your consideration and I hope you have an excellent afternoon!

Sincerely,
Ashley Powell


Mr. Garrett,

I am opposed to the rezoning of Parcel 18909 for the following reasons.

1.  The area of US Highway 15/501 near the parcel is already highly traveled.  Nearby intersections have already been the scene of numerous accidents.  I am concerned that with such a large event center/church as the one proposed there will be even more accidents.

2.  A rezoning will also lead to a tax exempt status for a large parcel of land.

Thank you for your time and consideration.
Blisse Adams


Ms Plummer / Planning Board Members ~
I appreciate the opportunity to share my views about the new location for the Chapel Hill campus of the Summit Church. My wife and I retired and live in Briar Chapel. We have been attending Summit campuses for many years. We would be thrilled to attend a campus that was closer to our home, rather than traveling over 20 minutes to the nearest location.
In additional to my personal benefit, I see a couple benefits for Chatham County:
1 - Many businesses on 15/501 would have more customers on Sundays because of the hundreds of church attendees. All restaurants would experience increased clientele.
2 - Church-goers are generally moral and up-standing members in the community. I have personally seen the Summit impact dozens of families. Earlier this month, the Chapel Hill campus sponsored a block-party for all the international students at UNC. Many volunteers manned kids games and bouncy houses, provided free lunch, and engaged positively as ambassadors to guests in our country. The church has a strong presence in the community and seeks opportunities to engage and meet needs.

I look forward to seeing how the Summit continues to serve and support the greater Triangle area. This ministry's southern-most extension into Chatham County will expand to reach many more families and businesses.
Thanks for your time~
Jeff R.
Briar Chapel Resident


Greetings.

I am writing to oppose the rezoning of property on 15-501 for Summit Church. I oppose the rezoning because I do not believe a church in this location is the best use of this land for Chatham County.

Because of the rapidly escalating impacts of climate change, I prioritize decisions through that lens. Will an action move us toward a solution for the climate crisis? I believe rezoning for a church on 15-501 moves us in the wrong direction. I would hope to see this land be used for dense housing in the future. The County has a great and growing need for affordable housing and an increasing need for public transit. Dense housing is more affordable and climate friendly. Transportation is the largest emitter of $CO_2$ in Chatham County. 15-501 provides one of the highest priority routes for enhanced public transit in Chatham County and a logical route to target for reducing vehicle miles traveled.

Rezoning for a church that does not pay taxes and sits empty most of the week in the middle of a large paved parking lot moves us in the opposite direction from the climate solutions we need to be implementing in Chatham County. Thank you for considering this input in your decision making.

Sincerely,

Vickie Atkinson


From: Michael Rodriguez <mjrodri1@gmail.com>
Sent: Monday, September 23, 2024 12:56 PM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: The Summit Church in Chatham County

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Greetings,

My name is Michael Rodriguez and I have been a Chatham County resident and small business owner for almost 15 years. I also own businesses in Chapel Hill and Carrboro, and have done so for more than a decade, while also serving on the Board of Directors for the Chamber for a Greater Chapel Hill-Carrboro for almost 4 years.

For 13 years I have attended the Summit Church, driving first to our Raleigh campus, then Chapel Hill, and currently the Apex location. And for most of this time I have often prayed for a Summit Church to come to Chatham County.

While I could write pages on the intangible benefits to having a Summit Church in any community, I believe that those points that are tangible and data driven make the most sense for this forum.

1. We make it our mission to serve the communities our churches are in. This comes with assistance to local schools whether it be for campus beautification, at-risk youth mentorship, and in some cases even substitute teacher coverage. We help serve refugees, offer aid to families in need, and genuinely attempt to understand and help the other needs we may not be aware of. A church of hundreds looking to share resources, talents, and time can only assist a community. Currently, these resources are being distributed to other communities due to a lack of presence in Chatham. This changes almost overnight with a campus coming here.

2. As a small business owner, I recognize the need for an increase to the shopping public. I have noted some concerns over the property tax loss, though presently it appears the tax benefits of this unused land is less than $500 annually. While my businesses themselves would not directly benefit from an increase in the population on Sunday's, I can assure you that surrounding restaurants, gas stations, and grocery stores would. The sales tax from lunches and goods bought on what is traditionally the slowest day for any business would far outweigh the concerned "loss" of tax revenue.

3. I have also noted a concern over traffic. Growth is coming to Chatham, period. Hundreds of apartments, a Community College, grocery stores, etc. are already built with more buildings, rooftops, and growth coming. Traffic to this point has not been affected as far as I have noticed, and the DOT will most likely already be investing in infrastructure to accommodate the current developments. And, of all days in a week, if there is a day that I <u>NEVER</u> see traffic, it is on Sunday mornings. Having a Summit in Chatham will not create gridlock. Our existing campuses are already in areas with

significantly more traffic and people, and we have not experienced any backlash due to traffic from local citizens or municipalities.

I find it hard to imagine the benefit to denying a group of hundreds the opportunity to worship in Chatham who will also seek to help our county and its people. I hope that our church's track record speaks for itself, and the board votes in favor of allowing the Summit Church to bless Chatham County.

Thank you all for your effort and consideration,
**Michael Rodriguez**
**Multi-Unit Franchisee, Subway**
**Board of Directors: The Chamber for a Greater Chapel Hill-Carrboro**
**FAF National Advisory Board: Subway**
**630 East St., Ste. 1**
**Pittsboro, NC 27312**
**mjrodri1@gmail.com**

Hi Dan,
I live in Briar Chapel and make the drive across the intersection at 15-501 several times a week to pick up/drop off my grandbaby.
I long ago learned to sit at the light after it turns green, in case someone is barreling through the red light. I'm sure I don't need to tell you how fast traffic is on this stretch of highway.
Please vote NO to approving the church that will literally add thousands of vehicles to this already dangerous intersection.
Thank you,
Melissa Carter

As concerned residents of Briar Chapel we oppose the zoning of the parcel ajcent to the Dogwood veterinary facility for use as a mega-church. There are many reasons why a facility of this size and utility would be adverse to this section of highway and the Briar Chapel community of opver 2,700 homes. Have we not learned anything from the St. Thomas More debacle on 15/501 where traffic nearly everyday is delayed for long periods owing to school opening and closing traffic? A church of this size is far better suited to access from a major highway such as Route 64.

We urge the Board not to appove zoning for this mega-church.

Dr. and Mrs. Edwin J. Andrews
278 Serenity Hill Circle

Chapel Hill, NC 27516-0389
+919-932-0942

**From:** Claire Eichenberg <claireeichenberg@yahoo.com>
**Sent:** Sunday, September 22, 2024 7:54 AM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Summit Church in Chatham

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi Angela,
I'm just writing in support of the Summit Church's new campus off the 15/501. We live off Mt. Gilead and have been going to the Apex campus, which is sooo far away, so we are super excited about the proposed new campus. I work at Pollard Middle School, close to the proposed site. Summit loves to do volunteer projects in support of kids and schools, and many other things. They would be a benefit to the whole community. Please approve this proposed site for the Summit campus.
Best regards,
Claire Eichenberg

**From:** Luke Rowe <luke.rowe61@gmail.com>
**Sent:** Saturday, September 21, 2024 5:29 PM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Locating a campus of the Summit Church

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Ms Plummer,

I had read recently on Next Door about a "Mega Church" that was trying to buy property on 15/501 across from the Veranda Development. A lot of folks are pretty upset, by a lot, I mean a few who get upset about most things in the form of Development. In this case the upset had as much to do about the "Mega" as the development.

I moved to Chatham County in September 2012 into the Legend Oaks neighborhood. It was at this time I also started to first attend the Summit Church. I have never associated the adjective "Mega" to our church. I have attended the Briar Creek campus as well as the East Chapel Hill HS location, neither are super convenient, but although I have visited other churches around here on varying Sundays, looking for an alternative I have not found

one that I have felt as connected to as the Summit. JD Greear and his staff are powerful preachers and as I experienced when I have served these on Sundays, a commitment to their mission. We have planted a lot of churches and as I travel for work I have attended a few. All independent, but initially funded by our congregation. I love that we do this.

The Chapel Hill campus is wonderfully led and I have enjoyed serving with them.

I am excited to have a campus close by and I have a list of friends I want to invite to come with me.

Unlike the comments from folks who has never attended a service, I found a positive and uplifting environment, committed to the Word and with Jesus at the center of it all. Messages which can be tough to hear, but messages that always end with the gift of Love.

Locally around the Summit our entire congregation engages with our neighbors and creates a positive impact. I am that person that will stop to help a stranger, say hello as I walk by folks heading into Harris Teeter or the local hardware stores. I know in my every action I reflect my Savior and the community of believers I belong to.

I am so excited at this potential development that I had to reach out and write. I hopel haven't overstepped.

I will say as a county resident, taxpayer, small business owner that having the Summit in Chatham County will attract residents and it will not impact other churches. The Lord speaks to us all in ways we can accept if we are open to it. For some that will be a small church. The Summit was once only 300 members. For others it will be attending a Catholic Church, the very definition of a Mega Church if I thought there needed to be a description like that of churches. But we are one church that meets locally, who votes on initiatives and spending, we participate.

Having the Summit close by will allow me to do even more than I have.

I have lived through massive development and the good and bad that can come from that. I grew up in Gaithersburg in Montgomery County Maryland. All the comments I read that folks worry about are centered on the idea that the good old days were yesterday. That is so not true, but development scares people because of the change, the traffic, the increased property taxes. But then you have more to do, places to eat, places for sports, parks, and yes, churches.

Ms Plummer, thank you for receiving my email. I will still of course attend the Summit wherever it is, but I feel that it would be a loss for some many of my neighbors who are yet unaware of all the good to come.

Please take care and good luck.

Lucien Rowe

840 Legend Oaks Drive
919-357-0160


Good Morning, Mr. Garrett,
Unfortunately, I won't be able to attend the meeting on the request for rezoning the parcels listed in my subject line, but please see my written statement below.

The proposal to build a megachurch in our community raises several significant concerns that warrant careful examination. While religious freedom is a fundamental right, constructing a megachurch can have far-reaching impacts on the local area and its residents.

The construction of a megachurch can significantly impact local infrastructure and traffic patterns. With thousands of attendees converging on a single location for services and events, surrounding roads and neighborhoods may experience increased congestion and noise pollution. This influx of traffic can strain existing infrastructure and potentially decrease the quality of life for nearby residents.

Megachurches often create insular communities that may not integrate well with the area's existing social fabric. The tendency to form large, homogeneous groups can lead to a sense of isolation from the broader community. This segregation effect contradicts the historical role of churches as institutions that bring together diverse groups of people on equal footing.

The physical presence of a megachurch can dramatically alter the landscape and character of a community. These structures often feature large, imposing designs that may not harmonize with the existing architectural aesthetic of the area. This alteration could potentially erode the unique identity and charm of our community, a concern that should not be overlooked.

Instead of concentrating resources in a single megachurch, distributing those resources among multiple smaller churches could lead to more effective community engagement and resource utilization. Smaller churches often have lower per capita overhead costs and may be better positioned to address the specific needs of their local communities.


1. Loss of tax revenue: As a tax-exempt entity, a megachurch doesn't contribute property taxes, potentially reducing local government income.

2. Limited economic diversity: A single large institution needs to provide the economic diversity that multiple commercial buildings could offer.
3. Potential for traffic congestion: Megachurches host large services and events that can cause significant traffic issues in the surrounding area, leading to potential disruptions and inconvenience for local residents.
4. The parking requirements are immense and contribute to the need to clear-cut a large area to create an area that lies empty for most of the time, thus impacting the beauty and the desired rural/ pocket communities as listed in the UDO.

While religious freedom and diversity are important values to uphold, the construction of a megachurch presents numerous challenges that may outweigh its potential benefits. The financial burden, community impact, and resource allocation concerns associated with megachurches suggest that alternative approaches to this land usage may be more beneficial for our area. By carefully considering these factors, we can work towards a future Chatham that is able to adapt and thrive, while maintaining the beauty and charm that attracts so many to Chatham and is outlined in Plan Chatham.

Sincerly,
Bryan Schroeder RN, MPH
8436933747


Dear Mr. Garrett:
I am writing to join the many neighbors who oppose the Summit Church rezoning request, based largely upon concerns about traffic congestion, loss of tax revenue, project scale, and environmental impact. In addition, as a retired city planner, I would like to share some more detailed land use and planning comments about this rezoning application.

- **Zoning and Land Use**

The county is in the process of completing a multi-year process of crafting the UDO, a unified development ordinance designed to ensure consistency between zoning and land development regulations and the planning goals expressed through the Comprehensive Plan and the future land use map. The UDO appears to be on track to be enacted soon.

In this system, one function of the compact community zoning is to channel higher-intensity growth along major roads and to places where infrastructure and similar development already exist, such as along Route 15-501 in North Chatham. This should allow other sections of the county to retain truly rural character, while driving some of Chatham County's rapid growth to more suitable areas.  The Summit rezoning proposal would undermine this growth management strategy by diverting to a single institutional land use 50+ acres now earmarked for village-type development and commercial services.

The regional scale of this proposal, at 82,000+ square feet (compared to, say, the 60,000 total square feet of the Community College campus), is at odds with the village scale intended for this area in the future land use map and by the CC zoning. Among its purposes, according to materials submitted by the applicant, is to relocate congregants from a Chapel Hill site, and to have a church branch available within 20 minutes of everyone in the Triangle.

As a longtime affordable housing advocate, I am aware also that the rezoning would eliminate one of the few areas with potential to host the various small-lot, denser and less costly housing types that are so sorely needed in the county's prohibitively expensive housing market. (Arguably the general rezoning of a second tract back to R-1, in connection with the conditional zoning, is also unnecessary, as it reinstitutes large-lot, one-acre rural residential zoning along the highway.)

- **Traffic Impact Analysis** (TIA)

Trip generation may be underestimated. The analysis submitted by the applicant does not seem to show any increase in trips on the one weeknight (either Wednesday or Thursday?) when the church holds a second service. The site plan shows a large building pad of undetermined square footage, for a future "accessory" building. Its use is not stated, but application materials suggest a gym or a community center. Those traffic counts should be included. The TIA uses some data based on the completion of turning lanes and other road improvements to be undertaken by NC DOT in 2038. 12 years after the church is scheduled to be built. Before then, "F" levels of service could exist on some side streets on Sundays, according to the TIA. Under these circumstances, the idea that a volunteer team could facilitate traffic flow into and out of the site, as suggested by the applicant, is highly unlikely.

- **Criteria for Rezoning**

The grounds for approving rezoning are 1) a defect in the zoning ordinance and 2) changed or changing conditions, if any, of the area or in the county generally, which make the proposed amendment reasonably necessary to the promotion of public health, safety, and general welfare. According to the Summit application, there are four local churches within 2 miles of its proposed development site. The Summit Church has 12 branches within the Triangle (source: Wikipedia). It is a stated goal of the church to provide a campus within 20 minutes of everyone in the Triangle. The church would provide "limited" employment, according to its application.

No one has claimed the zoning is defective. It is hard for me to see why a rezoning to institutional/office use to accommodate the applicant's wish to have a church branch convenient to everyone in the region is a necessary response to changing conditions, or is essential to public health, safety and welfare. Thank you for this opportunity to express my concerns.

Gail Friedman
205 Fearrington Post, Pittsboro 27312
gbfriedman21@gmail.com


Mr Garrett

As a resident of the Briar Chapel community since early 2012, I have noticed the development of the 15-501 corridor. I think the Board of Commissioners has done a reasonable job of trying to develop and handle the unprecedented growth and yet maintain the rural feel of Chatham County. The most recent pending zoning board notice to change the acreage next to Dogwood Vet Hospital in order to allow construction of Summit Church , a mega church, is not consistent with the development of property in the area. In my conversations with neighbors in Briar Chapel, a community of 2,700+ homes, there is not one person in Briar Chapel that is in favor of the land usage being proposed. This is also the same sentiment of Fearrington Village which is less than a mile away from the proposed site. There are multiple reasons for this sentiment:
a) a valuable piece of real estate in Chatham county gets developed free of property taxes-which is a loss of substantial revenue for the county,
b) in order to support the cost of an infrastructure of a church this size, the facility will need to conduct events multiple days of the week. In general, the events which are not church sponsored will generate revenue for the church. The use on Sunday as well as other days of the week will put an additional burden on the roads and traffic patterns around the area.
c) Chatham county does not have the road infrastructure to support this significant increase in traffic flow that will be created on Sundays or any other days of use. The county will likely have to utilize the services of the Sheriff's Department to supply traffic control; for every event-Sundays and weekdays. This is a cost to the county which has no revenue offset.
d) The Briar Chapel community will become the innocent bystander of the increased traffic flow as a result as people exit the parking lots after any event will be looking for exit routes to get to Andrews Store Road or Manns Chapel Road instead of fighting the traffic on 15-501. This will potentially cause undo wear on our roads; create unsafe conditions for the residence walking and biking on our streets; and the additional traffic could have an adverse effect on the value of homes in our quiet community.

We urge the Chatham County Board of Commissioners to vote not in favor of this rezoning request.

Thank you for your time, regards
Jeff and Avril Kelchner
296 Serenity Hill Circle
Chapel Hill, NC



We've recently learned that a new 80,000 sq ft church is being proposed along 15-501 near Briar Chapel. We already have many beautiful houses of worship in the area and bring a monstrosity like this to our beautiful county just doesnt make sense.
We consist of 3 x households and none of us are for something like this.
Thank you for listening.

Brennan Barber
1133 Great Ridge Pkwy


From: Kim McCraw <kmccraw29@gmail.com>
Sent: Friday, September 20, 2024 1:29 PM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: Proposed Site For The Summit Church

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi,
I know there has been so much negativity with this proposal and I would like to share my perspective. I recently moved to Chatham Park and absolutely love it here! Even though I am new to the area , I am no stranger to the Triangle. My daughter lives in Briar Chapel and my son lived in Durham before he passed. Both my daughter and son are members of the Summit and I visited many times with them (RDU campus).  I have not found a home church since I've been to the area but watch Summit online. That's why I was so excited to see that the Summit may possibly open a campus on this side of town! I know some of the feedback has been about the traffic it would create and concerned about no revenue since a church is non-profit/tax exempt but I beg to differ. Yes, there will be more traffic but the other campuses create traffic and it's not an issue. They do an amazing job with traffic flow and I feel that would be handled here as well. Having the church on this side of town will encourage members to stay on this side of town with dollars spent on Sunday lunches, gas, and other expenses kept in Chatham County. In addition, The Summit Church has an incredible missionary program, starting with their own community. Their resources could help so many in the area. From a personal perspective, they were there for my son and our entire family as he was in Duke Hospital for a month before losing his battle. The small group he and his girlfriend belonged to through the Summit provided so much love and support during a very difficult time. Yes, there are several wonderful churches in the area but there is no reason to limit the word and works of God. A church may fit the needs of one person but not another. With more choices, I think we would see an increase of church attendance and outreach in our own community. I , for one, will be there the moment the doors (hopefully) open and can't wait to share what a blessing and positive impact this "Mega Church" will be to this wonderful community I now call home. Thank you for your careful consideration of allowing The Summit to plant here.
Respectfully,
Kim McCraw


From: Derrick Jackson <derrickjacksonjr@gmail.com>
Sent: Friday, September 20, 2024 10:28 AM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: Support for Summit Chapel Hill Campus in Chatham County

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Angela Plummer and the Planning Board,

I am writing to express my enthusiastic support for the potential new Summit Chapel Hill Campus in Chatham County. As a long-standing member of the Summit Church for almost 5 years, my family and I have experienced firsthand the positive impact that the Summit has had on our lives and the community.

The Summit Church has been a source of spiritual growth, support, and community for us. We have witnessed how the Summit Church has made a difference in the lives of many individuals and families, including our own. The prospect of having a Summit campus closer to our Chatham County residence is incredibly exciting for us.

I believe that a Summit Church campus in Chatham County would be a valuable addition to the community, providing a place for spiritual growth, support, and community involvement. I wholeheartedly support this initiative and believe it will have a positive impact on the community.

Thank you for considering my feedback and for the opportunity to voice my support for the Summit Chapel Hill Campus in Chatham County.

Warm regards,

Derrick Jackson
[Chatham County Resident]

From: Paige R.
Sent: Friday, September 20, 2024 10:25 AM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: Exciting New Summit Church location

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello Ms. Plummer,
I live in the Briar Chapel neighborhood and I wanted to tell you how excited I am with the prospect of having Summit Church so close to my home! I was recently on UNC's campus near where the International students live, many of them with their families. Summit Church was conducting a free event for these students and families with free food (hotdogs, burgers, chips, drinks), a bouncy house, corn hole, badminton, basketball, and other games ~ all for FREE! The students seemed so thankful and the church members working the event were engaging with the students in conversation and playing games.

I've read about how they send letters of encouragement to teachers at the high school that hosts them. Also, in August, the members purchased hundreds of book bags and school supplies for children in the community. The children in our area will benefit greatly from the work they do to support families in our general area.

It will be exciting to see how they use their resources to support our community and its residents. My husband and I are anxious to see this church built and get involved in all the great investments they'll make in our area as they've done in East Chapel Hill. I keep seeing them labeled as a "mega church" but the attendance I've seen for the Chapel Hill campus is in the hundreds, which could hardly pass for "mega" - I would think that label would require a number in the thousands.

Anyway, I've seen so much bad press on Next Door that I wanted to use your address that was supplied in a post to hopefully weigh in on what I see as a positive attribute to our community. Sure, they may be a tax-free entity but it seems like they pour a lot of their own money and resources into the community where they are located.
Sometimes people are averse to change and want to only see negative aspects instead of realizing the positive impacts a change can have on their community. I wanted to weigh in on what those positives could be (based on what I've personally seen and read) if people would be a little more open-minded to see them.

Thank you for reading,
Paige R.


Dear Mr. Garrett,

Good morning.  I am writing to express my deep concern and current opposition to the proposed Summit 'mega church' development.

I am a Chatham County resident.  My wife and I own a home in the Briar Chapel neighborhood and we have two young children (562 Beacon Ridge Blvd).  We are also people of faith and regularly attend worship.  I appreciate what a church or place of worship can do or be, especially when they integrate themselves within a community.  However, with a site this large, my and my family's concerns are functional as the taxpaying residents living closest and most directly affected.

1.  <u>Tax Base</u> – I am most concerned at Summit's free ridership.  As a religious organization, Summit has tax-exempt status.  They propose a 50+ acre site along our vital, 15/501 throughway, with 3,000 cars travelling to/from on Sunday and another 600-700 midweek.   Summit is too big to contribute practically nothing while requiring much of, and straining, our most costly and critical public goods and services. Yes, Chatham may be growing quickly, but we are also not yet Durham, Orange, or Wake counties where Summit has other locations.

This will strain and increase O&M of our transportation infrastructure, potentially requiring need for more traffic lights and lanes, while local taxpaying residents are left footing the bill. Moreover, removing prime land for continued commercial and residential development amplifies the losses to our county's tax base in the form of county property, payroll, sales and use, or other taxes.

2.  <u>Access to Services / Quality of Life</u> – In addition to infrastructure, Summit will also increase demand on our police, EMT, fire department, and other critical services.  As these are stretched increasingly thin, it is the local resident, taxpayer base – including me and my family – who will suffer the consequence (while footing the bill).

The reality is that churches and ministries this large are a form of 'Big Business' whether we like thinking about them this way or not --- collecting millions annually in membership, tithes, and donations. I hope you and the County Planning Board will engage Summit and require them to commit economically to mitigate or offset the large costs and challenges imposed on the community they profess to serve. I also look forward to learning how Chatham County intends to address the challenges and new budget constraints imposed by Summit to minimize financial and quality of life costs to residents.

Thank you for your and the Board's time and consideration. I appreciate it. Happy to answer any questions you may have if helpful.

Very respectfully,
Michael


**Michael A. Zorger**
(Pronouns: he/him/his)
Cell: 202-304-8916



Dear Mr.Garrett,
     I am concerned about the mega church that is proposed to be built and its impact on our roads and probably increase in taxes to maintain and improve our infrastructure. The traffic on 15/501 is already heavy with traffic. I can't imagine the impact this mega church will have on our main road.
Lisa Rothman
478 Abercorn Circle
Chapel Hill, NC. 27516



No. This is a bad idea. The only reason I could think anyone in government would ever approve of this or anything like this is because they are lining their pockets. Many, many people think the same way but would not express it this bluntly. Please. This is a very bad idea.

Sincerely,
Melissa Tomich



Hello Dan

I currently live in Briar Chapel. There
are a lot of new buildings starting up
along Hwy 15-501. Traffic has increasing a lot since moving here in 2015. A very large Church/ Mega Church and recreation center would increase traffic dramatically.
Also there are ample Churches here that would lose their parishioners.
We have Chatham Community Church,
multiple Baptist, Presbyterian, Episcopal and Methodist Churches as well.

The County will not receive any taxes
from this venture either.

Respectfully,
Linda Arends
ncsunflower@icloud.com


Hi Angela and Dan,

Mega churches can have a mega impact on the quality of life for their neighbors. You can
read about how the issue developed in Durham: https://abc11.com/archive/8979089/

Below I've highlighted three key issues: Noise, Traffic and Citizen Tax Burden.

There are three general issues:
1. Noise: Rock oriented churches create a lot of noise. I love live music but it can be a
nuisance for the community. To run a facility like this, there will be many hours of practice
and performances during mornings and nights throughout the week. Noise ordinances
don't protect neighbors from booming bass or melodies that you can hear over the TV or
while doing homework. Here's a dispute that's ongoing in Pittsburgh in 2024: Moon
Township residents upset about noise from new megachurch nextdoor.

2. Traffic: How many events will they have throughout the week? How many special events
will they have throughout the year? The traffic study shows 2,768 trips on Sundays. But the
facility has 1600 seats for the audience and probably 100+ support staff. It's not clear that
the traffic analysis accounts for the capacity and frequency of events.

| Table 1 – ITE Trip Generation Summary | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Weekday Site Trips** | | | | | | **Weekday** | | **AM** | | **PM** | |
| LUC | Description | Density | Variable | PK HR | METHOD | Daily | In | Out | Total | In | Out | Total |
| 560 | Church [Data Range: 10-50] | 88 | 1000 GFA | Adjacent | RATE* | 669 | 17 | 11 | 28 | 19 | 24 | 43 |
| | Church Total | | | | | 669 | 17 | 11 | 28 | 19 | 24 | 43 |
| **Sunday Site Trips** | | | | | | **Sunday** | | **Sunday Peak** | | | |
| LUC | Description | Density | Variable | PK HR | METHOD | Daily | In | Out | Total | | |
| 560 | Church [Data Range: 10-50] | 88 | 1000 GFA | Adjacent | RATE* | 2,768 | 438 | 474 | 912 | | |

3. Tax Payer Liability: Summit Church will not pay taxes to support our community. In 2024
they are expected to generate $51M in revenue. Though they don't provide full details, they
write that 40-60% of their revenue goes towards staffing and support and 26% is used for
growth (i.e. the proposed building). It would be helpful to know how much revenue this
location expects to make so that we can benchmark their contributions to the Chatham
community against other local businesses.

Thanks for the opportunity to provide feedback about concerns for this project.

Greg Prospero


Dear Sir,
If the church owns the land, I believe they should be allowed to build on it. The people who attend may have paid Chatham taxes. All probably have paid State taxes. The ones who travel may buy gas, food, something as they come or go. Let them rent out their spaces as long as they open Chatham County laws. There are FAR worse things to be built then a Mega Church. I don't live near there, I travel 15/501 as I go to UNC appointments. This is only my opinion.
Thank you
Ann Zimmerman


Dear Members of the Chatham County Planning Board,

I hope this letter finds you well. I am writing to express my concerns and strong opposition to the proposed development of the Summit Church complex, which includes a large sanctuary designed to accommodate up to 1,200 people, along with a parking lot for approximately 600 vehicles.

