IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

THE SUMMIT CHURCH-HOMESTEAD    )
HEIGHTS BAPTIST CHURCH, INC.,   )
                                )
          Plaintiff,            )
                                )
     v.                         )          1:25-cv-113
                                )
CHATHAM COUNTY, NORTH CAROLINA  )
BOARD OF COMMISSIONERS,         )
                                )
          Defendant.            )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

　　Before this court is Plaintiff's Motion for Preliminary
Injunction Pursuant to Federal Rule of Civil Procedure 65(a),
(Doc. 5). For the reasons stated herein, Plaintiff's motion will
be granted in part and denied in part.

## I.　FACTUAL BACKGROUND

　　Plaintiff Summit Church ("Plaintiff" or "Summit") is a
religious nonprofit corporation organized and existing under
North Carolina law. (Compl. (Doc. 1) ¶ 1; Answer (Doc. 19) ¶ 1.)
Defendant Chatham County Board of Commissioners ("Defendant" or
"Chatham County") is the "policy-making body of Chatham County,"
North Carolina. (Compl. (Doc. 1) ¶ 2; Answer (Doc. 19) ¶ 2.)

**A.** <u>**Summit Church's Growth and Search for Property**</u>

Summit Church has various church campuses across the Triangle region of North Carolina. (<u>See</u> Doc. 7 at 2 (citing Pastor J.D., <u>Why the Summit Church is Multi-Site</u>, J.D. Greear Ministries (June 3, 2013), https://jdgreear.com/why-the-summit-is-multi-site/).)[1]

This dispute revolves around Summit's efforts to build a permanent Chapel Hill church campus in Chatham County. Currently, Summit conducts services for its greater Chapel Hill parishioners out of East Chapel Hill High School. (Pl.'s Ex. A, Aff. of Todd Ervin ("Ervin Aff.") (Doc. 7) at 34.) But the arrangement with East Chapel Hill High school has become "increasingly burdensome" for Summit due to "a general inability to use of [sic] the property during the week, size constraints, and difficulties setting up the space for the worship service and childcare on a weekly basis." (<u>Id.</u>) According to Summit's Chapel Hill Lead Pastor, Eric Gravelle, the Chapel Hill congregation, which totals around 800 people, is "running up

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

- 2 -

right now against [the high school's] capacity." (06/09/2025 Hr'g Test. of Eric Gravelle.)[2]

In response to the problems associated with the East Chapel Hill High School arrangement, Summit began looking for property where it could establish a permanent Chapel Hill campus. (Pl.'s Ex. A, Ervin Aff. (Doc. 7) at 34; 06/09/2025 Hr'g Test. of Todd Ervin.) In 2022, Summit identified "six undeveloped parcels of land" in Chatham County, North Carolina, that it thought were "perfect for a new Chapel Hill Campus." (Pl.'s Ex. A, Ervin Aff. (Doc. 7) at 34-35.) According to Gravelle, in his six years at Summit, this property is the first feasible land the church has located. (06/09/2025 Hr'g Test. of Eric Gravelle.)

These six parcels ("the Property") consist of four parcels on the eastern side of U.S. Highway 15-501 and two parcels on the western side. (See Compl. (Doc. 1) ¶ 37; Answer (Doc. 19) ¶ 37.) The parcels are across from and adjacent to "The Veranda Shopping Center." (See Compl. (Doc. 1) ¶ 41; Answer (Doc. 19) ¶ 41; Def.'s Ex. C, Summit Church - Chatham Campus (Doc. 16-23) at 3.) Less than a mile north of the Property is "Chatham Downs," which "includes more than 80,000 square feet of commercial space, anchored by a grocery store," as well as "501 Landing and

---

[2] Eric Gravelle and Todd Ervin testified at the hearing held on June 9, 2025. This court finds their testimony credible and adopts that testimony as fact unless otherwise noted.

Chatham Professional Park," which together provide "more than 31,000 square feet of commercial space" on ten acres of land. (Compl. (Doc. 1) ¶ 42; Answer (Doc. 19) ¶ 42.) Approximately 2.8 miles north of the Property is a Walmart, which exceeds 150,000 square feet. (Compl. (Doc. 1) ¶¶ 43-44; Answer (Doc. 19) ¶¶ 43-44.)

In 2019, a non-religious entity developed a plan for an "active-adult (55+) community called 'Herndon Farms'" on the six parcels of land at issue here. (Compl. (Doc. 1) ¶ 46; Answer (Doc. 19) ¶ 46.) The Herndon Farms plan, which envisioned 161 residential units, a 140,000 square foot congregate care facility, a 10,000 square foot office/daycare, and a barn for events, (see generally Pl.'s Ex. 5, Herndon Farms Application (Doc. 1) at 356-385), was approved by the County Commission in 2022, (Compl. (Doc. 1) ¶ 47; Answer (Doc. 19) ¶ 47). In connection with that approval, the parcels were rezoned from a residential zoning with a minimum lot size of 40,000 square feet ("R-1") to "Conditional District-Compact Community" ("CD-CC"). (Compl. (Doc. 1) ¶ 47; Answer (Doc. 19) ¶ 47.) The approval expired when the Herndon Farms plans were not submitted by the deadline established by ordinance. (Compl. (Doc. 1) ¶ 52; Answer (Doc. 19) ¶ 52.)

Accordingly, when Summit discovered the Property, all six parcels were zoned as "Conditional District-Compact Community." (See Compl. (Doc. 1) ¶ 47; Answer (Doc. 19) ¶ 47.) The Chatham County Zoning Ordinance explains that "approval of a conditional zoning district is required as a prerequisite to any use or development." (Pl.'s Ex. 4, Zoning Ordinance (Doc. 1) at 231.) Summit sought to return three of the six parcels (around 47 acres) to their pre-Herndon Farms zoning, R-1, and sought to rezone the other three parcels (around 50 acres) to "Conditional District-Office & Institutional," in connection with its plan to build a church campus. (See Pl.'s Ex. 9, Letter of Clarification (Doc. 1) at 483; Compl. (Doc. 1) ¶ 59; Answer (Doc. 19) ¶ 59.)

In pursuit of these two rezonings ("the proposal"),[3] Plaintiff was required to follow the rezoning procedure outlined in the Chatham County zoning ordinance. (See Pl.'s Ex. 4, Zoning Ordinance (Doc. 1) at 232.) Substantively, Chatham County land use is governed by "Plan Chatham" — a comprehensive land use plan adopted November 20, 2017, and a corresponding Future Use Map, which is considered "a framework for future land use."

_____

[3] Although these constituted two separate rezoning applications, Plaintiff submitted them in tandem, and they were considered and ultimately denied by the Board of Commissioners in tandem. Accordingly, this court treats these separate applications as two parts comprising Plaintiff's entire proposal to the Chatham County Board of Commissioners.

- 5 -

(Pl.'s Ex. 1, Plan Chatham (Doc. 1) at 55, 98, 99.) The primary land use goal of Plan Chatham is to "[p]reserve the rural character and lifestyle of Chatham County." (Id. at 115.) Plan Chatham defines "rural character" as follows:

> The combination of natural and built features that portray the traditional form and preserve the traditional function of the rural landscape. In Chatham County, rural character is manifested in a backdrop of forests and fields, dotted with natural features such as creeks and hills and structures such as barns, silos, churches, poultry houses, general stores, and craft studios. These physical features support traditional rural activities, such as farming, lumbering, craft making, and outdoor recreation that have been practiced for generations in the County. Homes in rural areas are either scattered at low densities or clustered together in small communities.

(Id. at 72-73.) Secondary land use goals according to Plan Chatham include "[d]iversify[ing] the tax base," "generat[ing] more quality, in-county jobs," and "[p]romot[ing] a compact growth pattern by developing in and near existing towns, communities, and in designated, well planned, walkable, mixed use centers." (Id. at 115.)