While I fully support the freedom of worship and community growth, I am deeply concerned about the potential negative impact this development could have on our local community for several reasons:

**1. Strain on Local Resources Without Paying Taxes**

The influx of visitors, especially during large events, may strain public resources like emergency services, road maintenance, and waste management. Local taxpayers will likely bear these costs without receiving benefits, as churches are exempt from taxes under their 501(c)(3) status. Why approve an organization that takes land and avoids taxes while homeowner taxes continue to rise year after year?

**2. Increased Traffic Congestion**
A complex of this size will significantly increase traffic, especially during weekend services and events. Our current infrastructure can't handle the volume, leading to congestion, longer commutes, and safety risks. There are larger areas in Chatham County better suited for this. Why target Briar Chapel and north Chatham?

**3. Need for More Diverse Retail**

Chatham County should bring more retail to the area and stop constraining it to the same main retailers that we see throughout the county. More diverse grocery options and large retail is needed in the area before we open it up to organizations that will sap resources without paying their fair share of taxes. With the growth of Chatham County, we have a unique opportunity to open more doors for business and jobs. That should come first.

I urge the board to carefully consider the long-term effects this development could have on our community and to explore alternative solutions that better align with the needs of both the church and the local area.

Thank you for your time and consideration of my concerns. I sincerely hope the board will take these issues into account when making a decision on this proposal.

Sincerely,
Courtney Delnevo

Good evening,

I had previously sent this email to Dorian, but was notified by Briar Chapel management that you are the correct person to direct this to, so I apologize if this is a duplicate. My name is Olivia Franek and I am writing in support of the Summit Church Parcel purchase near Briar Chapel. When listening to the meeting that was held on Monday, August 19th, 2024, I heard opposing views to the church purchasing the land in Chatham County. As a Chatham County and Briar Chapel resident since 2020 and attendee of Summit Church since 2015, our family is in favor of Summit Church purchasing the parcels for use of a church facility.

The concerns regarding traffic flow for the church expecting 3000 people on Sundays are understandable, however Summit has already done an incredible job at all of their other campuses in the triangle area, and have a team of safety and transportation who work to keep things flowing. Traffic concerns are not new to them and they are well equipped to handle the concerns here in Chatham County. We never have sat in a parking lot waiting to get out of church. Everything has gone very smoothly. This has always been the case since we started with Brier Creek being the main campus of the church with large volumes of people and then when they moved to Capitol Hills. There are residents of Briar Chapel who now drive to the Chapel Hill or Brier Creek campuses because they started attending Summit prior to moving to Briar Chapel, and having a closer location would provide many benefits for these families.

The weeknight involvement discussed in tonight's meeting involved statements including people going to church would be going more than just Sundays. While this may be true, the volume is significantly less than on Sundays. Summit would have specific number on these concerns.

The concern of property tax not being paid due to it being a religious facility and the county losing out on money is a legitimate one, however as I do not know exact numbers of what property tax would

bring, the amount of growth for local businesses in the area would be hugely beneficial to the county and I feel could offset many of these concerns about money loss from the property tax. I also want to bring up that the county could have another company purchase this land and rezone that could provide property tax, but would not necessarily be what the neighboring homes would want either (retail stores, more housing, etc). Summit has been very adaptable to the concerns of Chatham County by increasing the barrier between the neighboring land, trying to match the aesthetic and sitting back farther off 15-501.

Summit Church has a huge history of bringing positive growth to the areas in which they obtain a place of worship, including positive community involvement events that could do a lot for Chatham County residents. From backpack and school supply drives to local mission work bettering local schools and helping with improvement of the area, Summit is committed to making the areas they dwell in a better place. They truly care about the community as a whole.

I appreciate your time.

Best,
Olivia Franek



Hi Dan,

I am a resident of Chatham County and Briar Chapel. I won't be able to attend the hearing on October 1st as I will be out of the country. Instead I am writing to voice my dissent for the re-zoning and construction of a Mega Church adjacent to our neighborhood. Nothing of tangible benefit will come from them being here. It's not worth the environmental destruction from the construction and perpetual pollution caused by the attendees. This will be a net-negative on the community.

Best,
Dave McQuain



In my 22 years living in Fearrington and now Galloway Ridge I have watched  my pastoral environment ( why I moved so far from CH), become a series of strip malls and commercial endeavors…….. as well as residential developments, while not directly on 15/501 have added to the traffic stream; lost is the experience and joy  of " driving into the country" after work.

A mega church, aside from the absence of taxes,  will create a weekend  disaster for those of us who ' might' want to risk driving on 15/501…. As well as whatever church activities happen during the week.

I don't understand why Chatham county would welcome a non-tax paying  establishment of such magnitude which would disrupt the lives of everyone using 15/501…… put it on 64 so there are multiple accesses and does not disturb, any further,  the bucolic environment we all moved here for.

Jane Ross,  Galloway Ridge

Hi Dan,
I wanted to write to express deep concern about having an 88,000+ foot mega church structure built on the 15/501 corridor that would regularly add thousands of additional vehicles on a main thoroughfare for a growing residential population.

I heard a rumor that construction of a Publix grocery store on this same property was previously declined due to similar concerns.  (Since I'm new-ish to the area, I don't know if that's true).  I would not be opposed to a Publix or a desperately needed Target there because the traffic flow is more varied.  But to construct a meeting place that would predictably add thousands of vehicles simultaneously would have an extremely negative impact.  Would the county construct a 3,000+ seat entertainment venue there?  (Think Red Hat Amphitheater)  The logjams would keep local residents from traveling to other businesses in the area.

Please take citizen concerns seriously and reject the mega church construction.

Thanks and Regards,
--Anne Hopp
82 Beacon Ridge Blvd, Chapel Hill (Briar Chapel)



**Cathy Holt**
21h · 👥

For my Chatham County Peeps:

I am so dismayed to learn that there is an 88,416 square foot church being proposed to be built on Chatham County's most important corridor 15/501 (near Briar Chapel). With 3000 members attending the traffic on 15/501 will be terribly impacted not to mention the impossibility of that many cars safely pulling in and out of the entrance. Also they are going to be offering the largest for rent auditorium space in Chatham County so the harm to our community will happen on more than just the days of church services.

No one complains about the lovely pastoral churches all over Chatham County. But this is a mega church and will negatively impact our quality of life with bottle necks along our access in and out of Pittsboro.

This would also have a negative impact on our County's infrastructure and burden our taxes with increased road work, police, etc. This is one of our prime pieces of land along our most important corridor and yet we would not receive any taxes from it because it's a church. Using vision as we determine how we develop this important area is critical. Development should at least be for tax paying entities carefully chosen and maybe those

paying entities carefully chosen and maybe those tax paying entities could help pay for us to protect some of the beauty of that area before it is gone forever.

The next meeting of the County Planning Board is October 1st. 6:30 at the Chatham County Old Ag Building, 65 East Chatham Street, Pittsboro. They are who will send their opinion to the County Board of Commissioners
whose next meeting is later in October.

I won't be in town on Oct. 1st but luckily we can send our opinions via letter to the Planning Department by writing to dan.garrett@chathamcountync.gov or preregister with him if you want to speak at the meeting. Even if you don't want to speak at the meeting, your presence matters!

Sincerely, Cathy Holt

https://www.cathyholtyoga.net

One more thing about the Summit Church plan. I see online complaints that churches don't contribute to tax revenue. 501Cs offer other benefits to a community that don't necessarily show up on a spreadsheet. Community use of their facility is one such benefit. Another benefit would be to local businesses such as when church members go for coffee/lunch/brunch after services.

Regards,
Terri Beresid

109 Plenty Ct.
Pittsboro, NC 27312


Hello Dan,

I have seen some uproar regarding a church's right to be built along 15/501 near Briar Chapel and I will not be able to attend the Oct. 1st meeting. But I wanted to voice my strong support for a church's right to be built here and think it would be a great addition to the Chatham community.

I believe it would improve quality of life for many and provide a lot of inherent benefits to our community.

Thank you for reading,

Garrett


Dear Mr. Garrett,

I am unable to attend the October 1 meeting, but would you please submit to the County Planning Board that I am strongly opposed to rezoning the property on 15/501 proposed for Summit Church.

This corridor has already experienced a high growth in traffic (and accidents) in the 6 years we have lived in Chatham County due to the development of over 2000 homes in Briar Chapel, new apartments built near the new Food Lion, new strip shopping centers and the domino effect of new homes in Chatham Park with cars living, commuting and shopping through this corridor.

There needs to be more thoughtful planning for a large church property removed enough from busy areas so as not to negatively impact the daily lives of people already living nearby. Thank you for your consideration and submitting my comments to the Planning Board.

Kathleen Webster
295 N Serenity Hill Circle
Chapel Hill


Hello

I'm writing about the plan for Summit church to build a location on 15/501 in Chatham.

I'm all for it! They have a long-standing, great reputation for encouraging a loving spirit and being community friendly. They are not my church home but I know many who go to one of their triangle locations. I can't think of a better use of space.

I won't be at the planning meeting but I wanted to send a quick note.  I see there is opposition on NextDoor but you need to know that there are plenty of people who think we need church in our lives.  I believe people will oppose any development along 15/501 and that if this plan gets rejected, the people who oppose it will complain about the next plan as well.  Funny how people move into an area and then want all future development to stop after the trees were cut down for the homes in their own neighborhood.

Regards,
Terri Beresid
109 Plenty Ct.
Pittsboro, NC  27312


Dear Mr. Garrett,

**There is no possible way that this is a good idea!**  The residents of two large communities, Briar Chapel and Fearington Village, need to pass through this area to access grocery stores, medical services, shopping and downtown Chapel Hill. There is no alternative route. A large facility such as this could back up traffic for miles and it won't just be on Sunday. As a retired Realtor, I can assure you that isolating these two communities will cause a drop in property values. If this becomes a reality, I personally will sell & move. Please do not allow this to happen!

 In addition, a mega church will be a user of county services **without paying taxes! That location could certainly be put to better use!** The area already has a number of smaller churches of various denominations and I doubt that any of them are full to capacity. A large church such as is proposed is much better suited to a more rural location, if it needs to exist at all. There is also development south of us in Chatham Park so somewhere near there might be a possibility.

Respectfully,
 Hope Skilling


I am extremely concerned about the construction of the new Baptist megachurch to be built along 15501.  With the construction of Chatham Park and the new housing development across from Southern Village, the traffic along 15501 will become unmanageable.  What is now a scenic roadway will become just another congested highway.  Please consider our quality of life in this area and the future of our neighborhood.

Sydney Dubbin


Message submitted from the <Chatham County, NC> website.

**Site Visitor Name:** Charles Waldren

**Site Visitor Email:** callenwaldren@gmail.com

Regarding the proposed large church. I don't see how, in these troubled times, how we can have too many places of worship.

Not sure for how long a proposal to build a mega church opposite the Veranda has been known. As a nearby resident, I have been made aware of such a proposal only within the last week. At the very least, communication to the public publicizing such a major building project has not been significant.

My concern about possible approval for such a proposal is two-fold. First, turning such a major piece of property tax-paying real estate over for the construction of a church would remove that property from the tax paying rolls. Should the County be willing to absorb that loss of revenue while simultaneously— and inevitably—increasing costs to the County to support the various service and infrastructure such a church building project would require?

Second, is there sufficient infrastructure capability in existence or, are the parcels involved in the proposal, capable of supporting such necessary infrastructure?
At the very least, there has to be sufficient road capacity for a significant increase in vehicular traffic; sufficient capacity for electric generation, running water capacity, sewage removal capacity, communication infrastructure capacity and traffic control to name but a few items.

Having done just a small bit of reading about mega churches, the literature suggests that membership enrollments in such churches is declining, parishioners seeming to be moving back to smaller churches which provide more personal connections/experiences.

If that trend is accurate, does that not suggest that a very large auditorium, as mentioned in some information available about this mega church proposal, would—of necessity— become a public performance/theater/concert facility more intentionally than a church meeting hall?

Hope the County "powers that be" Will take these concerns under careful consideration prior to allowing approval for so large and costly-to-the-County proposal to move forward.

Thank you for your consideration.

David Harrison
108 Cardinal Ridge Road
Sent from my iPad

Dear Members of the Chatham County Planning Board,
I am writing to you regarding Qunity PA's and the Summit Church's request to rezone 6 parcels near the entrance to the Briar Chapel Community. I believe that you've received many other communications regarding this request that have identified concerns that residents in Briar Chapel and the surrounding communities have about

the construction of a megachurch on this site. Although I concur with many of these, I would like to focus on the impact of the facility on the safety of travel in its vicinity.

As I'm sure that the Sheriff's Office is aware, there are frequent accidents at the intersection of Briar Chapel Parkway and 15-501. **I ask that if you don't have an exact number you obtain that information before considering this request**. Cars are traveling through this intersection at 55 mph on six lanes of traffic. The intersection of Lystra and 15-501 has been improved by a new traffic signal and expanded turn lane, but accidents are not uncommon there as well.

When people are attending a service or an event at Summit Church from home, in order to return home they will have to make a U-turn on 15-501 either with or without the benefit of a traffic light. If a thousand or more people dismiss <u>at the same time,</u> the backup on 15-501 both north and south of the church entrance where participants are making U-turns will be massive. People will misjudge the speed of oncoming traffic and impatient drivers will be running red lights after long delays. The only solution to this would be to place a light and intersection at the church's entrance; however, this would be so close to the Briar Chapel entrance light that it would not be advisable and, maybe, not even permitted due to the proximity.

In short, approval of this request will create a predictable traffic hazard that will lead to serious injuries or even deaths. I urge you to deny this request or, at least, prohibit ingress and egress from 15-501 and require that the church gain access to the side street across from the Briar Chapel entrance.

Thank you for your service and consideration of this request.

Sincerely,
Neil Pedersen
209 Wildwind Drive


Dan,

My wife and I are current residents of Briar Chapel, and have been since 2018. We were recently made aware of a rezoning proposal to accommodate the construction of an extremely sizable new church on 15-501 across from the Veranda (the Summit Church Conditional District Rezoning) located on approximately 50 acres of land.

This church would sit across the street from the main entrance to Briar Chapel and the Veranda on 15-501. Over the years, we have witnessed a variety of car accidents at or near this very area. This proposed rezoning and construction would significantly increase traffic flows on 15-501, and cars seeking to enter and exit the church on a two lane highway

where cars routinely travel at 50-55 mph. It is easy to envision that car accidents in this area will only increase if the rezoning is granted.

This construction would bring no new tax revenue to Chatham County (as churches are tax exempt), yet would have the ability to negatively impact property values in Briar Chapel and surrounding developments.  We would strongly encourage the County Planning Board to deny this rezoning proposal, as the likely negative impacts from the project seem to far outweigh any perceived benefits.

Your consideration of our thoughts on this proposal are appreciated.

Regards,


Andy and Patty Mahder
184 Windy Knoll Circle
Chapel Hill, NC 27516



Hello Dan,
I reside in Briar Chapel. I do **not** support the proposed mega church so close to my community. The location of this church will create a traffic nightmare and will strain the resources of Chatham County. Please take my concerns into consideration.
Thank you.
Andrea Slavin



Good morning Dan.  I am writing to express my thoughts upon the Mega Church project slated for 15-501 South.   Please, please, please re-consider this location and **re-locate the Church to a less populated area.**  In the 15 years since I moved to Chatham County, the area has become more and more congested due to the influx of new housing and new commercial construction.  15-501 South has become a major thoroughfare.  At peak traffic times, the road is not only congested, but dangerous, as the traffic disregards the posted speed limits.  In this regard, there have been a great increase in the amount of accidents, many of the very serious.

So, this is a very sincere request to **re-locate the proposed Mega Church**.

Thank you for your attention to this matter.
Concerned citizen,
Ellen Cuttler

Dear Mr. Garrett,

Please convey my thoughts to your colleagues on the Chatham County Planning Board.

The prospect of any enormous tax-exempt organization planted on congested Hwy 15-501 in the heart of a busy residential and retail district seems ill-conceived. In addition to creating chaos, emissions, and noise associated with idling cars on Sundays, a facility the size of Prosperity Gospel is likely to also include a weekday school program that will further tie up roads for families in our Bynum, North and West Williams and Pittsboro precincts. Further, it is not the type of development that promotes the use of mass transit. Therefore, the proposal seems inconsistent with the Draft UDO (p. 313) and the Chatham County Comprehensive Plan land use plan.

I am no expert on planning. And I am not opposed to places of worship *per se*. However, all the pieces of the puzzle must work together to create a cohesive and comfortable whole.

*Adrienne Lallo*
*884 Fearrington Post*
*(884 Ashton)*
*Pittsboro NC 27312*
*512-619-1365*


Dear Sir:

I am writing to express opposition to the proposed building of a large church near Briar Chapel on Hwy 15/501. The Chatham Park development will inevitably result in a dramatic increase in traffic along the highway, and the addition of a large church will only compound the problem. Moreover, as a church, its tax exempt status will allow it to escape responsibility for contributing to the county's coffers. Surely there is a better use for this land, if it must be developed.


Sincerely,
Marcia Culley


**From:** Cathy Holt <holtcathy69@gmail.com>
**Sent:** Tuesday, September 17, 2024 6:33 AM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** protecting 15/501

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Ms. Plummer,
I am so dismayed to learn that there is an 88,416 square foot church being proposed to be built on Chatham County's most important corridor 15/501 (near Briar Chapel). With 3000 members attending the traffic on 15/501 will be terribly impacted not to mention the impossibility of that many cars safely pulling in and out of the entrance. Also they are going to be offering the largest for rent auditorium space in Chatham County so the harm to our community will happen on more than just the days of church services.

No one complains about the lovely pastoral churches all over Chatham County. But this is a mega church and will negatively impact our quality of life with bottle necks  along our access in and out of Pittsboro.

This would also have a negative impact on our County's infrastructure and burden our taxes with increased road work, police, etc. This is one of our prime pieces of land along our most important corridor and yet we would not receive any taxes from it because it's a church. Using vision as we determine how we develop this important area is critical. Development should at least be for tax paying entities carefully chosen and maybe those tax paying entities could help pay for us to protect some of the beauty of that area before it is gone forever.
 Please do what you can to use thoughtful vision for keeping a quality of life in Chatham County for its citizens.
Sincerely, Cathy Holt


Dear Dan,
Many of us are alarmed at the proposed Church building. We are concerned about the traffic impact on this section of 15/501 as it is the primary corridor that runs north and south in Chatham County and is our most direct access to Chapel Hill and I-40 to the north, and Highway 64 to the south.  This increase in traffic could create bottlenecks, and not only adversely affect our every-day driving but cause difficulty in accessing emergency services to hospitals and slow down the ability of ambulances, police, and firetrucks to respond to calls.

There is the additional question of the impact that such an increase in use of our roadways will have on our infrastructure, road maintenance, need for turn-in areas, traffic lights, etc.  Such a burden is likely to increase our taxes, as this church would have tax-exempt status.

Please vote against it.  Thank you for your consideration.
Daniela Sever


Dear Mr. Garrett

I am writing to voice a no for the Mega church approval. That intersection is already riddled with heavy traffic and the have a Mega church added would certainly be an enormous burden for everyone. Its not to right location.

Please consider the total impact and say no to this project. Find a better location that is suitable and avoids a major impact on exiting infrastructure, animals, co considerable loss of trees, plus avoids having additional red lights and traffic circles which adds even more delays to commuters day.

Thanks for your consideration
A Johnson

If this church has any political agenda, I don't want it in my voting district. Keep religion out of politics! Please!
Jim

Jim Aiken

Hi

I am a resident of Fearrington Village and am opposed to the rezoning discussions regarding the Mega Church possibility on 15/501.  We already have so much traffic there that this church would make it worse.

Thanks,

Lynne de Sherbinin

Dear Mr. Garrett,

For the record, we are totally opposed to the building of a mega church on 15-501 as described [Summit Church].
It will be detrimental to our quality of life, deprive the county of much needed taxes, and serve thousands of people
who don't even live here.

I have been a homeowner, resident of Fearrington Village for over 10 years and have served on our local HOA board
for several years.

How can we prevent this from happening?
Please advise.

Yours truly,
Brenda Ungerland

Dear Mr. Garrett.

Along with so many of my neighbors in Briar Chapel & the surrounding communities, I wish to express my opposition to the Mega Church under consideration. It seems beyond reason why such a structure would even be considered for this location. The size and member traffic would be equivalent to having a sports facility in the middle of a residential area.

Lastly, with rising taxes and the need for revenue in Chatham county, this would be an incredible loss of tax income.

Please forward my opposition to the Board of Commissioners.

Sincerely,

Mark & Patti Sonnentag

Briar Chapel

I am a resident of Briar Chapel and have been since 2018. I am concerned about the impact the Summit Church will have on our community and the residents near us. With the large capacity of the church and its draw, we will have many more cars driving on 15/501 each way, each day. There are many accidents occurring on the intersection of 15/501 and Briar Chapel Parkway and at the intersections at Fearrington Village and Galloway Ridge. Some have resulted in serious injuries and caused rerouting of traffic.Will the police and emergency vehicles be able to tend to these accidents? Will they be able to respond to crises and health issues in our community and those near us? Will this cause more environmental issues with the increased traffic and pollution? Where is the water for use in the church coming from? As stated in many national articles, we have one of the worst water systems in the country with contaminants and other materials which are adverse to health- especially the young and elderly residents. I think it is time for the county to be cognizant of the fact that this will lead to many more developments and our natural beauty and farm areas will be gone. Many came here because of the area and lifestyle, but are being sent back into an era of overdevelopment and heavy traffic like we experienced in Massachusetts. I am not against growth, but I am against growth that will adversely affect my lifestyle, health and being able to have rapid response to healthcare if needed. Finally, this area will not be paying taxes and will impact the economic growth of the area and increase liability for all residents of Chatham County. Thank you for listening, Lois Sobel

i am very concerned about the mega church that wants to be built across from briar chapel on 15/501. we cannot take all that traffic here. we do not want our taxes increased for more roads, lights, etc. to accommodate this. it does not belong in this area and will lower our home values. they will not pay taxes but we will have to pay more for that building. we cannot allow this to move here. please stop it ! thank you, antoinette greaves briar chapel resident

**From:** Lynn Hayes <lynnhayes@gmail.com>
**Sent:** Wednesday, September 11, 2024 9:09 PM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>; Jenifer Johnson <jenifer.johnson@chathamcountync.gov>

**Cc:** Richard Hayes <richhayes3@bellsouth.net>
**Subject:** Re: Herndon Farms

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Angela and Jenifer,

I have learned more about the traffic patterns regarding the proposal for Summit Church and we have some serious concerns about the turn lanes after digging into the traffic impact analysis. The "super streets" that are proposed for 15-501 are not funded and would not be put in place before the church was built. The U-turn lanes at Poplar, Lystra and Vickers only have room for about 10 cars to line up - if there are hundreds of cars leaving the church at one time it would be a big mess as cars try to cross 15-501 to get to the turn lane which is backed up down 15-501 and thereby blocking the lanes of traffic.

Please consider these concerns as you review the proposal.

Lynn and Rich Hayes

On Aug 19, 2024 at 3:19:31 PM, Lynn Hayes <lynnhayes@gmail.com> wrote:
Dear Angela and Jenifer,

We live at 612 Oak Island and are also the owners of 570 Oak Island. We are in support of the rezoning by Summit Church of the properties formerly submitted for the Herndon Woods project and are in fact grateful to Summit Church for their kindness in doing so.

Please feel free to contact us with any questions.

Sincerely,

Lynn and Rich Hayes


**From:** Howard Fifer <howard4868@gmail.com>
**Sent:** Sunday, September 8, 2024 6:16 PM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Cc:** katiekenlan@gmail.com
**Subject:** MegaChurch application/Environmental issues

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Ms. Plummer,

I wish to register my opposition to allowing this project to proceed as requested. There is no adequate provision for waste water treatment as presented, and indeed, no adequate plan is even possible given the stated uncertainty of use/future uses of this development.

There are no specifics provided as frequency and/or types of future uses, indoors or outdoors. The plan vaguely alludes to another future building on site, and future unspecified uses (by # of events or # of participants) which makes a rational assessment of the adequacy of wastewater treatment via sceptic fields impossible. Sceptic fields in the generally poor drainage clay is not advisable, but certainly when there is no demonstration of the permeability of the specific placement (and even then efficacy and protection to the public and environment from potential harm should be assured with adequate bonding/insurance).

The unavoidable issue is there is no estimate, or certainty, of how much wastewater will be created at this site from the proposed development. Current and future possible uses not described, limited or restricted in any way. The amount (number and size) of future usage for related and/or commercial events is not set forth. The absence of a list of future uses (outdoor uses, future building, and renting of space for others to use at an unspecified # of events for an unspecified # of people) prove conclusively that they have not met their obligation to have proper wastewater treatment plans in order to allow this application to be approved. It is an issue this request to allow specific future uses which are asked for without any demonstration or accounting for wastewater thus created—no estimate of amount (none is possible) so no demonstration of providing for this mandatory aspect of getting the project built in this location.

Thank you for considering this. I will be out of town at your next public meeting and unable to comment in person. I have taken the liberty of including Commissioner Katie Kenlan to allow her to be apprised of my environmental concerns.

Howard Fifer


Hi

I wanted to reach out with comments about the proposed megachurch on 15-501 (by Vickers Rd) that is slated to be discussed on October 1. I live in the McGregor Woods neighborhood off of Vickers Rd, and am OPPOSED to this church. As someone who has had to drive past St Thomas Moore for years when their services release, I can attest that the traffic is horrible. This church would have MORE seats and more offerings to the community on a weekly basis, which would increase traffic exponentially. In addition, there is a U-turn required if coming from the north at the VIckers Rd light. People already do not give correct right-away there, and the Briar Chapel traffic at that intersection can already be a lot. To add literally THOUSANDS more cars in order for the church to come on 15-501 would be an absolute nightmare. Its way too big for that spot (especially with the U-Haul business right there which creates a lot of large truck traffic), and needs to find another place where there is less of a traffic burden. I am also concerned about both noise and light pollution in our neighborhood-this is a more rural area and I do not see why this church is a necessity. I

am very much against this church being developed on the parcel currently being considered.

Amy Magrinat
35 W Newman Rd
Chapel Hill 27517
Planning Board Meeting on October 1


I am vehemently opposed to this facility being built directly across from Briar Chapel. This is shameful to perpetrate on this community.
Barbara Kaser
77 Sagebrush Rd
Chapel Hill


Mr. Garrett,

    Please let the Board of Commissioners know that there is strong opposition to the planned mega-church behind Dogwood Vet Hospital in the Briar Chapel community. The traffic will be greatly affected when the church has events, which I am sure will occur more often than just Sunday. Also, this church will not be paying taxes so that property will be lost revenue for the county. I have not spoken to a single resident in Briar Chapel that supports building a mega-church at the entrance to our community. Please vote this down.

Judy Benson
1172 Great Ridge Pkwy
Chapel Hill, NC
Briar Chapel


Mr. Garrett,

    Please let the Board of Commissioners know that there is strong opposition to the planned mega-church behind Dogwood Vet Hospital in the Briar Chapel community. The traffic will be greatly affected when the church has events, which I am sure will occur more often than just Sunday. Also, this church will not be paying taxes so that property will be lost revenue for the county. We have not spoken to a single resident in Briar Chapel that supports building a mega-church at the entrance to our community. Please vote this down.


Stephen & Susan Gerstl
260 Serenity Hill Cir.