The Property is located within a "Compact Residential" segment of Plan Chatham's Future Use Map. (Compl. (Doc. 1) ¶ 37; Answer (Doc. 19) ¶ 37.) Plan Chatham describes "Compact Residential" as a "[mi]x of detached and attached residential units complemented by a variety of open spaces. Mix of uses include single family detached and attached units and some

- 6 -

multifamily units. Community centers, amenities, recreational uses, schools, and churches may be part of the fabric." (Pl.'s Ex. 1, Plan Chatham (Doc. 1) at 101.)

In October 2023, Summit, knowing the Property needed County approval to be used as a church campus, organized a meeting between its design representative, Qunity, PA, and Chatham County's planning staff. (Compl. (Doc. 1) ¶ 54; Answer (Doc. 19) ¶ 54; Pl.'s Ex. A, Ervin Aff. (Doc. 7) at 35.) According to representations made to this court by Defendant's attorney during the June 9 hearing, it is undisputed that at this meeting, the review staff opined that Summit's project was "consistent with Plan Chatham and the Future Use Map." (Compl. (Doc. 1) ¶ 55; Answer (Doc. 19) ¶ 55; 06/09/2025 Oral Arg. of Def.'s Att'y; see also Pl.'s Ex. A, Ervin Aff. (Doc. 7) at 35 ("We received positive feedback from the County's staff during that meeting.").) Following that meeting, Plaintiff acquired an option from the current property owner to purchase the Property, which expires June 30, 2025. (Pl.'s Ex. A, Ervin Aff. (Doc. 7) at 35-36; 06/09/2025 Hr'g Test. of Todd Ervin.)

B.   **Chatham County Rezoning Procedure**

Procedurally, an applicant requesting a new conditional zoning district must hold a community meeting, meet with the Chatham County Appearance Commission for review of landscaping

and signage plans, and submit a completed application and supporting information to the Planning Department. (Pl.'s Ex. 4, Zoning Ordinance (Doc. 1) at 234–35.) Then, the Board of Commissioners and the Planning Board receive public comment on the application at a public hearing, which may be continued in order to receive "more public input or requested information from the applicant." (Id. at 236.) Once the public hearing is closed by the Board of Commissioners, "the Planning Department shall prepare an analysis of the application and a recommendation to approve, deny, or defer action on the application." (Id. at 337.) The Planning Board then considers the application and provides "a written recommendation to the Board of Commissioners that addresses consistency with the adopted comprehensive plan and other matters as deemed appropriate." (Id.) After receiving the recommendation from the Planning Board, the Board of Commissioners votes on whether to approve or deny the application. (Id. at 338.)

C.    **Summit Church's Rezoning Proposal**

In accordance with the Chatham County rezoning procedure, Plaintiff met with the Appearance Commission on April 24, 2024, (Pl.'s Ex. 7, Summit Findings Summary (Doc. 1) at 468), and held a community meeting on April 29, 2024, (id. at 467; see also Def.'s Ex. K, Report of Community Meeting (Doc. 16-25) at 11).

In May 2024, Plaintiff submitted its rezoning proposal. (Pl.'s Ex. A, Ervin Aff. (Doc. 7) at 36.)

## 1. August 19, 2024 Public Hearing – Board of Commissioners

On Monday, August 19, 2024, the Board of Commissioners held a public hearing on Plaintiff's proposal. (Compl. (Doc. 1) ¶ 64; Answer (Doc. 19) ¶ 64.) At this hearing, the Chatham County Zoning Administrator presented Plaintiff's proposal to the Board of Commissioners. In doing so, she stated that the Appearance Commission had been "very happy with [Plaintiff's] proposed landscaping plan, they just recommended a few changes here and there, but they felt that the applications really took special care . . . in being sensitive to the views from the . . . adjoining properties." See Chatham County North Carolina, Board of Commissioners on 2024-08-19, at 03:09:07 (Granicus) https://chathamnc.granicus.com/player/clip/445?view_id=2&redirect=true (last visited 06/18/2025). Next, a representative from Qunity presented the proposal on behalf of Plaintiff. Id. at 3:13:08.

Board members expressed the following concerns with the proposal: the church campus would not generate tax revenue, id. at 3:17:56, would increase traffic, id. at 3:20:15, and would not preserve Chatham County's rural character, id. at 3:19:55,

- 9 -

3:20:30. Specifically, then-Vice Chair, Karen Howard, stated that "for me, this just seems like a really big, brand-new megachurch looking for a place to go and it feels like a really poor fit for what we are envisioning and this deep commitment . . . for not . . . giving up the northeast to development," id. at 3:20:46, and that it "feel[s] like something that is . . . sort of antithetical to real rural character preservation," id. at 3:21:33.

The Board of Commissioners referred Plaintiff's proposal to the Planning Board. (Compl. (Doc. 1) ¶ 70; Answer (Doc. 19) ¶ 70.)

### 2. September 3, 2024 Public Hearing – Planning Board

On September 3, 2024, the Planning Board heard Summit's proposal at a public hearing. (Compl. (Doc. 1) ¶ 73; Answer (Doc. 19) ¶ 73.) According to the meeting minutes, the Zoning Administrator presented the project to the Planning Board and summarized the concerns discussed at the August Board of Commissioners public hearing. (Pl.'s Ex. 8, September 3rd Planning Board Minutes (Doc. 1) at 466.) At this meeting, the Zoning Administrator provided the Planning Board with a consistency statement for consideration, expressing "[t]he rezoning request is consistent with the comprehensive plan by being located within a compact community node where churches are

- 10 -

specifically mentioned as part of the fabric of development."
(Id. at 468.) Following the Zoning Administrator's presentation,
a Qunity representative gave a brief presentation to the
Planning Board on behalf of Summit. (Id. at 469.) In response to
the concerns about traffic congestion, she relayed to the
Planning Board that Summit intended to institute a "traffic
safety plan" at the first church meeting in order to address
some of the traffic concerns. (Id.)

    After the presentations, ten community members spoke in
opposition to the proposal, citing concerns with traffic
congestion and traffic accidents, rural character, the size of
the church, and the church's lack of tax revenue generation.
(Id. at 469–74.) One community member spoke in support of the
proposal, expressing his desire to "live 10 minutes away from my
church not 30 minutes away." (Id. at 471.) The Planning Board
members expressed the following concerns: 1) traffic impact, 2)
tax revenue generation, 3) the size of the church, and 4)
maintaining the rural nature of Chatham County. (Id. at 476–79.)
The Planning Board continued its consideration of the proposal
until October 1, 2024. (Id. at 479.)

### 3.  Letter of Clarification and Public Comment

    Between the September 1, 2024 meeting and the October 1,
2024 meeting, Plaintiff's representative, Qunity, submitted a

- 11 -

Letter of Clarification to address the concerns of the Planning Board members and the community members who spoke at the public hearing. (See Pl.'s Ex. 9, Letter of Clarification (Doc. 1) at 482.) The letter explained, for example, 1) that Summit's proposal contained less tax-exempt land than the approved Herndon Farms proposal and would increase consumerism in the area, (see id. at 484–85), 2) that although "rural character" is the number one goal of Plan Chatham, the Plan also envisions areas of growth and Summit's proposal is within the "second to most growth designated areas in the County" according to the Plan, (id. at 485), 3) that churches are specifically envisioned within this designated area in Plan Chatham, (id. at 488), and 4) that the current Traffic Impact Analysis "substantially meets DOT criteria," (id. at 491).