Chapel Hill, NC  27516

Briar Chapel

Dear Mr. Garrett,
I am writing in opposition to the proposed rezoning for the Summit Church development off of 15-501 in Chatham County. I recognize that development is expected for our rural community, but I hope that it will be done thoughtfully and with the residents in mind.
I oppose the development for two reasons: increased traffic on an already busy 15-501 corridor and the tax-exempt status of the development. The increased traffic on Sundays and also during the week will make that section of 15-501 a nightmare for local residents. I've witnessed firsthand the impact on increased traffic in Chapel Hill by the expansion of St. Thomas More Church. The fact that the property would be used by an organization that is tax-exempt puts additional burden on residents of Chatham County, many of whom are retired and living on fixed incomes.
I urge you to vote against rezoning for the development of Summit Church.
Regards,
Steven Leadon
36 Monarch Trl.
Chapel Hill, NC 27516

Mr. Garrett,

I, too, oppose the idea of a mega church being allowed at Vickers Road and NC 15-501.

Excessive traffic and the loss of a significant amount of property taxes are the main causes for my opposition.

I encourage you to vote down this proposal.

Thank you.
Jim Proper
44 Ashwood Drive
Chapel Hill, ANC 27516

Dear Mr. Garrett,

Please let me add my concern to those who have expressed opposition to the building of the Summit Church, a "mega-church" on Highway 15-501 close to the Briar Chapel neighborhood in Chatham County. I am a homeowner in Briar Chapel and understand that the Church intends to build immediately across the highway from the entrance to our neighborhood. Having briefly researched the Summit Church and as stated in their

own website, their primary mission is to grow each of their many congregations by conversion. They project a membership of several thousand families for each location. This will inevitably cause a disruption of our current traffic patterns so extreme as to make entry and exit from the main entrance to our neighborhood impossible on Sunday mornings and on any other days and times that the church holds events, ie: choir practice, bible study, education, etc.

It is also of great concern that, as a religious organization, they will be assessed no local property taxes. This will essentially render the proposed 500 acres lost revenue for Chatham County. And, while Chatham County is certainly growing, particularly in the northern parts, it is not one of North Carolina's wealthier counties. Can we really afford to essentially give away this much future tax revenue when our county residents have infrastructure and service needs as the county grows? I believe not.

My neighbors here in Briar Chapel share in my concern that the approval of the building of a Summit Church so close to a large family neighborhood such as ours will result in both untenable traffic and overpopulation issues as well as future loss of county tax revenue. We beg you to please vote down this proposal.

With respect,

*Kathleen Page Hundley*
*919-240-7606, hm*
*919-594-9167, cell*
*p.hundley913@gmail.com*

Mr. Garrett,
    Please let the Board of Commissioners know that there is strong opposition to the planned mega-church behind Dogwood Vet Hospital in the Briar Chapel community. The traffic will be greatly affected when the church has events, which I am sure will occur more often than just Sunday. Also, this church will not be paying taxes so that property will be lost revenue for the county. I have not spoken to a single resident in Briar Chapel that supports building a mega-church at the entrance to our community. Please vote this down.
Sincerely,
Veda Puglia
1698 Briar Chapel Parkway
Chapel Hill, NC

To whom it may concern,
the  Board of Commissioners , I strongly vote against the building of the planned mega-church behind Dogwood Vet Hospital in the Briar Chapel community. The traffic will be greatly affected when the church has events, which I am sure will occur more often than just Sunday. Also, this

church will not be paying taxes so that property will be lost revenue for the county. I have not spoken to a single resident in Briar Chapel that supports building a mega-church at the entrance to our community.
Please consider my opposition to the building of the Mega church at the entrance of my community.
Thanks
Orna Kafri
71 Salt Cedar LN
Chape Hill, NC 27516


I concur.

On Thu, Sep 5, 2024 at 11:04 AM Alan Rosenfeld <arosenfeld37@yahoo.com> wrote:

Mr. Garrett,

Please let the Board of Commissioners know that there is strong opposition to the planned mega-church behind Dogwood Vet Hospital in the Briar Chapel community. The traffic will be greatly affected when the church has events, which I am sure will occur more often than just Sunday. Also, this church will not be paying taxes so that property will be lost revenue for the county. I have not spoken to a single resident in Briar Chapel that supports building a mega-church at the entrance to our community. Please vote this down.

Alan Rosenfeld
216 Hill Creek Blvd
Chapel Hill, NC
Briar Chapel


I strongly agree. This is already an increasingly congested area.
Thanks, Larry.
C Lawrence Kien, MD, Ph.D.


As a resident of Briar Chapel, I am strongly opposed to building a mega church on 15/501 across from Briar Chapel. This would create a permanent traffic nightmare, not just on Sundays and not just for Briar Chapel homeowners. Surely the church can find an alternative location on a less populated corridor. I urge Chatham County to block this development. Thank you for your consideration. Laurie Leichman


Mr. Garrett,

I live in Pittsboro and frequently travel 15-501 to and from Chapel Hill.  I strongly oppose the planned church to be located behind Dogwood Veterinary Hospital.  The intersection at Briar Chapel Parkway, 15/501 and Vickers Road is often the scene of automobile accidents because of the high traffic volume.  That intersection currently services 2500 homes within Briar Chapel, a daycare center and multiple businesses.  Adding additional demands on that intersection will exceed the road's capacity and compromise the safety of motorists.  Has there been a traffic impact analysis to support this proposal?

Respectfully,
Donna Sukkar

This is a great idea Alan. I am going to write to Mr Garrett as well.

Anita

On Sep 5, 2024, at 11:04 AM, Alan Rosenfeld <arosenfeld37@yahoo.com> wrote:

Mr. Garrett,

    Please let the Board of Commissioners know that there is strong opposition to the planned mega-church behind Dogwood Vet Hospital in the Briar Chapel community. The traffic will be greatly affected when the church has events, which I am sure will occur more often than just Sunday. Also, this church will not be paying taxes so that property will be lost revenue for the county. I have not spoken to a single resident in Briar Chapel that supports building a mega-church at the entrance to our community. Please vote this down.

Alan Rosenfeld
216 Hill Creek Blvd
Chapel Hill, NC
Briar Chapel

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Mr. Garrett

I am urging you to vote down the planned mega-church behind Dogwood veterinarian Hospital in the Briar Chapel community. There is strong opposition to this church since it will not be paying taxes

resulting in lost revenue for the county. We in the Briar Chapel community are deeply opposed to this mega church that will have a dramatic impact on the traffic in this community. Please let the board of commissioners know that there is strong opposition to this mega church.

If you have any suggestions as to what we can do to stop this, please let us know.

Regards

Anita Stamm
661 Great Ridge Parkway
Chapel Hill, NC

# I concur.  Is there a way we can add our signatures??

On Thu, Sep 5, 2024 at 11:04 AM Alan Rosenfeld <arosenfeld37@yahoo.com> wrote:

Mr. Garrett,

    Please let the Board of Commissioners know that there is strong opposition to the planned mega-church behind Dogwood Vet Hospital in the Briar Chapel community. The traffic will be greatly affected when the church has events, which I am sure will occur more often than just Sunday. Also, this church will not be paying taxes so that property will be lost revenue for the county. I have not spoken to a single resident in Briar Chapel that supports building a mega-church at the entrance to our community. Please vote this down.

Alan Rosenfeld
216 Hill Creek Blvd
Chapel Hill, NC
Briar Chapel

Mr. Garrett,

    Please let the Board of Commissioners know that there is strong opposition to the planned mega-church behind Dogwood Vet Hospital in the Briar Chapel community of 2000+ homes. The traffic will be greatly affected when the church has events, which I am sure will occur more often than just Sunday. Also, this church will not be paying taxes so that property will be lost revenue for the county. I have not spoken to a single resident in Briar Chapel that supports building a mega-church at the entrance to our community. Please vote this down.

Thank you

Leslie Adams
156 Post Oak Rd
Chapel Hill NC  27516
Briar Chapel


Mr. Garrett,

    Please let the Board of Commissioners know that there is strong opposition to the planned mega-church behind Dogwood Vet Hospital in the Briar Chapel community. The traffic will be greatly affected when the church has events, which I am sure will occur more often than just Sunday. Also, this church will not be paying taxes so that property will be lost revenue for the county. I have not spoken to a single resident in Briar Chapel that supports building a mega-church at the entrance to our community. Please vote this down.

James McKay
251 Serenity Hill Circle
Chapel Hill, NC
Briar Chapel


Mr Garrett
I sent the previous message to Chatham County officials but I was not sure of the correct zoning contact, so I'm forwarding it to you. Please take into consideration my **strong** opposition to the rezoning for the Summit Church  project, as a Briar Chapel resident. I've outlined some of my concerns  below in my original email. If you re not the correct contact, please forward along.
Thank you
Gina M. Donato, Ph.D.
112 Treywood Lane
Chapel Hill, NC 27516


Mr. Garrett,

    Please let the Board of Commissioners know that there is strong opposition to the planned mega-church behind Dogwood Vet Hospital in the Briar Chapel community. The traffic will be greatly affected when the church has events, which I am sure will occur more often than just Sunday. Also, this church will not be paying taxes so that property will be lost revenue for the county. I have not spoken to a single resident in Briar Chapel that supports building a mega-church at the entrance to our community. Please vote this down.

Alan Rosenfeld
216 Hill Creek Blvd
Chapel Hill, NC
Briar Chapel


**From:** nancy dail <nancydail.myarbonne@gmail.com>
**Sent:** Wednesday, September 4, 2024 6:24 PM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Summit church in Chatham County

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

I am totally in support of Summit church having a satellite location in Chatham County!!

I'm excited the new location will be very close. I have driven to Durham and Apex in order to go to this church. I have heard there is lot of chatter complaining about the presence of a "megachurch" with claims that the church doesn't do any good for the community. Clearly, those folks don't know Summit. It has been a major positive force in its communities on many levels. There are bad churches out there. I'm very grateful for churches like Summit that strive to do things the right way. And for those worried about traffic, I've never had to sit in traffic because of any Summit campus. The traffic concern is a red herring.

Progress is coming to Chatham County and this is a huge sign that it's bringing good opportunities to the community!!

Mr. Garrett,
   Please let the Board of Commissioners know that there is strong opposition to the planned mega-church behind Dogwood Vet Hospital in the Briar Chapel community. The traffic will be greatly affected when the church has events, which I am sure will occur more often than just Sunday. Also, this church will not be paying taxes so that property will be lost revenue for the county. I have not spoken to a single resident in Briar Chapel that supports building a mega-church at the entrance to our community. Please vote this down.

Wilbur Carter
102 Serenity Hill Circle
Chapel Hill, NC
Briar Chapel


**From:** Liz Kawabata <lizkawabata@gmail.com>
**Sent:** Wednesday, September 4, 2024 11:48 AM
**To:** Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Proposed Mega Church

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Dear Ms. Plummer,

As a citizen of Chatham County, I am against building the proposed Mega Church across from the entrance of Briar Chapel.

First, I believe that Mega Churches do not foster strong community ties because the attendees come from many outlying communities. We have enough churches already.

Second, the size and the structure would be a blight on the surrounding area.

Third, the traffic from services and events would make that part of 15/501 more crowded and more dangerous than it is now.

Fourth, the Mega Church would not generate any revenue for Chatham County, while using many of its resources.

Please vote against this proposal.

Thank You.
Elizabeth Kawabata

**From:** mtadd@earthlink.net <mtadd@earthlink.net>
**Sent:** Tuesday, September 3, 2024 3:52 PM
**To:** Jason Sullivan <jason.sullivan@chathamcountync.gov>
**Subject:** tonight's meeting

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Hello Mr. Sullivan,

As I will be unable to attend tonight's meeting I would like to ask that the planning board address what I think is an extremely important concern regarding the potential approval of the Mega Church ( I sincerely hope that it won't be approved) is what is their plan to accommodate the parking of 3,000 cars? Do they plan on building a mega parking deck, or just pave the heck out of what once was a forest? Is anyone considering the environmental impact? Not just the displacement of a variety of animals from insects to mammals that live in these woods, but also what will it do in terms of climate change? Fewer trees, more pavement and impervious surface will just add to the warming of our area and potentially cause flooding as where will the rain water go? I moved to Fearrington five years ago and never in my wildest imagination did I think there would be such out-of-control development

on 15-501. As you know there have been many accidents all along the northern corridor towards Chapel Hill. Many have been at the entrance to Fearrington. The last thing we need is an enormous influx of traffic.

I look forward to hearing from you,

Best,
Maria Tadd

From: Belle Brooks <brownmom15@gmail.com>
Sent: Wednesday, September 4, 2024 7:48 AM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: Summit Church

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning Angela!  My name is Belle Brooks and I am a native of Chatham County. My family has been attending the Summit Church since June 2016. We drive 45 minutes to the Briar Creek campus. My son and daughter-in-law have a four year old daughter that began attending Awana this past fall which is a program that teaches children to memorize scripture. They made that drive twice on Sundays which is a total of three hours in the car. You know this church is special to drive that far!! We have often invited friends to join us there but most people don't want to drive that far.  We have been praying for a Chatham County campus for years now. I am amazed at the pushback the county is receiving!  If the main reason is increased traffic, that can easily be handled with turn lanes and traffic lights. If economic value to the community is the reason, then remember many of these churchgoers will then go out to eat. That would be a boost to the area.

The Summit Church is a very different church than others in the area. This church reaches out to the community to help meet the needs of the community.  After all, one of the church's purposes is to love on the surrounding people, offer help and hope.  Having grown up in church all my life I can testify to the love and inclusion found in this church.

I thank you for considering our pleas to approve this site.
Sincerely,
Belle Brooks

From: Olivia Franek <oliviaailifranek@yahoo.com>
Sent: Monday, August 19, 2024 9:33 PM
To: Dorian McLean <dorian.mclean@chathamcountync.gov>
Subject: Comments for Rezoning Summit Church Parcel

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good evening,

My name is Olivia Franek I am writing in support of the Summit Church Parcel purchase near Briar Chapel. When listening to the meeting held tonight, Monday, August 19th, 2024, I heard opposing views to the church purchasing the land in Chatham County. As a Chatham County and Briar Chapel resident since 2020 and attendee of Summit Church since 2015, our family is in favor of Summit Church purchasing the parcels for use of a church facility.

The concerns regarding traffic flow for the church expecting 3000 people on Sundays are understandable, however Summit has already done an incredible job at all of their other campuses in the triangle area, and have a team of safety and transportation who work to keep things flowing. Traffic concerns are not new to them and they are well equipped to handle the concerns here in Chatham County. We never have sat in a parking lot waiting to get out of church. Everything has gone very smoothly. This has always been the case since we started with Brier Creek being the main campus of the church with large volumes of people and then when they moved to Capitol Hills. There are residents of Briar Chapel who now drive to the Chapel Hill or Brier Creek campuses because they started attending Summit prior to moving to Briar Chapel, and having a closer location would provide many benefits for these families.

The weeknight involvement discussed in tonight's meeting involved statements including people going to church would be going more than just Sundays. While this may be true, the volume is significantly less than on Sundays. Summit would have specific number on these concerns.

The concern of property tax not being paid due to it being a religious facility and the county losing out on money is a legitimate one, however as I do not know exact numbers of what property tax would bring, the amount of growth for local businesses in the area would be hugely beneficial to the county and I feel could offset many of these concerns about money loss from the property tax. I also want to bring up that the county could have another company purchase this land and rezone that could provide property tax, but would not necessarily be what the neighboring homes would want either (retail stores, more housing, etc). Summit has been very adaptable to the concerns of Chatham County by increasing the barrier between the neighboring land, trying to match the aesthetic and sitting back farther off 15-501.

Summit Church has a huge history of bringing positive growth to the areas in which they obtain a place of worship, including positive community involvement events that could do a lot for Chatham County residents. From backpack and school supply drives to local mission work bettering local schools and helping with improvement of the area, Summit is committed to making the areas they dwell in a better place. They truly care about the community as a whole.

I appreciate you reading my e-mail, and if there is a better way to get this message out to the public by speaking at a future meeting where this is on the agenda, I would love to do so.

Best,
Olivia Franek

Chris,

Regarding the abstract, we add information about the item after the public hearing as the item proceeds to the Planning Board and more information is added after they make a recommendation to the Commissioners. The full application is available for the items and that has all the information that's available to staff prior to the public hearing.

Jason Sullivan
Planning Director
Chatham County
P.O. Box 54
80-A East St.
Pittsboro, NC 27312
Office: 919/542-8233
Fax: 919/542-0527

**From:** C Bouton <csbouton42@gmail.com>
**Sent:** Sunday, August 18, 2024 4:34 PM
**To:** Jason Sullivan <jason.sullivan@chathamcountync.gov>
**Subject:** Re: Public input for county development

Thanks so much for your help, Jason. However, I'm afraid that there is no information for the property abstracts on either link you sent other than default section titles. This is quite disheartening, especially since there is no easy way to put these in proper context for input as a Chatham resident and in such short notice.

Aside from this, I would really like to speak with you about information accessibility on the County website. Is this something you can address? I ask as a resident who is over 55-yo, a full-time employed commuter in the Triangle, and a part-time family caregiver - super busy. I'm glad to schedule a call at your convenience during your weekly business hours. Please let me know if I need to contact a different person or even a different office to address the fact that there is no timely & succinct way for Chatham County residents to look up items like this for appropriate research on opportunities for public comment.

BTW, you are awesome to take the time on your weekend to write me about my questions. I truly appreciate your efforts.

Kindest regards,
Chris Bouton
919-491-5631

On Sun, Aug 18, 2024, 9:55 AM Jason Sullivan <jason.sullivan@chathamcountync.gov> wrote:

Chris,

The signs on 15-501 are for a proposed church and you can view the rezoning application on the following webpages –

https://www.chathamcountync.gov/government/departments-programs-i-z/planning/rezonings-subdivision-cases/2024-items/summit-church-conditional-district-rezoning

https://www.chathamcountync.gov/government/departments-programs-i-z/planning/rezonings-subdivision-cases/2024-items/summit-church-general-use-rezoning.

These properties are currently approved for a compact community, but it appears the developer is not moving forward with the project. The public hearings for these items is tomorrow night and the commissioners meeting starts at 6pm in the Historic Courthouse in Pittsboro. You can provide comments during the public hearing or in writing and here is the link to sign up - https://www.chathamcountync.gov/government/board-of-commissioners/commissioner-meetings/public-input-hearing-sign-up.

 I think the sign on 64 is within the Town of Pittsboro's planning jurisdiction and I've copied the town planning director on this email.

 Jason Sullivan
Planning Director
Chatham County
P.O. Box 54
80-A East St.
Pittsboro, NC 27312
Office: 919/542-8233
Fax: 919/542-0527

**From:** C Bouton <csbouton42@gmail.com>
**Sent:** Tuesday, August 13, 2024 3:09 PM
**To:** Jason Sullivan <jason.sullivan@chathamcountync.gov>
**Subject:** Re: Public input for county development


Hi Jason,

There are signs on 15-501, and I saw another near Business 64 East in the recent past, but there was nowhere online to review for public comment.

Is there a link on the Chatham County website?
Thanks,
Chris

On Tue, Aug 13, 2024, 1:39 PM Jason Sullivan <jason.sullivan@chathamcountync.gov> wrote:

Chris,

Are the signs along 15-501 or west of Goldston? Thanks

Jason Sullivan
Planning Director
Chatham County
P.O. Box 54
80-A East St.
Pittsboro, NC 27312
Office: 919/542-8233
Fax: 919/542-0527

**From:** C Bouton <csbouton42@gmail.com>
**Sent:** Tuesday, August 13, 2024 11:22 AM
**To:** Jason Sullivan <jason.sullivan@chathamcountync.gov>
**Subject:** Public input for county development

> WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning, Jason.

I hope you are doing well. Your name was listed on the Planning Board web page, and I hope you are the correct person to email for assistance. I'm looking for the page on the County website for submitting public comment for the yellow property notice signs so that I can research what's going on and submit my comments. Unfortunately, I can't find anything on the website for this. The only public comment input I found is for the County Commissioner meetings. Where can I find the listings for public comment information?

Thanks for your help.

Kind regards,

Chris Bouton
csbouton42@gmail.com

From: Marion Haywood <marion.haywood@gmail.com>
Sent: Monday, August 19, 2024 3:33 PM
To: Angela Plummer <angela.plummer@chathamcountync.gov>; Jenifer Johnson
<jenifer.johnson@chathamcountync.gov>
Subject: Oak Island rezoning

WARNING: This message originated from outside the Chatham County email system. Do not click links or
open attachments unless you recognize the sender and know the content is safe.

Hello Angela & Jennifer.
I live at 501 Oak Island Drive and am in favor of the zoning request to return the land parcels adjoining
my property to R1 - residential.
Please contact me if you have further information regarding this matter or have questions.
Sincerely,
Marion Haywood


August 19, 2024
RE: Summit Church Conditional District Rezoning
Dear Chatham County Commissioners:
I am writing request that you reject the conditional rezoning application for the properties
listed in the Summit Church Conditional District request on your agenda this evening. I
support the neighbors of these parcels to return the zoning of this property to comply with
the Chatham County's Comprehensive Plan, which includes "preserving rural character
was identified as the most important goal during the planning process." (p.18)
This project does not fit the intent of our Comprehensive Plan with a 60,000 square foot
building and 527 parking spaces plus a future secondary building of unknown area. This
will not preserve the rural aspect of our county, especially in an area that is already
becoming highly developed.
As a commuter who passes this property every day, I also believe that the size of this
project is not conducive to retaining ease of traffic in that part of 15-501. This stretch is
already very easily backed up with regular commuter and school traffic, and that has only
increased with the construction traffic along this route. Traffic pattern updates between
this proposed project and Fearrington Village have been very disruptive for the only
roadway between Pittsboro and Chapel Hill. Please return this property to the original
zoning that retains our county's rural character.
Thank you for your consideration.
Kind Regards,
Chris Bouton
Pittsboro, NC
**From:** Gina Donato <gmdonatophd@gmail.com>
**Sent:** Wednesday, August 21, 2024 2:05 PM
**To:** Jenifer Johnson <jenifer.johnson@chathamcountync.gov>; Angela Plummer
<angela.plummer@chathamcountync.gov>; Jason Sullivan <jason.sullivan@chathamcountync.gov>
**Subject:** Chatham county zoning

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

I just wanted to voice my opinion AGAINST the Chatham County rezoning for the Summit Megachurch- A rezoning request by Qunity, PA to rezone Parcels 18750, 18896, 18897 from CD-CC Conditional District Compact Community to CD-O&I Conditional District Office & Institutional for a church/place of worship, being a total of 50.117 acres, located at 9780 US 15-501 N, Williams Township.

As a resident of Briar Chapel, the size and scope of this establishment would be a huge impediment to traffic on 15-501, noise in the community and disruption of the area considering the number of people, services and parking spots that are required. We would like to keep the area as residential as possible and this amount of rezoning would be quite a disruption to the feel and residents. Please consider denying this project.

Gina M. Donato, Ph.D.
112 Treywood Lane
Chapel Hill, NC 27516

From: Barbara Falotico <barbara.falotico@icloud.com>
Sent: Wednesday, August 21, 2024 2:01 PM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: Mega church opposition

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

My husband and I live in Briar Chapel. We are strongly against a megachurch development across from our neighborhood. The 15-501 intersection is dangerous enough with volume and speed. I'm opposed to the increased volume of traffic on a permanent basis.
A very concerned resident,
Barbara Falotico
45 Post Oak Road
Chapel Hill, NC 27516
621-786-3130


**From:** Susan G <susanguza@msn.com>
**Sent:** Wednesday, August 21, 2024 2:46 PM
**To:** Jenifer Johnson <jenifer.johnson@chathamcountync.gov>; Angela Plummer <angela.plummer@chathamcountync.gov>; Jason Sullivan <jason.sullivan@chathamcountync.gov>
**Subject:** RE: Summit Church Conditional District Rezoning

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

I agree with Chris Bouton's statement below. I also ask that the rezoning request by Qunity, PA to rezone Parcels 18750, 18896, 18897 from CD-CC Conditional District Compact Community to CD-O&I Conditional District Office & Institutional for a church/place of worship, being a total of 50.117 acres, located at 9780 US 15-501 N, Williams Township submitted by Summitt Church be denied.
Susan Guza, Briar Chapel Resident


**From:** Mirinda Kossoff <mkossoff31@gmail.com>
**Sent:** Wednesday, August 21, 2024 5:02 PM
**To:** Jason Sullivan <jason.sullivan@chathamcountync.gov>
**Subject:** No to another megachurch

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

I am against another megachurch being built on 15-501 near Fearrington where I live. A church brings more traffic, doesn't pay taxes and contributes nothing to the community. If the land is to be developed, we need more goods and services, not a church.
Thank you,
Mirinda Kossoff
From: Vicky Copelton <minkadog73@icloud.com>
Sent: Wednesday, August 21, 2024 3:52 PM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: Summit church

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Please please do not support the mega church between Fearrington and Harris Teeter. Vicky Copelton
Sent from Vicky's IPAD

From: Rich Feldman <richard.feldman777@gmail.com>
Sent: Wednesday, August 21, 2024 5:42 PM
To: Jenifer Johnson <jenifer.johnson@chathamcountync.gov>
Subject: NO mega church!

Ms. Johnson,

I am AGAINST a mega church being built on 15/501 by Fearington Village, and I will vote AGAINST any elected official who supports building such a monstrosity in our community.

There are "plenty" of local churches and synagogs that support our community, and the very LAST thing our community needs is a three-ring circus eye-sore church "corporation" hogging 50 acres of tax-exempt land.

Thank you.

Richard Feldman
1353 Cedar Grove Road
Pittsboro, NC 27312

From: charles brock <ken-tucky@att.net>
Sent: Wednesday, August 21, 2024 7:07 PM
To: Jenifer Johnson <jenifer.johnson@chathamcountync.gov>
Subject: Church

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Stop the development of a mega church!
Do not build mega church.
We already have numerous churches in Chatham!!!
Ken Brock Chatham county

**From:** Janet Stevens <janstevens17@hotmail.com>
**Sent:** Wednesday, August 21, 2024 7:17 PM
**To:** Jenifer Johnson <jenifer.johnson@chathamcountync.gov>
**Subject:** Zoning request 24-5452 summit church on 15-501

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Thank you for taking comments on the above.
3,000 cars is huge, certainly bigger than the high schools that already cause quite a jam.

 This does not fit with keeping some rural areas in this part of Chatham County.  It is good the building would be set back as it looks very utilitarian. With all the other churches in the area I would think it would pull from some of them.

Thank you
Janet Stevens
823 Fearrington Post


From: Ruth Ann Burk <ruthann.burk@gmail.com>
Sent: Thursday, August 22, 2024 8:48 AM
To: Jason Sullivan <jason.sullivan@chathamcountync.gov>
Subject: Mega Church

I am a resident of Fearrington Village and totally opposed to the construction of a mega church between our village and Harris Teeter. Church will not pay taxes and have a negative impact to traffic.
This is a terrible proposal. Vote NO.
Ruth Ann Burk
1395 Bradford Pl


**From:** Kristina Solovieva <kristinasolohomes@gmail.com>
**Sent:** Thursday, August 22, 2024 9:48 AM
**To:** Jenifer Johnson <jenifer.johnson@chathamcountync.gov>; Angela Plummer <angela.plummer@chathamcountync.gov>
**Subject:** Yes-for Mega Summit Church

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Hi Jennifer and Angela,
We just moved to Pittsboro from California and I love that this community is building more churches, more restaurants, more businesses, parks and more infrastructure. I know there was a post on Nextdoor that triggered a lot of negative emails addressed to you. Please count us in for the Christ focused vision for the area.