Additionally, around this time, hundreds of community members submitted written comments. Some public comments expressed support, (see generally Pl.'s Ex. 10, Public Comments (Doc. 1) at 551–686; Def.'s Ex. Q, Public Comments (Doc. 16-26) at 9–143), but many of the comments reiterated concerns with traffic, taxes, and the rural character of the County. (Id.) Some citizens commented specifically on Summit's religious mission and values.

> This county is known for its progressive, LGBTQ-friendly, and open-minded atmosphere, which is why many

of us have chosen to call it home. Building a mega-
church in this area runs contrary to these values, and
many residents, including myself, are deeply concerned.
. . . This project does not align with the needs or
values of our community . . . .

(Pl.'s Ex. 10, Public Comments (Doc. 1) at 568.)

Throw in the political work Evangelical churches view as
central to their mission, and we end up in a situation
where the citizens of Chatham County are forced to carry
the tax and infrastructure burden of what amounts to a
political organization.

(Id. at 571.)

Summit Church . . . has publicly known views that oppose
LGBTQ+ rights and inclusion. Approving the construction
of a large-scale institution led by an organization with
these discriminatory views sends a message of exclusion
and intolerance. Chatham County prides itself on being
a welcoming, inclusive community, and the establishment
of a church that promotes exclusionary values would be
harmful to the social fabric of the area.

(Id. at 592.)

Can I add I would be in favor of anything that is more
community friendly and does not discriminate? 100% in
favor of anything that isn't a divisive religious
organization?

(Id. at 603.)

You want high income workers living and paying taxes in
Chatham County? Then you'd better not invite a churchful
of ignorant zealots with outstanding sexual abuse
charges to ruin traffic and consume resources tax free.
We'd rather pay the higher taxes in Orange County than
subsidize these high-earning homophobes.

(Id. at 613.)

I don't think the mega church that is proposed to be
another location for Summit Church is a fit for our
county. Besides the pressure on the infrastructure of
the 15-501 highway, this church discriminates against

- 13 -

>50% of the residents of our county. The theology is consistent with Complementarianism. This is a belief that . . . [o]nly men should hold leadership positions in the church. . . . I would never expect you to support an organization that would repress people based on their sex, creed, color or sexual orientation.

(Id. at 617–18.)

[M]ega churches, especially in this instance [sic] do not promote the values that they put forth. . . . There is nothing wrong with a church, we have many within the county and they are all great places of worship and public gathering. But Churches of this kind are not the same. They do not expound the same benefits as other religious churches we have. These institutions are about one thing, profit.

(Id. at 625–26.)

I am AGAINST a mega church being built on 15/501 by Fearington Village, and I will vote AGAINST any elected official who supports building such a monstrosity in our community. There are "plenty" of local churches and synagogs [sic] that support our community, and they very LAST thing our community needs is a three-ring circus eye-sore church "corporation" hogging 50 acres of tax-exempt land.

(Id. at 679.)

The mission and values of the Summit Church is to "plant 1,000 churches". They prioritize the gospel, but do not claim to support the community as a priority.

(Id. at 684.)

A mega church would not only sorely affect the quality of life in surrounding communities, it would go against the teachings of Jesus to love your neighbor as yourself.

(Id. at 685–86.)

- 14 -

### 4. October 1, 2024 Public Hearing – Planning Board

On October 1, 2024, the Planning Board had a second public hearing regarding Plaintiff's rezoning proposal. (See Pl.'s Ex. 11, October 1st Planning Board Minutes (Doc. 1) at 688.) The Zoning Administrator gave a brief overview of Summit's proposal and Summit's representatives provided an updated presentation to the Planning Board and traffic analysis clarifications. (Id. at 692–93.) Specifically, Plaintiff's traffic expert explained that the North Carolina Department of Transportation ("NCDOT") had issued preliminary review of Summit's Traffic Impact Analysis, which "indicate[s] the TIA substantially meet[s] NCDOT's criteria for further review and comments." (Id. at 693; see also Def.'s Ex. T, North Carolina DOT Preliminary Review (Doc. 16-27) at 1.)

Twenty-three citizens provided comments on the proposal at this hearing. (See Pl.'s Ex. 11, October 1st Planning Board Minutes (Doc. 1) at 693–701.) These comments largely focused on the proposal's traffic impact, the fact the church campus would be tax-exempt, and the size of the proposed church, although several comments expressed support for the proposal and the ways Summit could contribute to the community of Chatham County. (Id.) Following public comment, members of the Planning Board expressed the following concerns with the proposal: 1) the peak

traffic impact, given that this is a main route to hospitals in
Chapel Hill, (id. at 702); 2) that the proposal did not match
Plan Chatham's vision for rural character preservation, (id.);
3) that the church's tax-exempt status would lose the County
millions in taxes over the years, (id. at 703); and 4) that the
scale of the church was too large, (id.). Following this
discussion, the Planning Board unanimously approved a motion to
declare this proposal as "inconsistent with the Comprehensive
Plan by, diversify the tax base and generate more high-quality
county jobs, and the goal that county residents can travel
safely and easily through the county." (Id. at 704.)

### 5. December 16, 2024 Public Hearing — Board of Commissioners

On December 16, 2024, the Board of Commissioners held a
public hearing on Plaintiff's proposal. Ten members of the
public spoke — four in opposition, citing traffic concerns and
rural character, and six in support, citing Summit Church's
efforts to contribute to local communities. See Board of
Commissioners on 2024-12-16, at 4:09:37–4:39:45,
https://drive.google.com/file/d/1E4wzhJ87tQ1wlW_DyRkZ6dL7y-
BV4TJY/view (last visited 06/18/2025). Later in the meeting, a
County official presented the proposal to the Board, offering to
answer questions and/or refer questions to the applicant's

representatives, who were in attendance. Id. at 5:41:21–5:46:01. The Board members asked no questions of the County official or the applicant. (Compl. (Doc. 1) ¶ 110; Answer (Doc. 19) ¶ 110.)

In response to the presentation, Chair Karen Howard stated the following:

> I am not inclined to go in a different direction than the Planning Board's unanimous decision. I have heard nothing and anticipate that I will hear nothing that is going to change my perspective on that. . . . We have heard from people who are quite frankly already commuting to a Summit Church somewhere that they're clearly comfortable with commuting to. I know that Chatham County is a community that cares deeply about its sense of place, and I intend to respect that.

See Board of Commissioners on 2024-12-16 at 5:46:29. After discussing her concern for the maintenance of rural character, she then stated

> I also know that Chatham County is a community that takes wonderful care of its own. There are volunteers in our schools, every one of our schools, every day. There are volunteers at our . . . thrift stores that support our schools every day. There are incredible small community churches all over this county that anyone is invited to, welcome in. We are meeting the needs of our community, we are loved, we are deeply cared for and the addition of a . . . and you can misnomer things and call them mega or whatever. That is a significant number and so in Chatham that would be a mega church, whether it considers itself a mega church or not. The amount of traffic that would be seen on our streets and in that particular stretch of our streets is not something that I think is interesting or compelling . . . .

Id. at 5:47:28. Following Chair Howard's statements, Board Member Amanda Robertson expressed her agreement, adding that the

- 17 -

Board has "heard our community speak on this." Id. at 5:50:38.

Chair Howard again spoke, acknowledging that while some might

find home at Summit Church, "Chatham County is not a place to

call home for that size of a church." Id. at 5:51:30. The Board

unanimously denied Summit's proposal.

At the end of the meeting, Chair Howard again spoke on

Plaintiff's proposal:

> I heard a lot from the group that was here talking about
> . . . what a church can do in our community. And I do
> believe, yes, churches can do wonderful things, but
> people, just ordinary people in our community are
> already doing wonderful things and we can continue to do
> that with or without a church.

Id. at 6:17:19.