 "Yes" to the new churches and businesses! It would be so boring to live around just the newly built ugly apartments surroundings

Thank you!

From: JR <jrichardson767@gmail.com>
Sent: Thursday, August 22, 2024 12:16 PM
To: Jason Sullivan <jason.sullivan@chathamcountync.gov>
Subject: Proposed Summit Church - SUPPORT

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

I am a Chatham County resident writing to voice SUPPORT for the project as long as the church pays reasonable impact fees for infrastructure costs directly attributable to its construction and operation.

I have lived and paid taxes in Chatham County from 1990-1993 and 1999-present. During this time there has been a continued inflow of new residents whose culture and background are neither Southern nor welcoming. Frequently these new residents try to control the county agenda, which is the case with the proposed Summit Church.

There has been a lengthy discussion on the Nextdoor app for two days about the project. It is clear from this open discussion that many of the objections are based on the religious and political bias of commenters who appear to have lived in Chatham County only a short time. If their highly biased objections (see example below) are used as a basis for rejecting the conservative Christian Summit Church's application it would unconstitutional. Further, objecting solely to THIS church on the basis of its tax-exempt status (like all churches, synagogues, mosques, etc) would be blatantly discriminatory and illegal.

So the county should stick to the direct collateral infrastructure costs associated with the church and make its decision solely on that basis. I hope the county responds by APPROVING.

John A Richardson
151 Turtlerun
Fearrington
Pittsboro, NC 27312
919-444-1042


From: ncsunflower@icloud.com <ncsunflower@icloud.com>
Sent: Friday, August 23, 2024 9:31 AM
To: Jenifer Johnson <jenifer.johnson@chathamcountync.gov>
Subject: Mega Church

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hello,
I would like to oppose the Mega Church plan on 15-501. Is there a website I can give my opinion on this? Thank you for your time

Linda Arends


From: nancy ferguson <nancyjoanandres@gmail.com>
Sent: Friday, August 23, 2024 11:46 AM
To: Jenifer Johnson <jenifer.johnson@chathamcountync.gov>
Subject: Mega Church on 15-501

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

I understand that a mega church is up for approval off of 15-501 between the Harris Teeter and Farrington Village. I hope this project will not be approved because of the heavy traffic we already have in that area. This project might be better off of HI 64. I live near the Harris Teeter and am very concerned about this project—the negative impact of excessive traffic and costs borne by all of us taxpayers.
Thanks for listening,
Nancy A Ferguson


From: Alissa Owens <alissaowens84@gmail.com>
Sent: Friday, August 23, 2024 11:05 AM
To: Dorian McLean <dorian.mclean@chathamcountync.gov>
Subject: Summit campus

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi, I am new to the Briar chapel community in Chapel Hill. We have been Summit church member since 2015. I was told there was possibility of a new campus being built near me!! We pray this is a go!
Alissa Owens


From: Judith Martin <wildflower28716@yahoo.com>
Sent: Saturday, August 24, 2024 11:15 AM
To: Angela Plummer <angela.plummer@chathamcountync.gov>
Subject: Summit mega church

Hello Angela,

I live in the Briar Chapel community across from the proposed sight for the mega church.

I am very upset about this proposal.

Chatham County needs new businesses, medical facilities, good restaurants and stores that would all bring in revenue for Chatham County.  At the same time giving all the residents the good services that we need.

We have lots of good churches here in the county. We do not need a mega church that uses prime real estate and does not create revenue for the county.  It will also cause a severe traffic problem on 15/501. And it will only serve those belonging to that church, not all the residents of Chatham County.

I am saying NO to this proposal, please do not do this.  It is not a good fit for Chatham County.

Sincerely,
Judith Martin
246 Salt Cedar Lane
Chapel Hill,NC 27516


From: Jessica Lynn <duddles123@icloud.com>
Sent: Sunday, August 25, 2024 1:10 AM
To: Jenifer Johnson <jenifer.johnson@chathamcountync.gov>
Subject: We don't need another mega church

Seriously. Enough with the craziness.
Do something. Stop the madness. Stop the lunacy. Please …


From: Judith Martin <wildflower28716@yahoo.com>
Sent: Saturday, August 24, 2024 11:03 AM
To: Jenifer Johnson <jenifer.johnson@chathamcountync.gov>
Subject: Mega church

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Sent from my iPad
Jenifer,
I live in the Briar Chapel community in Chatham County across from where the proposed Mega church might go.

I am very upset about this proposal.
Chatham County needs new businesses, medical facilities, good restaurants and stores.  Those would all provide revenue for Chatham County and  much needed services for all the residents.  We have lots of good churches here. The Summit mega church will not provide revenue for Chatham County. It will create a severe traffic problem on 15/501. And it will only serve those belonging to that church, not all of the residents.

I am saying no to this proposal, please don't do this. It is not a good fit for Chatham County.

Sincerely,

Judith Martin
246 Salt Cedar Lane
Chapel Hill, NC 27516

**From:** Katie Breitholtz <klbreitholtz@gmail.com>
**Sent:** Sunday, August 25, 2024 8:44 AM
**To:** Jenifer Johnson <jenifer.johnson@chathamcountync.gov>
**Subject:** Summit Church Development

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Dear Ms. Jenifer Johnson,

I am writing to express my concern with the development of the Megachurch Summit Church being proposed for development near Fearrington Village. The proposed development is another big box church being dumped into our community without true benefits to Chatham County. Churches do not pay taxes to support our public schools, local or state governments, and property tax dollars. With a large influx of people moving to our area, it is important we support the community with more small businesses that will meet the needs of our incredible community. The mission and values of the Summit Church is to "plant 1,000 churches". They prioritize the gospel, but do not claim to support the community as a priority. As a member of Chatham County and public school teacher, I'd propose to deny their right to build a megachurch. If the need to truly develop the land, it could be used for economic development that would employ local residents and bring tax dollars to support our community. Thank you for your time and service to our community.

Respectfully,
Katie Breitholtz


From: KEN MURPHY <kmurphy19662003@yahoo.com>
Sent: Saturday, August 24, 2024 8:48 PM
To: Jenifer Johnson <jenifer.johnson@chathamcountync.gov>
Subject: No mega church!

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Plenty of churches for everyone. Save our land for tax paying entities.

Kenneth Murphy
113 colonial trail ct
Pittsboro Nc
From: Linda Fleishman <fleishman.linda@gmail.com>
Sent: Friday, August 23, 2024 4:02 PM

To: Jenifer Johnson <jenifer.johnson@chathamcountync.gov>
Subject: Mega Church Zoning

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good Afternoon,
I live in Briar Chapel. I am very disturbed at the thought of a Mega Church being built behind Harris Teeter off 15/501. I can't imagine the traffic from such a venue. How can I find out more about the proposed plans? And, what can be done to stop such a disastrous project? I can't see where it would increase the tax base since churches are non profit and the wear and tear and disturbance to the neighborhood would be a huge problem.
Regards,
Linda Fleishman


From: margaret deprater <mdeprater@hotmail.com>
Sent: Monday, August 26, 2024 11:35 AM
To: Jenifer Johnson <jenifer.johnson@chathamcountync.gov>
Subject: Mega Church proposal

WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Jennifer, please voice the following concerns regarding the Mega Church project proposal:  New construction planned for these 50 acres to be built near Briar Chapel entrance :  this site incurs large travel volumes on Sundays; this site would need more hiring of professionals to direct traffic volume; this site does not have adequate parking; this site construction would add to pollution problems and endanger the environment.  Therefore I voice objection to this proposal.  Signed Margaret R DePrater 510 Fearrimgton Village:


**From:** Sharon Blessum <skyprairie@gmail.com>
**Sent:** Monday, August 26, 2024 11:26 AM
**To:** Jenifer Johnson <jenifer.johnson@chathamcountync.gov>
**Subject:** MEGA CHURCH ON 15/501

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

 I am not able to attend the meeting Sept 3 s0 I hope my comment here will matter. I live at Fearrington Village and we already have MANY accidents on the corners of 15/501 and Weathersfield, 15/501 and Village Way. The DOT improvements have not stopped the problem. As well as the many changes on that road from here north (and south). A large church population would not only create the most horrific congestion, it would be very dangerous. I beg of you to protect the residents up and down an already challenging roadway. A mega church would not only sorely affect the quality of life in

surrounding communities, it would go against the teachings of Jesus to love your neighbor as yourself.

Peace and Beauty,
*Sharon* Blessum


**From:** Barbara Rounds <barbararounds1@gmail.com>
**Sent:** Friday, August 23, 2024 9:40 PM
**To:** Jason Sullivan <jason.sullivan@chathamcountync.gov>
**Subject:** Please Choose Another Location

**WARNING: This message originated from outside the Chatham County email system. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

This Highway where you have chosen to locate a church open to the public will cause unnecessary stress and traffic to this small local community.
Please choose a private or smaller road that will not cause congestion.

Please confirm you have received my request.

Kind regards,
Barbara Rounds
1368 Fearrington Post
Fearrington Village
Pittsboro

# EXHIBIT 11



# Chatham County Planning Board Minutes
## October 1, 2024

The Chatham County Planning Board met in regular session on the above date and the meeting were as follows:

| Present | | Absent |
|---|---|---|
| Jon Spoon, Chair | Eric Andrews | Mary Roodkowsky, Vice-Chair |
| Tony Mayer | Clyde Frazier | |
| Elizabeth Haddix | Nelson Smith | |
| Shelley Colbert | Amanda Roberson | |

Planning Department
Jason Sullivan, Director, Angela Plummer, Zoning Administrator, Kimberly Tyson, Subdivision Administrator, Hunter Glenn, Planner II, and Daniel Garrett, Clerk to the Planning Board.

I. CALL TO ORDER:
Chair Spoon called the meeting to order at 6:30 p.m.

II. DETERMINATION OF QUORUM:
Chair Spoon stated there was a quorum, 8 members were present, Vice-Chair Roodkowsky was absent.

III. APPROVAL OF AGENDA:
Approval of the Agenda – Chair spoon said there are two items on consent, one is for the Vickers Village Conditional District revision, we had previously approved their subdivision extension unanimously. The other item is for a Final Plat in Fearrington Village. Motion made by Ms. Haddix to approve the agenda and the two items on consent, seconded by Mr. Andrews. The agenda and consent items were approved, 8-0, unanimously.

IV. APPROVAL OF THE MINUTES:
Consideration of the September 3, 2024 meeting minutes. Motion by Mr. Mayer to approve the September 3rd minutes and seconded by Ms. Robertson, the minutes were approved 8-0, unanimously.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 688 of 743

V.  PUBLIC INPUT SESSION:

- Chair Spoon said there has been some misinformation about the subject matter for tonight's meeting. We will not be discussing the Unified Development Ordinance at this meeting; we will be discussing that at our October 8th special meeting at 6:30pm located at the Agriculture and Conference Center. We will receive a presentation from the consultants and have Board discussion during that meeting. Chair Spoon also explained that the public who signed up to speak on a specific agenda item will have their opportunity to speak during that time. This public input session is for anyone who would like to speak about anything that is not specific to an item on the agenda. Chair Spoon called Ms. Joyce Frank to speak.

- Ms. Joyce Frank of 298 Lindo Johnson Road said thank you for the opportunity to speak to you this evening. My name is Joyce Bouldin Frank, I have lived on Lindo Johnson Road in Pittsboro for 54 of my 64 years and have never had a zip code that was not 27312. What I would like share will not be technical, but it will be from my heart. It has been difficult for me to witness all the development that I see in Pittsboro and the Chatham Park area. There seems to be a new housing development, either complete or under construction, everywhere I turn. That kind of expansion in and around town is understandable, but it is bleeding into our agricultural areas and destroying our rural communities. It is now impacting my immediate neighborhood, and it is breaking my heart! I live half way between Pittsboro and Siler City. That is about as far away from "town" as you can get. However, less than a mile from my home, on Buckner Clark Rd., a developer is planning to build over 130 homes on 1 acre lots, in a 180-acre space, and right in the middle of agricultural properties. Back in the 1960's, I recall Buckner Clark Rd. having roughly 5 mailboxes along it is 2 ½ mile stretch. Recently I counted approximately 65 mailboxes: an average of 1 new home per year over a 60-year period. With this new development, more than 2 times the number of homes will be added to my neighborhood in a fraction of the time. As it is now, it is challenging to turn onto Buckner Clark Rd. from Lindo Johnson Rd. I have no idea how things will be when the traffic level is increased due to the proposed development! I expect that all the rural areas that have had to cope with the hundreds of housing developments imposed on them have probably experienced the same thing. Board members, please consider us "country folk" who want to keep our country "country" and consider those who would like to move into our area because it is the country. Whatever is in your power to make this happen would be applauded by all of us whose hearts are breaking and lives are being impacted negatively by all this unbridled growth in Chatham County. Thank you for your time. I appreciate whatever you can do to protect rural Chatham County.

VI.  CONSENT ITEMS:

1. A legislative request for a revision to the existing Conditional District Compact Community for Vicker's Village, to be located at US 15/501 N and Jack Bennett's and Vicker's Roads, that was approved on November 15, 2021, to modify Condition Numbers 5, 6, 7, and 8 to modify the phasing of the project and Condition Number 22 to expand the requirement for the first building permit for three more years from a new approval date, Williams Township.

2. Request by Van Finch on behalf of Fitch Creations, Inc for subdivision Final Plat review of Section X Area "F" Currituck, consisting of 6 lots on 3.755 acres, located off Millcroft, (SR-1817), parcel 18998.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 689 of 743

- These consent items were approved with the meeting agenda approval.

VII. <u>SUBDIVISION ITEMS:</u>

1. Request by Jeff Foster, P.E. on behalf of Maurice Nunn for subdivision First Plat review of New Hope Overlook, consisting of 22 lots on 45.115 acres, located off New Hope Church Road (SR-1733), parcels 75213 & 19704.

Ms. Tyson said the request is for First Plat review and recommendation of New Hope Overlook, consisting of 22 lots on 45.115 acres, located off New Hope Church Road, S.R. 1733. Per the Subdivision Regulations, Section 5.2C(4), a Public Hearing shall be held at the first Planning Board meeting to receive comments on the proposed subdivision. Item (b) states that following the Public Hearing, the Planning Board shall review the proposal, staff recommendation, and public comments and indicate their recommendation for approval, disapproval, or approval subject to modifications. As stated above, the Planning Board has two (2) meetings to act on the proposal. The road is to be built as a 20-foot-wide travel way with a 60-foot-wide public right-of-way.

The applicant received comments during the Concept Plan TRC Meeting. The Chatham County Historical Association asked to be contacted if any gravesites or old structures are found. Notification of the proposed development was provided to the Chatham County School System. Randy Drumheller, Chatham County Schools Director of Maintenance and Construction was contacted by email dated August 6, 2024.

The developer submitted the General Environmental Documentation, and a letter dated June 6, 2024, from North Carolina Department of Natural and Cultural Resources Natural Heritage Program to Chatham County Land & Water Resources Division for review. The letter states "A query of the NCNHP database, indicates that there are records for rare species, important natural communities, natural areas, and/or conservation/managed areas within the proposed project boundary. 'Potential Occurrences' table summarizes rare species and natural communities that have been documented within one-mile radius of the property boundary. The proximity of these records suggests that these natural heritage elements may potentially be present in the project area if suitable habitat exists." Taylor Burton, Senior Watershed Specialist, reviewed the information submitted. Ms. Burton replied in a letter dated August 8, 2024, that the requirement has been met. Additional comments included any Allowable uses and Allowable with Mitigation uses in the protected riparian buffer will require a Buffer Authorization from Chatham County, all permits with wetland and stream impacts from NC Division of Water Resources and the US Army Corps of Engineers will need to be obtained prior to receiving approval from Chatham County for a Grading Permit and Land Disturbing Permit.

A community meeting was held on June 11, 2024, at New Hope Baptist Church. Approximately six people attended the meeting. The attendees voiced their concerns about the lack of utilities i.e., internet and public water. The TRC met on September 11, 2024, to review the First Plat submittal. Mr. Jeff Foster, P.E. with CE Group were present and gave a brief overview of the project. Mr. Foster stated they have been working with the soil scientist to finalize the septic areas and lot lines between lots 6 & 7 will need to be adjusted.

Staff discussion included:

- Location of the mail kiosk.

- Standard setbacks will apply to the subdivision and concerns with lot 11 building footprint setbacks.

- Need to apply for a driveway permit with NCDOT and Mr. Foster stated he will confirm the sight distance.

- A possible missing wetland on the buffer report. The SCM located at the beginning of the subdivision easement is encroaching into the riparian buffer. Will a sign easement be on lot 16? Mr. Foster stated a sign easement will be placed on lot 16.

- Environmental Health stated LSS identified surface and subsurface drip soils in 2022. LSS report indicates more work needs to be completed to determine the number of lots the soil can support.

A soils report has been completed by Soil & Environmental Consultants, PA. and fieldwork was completed March and April of 2022 per the soils report. Individual wells. The road name New Hope Overlook Drive has been approved by Chatham County Emergency Operations Office as acceptable for submittal to the Board of Commissioners for approval. Kevin Murphrey with Soil & Environmental Consultants, Inc. (S&EC) completed a site visit in April and June of 2024, and

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 690 of 743

identified eight (8) surface waters within the review area that were potentially subject to riparian buffers. Kevin Murphrey, with S&EC completed the on-site riparian buffer and Watershed Protection staff confirmed the findings of S&EC personnel. A confirmation letter dated July 12, 2024, stated two (2) ephemeral streams, two (2) intermittent streams, and four (4) potential wetlands. A 30-ft buffer from top of bank landward on both sides of the feature for all ephemeral streams, a 50-ft buffer will be required beginning at the flagged boundary and proceeding landward on all wetlands, a 50-ft buffer from top of bank landward on both sides of the feature for all intermittent streams, and a 100-ft buffer from top of bank landward on both sides of the feature for all perennial streams. On-site determination expires five years from the date of the riparian buffer report. The Jurisdictional Determination has been submitted to the Army Corp of Engineers. There are three (3) proposed stormwater devices and as part of the stormwater permitting process additional information will be provided to the Watershed Protection Department during the permitting process. A Stormwater Permit and Sedimentation & Erosion Control Permit will be obtained from the Chatham County Watershed Protection Department prior to Construction Plan submittal. No land disturbing activity can commence on the property prior to obtaining Construction Plan approval. Site visits were scheduled for September 18 & 19, 2024, for Planning Department staff and various board members to attend.

Ms. Tyson said the Planning Department recommends granting approval of the road name New Hope Overlook Drive granting approval of the First Plat for New Hope Overlook with the following conditions:

1. Approval of the First Plat shall be valid for a period of twenty-four (24) months following the date of approval by the Board of Commissioners and the Construction Plan approval shall be valid for a period of twenty-four (24) months from the date of approval by the Technical Review Committee or Board of Commissioners

- Mr. Frazier said during the TRC meeting there was some concern about lot 11 and the building setbacks, has that been corrected? Ms. Tyson said yes it has been corrected on the plat. Mr. Frazier also asked about lot 1A what is going to be on that lot because there does not seem to be a home site located on it. Ms. Tyson said Mr. Jeff Foster with the CE Group would be able to answer that question.

- Mr. Foster gave a brief overview of the project and said the Board members that went to the site visit will appreciate that the infrastructure will be minimal and minimal impact to water features. We are not proposing to disturb any of those features. The goal is to create 22 lots, but it could be less, we would not try to come back and increase the lot count on this project. Most of the project is surrounded by US Army Corps land and the other property owners are family members of the applicant. Mr. Foster said lot 1A is part of lot 1, but it is not contagious. We decreased the size of lot 16 and increased lot 1.

- Ms. Robertson said she walked the property on the site visit and it is clear that there would be no tree removal and was thankful for Mr. Nunn and the others at the site visit who helped remove her car from being stuck in the soft ground after a recent rain. It was refreshing to hear that the developer will be willing to lose a lot if needed to make the development fit correctly. Ms. Robertson said she did not see anything that would raise any concern.

- Mr. Frazier said this is a straight forward project and made a motion to approve this item, Ms. Robertson seconded the motion.

- Mr. Mayer said he went to the site visit as well and was thankful for no stream crossings and seemed like a straight forward project. It was nice to see some lonely pines out there and good to know they will most likely not be disturbed.

There was a vote to approve this item, the First Plat was approved 8-0, unanimously.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 691 of 743

VIII.  <u>ZONING</u>:

1. A legislative request by Qunity, PA to rezone Parcels 18750, 18896, 18897 from CD-CC Conditional District Compact Community to CD-O&I Conditional District Office & Institutional for a church/place of worship, being a total of 50.117 acres, located at 9780 US 15-501 N, Williams Township.

2. A legislative request by Qunity, PA to rezone Parcels 2752, 93852, 18909 from CD-CC Conditional District Compact Community to R-1 Residential, being a total of approximately 46.607 acres, located of US 15-501 N, Baldwin Township.

- Chair Spoon said the Board is going to consider both of these rezoning items together since they are linked by one project, so we will hear the public input for all the parcels involved in these rezoning items. First we will have a brief update from the Planning staff and allow the applicant 15 minutes for a presentation, then we will move into public input. Chair Spoon said the Planning Board will be evaluating this on its merits as a rezoning application based on the land use, there has been a lot of broader discussions about the need or the perceived lack of need for religion in this part of the county, that will not be part of our discussion. Chair Spoon said during the public input we will have to stick with the 3-minute time limits and if you hear what you wanted to say has already been said, you can just let us know if you agree or disagree with the rezoning proposal.

- Ms. Plummer gave a brief overview of the two rezoning applications and introduced the representative of the applicant Ms. Jael Wagoner and Ms. Courtney Queen with Qunity and Mr. Baohong Wan with Gannett Fleming.

- Ms. Wagoner and Mr. Wan provided an updated presentation to the Planning Board with PowerPoint slides. Ms. Wagoner said today they wanted to provide clarifications from what we have heard from the community as well as emails that were received by the Planning staff. Ms. Wagoner said the key points for consideration are proposed Land Use meets the Comprehensive Plan and Future Land Use Map, parcels are uncoupled from original parcel assemblage CRZ limits land use, conditional rezoning required if any other land use type is proposed, and neighborhood meeting was completed in accordance with Chatham County regulations on 4/29/2024. Ms. Wagoner touched on the potential economic impact, preserving the rural character with different simulated viewsheds and the distance the building will be from Hwy 15/501. Ms. Wagoner also stated that Summit Church meets goals 1,3,5,6, and 10 of the Comprehensive Plan and on page 47 churches are listed as part of the fabric of the rural character. Ms. Wagoner compared the Summit Church proposal and current regulations to the potential submittals in this area once the Unified Development Ordinance has been adopted, there will be more buildable area and less trees with larger height allowances.

- Ms. Wagoner discussed the church plant verification; she said it is true; a major Summit Church initiative is to plant 1000 churches. This is part of their mission to support new churches to develop locally around the U.S. and across the globe. However, this development is a local branch of Summit Church which is rooted in the Triangle region. Summit Church has a primary purpose of providing everyone in the Triangle access to local facilities of no more than 20 minutes from where people live, work, and play. Their goal is to meet the needs

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 692 of 743

of every community by assisting in community organization, public schools, local families, and area universities. Ms. Wagoner said that this development will address wastewater clarification with an entirely on-site, subsurface holding tanks, and underground drip system. The flow equalization methodically limits use.

- Mr. Wan with Gannett Fleming provided traffic analysis clarifications. Gannett Fleming started TIA scoping coordination with NCDOT in July 2024. The final TIA scoping document (MOU, dated 8/9/2024) was approved by NCDOT on August 12, 2024. The Summit Church Traffic Impact Analysis was completed on 8/16/2024 and submitted to the County and NCDOT for review and comment. NCDOT issued preliminary review on 9/13/2024, indicating the TIA substantially meet NCDOT's criteria for further review and comments. Mr. Wan provided a slide with comparisons of daily trips of the proposed Summit Church to the existing Herndon Farms project and the Vickers Village project. In all, the Summit Church project will be far less vehicle trips. Mr. Wan also discussed the future plans and improvements to Hwy 15/501 and how it will be capable of increased traffic demands. Mr. Wan also showed a slide with a list of recommendations of future access points and traffic light intersections. Mr. Wan and Ms. Wagoner thanked the Planning Board.

Public Input:

- Ms. Teresa Weedon of 249 Tabacco Farm Way said I oppose the Summit megachurch. I am definitely not a planning or traffic expert, but I just completed a common-sense review of the Traffic Impact Analysis for Summit church. I am planning to forward my questions to the Planning staff, I expect that there must be explanations that I missed for there to be such a poor impact analysis report. Peak traffic could be really bad locally, it looks like somewhere between 100 to 355 cars will be routing through or past the immediate entrances to the Briar Chapel community. Three factors have been included to create three scenarios. Factor one is the U-turn at Hwy 15/501 and Briar Chapel Parkway. There will probably be delays at the U-turn that are not taken into account in the report. Factor two is the total number of car trips, there could be considerably more total car trips because the capacity of the future accessory building on the Summit Church site is not taken into account in the report. Factor three is the number of car trips from places in the north like Chapel Hill, most of the population is in the north. Summit Church will probably be closing their temporary site at East Chapel Hill High School with the church supporters traveling south. The report has not taken north direction into account. The Sunday peak will stretch for most of the day not just several hours around the first church service. Sunday appears to be three church services with three peaks, the report has all the numbers, but it does not describe the three peaks. There could be peak events during the week, all of the traffic problems could occur during the week for special events with the church renting out the location. The report has not identified this fact. Ms. Weedon provided a diagram to the Planning staff to handout to the Planning Board members. Ms. Weedon thanked the Planning Board.

- Mr. James Coplan of 4328 Millcreek Circle said he has lived here for 8 years. I wish to register my opposition to this proposal primarily because even though this development would be in Chatham County it is not in fact for the people of Chatham County. If we refer to the supplemental report, they said the Chapel Hill campus is planning to relocate to this permanent facility with approximately 800 parishioners from the Chapel Hill transient campus and approximately 15% of them are Chapel Hill residents. If you do the math, that means that 85% of the first batch of parishioners are not going to be Chatham County residents, they will be Orange County residents. Mr. Coplan provided a graph to the Planning Board members showing three different possibilities of potential growth of either Chatham County or Orange County residents attending the church. Mr. Coplan said I am pro rural country churches and if Summit Church keeps planting their large churches it will be the same as big box stores putting the mom-and-pop stores out of business, they will bleed all the small churches dry of parishioners. Summit Church would have to recruit 1000 new members to have a 50/50 split of Chatham and Orange residents. Why should we give up irreplaceable natural resources, why should we put our local churches at risk, and property tax issues for a church that fundamentally is not going to serve the local people of Chatham County.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 693 of 743

- Ms. Stacy Donelan of 112 Treywood Lane thanked the Planning Board for allowing the public to come back and speak on this topic. I am still in opposition to the Summit Church rezoning project. Summit Church has 12 campuses in the Triangle area and if the proposed rezoning application is approved the Chapel Hill location will be folded into this location with 800 members coming down Hwy 15/501. Only 15% of the members will be Chatham residents, that is from the clarification document that was submitted to the board. An unknown number of parishioners from the west Cary or Apex locations could also transition to the proposed location. Of the 11 campuses, 6 campuses are 30 miles away from the proposed site. There will be an anticipated 1,200 members expected in two services on Sunday with 2,400 members. There is a possibility that there will be regional activities that will invite members form mutable campuses. There are many unknows whether this church will sponsor regional activities, the purpose of the accessory building is another unknown. Will our area of Chatham County be overwhelmed by the goals of Summit Church? Summit Church describes its vison as having a campus within 20 minutes of everyone in the Triangle. Does their goals align with the goals of Chatham County? A primary Chatham County planning goal along Hwy 15/501 to promote mixed-use development, housing, businesses, and mindfulness of the remaining rural qualities. Business rezoning proposal fit that goal. Rapid population in Chatham County is current and will continue to occur whether the church complex is approved or not. Chatham, County is projected by the office of state management to grow by about 8.2%, from 83,000 to 90,000 between now and 2030. Chatham County needs affordable housing and this large piece of land can provide land for affordable housing and senior living. Do we want thousands of cars a month coming into Chatham County to attend an immense church? The pollution, the traffic, does that serve our needs and goals. It serves the goals of Summit Church, but I do not believe it will serve the goals of the residents of Chatham County. One lane traffic flow when you are leaving church will create severe U-turn bottle neck at multiple intersections. To Ms. Plummer and Ms. Tyson, when we come up here and speak against a proposal you have been assigned, please do not take it personally. We know you are just doing your job.