On the same day as the December meeting, the Board of

Commissioners issued a Non-Consistency Statement, which

explained that Plaintiff's Proposal was denied because it was

> not consistent with the Chatham County Land Conservation
> and Development Plan;[4] and
>
> **WHEREAS**, in addition, the Chatham County Board of
> Commissioners considers the Amendment not to be
> reasonable and in the public interest because the
> rezoning is not consistent by not providing a diversity
> in the tax revenue and does not provide more high-quality
> jobs for the area.

---

[4] This court understands "Chatham County Land Conservation
and Development Plan" to refer to "Plan Chatham." (See Pl.'s Ex.
1, Plan Chatham (Doc. 1) at 64 ("Plan Chatham is meant to serve
as an update to the Chatham County Land Conservation and
Development Plan.").)

(Pl.'s Ex. 12, Non-Consistency Statement (Doc. 1) at 707.)

## II. **PROCEDURAL HISTORY**

On February 14, 2025, Plaintiff filed its complaint, alleging that Defendant violated various provisions within the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq, (Compl. (Doc. 1)), the instant Motion for Preliminary Injunction Pursuant to Federal Rule of Civil Procedure 65(a), (Doc. 5), and a memorandum in support, (Pl.'s Mem. Supporting Pl.'s Mot. for Prelim. Inj. ("Pl.'s Mem.") (Doc. 7)). In its motion for preliminary injunction, Plaintiff asks this court to "mandatorily enjoin[] the Board to approve the two zoning applications that are the subject of this action" and to "provid[e] such further relief as this Court deems appropriate." (Doc. 5 at 3.) On March 27, 2025, Defendant responded in opposition, (Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. & Mem. in Supp. of Def.'s Mot. to Dismiss ("Def.'s Resp.") (Doc. 16)), and on April 16, 2025, Plaintiff replied, (Pl.'s Reply in Supp. of its Mot. for Prelim. Inj. ("Pl.'s Reply") (Doc. 21)).

Defendant filed a motion to dismiss on March 27, 2025, (Doc. 17), which this court denied, without prejudice, during a motions hearing on June 9, 2025. (See Docket Entry 06/09/2025.)

- 19 -

During the June 9 motions hearing, this court also heard evidence and argument on Plaintiff's motion for preliminary injunction. The motion is ripe and ready for ruling.

## III. STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). "A preliminary injunction is an extraordinary remedy, and a mandatory preliminary injunction," which Plaintiff seeks here, "is granted even more rarely than a prohibitory injunction." Russell v. Merrill Lynch, Inc., No. 1:09CV534, 2009 WL 2595695, at *1 (M.D.N.C. Aug. 20, 2009); see also Pierce v. N. Carolina State Bd. of Elections, 97 F.4th 194, 209 (4th Cir. 2024) ("Mandatory preliminary injunctions are warranted only in the most extraordinary circumstances." (citation and internal quotation marks omitted)); Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc., 131 F.4th 205, 223 (4th Cir. 2025) (explaining that mandatory preliminary injunctions are "highly disfavored").

A mandatory injunction stands in contrast to a prohibitory injunction. See League of Women Voters of N. Carolina v. North Carolina, 769 F.3d 224, 236 (4th Cir. 2014). "Whereas mandatory injunctions alter the status quo, prohibitory injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." Id. (citation and internal quotation marks omitted). To obtain a mandatory preliminary injunction, a Plaintiff must satisfy the Winter factors and show that a preliminary injunction is "necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind." See Bach v. L. Sch. Admission Council, Inc., No. 1:13-CV-888, 2014 WL 12987279, at *1 (M.D.N.C. Feb. 4, 2014) (citation omitted).

## IV.  **ANALYSIS**

Plaintiff brings four claims for relief under RLUIPA, 42 U.S.C. §§ 2000cc et seq. First, Plaintiff alleges that Defendant violated 42 U.S.C. § 2000cc(a), which prohibits a government from imposing or implementing a land use regulation in a manner that imposes a "substantial burden" on a religious institution's religious exercise ("the substantial burden claim"). (Compl. (Doc. 1) ¶¶ 122-39.) Second, Plaintiff alleges that Defendant violated 42 U.S.C. § 2000cc(b)(1), which prohibits a government

- 21 -

from imposing land use regulations in a manner that treats a religious institution on "less than equal terms" with a non-religious assembly or institution ("the equal terms claim"). (Id. ¶¶ 140-48.) Third, Plaintiff alleges that Defendant violated 42 U.S.C. § 2000cc(b)(2), which prohibits governments from imposing land use regulations that discriminate against institutions on the basis of religion or religious denomination ("the discrimination claim"). (Id. ¶¶ 149-76.) Fourth, Plaintiff alleges that Defendant violated 42 U.S.C. § 2000cc(b)(3)(B), which prohibits a government from imposing a land use regulation that "unreasonably limits religious assemblies, institutions, or structures within a jurisdiction" ("the unreasonable limit claim"). (Id. ¶¶ 177-87.)

## A.   Likelihood of Success on the Merits

Plaintiff has demonstrated a likelihood of success on the merits of its substantial burden claim.[5]

---

[5] Plaintiff does not assert its unreasonable limitation claim as a basis for a preliminary injunction. (See generally Pl.'s Mem. (Doc. 7); Pl.'s Reply (Doc. 21).) Additionally, it appears to this court that, for many of the same reasons that Plaintiff is likely to succeed on its substantial burden claim, Plaintiff's equal terms and discrimination claims also have merit and this court reiterates the summary analysis it articulated at the conclusion of the June 9 hearing. However, the court, after review of the full record, finds the substantial burden claim sufficient to find a preliminary injunction is warranted and more appropriate for a memorandum opinion at this early stage of the proceedings.

### 1. __Substantial Burden__

42 U.S.C. § 2000cc(a) states:

No government shall impose or implement a land use
regulation in a manner that imposes a substantial burden
on the religious exercise of a person, including a
religious assembly or institution, unless the
government demonstrates that imposition of the burden on
that person, assembly, or institution—

> (A) is in furtherance of a compelling governmental
> interest; and

> (B) is the least restrictive means of furthering
> that compelling governmental interest.

42 U.S.C. § 2000cc(a). In determining what constitutes a

"substantial burden" upon religious exercise, courts in the

Fourth Circuit "utilize a two step analysis" asking first

"whether the impediment to the organization's religious practice

is substantial" and then, "whether the government or the

religious organization is responsible for the impediment."

Canaan Christian Church v. Montgomery Cnty., Md., 29 F.4th 182,

192 (4th Cir. 2022).

### i. __Is the impediment substantial?__

In the land use context, an impediment is considered

substantial where "the property would serve an unmet religious

need, the restriction on religious use is absolute rather than

conditional, and the organization must acquire a different

property as a result." Canaan, 29 F.4th at 192-93 (citation

omitted).

- 23 -

Here, Defendant argues that the "impediment" in question —
the denial of Plaintiff's proposal — is not a "substantial
burden" on its religious exercise because Plaintiff only had an
option to purchase the property, and thus "does not have to
'acquire a different property' because it has not even acquired
the property at issue." (Def.'s Resp. (Doc. 16) at 8.) This
argument is without merit according to the plain language of
RLUIPA, which defines "land use regulation," as

> a zoning or landmarking law, or the application of such
> a law, that limits or restricts a claimant's use or
> development of land (including a structure affixed to
> land), if the claimant has an ownership, leasehold,
> easement, servitude, or other property interest in the
> regulated land or a contract or option to acquire such
> an interest.

See 42 U.S.C. § 2000cc-5(5) (emphasis added); (Pl.'s Reply (Doc.
21) at 3-4). Accordingly, Plaintiff's interest in the Property,
by virtue of its option, is within the ambit of RLUIPA's
protection. Because of the denial of its proposal, Plaintiff is
unable to take advantage of its option and will have to identify
an alternative property.