- Dr. Taylor Fisher of 75 Hill Creek Boulevard said thank you to each Planning Board member for serving our communities and our county. I am here to address my enthusiastic support for the rezoning of the parcels of land for Summit Church. I have lived in North Carolina my entire life and been attending Summit Church since 2004. Summit Church has been an incredible blessing for my life, provided me with hope, encouragement, love, joy, peace, and a welcoming family. Summit Church has always sought to meet the needs and serve the community well. I have had the privilege of serving those in need by providing meals, home improvement, clothing, and medical services alongside Summit church and other ministries. I am thrilled to think of all the incredible opportunities to meet the needs within the Chatham County communities. My family and I recently had the pleasure of serving international students at UNC by hosting a block party. The majority of the students are several thousands of miles away from everyone and everything they know. I spoke for a long time with a student from Korea who is here to earn his PhD. He was so thankful for this event which included food, games, and fellowship. The generosity made such an impact he shared he was already hoping to remain in North Carolina after graduation specifically to live and work here in Chatham Park. Summit church has a wealth of experience supporting local schools by providing gift bags, meals for teachers and students, offering tutoring and substitute teacher services, completing landscape and campus projects such as painting and deep cleaning. Summit Church provides love and support for families with foster children and fortunately we have been able to celebrate adoptions in several families. When crisis hits, Summit church is willing to provide resources whether they are professional or personal. When we received a terminal diagnosis for one of our children without any hesitation our first phone call was to a Summit Church pastor who was soon by our side walking with us through that entire season of our lives and still today. I cannot wait for all of our Chatham County communities to have convenient access to positive engagement of Summit Church and all it has to offer. Thank you.

- Mr. Andy Pignatora of 60 Treywood Lane said I am here to voice my objection. My wife and I are local business owners, we run a business across the street from the proposed site. I do not really have a problem for whatever goes in there, it just has to make sense and this particular proposal does not make a lot of

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 694 of 743

sense to me. We have lived in Briar Chapel for almost 11 years and as we have seen the traffic on Hwy 15/501 has increased more and more with serious car accidents. My problem is the periods on Sunday when traffic would most likely impact my business as we are a robust breakfast business. The use of the land for something that really is not employing people or contributing to the tax base of the county seems to be a missed opportunity. It was said that the landscape architect would encourage other businesses to open to service that area, unless there is an infrastructure plan going in along Hwy 15/501 up to the county line, opening a business on Hwy 15/501 is very difficult. There is no sewage available, so to support that many people, I have not heard of a new development that would bring that many people, it would be a transient situation, they are not going to stop and buy in Chatham, they will go back to where they came from. I just do not see any upside, if it were a sports facility where people are coming for a short period once or twice a week, I would voice the same opinion. Thank you.

- Peter Falotico of 45 Post Oak Road said I have been a resident homeowner of Briar Chapel in Chatham County for 10 years. I would like to speak about my traffic safety concerns regarding the rezoning of 3 parcels 18750, 18896, 18897 on 15-501 North of Vickers Road. Has the North Carolina State Highway Patrol or the Chatham County Police been asked to render an opinion of this rezoning proposal regarding the safety of travelers along 15-501 between Vickers Road and the Harris Teeter entrance and between Lystra Road and Briar Chapel Parkway, during Sunday services, Holiday services, Holy week, and for special events? Who would be legally responsible to control the abnormal volume of traffic during these times? How long will it take to get 600 to 900 North bound vehicles on 15-501, going to services and/or events, to turn right into the proposed site? How long will it take vehicles to leave and exit onto 15-501? Will traffic temporarily back up into 15-501 in both directions? If the proposed parking lots are full, will vehicles be permitted to overflow park on the shoulders of 15-501? How many vehicles headed South can get into the u turn lane safely at Briar Chapel Parkway before backing up into the left lane on 15-501? How many vehicles headed North can get into the u turn lane safely at Lystra Road before backing up into the left lane on 15-501? Chatham County residents who drive on 15-501 between Lystra Road and Vickers Road/Briar Chapel Parkway need to know we will be safe if this rezoning proposal is approved. This rezoning is going to cause additional accidents. Thank you for allowing me to ask questions.

- Barbara Falotico of 45 Post Oaks Road said I am a Briar Chapel resident. Tonight, I am addressing my concerns for the 88,000 sqft church and campus on Hwy 15/501. My comments are specifically around crash frequency. My remarks will be based on data from the NCDOT statistics map of crash frequency by intersection. The incidents were collected from the years 2019-2023. Allow me to share some crash numbers near the proposed Summit campus. The church will be located between Briar Chapel Parkway, Vickers Road, and Lystra Road. The crash frequency by Briar Chapel Parkway and Vickers Road was 29 total crashes. The crash frequency by Lystra Road was 37 total crashes. Manns Chapel Road had the third highest crash frequency in Chatham County with 45 total crashes. South of the proposed Summit campus we have Village Way and Fearrington Village with 31 crashes and Mt. Gilead Road has 43 crashes. These statistics are actually deflated due to the 2020 pandemic shutdown. Yet, that are at least double the crashes from other intersections along Hwy 15/501 from the Chatham County line to Hwy 64. What will the dangers be if the Summit rezoning application is approved? Summit Church anticipates 1,200 members for Sunday service through two services with over 900 cars at peak time. That is only on Sundays, what other major events will Summit sponsor that will draw similar or higher car volumes, we do not know. We know that Summit Church Chapel Hill members will transition to the new structure, how will their trip from the north back home impact our dangerous intersections? We do not know the numbers traveling from Cary and Apex, what will the crash incidents be when massive car volumes have to navigate through the U-turns that are necessary in the plan to exit and enter the two driveways that are directly off Hwy 15/501? If the Summit proposal is approved a mammoth structure will be built, generating hundreds of car trips in the most dangerous section of Hwy 15/501. Thank you for the opportunity to speak and I oppose this zoning resolution.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 695 of 743

- Ms. Stephanie Powell of 114 Beacon Ridge Boulevard said I want to applaud Mr. Spoon for making the announcement that you are going to review this application on the land use and not on the basis of religion or any other basis. In your imagination substitute Summit Church with another hypothetical applicant that is not a church, but a company that does the same thing on the property only not for religious purposes. I would like to ask you if you would look at this and decide if you would recommend approval or denial of this rezoning based on this potential applicant I will refer to as the user. The question is, would you recommend rezoning if the user generated substantial traffic along Hwy 15/501 which would cause traffic backups and dangerous unsafe conditions. Would you approve this zoning application if the user has a net negative fiscal impact on the county, generates no property taxes and does not provide employment opportunities, and has no other revenue sources? Saying people may stop along the way to purchase a coffee or frequent the small shops in Pittsboro is not a good reason. Would you approve this rezoning if the user burdens Chatham County infrastructure without contributing to its cause? Would you approve this rezoning if the user operates its business located on the project substantially for the benefit to residents outside of Chatham County and its businesses supported by the most part by interested parties or "insiders" of the user. After rezoning this key 50-acre tract will be forever a lost opportunity for Chatham County and will never be available to provide a much-needed services, sales, affordable housing, and other positive uses for the benefit of Chatham County. Would you approve this for the user if they had an 88.000 sqft building and a future building with an outdoor areas to increase and add to the users frequencies scope and types of activities that will not be controllable by Chatham County. Would you really want to approve this rezoning applied by the user? Thank you and Ms. Powell asked for the people in attendance tonight who are opposed to the rezoning to stand.

- Mr. Alex Harris of 46 Mallard Landing Drive said I am here tonight to express my support for the rezoning for the proposed Summit Church location. My wife and I have been attending Summit for over 6 years now and recently have joined as members. The church has had an amazing impact on us individually and as a family including relationships we have gained with other members that live here in Chatham, which some are here tonight. One of the things that has really stood out to us while attending Summit is the churches desire to benefit the community within where it is located. An example I can share is with my own experience during the early days of attending Summit, I helped repaint classrooms in a Durham County elementary school as Summit's serve out youth project that year. There are other types of involvement in the church, there seems like there is some kind of initiative going on that is supporting the neighbors. Something else about this church that has stood out for us is the quality of the youth program, I believe both members and non-members can benefit from having this in our area. My wife and I have a toddler and feel great about the care she receives both from the staff and volunteers on a weekly basis. As parents we can appreciate and see the importance of having a safe place for kids in our community. I am a proud Chatham County native and a lifelong resident, I do not say that because it gives my opinion any more weight than anyone else here tonight, I say it to the Planning Board to affirm that there is Chatham residents who have seen the trajectory the county has been on for quite a while now and believe that Summit will be a great addition. I hope you recommend this rezoning for approval and thank you.

- Ms. Bethany Harris of 46 Mallard Landing Drive said thank you for allowing me to be here to voice my support for the Summit rezoning as a Chatham County resident. I could tell you all the ways this would impact me and my family to have our church located right outside of neighborhood. Our daughter was in the NICU for quite some time and it was members of the Summit Church that brought us meals, checked in on us, and asked what it is they could do to help. I want to focus more on how this church would positively impact this community. We have attended Summit Church for many years and we have seen the heart that those campuses have for their communities, whether that is partnering with a local school or supply fundraisers of supporting local college students or lunches for healthcare workers to give them a chance to connect with one another. Those are just small ways I have seen Summit reach out to the community for the years that we have been there. I think about this tragedy that has just happened in western North Carolina and has been proud of the way Summit has already jumped into action trying to help by partnering with organizations there to find out what the needs are and how we can help with supplies. This has impacted

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 696 of 743

thousands of people in North Carolina, I am a nurse and I care deeply for people and I truly believe that this church can help care for this community and I hope we have a chance to share our hearth with Chatham county.

- Ms. Esther Thyssen of Fearrington village said as a resident that has access to Hwy 15/501 to go anywhere outside of Fearrington Village I would like to object to the rezoning application. I wish to address the impact on the environment and the natural character of the Hwy 15/501 corridor as defined in the Plan Chatham corridor study which is part of the Comprehensive Plan. Preserving the natural character of Chatham County is a primary goal they have in the Plan. The current zoning application on behalf of Summit Church for the development of these large parcels along the east side of the corridor should be rejected. On these parcels the plan is to reconfigure the environment and remove a significant concentration of trees, tear up and rearrange the topography, and significantly alter the viewsheds along Hwy 15/501. The plans submitted by Qunity will erase densely forested areas and locates the excavated basin for stormwater control where most of the trees are currently growing on parcel 18750. In addition, the plan locates a new open field on parcels 18897 and 18896 where the tree cover is dense. The application should be denied because the plan locates the children's play area near the high voltage powerlines which may expose them to danger and could cause health concerns. The application should be rejected because it locates substantial parking lots under the Duke Energy powerlines and the parking areas would be fully illuminated and seen along the corridor. The rezoning application should be denied because the plan disregards the objective to retain the natural character of the environment including wildlife habitats.

- Ms. Erin Carter of 34 Hunters Way said I live very close to the proposed site. The intersection of my neighborhood will be the source of all of the U-turns where 85% of the parishioners will be coming from the north. One big concern I have is trying to get out of my neighborhood every once in a while. I am here representing the Vickers Road community; we are a vibrant active pedestrian area with four children under the age of 2 and you will see strollers and kids riding their bikes and middle school and high school age kids out playing. It is not just a street for us, but a vital place for exercise, play, interaction, and social gatherings. We can cross Hwy 15/501 and visit the businesses on the other side. I would not imagine doing that anymore when there are thousands of cars turning at that intersection. It just seems like a poor fit for the area. The U-turn where all the traffic is going to be cannot fit more than 5 cars in it right now. Imagine how many light cycles that is going to take every Sunday morning when everyone is trying to get in there. We lack the necessary stop lights and crosswalks to support vehicle or pedestrian safety with this enormous volume of traffic. There is no crosswalks so you can expect to see even more pedestrian fatalities when this traffic increases. The church may serve their members well, it will not offer any or little benefit to the surrounding community. The interests of the church goers does not align with the people of the community. We are not opposed to religious institutions or to development but the scale of impacts to this development are disproportionate and detrimental to our neighborhood. The mixed use under the compact community ordinance will support increased housing and employment for Chatham County and we hope that it remains that way. Vickers Village will provide housing and businesses and even a park which we are looking forward to. The church says they will open their access to the playground, but a lot of churches lock theirs so I am not convinced by that. We have only heard from current members of Summit church for support, it is a small segment of the population that is going to benefit from this. As someone who cares about housing and employment in Chatham County I do not see the benefit, it really is just a giant event center coming here to benefit a very small selection of people and degrade the quality of life for everyone else, especially those that live near the site. It is going to impact the safety and that is too big of a price to pay, thank you.

- Mr. Howard Fifer of 653 Spindlewood in Fearrington Village said I would like to recognize the board members; you do a lot of important work and thank you. I am here to oppose the application by Summit Church specifically the wastewater treatment issues the development raises which are unaddressed or addressable. This project if allowed to proceed will create great risks and inevitable problems within the protected watershed area of Jordan Lake, the drinking water source for the residents of Chatham County.

The applicants clarifications submitted September 17th fails to address this issue in a meaningful way. Amazingly, the applicant actually admit that they are not telling you what their treatment and disposal system will be. That risk of wastewater discharge is not addressed in the initial plan and is not addressed in the so-called certification, they flat out state and I quote, "treatment and disposal system has not been finalized." They are selling it, but are you buying it? In addition to this admitted failure, the so called 299,999 gallons estimated flow per day, that does not include the wastewater from the future accessory building also included in the application. They are selling it, but are you buying it? The Summit Church consultants have used the traditional evaluation methodology for this project that spreads demand to every day of the week to arrive at the 299,999 gallons daily average, it clearly will not work for the surge demand that this project will have on Sundays and Wednesdays and ignores the future accessory building. A septic system will need to be designed to handle the peak capacity for all building Summit will place on their site. They are selling it, but are you buying this? When that average daily flow is exceeded as it inevitably will be, their plan is to come back to you and ask for changes. This does not meet any rational definition of a plan especially when it puts the counties drinking water source at risk. They are selling it, but are you buying it? What has been presented is a sales pitch not a good faith effort to present a real plan. It is clear why this path has been chosen, if they could have presented a real and workable plan, they would have.

- Mr. James Shamp of 1391 Bradford Place said thank you for your service this is a tough duty. I recently retired after 18 years with the North Carolina Biotechnology Center, one of the nation's most successful economic development organization. Now in its 40th year NC Biotech fostered the development of life sciences statewide. These include 38 firms providing jobs and tax revenue for Chatham County, with production facilities such as medical device companies to human health and agricultural consulting and support companies. You can find them at the NC Biotech directory at ncbiotech.org. Please understand I am not here acting as a representative of NC Biotech, I am representing myself, my family, and my neighbors, as a 35-year resident of the Triangle and for the latter part as a Chatham County renter, homeowner, and tax payer. Based on my professional experience I am concerned that some of Chatham County's most important and valuable real estate may be squandered with a single bad decision. An e-mail that I sent you last night I included a link to a comprehensive impact study for the town of Davidson in Mecklenburg County from four years ago. It shows that institutional land use that is the only type that results in a net fiscal deficit. It is made especially clear in graphs on pages 46 and 51 which I will include in my handout to you when I finish. It is significant because the same conditions apply here and Chatham County has clearly documented its own guidance for its own fiscal impact analysis. The Plan Chatham document recognizes comparable city methodology as helpful when there is no precedent in the local community for the proposed type of project, it applies here. The possibilities are greatest in this Hwy 15/501 corridor for maximizing tax revenues and our best quality of life benefits, employment, housing, and retail, and more. Summit Church would be better suited for a different part of Chatham County such as the area on Hwy 64 or the northeast corner. Let us not lose sight of the fact that our planning requires that we embrace and retained some of the natural beauty of this stretch of Hwy 15/501. We could even apply some of the tax revenue from its high value development to buy, maintain, and display county owned rural buffers. Thank you for your time.

- Mr. David Kaherl of 557 The Parks Drive said the Planning committee has done excellent work for Chatham County and developing this comprehensive plan in 2017. I am going to reference those experts because that is the challenge for you all. The most important goal is to preserve the rural character of the County. Rural character is manifested in the backdrop a forests and fields dotted with natural features such as creeks, hills, and structures such as barns, churches, poultry houses, and general stores. Supporting this rezoning is both insightful and an effective way to use this property. This project will preserve the wooded nature of the property with the building being so far offset significantly from Hwy 15/501, it includes an open space and a water feature adding to the beauty and charm of the property. In 2015 the population of Chatham County was 70,928 people which is an 80% increase from 1990, and by 2040 it is expected to be 128,000 people. Sections of Hwy 15/501 has been designated as community centers where recreational uses, schools, and churches were envisioned to be part of the project. Supporting the rezoning of these parcels would create

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 698 of 743

diversity in the property use along Hwy 15/501, but the expected population growth rezoning would be an effective choice in providing opportunities for new places of worship for these new Chatham County residents. Limited access to sewer has been a real barrier for industry in Chatham County especially along Hwy 15/501, but supporting the rezoning of these parcels will limit the burden for the county for those infrastructure needs. Qunity has recommended a green drip system which accommodates this large influx once a week demand which eliminates the need for that additional required infrastructure. In addition, Hwy 15/501 is a 4-lane divided highway which is already designed to support heavy traffic volume. The traffic generated by this project will be significantly less than any demand a compact community development would be in that area. Supporting the rezoning of these parcels aligns with one of the key points of the Comprehensive Plan which is fostering a healthy community. Summit has a proven track record in investing in communities they serve from food banks, to supporting educators and local schools, providing mental health support through their counseling ministry.  This means Chatham County residents would be served by their neighbors. I ask you today to make a decision to support this rezoning and allow Summit to invest in Chatham County, thank you.

- Mr. Chris Young of 15 Bennett Ridge Road said as a Chatham County resident I would like to speak in support of the summit church rezoning application. Summit Church has been a part of my life for over 20 years and over that time Summit Church has been foundational in my personal growth and the growth of my family. It has served as a beacon of community in the lives of my family as a whole. The Summit Church campus that we currently attend at East Chapel Hill High School and I would like to share some of the community impacts of that church in Orange County because it is reasonable to expect those same impacts in Chatham County if this project is to move forward. Over the past several years our church has engaged in several community organizations such as schools and families that have critical needs and provides support. We have partnerships with organizations like Hargraves Community Center. Summit church provides school supplies to over 200 children annually, we have renovated homes for people in need, we have supported over 300 families for Thanksgiving meal collections, and additionally we have maintained an ongoing presence in the public schools by mentoring student leaders, by providing meals for teachers and students, and supported extracurricular programs. The involvement does not stop there, we have supported foster families, provided counseling for individuals who are in crisis, and I have even helped people reintegrate back into society after incarceration. At UNC we played a significant role in providing mental health and providing a sense of belonging for students. In short our church has been deeply committed to fostering a stronger and healthier community and hopefully we look forward to continuing that work for years to come. Personally, I am excited for the prospect of a Summit Church supporting our community here in Chatham County. I think of my children's friends and families and the people in the community as a whole and I am excited for the opportunity through summit church to supporting those people. Summit Church will be a blessing to Chatham County and thank you for your time and your consideration.

- Ms. Allison Young of 15 Bennett Ridge Road said thank you for taking the time to listen to all of the opinions, I support this rezoning.  Chatham county is growing and with that comes a lot more people and a lot more traffic, but I have seen Summit Church serve its community in a way that I am excited about to see in Chatham County, thank you.

- Mr. Jeff Robinson of 174 Copper Leaf Avenue said I am a retired Lieutenant Colonel and I moved here about a year ago Briar Chapel to be closer to family. We got connected to the Summit Church Chapel Hill campus immediately to arriving in the area and I want to share some of the benefits I perceive for Chatham County. For all of the people that will be driving along the 15/501 corridor will be a lot of consumers that will be able to enjoy the businesses and restaurants that are already in this area. I will candidly say Baptists like to eat, especially lunch. The Chapel Hill campus has a strong presence in the community and we do seek opportunities to meet needs. I personally the scene Summits impact on hundreds of families as we support public schools and Hargraves Community Center. The same desire will continue when the Chapel Hill campus would be relocated here. We will continue to serve and look forward to developing a similar

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 699 of 743

partnerships in this local community. Lastly, Summit Church does provide benevolent assistance for families in financial need, church members and non-church members alike, and the pastoral staff is available for counseling and even conducting Funeral services for those in the community. In closing, we look forward for Summit Church continuing to serve the local residents in Chatham County and the campus presence would help many families and businesses in the future, thank you.

- Ms. Priscilla Dennison of 491 Beechmast in Fearrington Village said thank you for your service to the Chatham community and the opportunity to speak tonight. I salute all of the people that are behind me who spoke tonight about the important things that I care about, especially the safety of my neighbors, friends, and myself. As a retired North Carolina public school teacher and Summit Chapel Hill member I look forward to the welcome care and local involvement my church community would bring to the people of my town. At my first visit to the Chapel Hill campus following the death of my husband 10 years ago, I found a vibrant, welcoming, group of people who cared well for me. I want to be part of giving that same care opportunity to the people that live around me now and those coming here in the future. The Summit community delights and joining other area churches, civic groups, and other nonprofits in loving our neighbors well. That involves ways of serving that specifically thrills my teacher heart. After school tutoring, school supply backpack drives, and holiday meal provisions. Because of their service focus I have joined with Second Bloom, Chatham Serves, the PTA thrift shops, and Women of Fearrington to support the needs and care for the people of my community. With the additional benefits of bringing new friendly faces to the restaurants, to the events, and the beautiful natural areas I see a full partnership presents for Summit members like me in the county I am so blessed to call home, thank you.

- Ms. Laura McKelvey of 155 West Newman Road said I am the HOA president of the Mcgregor Woods neighborhood which is off of Vickers Road. We have a very quiet neighborhood and we do have a number of people who walk with baby strollers, ride their bikes, and walk dogs in that neighborhood and I am concerned with the impacts. I will have to say I was a little bit taken aback by the traffic chart during the presentation I found it disingenuous that he compared the vehicle trips of the church to Vickers Village because in our case that would be a commutative impact not an either/or scenario, and I found that to be a little bit insulting. I was not aware that the wastewater treatment plant would be an underground drip which also struck me as very concerning because as you may know Chatham County is in a bedrock, we do not have a true aquifer, our water supply comes through fractures with the filter capacity to be limited, and having something drip has more access to those fractures. The quality and quantity of drinking water may be impacted by this church. I agree with many of the statements that we have heard tonight, I am very concerned about the increase in traffic, I am very concerned about the increase of impervious surface, and the impact on water quality. Thank you.

- Ms. Christine Williams of 808 Highland Trail said the zoning regulations states, to organize efficient and livable communities with diverse business to support a growing population. Churches are important anchors for growing communities and Summit Church already has 12 different locations therefore there are no compelling arguments by combining not just 2 but 3 large tracts of land will align with Chatham County's goal to be organized, efficient, and livable. This development does not appear to be necessary for the ongoing growth of Summit Church. The components of the megachurch development argue that much of the 50-acre lot will be community space, but I argue that space will be used for its own group use and there are no regulations that provide any guarantee that it will be a true open space for the public population. They are already thoughts of expansion for buildings on the property as noted in their proposal. Think about the area around Saint Thomas Moore in Chapel Hill and how congested it has become. This large structure is not characteristic at all to other local churches or keeping with Chatham County rural aesthetics. If such a large change in zoning is to be considered placing it along the highway with clear inlets and outlets would be more appropriate. Consider Hwy 64 verses Hwy 15/501 with its expanding traffic usage between Pittsboro and Chapel Hill. These extra 2 parcels would be better used to benefit the entirety of the community. In other words, for development of diverse businesses that will generate employment opportunities and create tax

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 700 of 743

revenue. Chatham County revenue is heavily dependent on property taxes from residents. Thus, the increase of infrastructure costs and needs overtime including road maintenance, police, fire, water, etc. for such a large facility will be burdened by all the citizens of Chatham County not just by Summit Church members which would come by other surrounding counties. Though diverse religious facility development is very important to the spiritual health of the community, practicing and celebrating one's faith does not actually require the development of a 50-acre, 88,000 sqft, 3000 parishioner megachurch. The gargantuan church facility size, which by the way, is 2 1/2 sizes bigger than Northwood High School, does not seem to be in line with current development and zoning in Chatham County. It would serve to diminish the livability of the immediate community while serving only a subsection of it. My family and I have lived here for over a decade and has served our community in different ways and argue to limit the development of Summit Church to one parcel, thank you.

- Mr. Scott Luley of 313 N. Serenity Hill Circle said my wife and I have lived here for 10 years and we have enjoyed it very much. We have been members of Summit at the high school for because we have been astounded by the fact that they seem to be very oriented to giving. There are givers and there are takers in today's world, we see that everywhere. They give all over the place in terms of so many areas that have been mentioned already, but we have been amazed and that is what attracted us to this church. That type of generosity has come in a variety of forms. I will just list a few that I do not think were mentioned, financial assistance to individuals, the needy, families, work projects, several different way to students from elementary school to universities. This happens year after year after year. I participated in one project where a family could not clean up their yard and the house was not maintained and we cleaned it up for them and helped them with a need. We talk dollars and cents, but to me I cannot quantify a changed life of a person. The fact that someone is needed and the need is met, that is huge. We are in favor of the Summit Church rezoning and we would like to ask you for your support, thank you.

- Mr. Jake Hollenbeck of Briar Chapel said I have been part of the Summit Church for 15 years and my wife has been a part of the church for 20 years and we both have been actively involved. I can personally say that I have seen lives changed because of the Summit, through hope and meeting the unmet needs of families. Yes, Summit has the goal of a thousand churches, that is not to reach a quota, the goal is for the church to reach that local area and the community they are in. So many college students that are lonely and have no sense of direction that have attended the Summit Church and has found direction, hope, belonging, and purpose. Nothing is guaranteed in this life, the world is uncertain and chaotic, but the Summit provides hope for people to get through these times, thank you.


Board Discussion:


- Ms. Colbert asked Ms. Wagoner about the presentation slide titled Comprehensive Plan 2017 & Proposed Development, who prepared this and how did they produce the Chapter 3 goals. Ms. Wagoner said she and Ms. Queen reviewed the goals that have been set forth in the Comprehensive Plan and these goals identify and align with the proposed development. Ms. Colbert asked if the goals listed on the left side of the slide are referring to the prior application for these parcels. Ms. Wagoner said we are basing the left side on a typical high-density development. Ms. Colbert said then you did not look at whether or not those goals were met in the prior application for Herndon Farms. Ms. Wagoner said no, this is looking at the Future Land Use for this area in consideration of the Comprehensive Plan. Ms. Colbert said on the right-hand side there is a goal 10, but it is not listed within the pages sited in Chapter 3. There was some discussion and goal 10 was listed on page 43 in the chapter.