Further, Plaintiff puts forth significant evidence that the
Property would serve its "unmet religious needs." Canaan, 29
F.4th at 192-93. Summit's congregation is outgrowing its current
facility, East Chapel Hill High School. (See 06/09/2025 Hr'g
Test. of Eric Gravelle (explaining that Summit's Chapel Hill

- 24 -

campus is currently "running up . . . against capacity").)
Additionally, Summit is limited in its use of this site to
Sunday morning worship and thus must "get creative" in finding
locations for other programs, such as "classes, equipping
seminars, and serving the community in different ways through
service projects" and when it cannot locate another site, it
must decline to offer these opportunities. (Id.) The Fourth
Circuit has found similar circumstances to constitute "evidence
of an unmet religious need." See Canaan, 29 F.4th at 193
(finding "overcrowded facility, the need for multiple services
to accommodate the number of members, and a lack of space for
programs" as "evidence of an unmet religious need").
Additionally, the lead pastor for Summit Church's Chapel Hill
campus testified that having a permanent Summit Church campus
and a building of its own would "remove many, many barriers"
faced by Summit in their current arrangement with East Chapel
Hill High School. (06/09/2025 Hr'g Test. of Eric Gravelle.)

Plaintiff's undisputed evidence shows that "its current
facilit[y] inadequately serve[s] its needs," and that the
Property at issue would ameliorate that problem. See Bethel
World Outreach Ministries v. Montgomery Cnty. Council, 706 F.3d
548, 558 (4th Cir. 2013) At this stage, it appears likely that
Plaintiff will be able to prove that the Property would serve an

- 25 -

unmet religious need. See id. (finding that "a fact finder could certainly conclude that [the plaintiff's] current facilities do not adequately serve its religious purposes" and that a "planned 800-seat church would alleviate [the plaintiff's] burden").

Finally, the "restriction" Plaintiff has faced on its "religious use is absolute rather than conditional." See Canaan, 29 F.4th at 192. "An impediment is absolute where land use restrictions wholly prevent a religious organization from building any house of worship on its property, rather than simply imposing limitations on the building." Alive Church of the Nazarene, Inc. v. Prince William Cnty., Virginia, 59 F.4th 92, 106 (4th Cir. 2023) (citing Bethel, 706 F.3d at 557-58). Plaintiff's proposal to build a house of worship on the Property was denied outright, without condition. (See Pl.'s Ex. 12, Non-Consistency Statement (Doc. 1) at 707.)

As a point of contrast, the court in Canaan found that a restriction was not absolute where "the County indicated during and after its review . . . that alternatives might have been more successful." See Canaan, 29 F.4th at 193. But here, Chatham County provided no such indication. In fact, after the Board denied Plaintiff's proposal, Chair Karen Howard made an unequivocal statement that "Chatham County is not a place to call home for that size of a church," Board of Commissioners on

2024-12-16 at 5:51:30, suggesting the denial extended beyond just these particular parcels of land in Chatham County. Although this court recognizes that Chair Howard is only one member of the Board of Commissioners, two facts render this statement especially significant. First, none of the other members of the Board of Commissioners disagreed with her statement, suggesting that the Board as a whole may object to Summit locating anywhere in Chatham County. Second, because Chair Howard led the statements of objection to Summit's proposal with the vocal approval of two other Commissioners, (see id. at 5:49:04-5:51:09), and the voting support of all Commissioners, the Chair's sweeping statement appears to reflect the Board's position.

Even if this court's interpretation of the chair's statement and its relationship to the other board members is not entirely correct, the chair's statement is substantively problematic as a representation from a commissioner, at least at this stage of the proceedings. First, Defendant does not offer any explanation or justification for the chair's sweeping statement that Summit Church could not call Chatham County home that would make the statement consistent with RLUIPA. Second, the qualification of "that size of a church" does not render the statement unproblematic. Herndon Farms, as approved for

- 27 -

development, was larger in terms of square footage than Summit, and there were several large developments including the Veranda, Chatham Downs, and a Walmart located not far from this site. "That size of a church" thus appears to be a justification for finding an inconsistency with Plan Chatham as applied to Summit's plans of use but not to other developments on the site or in the area. Relatedly, for a governmental body to single out religious organizations for limitations as to size but require no corresponding limitation for non-religious businesses or organizations appears to impinge upon rights protected by RLUIPA. See 42 U.S.C. § 2000cc(b)(1) (A government violates RLUIPA's Equal Terms provision when it "impose[s] or implement[s] a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution."). While the chair did mention the relationship of traffic at that location to the size of the church earlier in the meeting, (see Board of Commissioners on 2024-12-16 at 5:48:15 (referencing "the amount of traffic . . . in that particular stretch")), her final statement is not limited to that particular stretch but extends to Chatham County as a whole. Finally, her statement stands in stark contrast to the Non-Consistency Statement, which limits

- 28 -

the specific reasons for non-consistency to tax revenue and
jobs.

A reasonable interpretation of the chair's statement, on
this record, makes this case distinguishable from Canaan because
it is difficult to read the chair's statement to suggest that
any alternatives might have been more successful unless Summit
chose to change its church plan and planned use. This court
finds these facts are all relevant to whether Defendant's
actions constitute a substantial burden.

Plaintiff has shown that it is likely to succeed in proving
that the impediment imposed by Chatham County — the denial of
its proposal — constituted a "substantial" burden on its
religious exercise. See Canaan, 29 F.4th at 192–93.

### ii. Who is responsible for the impediment?

As to the second step, the impediment must be imposed by
the government and not be "self-imposed" by the plaintiff. See
Alive Church, 59 F.4th at 106. An impediment will be considered
"self-imposed" by the plaintiff if it "was not imposed by
governmental action altering a legitimate, pre-existing
expectation that a property could be obtained for a particular
land use." Andon, LLC v. City of Newport News, Va., 813 F.3d
510, 515 (4th Cir. 2016). In other words, "if a religious
institution acquires land knowing that it is subject to certain

- 29 -

restrictions, any burden resulting from those restrictions has not been imposed by the government; but rather, the burden is self-imposed." Alive Church, 59 F.4th at 106. However, where a religious institution "knowingly purchases land subject to certain restrictions, but reasonably expects that it can comply with those restrictions, the burden is not self-imposed if the government 'subsequently makes development and use practically impossible.'" Id. at 107 (citing Canaan, 29 F.4th at 194).

Recent Fourth Circuit cases have illustrated "self-imposed burden" and what it means for a plaintiff to "reasonably expect[] that it can comply with [land use restrictions]." Id.

In Andon, the property at issue could only by used for a place of worship when four statutory conditions were satisfied, including a condition that any building or structure be "setback" 100 feet from "any side or rear property line which is zoned single-family residential." 813 F.3d at 512. A religious congregation sought to lease a building on the property to use for a place of worship, but the building did not comply with the setback provision. Id. at 512–13. Despite knowing the setback was an impediment, the property owner and congregation entered into a lease that was "contingent on [the landowner] obtaining 'City approval' allowing operation of a church facility on the

property." Id. at 513. The property owner requested a variance from the setback requirement, which was denied. Id.

In response to the variance denial, the property owner and congregation sued under RLUIPA. The Fourth Circuit affirmed the district court's dismissal of the plaintiffs' substantial burden claim finding that "[t]he plaintiffs . . . never had a reasonable expectation that the property could be used as a church," because "[w]hen the plaintiffs entered into the prospective lease agreement, the property was not a permitted site for a community facility such as a church, and had not met applicable setback requirements for that type of use for at least 14 years." Id. at 515. Further, "[b]efore [the property owner] filed the application seeking a variance, the Zoning Administrator informed [it] that the application would not be approved for failure to meet the setback requirement." Id. Thus, the plaintiffs' burden was self-imposed because they "knowingly entered into a contingent lease agreement for a non-conforming property." Id.