- Ms. Colbert said something on the left side of the slide is missing because the prior zoning that the Planning Board recommended and approved for Herndon Farms, the Planning department indicated that they had in

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 701 of 743

fact met goals 1, 5, 6, and 7, and those were not listed in terms of what is referring to is heightened city development for the compact community. Was that overlooked? Ms. Wagoner said this is comparing a high-density development to the new regulations in the Unified Development Ordinance (UDO). Ms. Colbert said we are not making decisions based on the new UDO. Ms. Wagoner said that is understood, we are looking at it from the aspect of the UDO is in its final stages, and we would assume if there were any changes before adoption they would be minor changes at this point. If this development is not approved, there is potentially some more significant impact that exasperate the gap between what we are hearing from the community and what would be allowed under the Future Land Use. Ms. Colbert said you are projecting what may happen with the UDO, but we are not addressing what is currently required. Ms. Wagoner said yes, but it is our understanding that the county is closing the loop on that and approval is imminent based on our discussions about the end research of ReCode Chatham.

- Ms. Wagoner asked if they could address some of the questions and comments about wastewater and traffic. Ms. Colbert said at this point we have heard from the public; we have heard from the applicant this should not be a rebuttal forum. Chair Spoon said he wants to see if there are questions from Board members that could be uniquely answered by the applicant.

- Mr. Frazer said referring to the traffic study, the level of service (LOF) in North Carolina goes from A through F. A is the best and F is what happens when you have a breakdown on a major highway, and the service is listed at a level F at Poplar Street and Hidden Oaks, it is listed at a level E at some of the turnarounds, and that does not seem good. Mr. Wag said yes, that is correct. In order for NCDOT to install a traffic signal in these location it has to meet certain thresholds. Mr. Frazier said the thing that surprised him was there were no road improvements at all at any of the intersections. Mr. Wag said currently the U-turns do have a 200 to 250 vehicle per hour capacity, and when you take that into consideration, that is why NCDOT requires a TIA study.

- Chair Spoon asked the Board members if they would like to share where they stand on this rezoning request. Chair Spoon said this has been a difficult item, we have had a lot of community input, and he has been evaluating this specifically for the zoning designation. Churches and non-profit entities can bring value to a community that cannot be captured in tax value, so he is not basing his decision on that. Chair Spoon said his major concern is the peak times of day when we are going to have traffic and major backups and this is one of our main routes to hospitals in Chapel Hill. Chair Spoon said he will not support this application for approval because if it were a music venue or performance space that had a similar traffic profile, it would not fit and function within that part of Chatham.

- Ms. Robertson said she agrees and traffic is one of the biggest challenges and in addition to that one of her bigger concerns is it does not fit within Plan Chatham. The main and top goal with Plan Chatham is rural character. Ms. Robertson said she served on the steering committee for the Comprehensive Plan and that was one of the big items we kept seeing over and over. Ms. Robertson read a definition from the Comprehensive Plan on page 18, "the combination of natural and built features that portray the traditional form and preserve the traditional function of the rural landscape. In Chatham County, rural characters manifested in a backdrop of forests and fields dotted with natural features, such as creeks, and hills, and structures, such as barns, silos, churches, poultry houses, general stores, and craft studios." Ms. Robertson said if you read that, dotted with natural features such as creeks, and hills, and structures, such as barns, silos, megachurches, poultry houses, general stores, and craft studios, that does not fit, and if you read through Plan Chatham rural character is all throughout it and the people of Chatham County understand what that is, and they have been very opposed when they have spoken to me about this. Ms. Robertson said personally this does not fit within the rural character, but we have also identified a major issue when it comes to traffic impact in that area and that is a huge concern as well.

- Mr. Andrews said he had done some research and one of the things that his research indicated that a denial of rezoning based on lack of revenue could be discriminatory and a violation of the 1st Amendment. So that is

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 702 of 743

a concern. Also, through his research there is a Religious Land Use and Institutionalized Persons Act that was adopted in 2000, which specifically gives Planning Boards guidance when it comes to approval of religious land use. With that being said, Mr. Andrews agrees with some of the other members of the Board that even if there is NCDOT approval, it is our Boards interpretation that the traffic issue could be impediment or dangerous and not compliant with our proposed land use, then that is enough reason for us to focus on. In the future when it comes to situations like this, more guidance from the County Attorney would be beneficial.

- Ms. Colbert said we currently have zoning designation for this area, and this is not about denying somebody something, it is about requesting a change to something that was previously approved. There was a lot of consideration that when into the initial rezoning from R1 to the compact community and the aspects that were considered back in 2021 and 2022 regarding the use of the corridor and how that was going to benefit the county. Some of the things that were discussed about Plan Chatham were specifically addressed in the Planning department recommendation and the Board of Commissioners approval for that. As a reminder, there is no by right for a rezoning, this is a discretionary matter for the commissioners and any applicant that comes before us for our recommendation or the BOC for approval understands that what they are requesting is a change to current use and what they have to demonstrate is the proposed change is better than the current zoning. This does not meet that requirement. If you go back and look at the staff reports, the public input, the changes that were made, and all of the other aspects that consider why compact community was deemed to be a good fit as opposed to R1, there is a lot in the public record concerning that. It does include economic impact and open space because under the current rule, 30% would have to be designated for open space. The UDO, for example, would only give 25% open space. The 30% on a 100-acre parcel would require 30 acres of open space. This project would propose 18 acres set aside for a net loss of 12 acres of open space and that is the impact to the rural character of Chatham County.

- Ms. Colbert said the last thing she would like to discuss is the difference between what the compact community would do in terms of residential compared to splitting it up and reverting it back to R1 impact not only economic development, but also what it means for county revenues. The County Attorney did say we could consider economic impact because we are considering a change. The difference is this, the R1 zoning would give us 46 acres of compact community back to R1, that is approximately 46 residential use. The last proposal for the compact community was for 161 units, that is what the BOC approved, although the first plat came through with 151 or 152 units. When we discuss economic impact we are comparing 46 units to the lesser number 151 units which was to serve an elderly population and a variety of different kinds of housing not merely single-family residences. Having that variety the compact community would offer should be part of our conversation. As of June 2024, in Chatham County the median residential value that includes single family-homes, condominiums, and townhouses, is $655,000 in Chatham County. This is a conservative number compared to the St. Lewis federal statistics that shows the average 20% higher. If you take 46 residential units that gives the county $30,130,000 of value for tax and revenue purposes. That translates into $257,000 a year at the current tax rates and over a 10-year period about $2.5 million in tax revenue from the R1. For the compact community rezoning with 151 residential units using the same median that would be a total estimated value of $100,415,000 using 2024 tax revenue rates that is approximately $856,000 a year times 10 years that is $8.5 million. Those are significant sums and that is a $6 million loss over a 10-year period to the county.

- Mr. Mayer said his main concern of this proposal is one of scale. The compact community seems to be what belongs here and would imagine some dense residential, affordable housing, some businesses that serve residents in that area that could bike to this location. We have to have communities that are oriented around bicycles and pedestrians. That is the future. This type of community would include churches, but churches around 300 people in size, that would fit into the vision he sees here. This project is just too large, it feels like it belongs in Chapel Hill, or Siler City, or along Hwy 64 where there is infrastructure in place to support it. We cannot fill Hwy 15/501 with nodes everywhere because then there are not any more nodes. Places where

people can bike and walk to get coffee or even healthcare, small scale community-oriented businesses. Mr. Mayer said he will not be supporting this project.

- Chair Spoon said this is a rezoning and depending on how we are inclined here we would need a consistency statement or an inconsistency statement.

Mr. Frazier made a motion that this rezoning request of parcels 18750, 18896, 18897 from CD-CC Conditional District Compact Community to CD-O&I Conditional District Office & Institutional is inconsistent with the Comprehensive Plan by, diversify the tax base and generate more high-quality county jobs, and the goal that county residents can travel safely and easily through the county. The motion for the inconsistency statement was seconded by Mr. Andrews. The inconsistency statement was approved with a vote of 8-0, unanimously.

Motion made by Ms. Colbert to deny the rezoning request from CD-CC Conditional District Compact Community to CD-O&I Conditional District Office & Institutional, seconded by Mr. Mayer. The rezoning request was denied by a vote of 8-0, unanimously.

Ms. Haddix made a motion that this rezoning request of 2752, 93852, 18909 from CD-CC Conditional District Compact Community to R-1 Residential is inconsistent with the Comprehensive Plan and the current compact community zoning in place is a better zoning designation for this area, seconded by Ms. Colbert.

Motion made by Ms. Haddix to deny the rezoning request from CD-CC Conditional District Compact Community to R-1, seconded by Ms. Colbert. The rezoning request was denied by a vote of 8-0, unanimously.

IX.  <u>NEW BUSINESS:</u>
No new business to report.

X.  <u>BOARD MEMBERS ITEMS:</u>

1. Update from the Planning Board liaisons.

- Mr. Mayer said he attended the Agriculture Advisory Committee and they have a lot of new members and have a constant stream of applications for conservation districts and they are really curious about the UDO. November is their next meeting.

- Chair Spoon said we have a meeting next Tuesday at the New Ag building to receive a presentation from the UDO consultants and we will have our discussion and hopefully make our way to a recommendation to the commissioners to adopt the UDO. We will make a list of concerned areas we give to the commissioners as they make their way through the final adoption process. Ms. Haddix said she will not be in attendance for next Tuesday due to work obligations. She did read through the minutes from the September 24th special meeting and is so thankful for the deliberation that is expressed in those minutes because some of her concerns were the same as other Board members. Ms. Colbert said it was suggested to produce our top 5 concerns, rather than limit them to 5 maybe we could have a top 5 tier and then a secondary tier of other concerns because some of us may have more than 5 and some of our concerns may overlap. Chair Spoon said we will accept more than 5, we were just trying to keep the list manageable. The plan is to go through the list of concerns and have a vote on each one of those so we will have a show of representation for how many Board members think that is a serious concern.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 704 of 743

2. Discuss and decide the November Planning Board meeting location.
   The Board discussed and agreed the November meeting will be held in person at the Chatham County Agriculture and Conference Center building.


XI.   <u>PLANNING DIRECTOR'S REPORTS:</u>
      Mr. Sullivan reported on the following:

          1. Minor Subdivisions / Exempt Maps - See Attachments.

XII.  <u>ADJOURNMENT:</u>
      Motion made by Mr. Frazier to adjourn the Planning Board meeting, seconded by Ms. Robertson. There being no further business, the meeting was adjourned at 9:00 p.m.


Signed: _____/_____
                Jon Spoon, Chair                                                    Date


Attest: _____/_____
                Dan Garrett, Clerk to the Board                          Date

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 705 of 743

# EXHIBIT 12



**COUNTY COMMISSIONERS**
Karen Howard, Chair
Katie Kenlan, Vice Chair
David Delaney
Franklin Gomez Flores
Amanda Robertson

**COUNTY MANAGER:** Dan LaMontagne

**RESOLUTION OF THE CHATHAM COUNTY BOARD OF COMMISSIONERS**

# Approving a Non-Consistency Statement and Statement of Non-Reasonableness for Denial of

**Qunity, PA dba Summit Church**

**WHEREAS**, the Chatham County Board of Commissioners has reviewed the application to rezone Parcels 18750, 18896, 18897 from CD-CC Conditional District Compact Community to CD-O&I Conditional District Office & Institutional for a church/place of worship, being a total of 50.117 acres, located at 9780 US 15-501 N, Williams Township (the "Amendment") and finds that the same is not consistent with the Chatham County Land Conservation and Development Plan; and

**WHEREAS**, in addition, the Chatham County Board of Commissioners considers the Amendment not to be reasonable and in the public interest because the rezoning is not consistent by not providing a diversity in the tax revenue and does not provide more high-quality jobs for the area;

NOW THEREFORE BE IT RESOLVED, by the Chatham County Board of Commissioners that, for the reasons set forth above, the Amendment and presented documentation are found not to be consistent with the county land use plan and are determined to be not reasonable and in the public interest.

Adopted, this the 16 day of December, 2024.

Karen S. Howard, Chair
Chatham County Board of Commissioners

ATTEST:

Jenifer K Johnson, MMC, Clerk to the Board
Chatham County Board of Commissioners

OFFICIAL SEAL
CHATHAM COUNTY OF NORTH CAROLINA
FOUNDED 1771

# EXHIBIT 13

# Chatham County
# Compact Communities Ordinance

## TABLE OF CONTENTS

Section 1. Enactment
Section 2. Title
Section 3. Purpose
Section 4. Jurisdiction
Section 5. Severability
Section 6. Location and Size
    6.1 Location
    6.2 Maximum Size
    6.3 Residential Density
    6.4 Maximum Built-upon Area
    6.5 Minimum Commercial Area
Section 7. Water and Wastewater
    7.1 Water Provision
    7.2 Wastewater Treatment
Section 8. Stormwater
    8.1 Guiding Principles
    8.2 Stormwater Management Plan
    8.3 Stormwater Controls
    8.4 Stormwater Maintenance
    8.5 Posting of Financial Security
    8.6 Public Filing of Stormwater Documents
Section 9: Buffers
    9.1 Riparian Buffers
    9.2 Perimeter Buffers
    9.3 Viewshed Buffers
Section 10. Recreation and Open Space
    10.1 Passive Open Space
    11.2 Active Recreational Facilities
Section 11. Community Facilities
    11.1 Impact Assessment
    11.2 Impact Mitigation

Section 12: Community Design
    12.1 Performance Standards
    12.2 Streets and Other Specifications
    12.3 Housing
    12.4 Appearance
    12.5 Green Building
Section 13. Definition of Terms
Section 14. Relationship to Existing Ordinance
Section 15. Waiver
Section 16. Effective Date
Attachment A.
    *Stormwater Management and Maintenance Plan Requirements*
Attachment B.
    *Compact Community Design Guidelines*
Attachment C.
    *Green Building Guidelines*
Attachment D.
    *Wastewater Management Guidelines*
Exhibit A.
    N.C. Department of Environment and Natural Resources *Stormwater Best Management Practices Manual* (April 1999)
Exhibit B.
    N.C. Department of Transportation *Traditional Neighborhood Development Guidelines* (August 2000)

(NOTE: Please check with the Chatham County Planning Department for current versions of exhibit documents)

# SECTION 1.  ENACTMENT

This ordinance is enacted pursuant to the authority granted by the General Statutes of North Carolina in the following chapters:  Chapter 153A, Article 6 for the purpose of promoting the public health, safety, or welfare; Chapter 113A for the purpose of assessing environmental impacts; Chapter 143, Article 21 for the purpose of protecting water supply watersheds; Chapter 460, Title III of the 1987 Session Laws regarding mitigating financial impacts on public facilities; and Chapter 153A, Article 18, Sections 153A-330 to 153A-335 and Chapter 153A, Article 18, Sections 153A-340 to 153A-348 for the regulation of development.  This ordinance establishes supplementary regulations to allow for the development of compact communities in Chatham County.

# SECTION 2.  TITLE

This ordinance shall be known and be cited as the "Compact Communities Ordinance" except as referred to herein where it shall be known as "this ordinance".

# SECTION 3.  PURPOSE

This ordinance is found to be necessary and appropriate in order to:

A.  Help implement the *Chatham County Land Conservation and Development Plan*;
B.  Protect Chatham County's rural character by adequately buffering compact communities from neighboring properties and roadways;
C.  Promote new communities that support mixed-use development, anchored by a village center composed of commercial, civic, and residential uses that add to Chatham County's tax base, help residents meet their daily needs, and preserve Chatham County's small-town atmosphere;
D.  Allow for compact village-style development surrounded by protected green space, at a size that is easily walkable and bikable by residents of all ages;
E.  Help meet the need for community facilities such as schools, stations for police, fire and EMS, recreation facilities, solid waste/recycling collection centers, libraries, and community centers on sites that are physically integrated into the community;
F.  Ensure sustainable water provision and wastewater treatment in a way that does not create a future economic burden for the taxpayers of Chatham County;
G.  Protect Chatham County's water quality and water resources, minimize its energy use, reduce household transportation costs, and protect its air quality;
H.  Establish a grid network of streets that provides multiple connections to different destinations, includes safe places for pedestrians and bicyclists to travel throughout the community, and allows for efficient transit service when and if it becomes available;
I.  Include a mix of housing types that are architecturally consistent, designed to promote safe, walkable neighborhoods, and affordable to a range of residents in Chatham County;
J.  Include neighborhood parks, active recreation areas, and larger open spaces throughout the community that are linked together by sidewalks and trails;
K.  Provide greater environmental, economic, and social benefits to Chatham County when compared with conventional development.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 710 of 743

# SECTION 4.  JURISDICTION

The provisions of this ordinance shall be applicable in all zoned areas of Chatham County, exclusive of the municipalities located therein and their extraterritorial jurisdictions, subject to the location provisions contained in Section 6.1 of this ordinance.

# SECTION 5.  SEVERABILITY

Should any section, sentence or clause of this ordinance be held invalid or unconstitutional, such decision shall not affect, impair or invalidate the validity of the remaining parts of this ordinance that can be given effect without the invalid provision.

# SECTION 6.  LOCATION AND SIZE

## 6.1 Location

Compact communities shall only be allowed in areas that meet all of the following conditions:

A.  Currently zoned for RA-40 Residential-Agricultural;
B.  Designated as either:
- WSIII – BW  (Balance of Watershed)
- WS IV – PA (Protected Area)
- Local Watershed Area (LWA);
C.  Have at least one access point that is within one (1) mile from a four-lane principal or minor arterial, as measured along the centerline of area roadways; and
D.  Are located within the portion of Northeast Chatham County that is generally described as follows:
- In the area of U.S. 15-501 on the east, Andrews Store Road on the south, and Mann's Chapel Road on the west and north;
- Within 1,700 feet of U.S. 15-501 on its eastern side, and is south of the U.S.15-501 intersection with Mann's Chapel Road, and north of a line one-half mile south of Andrews Store Road; and
- Within one-half mile of Andrews Store Road on its southern side, and is east of the intersection with Andrews Store Road and Mann's Chapel Road, and is west of a line 1700 feet east of U.S. 15-501.

The map attached hereto and incorporated herein by reference provides a more detailed description and is the controlling definition of this location. (#2)

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 711 of 743



CHATHAM COUNTY COMPACT COMMUNITY AREA

μ

## 6.2 Maximum Size

No compact community shall include more than two thousand six hundred fifty (2,650) dwelling units.

## 6.3 Residential Density (Maximum and Minimum)

Each compact community shall be allowed a maximum overall residential density of no more than two (2) dwelling units for each acre of gross land area in the project. Accessory units shall count as one half (1/2) a dwelling unit for the purposes of this calculation. Spray fields located off the project area shall not count as part of the project for the purposes of the maximum residential density calculation.

The minimum net residential density shall be at least five (5) units per net acre as measured by the total number of residential units divided by the total area excluding community facilities, street rights of way, buffers, open space, and non-residential areas .

## 6.4 Maximum Built-upon Area

To maintain a base level of watershed protection, the overall maximum built-upon or impervious area for a compact community shall be no greater than twenty-four percent (24%) of the total project area.

## 6.5 Minimum Commercial Area

Each compact community shall include not less than one hundred thousand (100,000) square feet of commercial development.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 712 of 743

At least twenty-five percent (25%) of the total planned commercial area) shall be developed before seventy-five percent (75%) of the maximum allowable dwelling units shall receive final subdivision plat approval.

At least fifty percent (50%) of the total planned commercial area) shall be developed before ninety percent (90%) of the maximum allowable dwelling units shall receive final plat approval. .

## SECTION 7.  WATER AND WASTEWATER

### 7.1 Water Provision

Each compact community shall be served by public water provided by Chatham County that is adequate to serve the reasonable needs of the community and that complies with all applicable regulations of the County.

### 7.2 Wastewater Treatment

### General Design Standards

Wastewater treatment shall occur at centralized wastewater treatment facilities either on-site or at existing, previously permitted off-site facilities as permitted by the State of North Carolina Department of Environmental and Natural Resources (NCDENR). Spray irrigation may occur off-site provided that said use conforms to the uses allowed in the applicable zoning district.

Wastewater collection, treatment, distribution and storage systems for compact communities must apply technologies approved by the State of North Carolina, with facilities and operating programs approved by the State of North Carolina, and with operations that are effectively monitored by the State.

### Location, Ownership, and Sizing of Wastewater Facilities and Spray Fields

Compact communities shall be served by wastewater collection, treatment, distribution and storage systems that are adequate to serve the reasonable needs of the community and service area (as defined by the North Carolina Utilities Commission) and comply with all applicable regulations. The wastewater facilities may also serve neighboring areas. Compact communities shall:

- Show the location of all wastewater facilities needed for the compact community at build out in the sketch design submitted to Chatham County.

    In the determination of adequacy, the County may consider any alternatives that provide reserve capacity in the wastewater system above the state required minimum, including but not limited to the following:

  - Increasing the amount of wet weather storage to provide reserve capacity;
  - Setting aside additional open space acreage for future spray irrigation to provide reserve capacity; and/or
  - Limiting spray irrigation on a certain portion of open space acreage during specified

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 713 of 743

times in order that the remaining capacity of the acreage to accept wastewater spray results in reserve capacity

**Wastewater Treatment System Operation and Management**

Wastewater collection, treatment, distribution and storage systems for compact communities shall be managed by an operator appropriately licensed by the State of North Carolina.

Provisions shall be made for sludge management and odor control that eliminates to the maximum extent possible adverse impacts to the compact community's residents and neighbors.

**Financial Guarantee**

A financial guarantee shall be required if final subdivision plat approval is requested prior to completion. Any such financial assurance shall satisfy the requirements of the subdivision regulations.

**Public Filing of Wastewater Documents**

To allow for ongoing public review, the developer of each proposed compact community shall furnish Chatham County an as-built copy of the plans and specifications for wastewater treatment facilities, infrastructure, and disposal or irrigation system, including all documents related to the location, sizing, ownership, and management of the disposal and irrigation sites used for the compact community, as well as any operational performance reports and data for water quality monitoring conducted for the treatment, disposal, and irrigation facilities and receiving waters surrounding them prior to final plat approval   The developer shall require the operator of such systems to furnish the County with copies of any approved plans modifying said systems and to notify the county and the residents of the compact community of any violations or citations issued in connection with the operation within 30 days thereof.

**SECTION 8.  STORMWATER**

**8.1 Guiding Principles**

Compact communities are strongly encouraged to use low impact development design techniques as part of the stormwater management system.  Low impact development design techniques emphasize the use of many smaller integrated stormwater controls that are distributed throughout the site, near the source of each impact.  Some references for how to learn more about low impact development design are included in Attachment A.

A compact community shall not discharge stormwater received during and after development at a rate or volume greater than that discharged prior to development in order that adjacent properties shall not be unreasonably burdened with surface waters as a result of the development. Likewise, compact communities shall not unreasonably impede the natural flow of surface waters from adjacent properties across the development, thereby unreasonably causing substantial damage to such properties.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 714 of 743

## 8.2 Stormwater Management Plan

The developer for each proposed compact community shall have a Stormwater Management Plan approved by Chatham County prior to approval of a final subdivision plat. This plan shall include the information specified in the *Stormwater Management and Maintenance Plan Requirements* displayed in Attachment A of this ordinance. The plan shall be certified to be in conformity with the North Carolina Stormwater BMP Manual by a North Carolina registered stormwater professional.

## 8.3 Stormwater Controls

Engineered stormwater management controls required in the approved Stormwater Management Plan shall be designed and constructed in order to satisfy the following requirements:

- Control and treat the first inch of stormwater runoff from the project site and from any offsite drainage routed to an on-site control structure;
- Ensure that the draw down time for this treatment volume is a minimum of forty eight (48) hours and a maximum of one hundred and twenty (120) hours; and
- Maintain the discharge rate for the treatment volume at or below the pre-development discharge rate for the 1-year, 24-hour storm.

## 8.4 Maintenance and Upkeep of Stormwater Controls

The developer for each proposed compact community shall have a Stormwater Operation and Maintenance Plan approved by Chatham County prior to approval of a final subdivision plat. This plan shall include the information specified in the *Stormwater Management and Maintenance Plan Requirements* in Attachment A of this ordinance. Maintenance and upkeep of stormwater controls shall be consistent with *Stormwater Best Management Practices* as documented by the State of North Carolina.

The developer of each compact community and all subsequent owning entities and parties responsible for the stormwater management system shall have an annual maintenance inspection conducted by a certified professional engineer on each control structure in the compact community. The maintenance inspection shall assess whether the structure is functioning according to its design specifications, and recommend any repairs needed to ensure that it meet these specifications. The maintenance inspection report shall detail any functional deficiencies in each control structure and how they are to be fixed, along with any other relevant information. The professional engineer shall submit a copy of each maintenance inspection report to Chatham County within thirty (30) days after the inspection is completed.

The maintenance, repairs, or reconstruction recommended in the maintenance inspection report shall be made within thirty (30) days of the completion of the report. A professional engineer shall submit a maintenance repair report to Chatham County within thirty (30) days after the repairs are made.

## 8.5 Posting of Financial Guarantee

All engineered stormwater controls shall be conditioned upon adequate financial assurance in favor of the compact community's property owner's association for the purpose of maintenance,

repairs or reconstruction necessary for adequate performance of the control structures for not less than ten (10) years after completion that shall be satisfactory to the County Attorney and approved by the Board of Commissioners.

## 8.6  Public Filing of Stormwater Documents

To allow for ongoing public review, the developer of each proposed compact community shall submit to Chatham County a copy of the final version of the Stormwater Management Plan, Stormwater Operation and Maintenance Plan, Stormwater Operation and Maintenance Agreement, and stormwater control designs used in the compact community.  These documents shall be submitted in electronic and hard copy format to the Chatham County Public Works Department prior to final plat approval for the project.  In addition, the developer and all subsequent owning entities and responsible parties of the stormwater management system shall submit any updates to these documents within thirty (30) days of when the documents are updated.


## SECTION 9:  BUFFERS

## 9.1 Riparian Buffers

In all residential, commercial, and civic areas in each compact community, vegetative buffers of the following widths shall be permanently protected along each side of the following streams:

- At least one hundred (100) feet along all perennial streams;
- At least fifty (50) feet along all intermittent streams;
- At least fifty (50) feet along all ephemeral streams shown on the Soil Survey maps and having a drainage area of more than twenty-five (25) acres;
- At least thirty (30) feet along all ephemeral streams shown on the Soil Survey maps and having a drainage area of between ten (10) acres and twenty-five (25) acres.

**Uses Within the Buffer**

No new development is allowed in the buffer area except for the following:
- Water dependent structures;
- Other structures such as flag poles;
- Signs and security lights which result in only diminutive increases in impervious area;
- Projects such as road crossings and greenways where no practical alternative exists;
- Desirable artificial stream bank or shoreline stabilization, as determined by Chatham County.

These activities should minimize built-upon surface area, direct runoff away from the surface waters (except sheet flow directed into a buffer), and maximize the utilization of stormwater best management practices.

To avoid a loss of effectiveness in protecting streams, the stream buffer shall remain in natural undisturbed vegetation, except as provided below.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 716 of 743

Clearing, grading or other land disturbing activities that would reduce the effectiveness of the buffer shall be revegetated.

Buildings and other features that require grading and construction shall be set back at least ten (10) feet from the edge of the buffer.

Crossings by streets, driveways, culverts, railroads, recreational features, intakes, docks, utilities, bridges or other facilities shall be designed to minimize the amount of intrusion into the buffer.