Similarly to Andon, in Canaan, the plaintiff sought to build a new church on property that was for sale and entered into a sale agreement "contingent on the approval of the extension of a public sewer line to the Property." 29 F.4th at 186. However, according to the controlling master land use plan,

- 31 -

"sewer [was] not to be extended to this Property 'for any use'."
Id. at 195. The county denied the request for sewer extension.
Id. at 191. The Fourth Circuit affirmed the district court's
grant of summary judgment for the defendant as to the
substantial burden claim, finding that "[b]ecause [a]ppellants
knowingly entered into a contingent sale agreement for property
that was expressly excluded from receiving public sewer access
under the master plan, they could not have had a reasonable
expectation of the County approving their [requests] for public
sewer access." Id. at 195; cf. Alive Church, 59 F.4th at 107
(affirming dismissal of substantial burden claim where plaintiff
"did not have a reasonable expectation of religious land use"
because it failed to comply with special use permit requirement
or statutory requirements).

Contrast Andon and Canaan with Bethel, where the plaintiff
sought to build a large church on 119-acre property. 706 F.3d at
552.

> The first regulation at issue in Bethel banned extension
> of public water and sewer services to certain
> classifications of property, including the plaintiff's
> property. [Bethel, 706 F.3d] at 553. In response to the
> county's implementation of this regulation, the
> plaintiff modified its construction plans and proposed
> to build a smaller church that operated on a private
> septic system. Id. at 554. Before those plans were
> approved, however, the county adopted a second
> regulation applicable to the plaintiff's property, which
> prohibited the construction of private institutional
> facilities including churches. Id.

- 32 -

_Andon_, 813 F.3d at 514-15. In _Bethel_, the court found a triable issue of fact "as to whether [the plaintiff] had a reasonable expectation of being able to build a church," because churches were permitted at the time plaintiff bought the property and although approval was not guaranteed and was within the discretion of the county, "modern zoning practices are such that landowners are rarely guaranteed approvals." _Bethel_, 706 F.3d at 558.

Defendant argues that Plaintiff's hardship is self-imposed because it was "fully aware when it entered into [its option agreement] that the property 'has no conforming uses under its current zoning'" and thus is analogous to _Andon_. (Def.'s Resp. (Doc. 16) at 8-9.) But this case is materially different from _Andon_. There, the plaintiff requested that a bright-line setback rule not be applied to its property. The court explained that if it agreed with the plaintiff that the variance denial violated RLUIPA, the court "effectively would be granting an automatic exemption to religious organizations from generally applicable land use regulations." _Andon_, 813 F.3d at 516. Here, unlike in _Andon_, Plaintiff is not seeking an exemption from generally applicable land use regulations but rather following established Chatham County procedures to rezone property, and nothing about Plaintiff's proposal is specifically prohibited by Chatham

- 33 -

County's zoning ordinance. See Hunt Valley Baptist Church, Inc.
v. Balt. Cnty., Maryland, No. CV ELH-17-804, 2017 WL 4801542, at
*27 (D. Md. Oct. 24, 2017) (finding plaintiff had stated a
RLUIPA substantial burden claim because even though "the
Property here could not be used for the construction of a place
of worship as a matter of right when the Church purchased the
land . . . unlike in Andon, the Church's proposal was not
categorically contrary to law" and plaintiff alleged its
proposal had met all necessary conditions for approval).

    For similar reasoning, this case is also unlike Canaan and
Alive Church. Plaintiff's request, unlike the plaintiffs in
those cases, was "not categorically contrary to law," see Hunt
Valley Baptist Church, 2017 WL 4801542, at *27, rather, to
obtain approval for the proposal, Plaintiff was required to
follow Chatham County's Zoning Ordinance procedure and abide by
the broad, open-ended substantive goals of Plan Chatham.
Although it was always possible that Plaintiff's proposal would
be denied, "modern zoning practices are such that landowners are
rarely guaranteed approvals," see Bethel, 706 F.3d at 558, and
Plaintiff has put forth significant undisputed evidence that it
complied with the substantive goals of Plan Chatham such that it
was reasonable to believe its proposal would be approved.

- 34 -

First, churches are explicitly listed as contemplated uses
for these parcels on the Plan Chatham Future Use Map. (See Pl.'s
Ex. 1, Plan Chatham (Doc. 1) at 101.) Second, Summit's proposal
made efforts to comply with Plan Chatham's goal of preserving
"rural character" by "retaining a substantial acreage of natural
areas," choosing a site within the "second to most growth
designated areas in the County," (Pl.'s Ex. 9, Letter of
Clarification (Doc. 1) at 485–86), and "building back from the
road," (Pl.'s Ex. 7, Summit Findings Summary (Doc. 1) at 431).
Third, at least some County officials expressed satisfaction
with Plaintiff's proposal. (See Pl.'s Ex. 8, September 3rd
Planning Board Minutes (Doc. 1) at 468; Pl.'s Ex. A, Ervin Aff.
(Doc. 7) at 35.) Fourth, Summit anticipated that the building of
its church campus would support "consumer-based services . . .
due to the increased demand to support the parishioner base
before and after the planned program events," (Pl.'s Ex. 9,
Letter of Clarification (Doc. 1) at 484), thereby aiding Plan
Chatham's objective to stop "retail leakage," (Pl.'s Ex. 1, Plan
Chatham (Doc. 1) at 107).

Additionally, the history of zoning in the area and the
Board of Commissioners' zoning record further support the
reasonableness of Plaintiff's expectation that it would be able
to build its church campus on the Property. See Reaching Hearts

Int'l, Inc. v. Prince George's Cnty., 584 F. Supp. 2d 766 (D. Md. 2008), aff'd, 368 F. App'x 370 (4th Cir. 2010) (recognizing "the track record of the agencies that would be reviewing [the plaintiff's] application" as a factor in determining if it was reasonable for plaintiff to expect its application would be approved). First, although the Commissioners articulated concerns regarding the size of the proposed church campus, this does not undermine Plaintiff's reasonable expectation of approval in light of the fact that two years prior, the Board of Commissioners, including at least one of same decisionmakers, (see 6/09/2025 Oral Arg. of Def.'s Att'y[6]), approved an even larger non-religious development, Herndon Farms, for the same property, (see Compl. (Doc. 1) ¶¶ 143-144; Answer (Doc. 19) ¶¶ 143-144). In fact, there are a variety of large commercial developments in close proximity to the Property. (See Compl. (Doc. 1) ¶¶ 40-44; Answer (Doc. 19) ¶¶ 40-44.) Second, since the adoption of Plan Chatham in 2017, the Board has voted on more than fifty rezoning requests and has only denied one (not including Plaintiff's denial). (Compl. (Doc. 1) ¶¶ 151-52; Answer (Doc. 19) ¶¶ 151-52.) Third, although members of the public expressed concerns with the proposal, the Board of

---

[6] While discussing the 2022 Herndon Farms zoning approval, this court asked, "Ms. Howard was still the chair?", to which Defendant's attorney responded, "Yes, sir."

Commissioners has, in the past, approved rezoning requests "even over public concerns regarding traffic or rural character." (Compl. (Doc. 1) ¶¶ 155; Answer (Doc. 19) ¶ 155.)

Finally, the Board of Commissioners' official reasons for denying Plaintiff's proposal appear inconsistent with Plan Chatham and thus do not change this court's analysis of Plaintiff's reasonable expectation of approval.[7] The Board's Non-Consistency Statement explained that Plaintiff's proposal was denied because: it was generally "not consistent" with Plan Chatham and "not . . . reasonable and in the public interest," but specifically because it would "not provid[e] a diversity in the tax revenue and does not provide more high-quality jobs for the area." (Pl.'s Ex. 12, Non-Consistency Statement (Doc. 1) at 707.)