The following are prohibited within riparian buffers:
- Wastewater treatment, disposal, and reuse components, including any wastewater sprayfields. Water and sewer lines are allowed to cross the buffer if no available alternative exists, provided that they are designed to minimize disturbance to the buffer (e.g. by running under bridges or crossing at right angles to the extent possible).
- Receiving areas for toxic or hazardous waste or other contaminants;
- Hazardous or sanitary waste landfills;
- Stormwater features, except in limited circumstances in buffers along ephemeral streams if the developer implements low impact development design techniques and/or other stormwater controls that meet or exceed the stormwater treatment and management performance provided by fully functioning ephemeral stream buffers in that location.

Stream buffers can be used for passive recreational activities with very low impact walking trails, with no impervious surface. Highly erosive activities such as use by bicycles should be discouraged. The service facilities for such activities, including but not limited to parking, picnicking and sanitary facilities, shall be located outside the buffer.

Horses and motorized all terrain vehicles are prohibited within the buffer, except for maintenance vehicles, emergency vehicles, and motorized wheel chairs for disabled persons.

Unpaved trails running parallel to the stream shall be located at least thirty (30) feet from the edge of the stream.

Paved trails up to eight (8) feet in width are allowed along any streams provided they are at least fifty (50) feet from the edge of perennial and intermittent streams, and provided that the buffer as a whole is extended a distance equal to the width of the trail. Bicycles are expressly allowed on paved trails.

Water oriented recreational facilities, such as boat or fishing piers shall require an approved use permit from the Watershed Administrator.

Clearing and re-vegetating the stream buffer for the purposes of improving its pollutant removal efficiency may be permitted, except within thirty (30) feet of a stream.

Invasive species listed by the North Carolina Botanical Garden may be removed from the buffer.

Natural regeneration of forest vegetation and planting of trees, shrubs, or ground cover plants to enhance the riparian buffer shall be allowed provided that soil disturbance is minimized. Plantings shall consist primarily of native species.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 717 of 743

Tracked or wheeled vehicles are not permitted within the riparian buffer, except for the purpose of maintaining utility corridors and providing emergency services. Bicycles are expressly allowed on paved trails.

## 9.2 Perimeter Buffer

Perimeter buffers shall be utilized to minimize the impacts of each compact community on adjacent properties along the entire perimeter of the compact community. Table 9.2 lists the minimum buffer width allowable, depending on the proposed land use along the edge of the compact community and the existing land use in the adjacent property at any point along the perimeter.

Chatham County may allow a reduction in the perimeter buffer width required by this ordinance of up to fifty percent (50%) if it determines that the impact of the compact community is adequately mitigated by community design or topography. In addition, Chatham County may allow a reduction in the perimeter buffer from fifty-one percent (51%) up to one hundred percent (100%) after giving the adjoining landowners an opportunity to comment and Chatham County determines that the impact of the compact community is adequately mitigated by the community design or topography. A developer of a Compact Community may request of the Board of Commissioners such a waiver or reduction at any time.

**Table 9.2   Width of Vegetative Perimeter Buffers**

| | | Land Use Adjacent to Compact Community Perimeter | | | | |
|---|---|---|---|---|---|---|
| | | Residential – large lot | Residential – small lot | Commercial | Recreational | Agricultural [2] |
| Compact Community Perimeter Land Use | Residential- large lot | 0 feet | 0 feet | 0 feet | 0 feet | 0 feet |
| | Residential - small lot | 100 feet | 100 feet | 0 feet | 0 feet | 100 feet |
| | Commercial | 200 feet | 200 feet | 0 feet | 200 feet [3] | 200 feet |
| | Recreational | 200 feet | 200 feet | 200 feet [3] | 0 feet | 200 feet |
| | Agricultural [2] | 0 feet | 0 feet | 0 feet | 0 feet | 0 feet |

[1]   The perimeter buffer requirements only apply to areas along the boundary of the compact community where no public road exists. In areas where a public road forms the boundary of the compact community, then the viewshed buffer requirements specified in Section 9.3 apply instead.

[2]   Any bona fide farming operation, including land enrolled in the use value assessment program for agricultural, horticultural, forest, or conservation purposes, or part of a Voluntary Agricultural District.

[3]   A barrier that assures the safety of recreational activity participants in the compact community may be substituted for a buffer at the discretion of Chatham County.

**Dedication of the Buffer**

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 718 of 743

The perimeter buffers required in this section only apply to areas along the boundary of the compact community where no public road exists. In areas where a public road forms the boundary of the compact community, then the viewshed buffer requirements specified in Section 9.3 apply instead. Once the perimeter buffer has been delineated, a deed restriction satisfactory to the County Attorney shall be filed with the Chatham County Register of Deeds that permanently protects this land as a buffer and identifies the maintenance responsibility that rests with the homeowners association.

**Perimeter Buffer Vegetation and Land Uses**

To the extent practicable, existing native forest vegetation shall be utilized for the perimeter buffer. Farms, pastures, and other traditional rural land uses owned by the developer or protected with a permanent conservation easement may be used to meet this requirement. Topographic features such as hills, valleys, and planted berms owned by the developer may also be used to meet this requirement.

Vegetative plantings in the buffer shall produce the effect of a natural forested area, using native species. The planting does not have to be opaque, but should function to significantly soften the visual impact of buildings, both initially and in the longer term. The visual buffering provided by vegetative plantings shall be effective in all seasons.

## 9.3 Viewshed Buffers

Viewshed buffers shall be utilized in order to minimize the impacts of compact communities on pre-development roadway views.

The developer shall map all roadway views into the project and delineate a continuous buffer of at least one hundred (100) feet in width. The buffer shall be measured at right angles to the edge of the roadway right of way into the compact community.

The Chatham County Board of Commissioners may allow a reduction in the viewshed buffer width required by this ordinance of up to fifty percent (50%) if it determines that the impact of the compact community is adequately mitigated by community design, topography, and/or guidelines for outdoor lighting such as those included in the proposed Chatham County lighting ordinance.

**Dedication of the Buffer**

Once the viewshed buffer has been delineated, a deed restriction satisfactory to the County Attorney shall be filed with the Chatham County Register of Deeds that permanently protects this land as a buffer and identifies the maintenance responsibility that rests with the homeowners association.

**Viewshed Buffer Vegetation and Land Uses**

To the extent practicable, existing native forest vegetation shall be utilized for this buffer, except that this requirement is optional for the developer where the use adjoining the applicable roadway is a commercial, institutional, or office use. Farms, pastures, and other traditional rural

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 719 of 743

land uses owned by the developer or protected with a permanent conservation easement may be used to meet this requirement. Topographic features such as hills, valleys, and planted berms owned by the developer may also be used to meet this requirement. Before any native vegetation is removed, a revised landscaping plan detailing what is proposed to be removed and the extent and type of replanting must be reviewed by the Chatham County Planning Department and the Chatham County Appearance Commission. Selective removal may be recommended in lieu of clearing the site of all existing native forested or vegetated areas.

Vegetative plantings in the buffer shall produce the effect of a natural forested area, using native species. The planting does not have to be opaque, but should function to significantly soften the visual impact of buildings, both initially and in the longer term. The visual buffering provided by vegetative plantings shall be effective in all seasons.

## SECTION 10. RECREATION AND OPEN SPACE

### 10.1 Passive Open Space

**Amount of Open Space Required**

Each compact community shall permanently protect a minimum of thirty percent (30%) of the gross project area as open space in order to maintain rural character and provide for passive recreation.

All of the land in neighborhood parks, active recreation, perimeter buffer, viewshed buffer, streams, wetlands, natural buffers, and major below-ground utility easements such as underground pipe lines may be counted toward meeting this requirement. Major aboveground utility easements such as high-tension power lines cannot be counted toward meeting this requirement.

**Use of Local and Regional Open Space Plans**

Priority for protection as open space shall be given to lands identified in the *Chatham County Inventory of Natural Areas and Wildlife Habitats*, *Chatham County Parks and Recreation Master Plan*, and the *Triangle GreenPrint Regional Open Space Assessment*. Nonalluvial wetlands including seeps, bogs, and vernal pools shall also be systematically inventoried in each proposed compact community, and shall be given priority for conservation.

The Chatham County Planning Director and the Chatham County Parks & Recreation Director shall be consulted when making the determination as to which lands in the compact community are shown in the plans and inventories listed above, and which lands shall be protected.

If the developer thinks that any of the lands identified in these documents that are found in the compact community cannot be protected, he/she shall provide a written technical justification to the Chatham County Planning Board from an appropriately certified professional as to why not, and propose that they not be included as open space.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 720 of 743

## Open Space Plan

At the time of submission of an application for sketch design, the developer shall submit an open space plan showing the network of passive open space, recreational facilities, and neighborhood parks in the compact community.

## Ownership and Maintenance of Open Space

All lands designated as open space land shall not be further subdivided, and shall include no permanent buildings or structures, except in connection with uses permitted thereon.  In addition, all of these lands shall be:

  A.   Deeded to an incorporated property owners association for permanent protection as open space; or
  B.   Granted to a non-profit land trust or other qualified conservation overseer for permanent protection as open space; or
  C.   Conveyed to Chatham County for permanent protection as open space, provided that the land is accepted by Chatham County.

If open space is granted to an incorporated property owners association or to Chatham County, a deed restriction satisfactory to the County Attorney shall be filed with the Chatham County Register of Deeds that permanently restricts the use of the land to passive open space.  If granted to a non-profit land trust or other qualified conservation overseer, a conservation easement shall be granted that protects the land in perpetuity as open space.

When the open space is transferred from the developer to one of the three types of recipients listed above, the transfer shall include specific contractual arrangements to provide for the ongoing maintenance of these lands.

## Open Space Uses

To protect water quality and help ensure that passive recreational uses can be maintained on open space in the compact community even in wetter years, developers must select one of the following two options:

  A. Designate twenty percent (20%) of the open space in the compact community as unsprayable with wastewater or reclaimed water.  The location of this area can be rotated so that all areas can be irrigated as necessary to keep them healthy, but the sprayfield must be sized with this assumption so that even in wetter years there is always dry, open land appropriately located and suitable for passive recreational uses such as throwing a football or playing catch.  Wetlands and riparian buffers designated in this ordinance cannot be counted toward meeting this twenty percent (20%) requirement; or

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 721 of 743

B.  Base the size of all irrigation ponds and wet weather storage ponds used in the wastewater or reclaimed water irrigation system on a mass water balance based upon the following data:

- Monthly precipitation from the 80th percentile year or greater for a recent 25-year period;
- Potential evapotranspiration; and
- Soil drainage.

These data must be taken from, or representative of, the proposed site for the compact community.

To help eliminate any potential conflicts between irrigation of reclaimed water and use of active recreational areas in the compact community, a management plan shall be developed for all active recreational areas that includes the following:

- A spray schedule for any reclaimed water used to irrigate it; and
- A public education program that includes written brochures, permanent postings in prominent public locations, and/or other appropriate means determined by Chatham County to educate potential users about the proper uses of reclaimed water and to notify them that the water is not potable.

The use of recreational motorized vehicles such as motorcycles or all-terrain vehicles shall be prohibited within open space.

## 10.2 Active Recreational Facilities

Land dedication and fees in lieu of dedication for active recreational facilities shall be provided in accordance with the applicable Chatham County regulations.

The County shall consult with the Chatham County Parks & Recreation Director and the Chatham County Planning Director before selecting which option to use in meeting these requirements.

Any land proposed for dedication for active recreation shall be physically integrated into the design of the community and be easily and safely accessible by pedestrians.

## SECTION 11.  COMMUNITY FACILITIES

## 11.1 Impact Assessment

The developer of each compact community shall conduct each of the following impact assessments:

A. Fiscal impact assessment.  This shall address all fiscal impacts on the county including those related to schools, police protection, fire protection, emergency medical services, and all other county services.
B. Transportation impact assessment.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 722 of 743

C. Environmental impact assessment. Where potential negative impacts have been identified, it shall be the responsibility of the developer to provide plans and methods of how such impacts may be alleviated or minimized to the satisfaction of the Board of County Commissioners.

Chatham County shall provide study parameters and criteria to be used. Chatham County shall also require the developer to pay for a consultant(s) selected by Chatham County to conduct a peer review of each impact assessment.

All impact assessments by the developer shall be completed and submitted with sketch plan submission for each proposed compact community.

The peer review results shall be available prior to the Planning Board's deliberations.

## 11.2 Impact Mitigation

The developer of each compact community shall satisfy the impacts created by the development for adequate public facilities and identified in the assessments required in Section 11.1 above. These impacts may be satisfied by providing fees or dedicating land sufficient to offset the impact of the development on schools, parks, recreational facilities, police protection, fire protection, emergency services, libraries, community centers, recycling and waste collection centers, and/or other public facilities

Any land proposed for dedication shall be physically integrated into the design of the community and be easily and safely accessible by pedestrians.

## SECTION 12.  COMMUNITY DESIGN

## 12.1 Performance Standards

The intent of this ordinance is to encourage a vibrant mix of residential, civic, retail, office, and open space uses that adhere to the following performance standards:

**Performance Standards:**

***Town center.***  Each project shall include an identifiable town center (not necessarily located in the geographic center of the project) -- a square, a green, and/or transit stop with shops, retail, and offices that are connected to the mix of residential uses in a practical way.

***Housing mix and development pattern.***  Each project shall provide a mix of three housing types: single-family detached dwellings; single-family attached dwellings such as duplexes and townhouses; and multi-family dwellings such as apartments.  The inclusion of rental housing as part of the multi-family component is strongly encouraged. The three housing types shall be fully integrated into the overall project design, with the highest residential densities occurring adjacent to civic-commercial uses, extending to lower residential densities at the periphery of the development.  The use of a grid pattern of streets for the majority of the development is required to the extent feasible, based on topographic considerations.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 723 of 743

**Commercial component.** Each project shall include a commercial area or areas to serve the community, with establishments that are less than ten thousand (10,000) square feet in size allowed inside the community, and larger establishments allowed on the periphery in proximity to a four-lane principal or minor arterial. All commercial establishments shall be pedestrian-accessible to community residents.

**Community/neighborhood gathering points.** All residential units shall be within walking distance of a neighborhood gathering point, such as an active recreational facility, community center, school, or neighborhood park.

**Open Space.** The design must, to the extent possible, preserve and protect prominent and/or significant natural features and, where appropriate, utilize them as areas for passive recreation. In addition, open space must be integrated into the plan for development, and include some flat dry land that is appropriate for passive recreational activities such as playing catch and throwing a football. To the extent practicable, the open space shall also be designed to connect with existing or planned open space on adjacent parcels to help form a connected network of open space throughout the county.

**Passive and active recreational opportunities.** Each project shall include the provision of both passive and active recreational opportunities. Small playgrounds and neighborhood parks shall be scattered throughout the community within walking distance of most homes.

**Interconnectivity.** Residential units, the town center, and community gathering points must be interconnected not only by roadways, but also through a network of pedestrian and bicycle pathways. At least thirty-three percent (33%) of these pathways must be completed before final plat approval of the final fifty percent (50%) of the maximum allowable dwelling units in the compact community are built One hundred percent (100%) of the pathways must be completed before final plat approval of the final ten percent (10%) of maximum approved dwelling units in the compact community.

**Narrow streets.** Streets shall be relatively narrow, with trees. Pedestrian walkways may be required on both sides of the street.

**Transit.** Park-and-ride spaces shall be set aside and identified in parking lots in the commercial center(s).

**Botanical preservation and diversity.** A landscape master plan shall be submitted with initial application for development. The developer shall be required to identify and retain major trees, and to identify and preserve natural areas, to the extent practicable.


## 12.2 Streets and Other Specifications

### Streets

All streets shall be public and constructed to North Carolina Department of Transportation (NCDOT) standards. Upon completion, the streets shall be offered for dedication to the NCDOT for maintenance. In exceptional circumstances, a very limited number of private roads may be allowed as dead-end minor residential streets for lengths not more than one thousand (1,000) feet in order to address topographic characteristics of a site.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 724 of 743

Developers are strongly encouraged to use NCDOT's *Traditional Neighborhood Development Guidelines* displayed in Exhibit B of this ordinance when designing the street system.

Alleys and private roads shall be dedicated to the incorporated property owners association or equivalent entity for the compact community.

**Building Height**

No building in the compact community shall have a height greater than sixty (60) feet. Chatham County may require buildings to have a lower height if it deems appropriate to help preserve the small town character of the development.

**Additional Guidelines**

Additional guidelines and options for how to meet the standards in this section are included in the *Compact Community Design Guidelines* contained in Attachment C of this ordinance.

## 12.3 Housing

**Construction Standards**

Manufactured homes built to the U.S. Department of Housing and Urban Development Code are not permitted in compact communities. Factory-built modular homes constructed to the standards of the North Carolina Building Code are permitted, provided that the site and building design, and exterior finishes and materials are compatible with surrounding dwellings.

**Accessory Dwellings**

Accessory dwellings are encouraged on lots containing single-family detached housing.
Each accessory dwelling shall count as one half (½) a dwelling unit toward the maximum allowable number of dwelling units for the project.

There may be not more than one accessory dwelling unit per lot.

The accessory dwelling unit may be attached or detached.

Each accessory dwelling unit shall not exceed one thousand (1,000) square feet or two-thirds (2/3) of the heated space in the principal dwelling unit, whichever is more limiting.

Accessory dwellings shall be designed to be harmonious with the primary dwelling on the same lot and with neighboring dwellings.

**Moderate Income Residents**

All compact communities shall either (i) provide housing for low and moderate-income households as provided in Subsection A below, or (ii) enter into a contract with the County which provides for payments to the County to be used to fund (a) construction of affordable housing or land for construction of affordable housing to address the needs of low and moderate

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 725 of 743

income residents of Chatham County, (b) programs which are designed to address family violence and issues related to the abuse of women, including without limitation buildings and facilities for such programs, (c) programs which are designed to address the needs of adults with intellectual and developmental disabilities, including without limitation buildings and facilities for such programs, and (d) programs which are designed to address the needs of low and moderate income persons, including without limitation buildings and facilities for such programs, as provided in Subsection B below. A "low income person" is a person or family whose income is fifty percent (50%) or less of the Area Median Family Income and a "moderate income person" is a person or family whose income is eighty percent (80%) or less of the Area Median Family Income.

Each compact community shall address the needs of low and moderate income persons by either the Moderately Priced Dwelling Option or the Payment-in-lieu Option:

**A.      Moderately Priced Dwellings Option**

1. A minimum of five percent (5%) of the total residential units in the development shall be held by and be affordable to buyers whose household incomes are no greater than sixty percent (60%) of the Area Median Family Income by family size if title to the lots so designated is donated to a nonprofit community agency designated by the County whose mission is to expand and preserve housing for low-income households. The designated agency(ies) will hold title to the land in perpetuity and lease it to qualifying households. The agency(ies) have a right of first refusal to purchase any home constructed by the qualifying family at any time the owner decides to sell it; or

2. A minimum of ten percent (10%) of the total dwellings in the development shall be sold and affordable to buyers whose household incomes are not greater than sixty percent (60%) of the Area Median Family Income by family size. The sale price and incomes of buyers shall remain limited according to the terms of this ordinance for at least thirty (30) years; or

3. Upon approval of Chatham County, the developer may meet this provision through an alternative means, provided that it does both of the following at a minimum:
   - Ensure the development and sale of moderately priced dwellings in a manner equivalent to that in Option A or Option B above; and
   - Ensure that at least 5% of the total dwellings in the compact community are affordable housing.

**Compliance with Moderately Priced Dwellings Option**

The subdivision preliminary and final plats for each compact community shall designate the lots for Moderately Priced Dwellings, and the developer, builder(s), and purchaser(s) shall be bound by this restriction according to the terms of this ordinance.

Upon final plat approval, the applicant shall execute and record a deed restriction satisfactory to the County Attorney binding the applicant and all other parties that receive title to the property on all lots for dwellings designated as "Moderately Priced."

Moderately Priced Dwelling unit lots shall be incorporated into the compact community in proportion to the development of dwelling unit lots without affordable housing restrictions.

Case 1:25-cv-00113-UA-JLW      Document 1      Filed 02/14/25      Page 726 of 743

Subsequent final residential subdivision phase plats shall not be approved until such time as completion of at least 90% of the affordable units in preceding residential phases.

**B.    Payment–in–lieu Option**

1.  A compact community developer may provide assistance to low and moderate income residents of Chatham County by entering into a contract with the County that provides a payment-in-lieu of lots within the development to fund (i) construction of affordable housing or land for construction of affordable housing to address the needs of low and moderate income persons and families, (ii) programs which are designed to address family violence and issues related to the abuse of women, including without limitation buildings and facilities for such programs, (iii) programs which are designed to address the needs of adults with intellectual and developmental disabilities, including without limitation buildings and facilities for such programs, and (iv) programs which are designed to address the needs of low and moderate income persons, including without limitation buildings and facilities for such programs. The payment to be made shall be calculated on a per lot basis based on the market value of a buildable single family lot within the compact community. The per lot rate shall be based on the greater of an appraisal made by a North Carolina certified appraiser approved by the County, or the average primary building site value for the most recent tax valuation made by the County. Any appraisal cost shall be paid by the developer; or

2.  A compact community developer may provide assistance to low and moderate income residents as well as other residents of Chatham County by entering into a contract with the County that provides payment to the County based on a formula mutually agreeable to the County and the developer to fund (i) construction of affordable housing or land for construction of affordable housing, (ii) programs which are designed to address family violence and issues related to the abuse of women, including without limitation buildings and facilities for such programs, (iii) programs which are designed to address the needs of adults with intellectual and developmental disabilities, including without limitation buildings and facilities for such programs, and (iv) programs which are designed to address the needs of low and moderate income persons, including without limitation buildings and facilities for such programs.

**Compliance with Payment- in-lieu Option**

The compliance with the payment-in-lieu option shall be memorialized by a contract between the County and the applicant or any developer holding a conditional use permit previously issued under the Compact Communities Ordinance. A contract entered into under this provision shall not supersede the provisions of a previously issued conditional use permit unless the contract expressly so provides. No contract shall be entered into under this provision until the public hearing and procedural requirements for the issuance or amendment of a conditional use permit have been complied with.

**<u>12.4 Appearance</u>**

All standards in the *Chatham County Design Guidelines for Commercial, Industrial, and Conditional Use Projects* shall apply to compact communities.

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 727 of 743

As part of the project review process, the developer of each compact community shall submit integrated Architectural Guidelines and Contextual Guidelines for review by Chatham County.

Utilities shall be placed underground in order to improve sight lines, open up sidewalks, and minimize the danger of interruptions in utility service during inclement weather.

Storage areas and loading areas reached by rear alleyways in storefront neighborhoods shall be opaquely screened.

## 12.5 Green Building

**Energy Conservation and Renewable Energy**

No compact community development shall deny or prohibit the installation of solar panels, either electric or thermal.

Additional guidelines for energy conservation and green building are included in the *Green Building Guidelines* contained in Attachment C of this ordinance.

## SECTION 15.  DEFINITION OF TERMS

"**Accessory unit**":  A second dwelling unit such as a garage apartment that is located on the same parcel as the main dwelling unit.

"**Affordable**":  Meeting the definition for "affordable housing, ownership" and/or "affordable housing, rental" provided in this ordinance.

"**Affordable housing, ownership**":  Housing that can be purchased by a household with an income no greater than sixty percent (60%) of the current HUD Area Median Family Income by family size, paying no more than thirty percent (30%) of its gross household income towards housing costs, including mortgage principle, mortgage interest, property taxes, and homeowners insurance.

"**Affordable housing, rental**":  Housing that can be rented by a household with an income no greater than forty percent (40%) of the current HUD Area Median Family Income by family size, paying no more than thirty percent (30%) of its gross household income for rent and any required housing fees.

"**Alley**":  A narrow access way along the rear property line of parcels that provides vehicle access and allows for services such as garbage collection, but that is not intended for general traffic circulation.

"**Area median family income**":  The average family income for different family sizes in an area as published annually by the U.S. Department of Housing and Urban Development.

"**Arterial, principal**":  A rural link in a network of continuous routes serving corridor movements having trip length and travel density characteristics indicative of substantial statewide or interstate travel and existing solely to serve traffic.  This network would consist of interstate routes and other routes designed as principal arterials.

"**Arterial, minor**":  A rural link in a network joining cities and larger towns and providing intrastate and intercounty service at relatively high (55 mph) overall travel speeds with minimum interference to through movement.  The network would primarily serve traffic.

"**Best Management Practice (BMP)**":  A structural or nonstructural management-based practice used singularly or in combination to reduce nonpoint source inputs to receiving waters in order to achieve water quality protection goals.

"**Bicycle pathways**":  Bike lanes, paths, and trails that provide a safe and accessible place for people to bike throughout the neighborhood.

"**Bona fide farm**":  The use of land for farming meeting one of the following criteria: 1) composing two or more acres on one or more tracts owned or leased by the bona fide farm unit; 2) average annual sales of one thousand dollars ($1,000) or more for the preceding three (3) years; or a minimum of ten (10) acres of forest land for which a management plan has been prepared; or 3) having a farm land use exemption from the County Tax Supervisor.

"**Buffer**":  An area of natural or planted vegetation measured landward from the normal pool elevation of impounded structures, the bank of each side of streams, the right of way of streets or boundary lines.  See also "riparian buffer".

"**Building**":  Any structure having a roof supported by columns or by walls, and intended for

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 729 of 743

shelter, housing or enclosure of persons, animals, property, commercial, and/or civic activities. The connection of two buildings by means of an open porch, breezeway, passageway, carport or other such open structure, makes them one building.

"**Built-upon area**":  Built-upon areas shall include that portion of a development project that is covered by impervious or partially impervious cover including buildings, pavement, gravel roads, recreation facilities (e.g. tennis courts), etc. (Note: Wooden slatted decks and the water area of a swimming pool are considered pervious.)

"**Build out**": The point at which all allowable residential, commercial, and civic structures in the community have been built and certified for occupancy.

"**Certificate of occupancy**":  A document issued by the Chatham County Building Inspector certifying compliance with all applicable state and local laws and authorizing occupancy of a building or structure.

"**Civic-Commercial Component**": An area of concentrated activity that includes different uses such as living, working, learning, playing, shopping, and eating.

"**Civic use**":  A place for public use or gatherings.  Examples include public open spaces such as parks and plazas, as well as schools, libraries, community centers, and athletic facilities.

"**Commercial area**":  Any area where the primary use involves an occupation, employment, or enterprise that is carried on for profit by the owner, lessee, or licensee.

"**Common open space**": An area of land and/or water generally lacking in man-made structures and reserved for enjoyment in its unaltered state, or for recreation, by residents of the compact community and their guests.

"**Compact community**":  A compact development with a mixed-use village center that is approved by the Chatham County Board of Commissioners as meeting the conditions specified in this ordinance.

"**Conditional use district**":  A zoning district requested by the property owner in which all uses are considered a special use.

"**Conservation easement**":  A legal agreement between a landowner and a qualified conservation overseer such as a land trust or government agency that permanently limits a property's use in order to protect its natural, agricultural, and/or historic features.

"**Corner lot**":  A lot abutting two or more streets at their intersection.

"**Dead-end street**":  A local access street that connects to another street at only one end.

"**Dedication**":  The object or the act of an owner offering property or property rights to the public.  Since a transfer of property rights is involved, dedications must be made by written recorded instruments.

"**Developer**":  The owner of land proposed to be developed as a compact community, or his representative.

"**Development**":  Any land-disturbing activity that adds to or changes the amount of impervious or partially impervious cover on a land area or which otherwise decreases the infiltration of precipitation into the soil.

"**Duplex**":  A single building consisting of two (2) dwelling units that are connected by or share a common wall or ceiling.

"**Dwelling unit**":  A building or portion thereof designed, arranged, or used for living quarters for one household.

"**Easement**":  A right that one party has in or over the land of another party.  Easements can be made to accommodate utilities, access, spray irrigation, conservation or other purposes.