_____

[7] This court's analysis of the Board's stated reasons for denying Plaintiff's proposal is not intended to supplant local policymaker discretion. Rather, because the Board of Commissioners, in its Non-Consistency Statement, concludes that it finds the proposal to be "not consistent with [Plan Chatham]" and "not to be reasonable and in the public interest" for the justifications set forth therewith, those justifications are therefore relevant to the question of the reasonableness of Plaintiff's belief that its proposal would be approved. (See Pl.'s Ex. 12, Non-Consistency Statement (Doc. 1) at 707.) Because, as will be explained, the proffered justifications appear inconsistent with Plan Chatham and unsupported by record evidence, this court is not persuaded, at this juncture, that these justifications undermine the reasonableness of Plaintiff's expectation of approval.

- 37 -

Plan Chatham's objective of "[d]iversify[ing] the tax base" aims to "[i]ncrease non-residential share of the tax base," "[i]ncrease high-quality, in-county jobs," and "[i]mprove workforce development systems." (Pl.'s Ex. 1, Plan Chatham (Doc. 1) at 95.) Potential metrics of this goal include "[n]on-residential tax base (as percentage of total)," "[n]umber of new living wage jobs," and "[n]umber of work experiences (internships, apprenticeships, job shadowing) undertaken by students in Chatham County Schools." (Id.)

While it is true that Plaintiff's proposal would only contribute <u>residential</u> taxable land, (<u>see</u> Pl.'s Ex. 9, Letter of Clarification (Doc. 1) at 484–85), Plaintiff specifically addresses in its Letter of Clarification how its proposal could "impact the surrounding consumer-based developments due to the increased demand to support the parishioner base before and after planned program events," (<u>id.</u> at 484).

Further, although the Board of Commissioners cites Summit's lack of high-quality jobs as a justification for denying Summit's proposal, the Board of Commissioners, in making its decision, did not point to any record facts which describe the nature of jobs and salaries that might be created. Thus, to assume Plaintiff's proposed church campus would not contribute to key metrics such as new living wage jobs or providing work

- 38 -

experiences, like internships, appears speculative at best on this record.[8]

Plan Chatham is clear in the ways that churches contribute to the community of Chatham County: "Churches . . . remain central gathering places in towns and rural townships in the County." (Pl.'s Ex. 1, Plan Chatham (Doc. 1) at 72.) "Gatherings" are recognized as an important part of Plan Chatham. (Id. at 123 (explaining that open space should be "designed and improved for active use and community gatherings"); id. at 141 (listing as an element of healthy communities "[g]athering places to create spaces conducive to social interaction").) Thus, while generating high-quality jobs and diversifying the tax base are key considerations under Plan Chatham generally, these goals do not appear to be key considerations for churches, whose intended impact in Chatham County is not driven by economic development, but rather a desire for community "gathering." The Board of Commissioners' reliance on "high-quality jobs" and "diversifying the tax base" seems to run contrary to the recognized purpose and importance

_____

[8] The only reference to jobs identified by this court in the Summit proposal is the statement "[t]he church will create a limited number of onsite jobs, both full-time and part-time." (Pl.'s Ex. 7, Summit Findings Summary (Doc. 1) at 430.) This statement does not provide any substantive basis upon which to conclude the jobs are somehow not sufficient to meet the Plan Chatham goals.

of churches in Chatham County. Although the findings here are preliminary, it appears on this record that the Commissioners' reasons for denying Summit's application are inconsistent with Plan Chatham's purpose and desire for community-oriented institutions, such as churches. While discovery and the development of additional facts may prove otherwise later, on this record, the Board of Commissioners' stated reasons for rejecting Summit's application do not rebut Summit's reasonable expectation that its plan complied with Plan Chatham and would be approved.

Here, the "arbitrary . . . nature of [the] defendant's challenged action suggests that [the] religious institution received less than even-handed treatment." Westchester Day Sch. v. Vill. of Mamaroneck, 504 F.3d 338, 351 (2d Cir. 2007) (explaining that in such cases "the application of RLUIPA's substantial burden provision usefully 'backstops the explicit prohibition of religious discrimination in the later section of the Act'" (citation omitted)). The evidence suggests that Plaintiff acquired its option "knowing[] . . . [the] land [was] subject to certain restrictions, but reasonably expect[ed] that it [could] comply with those restrictions," yet Chatham County "'subsequently [made] development and use practically impossible.'" Alive Church, 59 F.4th at 107 (citation omitted).

- 40 -

This court finds that Plaintiff is likely to succeed in establishing that it was reasonable in expecting its proposal would be approved.

### iii. <u>Least Restrictive Means of Furthering a Compelling Governmental Interest</u>

Assuming Plaintiff does ultimately succeed in proving that Defendant imposed a substantial burden upon its religious exercise, such a substantial burden does not violate RLUIPA if it "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." <u>See</u> 42 U.S.C. § 2000cc(a)(1). In other words, the restriction must satisfy strict scrutiny. <u>See</u> <u>Canaan</u>, 29 F.4th at 192.

Defendant argues that its denial of Plaintiff's proposal is justified because "Plaintiff's proposed use of the property would have posed a threat to public safety because congestion on the public roadways could threaten the timely response of emergency responders," which Defendant contends is a compelling state interest. (Def.'s Resp. (Doc. 16) at 9.) Plaintiff argues that this is a post-hoc rationalization for purposes of litigation and should be rejected. (Pl.'s Reply (Doc. 21) at 7–8.)

This court agrees with Plaintiff and thus need not consider whether Defendant's proffered justification "advance[s] interests of the highest order," Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546 (1993) (citation and internal quotations omitted), such that it may be considered a compelling governmental interest. "To survive strict scrutiny review, the government must show that pursuit of its compelling interest was the actual reason for its challenged action." Redeemed Christian Church of God (Victory Temple) Bowie, Md. v. Prince George's Cnty., Md., 17 F.4th 497, 510 (4th Cir. 2021) (emphasis added). But there was no mention of a concern with timely emergency response during the Board of Commissioners' discussion prior to denying Plaintiff's proposal, see Board of Commissioners on 2024-12-16 at 5:46:28-5:52:24, nor in the Non-Consistency Statement denying Plaintiff's proposal, (see Pl.'s Ex. 12, Non-Consistency Statement (Doc. 1) at 707). There is no evidence in this record that "the timely response of emergency responders" was the "actual reason" the Board of Commissioners denied Plaintiff's proposal, nor is there any evidence of facts

considered by either the Planning Board or the Board of Commissioners to support the concern.[9]

But even if this interest were the "actual reason" for the denial of Plaintiff's proposal, and assuming it constitutes a "compelling governmental interest," Defendant does not put forth <u>any</u> argument or evidence that a complete and unequivocal denial of Plaintiff's proposal is the "least restrictive means" of furthering that interest. Defendant has not put forth any "evidence showing that [it] considered other ways of achieving

---

[9] Defendant, at the motions hearing, (<u>see</u> Docket Entry 06/09/2025), pointed this court to the October 1, 2024, Planning Board meeting, during which a Planning Board member expressed concern that Plaintiff's proposal would cause "traffic and major backups and this is one of our main routes to hospitals in Chapel Hill." (Pl.'s Ex. 11, October 1st Planning Board Minutes (Doc. 1) at 702.) This statement does not change this court's analysis for two reasons. First, high traffic volume on a main route to hospitals does not necessarily mean delayed response times, making the comment an unsupported opinion rather than a substantive concern. Second, it was the Board of Commissioners in December, not the Planning Board in October, that had the final say as to whether Plaintiff's proposal was approved or denied, and there is no indication that the Board of Commissioners, in denying Plaintiff's proposal in December, relied upon a concern with "the timely response of emergency responders." (<u>See</u> Pl.'s Ex. 12, Non-Consistency Statement (Doc. 1) at 707); <u>Board of Commissioners on 2024-12-16</u> at 5:46:28–5:52:24.

its interest in [the timely response of emergency responders],"[10] Redeemed Christian Church, 17 F.4th at 511, which "undermines" any suggestion that an outright denial was the least restrictive means of furthering that interest. Id. Accordingly, as the evidence at this stage shows that Plaintiff's religious exercise was substantially burdened by Chatham County and that such substantial burden does not satisfy strict scrutiny, this court finds Plaintiff is likely to succeed on the merits of its substantial burden claim.