"**Ephemeral stream**":  A feature that carries only stormwater in direct response to precipitation with water flowing only during and shortly after large precipitation events.  An ephemeral stream may or may not have a well-defined channel, the aquatic bed is always above the water table, and stormwater runoff is the primary source of water.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 730 of 743

"**Fee in lieu**":  A fee charged to a developer in place of requiring the dedication of land to help offset the cost of new development on public infrastructure such as roads, schools, recreational facilities, and fire stations.

"**Fee simple**":  An absolute ownership interest in a given tract of land.

"**Green**":  A public space consisting of grassy areas and trees available for unstructured recreation and bordered by buildings.

"**Gross land area**":  The size of the entire site proposed for development as a compact community.

"**Homeowners association**":  See "property owners association".

"**Impervious surface**":  Any surface that impedes or prevents natural infiltration of water into the ground, including but not limited to buildings, paved roads, paved parking lots, airport runways, and the like.

"**Infiltration**":  The process of percolating stormwater into the subsoil.

"**Intermittent Stream**":  A stream that flows for only part of the year.  It includes a well-defined channel that contains water for only part of the year, typically during winter and spring when the aquatic bed is below the water table.

"**Land-disturbing activity**":  Any use of the land that results in a change in the natural cover or topography that may cause or contribute to sedimentation.

"**Landfill**":  A facility for the disposal of solid waste on land in a sanitary manner in accordance with Chapter 130A Article 9 of the North Carolina General Statutes.

"**Land trust**":  A private, non-profit organization that protects natural resources, cultural resources, or affordable housing through land acquisition, conservation easements, and/or education.

"**Large lot residential development**":  Development on lots of 2 acres or greater.

"**Lot**":  A portion of a subdivision or any other parcel of land intended as a unit for transfer or ownership or for development or both.

"**Low impact development design**":  Integrated techniques and practices intended to capture and treat stormwater runoff on site and mitigate the effects of increased stormwater peak rate, volume, velocity, and pollutant loading from development.  Examples include vegetated buffers, grassed swales, and bioretention areas.

"**Major collector road**":  A road that provides service to small local communities and links with locally important traffic generators with their rural hinterland.

"**Major utility easements**":  Corridors that legally allow for overhead electric utility lines, gas lines, and other utilities.

"**Minor arterial**":  See "Arterial, minor".

"**Minor residential street**":  A local access street no greater than 1,000 feet in length that serves no more than twenty (20) dwelling units.

"**Multi-family dwelling**":  A structure arranged, designed, and intended to be the residence of more than one family, with each family having independent cooking and bathing facilities. Examples include apartments and sometimes condominiums.

"**Nonalluvial**":  Not related to streams or moving water.

"**1-year, 24-hour storm**":  The surface runoff resulting from a rainfall lasting 24 hours of an intensity expected to be equaled or exceeded on the average of once in 1 year, and of a duration which will produce the maximum peak rate of runoff for the watershed of interest under average antecedent wetness conditions.

"**Open space**":  Land required to be permanently protected for passive recreational uses in accordance with the provisions of this ordinance.

"**Owning entity**":  The party responsible for the maintenance of stormwater structures as provided in the Operation and Maintenance Agreement.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 731 of 743

"**Passive open space**":  Land that is left in an open, undeveloped state for recreational activities such as walking and hiking.

"**Pedestrian walkways or pathways**":  Sidewalks, paths, and trails that provide a safe and accessible place for people to walk throughout the neighborhood.

"**Perennial stream**":  A stream or river that flows throughout the year except during extreme droughts.  It includes a well-defined channel that contains water year round during a year of normal rainfall with the aquatic bed located below the water table for most of the year.

"**Perimeter buffer**":  Land that either obscures or significantly softens the external view of the compact community from adjacent properties.

"**Perpetuity**":  Permanently.

"**Principal arterial**":  See "Arterial, principal".

"**Project**":  A compact community proposed under this ordinance.

"**Property owners association**":  An incorporated association of the property owners in a compact community formed to manage common open space, administer the codes, covenants, and restrictions established for the compact community, and make other community governance decisions vested in it by its articles of incorporation.

"**Public wastewater management utility**":  Persons and corporations, or their lessees, trustees, and receivers, now, or hereafter, furnishing wastewaster treatment service to the public for compensation as defined in N.C. General Statutes 62-3.

"**Public water service**": Persons and corporations, or their lessees, trustees, and receivers, now, or hereafter, furnishing water to fifteen (15) or more residential customers for compensation, or furnishing water to non-residential customers of any number, as defined in N.C. General Statutes 62-3.

"**Qualified conservation overseer**":  A certified, tax-exempt charitable conservation organization or agency eligible to receive and hold conservation easements as approved by the Internal Revenue Service.

"**Reclaimed water**":  Water that as a result of reclamation of wastewater is suitable for direct beneficial use or a controlled use that would not otherwise occur.

"**Registered stormwater professional**":  A professional engineer, landscape architect (to the extent that Chapter 89A of the N.C. General Statutes allow), or surveyor (to the extent that the design represents incidental drainage within a subdivision, as provided in N.C. General Statutes 89 (C)-3(7)).

"**Responsible party**":  The incorporated entity vested with legal responsibility to ensure that a system such as the stormwater management system or sprayfield management system is properly operated and maintained.

"**Riparian buffer**":  A strip of natural or planted vegetation strip of land that lies along a stream, river, or lake and provides such functions as protecting water quality, providing wildlife habitat, and storing flood waters.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 732 of 743

"**Single-family attached dwelling**":  A dwelling unit connected to other dwelling units in the same building designed for and occupied exclusively by one family or household.  Examples include duplexes and townhomes.

"**Single-family detached dwelling**":  A dwelling unit that entirely occupies a separate, individual building designed for and occupied exclusively by one family or household.

"**Small-lot residential development**":  Development on lots of less than 2 acres in size.

"**Spray field**":  The area used for disposal of treated wastewater or irrigation with reclaimed water.

"**Spray field, offsite**":  A spray field that is not physically integrated into the design of the compact community but instead is on an adjacent or nearby parcel of land.

"**Steep slopes**":  Slopes with a grade of 25% or greater.

"**Stormwater BMP manual**":  The latest version of the *Stormwater Best Management Practices* manual provided by the North Carolina Division of Water Quality.

"**Stormwater controls**":  Structural and non-structural techniques, practices, and/or engineered facilities intended to treat stormwater runoff and/or mitigate the effects of increased stormwater peak rate, volume, and velocity due to development.  Examples include detention ponds, constructed wetlands, sand filters, vegetated buffers, grassed swales, and bioretention areas.

"**Stormwater features**":  The system of inlets, conduits, channels, ditches, ponds, and other similar and associated devices which serve to collect, convey, detain, retain, and/or treat stormwater from a given drainage area.

"**Stormwater management**":  The use of structural or non-structural practices that are designed to reduce stormwater runoff pollutant loads, discharge volumes, and/or peak flow discharge rates.

"**Stormwater Operation and Maintenance Agreement**":  The legally binding agreement established to implement the Stormwater Operation and Maintenance Plan for the compact community.

**Stormwater Operation and Maintenance Plan**":  The plan that a developer and subsequent parties must follow to ensure that stormwater management controls serve their intended function over time.

"**Stormwater runoff**":  The direct runoff of water resulting from precipitation in any form.

"**Stream**":  A body of water flowing in a natural surface channel.  Flow may be continuous or only during wet periods.

"**Swale**":  An elongated depression in the land surface that is at least seasonally wet, is usually heavily vegetated, and is normally without flowing water.  Swales conduct stormwater into primary drainage channels and provide some groundwater recharge.

"**Treatment volume**":  The amount of stormwater runoff included in the first inch of rainfall on a compact community.

"**Tree**":  A perennial woody plant with single or multiple trunks and few if any branches on its lower part, which at maturity will obtain a minimum six-inch caliber.

"**Use value assessment**":  The assessment of land based on its natural resource value as farmland, forestland, horticultural land, or conservation land, as opposed to its development value.  Such an assessment is available to qualifying properties in all 100 counties in North Carolina.  The requirements for qualification are defined in N.C. General Statutes 105-277.2 to 105-277.7.

"**Viewshed buffer**":  Land that either obscures or significantly softens the external view of the compact community from public roadways that run along the boundary of the development.

"**Voluntary Agricultural District**":  A special farming district established under the Chatham County Farmland Preservation Program Ordinance.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 733 of 743

"**Walkable**": Community, streetscape, and building design and scale that provide for convenient, safe, comfortable, and visually interesting pedestrian access and mobility.

"**Wastewater treatment facility**": One facility in the larger wastewater management system.

"**Wastewater management system**": The collection of facilities that are operated and maintained for the collection, treatment, and safe disposal of wastewater discharged from residential, commercial, and civic properties.

"**Watershed Administrator**": An official or designated person of county responsible for administration and enforcement of the *Chatham County Watershed Protection Ordinance*, and of designated sections of this ordinance.

"**Wetlands**": Waters as defined by N.C. General Statutes 143-212(6) and areas that are inundated or saturated by an accumulation of surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs, and similar areas.

## SECTION 14. RELATIONSHIP TO EXISTING ORDINANCES.

It is the intent of the Board of Commissioners that this ordinance shall supplement the Chatham County Zoning, Subdivision, and Watershed Protection Ordinances with respect to Compact Communities as defined therein.

To the extent the provisions of this ordinance are the same in substance as previously adopted provisions of the Chatham County Zoning, Subdivision, and Watershed Protection Ordinances, they shall be considered as continuations thereof and not as new enactments, unless as otherwise specified.

To the extent the provisions of this ordinance conflict with any other ordinance or law or where the provisions hereof impose conflicting regulations, the most restrictive provision or the one which imposes the highest standards or requirements shall prevail, except as otherwise specified."

## Section 15. Waiver.

With the approval of the Board of Commissioners, the requirements of this ordinance may be adjusted, modified, reduced or waived based upon the absence of any reasonable relationship or nexus between the impact of the compact community development and the inclusionary or other requirements set forth herein.

## SECTION 16. EFFECTIVE DATE.

This ordinance shall become effective April 19, 2004.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 734 of 743

# SECTION 17.  REVISIONS

**April 19, 2004**
~~Section 6.1 Location~~ – revised to reduce area and address access – as follows:

## 6.1 Location

Compact communities shall only be allowed in areas that meet all of the following conditions:

~~A.~~ ~~Currently zoned for RA-40 Residential-Agricultural;~~
~~B.~~ ~~Designated as either:~~
  - ~~WSIII – BW  (Balance of Watershed)~~
  - ~~WS IV – PA (Protected Area)~~
  - ~~Local Watershed Area (LWA);~~
~~C.~~ ~~Have at least one access point that is within one (1) mile from a four-lane principal or minor arterial, as measured along the centerline of area roadways; and~~

~~D.~~ ~~Are located within the portion of Northeast Chatham County that is:~~
  - ~~Bounded by U.S. 15-501 on the east, Andrews Store Road on the south, and Mann's Chapel Road on the west and north; and/or~~
  - ~~Within 1,700 feet of U.S. 15-501 on its eastern side, and is south of the U.S.15-501 intersection with Mann's Chapel Road, and north of the U.S. 15-501 intersection with Andrews Store Road; and/or~~
  - ~~Within one-half mile of Andrews Store Road on its southern side, and is east of the intersection with Andrews Store Road and Mann's Chapel Road, and is west of the intersection of Andrews Store Road and U.S. 15-501.~~

A.     Currently zoned for RA-40 Residential-agricultural;

B.     Designated as either:
  - WSIII – BW (Balance of Watershed)
  - WSIV – PA (Protected Area)
  - Local Watershed Area (LWA);

C.     Have at lease one access point from a four-lane arterial; and

D.     Are located within the portion of Chatham County that is:
  - Bounded by U.S. 15-501 on the east, Andrews Store Road on the south, and Mann's Chapel Road on the west and north; and
  - Within 1,400 feet of U.S. 15-501 on its eastern side, and is south of the U.S. 15-501 intersection with Jack Bennett Road (SR 1717) and north of the U.S. 15-501 intersection with Village Way (SR 1718); and
  - Within 2,500 feet south, east and west of the intersection of Andrews Store Road (SR 1528) and Parker Herndon Road (SR 1526).

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 735 of 743

    1.      That the following text amendment to the Compact Communities Ordinance be approved and accompanying map be incorporated as follows

## 6.1 Location

Compact communities shall only be allowed in areas that meet all of the following conditions:

A.    Currently zoned for RA-40 Residential-Agricultural;

B.    Designated as either:
- WSIII – BW  (Balance of Watershed)
- WS IV – PA (Protected Area)
- Local Watershed Area (LWA);

C.    Have at least one access point that is within one (1) mile from a four-lane principal or minor arterial, as measured along the centerline of area roadways; and

D.    Are located within the portion of Northeast Chatham County that is generally described as follows:
- In the area of U.S. 15-501 on the east, Andrews Store Road on the south, and Mann's Chapel Road on the west and north;
- Within 1,700 feet of U.S. 15-501 on its eastern side, and is south of the U.S.15-501 intersection with Mann's Chapel Road, and north of a line one-half mile south of Andrews Store Road; and
- Within one-half mile of Andrews Store Road on its southern side, and is east of the intersection with Andrews Store Road and Mann's Chapel Road, and is west of a line 1700 feet east of U.S. 15-501.

The map attached hereto and incorporated herein by reference provides a more detailed description and is the controlling definition of this location.



CHATHAM COUNTY COMPACT COMMUNITY AREA

µ

Case 1:25-cv-00113-UA-JLW   Document 1   Filed 02/14/25   Page 736 of 743

**July 18, 2012**
**Section 12.3 Moderately Priced Dwellings** – Section renamed "Moderate Income Residents" and revised to allow a payment-in-lieu of construction option – as follows:

~~Moderately Priced Dwellings~~

~~All compact communities shall provide housing for low and moderate-income households. These shall be designated as "Moderately Priced Dwellings."~~

~~Each compact community shall provide~~ <u>one</u> ~~of the following options for Moderately Priced Dwellings:~~

~~A.~~ ~~A minimum of five percent (5%) of the total residential units in the development shall be held by and affordable to buyers whose household incomes are no greater than sixty percent (60%) of the Area Median Family Income by family size if title to the lots so designated is donated to a nonprofit community agency designated by the County whose mission is to expand and preserve housing for low-income households. The designated agency (ies) will hold title to the land in perpetuity and lease it to qualifying households. The agency (ies) have a right of first refusal to purchase any home constructed by the qualifying family at any time the owner decides to sell it.~~

~~B.~~ ~~A minimum of ten percent (10%) of the total dwellings in the development shall be sold and affordable to buyers whose household incomes are no greater than sixty percent (60%) of the Area Median Family Income by family size. The sale price and incomes of buyers shall remain limited according to the terms of this ordinance for at least thirty (30) years.~~

~~C.~~ ~~Upon approval of Chatham County, the developer may meet this provision through an alternative means, provided that it does both of the following at a minimum:~~
- ~~Ensure the development and sale of moderately priced dwellings in a manner equivalent to that in Option A or Option B above; and~~
- ~~Ensure that at least 5% of the total dwellings in the compact community are affordable housing.~~

~~Compliance~~

~~The subdivision preliminary and final plats for each compact community shall designate the lots for Moderately Priced Dwellings, and the developer, builder(s), and purchaser(s) shall be bound by this restriction according to the terms of this ordinance.~~

~~Upon final plat approval, the applicant shall execute and record a deed restriction satisfactory to the County Attorney binding the applicant and all other parties that receive title to the property on all lots for dwellings designated as "Moderately Priced."~~

~~Moderately Priced Dwelling unit lots shall be incorporated into the compact community in proportion to the development of dwelling unit lots without affordable housing restrictions. Subsequent final residential subdivision phase plats shall not be approved until such time as completion of at least 90% of the affordable units in preceding residential phases.~~

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 737 of 743

**Moderate Income Residents**

All compact communities shall either (i) provide housing for low and moderate-income households as provided in Subsection A below, or (ii) enter into a contract with the County which provides for payments to the County to be used to fund construction of affordable housing or land for construction of affordable housing to address the needs of low and moderate income residents of Chatham County as provided in Subsection B below. A "low income person" is a person or family whose income is fifty percent (50%) or less of the Area Median Family Income and a "moderate income person" is a person or family whose income is eighty percent (80%) or less of the Area Median Family Income.

Each compact community shall address the needs of low and moderate income persons by either the Moderately Priced Dwelling Option or the Payment-in-lieu Option:

**A. Moderately Priced Dwellings Option**

1. A minimum of five percent (5%) of the total residential units in the development shall be held by and be affordable to buyers whose household incomes are no greater than sixty percent (60%) of the Area Median Family Income by family size if title to the lots so designated is donated to a nonprofit community agency designated by the County whose mission is to expand and preserve housing for low-income households. The designated agency(ies) will hold title to the land in perpetuity and lease it to qualifying households. The agency(ies) have a right of first refusal to purchase any home constructed by the qualifying family at any time the owner decides to sell it; or

2. A minimum of ten percent (10%) of the total dwellings in the development shall be sold and affordable to buyers whose household incomes are not greater than sixty percent (60%) of the Area Median Family Income by family size. The sale price and incomes of buyers shall remain limited according to the terms of this ordinance for at least thirty (30) years; or

3. Upon approval of Chatham County, the developer may meet this provision through an alternative means, provided that it does both of the following at a minimum:
   - Ensure the development and sale of moderately priced dwellings in a manner equivalent to that in Option A or Option B above; and
   - Ensure that at least 5% of the total dwellings in the compact community are affordable housing.

**Compliance with Moderately Priced Dwellings Option**

The subdivision preliminary and final plats for each compact community shall designate the lots for Moderately Priced Dwellings, and the developer, builder(s), and purchaser(s) shall be bound by this restriction according to the terms of this ordinance.

Upon final plat approval, the applicant shall execute and record a deed restriction satisfactory to the County Attorney binding the applicant and all other parties that receive title to the property on all lots for dwellings designated as "Moderately Priced."

Moderately Priced Dwelling unit lots shall be incorporated into the compact community in proportion to the development of dwelling unit lots without affordable housing restrictions.

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 738 of 743

Subsequent final residential subdivision phase plats shall not be approved until such time as completion of at least 90% of the affordable units in preceding residential phases.

**B.       Payment–in–lieu Option**

1.  A compact community developer may provide assistance to low and moderate income residents of Chatham County by entering into a contract with the County that provides a payment-in-lieu of lots within the development to fund construction of affordable housing or land for construction of affordable housing to address the needs of low and moderate income persons and families.  The payment to be made shall be calculated on a per lot basis based on the market value of a buildable single family lot within the compact community.  The per lot rate shall be based on the greater of an appraisal made by a North Carolina certified appraiser approved by the County, or the average primary building site value for the most recent tax valuation made by the County.  Any appraisal cost shall be paid by the developer; or

2.  A compact community developer may provide assistance to low and moderate income residents of Chatham County by entering into a contract with the County that provides payment to the County based on a formula mutually agreeable to the County and the developer to fund construction of affordable housing or land for construction of affordable housing.

**Compliance with Payment- in-lieu Option**

The compliance with the payment-in-lieu option shall be memorialized by a contract between the County and the applicant or any developer holding a conditional use permit previously issued under the Compact Communities Ordinance.  A contract entered into under this provision shall not supersede the provisions of a previously issued conditional use permit unless the contract expressly so provides.  No contract shall be entered into under this provision until the public hearing and procedural requirements for the issuance or amendment of a conditional use permit have been complied with.

**November 18, 2013**
**Section 12.3 Housing**

**Moderate Income Residents**

All compact communities shall either (i) provide housing for low and moderate-income households as provided in Subsection A below, or (ii) enter into a contract with the County which provides for payments to the County to be used to fund (a) construction of affordable housing or land for construction of affordable housing to address the needs of low and moderate income residents of Chatham County, *(b) programs which are designed to address family violence and issues related to the abuse of women, including without limitation buildings and facilities for such programs, (c) programs which are designed to address the needs of adults with intellectual and developmental disabilities, including without limitation buildings and facilities for such programs, and (d) programs which are designed to address the needs of low and moderate income persons, including without limitation buildings and facilities for such programs,* as provided in Subsection B below.  A "low income person" is a person or family whose income is fifty percent (50%) or less of the Area Median Family Income and a "moderate

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 739 of 743

income person" is a person or family whose income is eighty percent (80%) or less of the Area Median Family Income.

Each compact community shall address the needs of low and moderate income persons by either the Moderately Priced Dwelling Option or the Payment-in-lieu Option:

**C.      Moderately Priced Dwellings Option**

4.   A minimum of five percent (5%) of the total residential units in the development shall be held by and be affordable to buyers whose household incomes are no greater than sixty percent (60%) of the Area Median Family Income by family size if title to the lots so designated is donated to a nonprofit community agency designated by the County whose mission is to expand and preserve housing for low-income households. The designated agency(ies) will hold title to the land in perpetuity and lease it to qualifying households.  The agency(ies) have a right of first refusal to purchase any home constructed by the qualifying family at any time the owner decides to sell it; or

5.   A minimum of ten percent (10%) of the total dwellings in the development shall be sold and affordable to buyers whose household incomes are not greater than sixty percent (60%) of the Area Median Family Income by family size.  The sale price and incomes of buyers shall remain limited according to the terms of this ordinance for at least thirty (30) years; or

6.   Upon approval of Chatham County, the developer may meet this provision through an alternative means, provided that it does both of the following at a minimum:
   • Ensure the development and sale of moderately priced dwellings in a manner equivalent to that in Option A or Option B above; and
   • Ensure that at least 5% of the total dwellings in the compact community are affordable housing.

**Compliance with Moderately Priced Dwellings Option**

The subdivision preliminary and final plats for each compact community shall designate the lots for Moderately Priced Dwellings, and the developer, builder(s), and purchaser(s) shall be bound by this restriction according to the terms of this ordinance.

Upon final plat approval, the applicant shall execute and record a deed restriction satisfactory to the County Attorney binding the applicant and all other parties that receive title to the property on all lots for dwellings designated as "Moderately Priced."

Moderately Priced Dwelling unit lots shall be incorporated into the compact community in proportion to the development of dwelling unit lots without affordable housing restrictions. Subsequent final residential subdivision phase plats shall not be approved until such time as completion of at least 90% of the affordable units in preceding residential phases.

**D.      Payment–in–lieu Option**

3.   A compact community developer may provide assistance to low and moderate income residents of Chatham County by entering into a contract with the County that provides a payment-in-lieu of lots within the development to fund (i) construction of affordable housing or land for construction of affordable housing to address the needs

Case 1:25-cv-00113-UA-JLW      Document 1      Filed 02/14/25      Page 740 of 743

of low and moderate income persons and families, *(ii) programs which are designed to address family violence and issues related to the abuse of women, including without limitation buildings and facilities for such programs, (iii) programs which are designed to address the needs of adults with intellectual and developmental disabilities, including without limitation buildings and facilities for such programs, and (iv) programs which are designed to address the needs of low and moderate income persons, including without limitation buildings and facilities for such programs.* The payment to be made shall be calculated on a per lot basis based on the market value of a buildable single family lot within the compact community. The per lot rate shall be based on the greater of an appraisal made by a North Carolina certified appraiser approved by the County, or the average primary building site value for the most recent tax valuation made by the County. Any appraisal cost shall be paid by the developer; or

4. A compact community developer may provide assistance to low and moderate income residents *as well as other residents* of Chatham County by entering into a contract with the County that provides payment to the County based on a formula mutually agreeable to the County and the developer to fund *(i)* construction of affordable housing or land for construction of affordable housing, *(ii) programs which are designed to address family violence and issues related to the abuse of women, including without limitation buildings and facilities for such programs, (iii) programs which are designed to address the needs of adults with intellectual and developmental disabilities, including without limitation buildings and facilities for such programs, and (iv) programs which are designed to address the needs of low and moderate income persons, including without limitation buildings and facilities for such programs.*

**Compliance with Payment- in-lieu Option**

The compliance with the payment-in-lieu option shall be memorialized by a contract between the County and the applicant or any developer holding a conditional use permit previously issued under the Compact Communities Ordinance. A contract entered into under this provision shall not supersede the provisions of a previously issued conditional use permit unless the contract expressly so provides. No contract shall be entered into under this provision until the public hearing and procedural requirements for the issuance or amendment of a conditional use permit have been complied with.

**June 16, 2014**
**Section 7.2 Wastewater Treatment, Section 9.2 Perimeter Buffer, and Section 9.3 Viewshed Buffers amended as follows:**

**7.2 Wastewater Treatment**

**General Design Standards**

~~The following are general wastewater options available for compact communities:~~

~~Off-site: Send wastewater to existing municipal treatment plants or construct new centralized wastewater treatment facilities;~~

Case 1:25-cv-00113-UA-JLW    Document 1    Filed 02/14/25    Page 741 of 743

~~Hybrid: Treat wastewater on-site and pipe treated water to an existing municipal treatment plant or new centralized wastewater treatment facilities; or~~

~~On-site: Treat wastewater on-site and distribute treated water onto the land surface via irrigation system(s).~~

*Wastewater treatment shall occur at centralized wastewater treatment facilities either on-site or at existing, previously permitted off-site facilities as permitted by the State of North Carolina Department of Environmental and Natural Resources (NCDENR). Spray irrigation may occur off-site provided that said use conforms to the uses allowed in the applicable zoning district.*

**Location, Ownership, and Sizing of Wastewater Facilities and Spray Fields**

Compact communities shall be served by wastewater collection, treatment, distribution and storage systems that are adequate to serve the reasonable needs of the community ~~and comply with all applicable regulations. Compact communities shall:~~ *and service area (as defined by the North Carolina Utilities Commission) and comply with all applicable regulations. The wastewater facilities may also serve neighboring areas. Compact communities shall:*

- ~~Locate the wastewater treatment facilities and infrastructure within the project boundaries;~~
- Show the location of all ~~spray fields~~ *wastewater facilities* needed for the compact community at build out in the sketch design submitted to Chatham County.

## 9.2 Perimeter Buffer

Perimeter buffers shall be utilized to minimize the impacts of each compact community on adjacent properties along the entire perimeter of the compact community. Table 9.2 lists the minimum buffer width allowable, depending on the proposed land use along the edge of the compact community and the existing land use in the adjacent property at any point along the perimeter.

Chatham County may allow a reduction in the perimeter buffer width required by this ordinance of up to fifty percent (50%) if it determines that the impact of the compact community is adequately mitigated by community design or topography. *In addition, Chatham County may allow a reduction in the perimeter buffer from fifty-one percent (51%) up to one hundred percent (100%) after giving the adjoining landowners an opportunity to comment and Chatham County determines that the impact of the compact community is adequately mitigated by the community design or topography. A developer of a Compact Community may request of the Board of Commissioners such a waiver or reduction at any time.*

## 9.3 Viewshed Buffers

**Viewshed Buffer Vegetation and Land Uses**

To the extent practicable, existing native forest vegetation shall be utilized for this buffer*, except that this requirement is optional for the developer where the use adjoining the applicable roadway is a commercial, institutional, or office use.* Farms, pastures, and other traditional rural land uses owned by the developer or protected with a permanent conservation easement may be used to meet this requirement. Topographic features such as hills, valleys, and planted berms owned by the developer may also be used to meet this requirement. *Before any native vegetation is removed, a revised landscaping plan detailing what is proposed to be removed and the extent*

Case 1:25-cv-00113-UA-JLW     Document 1     Filed 02/14/25     Page 742 of 743

*and type of replanting must be reviewed by the Chatham County Planning Department and the Chatham County Appearance Commission. Selective removal may be recommended in lieu of clearing the site of all existing native forested or vegetated areas.*