## B.   Irreparable Harm

To obtain a preliminary injunction, a plaintiff must show "that [it] is likely to suffer irreparable harm in the absence of preliminary relief." Winter, 555 U.S. at 20. The likelihood of irreparable harm must be more than a mere "possibility." Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017). "The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." Id. (citation omitted).

---

[10] There is evidence that Gannett Fleming, the traffic consultant working on behalf of Qunity, provided suggestions to "mitigate the traffic-related impacts caused by the Summit Church Chatham County and to provide for efficient, and reliable traffic flow." (See Def.'s Ex. M, Traffic Impact Analysis (Doc. 16-25) at 25–26.) There is also evidence that the North Carolina DOT offered additional recommendations. (See Def.'s Ex. U, NCDOT Review of TIA (Doc. 16-27) at 2–5.) However, there is no indication that Defendant ever considered these suggestions.

Plaintiff argues that it has suffered and will continue to suffer irreparable harm because its rights under RLUIPA are being violated and it "risks losing the property due to the pending expiration of its option to purchase (June 30, 2025)." (Pl.'s Mem. (Doc. 7) at 26-27.) Defendant argues that Plaintiff has not shown irreparable harm because 1) Plaintiff has not suffered a RLUIPA violation and 2) Plaintiff has not demonstrated that the risk of losing the property is likely, because "it has not alleged any facts that indicate there are other buyers actively pursuing purchase of this property or that it could not extend its purchase option." (Def.'s Resp. (Doc. 16) at 17.)

This court is not persuaded that Plaintiff has established imminent and irreparable harm with respect to losing its option to purchase the parcels as might otherwise require entry of a mandatory injunction. There has been no evidence introduced that it is incapable of extending its option or that there are others interested in purchasing the property.

Notwithstanding the speculative harm associated with the expiration of Plaintiff's option, this court finds that Plaintiff has established irreparable harm by way of Plaintiff's substantial burden RLUIPA claim, upon which this court has found Plaintiff is likely to succeed. At least one district court in

this circuit has explained that "infringement of one's rights under RLUIPA constitute[s] irreparable injury." <u>Reaching Hearts</u>, 584 F. Supp. 2d at 795. Additionally, the Fifth Circuit in <u>Opulent Life Church v. City of Holly Springs, Mississippi</u>, explains

> "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." <u>Elrod v. Burns</u>, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); <u>see</u> <u>also</u> 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). This principle applies with equal force to the violation of RLUIPA rights because RLUIPA enforces First Amendment freedoms, and the statute requires courts to construe it broadly to protect religious exercise.

697 F.3d 279, 295 (5th Cir. 2012). This court finds the reasoning of <u>Reaching Hearts</u> and <u>Opulent Life Church</u> persuasive. Because Plaintiff is likely to succeed on its substantial burden RLUIPA claim, it has demonstrated irreparable harm. <u>Cf.</u> <u>WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave</u>, 553 F.3d 292, 298 (4th Cir. 2009) (explaining, in First Amendment context, that a plaintiff's asserted irreparable harm is "'inseparably linked' to the likelihood of success on the merits").

- 46 -

## C. **Balance of Equities/Public Interest**

The balance of the equities and public interest factors "merge when the Government is the opposing party." Miranda v. Garland, 34 F.4th 338, 365 (4th Cir. 2022) (citation omitted). Plaintiff argues that "injunctions protecting First Amendment freedoms are always in the public interest," (Pl.'s Mem. (Doc. 7) at 27 (quoting Christian Legal Soc'y v. Walker, 453 F.3d 853, 859 (7th Cir. 2006))), and that "the public 'undoubtedly has an interest in seeing its governmental institutions follow the law,'" (id. (quoting Roe v. Shanahan, 359 F. Supp. 3d 382, 421 (E.D. Va. 2019))). Defendant, in its brief, does not address the balance of equities/public interest factor, (see generally Def.'s Resp. (Doc. 16)), but at oral argument urged this court to consider the potential detriment to Chatham County were the court to grant a mandatory injunction that forces the County to approve Plaintiff's proposal.

This court agrees that the public and Plaintiff have a strong interest in religious liberty, which RLUIPA protects. See Holt v. Hobbs, 574 U.S. 352, 356 (2015) ("Congress enacted RLUIPA . . . 'in order to provide very broad protection for religious liberty.'") Defendant has not shown that it would be measurably harmed by a preliminary prohibitory injunction that

prevents it from denying Plaintiff's land use proposal during
the pendency of this suit.

However, as to Plaintiff's request for preliminary
mandatory injunctive relief, this court finds the balance of
equities and public interest tilts in Chatham County's favor.
Mandatory injunctions are "highly disfavored," see Real Time Med
Sys., Inc., 131 F.4th at 223, and this policy appears especially
salient where the requested mandatory injunction would, as here,
result in a federal court commanding a local government to
affirmatively act in the confines of traditional local control,
see Rapanos v. United States, 547 U.S. 715, 738 (2006)
("Regulation of land use . . . is a quintessential state and
local power."). Further, as Defendant expressed at oral
argument, there is significant potential harm associated with
issuing the mandatory preliminary injunction Plaintiff seeks,
which would require Chatham County to approve Plaintiff's
proposal and permit Plaintiff to begin constructing its church
campus. If, at a later date, either before this court or on
appeal, Defendant ultimately prevails — the result would be an
improperly built or half-built church campus in Chatham County.
Such a conundrum would not be in the interest of the County or
its residents.

Accordingly, in considering the totality of the <u>Winter</u> factors, this court finds that Plaintiff is entitled to a preliminary prohibitory injunction, but because the balance of equities/public interest factor favors Defendant with respect to a preliminary mandatory injunction, this court declines to grant that form of relief.

**V.**   <u>**BOND**</u>

Federal Rule of Civil Procedure 65(c) requires that Plaintiff post a bond "in an amount that the court considers proper to pay the costs and damages sustained by any party . . . wrongfully enjoined." Fed. R. Civ. P. 65(c). Defendant has presented no evidence of potential damages from this injunction. This court will therefore require Plaintiff to post a bond in the amount of $2000.00 which this court finds sufficient.

**VI.**   <u>**CONCLUSION**</u>

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Preliminary Injunction Pursuant to Federal Rule of Civil Procedure 65(a), (Doc. 5), is **GRANTED IN PART** and **DENIED IN PART**. It is **DENIED** as to the request for a mandatory injunction, but **GRANTED** as to the request for additional relief as this court deems appropriate, namely, a prohibitory injunction.

**IT IS FURTHER ORDERED** that Defendant Chatham County, North Carolina Board of Commissioners is hereby **ENJOINED** from denying Plaintiff's rezoning proposal, pending further order of this court.

**IT IS FURTHER ORDERED** that the County's December 16, 2024, denial shall be of no force and effect pending further order of the court.

This order shall become effective at the date and time of filing with the Clerk and upon Plaintiff's posting of a bond in the amount of Two Thousand Dollars and 00/100 Cents ($2,000.00) with the Clerk.

This the 20th day of June, 2025.

_William L. Osteen, Jr._
United States District Judge